**DEBEVOISE & PLIMPTON LLP**

M. Natasha Labovitz (*pro hac vice* pending)
Sidney P. Levinson (*pro hac vice* pending)
Elie J. Worenklein
Shefit Koboci (*pro hac vice* pending)
66 Hudson Boulevard
New York, NY 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
nlabovitz@debevoise.com
slevinson@debevoise.com
eworenklein@debevoise.com
skoboci@debevoise.com

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

**COLE SCHOTZ P.C.**

Michael D. Sirota
Warren A. Usatine
Felice R. Yudkin
Ryan T. Jareck
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone: (201) 489-3000
Facsimile: (201) 489-1536
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>CCA Construction, Inc.,[1]<br><br><div align="right">Debtor.</div> | Chapter 11<br><br>Case No. 24-_____ (____) |

## DEBTOR'S MOTION FOR
## ENTRY OF INTERIM AND FINAL ORDERS (I)
## AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION
## FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY
## ADMINISTRATIVE EXPENSE CLAIMS; (III) MODIFYING THE
## AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtor and debtor in possession ("**CCA**" the "**Debtor**") respectfully

states as follows in support of this motion:

---

[1]    The last four digits of CCA's federal tax identification number are 4862.  CCA's service address for the purposes of this chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

## **Relief Requested**

1.      CCA seeks entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** (the "**Interim Order**") and **Exhibit B** (the "**Final Order**"), granting the following relief:

(a)      authorizing CCA to enter into the DIP Facility on the terms and conditions set forth in the DIP Credit Agreement;

(b)      authorizing CCA, subject to satisfaction (or waiver) of all applicable terms and conditions precedent under the DIP Loan Documents (as defined below) in accordance therewith:

(i)      to incur DIP Loans in an aggregate principal amount not to exceed $5.0 million, comprised of a single borrowing of the DIP Commitments, upon entry of the Interim Order (the "**Interim Commitment**s");

(ii)      to incur DIP Loans in an aggregate principal amount not to exceed $3.0 million, comprised of a single borrowing of the DIP Commitments, upon entry of the Final Order (the "**Final Commitment**s");

(iii)      to incur subsequent DIP Loans in an aggregate principal amount not to exceed $40.0 million (inclusive of the Interim Commitments and the Final Commitments)

(c)      authorizing CCA, to (i) enter into, execute, and deliver the DIP Credit Agreement and any additional documentation governing the DIP Facility consistent with the terms of (or as may be required by) the DIP Credit Agreement (the DIP Credit Agreement, collectively with the Interim Order, the Collateral Documents, the Approved Budget, and any other document delivered to any DIP Secured Party in connection with any of the foregoing, in each case, as the same may be amended, restated, or otherwise modified from time to time in accordance with the terms of the Interim Order, the Final Order and the DIP Credit Agreement, are referred to herein as the "**DIP Loan Documents**"); and (ii) to perform such other and further acts as may be necessary or appropriate in connection therewith, or otherwise required under the DIP Loan Documents;

(d)      authorizing CCA to use the proceeds of the DIP Loans (collectively, the "**DIP Loan Proceeds**") as permitted in the DIP Loan Documents and in accordance with the Interim Order, the Final Order and the Approved Budget;

(e)     granting valid, binding, continuing, enforceable, and automatically perfected (i) security interests in and liens on all of the Collateral (as defined in the DIP Credit Agreement , and referred to herein as the "**DIP Collateral**") to the DIP Agent for the benefit of the DIP Secured Parties, and (ii) granting superpriority administrative expense status to all principal, interest, costs, expenses, fees, and other charges at any time payable by CCA to the DIP Secured Parties in connection with the DIP Loan Documents, all reimbursement obligations, and all other indebtedness and obligations contemplated under any of the DIP Loan Documents (all of the foregoing being collectively called the "**DIP Obligations**"), in each case subject to the Carve Out;

(f)     authorizing CCA to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Loan Documents as and when such amounts become due and payable without other or further notice or order;

(g)     modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Interim Order, the Final Order and the other DIP Loan Documents;

(h)     subject to entry of the Final Order, waiving CCA's ability to surcharge against any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code;

(i)     scheduling a final hearing (the "**Final Hearing**") to consider entry of the Final Order, and in connection therewith, giving and prescribing the manner of notice of the Final Hearing on the motion;

(j)     waiving any applicable stay with respect to the effectiveness and enforceability of the Interim Order and the Final Order (including under Bankruptcy Rule 6004); and

(k)     granting CCA such other and further relief as is just and proper.

### Jurisdiction and Venue

2.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and CCA consents to the entry of a final order by the Court in connection

with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.       Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.       The bases for the relief requested herein are sections 105, 362, 363, 364, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), and rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), rules 4001-3, 9013-1 and 9013-5 of the Local Bankruptcy Rules for the District of New Jersey (the "**Local Rules**"), and this Court's General Order Governing Chapter 11 Complex Case Procedures, dated August 1, 2024 (the "**Chapter 11 Complex Case Procedures**").

## <u>Background</u>

5.       CCA is headquartered in New Jersey and provides construction management, program management, and general contracting services for public and private clients through its non-debtor operating subsidiaries (the "**Non-Debtor Subsidiaries**," and together with CCA, the "**CCA Group**"). In particular, CCA supports its Non-Debtor Subsidiaries by providing them with key shared services to enable them to deliver large-scale projects in civil, commercial, residential, and public infrastructure sectors.

6.       On the date hereof (the "**Petition Date**"), CCA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. CCA is operating its business and managing its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this chapter 11 case and no statutory committees have been appointed or designated.

7.     Additional information regarding CCA, the events leading up to the Petition Date, and the facts and circumstances supporting the relief requested in this motion is set forth in the *Declaration of Yan Wei, Chairman & Chief Executive Officer of the Debtor, in Support of Chapter 11 Petition* (the "**Wei Declaration**") and the *Declaration of Evan Blum in Support of First Day Pleadings and Debtor-in-Possession Financing* (the "**BDO Declaration**" and, together with the Wei Declaration, the "**First Day Declarations**")[2], which are filed contemporaneously herewith and incorporated herein by reference.

## Preliminary Statement

8.     This chapter 11 case is one of last resort and was necessitated by the October 18, 2024, crippling $1.6 billion judgment (the "**BMLP Judgment**") entered against CCA[3] and in favor of BML Properties Ltd. ("**BMLP**").  CCA's financial decline, which began in 2015 as a result of the broad retreat from, and policy changes negatively impacting, Chinese investment in U.S.-based construction projects, was only further exacerbated by the Baha Mar Litigation (as defined in the Wei Declaration) and the BMLP Judgment.  CCA believes that it has meritorious grounds to appeal the BMLP Judgment and is in the process of pursuing such appellate rights. However, CCA cannot satisfy the BMLP Judgment or post a supersedeas bond necessary for an appeal, thus necessitating this bankruptcy case in order to preserve and maximize going concern value for CCA's stakeholders.

9.     Given CCA's financial distress, the CCA Group has, over the past several years, relied heavily upon intercompany debt financing provided by CCA's parent, CSCEC Holding Company, Inc.  ("**CSCEC Holding**").   As of the Petition Date, the balance of CCA's

---

[2]     Capitalized terms not defined herein shall have the meanings ascribed to them in the First Day Declarations.

[3]     The BMLP Judgment was also entered against non-debtor affiliates CSCEC (Bahamas) Ltd. and CCA Bahamas, Ltd.

intercompany obligation to CSCEC Holding is approximately $124.8 million. CCA and its financial advisors at BDO Consulting Group, LLP ("**BDO**") project that the CCA Group will require substantial financing in order to continue operations, as well as fund administrative costs during the pendency of the appeal and this chapter 11 case. The DIP Facility is critical to enabling CCA to fund such operations and administrative costs as it pursues consummation of a plan of reorganization and preserves and maximizes the value of CCA's estate for the benefit of all stakeholders.

10. By this motion, CCA seeks approval to obtain debtor-in-possession financing, consisting of the DIP Facility (as defined below) in the aggregate principal amount of up to $40.0 million (the "**DIP Commitments**") comprising of a first lien secured multi-draw term loan facility (the "**DIP Facility**," and each individual loan made thereunder a "**DIP Loan**," collectively the loans made thereunder, the "**DIP Loans**," and together with related obligations incurred under the DIP Facility the "**DIP Obligations**"), $5.0 million of which will be available in a single draw upon entry of the Interim Order, $3.0 million of which will be available in a single draw upon entry of the Final Order, and the remainder of which will be available in multiple draws of no less than $500,000 per single draw following entry of the Final Order (or, in the event the remaining balance of DIP Commitments are less than $500,000, the full remaining balance of the DIP Commitments). The DIP Facility will be provided by CSCEC Holding (the "**DIP Lender**," and together with all successors and permitted assigns, the "**DIP Lenders**");[4] in each case subject to the satisfaction of the conditions precedent set forth in the

---

[4]     For the avoidance of doubt, and subject to any restrictions on assignment expressly set forth in the DIP Credit Agreement, (a) nothing herein shall preclude the ability of the DIP Lenders to, in accordance with the applicable DIP Loan Documents, offer a portion of the DIP Commitments and DIP Loans to third-party capital providers and other financial institutions or other entities, it being understood that no such assignment or transfer shall become effective with respect to any portion of the DIP Commitments until the Closing Date (as

DIP Credit Agreement attached hereto as **Annex A** without exhibits or schedules (the "**DIP Credit Agreement**").  The DIP Lender shall serve as administrative and collateral agent (in such capacities, together with its successors in such capacities, the "**DIP Agent**," and the DIP Agent, together with the DIP Lenders, are the "**DIP Secured Parties**" and each is a "**DIP Secured Party**").

11.     As more fully described in paragraphs 41 through 43 below, the terms of the DIP Facility are highly favorable in numerous respects, such as (a) an interest rate in the fixed amount of 9.5% which shall be paid-in-kind or, at the option of CCA, in cash, (b) no obligation to pay commitment, exit or other similar fees, (c) allowing for multi-draws that preserve the commitment while reducing the accrual of interest, (d) adjusting downward the principal balance of the DIP Financing to account for payments by CCA that are allocable to affiliates outside of the CCA Group (in exchange for the right to pursue such claims directly against the applicable affiliate), and (e) minimizing the conditions required for funding, thereby limiting execution risk.

12.     Importantly, CCA, working through its counsel, BDO and a special committee of CCA's board (the "**Special Committee**") consisting of its independent director, M. Elizabeth Abrams (the "**Independent Director**") constructed and negotiated the DIP Facility in a manner that does not provide any benefits to the DIP Secured Parties beyond those generally afforded to third-party lenders.  To that end, (a) the DIP Facility and proposed Interim Order and Final Order do not provide for any release of claims against the DIP Secured Parties on account of their prepetition claims (the only release is limited to claims arising under or related to the DIP Facility), (b) the DIP Facility does not provide for any "roll-up" of the DIP Lender's prepetition

---

defined in the DIP Credit Agreement); and (b) thereafter, assignments and participations of DIP Loans and DIP Commitments shall be in accordance with the DIP Loan Documents.

debt, and (c) as referenced above and more fully described in paragraph 42 below, the amount of CCA's principal obligation under the DIP Facility will be adjusted downward to account for any portion of shared services or other expenses paid by CCA that are allocated to any of CCA's affiliates outside of the CCA Group (in exchange for the right to pursue such claims directly against the applicable affiliate). Further, in order to ensure that the DIP Secured Parties will not use the DIP Financing to leverage the bankruptcy process, many of the negative covenants or milestones that would ordinarily be contained in a DIP facility provided by a third-party lender are not included here.

13.     The commitment to provide the DIP Facility was obtained from the DIP Lender following a marketing process as further described in the BDO Declaration. To date, CCA's financial advisors at BDO have engaged with representatives of potential funding sources to ascertain whether there was, in fact, any market interest in providing postpetition financing on better terms. So far, during the period of time that has elapsed since entry of the BMLP Judgment, BDO has been unable to identify any alternative financing source that is prepared to provide financing on equivalent or more favorable terms offered by the DIP Lender. That said, CCA and its advisors will continue to market the opportunity to provide the DIP Facility to CCA and, accordingly, CCA reserves the right between now and the Final Hearing to propose, in the exercise of its business judgment, alternative DIP financing that would provide for repayment of any amounts advanced by the DIP Lender under the Interim DIP Order. Importantly, the DIP Facility does not provide for any prepayment premium or exit fee if CCA exercises its business judgment to pursue alternative financing prior to entry of the Final Order, thereby allowing for completion of a sufficient marketing process.

14.     Given the affiliation of CCA and the DIP Lender, both the marketing process to seek DIP financing and the negotiation of the terms of the DIP Facility have been overseen by the Special Committee led by its Independent Director, who has more than twenty years of investment banking experience serving distressed companies both as an advisor and a board member.  The other directors of CCA have been recused from overseeing that marketing process and any board decisions regarding the DIP Facility.

15.     For these reasons, and for the reasons set forth below and in the BDO Declaration, CCA believes that entering into the DIP Facility is a sound exercise of CCA's business judgment and consistent with its fiduciary duties.  Accordingly, CCA respectfully requests that the Court enter the proposed Interim Order and Final Order.

**Concise Statement Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-3**

16.     The table contains a summary of the material terms of the proposed DIP Facility and the Interim Order and the Final Order, as required by the disclosure requirements of Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-3.[5]

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Borrower:**<br>Bankruptcy Rule 4001(c)(1)(B) | CCA Construction, Inc.<br><br>*Preamble to DIP Credit Agreement.* |

---

[5]  This summary, including the defined terms it uses (whether or not defined within the summary), is qualified in its entirety by the provisions of the DIP Loan Documents and the Interim Order and the Final Order, as applicable.  To the extent that there are any conflicts between this summary, on the one hand, and any DIP Loan Document, the Interim Order and the Final Order, as applicable, on the other, the terms of such DIP Loan Document or the Interim Order and the Final Order, as applicable, shall govern.

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **DIP Lender:**<br>Bankruptcy Rule<br>4001(c)(1)(B) | CSCEC Holding Company, Inc.<br><br>*Preamble to DIP Credit Agreement.* |
| **DIP Agent**<br>Bankruptcy Rule<br>4001(c)(1)(B) | CSCEC Holding Company, Inc.<br><br>*Preamble to DIP Credit Agreement.* |
| **Term**<br>Bankruptcy Rule<br>4001(b)(l)(B)(iii),<br>4001(c)(1)(B) | The Maturity Date of the DIP Facility is 12 months and subject to a 6-month extension with the consent of the DIP Lender.<br><br>*DIP Credit Agreement, definition of "Maturity Date"* |
| **Commitment**<br><br><br>Bankruptcy Rule<br>4001(c)(1)(B) | DIP Commitment of $40.0 million consisting of $5.0 million available as a single draw upon entry of Interim Order, $3.0 million available as a single draw upon entry of Final Order, and the remainder available in multiple draws of no less than $500,000 per single draw (or, if the remaining balance of the DIP Commitment is less than $500,000, the full amount of any remaining balance).<br><br>*DIP Credit Agreement, Section 1.1(a)* |
| **Conditions to Borrowing**<br>Bankruptcy Rule<br>4001(c)(1)(B) | Among other customary conditions to borrowing, CCA must deliver to the DIP Lender 13-week cash flow projections, in form and substance acceptable to the Required Lenders (the "**Approved Budget**"), which are attached to the Interim Order as Annex B.<br><br>*DIP Credit Agreement, 2.1 (c)* |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | 9.5%, payable in kind or, at the option of the Borrower, in cash<br><br>*DIP Credit Agreement, Section 1.3(a)* |
| **Repayment of Principal**<br>Local Rule 4001-3 (b)(2)(E) | The DIP Obligations shall be adjusted downward by an amount equal to any portion of Shared Services that are allocable to any entity that is not a member of the CCA Group.  The DIP Agent shall be assigned any Intercompany Claim that exists on account of such allocation of the cost of Shared Services to any entity that is not a member of the CCA Group, and the DIP Agent shall be entitled to seek payment of such Intercompany Claims directly from any entity that is not a member of the CCA Group.<br><br>*DIP Credit Agreement, Section 1.5(d)*<br><br>CCA must prepay DIP Obligations within one Business Day of receiving over $2.5 million from any Collateral disposition (or $10.0 million in total dispositions).<br><br>*DIP Credit Agreement, Section 1.7(a)*<br><br>The Borrower must prepay DIP Obligations within one Business Day upon incurring non-permitted, pari passu or senior Indebtedness, using 100% of the proceeds plus interest.<br><br>*DIP Credit Agreement, Section 1.7(b)* |
| **Use of Proceeds**<br>Bankruptcy Rule 4001(b)(l)(B)(ii) | (a) to pay reasonable fees, costs, and expenses of the DIP Lender as contemplated by the DIP Loan Documents, (b) to provide working capital and for other general corporate purposes of the Borrower and, to the extent authorized by the Bankruptcy Court, its non-Debtor affiliates, and (c) to pay professional fees and other administration costs of the chapter 11 case.<br><br>*DIP Credit Agreement, Section 4.4* |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x); Local Rule 4001-3 | Subject to and effective upon entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration shall be imposed upon any DIP Secured Party or on any DIP Collateral pursuant to section 506(c) of the |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | Bankruptcy Code or otherwise without the prior written consent of such DIP Secured Party, and no such consent shall be implied from any action, inaction, or acquiescence by any DIP Secured Party.<br><br>*DIP Credit Agreement, Section 6.5; Interim Order ¶ 8; Final Order ¶ 8.* |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001- 3(b)(2)(C) | <u>Expense Reimbursement</u>: Subject to the procedures for reimbursement described in the Interim Order and the Final Order, CCA shall reimburse the DIP Secured Parties for their reasonable and documented out-of-pocket fees, costs, and expenses, whether accrued on, prior to, or after the Closing Date, in connection with (a) the preparation, negotiation, execution, and administration of the DIP Loan Documents and any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, including any amendment or waiver of the DIP Loan Documents, (b) the funding of the DIP Loans, (c) the creation, perfection, or protection of the DIP Liens (including all search, filing and recording fees), (d) internal audit reviews and field examinations, (e) the enforcement or preservation of any right or remedy under any DIP Loan Document, any DIP Obligation, or with respect to the DIP Collateral, (f) the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or request for document production relating thereto) with respect to, any proceeding related to CCA, any DIP Loan Document or DIP Obligation, (g) the review of pleadings and other filings made with the bankruptcy court, (h) attendance at hearings in respect of the chapter 11 case, (i) any refinancing or restructuring of the DIP Loans in the nature of a "work-out," and (j) defending and prosecuting any actions or proceedings arising out of or relating to the DIP Obligations or any transactions related to arising in connection with the DIP Loan Documents; *provided* that, in the case of each of the foregoing clauses (a)-(j), attorney costs shall be limited to one law firm on behalf of all DIP Secured Parties and, to the extent necessary, one local counsel in each relevant jurisdiction (and in the case of an actual or perceived conflict of interest, one additional law firm on behalf of the affected DIP Secured Party). |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | *DIP Credit Agreement, Section 9.4; Interim Order ¶ 7; Final Order ¶ 7.* |
| **Reporting Obligations** Bankruptcy Rule 4001(c)(1)(B), Chapter 11 Complex Case Procedures | (a) On or prior to the Closing Date, deliver 13-week cash flow projections in form and substance acceptable to the Required Lenders.<br><br>*DIP Credit Agreement, Section 2.1(c)*<br><br>(b) Deliver unaudited consolidated financial statements within 60 days of each of the first three fiscal quarters and 120 days after the end of each fiscal year.<br><br>*DIP Credit Agreement, Section 4.2(a)*<br><br>(c) Provide monthly cash position report and reconciliation of actual vs. anticipated use of Borrowings as per the Approved Budget.<br><br>*DIP Credit Agreement, Section 4.2 (b)* |
| **Liens and Priorities** Bankruptcy Rules 4001(c)(l)(B)(i), 4001-3(c)(1) | Senior first priority lien on all DIP Collateral, other than avoidance actions under chapter 5 of the Bankruptcy Code ("**Avoidance Actions**"), provided, that (i) upon entry of a Final DIP Order, Collateral shall include a senior lien on the proceeds of such Avoidance Actions, and (ii) the lien granted to DIP Secured Parties shall be junior in priority to Senior Permitted Liens and the Carve Out.<br><br>*DIP Credit Agreement, Section 6.1* |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B)**;** Local Rule 4001-3(c)(3) | Usual and customary events of defaults for facilities of this type and purpose, including nonpayment of obligations, defaults under covenants, breaches of representations and warranties, invalidity of liens or collateral documents, and the occurrence of certain adverse actions or consequences in the chapter 11 case.<br><br>*DIP Credit Agreement, Section 7.1* |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The DIP Facility provides that, upon the occurrence of an Event of Default and after five business days from a Notice of Default, the DIP Agent may proceed against and realize upon the DIP Collateral notwithstanding the automatic stay set forth in section 362 of the Bankruptcy Court.<br><br>*Interim Order ¶16; Final Order ¶ 16* |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B); | The Interim Order and the Final Order provide a "Carve Out" of certain statutory fees, allowed professional fees of CCA and any statutory creditors' committee, including a Post-Carve-Out Trigger Notice Cap, all as detailed in the Interim Order and the Final Order.<br><br>*Interim Order ¶ 9; Final Order ¶ 9* |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | CCA shall indemnify, defend, and save and hold harmless the DIP Agent and each DIP Lender and each of their Related Persons and their respective officers, directors, employees, agents and advisors (each, in its capacity as such, an "**Indemnitee**") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including Attorney Costs) that may be incurred by or asserted or awarded against any Indemnitee, in each case arising out of or in connection with or by reason of (including in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) the DIP Credit Agreement, the other DIP Loan Documents, the transactions contemplated hereby or thereby or the actual or proposed use of the proceeds of the DIP Loans, except to the extent such claim, damage, loss, liability, or expense is found in a final, non-appealable judgment by a court of competent jurisdiction (or a settlement tantamount thereto) to have resulted from such Indemnitee's bad faith, gross negligence or willful misconduct; *provided* that any such Attorney Costs shall be |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
|  | limited to one law firm on behalf of all DIP Secured Parties and, to the extent necessary, one local counsel in each relevant jurisdiction (and in the case of an actual or perceived conflict of interest, one additional law firm on behalf of the affected DIP Secured Party).<br><br>*DIP Credit Agreement, Section 9.4(b)* |

## Overview

### I.    CCA's Prepetition Capital Structure

17.    As described in the First Day Declarations, to support its operations, CCA has historically relied on financing from CSCEC Holding.  As of the Petition Date, the balance of CCA's intercompany loan obligations to CSCEC Holding is approximately $124.8 million.  Other than the intercompany loan obligation to CSCEC Holding, CCA is not a party to any bank loans or other financing arrangements.  CCA is, however, one of the indemnitors with respect to potentially significant surety bond obligations associated with certain construction projects of its Non-Debtor Subsidiaries, which could become crystallized claims if the Non-Debtor Subsidiaries are unable to complete those projects or pay costs associated with them.  Currently, the total amount of surety bond obligations to the various sureties is approximately $700 million.

### II.    Intercompany Transactions

18.    As described in more detail in CCA's cash management motion, filed contemporaneously herewith, CCA routinely engages in intercompany transactions with its Non-Debtor Subsidiaries and certain other affiliates of CCA that are not part of the CCA Group ("**Intercompany Transactions**").  These Intercompany Transactions, which arise in the ordinary course of business and give rise to intercompany receivables and payables (each, an "**Intercompany Claim**"), relate to CCA providing services or making expenditures on behalf of

the Non-Debtor Subsidiaries and other affiliates.  The terms of the Intercompany Transactions are generally governed by and processed pursuant to a series of prepetition agreements between CCA and certain affiliates (collectively, the "**Shared Services Agreements**").[6]

19.  In accordance with the Shared Services Agreements, CCA is generally entitled to reimbursement for its costs from the participating affiliates under an allocation mechanism based upon whether such costs are directly or indirectly incurred by CCA on behalf of the participating affiliate.  Direct costs, such as amounts paid to CCA's employees engaged in specific, project-related work for participating affiliates (e.g., overseeing a safety program at Plaza Construction LLC; IT software provisioning at CCA International Group, Inc.), and third-party expenses that are directly attributable to participating affiliates (e.g., insurance; software licenses), are allocated to the applicable affiliates at the time of payment by CCA.  CCA's direct employee cost allocation is reviewed and adjusted periodically.  CCA's direct third-party costs are generally allocated by usage or based upon revenue at each participating affiliate.  Indirect costs, such as CCA employee costs related to providing general shared services to affiliates and third-party expenses that are not directly attributable to participating affiliates (e.g., tax and audit preparation) are allocated to the applicable affiliates at year-end despite these costs being paid by CCA at the time incurred.  Indirect employee costs are allocated based upon headcount at each entity.  Indirect third party expenses are allocated by shared services department based on the percentage of time that each respective department allocates to participating affiliates.  Certain of

---

[6]  There are several distinct Shared Services Agreements with different affiliates, however, the terms of the Shared Services Agreement are substantially the same.  The services under the Shared Services Agreements were initially provided by CSCEC Holding, CCA's parent.  However, in accordance with section 1 of the Shared Services Agreements, CSCEC Holding was authorized to, and did, delegate its rights and obligations under the Shared Services Agreement to CCA on March 10, 2021.

these third party expenses remain CCA's responsibility.   CCA records journal entries documenting all Intercompany Transactions under the Shared Services Agreements.

20.      In order to account for the portion of the costs of the Shared Services Program (as defined in the BDO Declaration) that are allocable to affiliates that are outside of the CCA Group, the DIP Facility includes a mechanism to ensure that CCA is not burdened with DIP Obligations, including any corresponding interest accrual, on account of that portion.   Specifically, the DIP Credit Agreement provides that the principal amount outstanding of the DIP Financing will be adjusted downward to account for any portions of shared services paid by CCA postpetition that are allocable to its affiliates outside of the CCA Group.   In lieu of including advances used to pay portions of shared services allocable outside of the CCA Group in the calculation of CCA's DIP obligations, the DIP Secured Parties will be assigned any Intercompany Claim that would otherwise be payable to CCA on account of the allocation of the cost of shared services to entities outside of the CCA Group.   The DIP Secured Parties will recover those allocated costs directly from the participating affiliates.

### III.   CCA's Immediate Liquidity Needs

21.      In conjunction with CCA's other advisors, BDO assisted CCA's management in determining CCA's postpetition cash requirements for its business.   As part of an evaluation of CCA's liquidity position, BDO assisted in the development of rolling 13-week cash forecast, as well as a long-term forecast of CCA's liquidity needs.   These forecasts take into account the expected effects of the chapter 11 filing and reflect anticipated disbursements during the projected 12-month period of the DIP financing.   BDO Declaration ¶ 7.

22.      Based on BDO's review and evaluation of CCA's financial forecasts and the Approved Budget, CCA requires an immediate capital infusion in the form of the DIP Facility in

order to operate its business postpetition and to preserve CCA as a going concern. The BMLP Litigation and the impact of the BMLP Judgment has only created further financial pressure on CCA. As CCA's financial forecasts and the Approved Budget reveal, CCA is a holding company that does not itself generate sufficient operating cash flow in the ordinary course of business to cover its operating and capital costs and the projected costs of this chapter 11 case. Rather, CCA's liquidity comes either from CSCEC Holding in the form of intercompany financing or, in certain instances, from payments received from its subsidiaries. CCA needs the DIP Facility to fund working capital, payroll obligations, pay suppliers, cover overhead costs, and make any other payments that are essential for the continued management, operation, and preservation of CCA's business. The ability to make these payments when due is essential to the continued operation of CCA's business during the pendency of this chapter 11 case. *Id.* ¶13.

23.     The proposed interim draw pursuant to the DIP Facility of $5 million is tailored to reflect the amount of liquidity that will be necessary for CCA to operate and meet its postpetition obligations during the first 30-60 days of the chapter 11 case, with modest cushion to account for contingencies that may arise during that interim period. Likewise, if CCA does not have access to the additional $3 million draw upon entry of the final order, or access to additional draws during the 12-month term of the DIP Financing, it will not be able to continue operating in the ordinary course and administering this chapter 11 case. To be clear, CCA does not intend to draw the full balance of the $40 million commitment under the DIP Financing upon entry of the final order. Rather, CCA intends to draw a sufficient amount of cash each month to cover the expenses reflected in the Approved Budget, with the unfettered ability to make additional draws as and when needed so that stakeholders have further assurance that there will be sufficient liquidity available at all times to account for unanticipated contingencies. *Id.* ¶ 15.

**IV.    CCA's Efforts to Obtain Financing from The DIP Lender and Other Lenders**

24.    Subsequent to the BMLP Judgment, CCA approached the DIP Lender, through its separate outside counsel, Lowenstein Sandler LLP, to ascertain whether the DIP Lender would be amenable to providing DIP financing in a chapter 11 case.  The DIP Lender indicated a willingness to provide such financing, leading to negotiations between CCA and the DIP Lender over the terms of such financing to be provided.  Those negotiations were conducted by CCA through its counsel and BDO, as well as the Independent Director on the Special Committee who provided direction to CCA's advisors with respect to the terms under which CCA would enter into a DIP financing arrangement with the DIP Lender.  The product of those negotiations was the DIP Facility, which as explained above provides highly favorable terms for CCA that enable CCA to have maximum flexibility at a minimum of cost and execution risk.  Moreover, such terms ensure that the DIP Lender and DIP Agent will not use the DIP Financing to leverage the bankruptcy process.  In addition, the DIP Facility, proposed Interim Order and proposed Final Order will not provide any "roll-up" of, or otherwise impact, the DIP Lender's prepetition claim. Nor does it provide for any release of claims (if any) against the DIP Secured Parties except with respect to claims arising under or related to the DIP Facility.

25.    Although CCA's advisors and the Independent Director regard the terms of the DIP Facility as highly favorable based on their experience and familiarity with the DIP financing market, CCA has nonetheless, through BDO, engaged in a marketing process to determine whether other potential third-party funding sources might exist that would provide comparable or more favorable terms.  Potential lenders who expressed interest were provided with a "teaser" and invited to execute a non-disclosure agreement ("**NDA**") to obtain more detailed information. As of the Petition Date, certain potential lenders have executed an NDA and received

confidential information.  To date, none of the parties contacted by BDO (or any other party) have expressed a firm willingness to provide such financing on equivalent or more favorable terms than the DIP Facility.  None were willing to provide financing on an unsecured basis or without the grant of a priming lien under section 364(d) of the Bankruptcy Code.  *Id.* ¶ 21.

26.    CCA, through BDO, intends to continue its marketing efforts to solicit proposals for potential alternative DIP financing prior to the Final Hearing.  *Id.* ¶ 22. CCA expressly reserves the right, in the exercise of its business judgment, to seek approval of an alternative DIP facility that will provide for repayment of any interim DIP Obligations.  As noted above, the DIP Facility to be provided by the DIP Lender does not provide for payment of any premium or exit fee if such financing is obtained prior to entry of the Final DIP Order.

## Basis for Relief

**I.    CCA Should Be Authorized to Obtain Postpetition Financing Through the DIP Loan Documents**

**A.    Entry into the DIP Facility Is an Exercise of CCA's Sound Business Judgment**

27.    Courts grant a debtor considerable deference in exercising its sound business judgment in obtaining postpetition credit so long as the agreement to obtain such credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, which aim to maximize the value of the estate for the benefit of all stakeholders.  *E.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").  To determine whether a debtor has met the business judgment

standard under provisions of the Bankruptcy Code, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

28.     Courts in the Third Circuit have consistently declined to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions were made in good faith.  *See In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003) (explaining that under the business judgment standard, a court should approve a debtor's business decision unless it was the product of bad faith or a gross abuse of discretion); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

29.     Courts assess the fairness and reasonableness of postpetition financing terms by considering them in light of the circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (finding financing terms, many of which favored the DIP lenders, reasonable when "taken in context, and considering the relative circumstances of the parties"); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into a "hard" bargain to acquire funds for its reorganization).

30.     In addition, in determining whether CCA has exercised sound business judgment in deciding to enter into the DIP Loan Documents, the Court may appropriately take into consideration non-economic benefits to CCA offered by a proposed DIP Facility.  For example,

in *In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 2009 WL 2902568 (Bankr. S.D.N.Y.

July 6, 2009), the Bankruptcy Court for the Southern District of New York observed that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms,
> a business decision to obtain credit from a particular lender is
> almost never based purely on economic terms.  Relevant features
> of the financing must be evaluated, including non-economic
> elements such as the timing and certainty of closing, the impact on
> creditor constituencies and the likelihood of a successful
> reorganization.  This is particularly true in a bankruptcy setting
> where cooperation and establishing alliances with creditor groups
> can be a vital part of building support for a restructuring that
> ultimately may lead to a confirmable reorganization plan.  That
> which helps to foster consensus may be preferable to a notionally
> better transaction that carries the risk of promoting unwanted
> conflict.

*Id.*, at *4.

31.     Courts emphasize that application of the business judgment rule under the

Bankruptcy Code is not an onerous standard and may be satisfied "as long as the proposed action

appears to enhance the debtor's estate." *Crystalin, LLC v. Selma Props., Inc. (In re Crystalin,*

*LLC)*, 293 B.R. 455, 463–64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp. v. Food Barn Stores,*

*Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566 n.16 (8th Cir. 1997) (emphasis in original,

internal alterations, and quotations omitted)).  Rather, courts require only that the debtor "show

that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v.*

*Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153

(D. Del. 1999) (citations omitted); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del.

1987); *see also In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (explaining

that the business judgment standard "is not a difficult standard to satisfy," and merely requires a

court to find that "a reasonable business person would make a similar decision under similar circumstances.")

32.     The DIP Facility is critical to CCA's ability to fund operations and pay the administrative costs of this chapter 11 case, provides CCA with sufficient liquidity to operate its business without presenting significant execution or funding risk, and better ensures that CCA's projected cash balance remains robust in downside scenarios.  BDO Declaration ¶ 12.  The DIP Facility will allow CCA to fund its business in the ordinary course, which will ensure continued, uninterrupted operations, preserving the value of the estate for the benefit of all stakeholders.  *Id.* ¶ 13.  Accordingly, the Court should authorize CCA's entry into the DIP Facility and into the DIP Loan Documents as a reasonable exercise of CCA's business judgment.

**B.     CCA Meets the Conditions Necessary Under Sections 364(c) and 364(d) to Obtain Postpetition Financing on a Secured and Superpriority Basis**

33.     CCA proposes to obtain financing under the DIP Facility by providing the DIP Secured Parties superpriority claims and liens pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.

34.     CCA meets the requirements for relief under sections 364(c) and 364(d) of the Bankruptcy Code, which permits a debtor, with Court authorization, to obtain postpetition financing and, in return, to grant superpriority administrative status and liens on its property. Specifically, section 364(c) of the Bankruptcy Code, in relevant part, provides as follows:

> If the trustee [or debtor-in-possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)      secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  In evaluating proposed postpetition financing under section 364(c) of the

Bankruptcy Code, courts perform a qualitative analysis and consider whether (a) unencumbered

credit or alternative financing without superpriority status is available to the debtor, (b) the credit

transactions are necessary to preserve assets of the estate, and (c) the terms of the credit

agreement are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and

the proposed lender.  *See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991);

*In re Ames Dep't Stores, Inc.*, 115 B.R. at 37–40; *Bland v. Farmworker Creditors*, 308 B.R. 109,

113–14 (S.D. Ga. 2003).  As set forth in the BDO Declaration, CCA has been unable to obtain

postpetition financing on an unsecured basis, and its request to the DIP Lender to provide

unsecured financing was declined.  BDO Declaration ¶¶ 18 n.4, 21.

35.      For the reasons set forth below, CCA submits that it has met the standards for

obtaining the proposed DIP Facility.

**C.      CCA is Unable to Obtain Financing on More Favorable Terms Than the DIP
Facility**

36.      A debtor need only demonstrate "by a good faith effort that credit was not

available without" the protections afforded to potential lenders by sections 364(c) and 364(d) of

the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The

statute imposes no duty to seek credit from every possible lender before concluding that such

credit is unavailable"); *Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584

(S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain

credit as an administrative expense); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 (approving

financing facility and holding that debtor made reasonable efforts to satisfy the standards of

24

section 364(c), to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders).

37.    Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor on an unsecured or administrative priority basis, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code). In fact, courts have explained that a "debtor is not required to 'seek credit from every possible source' but rather must demonstrate 'that it has made a reasonable effort to seek other sources of credit available under section 364(a) and (b).'"  *In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *10 (Bankr. S.D.N.Y. 2016)

38.    As described more fully above and in the BDO Declaration, CCA, through its financial advisors at BDO, has sought to market the opportunity to provide DIP financing to multiple potential lenders who regularly provide such DIP financing in amounts comparable to that sought by CCA, and has further sought to engage in good faith negotiations with the DIP Lender to obtain the best financing terms available.  BDO Declaration ¶¶ 17, 21.  To date, no lender has expressed a firm willingness to provide postpetition financing to meet CCA's immediate cash needs in the timing required on equivalent or more favorable terms than those

under the DIP Loan Documents. *Id.* Further, the DIP Facility does not prime any valid, enforceable, and nonavoidable liens. Therefore, CCA submits that the requirements of section 364 of the Bankruptcy Code have been satisfied.

      **D.**      **The DIP Facility Is Necessary to Preserve CCA's Estate**

      39.      CCA's quick access to postpetition financing is essential to its ability to preserve and maximize value for the benefit of all stakeholders.  As of the Petition Date, CCA has approximately $213,000 of cash on hand.  CCA thus needs an immediate capital infusion to operate its business postpetition and to fund this chapter 11 case.  CCA is unable to generate sufficient levels of operating cash flows in the ordinary course of business to cover either its operating costs going forward, or the projected restructuring costs of this chapter 11 case without the DIP Facility.  BDO Declaration ¶ 15.  The liquidity to be provided by the DIP Facility will enable CCA to fund its operations during the course of this chapter 11 case and to preserve and maximize the value of its estate for the benefit of all stakeholders. *Id.* ¶ 13.

      **E.**      **The Terms of the DIP Facility Are Fair, Reasonable, and Adequate Under the Circumstances**

      40.      In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both CCA and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.* (*In re Ellingsen MacLean Oil Co.*), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The terms and conditions of the DIP Facility are fair, reasonable, and appropriate under the circumstances.

41.   <u>Interest and Fees</u>.  Under the DIP Loan Documents, CCA has agreed, subject to Court approval, to pay interest and reimburse certain fees to the DIP Lender.  Specifically, CCA has agreed to pay (a) 9.5% per annum in interest on the outstanding principal amount of the DIP Loans, which shall be paid-in-kind or, at the option of CCA, in cash.  There are no commitment, exit or comparable fees payable under the DIP Facility.  CCA will reimburse the DIP Secured Parties for reasonable, documented out-of-pocket expenses such as attorney's fees.  As set forth in the BDO Declaration, CCA believes that the interest rate and fees to be paid under the DIP Facility are favorable and appropriate, particularly in light of the circumstances of this chapter 11 case.  BDO Declaration ¶ 19.  All of the terms of the DIP Facility were negotiated by CCA and its advisors, acting at the direction of the Independent Director, and compared to comparable debtor-in-possession financing agreements, to ensure that the terms were as favorable to CCA as possible under the circumstances. *Id.* ¶¶ 17-22.  CCA believes that such terms represent fair consideration for the critical financing being provided by the DIP Lender.

42.   <u>Downward Adjustment of Principal DIP Loan Balance for Certain Payments of Shared Services.</u>  In order to account for the portion of the costs of the Shared Services Program (as defined in the BDO Declaration) that are allocable to affiliates that are not within the CCA Group, the DIP Facility includes a mechanism to ensure that CCA is not burdened with DIP obligations, including any corresponding interest accrual, on account of that portion of funding. Specifically, the DIP Credit Agreement provides that the principal amount outstanding of the DIP Financing will be adjusted downward to account for any portions of shared services paid by CCA postpetition that are allocable to the DIP Lender or to its affiliates outside of the CCA Group.  This downward adjustment ensures that the proceeds of the DIP Loan are not used to incur interest on obligations that are outside of the CCA Group and helps preserve CCA's

financial resources and value for the benefit of all stakeholders.  In lieu of including advances used to pay portions of shared services allocable outside of the CCA Group in the calculation of CCA's DIP Obligations, the DIP Secured Parties will instead be assigned any Intercompany Claim that would otherwise be payable to CCA on account of the allocation of the cost of shared services to entities outside of the CCA Group.  The DIP Secured Parties will recover those allocated costs directly from the participating affiliates.

43.   <u>Carve Out</u>.  The DIP Credit Agreement, the Interim Order and the Final Order subject the security interests and administrative expense claims under the DIP Facility to the Carve Out, in the amount of $3.0 million.  Carve outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any official committee appointed can reimburse professionals in certain circumstances during an event of default under the terms of the debtor's postpetition financing.  *See In re Molycorp, Inc.*, 562 B.R. 67, 76 (Bankr. D. Del. 2017) ("the effect of a carve-out is to allow affected professionals to look to the secured creditor's collateral where otherwise they would not be able to do so.").  *See also In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve Out protects against administrative insolvency during the course of this chapter 11 case by ensuring that, notwithstanding the grant of superpriority claims and liens under the DIP Facility, assets remain for the payment of the fees of the Office of the United States Trustee for the Southern District of New Jersey and professional fees of CCA and any official committee.

**II.     The DIP Agent and the DIP Lender Should Be Afforded Good Faith Protection Under Section 364(e) of the Bankruptcy Code**

44.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. 11 U.S.C. § 364(e).  Section 364(e) of the Bankruptcy Code provides as follows:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

*Id.*

45.     The DIP Facility is the result of (a) CCA's reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain vital post-petition financing and (b) extensive arm's length, good faith negotiations between CCA and the DIP Lender.  BDO Declaration ¶¶ 17-22.  CCA submits that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to the DIP Agent, the DIP Lender, or any other party to the DIP Loan Documents other than as described herein.  Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to CCA have been extended by the DIP Agent and the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and, therefore, the DIP Agent and the DIP Lender are entitled to all the protections afforded thereby.

**III.      The Automatic Stay Should Be Modified on a Limited Basis**

46.      The proposed Interim Order and the Final Order provide that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to permit (a) CCA to grant the liens and claims provided for under the DIP Facility, (b) CCA to incur the liabilities and obligations contemplated in the DIP Loan Documents, (c) CCA to pay all amounts required in accordance with the DIP Loan Documents, (d) the DIP Secured Parties, subject to certain limitations, to exercise remedies upon the occurrence and during the continuation of an event of default under the DIP Loan Documents, and (e) the DIP Secured Parties to implement all of the terms, rights, benefits, privileges, remedies, and provisions of the Interim Order and the Final Order, the DIP Loan Documents, as applicable, including allowing the DIP Secured Parties to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order and the Final Order.

47.      A stay modification of this kind is a customary and standard feature of debtor-in-possession financing arrangements, and, in CCA's business judgment, is reasonable and fair under the circumstances of this chapter 11 case.  *See, e.g.*, *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) [ECF No. 297]; *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. May 24, 2023) [ECF No. 285]; *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 24, 2023) [ECF No. 716]; *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Sept. 5, 2019) [ECF No. 222]; *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. Apr. 22, 2019) [ECF No. 376]; *In re Aegean Marine Petroleum Network, Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. Jan. 15, 2019) [ECF No. 290].

IV.    **Failure to Obtain Access to the DIP Facility Would Cause Immediate and Irreparable Harm**

48.    Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

49.    CCA requests that the Court hold a hearing to consider entry of the Interim Order authorizing CCA to immediately withdraw and borrow the Interim Commitments under the DIP Facility.  CCA is at risk of suffering immediate and irreparable harm if the Interim Order approving the DIP Facility is not entered sooner than 14 days after service of this motion and if CCA is not permitted to access the DIP Facility.  CCA requires access to the DIP Facility prior to the Final Hearing and entry of the Interim Order in order to continue operating, to pay its administrative expenses, and to implement the relief granted in relation to CCA's other "first day" motions.  This relief is necessary for CCA to preserve and maximize value and, therefore, to avoid immediate and irreparable harm and prejudice to CCA's estate and all parties in interest.

## Request for Final Hearing

50.    Pursuant to Bankruptcy Rule 4001(c)(2), CCA requests that the Court set a date for the Final Hearing and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

51.    To successfully implement the foregoing, CCA requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and

that CCA has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).   As described above, the relief requested by CCA is needed immediately for CCA's business operations to continue without interruption and to preserve value for CCA's estate for the benefit of all stakeholders.

## **Waiver of Memorandum of Law**

52.     CCA respectfully requests that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which CCA relies is set forth herein and the motion does not raise any novel issues of law.

## **Reservation of Rights**

53.     Nothing in this motion or any action taken by CCA pursuant to relief granted in relation to this motion is intended to be or should be construed as: (a) an admission as to the amount, basis, or validity of any particular claim against CCA; (b) a waiver of CCA's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission relating to any existing lien, security interest or other encumbrance on property of CCA's estate; or (g) a waiver or limitation of any of CCA's rights under the Bankruptcy Code or other applicable law.   CCA expressly reserves all rights with respect to the foregoing matters.

## **Notice**

54.     CCA will provide notice of this motion to: (a) the Office of the United States Trustee for the District of New Jersey; (b) the entities listed on the *List of Creditors Holding the 20 Largest Unsecured Claims*; (c)  the Internal Revenue Service; (d) the Office of the United

States Attorney for the District of New Jersey; (e) the DIP Secured Parties; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, CCA respectfully submits that no further notice is necessary.

## **No Prior Request**

55.    No prior request for the relief sought in this motion has been made to this Court or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, CCA respectfully requests that the Court (a) enter the Interim Order and

Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the

relief requested herein and (b) grant such other and further relief as is just and proper.

Dated:    December 22, 2024

<div style="margin-left: 40%;">

*/s/ Michael D. Sirota*
_____
**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Felice R. Yudkin
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone:  (201) 489-3000
Facsimile:   (201) 489-1536
msirota@coleschotz.com
wusatine@coleshotz.com
rjareck@coleshotz.com
fyudkin@coleshotz.com

-and-

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (*pro hac vice* pending)
Sidney P. Levinson (*pro hac vice* pending)
Elie J. Worenklein
Shefit Koboci (*pro hac vice* pending)
66 Hudson Boulevard
New York, NY 10001
Telephone:     (212) 909-6000
Facsimile:     (212) 909-6836
nlabovitz@debevoise.com
slevinson@debevoise.com
eworenklein@debevoise.com
skoboci@debevoise.com

*Proposed Co-Counsel for the Debtor and Debtor in
Possession*

</div>

## **EXHIBIT A**

**Interim Order**

**UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (*pro hac vice* pending)
Sidney P. Levinson (*pro hac vice* pending)
Elie J. Worenklein
Shefit Koboci (*pro hac vice* pending)
66 Hudson Boulevard
New York, NY 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
nlabovitz@debevoise.com
slevinson@debevoise.com
eworenklein@debevoise.com
skoboci@debevoise.com

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Felice R. Yudkin
Ryan T. Jareck
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

| | |
|---|---|
| In re: | Case No. 24-_____ (___) |
| CCA Construction, Inc.,[1] | Chapter 11 |
| Debtor. | Judge: |

---

[1]  The last four digits of CCA's federal tax identification number are 4862.  CCA's service address for the purposes of this chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

(Page | 2)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

**INTERIM ORDER (I) AUTHORIZING
THE DEBTOR TO OBTAIN POSTPETITION
FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS; (III) MODIFYING
THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered two (2) through forty-one (41), is

**ORDERED**.

(Page | 3)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (____) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Upon CCA's motion filed on the Petition Date [Docket No. ___] (the "**Motion**")[2] pursuant to sections 105, 362, 363, 364. 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Local Rules 4001-3, 9013-1, and 9013-5 for entry of this Interim Order and a Final Order:

(a)    authorizing CCA, on the terms set forth in the DIP Loan Documents (as defined below), to obtain postpetition financing, consisting of up to $40,000,000 (the "**DIP Commitments**") comprising a first lien secured multi-draw term loan facility (the "**DIP Facility**," and  each individual loan made thereunder, a "**DIP Loan**," collectively the loans made thereunder, the "**DIP Loans**," and, together with related obligations incurred under the DIP Facility, the "**DIP Obligations**"), $5,000,000 of which will be available in a single draw upon entry of this Interim Order, $3,000,000 of which will be available in a single draw upon entry of a final order granting the relief sought in the Motion in form and substance reasonably acceptable to the DIP Lenders (the "**Final Order**"), and the remainder of which will be available in multiple draws of no less than $500,000 per single draw following entry of the Final Order (or, in the event the balance of DIP Commitments are less than $500,000, the full amount of undrawn DIP Commitments), from CCA's parent company, CSCEC Holding Company, Inc. (the "**DIP Lender**," and

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

(Page | 4)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

together with all other entities that become lenders under the DIP Loan Documents from time to time and each of their respective successors and permitted assigns, the "**DIP Lenders**");[3] in each case subject to the satisfaction of the conditions precedent set forth in the DIP Credit Agreement; for which CSCEC Holding Company, Inc. shall serve as administrative and collateral agent (in such capacities, together with its successors in such capacities, the "**DIP Agent**," and the DIP Agent, together with the DIP Lenders, are the "**DIP Secured Parties**" and each is a "**DIP Secured Party**"); authorizing CCA to execute and deliver additional documentation consistent with the terms of (or as may be required by) the DIP Credit Agreement substantially in the form attached hereto as **Annex A** without exhibits or schedules (as such agreement may be amended, in accordance with its terms and this Interim Order, and including the exhibits and schedules thereto, the "**DIP Credit Agreement**") and the other DIP Loan Documents, and to perform such other and further acts as may be necessary or appropriate in connection therewith, or otherwise required under the DIP Loan Documents;

(b)    authorizing CCA to use proceeds of the DIP Loans (the "**DIP Loan**

---

[3]    For the avoidance of doubt, (a) nothing herein shall preclude the ability of the DIP Lenders to, in accordance with the applicable DIP Loan Documents, offer a portion of the DIP Commitments and DIP Loans to third-party capital providers and other financial institutions or other entities, it being understood that no such assignment or transfer shall become effective with respect to any portion of the DIP Commitments until the Closing Date (as defined in the DIP Credit Agreement); and (b) thereafter, assignments and participations of DIP Loans and DIP Commitments shall be in accordance with the DIP Loan Documents.

(Page | 5)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (____) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

**Proceeds**") as permitted in, and solely in accordance with, the DIP Loan Documents, this Interim Order, and the Approved Budget (as defined herein);

(c)     granting valid, binding, continuing, enforceable, and automatically perfected (a) security interests in and liens on all of the Collateral (as defined in the DIP Credit Agreement) to the DIP Agent for the benefit of the DIP Secured Parties, and (b) granting superpriority administrative expense status to the DIP Obligations (as defined below), in each case subject to the Carve Out (as defined below);

(d)     authorizing CCA to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Loan Documents as and when such amounts become due and payable without other or further notice or order;

(e)     vacating and modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Loan Documents;

(f)     subject to entry of the Final Order, waiving CCA's ability to surcharge against any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code;

(g)     scheduling a final hearing on the Motion as described in paragraph 22 below (the "**Final Hearing**") to consider entry of the Final Order, and in connection therewith, giving and prescribing the manner of notice of the Final Hearing;

| (Page \| 6) | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

(h)    waiving any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

(i)    granting CCA such other and further relief as is just and proper.

Upon consideration of (a) the Motion and the exhibits attached thereto, (b) the evidentiary record made at the interim hearing, which was held on December 23, 2024, pursuant to Bankruptcy Rule 4001(c)(2) (the "**Interim Hearing**"), (c) the First Day Declarations, (d) the arguments and statements of counsel at the Interim Hearing, and (e) all matters brought to the Court's attention at the Interim Hearing, and the Court having found and determined that (i) the relief sought in the Motion is necessary to avoid immediate and irreparable harm to CCA and its estate as contemplated by Bankruptcy Rule 6003, and is in the best interests of CCA, its estate, creditors, stakeholders, and all other parties-in-interest, and essential for the continued operation of CCA's business and the preservation of the value of CCA's assets and (ii) the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND DETERMINES:**[4]

A.    <u>Petition Date</u>.  On December 22, 2024 (the "**Petition Date**"), CCA filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code and is continuing

---

[4]    To the extent any findings of fact constitute conclusions of law, they are adopted as such, and vice versa.

(Page | 7)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

to operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.  No trustee or examiner has been appointed in this case.

B.    <u>Jurisdiction; Core Proceeding</u>. This Court has jurisdiction over this chapter 11

case, the Motion, this Interim Order, and the parties and property affected hereby pursuant to 28

U.S.C. §§ 157(b) and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under

Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984,

and amended on September 18, 2012 (Simandle, C.J.).  This is a "core" proceeding pursuant to

28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409.

C.    <u>Immediate Need for Postpetition Financing</u>. An immediate and ongoing need

exists for CCA to obtain the DIP Loans in order to permit, among other things, CCA to meet its

obligations arising during CCA's chapter 11 case, including the administration of CCA's chapter

11 case, so as to maximize the value of its business and assets as debtor in possession under

chapter 11 of the Bankruptcy Code.  CCA does not have sufficient available sources of working

capital to operate its business without access to the DIP Facility, warranting expedited

consideration of the Motion and entry of this Interim Order.  CCA's ability to preserve and

maintain its assets, to pay employees, and to otherwise fund operations and an orderly chapter 11

process, is essential to CCA's viability and preservation of the going-concern value of its

business and the value of its assets.  Without access to the DIP Facility, CCA's estate would

suffer immediate and irreparable harm.

(Page | 8)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

D.     Proposed DIP Facility. CCA has requested that the DIP Lenders establish the DIP Facility pursuant to which CCA may obtain DIP Loans from time to time in accordance with the DIP Loan Documents, with all DIP Loans to be secured by DIP Liens (as defined below) upon the Collateral as described below, and all DIP Loans and obligations of CCA contemplated by the DIP Loan Documents to be granted superpriority administrative expense claims, as and to the extent set forth in the DIP Loan Documents. The DIP Lenders are willing to establish the DIP Facility upon the terms and conditions set forth in the DIP Loan Documents.

E.     No Credit Available on More Favorable Terms. Despite diligent efforts and a sufficient marketing process, CCA has been unable to obtain postpetition financing on terms more favorable than those offered by the DIP Lenders under the DIP Loan Documents. CCA is unable to obtain adequate unsecured credit under section 503(b)(1) of the Bankruptcy Code. CCA also is unable to obtain secured credit allowable under section 364 of the Bankruptcy Code without granting the DIP Liens and the DIP Superpriority Claims (each, as defined below) under sections 364(c) and 364(d) of the Bankruptcy Code on the terms and conditions set forth in this Interim Order and the other DIP Loan Documents.

F.     Approved Budget. CCA has delivered to the DIP Agent a 13-week cash flow forecast of receipts and disbursements for the period from the Closing Date (as defined in the DIP Credit Agreement), attached to this Interim Order as **Annex B** (the "**Approved Budget**"), which Approved Budget is reasonably acceptable to the DIP Lenders in accordance with the DIP Loan Documents. The DIP Secured Parties are relying upon the Approved Budget in entering into the DIP Loan Documents.

(Page | 9)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

G.      Certain Conditions to DIP Facility. The DIP Lenders' willingness to make the DIP Loans is conditioned upon, among other things, (a) CCA obtaining Court approval to enter into the DIP Loan Documents and to incur all of its obligations thereunder, and to confer upon the DIP Secured Parties all rights, powers, and remedies thereunder and (b) the DIP Secured Parties being granted, as security for the prompt payment of the obligations under the DIP Facility and all other DIP Obligations, perfected security interests in and liens upon the Collateral, and that such perfected security interests and liens have the priorities set forth herein and in the other DIP Loan Documents.

H.      Interim Hearing. Pursuant to Bankruptcy Rule 4001(c)(2), CCA has requested in the Motion that the Court hold the Interim Hearing to authorize CCA to enter into the DIP Loan Documents during the period (the "**Interim Period**") from the date of entry of this Interim Order through the earliest of (a) the date of the entry of the Final Order following the Final Hearing, (b) the Termination Declaration Date (as defined below), or (c) the Maturity Date (as defined in the DIP Credit Agreement).

I.      Service of Motion and Notice of Interim Hearing. The affidavit and declaration of service on file with the Court [Docket No. ___] demonstrate that CCA has served copies of the Motion (together with the copies of the proposed DIP Credit Agreement and Approved Budget annexed hereto as **Annexes A and B**, respectively), and notice of the Interim Hearing by electronic mail, telecopy transmission, hand delivery, overnight courier, or first class United States mail upon (a) the Office of the United States Trustee for the District of New Jersey; (b) the entities listed on the *List of Creditors Holding the 20 Largest Unsecured Claims*; (c)  the

(Page | 10)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Internal Revenue Service; (d) the Office of the United States Attorney for the District of New Jersey; (e) the Initial DIP Lenders and their counsel Lowenstein Sandler LLP; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Court finds that the foregoing notice of the Motion, as it relates to this Interim Order and the Interim Hearing, is appropriate, due, and sufficient for all purposes under the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, including sections 102(1) and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c), and that no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

J.     Prior Liens. Nothing herein shall constitute a finding or ruling by this Court that any alleged Prior Lien (as defined in the DIP Credit Agreement) is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest, including CCA, the DIP Agent, or any statutory creditors' committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prior Lien. The right, if any, of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Prior Lien.

K.     Finding of Good Cause. Good cause has been shown for the entry of this Interim Order and authorization for: (a) the DIP Lenders to provide CCA with the DIP Loans and (b) CCA to accept, incur, and undertake the DIP Obligations pursuant to the DIP Loan Documents during the Interim Period. CCA's need for financing of the type afforded by the DIP Loan Documents is critical. Entry of this Interim Order will preserve the value of the assets of CCA's estate and is in the best interests of CCA, its creditors and its estate. The terms of the

(Page | 11)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

DIP Facility are fair and reasonable, including the interest rates and fees owed thereunder, reflect CCA's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

L.    <u>Finding of Good Faith</u>.  Based upon the record presented at the Interim Hearing, the DIP Facility has been negotiated in good faith and at arm's length between CCA, on the one hand, and the DIP Secured Parties, on the other.  All of the DIP Obligations, including all DIP Loans made pursuant to the DIP Loan Documents and all other liabilities and obligations of CCA under this Interim Order, owing to the DIP Secured Parties shall be deemed to have been extended by the DIP Secured Parties in "good faith," as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  The DIP Secured Parties shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

M.    <u>No Liability to Third Parties</u>.  Subject to entry of the Final Order, CCA stipulates and the Court finds that in making decisions to advance DIP Loans to CCA, in administering any DIP Loans, in accepting the Approved Budget, or in taking any other actions permitted by this Interim Order or the other DIP Loan Documents in their respective capacities as DIP Lenders or DIP Agent, none of the DIP Secured Parties shall be deemed to be in control of the operations of CCA or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of CCA.

(Page | 12)

| Debtor: | CCA Construction, Inc. |
|---|---|
| Case No.: | 24-_____ (____) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

N.     <u>Immediate Entry</u>. CCA has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and the Local Rules.  Absent the immediate grant by the Court of the interim relief sought by the Motion, CCA's estate will be immediately and irreparably harmed pending the Final Hearing.  The consummation of the DIP Facility in accordance with the terms of this Interim Order and the other DIP Loan Documents, is in the best interest of CCA's estate, and is consistent with CCA's exercise of its fiduciary duties.  Under the circumstances, the notice given by CCA of the Motion and Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(c) and the Local Rules.  No further notice of the relief sought at the Interim Hearing is necessary or required.

O.     <u>No Claims or Causes of Action.</u>  Subject to entry of the Final Order, there exist no claims or causes of action against any of the DIP Agent or the other DIP Secured Parties with respect to, in connection with, related to, or arising from the DIP Loan Documents, or the DIP Facility that may be asserted by the DIP Secured Parties or CCA or any other person or entity.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDICATED, AND DECREED** as follows:

1.     <u>Grant of Motion; Authorization of Interim Financing; Use of Proceeds.</u>

(a)     The Motion is hereby granted as and to the extent provided herein, and the Court hereby authorizes and approves CCA's execution and delivery of the DIP Loan Documents, and CCA's execution and delivery of all instruments, security agreements, assignments, pledges, mortgages, reaffirmations, and other documents referred to therein or reasonably requested by the DIP Secured Parties to give effect to the terms thereof and

(Page | 13)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

as will be drafted and executed as contemplated therein, in each case, in final form and substance consistent with this Interim Order and otherwise reasonably acceptable to the DIP Secured Parties (collectively, this Interim Order, the DIP Credit Agreement, the Collateral Documents, the Approved Budget, and any other document delivered to any DIP Secured Party in connection with any of the foregoing, in each case, as the same may be amended, restated, or otherwise modified from time to time in accordance with the terms of this Interim Order and the DIP Credit Agreement, are referred to herein as the "**DIP Loan Documents**").

(b)     CCA is hereby authorized to borrow under the DIP Loan Documents and this Interim Order up to an interim aggregate principal amount of $5,000,000 during the Interim Period, subject to any conditions and limitations on availability in the DIP Loan Documents, plus all interest, fees, and other charges payable in connection with the DIP Loans as provided in the DIP Credit Agreement and other DIP Loan Documents; to incur any and all liabilities and obligations under the DIP Loan Documents; and to pay all principal, interest, fees, expenses, and other obligations provided for under the Approved Budget and the other DIP Loan Documents, including the obligations under the DIP Loan Documents to indemnify each Indemnitee (as defined in the DIP Credit Agreement);

(c)     No DIP Secured Party shall have any obligation or responsibility to monitor the use of the DIP Loans, and each DIP Secured Party may rely upon CCA's representations that the amount of the DIP Loans requested at any time, and the use thereof, are in accordance with the requirements of this Interim Order, the Approved

(Page | 14)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Budget, the DIP Loan Documents, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

(d)    CCA may obtain and use the DIP Loan Proceeds during the Interim Period only as permitted under the DIP Loan Documents.  For the avoidance of doubt, no DIP Loan Proceeds may be used to make any payment in settlement or satisfaction of any prepetition claim or administrative claim, unless such payment is (a) contemplated by this Interim Order, the Final Order, the DIP Credit Agreement, or an Acceptable Plan, (b) in compliance with the Approved Budget, (c) made with the prior written consent of the DIP Lenders in accordance with the terms of the DIP Credit Agreement, or (d) to the extent required by applicable law, separately approved or authorized by the Court upon notice to the DIP Agent.

2.    <u>Entry into, Execution, Delivery, and Performance of DIP Loan Documents</u>. CCA is hereby authorized to (a) enter into the DIP Credit Agreement and the other DIP Loan Documents, (b) incur and perform the DIP Obligations arising from and after the date of this Interim Order under the DIP Facility, (c) repay amounts borrowed, together with interest, and (d) pay all fees, costs, and expenses contemplated therein (including but not limited to indemnification of the Indemnitees), as well as any other outstanding DIP Obligations to the DIP Secured Parties, in each case in accordance with and subject to the terms and conditions set forth in this Interim Order, the other DIP Loan Documents, and such additional documents, instruments, and agreements as may reasonably be required by the DIP Secured Parties to implement the terms or effectuate the purpose of and transactions contemplated by the DIP Loan

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Documents, the terms of which are incorporated by reference. The DIP Loan Documents may be executed and delivered on behalf of CCA by any officer, director, or agent of CCA, who by signing shall be deemed to represent himself or herself to be duly authorized and empowered to execute such DIP Loan Documents for and on behalf of CCA. The DIP Secured Parties shall be authorized to rely upon any such person's execution and delivery of any of the DIP Loan Documents as having done so with all requisite power and authority to do so, and the execution and delivery of any of the DIP Loan Documents by any such person on behalf of CCA shall be conclusively presumed to have been duly authorized by all necessary corporate action of CCA. Upon execution and delivery thereof, each of the DIP Loan Documents shall constitute valid and binding obligations of CCA, enforceable against CCA in accordance with its terms for all purposes during its chapter 11 case, any subsequently converted case of CCA under chapter 7 of the Bankruptcy Code (a "**Successor Case**"), and after the dismissal of any chapter 11 case. Subject to the provisions of paragraph 14, no obligation, payment, or transfer under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including under sections 502(d), 544, 547, 548, 549, or 550 of the Bankruptcy Code or under any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.

3.     <u>DIP Liens</u>. As security for CCA's payment and performance under the DIP Loan Documents, all principal, interest, costs, expenses, fees, and other charges at any time payable by

(Page | 16)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

CCA to the DIP Secured Parties in connection with the DIP Loan Documents, all reimbursement obligations, and all other indebtedness and obligations contemplated under any of the DIP Loan Documents (all of the foregoing being collectively called the "**DIP Obligations**"), the DIP Agent, for itself and for the benefit of the DIP Lenders, is hereby granted the following valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens upon all of the DIP Collateral (collectively, the "**DIP Liens**") in the priorities set forth in subparagraphs (a) and (b) below, each of which shall be subject to the Carve Out:

(a)    First priority liens pursuant to section 364(c)(2) of the Bankruptcy Code on all Collateral that was not encumbered by Permitted Senior Liens (as defined below), and

(b)    to the extent any Collateral is subject to any (i) liens perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code or (ii) liens on retainers held by professionals, to the extent such retainers are not prohibited under the Bankruptcy Code or any applicable orders of the Court (the foregoing clauses (i) and (ii) being referred to collectively as the "**Permitted Senior Liens**"), senior liens, pursuant to section 364(d) of the Bankruptcy Code, on such Collateral subject and subordinate only to Permitted Senior Liens

(c)    <u>Liens Senior to Certain Other Liens</u>. The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of CCA or CCA's estate under section 551 of the Bankruptcy Code, (B) except to

(Page | 17)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

the extent the DIP Loan Documents expressly allow a postpetition lien to have priority over the DIP Liens, any postpetition liens granted by CCA to other persons or entities or otherwise arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board, or court for any liability of CCA, or (C) any intercompany or affiliate liens or security interests against CCA; (ii) subordinated to or made *pari passu* with any other lien or security interest on the Collateral under section 363 or 364 of the Bankruptcy Code; or (iii) subject to sections 510(c), 548 549, or 550 of the Bankruptcy Code.  In no event shall any person or entity who pays (or, through the extension of credit to CCA, causes to be paid) any of the DIP Obligations be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens, or priorities granted to or in favor of, or conferred upon, any DIP Secured Party by the terms of any DIP Loan Documents or this Interim Order unless such person or entity contemporaneously causes payment in full of all of the DIP Obligations.

(d)     <u>Right to Challenging Competing Liens</u>. The DIP Agent (at the direction of the DIP Lenders in accordance with the terms of the DIP Credit Agreement) shall have the right and the standing to challenge the validity, priority, perfection, extent, or amount of any lien or security interest filed or otherwise asserted against CCA that relates to DIP Collateral that purports to be senior or *pari passu* with to any DIP Lien, including any lien or security interest that, if found to be valid, enforceable, non-revocable, and perfected, would constitute a Prior Lien.

(Page | 18)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

(e)     <u>Exclusion from Collateral</u>.  Solely for the purposes of this Interim Order, notwithstanding anything to the contrary herein or in the DIP Loan Documents, Collateral shall not include any of CCA's (i) leasehold interests in equipment leases or the equipment leased thereunder or (ii) equipment subject to financing arrangements (whether through secured loans, finance leases, or otherwise) and interests in the underlying financing agreements, in each case to the extent that the relevant lease or financing agreement prohibits or conditions the grant of a lien or the assignment of the lease or other financing agreement upon the consent of a non-debtor counterparty to the extent such consent (A) is not actually obtained (after the use of commercially reasonable efforts to obtain such consent) and (B) is required under applicable law to grant the applicable security interest.

4.     <u>Superpriority Claims</u>.

(a)     <u>Allowed Claims</u>. All DIP Obligations shall at all times constitute superpriority administrative expense claims against CCA (the "**DIP Superpriority Claims**") that will, in accordance with section 364(c)(1) of the Bankruptcy Code, have priority over any and all administrative expenses of and unsecured claims against CCA now existing or hereafter arising, of any kind or nature whatsoever, including but not limited to all administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 328, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code (including those resulting from the conversion of this chapter 11 case pursuant to section 1112 of the Bankruptcy Code),

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

subject only to the Carve Out.  The DIP Superpriority Claims shall survive any conversion of this chapter 11 case to a case under chapter 7 of the Bankruptcy Code or the dismissal of this chapter 11 case.  Subject only to the Carve Out, the DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of CCA and its estate (excluding Avoidance Actions but, upon entry of the Final Order, including Avoidance Proceeds (as such terms are defined below)).

(b)      Proceeds of Avoidance Actions.  Subject to entry of the Final Order, the DIP Superpriority Claims shall have recourse to all proceeds (the "**Avoidance Proceeds**") of all of CCA's claims and causes of action pursuant to sections 502(d), 544, 545, 547, 548, 549, 550, 551, 553(b), 732(2), or 742(2) of the Bankruptcy Code (the "**Avoidance Actions**"), including but not limited to all of CCA's claims and causes of action pursuant to section 549 and 550 of the Bankruptcy Code to avoid and recover any postpetition transfer of DIP Collateral or postpetition transfer of DIP Loan Proceeds.

5.      Repayment of DIP Obligations.  The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Loan Documents and as provided herein, without defense, offset, or counterclaim.  Without limiting the generality of the foregoing, in no event shall CCA be authorized to offset or recoup any amounts owed, or allegedly owed, by any DIP Secured Party to CCA or any of its subsidiaries or affiliates against any of the DIP Obligations without the prior written consent of the DIP Secured Parties, if any, that would be adversely affected by any such offset or recoupment, and no such consent shall be implied from any action, inaction or acquiescence by any DIP Secured Party.

(Page | 20)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

6.    <u>Payments Free and Clear</u>.  All payments or proceeds remitted to the DIP Agent by or on behalf of CCA pursuant to the DIP Loan Documents, the provisions of this Interim Order, or any subsequent order of this Court or any other court exercising jurisdiction over this chapter 11 case or any Successor Case, shall be received free and clear of any claim, charge, assessment, or other liability, including any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (subject to entry of the Final Order).

7.    <u>Fees and Expenses of Estate Professionals</u>. Subject to paragraphs 12 and 13 below, CCA is authorized to use DIP Loan Proceeds to pay such compensation and expense reimbursement (collectively, "**Professional Fees**") of professional persons (including attorneys, financial advisors, accountants, investment bankers, appraisers, and consultants, in each case to the extent such professional person's retention is subject to court approval) retained pursuant to section 327, 330, 331, 363, or 1103 of the Bankruptcy Code, as applicable, by CCA (such retained professionals, the "**Debtor's Professionals**") or a statutory creditors' committee, (such retained professionals, the "**Committee Professionals**" and, collectively with CCA's Professionals, the "**Professionals**"), to the extent that such compensation and expense reimbursement is authorized and approved by the Court at any time.

8.    <u>Section 506(c) Claims</u>.  Subject to entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration shall be imposed upon any DIP Secured Party or on any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of such DIP Secured Party, and no such consent shall be implied from any action, inaction, or acquiescence by any DIP Secured Party.  Further, CCA

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

waives, and shall not assert in this chapter 11 case or any Successor Case, any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise with respect to the DIP Obligations or the DIP Liens.

9.    Carve Out.

(a)    Notwithstanding anything to the contrary in this Interim Order, any other DIP Loan Document, or any other order of this Court to the contrary, the rights and claims of the DIP Lenders, including the DIP Liens and DIP Superpriority Claims, shall be subject and subordinate in all respects to the payment of the Carve Out.  As used in this Interim Order, "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under sections 156(c) and 1930(a) of title 28 of the United States Code plus interest, if any, as set forth in section 3717 of title 31 of the United States Code (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (as defined below), whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) accrued or incurred by the Professionals (such fees and expenses, the "**Allowed Professional Fees**") at any time before or on the first business day following the day on which a Carve Out Trigger Notice is delivered by the DIP Agent in accordance with this paragraph 9 (such date of

(Page | 22)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

delivery, the "**Termination Declaration Date**"); and (iv) Allowed Professional Fees incurred after the first business day following the Termination Declaration Date, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, in an aggregate amount not to exceed $3,000,000 less the amount of any prepetition retainers received by the Professionals and not applied to the fees, disbursements, costs, and expenses set forth in clause (iii) above (the amount set forth in this clause (iv), the "**Post-Carve Out Trigger Notice Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the DIP Lenders) to CCA, its lead restructuring counsel, the U.S. Trustee, and counsel to any statutory creditors' committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in any DIP Loan Document), stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     On the Termination Declaration Date, the Carve Out Trigger Notice shall constitute a demand to CCA to utilize all cash on hand as of such date to fund a reserve in an amount equal to the then-unpaid amounts of the Allowed Professional Fees within one business day of the Termination Declaration Date; *provided* that in the event that a Termination Declaration Date occurs, each Professional shall have two business days to deliver to CCA such Professional's good faith estimate of the Allowed Professional Fees incurred through the Termination Declaration Date, and CCA shall fund into the Carve Out Account (as defined below) such amounts within one business day of receipt of such

(Page | 23)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

estimates.  CCA shall deposit and hold such amounts (the "**Pre-Carve Out Trigger Notice Reserve**") in the Carve Out Account in trust to pay such then-unpaid Allowed Professional Fees prior to any and all other Allowed Professional Fees.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to CCA to utilize all cash on hand as of such date and any available cash thereafter held by CCA, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  CCA shall deposit and hold such amounts (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") in a segregated account (the "**Carve Out Account**") at an institution reasonably designated by the DIP Agent (at the direction of the DIP Lenders) in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap prior to any and all other Allowed Professional Fees.  For the avoidance of doubt, the Carve Out Account and all funds on deposit therein from time to time, including but not limited to the Carve Out Reserves, shall continue to constitute Collateral, subject only to the terms of the Carve Out as described in this paragraph 9.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**") until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to repay the DIP Obligations, unless the DIP Obligations have been indefeasibly paid in full and all DIP Commitments have been terminated, in which case

| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

such remaining funds shall be retained by CCA.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "**Post-Carve Out Amounts**") until paid in full, and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to repay the DIP Obligations, unless the DIP Obligations have been indefeasibly paid in full and all DIP Commitments have been terminated, in which case such remaining funds shall be retained by CCA.

(c)     Notwithstanding anything to the contrary in this Interim Order or the other DIP Loan Documents, following delivery of a Carve Out Trigger Notice, none of the DIP Secured Parties shall be permitted to sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of CCA in the Carve Out Account unless and until the Pre-Carve Out Amounts (with respect to the Pre-Carve Out Trigger Notice Reserve) or Post-Carve Out Amounts (with respect to the Post-Carve Out Trigger Notice Reserve), as applicable, are paid in full as described in paragraph 9(b) above. Further, notwithstanding anything to the contrary in this Interim Order or the other DIP Loan Documents, (i) disbursements by CCA from the Carve Out Account shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, (iii) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

CCA, and (iv) the Carve Out as provided for and capped by this Interim Order shall be senior to and have priority over all liens securing the DIP Obligations and the DIP Superpriority Claims.  Notwithstanding the foregoing, subject to the terms of any applicable retention orders entered by the Court, the DIP Secured Parties reserve all of their rights to challenge or otherwise object to any of the fees or expenses sought to be approved by any of the Professionals.

(d)     Any payment or reimbursement made prior to the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.  Any payment or reimbursement made on or after the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

(e)     None of the DIP Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional incurred in connection with the chapter 11 case or any Successor Case.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional or to guarantee that CCA has sufficient funds to pay such compensation or reimbursement.

10.     <u>DIP Loan Proceeds Restrictions</u>. Neither the Carve Out nor any DIP Loan Proceeds or Collateral shall be used to, among other things (any of the following each a "**Prohibited Purpose**"): (a) object to, seek subordination of, or contest the validity, extent, perfection, priority, or enforceability of the DIP Facility or the amount due thereunder and the

(Page | 26)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

superpriority claims granted thereby, the DIP Liens; (b) investigate, initiate, assert, or prosecute any claim, defense, demand, or cause of action against the DIP Agent or the DIP Lenders or any of their respective officers, directors, employees, agents, attorneys, representatives, subsidiaries, affiliates, or shareholders, under or relating to the DIP Facility, including, in each case, any action, suit or other proceeding for breach of contract or tort or pursuant to sections 105, 506, 510, 544, 547, 548, 549, 550, 551, 552, or 553 of the Bankruptcy Code, or under any other applicable law (state, federal, or foreign), or otherwise; (c) prevent, hinder, or delay, whether directly or indirectly, any DIP Secured Party's assertion or enforcement of its liens and security interests, or its efforts to realize upon any DIP Collateral or the claims authorized or granted maunder the DIP Loan Documents or exercise any other rights and remedies under the DIP Loan Documents or applicable law; (d) seek to modify any of the rights granted under this Interim Order to any DIP Secured Party; (e) assert any defense, counterclaim, or offset any DIP Obligations or any other rights or claims granted by this Interim Order or the Other DIP Loan Documents; or (f) object to, contest, delay, prevent, or interfere in any way with the exercise of rights or remedies by any DIP Secured Party with respect to any Collateral unless as specifically permitted by the DIP Loan Documents.

11.  <u>Reservation of Rights</u>.

(a)  <u>Protection from Subsequent Financing Order</u>.  Prior to the payment in full of all DIP Obligations and the termination of all funding commitments under the DIP Facility in accordance with the terms of the DIP Loan Documents, there shall not be entered in this chapter 11 case or in any Successor Case any order other than with the

(Page | 27)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

consent of the DIP Agent and the requisite DIP Lenders (as provided for in the DIP Loan Documents) that authorizes the obtaining of credit or the incurrence of indebtedness by CCA (or any trustee or examiner) that is: (i) secured by a security interest, mortgage, or other lien on all or any part of the DIP Collateral that is equal or senior to the DIP Liens or (ii) entitled to claims with payment priority that is equal or senior to the DIP Superpriority Claims; *provided, however*, that nothing herein shall prevent the entry of an order that specifically provides for, as a non-waivable condition to the granting of the benefits of clauses (i) and (ii) above, (1) the indefeasible payment in full and in cash of all of the DIP Obligations and (2) the termination of any funding commitments under the DIP Loan Documents.

(b)    <u>Rights Upon Dismissal, Conversion, or Consolidation</u>. The dismissal, conversion, transfer of venue, or substantive consolidation of this chapter 11 case shall not affect the rights or remedies of any DIP Secured Party under the DIP Loan Documents or this Interim Order, and all of the respective rights and remedies hereunder and thereunder of each DIP Secured Party shall remain in full force and effect as if such chapter 11 case had not been dismissed, converted, transferred, or substantively consolidated.

(c)    <u>Survival of Interim Order</u>. This Interim Order, and any actions taken pursuant hereto, shall survive the entry of and shall not be modified, superseded, impaired, discharged, or in any way altered, without the consent of the DIP Secured Parties, by any order that may be entered: (i) confirming any plan of reorganization or

(Page | 28)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

liquidation in CCA's chapter 11 case; (ii) converting CCA's chapter 11 case to a case under chapter 7 of the Bankruptcy Code; (iii) dismissing CCA's chapter 11 case or any Successor Case; (iv) transferring venue of CCA's chapter 11 case to another court; or (v) pursuant to which the Court abstains from hearing the chapter 11 case or any Successor Case.   The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the DIP Secured Parties pursuant to this Interim Order or the other DIP Loan Documents, shall continue in full force and effect notwithstanding the entry of any such order, and such rights, claims and liens shall maintain their priority as provided by this Interim Order and the other DIP Loan Documents to the maximum extent permitted by law until all of the DIP Obligations are indefeasibly paid in full in accordance with the DIP Loan Documents.

(d)     No Discharge. None of the DIP Obligations shall be discharged by the entry of any order confirming a plan of reorganization or liquidation in this chapter 11 case unless such obligations have been indefeasibly paid in full and in cash in accordance with the DIP Loan Documents on or before the effective date of such plan, or each of the DIP Secured Parties has otherwise agreed in writing, and, pursuant to section 1141(d)(4) of the Bankruptcy Code, CCA has waived such discharge.

(e)     Credit Bid Protection. The DIP Secured Parties shall have, pursuant to section 363(k) of the Bankruptcy Code, the unqualified right to credit bid, or purchase, up to the full amount of the DIP Obligations and the DIP Superpriority Claims, without the need for further Court order authorizing the same, in connection with any sale of any of

(Page | 29)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

the DIP Collateral, whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. CCA shall not object to or support any objection to any DIP Secured Party credit bidding up to the full amount of its outstanding DIP Obligations in accordance with the applicable DIP Loan Documents in any sale of any DIP Collateral, whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

(f)    No Marshaling. Subject to entry of the Final Order, in no event shall any DIP Secured Party be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any DIP Collateral.

(g)    No Requirement to File Claim for DIP Obligations. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, no DIP Secured Party shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Loan Documents applicable thereto without the necessity of filing any such proof of claim or request for payment of administrative expenses; and the filing of or failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Loan Documents or of any DIP Obligations arising at any time

(Page | 30)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

thereunder, or prejudice or otherwise adversely affect any DIP Secured Party's rights, remedies, powers, or privileges under any of the DIP Loan Documents, this Interim Order, or applicable law.

12. <u>Automatic Perfection of Liens</u>. The DIP Liens are effective, valid, binding, enforceable, and duly perfected upon entry of this Interim Order.  None of the DIP Secured Parties shall be required to file any UCC-1 financing statement, mortgage, deed of trust, assignment, pledge, security deed, notice of lien, or any similar document or instrument in any jurisdiction or take any other action (including taking possession of any of the DIP Collateral) in order to validate the perfection of any DIP Liens, but all of such filings and other actions are hereby authorized by the Court.  If the DIP Agent, in its discretion, chooses to file or record any such mortgage, deed of trust, assignment, pledge, security deed, notice of lien, or UCC-1 financing statement, or take any other action in any jurisdiction to evidence the perfection of any part of the DIP Liens, CCA and its respective officers are authorized and directed to use commercially reasonable efforts to execute, file, and record any documents or instruments as the DIP Agent may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.  The DIP Agent may, in its reasonable discretion, file a certified copy of this Interim Order in any filing office in any jurisdiction in which CCA is organized or has or maintains any DIP Collateral or an office, and each filing office is directed to accept such certified copy of this Interim Order for filing and recording.  The DIP Agent or the DIP Lenders may require CCA to enter into non-U.S. security documentation with respect to any Collateral located in non-U.S.  jurisdictions, and

(Page | 31)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

CCA and its respective officers are authorized and directed to use commercially reasonable efforts to execute, file, and record any documents or instruments as the DIP Agent or the DIP Lenders may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

13.     Reimbursement of Fees, Costs, and Expenses of DIP Secured Parties. CCA shall reimburse the DIP Secured Parties for their reasonable and documented out-of-pocket fees, costs, and expenses, whether accrued on, prior to, or after the Closing Date, in connection with (a) the preparation, negotiation, execution, and administration of the DIP Loan Documents and any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, including any amendment or waiver of the DIP Loan Documents, (b) the funding of the DIP Loans, (c) the creation, perfection, or protection of the DIP Liens (including all search, filing and recording fees), (d) internal audit reviews and field examinations, (e) the enforcement or preservation of any right or remedy under any DIP Loan Document, any DIP Obligation, or with respect to the DIP Collateral, (f) the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or request for document production relating thereto) with respect to, any proceeding related to CCA, any DIP Loan Document or DIP Obligation, (g) the review of pleadings and other filings made with the Bankruptcy Court, (h) attendance at hearings in respect of the chapter 11 case, (i) any refinancing or restructuring of the DIP Loans in the nature of a "work-out," and (j) defending and prosecuting any actions or proceedings arising out of or relating to the DIP Obligations or any transactions related to arising in connection with the

(Page | 32)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

DIP Loan Documents; *provided* that, in the case of each of the foregoing clauses (a)-(j), such fees, costs, and expenses of counsel shall be limited to one law firm on behalf of all DIP Secured Parties and, to the extent necessary, one local counsel in each relevant jurisdiction (and in the case of an actual or perceived conflict of interest, one additional law firm on behalf of the affected DIP Secured Party). Each professional or party shall provide copies of applicable invoices (which invoices may be redacted or summarized for protection of an applicable privilege or the work product doctrine) (the fees thereunder, the "**Invoiced Fees**") to lead restructuring counsel to CCA, counsel to any statutory creditors' committee, and the U.S. Trustee, and any other party as directed by the Court, which invoices shall, for any law firm or other counsel, include (i) a general, brief description of the nature of the matters for which services were performed, (ii) a list of the relevant attorneys and total hours billed by each for the relevant period, and (iii) such other detail regarding the Invoiced Fees as the U.S. Trustee may reasonably request to be provided on a confidential basis. Any objections raised by CCA, the U.S. Trustee, or any statutory creditors' committee, or any other party provided invoices as directed by the Court challenging any portion of the Invoiced Fees (such portion, the "**Disputed Invoiced Fees**") must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional or party within 10 business days of receipt (the "**Review Period**") and, if after the Review Period an objection remains unresolved, such objection will be subject to resolution by the Court. After the Review Period, the undisputed portion of Invoiced Fees will be paid promptly by CCA, without the necessity of filing formal fee applications, regardless of whether such amounts arose or were incurred before or after the Petition Date.

(Page | 33)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Notwithstanding the foregoing, CCA is authorized to pay any such costs, fees, and expenses required as a condition precedent to the obligations of the DIP Lenders pursuant to the DIP Credit Agreement without the need to provide notice to any other party or otherwise comply with the procedures set forth in this paragraph 13 and without any further application to or order of this Court.  CCA shall pay any Disputed Invoiced Fees promptly upon resolution of the objection, including to the extent resolved through approval by the Court, to the extent of such approval.  In no event shall any invoice or other statement submitted by any DIP Secured Party to CCA, any statutory creditors' committee, the U.S. Trustee, or any other interested person (or any of their respective Professionals) with respect to fees or expenses incurred by any professional retained by such DIP Secured Party operate to waive the attorney/client privilege, the work-product doctrine, or any other evidentiary privilege or protection recognized under applicable law.

14.    <u>Amendments and Waivers</u>. CCA and the DIP Secured Parties are hereby authorized to enter into, in accordance with the terms of the applicable DIP Loan Documents and without further order of the Court, any amendments to, modifications of, or waivers with respect to any of such DIP Loan Documents (and the payment of any fees, expenses, or other amounts payable in connection therewith) on the following conditions:  (a) the amendment, modification, or waiver must not constitute a material change to the terms of such DIP Loan Document; and (b) copies of the amendment, modification, or waiver must be served upon counsel for any statutory creditors' committee and the U.S. Trustee.  Any amendment, modification, or waiver that constitutes a material change, to be effective, must be approved by

| Debtor: | CCA Construction, Inc. |
|---|---|
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

the Court.  For purposes hereof, a "material change" shall mean a change to a DIP Loan Document that operates to shorten the term of the DIP Facility or the maturity of the DIP Obligations, to increase the aggregate amount of the DIP Commitments, to increase the rate of interest other than as currently provided in or contemplated by such DIP Loan Documents, to add specific Events of Default, or to enlarge the nature and extent of remedies available to the DIP Agent following the occurrence of an Event of Default.  Without limiting the generality of the foregoing, no amendment of a DIP Loan Document that postpones or extends any date or deadline therein or herein (including the expiration of the term of a DIP Facility), nor any waiver of an Event of Default, shall constitute a "material change" and any such amendment or waiver may be effectuated by CCA and the applicable DIP Secured Parties without the need for further approval of the Court.

15.  <u>Events of Default; Remedies</u>.

(a)  <u>Notice of Default</u>.  Upon the occurrence of an Event of Default under (and as defined in) any DIP Loan Document and during the continuance thereof:  (i) the DIP Lenders may declare, on a pro rata basis, all or any portion of the DIP Facility and DIP Commitments to be suspended or terminated, whereupon such DIP Facility and DIP Commitments shall forthwith be suspended or terminated; (ii) CCA shall have no right to request any extension of credit under the DIP Facility or to use DIP Loan Proceeds or any Collateral or proceeds of Collateral other than towards the satisfaction of the DIP Obligations and the Carve Out pursuant to this Interim Order and the other DIP Loan Documents, and (iii) subject to the terms of the DIP Credit Agreement, the DIP Agent

(Page | 35)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

may in its discretion serve upon counsel for CCA, counsel for any statutory creditors' committee, and the U.S. Trustee a written notice (a "**Default Notice**") setting forth the Events of Default, in which event (unless the Court determines that no Event of Default exists or continues to exist, after notice and a hearing) effective five business days after the Default Notice is filed (the "**Remedies Notice Period**"), the DIP Agent shall be deemed to have received complete relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code (and any other stay then in effect) and shall be authorized, without further notice to CCA or any other interested party or any further order of this Court, to (A) declare all or any portion of the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other DIP Obligations and other amounts owing or payable under any of the DIP Loan Documents, to be immediately due and payable, (B) demand payment and enforce collection of all DIP Obligations, and (C) otherwise exercise all rights and remedies available to them under the DIP Loan Documents, as applicable.  During the Remedies Notice Period, CCA and any statutory creditors' committee shall be entitled to seek an emergency hearing with the Court (such hearing, a "**Remedies Hearing**").  In any Remedies Hearing, subject to entry of the Final Order, CCA shall waive its right to and shall not be entitled to seek relief, including under section 105 of the Bankruptcy Code, to the extent that such relief would impair or restrict the rights and remedies of the DIP Agent as set forth in this Interim Order or in any of the other DIP Loan Documents, and the only issue that may be raised by CCA is whether an Event of Default has in fact occurred.  Prior to the adjudication of

(Page | 36)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

the Remedies Hearing, CCA may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of an Event of Default) solely to fund essential operations in accordance with past practice, the DIP Loan Documents, and the Approved Budget. Upon the effectiveness of any relief from the automatic stay granted or deemed to have been granted pursuant to this paragraph 15(a), the DIP Agent may, in its discretion, take all actions and exercise all other rights and remedies under this Interim Order, the other DIP Loan Documents, and applicable law that may be necessary or deemed appropriate to collect any of the DIP Obligations, and otherwise enforce any of the provisions of this Interim Order and the other DIP Loan Documents.  The DIP Agent's delay or failure to exercise rights and remedies under any DIP Loan Documents, this Interim Order, or applicable law shall not constitute a waiver of any of its rights and remedies hereunder, thereunder, or otherwise, unless any such waiver is pursuant to a written instrument executed by the DIP Agent.

(b)    <u>Rights Cumulative</u>. The rights, remedies, powers, and privileges conferred upon any DIP Secured Party pursuant to this Interim Order shall be in addition to and cumulative with those contained in the other applicable DIP Loan Documents and created under applicable law.

16.    <u>Modification of Automatic Stay</u>. The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to implement the provisions of this Interim Order and the other DIP Loan Documents, thereby permitting the DIP Agent, as and to the extent provided herein, to receive proceeds of the Collateral for application to the DIP

(Page | 37)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Obligations, to file or record any UCC-1 financing statements, mortgages, deeds of trust, assignments, pledges, security deeds, or other instruments and documents evidencing or validating the perfection of any DIP Liens, and to enforce any DIP Liens.

17.     <u>Effect of Appeal</u>. Consistent with section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Interim Order are hereafter modified or reversed, such modification or reversal on appeal shall not affect the validity of any debt so incurred, or any liens or priorities granted by CCA to any DIP Secured Party, prior to the effective date of such modification or reversal, whether or not any such entity knew of the appeal, unless the authorization and incurring of such debt, or the granting of such lien or priority, were stayed pending appeal.

18.     <u>Service of Interim Order</u>. Promptly after the entry of this Interim Order, CCA shall serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing.

19.     <u>No Deemed Control; Exculpation</u>.

(a)     Subject to entry of the Final Order, in determining to make any DIP Loans under the DIP Loan Documents, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the other DIP Loan Documents, no DIP Secured Party shall be deemed to be in control of CCA or its operations with respect to the operation or management of such Debtor, nor shall the DIP Secured Parties (in their respective capacities as such) owe any fiduciary duty to CCA, its creditors, shareholders, or estate.

(Page | 38)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

(b)    None of the DIP Loan Documents or any other document related to the DIP Facility shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Secured Party any liability for any claims arising from the prepetition or postpetition activities of CCA in the operation of its business or in connection with its restructuring efforts.  So long as a DIP Secured Party complies with its obligations under the applicable DIP Loan Documents and applicable law: (i) such DIP Secured Party shall not, in any way or manner, be liable or responsible for (A) the safekeeping of the DIP Collateral, (B) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (C) any diminution in the value thereof, or (D) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person or entity; and (ii) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by CCA.

20.    <u>Binding Effect; Successors and Assigns</u>. The provisions of this Interim Order shall be binding upon all parties in interest in this chapter 11 case and any Successor Case, including but not limited to CCA, the DIP Secured Parties, and their respective successors and assigns (including any chapter 11 or chapter 7 trustee hereafter appointed for the estate of CCA, any examiner appointed pursuant to section 1104 of the Bankruptcy Code, any statutory creditors' committee, or any other fiduciary appointed as a legal representative of CCA or with respect to any property of the estate of CCA), and shall inure to the benefit of CCA, the DIP Secured Parties, and each of their respective successors and assigns.  In no event shall any DIP Secured Party have any obligation to make DIP Loans to, or permit the use of the Collateral by,

(Page | 39)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

any chapter 7 trustee, chapter 11 trustee, or similar responsible person appointed or elected for the estate of CCA.

21.     <u>Objections Overruled</u>. Any and all objections to the relief requested in the Motion, to the extent that such objections are to entry of this Interim Order and that have not otherwise been withdrawn, waived, or resolved by consent at or before the Interim Hearing, and all reservations of rights included therein, are hereby OVERRULED and DENIED.

22.     <u>Final Hearing</u>. The Final Hearing shall be held on **January [●], 2025**, at **[Time] (Eastern Time)**. If any or all of the provisions of this Interim Order are modified, vacated, or stayed by the Final Order, then any DIP Obligations incurred prior to the effective date of such modification, vacatur, or stay shall be governed in all respects by the provisions of this Interim Order, and the DIP Secured Parties shall be entitled to the protections afforded under section 364(e) of the Bankruptcy Code and to all the rights, remedies, privileges, and benefits, including, the DIP Liens and DIP Superpriority Claims granted herein and pursuant to the DIP Loan Documents, with respect to all such DIP Obligations.

23.     <u>Objection Deadline</u>. If any party in interest objects to any of the provisions of this Interim Order being approved on a final basis, such party may assert such objection at the Final Hearing through a written statement setting forth the basis for such objection that is filed with the Court on or before **January [•], 2025**, at **[Time] (Eastern Time)** and concurrently served upon and actually received by (a) proposed counsel to CCA, Debevoise & Plimpton LLP, 66 Hudson Boulevard East, New York, NY 10011 (Attn: M. Natasha Labovitz, Sidney P. Levinson,  Elie J. Worenklein and Shefit Koboci), and Cole Schotz P.C., Court Plaza North, 25

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Main Street, Hackensack, NJ 07601 (Attn: Michael D. Sirota, Warren A. Usatine, Felice R. Yudkin and Ryan T. Jareck), (b) the Office of the United States Trustee for the District of New Jersey; (c) counsel to the DIP Lenders, Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, New Jersey 07068 (Attn: Jeffrey Cohen and Andrew Behlmann); and (d) counsel to any statutory creditors' committee appointed in this chapter 11 case. If an objecting party fails to appear at the Final Hearing and assert the basis for such objection before the Court, such objection shall be deemed to have been waived and abandoned by such objecting party.

24.    <u>Conditions Precedent</u>. No DIP Lender shall have any obligation to make any DIP Loans, or otherwise fulfil any obligation of such DIP Lender set forth in the DIP Loan Documents, unless the conditions precedent to making such extensions of credit or fulfilling any such obligation under the DIP Loan Documents have been satisfied in full or waived in accordance with the DIP Loan Documents.

25.    <u>Effectiveness; Enforceability</u>. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Interim Order; and any stay of the effectiveness of this Interim Order that might otherwise apply is hereby waived for cause shown.

(Page | 41)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

26.    <u>Inconsistencies</u>. To the extent that any provisions in the other DIP Loan Documents is inconsistent with any of the provisions of this Interim Order, the provisions of this Interim Order shall govern and control.

27.    <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

## ANNEX A

**DIP Credit Agreement**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of

December 23, 2024,

by and among

**CCA CONSTRUCTION, INC.,**

as the Borrower and Debtor-in-Possession,

**CSCEC Holding Company, Inc.**,

as the Agent,

and

**THE OTHER PERSONS PARTY HERETO**,

as the Lenders

# TABLE OF CONTENTS

ARTICLE I THE CREDIT ................................................................................................ 1

    1.1.    Amounts and Terms of Commitments .................................................. 1
    1.2.    Evidence of Loans; Notes ..................................................................... 2
    1.3.    Interest, Fees, and Other Amounts ..................................................... 2
    1.4.    Procedure for Borrowing .................................................................... 3
    1.5.    Payments by the Borrower .................................................................. 3
    1.6.    Optional Prepayments ......................................................................... 5
    1.7.    Mandatory Prepayments ..................................................................... 5
    1.8.    Termination Date ................................................................................. 5

ARTICLE II CONDITIONS PRECEDENT ................................................................... 6

    2.1.    Conditions to Effectiveness of Credit Agreement .............................. 6
    2.2.    Conditions to Each Borrowing ............................................................ 7

ARTICLE III REPRESENTATIONS AND WARRANTIES ......................................... 8

    3.1.    Corporate Existence and Power .......................................................... 8
    3.2.    Corporate Authorization; No Contravention ..................................... 8
    3.3.    Governmental Authorization; Consents .............................................. 8
    3.4.    Binding Effect ...................................................................................... 9
    3.5.    Litigation .............................................................................................. 9
    3.6.    Margin Regulations ............................................................................. 9
    3.7.    Regulated Entities ............................................................................... 9
    3.8.    Ownership and Possession of Property ............................................... 9
    3.9.    Full Disclosure .................................................................................... 9
    3.10.    Sanctions, Foreign Assets Control Regulations, and Anti-Money
           Laundering .......................................................................................... 10
    3.11.    Foreign Corrupt Practices Act .......................................................... 10
    3.12.    Fraudulent Transfer .......................................................................... 10
    3.13.    Payment of Taxes .............................................................................. 10
    3.14.    Collateral ............................................................................................ 11

ARTICLE IV AFFIRMATIVE COVENANTS ............................................................ 11

    4.1.    Notices; Other Information ................................................................ 11
    4.2.    Financial Reporting Requirements ................................................... 11
    4.3.    Compliance with Laws; Maintenance of Existence ........................... 12
    4.4.    Use of Proceeds .................................................................................. 12
    4.5.    Further Assurances ............................................................................ 12
    4.6.    Bankruptcy Matters ........................................................................... 13
    4.7.    OFAC; Anti-Money Laundering ....................................................... 13
    4.8.    Insurance ............................................................................................ 13
    4.9.    Maintenance of Properties; Permits .................................................. 14
    4.10.    Taxes ................................................................................................... 14
    4.11.    Books and Records; Inspection ......................................................... 14
    4.12.    Environmental .................................................................................... 14
    4.13.    Disclosure Updates ............................................................................ 14

4.14.   Further Assurances................................................................................. 15
4.15.   Approved Budget ................................................................................... 15

ARTICLE V NEGATIVE COVENANTS ............................................................ 15

5.1.    Limitation on Liens................................................................................ 15
5.2.    Margin Stock; Use of Proceeds............................................................. 15
5.3.    Bankruptcy Matters............................................................................... 15
5.4.    Restrictions on Fundamental Changes................................................... 16
5.5.    Disposal of Assets................................................................................. 16
5.6.    Change Name ........................................................................................ 16
5.7.    Nature of Business ................................................................................ 16
5.8.    Change of Control ................................................................................. 17
5.9.    Accounting Methods ............................................................................. 17
5.10.   Transactions with Affiliates ................................................................. 17
5.11.   Chapter 11 Case .................................................................................... 17
5.12.   Plan ....................................................................................................... 17
5.13.   Acquisitions, Loans or Investments...................................................... 17
5.14.   Payments on Indebtedness .................................................................... 17
5.15.   Restricted Transactions......................................................................... 17
5.16.   Termination or Severance Payments ..................................................... 17

ARTICLE VI SUPERPRIORITY CLAIMS, COLLATERAL, ETC......................... 18

6.1.    Grant of Security................................................................................... 18
6.2.    Administrative Priority ......................................................................... 18
6.3.    No Filings Required............................................................................... 18
6.4.    No Discharge; Survival of Claims ........................................................ 18
6.5.    Prohibition on Surcharge; Etc............................................................... 18
6.6.    Marshalling Obligations ....................................................................... 19

ARTICLE VII EVENTS OF DEFAULT ............................................................ 19

7.1.    Events of Default .................................................................................. 19
7.2.    Remedies............................................................................................... 21
7.3.    Rights Not Exclusive ............................................................................ 23
7.4.    Credit Bidding....................................................................................... 23

ARTICLE VIII THE AGENT ........................................................................... 23

8.1.    Authorization and Action...................................................................... 23
8.2.    The Agent Individually ......................................................................... 23
8.3.    Duties of the Agent:  Exculpatory Provisions....................................... 24
8.4.    Reliance by the Agent ........................................................................... 24
8.5.    Delegation of Duties ............................................................................. 25
8.6.    Resignation of the Agent ...................................................................... 25
8.7.    Non-Reliance on the Agent and Other Lenders ..................................... 26
8.8.    Indemnification ..................................................................................... 26
8.9.    Authorization to Credit Bid .................................................................. 27

Page

ARTICLE IX MISCELLANEOUS .................................................................................. 28

    9.1.    Amendments and Waivers ........................................................................ 28
    9.2.    Notices ....................................................................................................... 29
    9.3.    No Waiver; Cumulative Remedies ........................................................ 29
    9.4.    Costs and Expenses; Yield Protection; Indemnity; Etc. ...................... 29
    9.5.    Payments Set Aside .................................................................................. 32
    9.6.    Assignments ............................................................................................. 32
    9.7.    Binding Effect .......................................................................................... 32
    9.8.    Counterparts; Facsimile Signature ........................................................ 33
    9.9.    Severability .............................................................................................. 33
    9.10.   Captions ................................................................................................... 33
    9.11.   Independence of Provisions ................................................................... 33
    9.12.   Interpretation .......................................................................................... 33
    9.13.   No Third Parties Benefited .................................................................... 33
    9.14.   Governing Law and Jurisdiction ........................................................... 33
    9.15.   Waiver of Jury Trial ............................................................................... 34
    9.16.   Entire Agreement; Release; Survival .................................................... 34
    9.17.   Patriot Act ............................................................................................... 35

ARTICLE X DEFINITIONS ........................................................................................... 35

    10.1.   Defined Terms ......................................................................................... 35
    10.2.   Other Interpretive Provisions ................................................................ 44
    10.3.   Accounting Terms and Principles .......................................................... 45

## SCHEDULES

| | |
|---|---|
| Schedule 1.1 | Term Loan Commitments |
| Schedule 5.1 | Liens existing on the Closing Date |
| Schedule 5.4(b) | Indebtedness existing on the Closing Date |

## EXHIBITS

| | |
|---|---|
| Exhibit I | Approved Budget |

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This **DEBTOR-IN-POSSESSION CREDIT AGREEMENT** (as amended, restated, replaced, supplemented, or otherwise modified from time to time, this "Agreement") is entered into as of December 23, 2024, by and among **CCA CONSTRUCTION, INC.**, a Delaware corporation and a debtor and debtor-in-possession ("CCA," the "Borrower" or "Debtor"), **CSCEC HOLDING COMPANY, INC.**, as agent for the Lenders (solely in such capacity, together with its successors and assigns in such capacity, the "Agent") and the other Persons from time to time party hereto, as lenders (collectively, the "Lenders" and each a "Lender").

WITNESSETH:

WHEREAS, on December 22, 2024 (the "Petition Date"), the Borrower filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case is being administered as Bankruptcy Case No. [●] (the "Chapter 11 Case") before the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court");

WHEREAS, the Borrower has requested that the Lenders make available for the purposes specified in this Agreement the credit facilities set forth herein; and

WHEREAS, the Lenders are willing to make available to the Borrower such credit facilities on the terms and under the conditions set forth herein.

NOW, THEREFORE, in consideration of the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent, and warrant as follows:

## ARTICLE I
## THE CREDIT

1.1.    Amounts and Terms of Commitments.

(a)     Subject to the terms and conditions of this Agreement and in the DIP Order, each Lender severally and not jointly agrees, subject to satisfaction of the applicable conditions set forth in Article II, to make available to the Borrower a multi-draw term loan facility in an aggregate amount equal to up to $40,000,000, with each Lender's commitment not to exceed the amount set forth opposite such Lender's name in Schedule 1.1 under the heading "Term Loan Commitments" (such amount being referred to herein as such Lender's "Term Loan Commitment," and such amounts collectively the "Term Loan Commitments"); provided that, notwithstanding anything to the contrary herein, (i) upon entry of the Interim DIP Order, a single Borrowing of the Loan shall be available to the Borrower in an amount not exceeding $5,000,000; provided further that, any and all of the Lenders' and Agent's expenses reimbursable hereunder that are incurred prior to the date of the Interim DIP Order shall be deducted from the amount of such first advance, (ii) upon entry of the Final DIP Order, a single Borrowing of the Loan shall be available to the Borrower in an amount equal to $3,000,000, and (ii) thereafter, the remainder of the Term Loan Commitments shall be available to the Borrower in multiple draws of no less than $500,000 per single draw (or, in the event the remaining balance of the Term Loan Commitments is less than $500,000, the full remaining balance of the Term Loan Commitments).

(b)      Amounts borrowed as Loans which are repaid or prepaid (whether as an optional prepayment or a mandatory prepayment) may not be reborrowed.

(c)      The Term Loan Commitments may be reduced (on a ratable basis) as provided in Section 7.2 hereof.

1.2.    Evidence of Loans; Notes.  The Loans made by each Lender with a Term Loan Commitment are evidenced by this Agreement and, if requested by such Lender, a Term Note (in a form reasonably acceptable to such Lender) payable to such Lender in an amount equal to the unpaid principal balance of the Loans held by such Lender.  The Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain accounts or records of each credit extension hereunder, and each assignment and assumption of a Lender's rights and obligations hereunder that is delivered to the Agent, at the Agent's office in a register, which shall set forth the names and addresses of the Lenders, and the Term Loan Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, and the Agent and the Lenders, shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent, as set forth in the Register, in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.

1.3.    Interest, Fees, and Other Amounts.

(a)      Each Loan shall bear interest on the outstanding principal amount thereof from the date when made at a rate per annum equal to 9.50%; provided that, notwithstanding the foregoing, if such interest rate exceeds the maximum interest rate allowed by applicable law, then the interest rate shall instead be the maximum interest rate allowed by applicable law.  Accrued interest on the Loans shall be payable, at the sole option of the Borrower, in cash or in kind, or in a combination of cash and in kind, in arrears, on each Interest Payment Date.  At least five (5) Business Days prior to each Interest Payment Date (but not earlier than ten (10) Business Days prior to such Interest Payment Date), the Borrower may furnish to the Agent written notice of its election to pay the accrued and unpaid interest on some or all of the Loans in cash, rather than in kind. In the absence of such notice, the accrued and unpaid interest on the applicable Loans shall be paid in kind by adding such interest to the principal amount of the applicable Loans.  Following any increase in the principal amount of any Loans, such Loans shall bear interest on such increased principal amount from and after the applicable Interest Payment Date.

(b)      Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the outstanding principal amount thereof at a per annum rate equal to two percentage points (2%) above the per annum rate otherwise applicable hereunder upon notice from the Agent (at the direction of the Required Lenders).  Any such notice may impose interest at the default rate retroactively to the date of the occurrence of the related Event of Default.

(c)     All computations of fees, interest, and other amounts payable under this Agreement shall be made on the basis of a 365-day year and actual days elapsed.  Interest, fees, and other amounts, as applicable, shall accrue during each period during which interest or such fees are computed from the first day thereof to the last day thereof.

(d)     Except to the extent provided to the contrary herein, interest, all fees payable hereunder or under any of the other Loan Documents, and all costs and expenses reimbursable hereunder or under any of the other Loan Documents shall be due and payable, in arrears, on each Interest Payment Date.  Once paid, the fees or any part thereof earned, due, and payable hereunder shall not be refundable under any circumstances (except as expressly provided herein, in the DIP Order or otherwise agreed).  All fees earned, due, and payable hereunder shall be paid in U.S. Dollars in immediately available funds and shall be in addition to any reimbursement of the Lenders' and Agent's reasonable and documented out-of-pocket expenses to the extent reimbursable hereunder.

1.4.     Procedure for Borrowing.

(a)     The Borrower shall request a Borrowing by written notice delivered to the Agent in the form of a Notice of Borrowing reasonably acceptable to the Agent, which notice must be received prior to 12:00 p.m. (New York City time) on the date which is three (3) Business Days prior to the requested Borrowing date. Such Notice of Borrowing shall specify:

(i)     the amount of the Borrowing;

(ii)     the proposed uses of the Borrowing in reasonable detail, which uses must be permitted by Section 4.4 hereof;

(iii)     the requested Borrowing date, which shall be a Business Day; and

(iv)     the account designated by the Borrower for disbursement of funds.

(b)     Following receipt of a Notice of Borrowing and upon satisfaction of the applicable conditions set forth in Article II, each Lender shall, before 12:00 p.m. (New York City time) on the requested Borrowing date (or such other time mutually agreed to by the Lenders and the Borrower), make its ratable portion of the proposed Borrowing available to the account designated by the Borrower in the applicable Notice of Borrowing, in immediately available funds in Dollars.

(c)     Notwithstanding anything to the contrary in this Section 1.4, the Borrower shall not be required to deliver any written notice for the initial Term Loan Commitment of $5,000,000 available upon entry of the Interim DIP Order, and each Lender shall make its ratable portion of the proposed Borrowing available one Business Day after entry of the Interim Order.

1.5.     Payments by the Borrower.

(a)     The Borrower shall repay the full amount of principal outstanding of the Loans, together with all accrued and unpaid interest thereon and all fees and expenses due and owing hereunder, on the earlier of (i) the date of an Acceleration or (ii) the Maturity Date.

(b)      All payments (including prepayments) made by or on behalf of the Borrower on account of principal, interest, fees, and other amounts required hereunder shall be made without set-off, recoupment, or counterclaim of any kind, and shall, except as otherwise expressly provided herein, be made to the Agent (for the ratable account of the Persons entitled thereto) at the address for payment (or account information) specified in the signature page hereof in relation to the Agent (or such other address (or account information) as the Agent may from time to time specify in accordance with Section 9.2), and shall be made in Dollars and in immediately available funds, no later than 12:00 p.m. (prevailing New York City time) on the date due.  All payments received by the Agent after 12:00 p.m. on the date due may be deemed received on the next succeeding Business Day, and any applicable interest or fees shall continue to accrue.  The Agent shall promptly distribute to each applicable Lender its pro rata share of such payment in like funds as received by wire transfer to the account designated by each such Lender to the Agent in writing.

(c)      If any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

(d)      The Obligations of the Borrower under this Agreement shall be adjusted downward by an amount equal to any portion of Shared Services paid by the Debtor on or after the Petition Date that, consistent with pre-petition ordinary course practice, are allocable to any entity that is not a member of the CCA Group.  Such adjustments shall be made on the last day of each calendar month, and any amount of Obligations attributable to such adjustments shall not accrue interest; provided that to the extent that the adjustment is not made with respect to any such portion of Shared Services paid by the Debtor within 60 days of the date that the applicable Obligations are incurred by the Borrower, such Obligations shall accrue interest from the date that such Obligations are incurred until such adjustment is made.  The Agent shall be assigned any Intercompany Claim that exists on account of such allocation of the cost of Shared Services to any entity that is not a member of the CCA Group, and the Agent shall be entitled to seek payment of such Intercompany Claims directly from any entity that is not a member of the CCA Group.   Notwithstanding anything herein to the contrary, in calculating the available amount of Term Loan Commitments, the dollar amount of such adjustments shall be included, as if such amounts remained Obligations, in making such calculation.

(e)      Each payment (excluding scheduled interest and amortization payments, which shall be paid as specified herein) made in respect of the Obligations shall be applied in the following order of priority:

(i)      first, to any fees or expenses due and owing to the Agent or the Lenders hereunder, until all such fees and expenses have been paid in full;

(ii)      second, to accrued and unpaid interest on the Term Loans, until all such accrued and unpaid interest has been paid in full;

(iii)      third, to the then-outstanding principal of the Term Loans, until all such outstanding principal has been paid in full;

-4-

             (iv)    <u>last</u>, to pay any other Obligation, until all such Obligations have been paid in full.

In the event of a direct conflict between the priority provisions of this <u>Section 1.5(d)</u> and any other provision contained in any other Loan Document (except for the DIP Orders), it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this <u>Section 1.5(d)</u> shall control and govern. Notwithstanding the foregoing, to the extent there is a conflict between the DIP Orders and any other Loan Document, the DIP Orders shall control and govern.

    1.6.   <u>Optional Prepayments</u>.  The Borrower may, at any time and from time to time, upon written notice to the Agent, voluntarily prepay the Loans in whole or in part, without any premium or penalty. Such notice must be provided at least three (3) Business Days before the prepayment date and must specify the amount and date of the prepayment. Any prepayment of Loans shall include accrued interest on the amount prepaid. The Borrower may select the specific Borrowing or Borrowings (and the order of maturity) to be prepaid. Prepayments shall be made in full without setoff or deductions, and will be distributed by the Agent to the Lenders according to their ratable shares.

    1.7.   <u>Mandatory Prepayments</u>.

        (a)    Within one (1) Business Day of the date of receipt by the Borrower of the Net Cash Proceeds of any disposition (whether through a voluntary or involuntary sale, the loss, destruction or damage thereof or any actual condemnation, confiscation, requisition, seizure or taking thereof or otherwise) of Collateral (other than the sale or replacement of such Collateral in the ordinary course of business), the Borrower shall prepay such portion of the outstanding amount of the Obligations in accordance with <u>Section 1.5(b)</u> in an amount equal to 100% of the Net Cash Proceeds received in connection with such sale or disposition, solely to the extent that the Net Cash Proceeds from any single disposition exceeds $2.5 million, or if the aggregate Net Cash Proceeds from all dispositions exceeds $10.0 million. Such prepayment shall include insurance proceeds, condemnation awards, and payments in lieu thereof, and accrued interest applied to the amount of such prepayment.  The provisions of this <u>Section 1.7(a)</u> shall not be deemed to be implied consent to any disposition of Collateral otherwise prohibited by the terms and conditions of this Agreement.

        (b)    Within one (1) Business Day of the date of incurrence by the Borrower of any Indebtedness (other than Permitted Indebtedness)that is *pari passu* or senior in priority to the Loans hereunder, the Borrower shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 1.5(b)</u> in an amount equal to 100% of the proceeds received by such Person in connection with the incurrence of such Indebtedness plus the accrued interest as applied to the principal amount of such prepayment.  The provisions of this <u>Section 1.7(b)</u> shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms and conditions of this Agreement.

    1.8.   <u>Termination Date</u>. The Term Loan Commitments shall automatically be reduced to zero and terminate upon the earliest of (A) an Acceleration, (B) the Maturity Date; or (C) the termination of the Term Loan Commitments in accordance with <u>Section 7.2</u> hereof.

## ARTICLE II
## CONDITIONS PRECEDENT

2.1.    <u>Conditions to Effectiveness of Credit Agreement</u>.    The effectiveness of this Agreement and the obligation of each Lender to advance any Loan hereunder is subject to satisfaction or waiver by the Lenders (in their sole discretion) of the following conditions:

(a)    <u>Credit Agreement</u>.    The Lenders and the Agent shall have received a counterpart of this Agreement executed by the Borrower.

(b)    <u>Collateral Matters</u>.    Subject to <u>Section 4.9</u>, the Agent and the Lenders shall have received (i) fully executed copies of each Collateral Document, and (ii) valid and perfected Liens on the Collateral and each UCC and any other financing statement and each document required by any Collateral Document or any applicable Requirements of Law to be filed, registered, or recorded in order to create in favor of the Agent, for the benefit of the Lenders, a valid and perfected Lien on the Collateral required to be delivered pursuant to each Collateral Document shall be in proper form for filing, registration, or recording.

(c)    <u>Approved Budget</u>.    The Lenders shall have received 13-week cash flow projections prepared by the Borrower, in form and substance acceptable to the Required Lenders (as shown on <u>Exhibit I attached hereto</u>, the "<u>Approved Budget</u>") on or prior to the Closing Date.

(d)    <u>DIP Order</u>.    The Interim DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, and shall not have been modified, amended, reversed, stayed or subject to a motion for re-argument or reconsideration, appealed, or vacated (unless, in each case set forth above, otherwise agreed to by the Required Lenders).

(e)    <u>Payment of Fees and Expenses</u>.    The Borrower shall have reimbursed the Agent and the Lenders for fees, costs, and expenses due and owing pursuant to <u>Section 9.4</u> (in each case, to the extent invoiced at least one (1) Business Day in advance).

(f)    <u>Litigation/Proceedings</u>.    Other than the Chapter 11 Case, there shall be no order, injunction or pending litigation that is not stayed in which there is a reasonable possibility of a decision that would have a Material Adverse Effect and no action, proceeding, investigation, regulation, legislation, or litigation shall have been instituted or threatened before any Governmental Authority seeking to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the transactions contemplated hereby and thereby and which, in the Lenders' reasonable judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents.

(g)    <u>Secretary's Certificate</u>.    The Agent shall have received a customary secretary's certificate for the Borrower attaching (i) the Borrower's articles of incorporation or organization or other similar document, certified by the applicable government authority, (ii) the Borrower's bylaws or operating agreement, (iii) the resolutions of the Borrower's board of directors or other appropriate governing body approving and authorizing the execution, delivery, and performance the Loan Documents, and (iv) incumbency specimens.

(h)    <u>Other Information</u>.  (i) The Agent and the Lenders shall have received all documentation and other information about the Borrower that they reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering laws, including the Patriot Act, and (ii) the Agent and the Lenders shall have received and be satisfied with such other information (financial or otherwise) or documentation with respect to the Borrower or the Chapter 11 Case reasonably requested by the Agent or the Lenders, as applicable.

(i)    <u>Representations and Warranties</u>.  All representations and warranties by the Borrower contained herein or in any other Loan Document shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representation or warranty shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date).

(j)    <u>No Default</u>.  No Default or Event of Default shall have occurred or shall be continuing or would result after giving effect to this Agreement and the other Loan Documents.

(k)    <u>UCC and Lien Searches</u>. The Agent shall have received appropriate UCC, tax, judgment, and mortgage search results and title reports, or their local equivalents, for the Borrower in its jurisdiction of organization and any other jurisdiction reasonably requested by the Lenders, in each case satisfactory to the Lenders in their sole discretion.

2.2.    <u>Conditions to Each Borrowing</u>.  The obligation of each Lender to advance any Loan hereunder is subject to satisfaction or waiver by the Lenders of the following conditions, each as of the date of such Borrowing:

(a)    <u>Borrowing Notice</u>.  The Agent shall have received a Notice of Borrowing in accordance with <u>Section 1.4(a)</u>.

(b)    <u>DIP Order</u>.  (x) With respect to any Borrowing during the Initial Commitment Period, the Interim DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed or subject to a motion for re-argument or reconsideration, appealed, or vacated (unless, in each case set forth above, otherwise agreed to by the Required Lenders) and (y) with respect to any Borrowing following the expiration of the Initial Commitment Period, the Final DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed or subject to a motion for re-argument or reconsideration, appealed, or vacated (unless, in each case set forth above, otherwise agreed to by the Required Lenders).

(c)    <u>Representations and Warranties</u>.  All representations and warranties by the Borrower contained herein or in any other Loan Document shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of the date of such Borrowing, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representation or warranty shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date).

(d)    <u>No Default</u>.  No Default or Event of Default shall have occurred or shall be continuing or would result after giving effect to any Loans.

-7-

The request by the Borrower and acceptance by the Borrower of the proceeds of any Loan shall be deemed to constitute, as of the date thereof and the date of such Borrowing, a representation and warranty by the Borrower that the conditions in this Section 2.2 have been satisfied.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Agent and each Lender that the following are, and after giving effect to the funding of any Loan will be, true, correct, and complete in all respects:

3.1.    Corporate Existence and Power.  The Borrower:

(a)    is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation, organization, or formation, as applicable;

(b)    has the power and authority and all governmental licenses, authorizations, Permits, consents, and approvals to own its assets, carry on its business as now conducted and as proposed to be conducted, and, subject to the entry of the DIP Order, to execute, deliver, and perform its obligations under the Loan Documents to which it is a party;

(c)    is duly qualified and licensed and in good standing, under the laws of each jurisdiction where its ownership, lease, or operation of Property or the conduct of its business requires such qualification or license; and

(d)    is in compliance with all Requirements of Law, except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2.    Corporate Authorization; No Contravention.  Subject to the entry of the DIP Order, the execution, delivery, and performance by the Borrower of this Agreement and each other Loan Document shall have been duly authorized by all necessary corporate action, and do not and will not:

(a)    contravene the terms of any of the Borrower's Organization Documents;

(b)    other than as a result of the commencement of the Chapter 11 Case, conflict with or result in any breach or contravention of, or result in the creation of any Lien under, any document evidencing any contractual obligation to which the Borrower is a party or any order, injunction, writ, or decree of any Governmental Authority to which the Borrower or its Property is subject; or

(c)    violate any Requirement of Law binding on the Borrower or its Property, except to the extent that any such violation would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.3.    Governmental Authorization; Consents.  Subject to the entry of the DIP Order, no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the

-8-

Borrower's operation of its business or the execution, delivery or performance by, or enforcement against, the Borrower of this Agreement or any other Loan Document except (a) recordings and filings in connection with the Liens granted to the Agent under the Collateral Documents and (b) those obtained or made on or prior to the date hereof.

3.4.    <u>Binding Effect</u>.  Subject to the entry of the DIP Order, this Agreement and each other Loan Document shall constitute the legal, valid, and binding obligations of the Borrower, enforceable against the Borrower in accordance with its respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

3.5.    <u>Litigation</u>.  Except for audits conducted by taxing authorities in the ordinary course of business and any related actions, suits, proceedings, claims, or disputes, or claims and disputes arising in connection with the Chapter 11 Case, there are no actions, suits, proceedings, claims, or disputes pending, or to the best knowledge of the Borrower, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, against the Borrower or any of its Properties which (a) purport to affect or pertain to this Agreement, any other Loan Document, or any of the transactions contemplated hereby or thereby or (b) either individually or in the aggregate, if determined adversely, would reasonably be expected to have a Material Adverse Effect.

3.6.    <u>Margin Regulations</u>.  The Borrower is not engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.

3.7.    <u>Regulated Entities</u>.  None of the Borrower, any Person controlling the Borrower, or any controlled subsidiary of the Borrower, is (a) an "investment company" within the meaning of the Investment Company Act of 1940 or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other federal or state statute, rule, or regulation limiting its ability to incur indebtedness or perform its Obligations under the Loan Documents.

3.8.    <u>Ownership and Possession of Property</u>.  The Borrower has (i) good, sufficient, and legal title to, and (ii) good and marketable title to (in the case of personal property), the Collateral as is necessary or used in the ordinary conduct of its business.

3.9.    <u>Full Disclosure</u>.  None of the representations or warranties made by the Borrower in the Loan Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement, or certificate furnished by or on behalf of the Borrower in connection with the Loan Documents (including the offering and disclosure materials, if any, delivered by or on behalf of the Borrower to the Agent or the Lenders prior to the date hereof), contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered; <u>provided</u> that with respect to any projections, the Borrower represents only that such projections were prepared in good faith based upon estimates, information, and assumptions believed to be reasonable.

3.10.   <u>Sanctions, Foreign Assets Control Regulations, and Anti-Money Laundering</u>.  To the extent applicable, the Borrower and each controlled subsidiary of the Borrower are in compliance in all material respects with all applicable economic sanctions laws, executive orders and implementing regulations of the United States, including but not limited to those promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("<u>OFAC</u>"), and of the United Nations Security Council, the European Union or any member state thereof, and the United Kingdom, and any other similar laws to which the Borrower and any of its controlled subsidiaries are subject ("<u>Sanctions</u>"), and all applicable anti-money laundering and counter-terrorism financing laws, including the U.S. Money Laundering Control Act, the Bank Secrecy Act and all regulations issued pursuant to it, and any other similar laws to which the Borrower and any of its controlled subsidiaries are subject.  None of the Borrower or any of its controlled subsidiaries, or (to the Borrower's knowledge) any of their respective directors, officers, employees, or agents is organized, resident, or located in a country or territory that is itself the target of comprehensive or country-wide sanctions at any relevant time (currently Cuba, Iran, Syria, North Korea, Sudan, the Crimea region, and the so-called Donetsk People's Republic and Luhansk People's Republic), or is otherwise the subject or target of any Sanctions or is owned or controlled by one or more Person that are the subject or target of any Sanctions, including but not limited to (a) a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "<u>SDN List</u>") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (b) a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person, or (c) a Person controlled by (including by virtue of the sanctioned person or entity being a director or owning voting shares or interests), or who is acting, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law.  No part of the proceeds will be used directly or indirectly for the purpose of financing, or with respect to, any activities or business of or with any country or person that is the subject or target of Sanctions.

3.11.   <u>Foreign Corrupt Practices Act</u>.  No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain, or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

3.12.   <u>Fraudulent Transfer</u>. No transfer of property is being made by the Borrower and no obligation is being incurred by the Borrower in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay or defraud either present or future creditors of the Borrower.

3.13.   <u>Payment of Taxes</u>. All United States federal, state and local and non-U.S. tax returns and reports of the Borrower required to be filed by the Borrower or with respect to the Collateral have been filed.  All United States federal, state and local and non-U.S. Taxes, assessments, fees and other governmental charges levied or imposed upon the Borrower or the Borrower's properties, income or assets or upon any Collateral, in each case, that are due and payable have been paid (whether or not shown on any tax return), other than Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are being maintained in accordance with GAAP. The Borrower has satisfied all of its material withholding Tax obligations. The Borrower

is not aware of any proposed Tax assessment against the Borrower or the Collateral with respect to United States federal, state or local or non-U.S. Taxes.

3.14.  Collateral.

(a)    Subject to the approval of the Bankruptcy Court, the Borrower has full right and power to grant to the Agent a perfected, security interest and Lien, in accordance with the required lien priority, on the Borrower's respective interests in the Collateral pursuant to this Agreement and the other Loan Documents.

(b)    Subject to the approval of the Bankruptcy Court, upon (i) the execution and delivery of this Agreement, and (ii) the filing of the necessary financing statements and other appropriate filings or recordations and/or delivery of any necessary certificates, as applicable, the Agent will have a good, valid and perfected Lien and security interest in the Collateral granted by the Borrower, in accordance with the required lien priority, subject to no transfer or other restrictions or Liens of any kind in favor of any other Person.

(c)    To the best of the Borrower's knowledge, no financing statement, mortgage or any other evidence of lien relating to any of the Collateral granted by the Borrower is on file in any public office except those on behalf of the Agent.

(d)    To the best of the Borrower's knowledge it is not party or otherwise subject to any agreement, document or instrument that conflicts with this Section 3.14.

ARTICLE IV
AFFIRMATIVE COVENANTS

The Borrower covenants and agrees that, so long as any Lender shall have any Term Loan Commitment hereunder, or any Loan shall remain unpaid, unsatisfied or outstanding:

4.1.  Notices; Other Information.

(a)    The Borrower shall promptly forward or make available to the Agent and the Lenders any such business, financial, corporate affairs and other information regarding the Borrower, its subsidiaries, and the Collateral as the Agent or any Lender may from time to time reasonably request.  For the avoidance of doubt, each Lender may share any such information, on a confidential basis, with any of such Lender's affiliates, employees, and financing sources.

(b)    The Borrower shall deliver to the Agent and the Lenders (i) promptly upon it becoming aware of any Default, notice of such default, and (ii) promptly upon becoming aware of any litigation threatened in writing against the Borrower or filed (other than any adversary proceeding filed in the Chapter 11 Case), or any event (other than events of public knowledge in the Chapter 11 Case), which would reasonably be expected to have a Material Adverse Effect, notice of such event.

4.2.  Financial Reporting Requirements.

(a)    The Borrower shall deliver to each Lender, in a form satisfactory to the Lenders, in their sole discretion, as soon as practically available in the ordinary course of business,

but in any event no later than: (i) 60 days following the end of each of the first three quarterly periods of each fiscal year, a copy of the unaudited consolidated financial statements of the Borrower and its consolidated subsidiaries as at the end of such quarter, consisting of a balance sheet, and related statements of operations, income, retained earnings, and owners' equity balance sheet of the Borrower and its consolidated subsidiaries for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case, in comparative form the figures for and as of the corresponding periods of the previous year, and (ii) 120 days following the end of each fiscal year, a copy of the unaudited consolidated financial statements of the Borrower and its consolidated subsidiaries as at the end of such fiscal year, consisting of a balance sheet, and related statements of operations, income, retained earnings, and owners' equity balance sheet of the Borrower and its consolidated subsidiaries for such fiscal year, setting forth in each case, in comparative form the figures for and as of the corresponding periods of the previous year.

(b)     The Borrower shall deliver to the Lenders, in a form satisfactory to the Lenders, in their sole discretion,  on a monthly basis (commencing on the first Friday after the Closing Date), a report of (i) the Borrower's cash position and (ii) a summary reconciliation of the actual use of proceeds of any previous Borrowing as compared to the anticipated use of proceeds of such Borrowings as set forth in the Approved Budget, in each case, for the week period which ended on the immediately preceding Friday.

(c)     All financial statements shall be prepared, and shall be complete, correct and fairly presenting in all material respects, in each case in accordance with GAAP consistently applied with prior periods the financial position and results of operations of the Borrower (provided that interim financial statements shall not be required to have footnote disclosure and may be subject to normal year-end adjustments). The Borrower agrees to maintain a system of accounting that enables the Borrower to produce unaudited financial statements in accordance with GAAP.

4.3.    Compliance with Laws; Maintenance of Existence.  The Borrower (a) shall comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except where the failure to comply would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, (b) shall preserve, renew, and keep in full force and effect its organizational existence (including being in good standing in its jurisdiction of incorporation or formation), and (c) shall take all reasonable action to maintain all necessary or desirable governmental licenses, authorizations, Permits, consents, and approvals to own its assets and carry on its business.

4.4.    Use of Proceeds.  Subject to the terms of the DIP Order, the proceeds of the Loans shall be used solely to (a) pay reasonable fees, costs, and expenses of the Agent and Lenders as contemplated by the Loan Documents, (b) provide working capital and for other general corporate purposes of the Borrower and, to the extent authorized by the Bankruptcy Court, its non-Debtor affiliates, and (c) pay professional fees and other administration costs of the Chapter 11 Case.

4.5.    Further Assurances.  Without any further order of the Bankruptcy Court, promptly upon request by the Agent (and the Agent shall make such request upon the direction of the Lenders), the Borrower shall take such additional actions and execute such documents as the Agent or the Lenders may reasonably require from time to time in order (a) to carry out more effectively the purposes of this Agreement or any other Loan Document, (b) to subject to the Liens created by any

of the Collateral Documents all of the Collateral, (c) to perfect and maintain the validity, effectiveness, and priority of any of the Collateral Documents and the Liens created thereby, and (d) to better assure, convey, grant, assign, transfer, preserve, protect, and confirm to the Agent and the Lenders the rights granted or now or hereafter intended to be granted to the Agent or the Lenders under any Loan Document.

4.6.    Bankruptcy Matters.

(a)    The Borrower shall comply with the DIP Order in all material respects.

(b)    The Borrower shall deliver to the Agent and the Lenders (i) as soon as practicable in advance of filing with the Bankruptcy Court, the proposed DIP Order and pleadings proposed to be filed seeking approval of the Loans (which, in each case, must be in form and substance reasonably satisfactory to the Agent and the Lenders prior to being filed), any other material filings proposed to be filed in the Chapter 11 Case, any plan of reorganization or liquidation, and any disclosure statement related to such plan; and (ii) reasonable access to information (including historical information) and senior management personnel.

4.7.    OFAC; Anti-Money Laundering.    The Borrower shall comply with the laws, regulations, and executive orders referred to in Sections 3.10 and 3.11.

4.8.    Insurance.    At the Borrower's expense, the Borrower shall maintain insurance with respect to its properties and assets covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses and consistent with the Borrower's usual and customary insurance policies. The Borrower shall maintain general liability, director's and officer's liability insurance, fiduciary liability insurance, employment practices liability insurance, as well as insurance against larceny, embezzlement, and criminal misappropriation. All such policies of insurance shall be with responsible and reputable insurance companies and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy and scope reasonably satisfactory to the Agent. All property insurance policies covering the Collateral are to be made payable to the Agent for the benefit of Lenders, in case of loss, pursuant to a standard loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as the Agent may reasonably require to fully protect the Agent's and Lenders' interest in the Collateral and any payments to be made under such policies. All certificates of property and general liability insurance are to be delivered to the Agent within 15 days of the Petition Date, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of the Agent and shall provide for not less than thirty (30) days (ten (10) days in the case of non-payment) prior written notice to the Agent of the exercise of any right of cancellation. If the Borrower fails to maintain the insurance required by this Section 4.8, Lender may arrange for such insurance, but at the Borrower's expense and without any responsibility on the Agent part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. The Borrower shall give the Agent prompt notice of any loss covered by its casualty or business interruption insurance. Upon the occurrence and during the continuance of an Event of Default, Lender shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder,

and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies; provided, however, that in the event the Agent does not exercise such rights, the Borrower may exercise those rights in its discretion.

4.9.    <u>Maintenance of Properties; Permits</u>.  The Borrower shall (a) maintain and preserve the Collateral that is necessary to the proper conduct of its business in good working order and condition, ordinary wear, tear, and casualty excepted to the extent permitted by the Approved Budget, (b) comply with the material provisions of all material leases related to the Collateral pledged by it, so as to prevent the loss or forfeiture thereof; and (c) maintain, comply with and keep in full force and effect its Permits with respect to the Collateral pledged by it.

4.10.    <u>Taxes</u>.  The Borrower shall or shall cause all assessments and Taxes imposed, levied, or assessed against the Borrower or any Collateral to be paid in full as the same shall become due and payable, before delinquency or before the expiration of any extension period, except to the extent that failure to do so is permitted by an order of the Bankruptcy Court in the Chapter 11 Case or otherwise pursuant to a plan of reorganization approved by the Lenders.

4.11.    <u>Books and Records; Inspection</u>.  The Borrower will maintain proper books of record and account in which entries that are full, true and correct in all material respects and are in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Borrower. The Borrower shall permit the Agent and each of its duly authorized representatives or agent to visit any of its properties and inspect any of its Collateral or books and records, to conduct appraisals and valuations, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as Lender may reasonably require and, so long as no Default or Event of Default exists, with reasonable prior notice to the Borrower. <u>Environmental</u>.  The Borrower shall:

(a)    keep the Collateral owned or operated by it free of any Environmental Liens;

(b)    comply with all applicable Environmental Laws, except where the failure to so comply would not reasonably be expected result in a Material Adverse Effect;

(c)    promptly notify the Agent of any release of which the Borrower has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by the Borrower that would reasonably be expected to result in a Material Adverse Effect; and

(d)    promptly, but in any event within five (5) Business Days of its receipt thereof, provide the Agent with written notice of any of the following: (i) written notice that an Environmental Lien has been filed against any of the Collateral, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against the Borrower, and (iii) written notice of a violation, citation, or other administrative order from a Governmental Authority.

4.13.    <u>Disclosure Updates</u>.  The Borrower shall promptly, and in no event later than three (3) Business Days after obtaining actual knowledge thereof, notify the Agent of any material inaccuracy or material misstatements contained in any schedule or report delivered by or on behalf of the Borrower pursuant to the terms of this Agreement.  The foregoing to the contrary notwithstanding,

any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior material inaccuracy or material misstatement nor shall any such notification have the effect of amending or modifying this Agreement or any of the schedules or reports hereto.

4.14.    Further Assurances.   Upon reasonable written notice from Lender, each Loan Party shall execute or deliver to Lender any and all financing statements, fixture filings, endorsements of certificates of title, mortgages, deeds of trust, and all other documents (collectively, the "Additional Documents") that Lender may reasonably request in form and substance reasonably satisfactory to Lender, to create, perfect, and continue perfected or to better perfect Lender's Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal).

4.15.    Approved Budget.   The Borrower shall comply with the Approved Budget.

ARTICLE V
NEGATIVE COVENANTS

The Borrower hereby covenants and agrees that, on and after the effective date of this Agreement and until the date that the Commitments hereunder have terminated and the principal of and interest on each of the Loans and all fees, expenses, and other amounts payable under any Loan Document (other than contingent indemnification obligations for which no claim or demand has been made) have been satisfied in full, in each case, except as contemplated by an Acceptable Plan, without the prior written consent of the Required Lenders (which may be evidenced by an email from the Agent's counsel), the Borrower will not, and will not permit any of its controlled subsidiaries to, directly or indirectly:

5.1.    Limitation on Liens.   (a) Except as provided in the DIP Order then in effect, make, create, incur, assume, or suffer to exist any Lien upon or with respect to any of its property or assets, including the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, other than Permitted Liens, without the prior written consent of the Required Lenders, or (b) enter into after the date hereof or allow to exist any contractual obligations (other than this Agreement) that limit the ability of the Borrower to create, incur, answer, or suffer to exist Liens on the Collateral in favor of the Lenders with respect to the Loans and the Obligations hereunder.

5.2.    Margin Stock; Use of Proceeds.   Use any portion of the Loan proceeds to purchase or carry Margin Stock or to repay or otherwise refinance indebtedness of others incurred to purchase or carry Margin Stock, or otherwise in any manner which is in contravention of any Requirement of Law or in violation of any Loan Document.

5.3.    Bankruptcy Matters.

(a)      Seek, consent to, incur, assume, create, permit, or suffer to exist (i) any material modification, amendment, stay, or vacation of the DIP Order, without the prior written consent of the Agent and the Lenders, except to the extent required by the Bankruptcy Court or applicable law; (ii) any Bankruptcy Court order materially impacting this financing or the Collateral in the Chapter 11 Case, unless such order is, in form and substance, reasonably satisfactory to the Agent and the Lenders, or as otherwise directed by the Bankruptcy Court; (iii) a claim for any

administrative expense or unsecured claim which is *pari passu* with or senior to the Superpriority Claim of the Agent and the Lenders in respect of the Obligations, except for the Carve-Out; or (iv) any Lien on any Collateral having a priority equal or senior to the Liens in favor of the Agent and the Lenders in respect of the Obligations (subject to the Carve-Out and Permitted Senior Liens).

(b)    Make any material expenditure except of the type and for the purposes provided for in the Approved Budget, provided that the Borrower may make expenditures as permitted by an order of the Bankruptcy Court.

(c)    Take any action reasonably expected to frustrate the effectiveness of this Agreement, without the prior written consent of the Required Lenders, unless otherwise directed by the Bankruptcy Court.

(d)    File a plan of reorganization or any related documents, including a disclosure statement and any plan supplement, that is inconsistent in any material respect with an Acceptable Plan.

5.4.    <u>Restrictions on Fundamental Changes</u>.  (a) Enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its equity interests, (b) liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), (c) suspend or close a material portion of its business, (d) divide into two or more Persons pursuant to a "plan of division" or similar method, or (e) create, or reorganize into, one or more Persons, in each case, as contemplated under the laws of any jurisdiction; provided, however, that the restrictions described in clauses (a) through (e) above shall apply only to the extent that any such transactions do not provide for the payment in full and in cash, of all Loans hereunder.

5.5.    <u>Disposal of Assets</u>.  Convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) (a) all or substantially all of the Collateral; provided, however, that such actions are not prohibited if (i) approved by the Special Committee and the Bankruptcy Court, and (ii) the proceeds from such transaction provides for payment in full and in cash of all DIP Obligations, or (b) any Collateral outside the ordinary course of business; provided, however, that such actions are not prohibited if (i) approved by the Special Committee and the Bankruptcy Court, and (ii) all proceeds from such Collateral are applied to repay the DIP Obligations.

5.6.    <u>Change Name</u>.  Change its name, state of organization, or organizational identity.

5.7.    <u>Nature of Business</u>.  Make any change in the nature of its business or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, that the foregoing shall not prevent the Borrower from (i) engaging in any business that is reasonably

related or ancillary to its or their business, or (ii) complying with any requirement of the Bankruptcy Code.

5.8.    Change of Control.  Cause, permit, or suffer, directly or indirectly, any Change of Control unless such transaction constituting a Change of Control provides for payment in full and in cash of all DIP Obligations.

5.9.    Accounting Methods.  Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP) and as otherwise permitted hereunder.

5.10.    Transactions with Affiliates.  Other than of a type consistent with intercompany arrangements existing on the date hereof, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate on terms that are less favorable to the Borrower or such subsidiary, as the case may be, than those that might be obtained at the time from Persons who are not such an Affiliate.

5.11.    Chapter 11 Case.  Seek, consent or suffer to exist (a) any modification, stay, vacation or amendment to the DIP Orders; (b) in connection with the Collateral, a priority claim for any administrative expense or unsecured claim against the Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in Section 503(b), 506(b) or (c) or 507(b) of the Bankruptcy Code) equal to or superior to the priority claim of the Agent or any Lender in respect to the Collateral; and (c) any Lien on Collateral having a priority equal or superior to the Liens in favor of the Agent in respect of the Obligations.

5.12.    Plan.  Propose and/or support any plan or reorganization that fails to pay in full in cash all Obligations on the effective date of said plan.

5.13.    Acquisitions, Loans or Investments.  Make any acquisition, advance, loan or any other investment of any kind or nature to any Person other than acquisitions of inventory in the ordinary course of the Borrower's business; provided, however, that the Borrower shall be permitted to make any acquisition, advance, loan or any other investment of any kind or nature if approved by the Special Committee and, to the extent necessary, the Bankruptcy Court.

5.14.    Payments on Indebtedness.  Make any payment with respect to any Indebtedness other than with respect to (i) the Obligations, (ii) repayment of prepetition Indebtedness approved by the Bankruptcy Court and (iii) regularly scheduled payments of junior indebtedness that is subordinated in writing to the DIP Obligations on terms reasonably acceptable to the Lenders.

5.15.    Restricted Transactions.  (a) Make a public announcement in respect of, enter into any agreement or letter of intent with respect to, attempt to consummate or support any third party's attempt to consummate any transaction or agreement that would adversely impact the Loans or consummation of an Acceptable Plan, or (b) become a general partner in any general or limited partnership or joint venture.

5.16.    Termination or Severance Payments. Increase any termination or severance entitlement whatsoever or pay any termination or severance pay to executives or any other employees

of the Borrower or any executives or any other employees of the Borrower's subsidiaries by an aggregate amount not to exceed $250,000,.

ARTICLE VI
SUPERPRIORITY CLAIMS, COLLATERAL, ETC.

6.1.    <u>Grant of Security</u>.  To secure the prompt payment and performance of any and all Obligations, the Borrower hereby pledges, assigns, and grants to the Agent, for the benefit of the Lenders, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, effective as of the date of entry of the Interim DIP Order, a valid and automatically perfected first priority Lien and security interest in the Collateral (the "<u>DIP Liens</u>").  The DIP Liens shall exclude avoidance actions under Chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>"), provided that, upon entry of the Final DIP Order, Collateral shall include a senior lien on the proceeds of such Avoidance Actions. The DIP Liens granted herein shall be junior and subordinate in all respects to, but only to, (i) the Carve-Out, (ii) any Permitted Senior Liens, and (iii) shall otherwise be senior to any Prior Liens.

6.2.    <u>Administrative Priority</u>.  The Borrower agrees that all Obligations hereunder shall constitute an allowed Superpriority Claim against it, pursuant to section 364(c)(1) of the Bankruptcy Code; <u>provided</u> that such Superpriority Claims shall be junior and subordinate in all respects to, but only to, the Carve-Out, and, in the case of Superpriority Claims with respect to the DIP Obligations.

6.3.    <u>No Filings Required</u>.  The DIP Liens shall be deemed valid and perfected and duly recorded by entry of the Final DIP Order.  Except for the registrations set forth in <u>Section 4.8</u>, neither the Agent nor the Lenders shall be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Liens granted by or pursuant to the Final DIP Order or this Agreement. Notwithstanding the foregoing, the Borrower irrevocably authorizes the Agent to prepare and file financing statements, including, without limitation, describing such property as "all assets, whether now owned or hereafter acquired, developed or created" or words of similar effect, to perfect the Agent's security interest in the Collateral, in all jurisdictions in which the Agent believes in its sole opinion that such filing is appropriate.  The Borrower also irrevocably authorizes the Agent to file such continuation statements and amendments and to take such other action as may be required or appropriate, in either case, in Agent's sole judgment, in order to perfect and to continue the perfection of Agent's security interests in the Collateral, unless prohibited by applicable law.

6.4.    <u>No Discharge; Survival of Claims</u>.  The Borrower agrees that the Obligations shall not be discharged by the entry of an order confirming a plan of reorganization or liquidation and hereby waives any such discharge, unless all Term Loan Commitments have been terminated and the Obligations (other than contingent indemnity or reimbursement Obligations for which no claim has been asserted) have been indefeasibly paid in full in cash, or otherwise satisfied pursuant to <u>Sections 1.8</u> and <u>1.9</u> hereof on or before the effective date of such plan.

6.5.    <u>Prohibition on Surcharge; Etc.</u>  Subject to entry of the Final DIP Order, no Person shall be permitted to surcharge the Collateral under section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out.  Until

the termination of this Agreement or the dismissal of the Chapter 11 Case, the Bankruptcy Court will retain jurisdiction over the Collateral for the purpose of enforcing this <u>Article VI</u>.

6.6.    <u>Marshalling Obligations</u>.  Subject to entry of the Final DIP Order, the Agent and the Lenders shall not be subject to the equitable doctrine of marshalling.  The Agent and the Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to entry of the Final DIP Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Agent or the Lenders with respect to the proceeds, products, offspring or profits of any of the Collateral.

<div align="center">

ARTICLE VII
EVENTS OF DEFAULT

</div>

7.1.    <u>Events of Default</u>.  Any of the following shall constitute an "Event of Default":

(a)    <u>Non-Payment</u>.  The Borrower fails to pay (i) any principal or interest on any Loan when and as required to be paid herein, or (ii) any other Obligation within three (3) Business Days from the date that such amount has become due;

(b)    <u>Representation or Warranty</u>.  Any representation, warranty or certification by or on behalf of the Borrower made or deemed made herein, in any other Loan Document, or which is contained in any certificate, document, or financial or other statement by any such Person, or their respective Responsible Officers, furnished at any time under this Agreement, or in or under any other Loan Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made, and such condition is not cured within five (5) Business Days after the date upon which (a) such default is known or reasonably should have become known to any officer of the Borrower or (b) the Borrower has received notice thereof.

(c)    <u>Covenant Default</u>.  The Borrower shall default in the observance or performance of any agreement contained in <u>Section 4.6</u> or <u>Article V</u> of this Agreement, and such condition is not cured within five (5) Business Days after the date upon which (a) such default is known or reasonably should have become known to a Responsible Officer of the Borrower or (b) the Borrower has received notice thereof.

(d)    <u>Other Covenant Defaults</u>.  The Borrower fails to perform or observe any term, covenant or agreement contained in this Agreement (other than as provided in paragraphs (a) through (c) of this <u>Section 7.1</u>) or any other Loan Document, and such default shall continue unremedied for a period of ten (10) days after the earlier to occur of (x) the date upon which a Responsible Officer of the Borrower becomes aware of such default and (y) the date upon which notice thereof is given to the Borrower by the Agent.

(e)    <u>Bankruptcy Defaults</u>.  The occurrence of any of the following in the Chapter 11 Case, and such occurrence is not cured within five (5)  Business Days after the Borrower receives notice thereof:

(i)    other than in connection with the payment in full or other satisfaction or refinancing of the Obligations, the filing of any motion, taking of any action or the filing of any

<div align="center">-19-</div>

reorganization or liquidation plan or disclosure statement in the Chapter 11 Case by the Borrower (A) to obtain financing under section 364(c) or (d) of the Bankruptcy Code that is senior to or *pari passu* with the financing provided under this Agreement, (B) to grant any Lien upon or affecting any Collateral that is senior to or *pari passu* with the Liens granted under the Collateral Documents, (C) to obtain administrative expense priority that is senior to or *pari passu* with the Obligations, except as expressly permitted in the DIP Order, or (D) that is otherwise materially adverse to the rights and remedies granted to the Agent or the Lenders hereunder or under the DIP Order;

(ii)      this Agreement, any of the other Loan Documents or the DIP Order for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction, or the Borrower shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Borrower or such Person) any other Person's motion to disallow in whole or in part the Agent's or the Lenders' claims in respect of the Obligations, to challenge the validity of any portion of the Loan Documents, the Loans, the DIP Liens, or the Obligations, or enforceability of the same, or which seeks to void, limit, subordinate or otherwise adversely affect any payment pursuant to the Loan Documents or the DIP Orders;

(iii)      the filing by the Borrower of a motion or other pleading seeking entry of an order, or the Bankruptcy Court shall enter any order, revoking, reversing, staying, vacating, rescinding, or materially modifying, supplementing, or amending the DIP Order currently in effect or any Loan Document, in each case except upon the Agent's prior written request at the direction of the Required Lenders or with the prior written consent of the Required Lenders in their sole discretion;

(iv)      the Bankruptcy Court shall enter any order (A) appointing a chapter 11 trustee under section 1104 of the Bankruptcy Code in the Chapter 11 Case or (B) appointing an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code in the Chapter 11 Case or otherwise, in each case without the prior written consent of the Required Lenders in their sole discretion;

(v)      the filing by the Borrower or any controlled subsidiary thereof of a motion or other pleading seeking entry of an order converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or dismissing the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily and the Obligations are not simultaneously indefeasibly paid in full; or

(vi)      an order is entered converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or dismissing the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily and the Obligations are not simultaneously indefeasibly paid in full;

(vii)      the entry of a final non-appealable order in the Chapter 11 Case (A) charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Agent or the Lenders; or (B) avoiding, limiting, modifying, subordinating, or recharacterizing any of the Obligations or requiring disgorgement by the Lenders of any amounts received in respect of the Obligations;

(viii)   the entry of an order which provides relief from the automatic stay otherwise imposed pursuant to section 362 of the Bankruptcy Code, which order permits any creditor, other than the Lenders (other than any creditor having a Lien on specific equipment that is senior to the Lenders), to realize upon, or to exercise any right or remedy with respect to, the Collateral;

(ix)   payment by the Borrower of prepetition debt (other than as approved by the Bankruptcy Court and as otherwise contemplated by this Agreement, the DIP Order, an Acceptable Plan, or with the prior written consent of the Required Lenders in their sole discretion (which may be evidenced by an email from the Agent's counsel);

(x)   without the prior written consent of the Required Lenders in their sole discretion, (A) if a plan of reorganization or liquidation is filed by the Borrower in the Chapter 11 Case, or an order shall be entered by the Bankruptcy Court confirming any plan in the Chapter 11 Case, that is not an Acceptable Plan, or (B) the Borrower withdraws any Acceptable Plan after having been filed in the Chapter 11 Case;

(xi)   the occurrence of any default or Event of Default under the DIP Order and the continuance thereof after any grace or cure period provided in such order or granted by order of a court in the Chapter 11 Case;

(xii)   a chapter 11 plan is confirmed that does not provide for the payment in full in cash of all Obligations on the effective date thereof, together with releases, exculpations, waivers and indemnifications for the Lenders and their officers, directors, employees, attorneys, and agents;

(xiii)   the DIP Order is modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of the Required Lenders;

(xiv)   the entry of any order approving any bidding procedures that disallows, or limits, the Lenders' credit bid; or

(xv)   any motion for any of the orders described in clauses (ii) through (xiv) above shall be made by a Person other than the Borrower, the Agent, or any Lender, and such application is not being diligently contested by the Borrower in good faith.

(f)   Collateral.  Any material provision of any Collateral Document shall for any reason cease to be valid and binding on or enforceable against the Borrower or the Borrower shall so state in writing or shall bring an action to limit its obligations or liabilities thereunder; or any Collateral Document (together with the DIP Order) shall for any reason (other than pursuant to the terms thereof) cease to create a valid Lien on the Collateral purported to be covered thereby; or the DIP Lien shall for any reason cease to be a perfected and senior priority Lien, subject only to the Carve-Out and Permitted Senior Liens.

7.2.   Remedies.  Except in the case of clause (a) below which shall require no prior written notice, on not less than five (5) Business Days' prior written notice by the Agent to counsel for the Borrower, the Office of the United States Trustee and counsel to any official committee of unsecured creditors appointed in the Chapter 11 Case, upon the occurrence and continuance of an Event of

-21-

Default and notwithstanding Section 362 of the Bankruptcy Code and without any further order of the Bankruptcy Court or any other court or the initiation of any further proceeding with the Borrower except as provided in this <u>Section 7.2</u>, the Agent may, and at the direction of the Required Lenders shall:

(a)    Declare, on a pro rata basis, all or any portion of the Term Loan Commitments to be suspended or terminated, whereupon such Term Loan Commitments shall forthwith be suspended or terminated;

(b)    Declare all or any portion of the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Documents to be immediately due and payable (such event being referred to herein as an "<u>Acceleration</u>") without presentment, demand, protest or (except as provided above) other notice or other requirements of any kind, all of which are hereby expressly waived by the Borrower;

(c)    Obtain and liquidate the Collateral. If notice of disposition of the Collateral is required by law, twenty (20) days' prior notice by the Agent to the Borrower designating the time and place of any public sale or the time after which any private sale or other intended disposition of the Collateral is to be made, shall be deemed to be reasonable notice thereof and shall constitute "authenticated notice of disposition" within the meaning of Section 9-611 of the UCC, and the Borrower waives any other notice. The Agent may bid for and purchase the Collateral at any public sale. The Agent may bid and purchase any Collateral at a private sale if the Collateral in question has a readily ascertainable market value;

(d)    Require the Borrower to assemble all of the Collateral constituting personal property without judicial process pursuant to Section 9-609 of the UCC;

(e)    Take possession of all Collateral constituting tangible personal property without judicial process pursuant to Section 9-609 of the UCC; and

(f)    Exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents, the DIP Order or applicable law, in each case, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code.

The Borrower shall not seek to enjoin, hinder, delay or object to the Agent's exercise of rights and remedies in accordance with this Agreement, and at any proceeding with respect to the Agent's exercise of rights and remedies, the Borrower shall not be entitled to raise any substantive objections, other than to challenge the occurrence of the relevant Event of Default. To the extent an Event of Default occurs as a result of the Borrower's failure to indefeasibly satisfy the Obligations in full by the Maturity Date, the Borrower waives any right (a) to any notice period set forth in this <u>Section 7.2</u> (except to the extent a notice period is required by operation of law) and (b) to challenge (i) whether or not the Maturity Date or an Event of Default has occurred and (ii) the Agent's exercise of its and the Lenders' rights and remedies against the Collateral, including without limitation, any foreclosure through a state court proceeding.

-22-

7.3.    <u>Rights Not Exclusive</u>.  The rights and remedies provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising. No exercise by the Agent or the Lenders of one right or remedy shall be deemed an election, and no waiver by the Agent or the Lenders of any Event of Default shall be deemed a continuing waiver. No delay by the Agent or the Lenders shall constitute a waiver, election, or acquiescence by it.

7.4.    <u>Credit Bidding</u>. The Borrower acknowledges that any Lender may, either directly or indirectly through one or more entities, (a) credit bid or purchase all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, (b) credit bid or purchase all or any portion of the Collateral at any other sale or foreclosure conducted in accordance with applicable law in any judicial action or proceeding or by the exercise of any legal or equitable remedy. In connection with any such credit bid, the Obligations shall be entitled to be, and shall be, credit bid by such entity or entities designated by any such Lender for the purpose of the consummation of such sale or foreclosure transaction without further action by such Lender, and any such credit bid amount may be applied by such Lender to payment of the Obligations under this Agreement.

<div align="center">ARTICLE VIII
THE AGENT</div>

8.1.    <u>Authorization and Action</u>.

(a)    Each Lender hereby irrevocably appoints CSCEC Holding Company, Inc. to act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof and thereof, together with such actions and powers as are reasonably incidental thereto.

(b)    The provisions of this Article are solely for the benefit of the Agent and the Lenders, and neither the Borrower nor any other Person shall have rights as a third party beneficiary of any of such provisions.

8.2.    <u>The Agent Individually</u>.

(a)    Any Person serving as the Agent hereunder who is also a Lender shall have the same rights and powers in its capacity as a Lender and may exercise the same as though it were not the Agent.  Each such Person and its affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or an affiliate thereof as if such Person were not the Agent hereunder and without any duty to account therefor to the Lenders.

(b)    Each Lender acknowledges that the Agent and its affiliates are engaged in a wide range of financial activities and businesses and may engage in such activities with or on behalf of the Borrower or its affiliates.  The Lenders acknowledge that, pursuant to such activities, the Agent or its affiliates may receive information regarding the Borrower or any of its affiliates (including information that may be subject to confidentiality obligations in favor of such Borrower or affiliate)

and acknowledge that the Agent shall not be under any obligation to provide such information to them.

8.3.    <u>Duties of the Agent:  Exculpatory Provisions</u>.

(a)    The Agent's duties hereunder and under the other Loan Documents are solely mechanical and administrative in nature, and the Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise upon the written direction of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); <u>provided</u> that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose it or any of its affiliates to liability or that is contrary to any Loan Documents or applicable law; and

(iii)    except as expressly set forth herein and in the other Loan Documents, shall not have any duty to disclose or be liable for the failure to disclose, any information relating to the Borrower or any of its affiliates that is communicated to or obtained by the Agent or any of its affiliates in any capacity.

(b)    The Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Section 9.1</u> or elsewhere herein) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non-appealable judgment, in connection with its duties expressly set forth herein.  The Agent shall not be deemed to have knowledge of any Default or the event or events that give or may give rise to any Default unless and until written notice describing such Default and such event or events is given to the Agent by the Borrower or any Lender.

8.4.    <u>Reliance by the Agent</u>.

(a)    The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document, or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of any Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Agent may consult with legal counsel (who may be

counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants, or experts.

(b)     The Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or such other number or percentage of the Lenders as shall be provided for herein or in the other Loan Documents) as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of the Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders; provided that the Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law.

8.5.    Delegation of Duties.  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Documents by or through any one or more sub-agents appointed by the Agent.  The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Persons.  Each such sub-agent and the Related Persons of the Agent and each such sub-agent shall be entitled to the benefits of all provisions of this Article VIII (among other relevant provisions of this Agreement) and (as though such sub- Agents were the Agent under the Loan Documents) as if set forth in full herein with respect thereto; provided that the Agent shall not be responsible for the negligence or misconduct of any sub-agents.

8.6.    Resignation of the Agent.  The Agent may at any time give notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor, which shall be a commercial bank or financial institution reasonably acceptable to the Required Lenders.  If no such successor Agent shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after notice was given, then the Agent may (but shall not be obligated to) appoint a successor Agent meeting the qualifications set forth above.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on such effective date and (a) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (b) all payments, communications and determinations provided to be made by, to or through the retiring Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided above.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article shall continue in effect for the benefit of such retiring Agent, its sub-agents, and their respective Related Persons in respect of any actions taken or omitted to be taken by any of them while the

retiring Agent was acting as Agent under this Agreement.  Upon resignation of the Agent, the fees paid to the Agent and the successor Agent shall be paid pro rata for the applicable years.

8.7.    <u>Non-Reliance on the Agent and Other Lenders</u>.

(a)    Each Lender confirms to the Agent, each other Lender and each of their respective Related Persons that it (i) possesses such knowledge and experience in financial and business matters that it is capable, without reliance on the Agent, any other Lender or any of their respective Related Persons, of evaluating the merits and risks (including tax, legal, regulatory, accounting and other financial matters) of entering into this Agreement, making Loans and other extensions of credit hereunder and under the other Loan Documents and in taking or not taking actions hereunder and thereunder, (ii) is financially able to bear such risk, and (iii) has determined that entering into this Agreement and making Loans and other extensions of credit hereunder and under the other Loan Documents is suitable and appropriate for it.

(b)    Each Lender acknowledges that it is solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Agreement and the other Loan Documents and that it has, independently and without reliance upon the Agent or any other Lender or any of their respective Related Persons and based on such documents and information, as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Persons and based on such documents and information as it shall from time to time deem appropriate, continue to be solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Agreement and the other Loan Documents, including:

(i)    the financial condition, status, and capitalization of the Borrower;

(ii)    the legality, validity, effectiveness, adequacy, or enforceability of this Agreement and each other Loan Documents and any other agreement, arrangement, or document entered into, made or executed in anticipation of, under, or in connection with any Loan Documents;

(iii)    determining compliance or non-compliance with any condition hereunder to the making of Loans; and

(iv)    the adequacy, accuracy, and/or completeness of any of the information delivered by the Agent, any other Lender or by any other Person under or in connection with this Agreement or any other Loan Documents, the transactions contemplated by this Agreement and the other Loan Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Loan Documents.

8.8.    <u>Indemnification</u>.  Each Lender severally agrees to indemnify and hold harmless the Agent (to the extent not promptly reimbursed by the Borrower) from and against such Lender's ratable share of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by the Agent under the Loan Documents (collectively, the "<u>Indemnified Costs</u>"); <u>provided</u> that no Lender shall be liable for any portion of such liabilities,

obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements resulting from the Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction; provided, further, that, any act taken with the consent or in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to not constitute gross negligence or willful misconduct for purposes of this Agreement.  Without limitation of the foregoing, each Lender agrees to reimburse the Agent promptly upon demand for its ratable share of any costs and expenses (including, without limitation, reasonable fees and disbursements of counsel) payable by the Borrower hereunder, to the extent that the Agent is not promptly reimbursed for such costs and expenses by the Borrower.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 8.8 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person and whether or not the Agent is a party to such investigation, litigation or proceeding.  Without prejudice to the survival of any other agreement of any Lender hereunder, the agreement and obligations of each Lender contained in this Section 8.8 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

8.9.    Authorization to Credit Bid. Each Lender hereby irrevocably authorizes the Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code or any similar laws in any other jurisdictions to which the Borrower is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Lenders shall be entitled to be, and shall be, credit bid by the Agent at the direction of the Required Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid, (i) the Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Lenders' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.1 of this Agreement), (iv) the Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Lenders, ratably on account of the relevant Obligations which were credit bid, interests, whether as

equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Lender or acquisition vehicle to take any further action, and (v) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata with their original interest in such Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Lender or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Obligations of each Lender are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Lender shall execute such documents and provide such information regarding the Lender (and/or any designee of the Lender which will receive interests in or debt instruments issued by such acquisition vehicle) as the Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid. Notwithstanding the grant of authority to the Agent in this paragraph, nothing herein shall impose an obligation on the to credit bid any of the Obligations, it being expressly understood and agreed by the Lenders that the Agent may appoint a third-party to perform such functions, and such third-party shall be entitled to all of the protections granted to an Agent under this Agreement and the other Loan Documents.

<div align="center">

ARTICLE IX
MISCELLANEOUS

</div>

9.1.    <u>Amendments and Waivers</u>.

(a)    No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by the Borrower therefrom, shall be effective unless the same shall be in writing and signed by the Agent, the Required Lenders and the Borrower, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u> that no amendment or waiver shall:

(i)    reduce or forgive the amount or extend the scheduled date of maturity of any Loan or reduce the stated rate of any interest or fee payable hereunder (other than as a result of any waiver of the applicability of any post-default increase in interest rate) or extend the scheduled date of any payment thereof or increase the amount or extend the expiration date of any Lender's Term Loan Commitment or change the currency in which any Loan is payable, in each case without the consent of each Lender directly and adversely affected thereby (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default shall not constitute an increase of the Term Loan Commitment of any Lender);

(ii)    amend, modify, or waive any provision of this <u>Section 9.1(a)</u> or reduce the percentage specified in the definition of "Required Lenders" or consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, in each case without the written consent of all the Lenders; or

<div align="center">-28-</div>

(iii)    release all or substantially all of the value of all or substantially all of the Collateral, in each case without the consent of all of the Lenders, except as expressly permitted hereby or by the DIP Order.

(b)    No amendment, waiver, or consent to this Agreement or any other Loan Document shall become effective prior to delivery of a copy of such amendment, waiver, or consent to the Lenders.

(c)    The parties hereto shall be permitted to amend this Agreement and the other Loan Documents without further approval or order of the Court to the extent provided in the DIP Order.

9.2.    Notices.

(a)    Addresses.    All notices and other communications required or expressly authorized to be made by this Agreement shall be given in writing or by Electronic Transmission, unless otherwise expressly specified herein, and addressed to the address set forth on the applicable signature page hereto.

(b)    Effectiveness.    All communications described in clause (a) above and all other notices, demands, requests, and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon personal delivery, (ii) if delivered by overnight courier service, one (1) Business Day after delivery to such courier service, (iii) if delivered by mail, three (3) Business Days after deposit in the mail, (iv) if by facsimile transmission, upon sender's receipt of confirmation of successful transmission, and (v) if by electronic mail, upon successful delivery.

(c)    Each Lender and the Agent shall notify the Borrower in writing of any changes in the address to which notices to such Lender or the Agent should be directed.

9.3.    No Waiver; Cumulative Remedies.    No failure to exercise and no delay in exercising, on the part of the Agent or any Lender, any right, remedy, power, or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.    No course of dealing between the Borrower, the Agent, or any Lender shall be effective to amend, modify, or discharge any provision of this Agreement or any of the other Loan Documents.

9.4.    Costs and Expenses; Yield Protection; Indemnity; Etc.

(a)    Any action taken by the Borrower under or with respect to any Loan Document, even if required under any Loan Document or at the request of the Agent or the Lenders, shall be at the expense of the Borrower, and neither the Agent nor the Lenders shall be required under any Loan Document to reimburse the Borrower therefor.    In addition, subject to the DIP Order, but regardless of whether or not the transactions contemplated hereby shall be consummated, the Borrower agrees to pay or reimburse the Agent and the Lenders for their reasonable and documented out-of-pocket fees, costs and expenses, whether accrued on, prior to, or after the Closing Date, which shall be part of the Obligations, in connection with:

(i)      the preparation, negotiation, and execution of the Interim DIP Order and the Final DIP Order;

(ii)      the preparation, negotiation, execution, and administration of the Loan Documents and any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, including any amendment, consent, waiver, assignment, restatement, or supplement thereto;

(iii)      the funding of the Loans;

(iv)      the creation, perfection, or protection of the DIP Liens (including all search, filing, and recording fees);

(v)      any internal audit reviews and field examinations;

(vi)      the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, or with respect to the Collateral;

(vii)      the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or request for document production relating thereto) with respect to, any proceeding related to the Borrower, any Loan Document, or any Obligation;

(viii)      the review of pleadings and other filings made with the Bankruptcy Court;

(ix)      the Chapter 11 Case, including, but not limited to, attendance at hearings in respect of the Chapter 11 Case;

(x)      any refinancing or restructuring of the Loans in the nature of a "work-out"; and

(xi)      defending and prosecuting any actions or proceedings arising out of or relating to the Obligations or any transactions related to arising in connection with the Loan Documents;

provided that, in the case of each of the foregoing clauses (i)-(xi), Attorney Costs shall be limited to one law firm on behalf of the Agent and the Lenders and, to the extent necessary, one local counsel in each relevant jurisdiction (and in the case of an actual or perceived conflict of interest, one additional law firm on behalf of the Agent or the affected Lender, as applicable).

(b)      The Borrower agrees to indemnify, defend, and save and hold harmless (to the fullest extent permitted by law) the Agent and each Lender and each of their Related Persons and their respective officers, directors, employees, agents, and advisors (each, in its capacity as such, an "Indemnitee") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities, and expenses (including Attorney Costs) that may be incurred by or asserted or awarded against any Indemnitee, in each case arising out of or in connection with or by reason of (including in connection with any investigation, litigation, or proceeding or preparation of a defense in

-30-

connection therewith) this Agreement, the other Loan Documents, the transactions contemplated hereby or thereby or the actual or proposed use of the proceeds of the Loans, except to the extent such claim, damage, loss, liability, or expense is found in a final, non-appealable judgment by a court of competent jurisdiction (or a settlement tantamount thereto) to have resulted from such Indemnitee's bad faith, gross negligence, or willful misconduct; <u>provided</u> that any such Attorney Costs shall be limited to one law firm on behalf of the Agent and the Lenders and, to the extent necessary, one local counsel in each relevant jurisdiction (and in the case of an actual or perceived conflict of interest, one additional law firm on behalf of the Agent or the affected Lender, as applicable). In the case of an investigation, litigation, or other proceeding to which the indemnity applies, such indemnity shall be effective whether or not such investigation, litigation, or proceeding is brought by the Borrower, its directors, shareholders, or creditors, whether or not any Indemnitee is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. The Borrower also agrees not to assert any claim against (in each case, in its capacity as such) any Agent, any Lender, or any of their respective Related Persons on any theory of liability, for special, indirect, consequential, or punitive damages arising out of or otherwise relating to this Agreement, the other Loan Documents, the transactions contemplated hereby, or thereby or the actual or proposed use of the proceeds of the Loans.

(c)      Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Requirements of Law. If any Taxes are required by applicable law to be deducted or withheld by the Borrower or the Agent from or in respect of any amount payable under any Loan Document to a Lender, (i) the Borrower or the Agent, as the case may be, shall make such deductions, (ii) the Borrower or the Agent, as the case may be, shall timely pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable Requirements of Law, and in the case of a payment by the Borrower, deliver to the Agent an original or certified copy of a receipt evidencing such payment, and (iii) if such Taxes are Indemnified Taxes, the amount payable by the Borrower shall be increased as necessary so that after such deductions have been made (including such deductions applicable to additional amounts payable under this Section), such Lender receives the amount it would have received had no such deductions been made. The Borrower shall timely pay to the relevant taxing authority in accordance with applicable law, or at the option of the Agent, timely reimburse the Agent for the payment of, any Other Taxes. The Borrower shall indemnify the Lender or the Agent, as applicable, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this subsection) payable or paid by such Lender or Agent or required to be withheld or deducted from a payment to such Lender or Agent and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant taxing authority. A certificate as to the amount of such payment or liability delivered to the Borrower by Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error. Each Lender shall deliver to the Agent and the Borrower, and the Agent shall deliver to the Borrower, on or before the date on which such Person becomes a party to this Agreement and from time to time thereafter, such properly completed and executed Tax forms or other Tax documentation reasonably requested by the Agent or the Borrower as will permit payments under the Loan Documents to be made without withholding or at a reduced rate of withholding or as may be required by the Agent or the Borrower to comply with the requirements of any taxing authority with respect to the transactions

contemplated hereby. Borrower's obligations under this Section 9.4(c) shall survive any assignment of rights by Lender but shall terminate upon repayment in full of all Obligations.

(d)        If a Lender requests compensation for increased costs pursuant to clause (b) of this Section, the Borrower is required to indemnify an Indemnitee pursuant to clause (c) of this Section, or the Borrower is required to pay additional amounts to a Lender pursuant to clause (d) of this Section, then such Lender or Indemnitee shall, at the request of the Borrower, use reasonable efforts to mitigate the effects of the event giving rise to such request or payment.

(e)        All the fees, costs, and expenses set forth in this Section 9.4 that have accrued on or prior to the Closing Date shall be paid by the Borrower on such date (and may be netted out of Loans incurred on such date).  Any amounts payable pursuant to this Section 9.4 following the Closing Date shall be paid within three (3) Business Days of receipt of an invoice relating thereto setting forth such expenses in reasonable detail, subject to the terms and conditions of the DIP Order.

9.5.    Payments Set Aside.  To the extent that any of the Agent or the Lenders receives a payment from the Borrower, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver, or any other party, then to the extent of such recovery, the Obligation or part thereof originally intended to be satisfied, and all Liens, rights, and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

9.6.    Assignments.  The Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of each Lender.  The rights and obligations of each Lender under this Agreement (including all or a portion of its Term Loan Commitment(s) and the Loans at the time owing to it) shall be assignable by such Lender without any consent of or notice to the Borrower; provided that (a) the parties to each assignment shall execute and deliver to the Agent an assignment and assumption agreement in such form approved by the Agent acting reasonably, and (b) if the assignee is not a Lender, then the assignee shall deliver to the Agent all documentation and other information about such assignee that the Agent reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering laws, and following the receipt by the Agent of the foregoing, it shall record the assignment in the Register. Notwithstanding the foregoing, no such assignment by a Lender shall be made (a) to any competitors of the Company or its Subsidiaries that have been specified to the Administrative Agents by the Company in writing from time to time, (b) any Persons designated in writing by the Borrower Representative or the Sponsor to the Administrative Agents on or prior to the Closing Date and (c) any Affiliates, of any Persons referenced in the foregoing clauses (a) and (b) that are either known Affiliates or are readily identifiable as Affiliates on the basis of such Affiliates' names or identified in writing by the Company or the Borrower Representative from time to time (any such Person described in subclauses (a) through (c), a "Disqualified Lender").

9.7.    Binding Effect.  Subject to Section 2.1 hereof, this Agreement shall become effective when it shall have been executed by the Borrower, the Agent and the Lenders.  Thereafter, it shall be binding upon and inure to the benefit of the Borrower, the estate of the Borrower, any trustee, or successor in interest of the Borrower in any chapter 11 Case or any subsequent case commenced

-32-

under chapter 7 of the Bankruptcy Code or any other bankruptcy or insolvency laws, the Agent and each Lender and, in each case, their respective successors and permitted assigns.

9.8.   <u>Counterparts; Facsimile Signature</u>.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

9.9.   <u>Severability</u>.  The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

9.10.   <u>Captions</u>.  The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

9.11.   <u>Independence of Provisions</u>.  The parties hereto acknowledge that this Agreement and the other Loan Documents may use several different limitations, tests, or measurements to regulate the same or similar matters, and that such limitations, tests, and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

9.12.   <u>Interpretation</u>.  This Agreement is the result of good faith negotiations among the parties hereto and has been reviewed by counsel to the Borrower, the Agent, and each Lender.  Accordingly, this Agreement and the other Loan Documents shall not be construed against the Borrower, the Agent, or the Lenders merely because of the Borrower's, the Agent's, or the Lenders' involvement in the preparation of such documents and agreements.  Without limiting the generality of the foregoing, each of the parties hereto has had the advice of counsel with respect to <u>Sections 9.14</u> and <u>9.15</u>.

9.13.   <u>No Third Parties Benefited</u>.  This Agreement is made and entered into for the sole protection and legal benefit of the Borrower, the Agent and the Lenders and their successors and permitted assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.  The Lenders shall not have any obligation to any Person who is not a party to this Agreement or the other Loan Documents.

9.14.   <u>Governing Law and Jurisdiction</u>.

(a)   <u>Governing Law</u>.  The laws of the State of New York shall govern all matters arising out of or in connection with this Agreement, including its validity, interpretation, construction, performance, and enforcement (including any claims sounding in contract or tort law arising out of

the subject matter hereof and any determinations with respect to post-judgment interest), except to the extent that the application of the Bankruptcy Code is mandatory.

(b)      Submission to Jurisdiction.  Any legal action or proceeding with respect to any Loan Document over which the Bankruptcy Court does not have, or declines to exercise, jurisdiction shall be brought exclusively in the courts of the State of New York located in the City of New York, Borough of Manhattan, or of the United States of America for the Southern District of New York, and in appellate courts from any of the foregoing, and, by execution and delivery of this Agreement, each party hereto hereby accepts for itself and in respect of its Property, generally and unconditionally, the jurisdiction of the aforesaid courts. The parties hereto hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

(c)      Service of Process.  Each party hereto hereby irrevocably waives personal service of any and all legal process, summons, notices, and other documents and other service of process of any kind and consents to such service in any suit, action, or proceeding brought in the United States of America with respect to or otherwise arising out of or in connection with any Loan Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of such party specified herein (and shall be effective when such mailing shall be effective, as provided therein).  Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

9.15.   Waiver of Jury Trial.  EACH PARTY HERETO, TO THE FULLEST EXTENT PERMITTED BY LAW, WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY.  THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

9.16.   Entire Agreement; Release; Survival.

(a)      THE LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT OF THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER HEREOF AND ANY PRIOR LETTER OF INTEREST, COMMITMENT LETTER AND SIMILAR AGREEMENTS INVOLVING THE BORROWER, THE AGENT AND ANY LENDER OR ANY OF THE AGENT'S OR THE LENDERS' AFFILIATES RELATING HERETO.  IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT (OTHER THAN THE FINAL DIP ORDER CURRENTLY IN EFFECT, IN WHICH CASE SUCH FINAL DIP ORDER SHALL GOVERN), THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS OTHERWISE EXPRESSLY STATED IN SUCH OTHER LOAN DOCUMENT OR SUCH TERMS OF SUCH OTHER LOAN DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH).

(b)     Subject to entry of the Interim DIP Order, execution of this Agreement by the Borrower constitutes a full, complete and irrevocable release of any and all claims against the Agent or any Lender (in each case, in its capacity as such) which the Borrower may have at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the subject matter of this Agreement and the other Loan Documents. In no event shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings). The Borrower hereby waives, releases and agrees not to sue upon any such claim for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings), whether or not accrued and whether or not known or suspected to exist in its favor.

(c)     Any indemnification or other protection provided to any Indemnitee pursuant to this Agreement shall (x) survive the termination of the Term Loan Commitments and the payment in full or other satisfaction of all other Obligations and (y) inure to the benefit of any Person that at any time held such a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns.

9.17.   Patriot Act.  Each Lender and the Agent that is subject to the Patriot Act hereby notifies the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Agent to identify the Borrower in accordance with the Patriot Act. The Borrower shall, promptly following a request by any Lender or the Agent, provide all documentation and other information that such Lender or the Agent, as applicable, reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money-laundering rules and regulations, including the Patriot Act. Each Lender acknowledges and agrees that neither such Lender, nor any of its affiliates, participants or assignees, may rely on the Agent to carry out such Lender's or its affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the Patriot Act or the regulations thereunder or any other anti-terrorism law, including any programs involving any of the following items relating to or in connection with the Borrower, any of its affiliates or agents, the Loan Documents or the transactions hereunder: (a) any identity verification procedures, (b) any record keeping, (c) any comparisons with government lists, (d) any customer notices or (e) any other procedures required under the Patriot Act or the regulations thereunder or such other laws.

ARTICLE X
DEFINITIONS

10.1.   Defined Terms.  The following terms are defined in the Sections or subsections referenced opposite such terms:

| Term | Section |
|------|---------|
| Acceleration | 7.2(b) |
| Agent | Preamble |
| Agreement | Preamble |
| Approved Budget | 2.1(c) |
| Bankruptcy Court | Recitals |

| Term | Section |
|---|---|
| Borrower | Preamble |
| Chapter 11 Case | Recitals |
| Conversion Shares | 1.9 |
| Debtor | Preamble |
| Event of Default | 7.1 |
| Indemnitee | 9.4(c) |
| Lender | Preamble |
| Lenders | Preamble |
| OFAC | 3.10 |
| Petition Date | Recitals |
| SDN List | 3.10 |
| DIP Lien | 6.1(a) |
| Term Loan Commitment | 1.1(a) |

In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings:

"<u>Acceptable Plan</u>") means a plan of reorganization or liquidation that provides for the indefeasible payment in full and in cash, of all DIP Obligations.

"<u>Affiliate</u>" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of ten percent (10%) or more of any class of the outstanding voting equity interests, securities or other equity or ownership interests of such Person.  For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"<u>Attorney Costs</u>" means all reasonable and documented fees and disbursements of any law firm or other external counsel acting for the Agent or any Lender hereunder and as permitted hereunder.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, 11 U.S.C. § 101, <u>et seq</u>.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure.

"<u>Borrowing</u>" means each borrowing under a Notice of Borrowing of Loan(s) by the Borrower from the Lenders pursuant to this Agreement.

"Business Day" means any day that is not a Saturday, Sunday, or a day on which banks are required or authorized to close in New York City.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed, except "Capital Expenditures" shall exclude any and all expenditures relating to or in accordance with a plan of reorganization.

"Carve-Out" has the meaning ascribed to such term in the DIP Order then in effect.

"CCA Group" means the Borrower and any of its subsidiaries.

"Change of Control" means, the acquisition, through purchase or otherwise (including the agreement to act in concert without anything more), by any Person or group (as such term is used in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended), after the date of this Agreement, of (i) the beneficial ownership, directly or indirectly, of 50% or more of the equity interests in the Borrower or (ii) all or substantially all of the assets of the Borrower.

"Collateral" means all prepetition and postpetition real property and all prepetition and postpetition tangible and intangible personal property of the Borrower, in each case, whether tangible or intangible, wheresoever located, and whether now owned by the Borrower or hereafter acquired and whether now existing or hereafter coming into existence, including, but not limited to, all accounts, contracts rights, chattel paper, cash, general intangibles, intellectual property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, and rents, together with all proceeds of each of the foregoing, including insurance proceeds (as each such term above is defined in the UCC, to the extent applicable).

"Collateral Documents" means, collectively, this Agreement, the DIP Order, and any and all other security agreements, pledge agreements, and other similar agreements, and all amendments, restatements, modifications, or supplements thereof, or thereto, by or between the Borrower pledging or granting a Lien on Collateral now or hereafter delivered to the Agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements, mortgages, or comparable documents now or hereafter filed in accordance with the UCC or comparable law against the Borrower in favor of the Agent, on behalf of the Lenders, as any of the foregoing may be amended, restated, and/or modified from time to time.

"Closing Date" means the date on which the Bankruptcy Court shall have entered the Interim DIP Order and all other conditions set forth in Section 2.1 hereof are satisfied or waived in accordance with the terms herein.

"Contingent Obligation" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter of credit or other obligation of another, provided, that for avoidance of doubt, Contingent Obligations shall not include any guarantee or other obligations under surety bonds; (ii) any obligations with respect to undrawn letters of credit, corporate credit cards, or merchant services issued or provided for the account of that Person; and (iii) all obligations arising under

-37-

any agreement or arrangement designed to protect such Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business or earnouts or any similar obligations. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by Agent in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"Default" means any event or circumstance that, with the passing of time or the giving of notice or both, would (if not cured or otherwise remedied during such time) become an Event of Default.

"DIP Order" means the Interim DIP Order or the Final DIP Order, as applicable.

"Dollars", "dollars" and "$" each mean lawful money of the United States of America.

"Electronic Transmission" means each document, instruction, authorization, file, information and any other communication transmitted, posted, or otherwise made or communicated by e-mail, facsimile or E-Fax, or other customary electronic system.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party relating to or arising out of violations of Environmental Laws or releases of Hazardous Materials (a) from any Collateral; (b) from adjoining properties or businesses of any real property that constitutes Collateral, or (c) from or onto any facilities, with respect to the Collateral, which received Hazardous Materials generated by any Loan Party.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on the Borrower, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Equity Interest" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person, whether voting or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the U.S. Securities and Exchange Commission under the Securities Exchange Act of 1934).

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Lender or required to be deducted or withheld from a payment to a Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Lender being organized under the laws of, or having its principal office or lending office in,  the jurisdiction imposing such Tax (or any political subdivision thereof), (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender pursuant to a law in effect on the date on which such Lender becomes a party to this Agreement or (c) Taxes attributable to such Lender's failure to provide any Tax forms or Tax documentation reasonably requested by the Agent or the Borrower pursuant to Section 9.4(c).

"Final DIP Order" means a final order of the Bankruptcy Court in form and substance reasonably acceptable to the Agent and the Lenders entered in the Chapter 11 Case after a final hearing authorizing and approving on a final basis, among other things, (a) the Borrower to obtain credit and incur the Obligations, (b) the substantive terms of this Agreement and the Loan Documents and (c) the granting of the Liens on the Collateral with the priority contemplated in this Agreement.

"GAAP" means generally accepted accounting principles in the United States applied on a consistent basis.

"Governmental Authority" means any nation, sovereign, or government, any state or other political subdivision thereof, any agency, authority, or instrumentality thereof and any entity or authority exercising executive, legislative, taxing, judicial, regulatory, or administrative functions of or pertaining to government, including any central bank, stock exchange, regulatory body, arbitrator, public sector entity, supra-national entity (including the European Union and the European Central Bank), and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

-39-

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 90 days after the date such payable was created and any earn-out, purchase price adjustment or similar obligation to the extent such earn-out or similar obligation has become fixed in amount or appears in the liabilities section of the balance sheet of such Person); (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all capitalized lease obligations of such Person; (f) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; and (g) all Contingent Obligations.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in clause (a) hereof, Other Taxes.

"Initial Commitment Period" means the period commencing on the date of entry of the Interim DIP Order and ending on the date of entry of the Final DIP Order.

"Interest Payment Date" means, as to any Loan, (a) the last day of each March, June, September, and December to occur while such Loan is outstanding and the final maturity date of such Loan (whether by Acceleration or otherwise) and (b) the date of any repayment of principal made in respect thereof.

"Intercompany Claim" means any claim, obligation, receivable, payable, or other liability of any kind, whether direct or indirect, absolute or contingent, and whether due or to become due.

"Interim DIP Order" means an order of the Bankruptcy Court in form and substance reasonably acceptable to the Lenders entered in the Chapter 11 Case after an interim hearing authorizing and approving on an interim basis, among other things, (a) the Borrower to obtain credit and incur the Obligations, (b) the terms of this Agreement and the other Loan Documents on an interim basis, and (c) the granting of the Liens on the Collateral with the priority contemplated in this Agreement.

"Lender" means each Lender that has a Term Loan or Term Loan Commitment (in its capacity as such).

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, fiduciary transfer for security purposes, charge, deposit arrangement, encumbrance, trust arrangement, easement, lien (statutory or otherwise), security interest or other security

-40-

arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever.

"Loan Documents" means this Agreement, the Collateral Documents, the DIP Order, the Term Notes and all notes, agreements, mortgages and documents delivered to the Agent or the Lenders in connection with any of the foregoing, and any other agreement entered into, now or in the future, by the Borrower or Lender in connection with this Agreement, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing.

"Loans" means, collectively, the Term Loans.

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U, or X of the Federal Reserve Board.

"Material Adverse Effect" means a material adverse change in (a) the business, operations, results of operations, assets, liabilities, prospects, or condition (financial or otherwise) of the Borrower, except as a result of the commencement of the Chapter 11 Case, (b) a material impairment of the Borrower's ability to perform its material obligations under any Loan Document, or of Lender's ability to enforce the Obligations or realize upon the Collateral, (c) the validity or enforceability of any Loan Document or the rights and remedies of the Lenders under any Loan Document, or (d) the validity, perfection, and priority of the DIP Liens on the Collateral to the extent required to be established and maintained by the DIP Order and the Collateral Documents in favor of the Lenders.

"Maturity Date" means the earliest of (a) the date that is 12 months after the Petition Date; provided that such date may be extended for an additional 180 days with the consent of the Lenders in their sole discretion, (b) entry by the Bankruptcy Court of an order dismissing the Chapter 11 Case or converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (c) the effective date of a chapter 11 plan in the Chapter 11 Case if the conversion election pursuant to Section 1.8 hereof is not made.

"Net Cash Proceeds" means with respect to any sale or disposition of Collateral by any Person, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person, in connection therewith, after deducting therefrom only (i) fees, commissions, and expenses related thereto and required to be paid in connection with such sale or disposition and (ii) taxes paid or payable to any taxing authorities in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amount of taxes so deducted are properly attributable to such transaction.

"Notice of Borrowing" means a notice given by the Borrower to the Agent, on behalf of the Lenders, pursuant to Section 1.4.

"Obligations" means all Loans and other indebtedness, fees, interest, advances, debts, liabilities, obligations, covenants, and duties owing by the Borrower to any Lender, the Agent, or any other Person required to be indemnified, that arises under any Loan Document, whether or not for the payment of money, whether arising by reason of an Borrowing, loan, guaranty, indemnification, or in any other manner (including under the DIP Order), whether direct

or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired, and including all interest not paid when due and all other expenses or other amounts that the Borrower is required to pay or reimburse under the Loan Documents or by law or otherwise in connection with the Loan Documents including, without limitation, in connection with the collection or enforcement of or preservation of rights under the Loan Documents.

"Organization Documents" means, (a) the certificate or articles of incorporation, the bylaws, any certificate of determination, or instrument relating to the rights of preferred shareholders of such corporation and any shareholder rights agreement or (b) any other document setting forth the manner of election or duties of the officers, directors, managers, or other similar persons, or the designation, amount or relative rights, limitations, and preference of the Equity Interests of a Person.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56.

"Permits" means, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance, or permission from, and any other contractual obligations with, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Permitted Indebtedness" means:

(a)     Indebtedness evidenced by this Agreement and the other Loan Documents (including, for the avoidance of doubt, the Carve Out);

(b)     Indebtedness outstanding as of the Closing Date and listed on Schedule 5.4(b) hereto;

(c)     Indebtedness, including any unsecured guarantees, incurred in the ordinary course of the Borrower's business with respect to surety and appeal bonds, performance bonds, bid bonds, appeal bonds, statutory bonds, completion guarantees and similar obligations; and

(d)     Indebtedness for purchase money obligations incurred after the Closing Date for equipment used in the ordinary course of the Borrower's business in an aggregate principal amount not to exceed at any time $200,000.

"Permitted Liens" means

(a)     Liens granted by the Interim DIP Order and created pursuant to the Collateral Documents to secure the Obligations;

(b)      Liens existing on the Closing Date and listed on <u>Schedule 5.1</u> hereto;

(c)      Permitted Senior Liens; and

(d)      Liens for Taxes that are not yet due and payable or that are being contested in good faith by appropriate proceedings with the appropriate taxing authorities and for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien.

"<u>Permitted Senior Liens</u>" means

(a)      Liens perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; and

(b)      Liens on retainers held by professionals, to the extent such retainers are not prohibited under the Bankruptcy Code or any applicable orders of the Bankruptcy Court.

"<u>Person</u>" means any individual, partnership, corporation (including a business trust and a public benefit corporation), joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture and any other entity or Governmental Authority.

"<u>Property</u>" means any interest in any kind of property or asset, whether real, personal, or mixed, and whether tangible or intangible.

"<u>Related Person</u>" means, with respect to any Person, in each case, in its capacity as such, each affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisors and other consultants and agents of or to such Person or any of its affiliates.

"<u>Remedial Action</u>" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"<u>Required Lenders</u>" means, at any time, Lenders having at the time in excess of fifty percent (50%) of the sum of the aggregate unfunded Term Loan Commitments then outstanding *plus* the Loans outstanding.

"<u>Requirement of Law</u>" means with respect to any Person, the common law and any federal, state, local, foreign, multinational, or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities), and the interpretation or

administration thereof by, and other determinations, directives, requirements, or requests of, any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Responsible Officer" means the chief executive officer or the president of the Borrower or any other officer having substantially the same authority and responsibility.

"Shared Services" has the meaning assigned to such term in the Debtors' Cash Management Motion [Bankruptcy Case No. ____, Docket No. ____].

"Special Committee" means a committee of the Board of Directors of the Borrower, comprised of independent, disinterested directors appointed pursuant to that certain Written Consent of the Sole Stockholder of CCA Construction, Inc., dated November 2, 2024, to evaluate, oversee, and make recommendations concerning potential restructuring and strategic alternatives, including assessing potential conflicts of interest.

"Superpriority Claim" means an allowed claim against the Borrower or its estate in the Chapter 11 Case which is an administrative expense claim having priority over (a) any and all allowed administrative expenses and (b) all unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including section 105, 326, 328, 330, 331, 364(c)(l), 365, 503, 506(c), 507, 546, 726, 1113, or 1114 of the Bankruptcy Code.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees, or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan Commitment" means, for each Lender, its Term Loan Commitment.

"Term Note" means a promissory note of the Borrower payable to a Lender and evidencing the Obligations of the Borrower to such Lender resulting from the Loans made to the Borrower by such Lender or its predecessor(s).

"Term Loan" means any amount borrowed under Section 1.1(a).

"UCC" means the Uniform Commercial Code of any applicable jurisdiction and, if the applicable jurisdiction shall not have any Uniform Commercial Code, the Uniform Commercial Code as in effect from time to time in the State of New York.

"United States" and "U.S." each means the United States of America.

10.2.   Other Interpretive Provisions.

(a)   Defined Terms. Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other Loan Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto. The meanings of defined terms shall be equally applicable to the singular and plural forms of the defined terms. Terms (including

uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein described.

(b)      <u>The Agreement</u>.  The words "hereof, "herein", "hereunder" and words of similar import when used in this Agreement or any other Loan Document shall refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document; and subsection, section, schedule and exhibit references are to this Agreement or such other Loan Documents unless otherwise specified.

(c)      <u>Certain Common Terms</u>.  The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.  The term "including" is not limiting and means "including, without limitation."  The term "or" has the inclusive meaning represented by the phrase "and/or".

(d)      <u>Performance; Time</u>.  Whenever any performance obligation hereunder or under any other Loan Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.

(e)      <u>Contracts; Instruments</u>.  Unless otherwise expressly provided herein or in any other Loan Document, references to agreements, orders and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments, thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(f)      <u>Laws</u>.  References to any statute or regulation may be made by using either the common or public name thereof or a specific cite reference and are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing, or interpreting the statute or regulation.

10.3.   <u>Accounting Terms and Principles</u>.  All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP.

[Signature Pages Follow.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

**<u>BORROWER:</u>**

**CCA CONSTRUCTION, INC.**

By: _____
Name: _____
Title: _____

Address for notices:

CCA Construction, Inc.
445 South Street, Suite 310
Morristown, NJ 07960

With a copy to:

Debevoise & Plimpton LLP
66 Hudson Blvd E
New York, NY 10001

Attention:  M. Natasha Labovitz and Sidney P. Levinson
Phone:  212-909-6000
Email:  nlabovitz@debevoise.com and slevinson@debevoise.com

[Signature Page to DIP Credit Agreement]

**LENDER:**

**CSCEC HOLDING COMPANY, INC.**

By: _____

Name: _____

Title: _____

Address for notices:

CSCEC Holding Company, Inc.
[445 South Street, Suite 310
Morristown, NJ 07960]

Attention:  Mr. Jichao Xu, Vice President
Phone:  (201) 876-2788
Email:  Xu.JiChao@CCA.US

With a copy (which shall not constitute notice) to:

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068

Attention: Andrew D. Behlmann, Jeffrey Cohen, and Raquel Smith
Phone:            (212) 262-6700
Email:       ABehlmann@lowenstein.com, JCohen@lowenstein.com, and RSmith@lowenstein.com

[Signature Page to DIP Credit Agreement]

**<u>AGENT:</u>**

**CSCEC HOLDING COMPANY, INC.**

By: _____

Name: _____

Title: _____


Address for notices:

CSCEC Holding Company, Inc.
[445 South Street, Suite 310
Morristown, NJ 07960]

Attention:  Mr. Jichao Xu, Vice President
Phone:  (201) 876-2788
Email:  Xu.JiChao@CCA.US


With a copy (which shall not constitute notice) to:

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068

Attention: Andrew D. Behlmann, Jeffrey Cohen, and Raquel Smith
Phone:           <u>(212) 262-6700</u>
Email:        <u>ABehlmann@lowenstein.com</u>, <u>JCohen@lowenstein.com</u>, and <u>RSmith@lowenstein.com</u>

[Signature Page to DIP Credit Agreement]

## <u>ANNEX B</u>

**Approved Budget**

**CCA Construction Inc. 13 Week Cash Flow Projection**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | Total | Timing Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 12/27/24 | 1/3/25 | 1/10/25 | 1/17/25 | 1/24/25 | 1/31/25 | 2/7/25 | 2/14/25 | 2/21/25 | 2/28/25 | 3/7/25 | 3/14/25 | 3/21/25 | 3/28/25 | Total | |
| | | | | | | | | | | | | | | | | |
| **HR** | 6,000 | 122,375 | 383,967 | 4,800 | 383,967 | 4,800 | 724,042 | 6,000 | 385,167 | 6,000 | 852,742 | 6,000 | 385,167 | 6,000 | 3,277,026 | |
| CCA Payroll | | | 379,167 | | 379,167 | | 379,167 | | 379,167 | | 379,167 | | 379,167 | | 2,275,000 | Bi Weekly |
| Health Insurance | | 117,575 | | | | | 117,575 | | | | 117,575 | | | | 352,726 | First week |
| CCA 401k Match | | | | | | | 221,300 | | | | | | | | 221,300 | One-time Feb 25 |
| Visa Fee and Other Exp | 6,000 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 78,000 | Weekly |
| Ordinary Course Bonuses | | | | | | | | | | | 350,000 | | | | 350,000 | One-time Mar 25 |
| | | | | | | | | | | | | | | | | |
| **IT** | | 70,000 | | | | | 70,000 | | | | 70,000 | | | | 210,000 | First week |
| | | | | | | | | | | | | | | | | |
| **Insurance** | | | 158,716 | | | | | 157,716 | | | | - | | | 316,432 | 2nd week |
| | | | | | | | | | | | | | | | | |
| **Employee Reimbursement** | 26,250 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 26,250 | 26,250 | 26,250 | 26,250 | 26,250 | 26,250 | 26,250 | 26,250 | 341,250 | Weekly |
| | | | | | | | | | | | | | | | | |
| **Office Expenses** | - | 18,500 | - | - | - | - | 15,000 | - | - | - | 215,000 | - | - | - | 248,500 | |
| | | | | | | | | | | | | | | | | |
| Rent | | | | | | | - | | | | - | | | | - | First week |
| Other | - | 18,500 | - | - | - | - | 15,000 | | | | 15,000 | | | | 48,500 | |
| Beijing Subsidiary Funding | | | | | | | | | | | 200,000 | | | | 200,000 | Quarterly |
| **Accounting & Finance** | 9,000 | - | 320,000 | - | - | 9,000 | 1,000 | - | - | 9,000 | 1,200,000 | - | - | 9,000 | 1,557,000 | |
| Professional Expenses | | | 320,000 | | | | 1,000 | | | | 1,200,000 | | | | 1,521,000 | First week |
| | | | | | | | | | | | | | | | | |
| Bank Fee | 9,000 | | | | | 9,000 | | | | 9,000 | | | | 9,000 | 36,000 | Last Week |
| **Licensing Fees** | | 1,500 | | | | | 1,500 | | | | 1,500 | | | | 4,500 | First week |
| | | | | | | | | | | | | | | | | |
| **Total Shared Services** | 41,250 | 233,375 | 883,683 | 25,800 | 404,967 | 34,800 | 837,792 | 189,966 | 411,417 | 41,250 | 2,365,492 | 32,250 | 411,417 | 41,250 | 5,954,708 | |
| | | | | | | | | | | | | | | | | |
| **Other Expenses** | - | 45,000 | - | - | - | - | 45,000 | - | - | - | 45,000 | - | - | - | 135,000 | |
| Independent Director | | 45,000 | | | | | 45,000 | | | | 45,000 | | | | 135,000 | First Week |
| | | | | | | | | | | | | | | | | |
| **Chap 11 Related Expenses** | 250,000 | - | - | 110,000 | 23,144 | - | 110,000 | - | - | 440,000 | 110,000 | - | - | 1,300,000 | 2,343,144 | |
| Debevoise | - | | | | | | | | | 240,000 | | | | 800,000 | 1,040,000 | Last Week |
| BDO | - | | | | | | | | | 120,000 | | | | 220,000 | 340,000 | Last Week |
| Cole Schotz | - | | | | | | | | | 80,000 | | | | 240,000 | 320,000 | Last Week |
| UCC Professionals | - | | | | | | | | | - | | | | 40,000 | 40,000 | Last Week |
| Claims Agent | | | | 10,000 | | | 10,000 | | | | 10,000 | | | | 30,000 | First Week |
| DIP Expenses | 250,000 | | | 100,000 | | | 100,000 | | | | 100,000 | | | | 550,000 | First Week |
| UST Fees | | | | | 23,144 | | | | | | | | | | 23,144 | Quarterly |
| | | | | | | | | | | | | | | | | |
| **Cash Out** | 291,250 | 278,375 | 883,683 | 135,800 | 428,111 | 34,800 | 992,792 | 189,966 | 411,417 | 481,250 | 2,520,492 | 32,250 | 411,417 | 1,341,250 | 8,432,852 | |
| | | | | | | | | | | | | | | | | |
| **Net CCA Cash Flow** | (291,250) | (278,375) | (883,683) | (135,800) | (428,111) | (34,800) | (992,792) | (189,966) | (411,417) | (481,250) | (2,520,492) | (32,250) | (411,417) | (1,341,250) | (8,432,852) | |
| | | | | | | | | | | | | | | | | |
| **Net Cash Flow (Excluding Funding)** | (291,250) | (278,375) | (883,683) | (135,800) | (428,111) | (34,800) | (992,792) | (189,966) | (411,417) | (481,250) | (2,520,492) | (32,250) | (411,417) | (1,341,250) | (8,432,852) | |
| | | | | | | | | | | | | | | | | |
| **Cash Funding Need:** | | | | | | | | | | | | | | | | |
| **From CSCEC Holding** | 5,000,000 | - | - | - | - | 3,000,000 | - | - | - | - | 619,852 | - | - | - | 8,619,852 | Weekly |
| | | | | | | | | | | | | | | | | |
| **Book Balances** | | | | | | | | | | | | | | | | |
| Beginning Balance | 213,000 | 4,921,750 | 4,643,375 | 3,759,692 | 3,623,892 | 3,195,781 | 6,160,981 | 5,168,189 | 4,978,223 | 4,566,807 | 4,085,557 | 2,184,917 | 2,152,667 | 1,741,250 | 213,000 | |
| Net Cash Flow (Excluding Funding) | (291,250) | (278,375) | (883,683) | (135,800) | (428,111) | (34,800) | (992,792) | (189,966) | (411,417) | (481,250) | (2,520,492) | (32,250) | (411,417) | (1,341,250) | (8,432,852) | |
| Funding From CSCEC Holding | 5,000,000 | | | | | 3,000,000 | - | | | | 619,852 | | | | 8,619,852 | |
| Ending Book Balance | 4,921,750 | 4,643,375 | 3,759,692 | 3,623,892 | 3,195,781 | 6,160,981 | 5,168,189 | 4,978,223 | 4,566,807 | 4,085,557 | 2,184,917 | 2,152,667 | 1,741,250 | 400,000 | 400,000 | |
| Cumulative CSCEC Holding Funding | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 8,000,000 | 8,000,000 | 8,000,000 | 8,000,000 | 8,000,000 | 8,619,852 | 8,619,852 | 8,619,852 | 8,619,852 | 8,619,852 | |

-

**CCA Construction Inc. Monthly Cash Flow Projection Notes**

|  | Notes |
|---|---|
| CCA Payroll | 41 CCA Construction employees; Includes future new hires/expats |
| Health Insurance | Includes CCA, Civil and Strategic Capital and life insurance for South Carolina |
| CCA 401k Match | Accrued up to 4% per paycheck through December. Paid in February. |
| Visa Fee and Other Exp | CCA and all subsidiaries |
| Ordinary Course Bonuses | Employee bonus Mar 25 (ordinary course / discretionary) |
| IT | Phone/cell phone/internet/printers/software/licenses paid by CCA and allocated to subsidiaries |
| Insurance | CCA pays to insurance company covering all subsidiaries.  Most policies are May to April.  2025 insurance rates are estimated to be lower than 2024 rates due to lower revenue |
| Employee Reimbursement | Employee related reimbursement for travel and meals |
| Rent | No cash payment from CCA to the Morristown Southgate LLC (landlord). $400k rent prepaid to Morristown Southgate LLC (related party landlord). $25k per month office rent (noncash payment) will reduce the prepayment amount. |
| Beijing Subsidiary Funding | Beijing fee to cover office and employee expenses primarily insurance for CCA employees |
| Professional Expenses | Audit, tax - covering all subsidiaries. Tax is contracted with CCA, Audit is contracted with CSCEC Holdings. The January 2025 payment relates to the remaining amounts owed for 2022 audit and 2023 tax. The March 2025 payment relates to 2023 and 2024 audit. No 2024 tax payment forecasted as this is being taken care of by CSCEC Holding. |
| Licensing Fees | Fees based on contract - primarily related to licensing |
| Independent Director | Independent director fees and expense reimbursement |
| Chap 11 Related Expenses |  |
| Debevoise | 80% monthly fees paid one month in arrears; 20% Holdback paid 120 days |
| BDO | 80% monthly fees paid one month in arrears; 20% Holdback paid 120 days |
| Cole Schotz | 80% monthly fees paid one month in arrears; 20% Holdback paid 120 days |
| Other Professionals | 80% monthly fees paid one month in arrears; 20% Holdback paid 120 days |
| Claims Agent | Monthly estimate |
| DIP Expenses | Reimbursement of expenses |
| UST Fees | Assumes 0.8% of quarterly disbursements |

**<u>EXHIBIT B</u>**

**Final Order**

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)** | |
| **DEBEVOISE & PLIMPTON LLP** M. Natasha Labovitz (*pro hac vice* pending) Sidney P. Levinson (*pro hac vice* pending) Elie J. Worenklein Shefit Koboci (*pro hac vice* pending) 66 Hudson Boulevard New York, NY 10001 Telephone: (212) 909-6000 Facsimile: (212) 909-6836 nlabovitz@debevoise.com slevinson@debevoise.com eworenklein@debevoise.com skoboci@debevoise.com **COLE SCHOTZ P.C.** Michael D. Sirota Warren A. Usatine Felice R. Yudkin Ryan T. Jareck Court Plaza North, 25 Main Street Hackensack, NJ 07601 Telephone: (201) 489-3000 msirota@coleschotz.com wusatine@coleschotz.com fyudkin@coleschotz.com rjareck@coleschotz.com *Proposed Co-Counsel to the Debtor and Debtor in Possession* | |
| In re: CCA Construction, Inc.,[1] Debtor. | Case No. 24-_____ (___) Chapter 11 Judge: |

---

[1]    The last four digits of CCA's federal tax identification number are 4862.  CCA's service address for the purposes of this chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

| (Page \| 2) | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

## FINAL ORDER (I) AUTHORIZING
## THE DEBTOR TO OBTAIN POSTPETITION
## FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY
## ADMINISTRATIVE EXPENSE CLAIMS; (III) MODIFYING
## THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered two (2) through thirty-nine (39), is

**ORDERED**.

(Page | 3)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Upon CCA's motion filed on the Petition Date [Docket No. ___] (the "**Motion**")[2] pursuant to sections 105, 362, 363, 364. 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Local Rules 4001-3, 9013-1, and 9013-5 for entry of this Final Order:

(a)     authorizing CCA, on the terms set forth in the DIP Loan Documents (as defined below), to obtain postpetition financing, consisting of up to $40,000,000 (the "**DIP Commitments**") comprising a first lien secured multi-draw term loan facility (the "**DIP Facility,**" and each individual loan made thereunder, a "**DIP Loan**," collectively the loans made thereunder, the "**DIP Loans**," and, together with related obligations incurred under the DIP Facility, the "**DIP Obligations**"), $5,000,000 of which became available in a single draw upon entry of the Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief [Docket No. ___] (the "**Interim Order**"), $3,000,000 of which will be available in a single draw upon entry of a final order granting the relief sought in the Motion in form and substance reasonably acceptable to the DIP Lenders (the "**Final Order**"), and the remainder of which will be available in multiple draws of no less than $500,000 per single draw following entry of the Final Order (or, in the event the balance of DIP Commitments are less than

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

| | |
|---|---|
| (Page | 4) | |
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

$500,000, the full amount of undrawn DIP Commitments), from CCA's parent company, CSCEC Holding Company, Inc. (the "**DIP Lender**," and together with all other entities that become lenders under the DIP Loan Documents from time to time and each of their respective successors and permitted assigns, the "**DIP Lenders**");[3] in each case subject to the satisfaction of the conditions precedent set forth in the DIP Credit Agreement; for which CSCEC Holding Company, Inc. shall serve as administrative and collateral agent (in such capacities, together with its successors in such capacities, the "**DIP Agent**," and the DIP Agent, together with the DIP Lenders, are the "**DIP Secured Parties**" and each is a "**DIP Secured Party**"); authorizing CCA to execute and deliver additional documentation consistent with the terms of (or as may be required by) the DIP Credit Agreement substantially in the form attached hereto as **Annex A** without exhibits or schedules (as such agreement may be amended, in accordance with its terms and this Final Order, and including the exhibits and schedules thereto, the "**DIP Credit Agreement**") and the other DIP Loan Documents, and to perform such other and further acts as may be necessary or appropriate in connection therewith, or otherwise required under the DIP Loan Documents;

---

[3] For the avoidance of doubt, (a) nothing herein shall preclude the ability of the DIP Lenders to, in accordance with the applicable DIP Loan Documents, offer a portion of the DIP Commitments and DIP Loans to third-party capital providers and other financial institutions or other entities, it being understood that no such assignment or transfer shall become effective with respect to any portion of the DIP Commitments until the Closing Date (as defined in the DIP Credit Agreement); and (b) thereafter, assignments and participations of DIP Loans and DIP Commitments shall be in accordance with the DIP Loan Documents.

| (Page | 5) | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

(b)  authorizing CCA to use proceeds of the DIP Loans (the "**DIP Loan Proceeds**") as permitted in, and solely in accordance with, the DIP Loan Documents, this Final Order, and the Approved Budget (as defined herein);

(c)  granting valid, binding, continuing, enforceable, and automatically perfected (a) security interests in and liens on all of the Collateral (as defined in the DIP Credit Agreement) to the DIP Agent for the benefit of the DIP Secured Parties, and (b) granting superpriority administrative expense status to the DIP Obligations (as defined below), in each case subject to the Carve Out (as defined below);

(d)  authorizing CCA to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Loan Documents as and when such amounts become due and payable without other or further notice or order;

(e)  vacating and modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Final Order and the other DIP Loan Documents;

(f)  waiving CCA's ability to surcharge against any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code;

(g)  waiving any applicable stay with respect to the effectiveness and enforceability of this Final Order (including under Bankruptcy Rule 6004); and

(h)  granting CCA such other and further relief as is just and proper.

(Page | 6)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Upon consideration of (a) the Motion and the exhibits attached thereto, (b) the evidentiary record made at the Final hearing, which was held on January [●], 2025, pursuant to Bankruptcy Rule 4001(c)(2) (the "**Final Hearing**"), (c) the First Day Declarations, (d) the arguments and statements of counsel at the Final Hearing, and (e) all matters brought to the Court's attention at the Final Hearing, and the Court having found and determined that (i) the relief sought in the Motion is necessary to avoid immediate and irreparable harm to CCA and its estate as contemplated by Bankruptcy Rule 6003, and is in the best interests of CCA, its estate, creditors, stakeholders, and all other parties-in-interest, and essential for the continued operation of CCA's business and the preservation of the value of CCA's assets and (ii) the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND DETERMINES:**[4]

A.    <u>Petition Date</u>. On December 22, 2024 (the "**Petition Date**"), CCA filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code and is continuing to operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this case.

B.    <u>Jurisdiction; Core Proceeding</u>. This Court has jurisdiction over this chapter 11 case, the Motion, this Final Order, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984,

---

[4]    To the extent any findings of fact constitute conclusions of law, they are adopted as such, and vice versa.

| (Page | 7) | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

and amended on September 18, 2012 (Simandle, C.J.).  This is a "core" proceeding pursuant to

28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409.

C.  <u>Immediate Need for Postpetition Financing</u>.  An immediate and ongoing need

exists for CCA to obtain the DIP Loans in order to permit, among other things, CCA to meet its

obligations arising during CCA's chapter 11 case, including the administration of CCA's chapter

11 case, so as to maximize the value of its business and assets as debtor in possession under

chapter 11 of the Bankruptcy Code.  CCA does not have sufficient available sources of working

capital to operate its business without access to the DIP Facility, warranting expedited

consideration of the Motion and entry of this Final Order.  CCA's ability to preserve and

maintain its assets, to pay employees, and to otherwise fund operations and an orderly chapter 11

process, is essential to CCA's viability and preservation of the going-concern value of its

business and the value of its assets.  Without access to the DIP Facility, CCA's estate would

suffer immediate and irreparable harm.

D.  <u>Proposed DIP Facility</u>.  CCA has requested that the DIP Lenders establish the

DIP Facility pursuant to which CCA may obtain DIP Loans from time to time in accordance with

the DIP Loan Documents, with all DIP Loans to be secured by DIP Liens (as defined below)

upon the Collateral as described below, and all DIP Loans and obligations of CCA contemplated

by the DIP Loan Documents to be granted superpriority administrative expense claims, as and to

the extent set forth in the DIP Loan Documents.  The DIP Lenders are willing to establish the

DIP Facility upon the terms and conditions set forth in the DIP Loan Documents.

| (Page \| 8) | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

E.       <u>No Credit Available on More Favorable Terms</u>. Despite diligent efforts and a sufficient marketing process, CCA has been unable to obtain postpetition financing on terms more favorable than those offered by the DIP Lenders under the DIP Loan Documents.  CCA is unable to obtain adequate unsecured credit under section 503(b)(1) of the Bankruptcy Code.  CCA also is unable to obtain secured credit allowable under section 364 of the Bankruptcy Code without granting the DIP Liens and the DIP Superpriority Claims (each, as defined below) under sections 364(c) and 364(d) of the Bankruptcy Code on the terms and conditions set forth in this Final Order and the other DIP Loan Documents.

F.       <u>Approved Budget</u>. CCA has delivered to the DIP Agent a 13-week cash flow forecast of receipts and disbursements for the period from the Closing Date (as defined in the DIP Credit Agreement), attached to this Final Order as **Annex B** (the "**Approved Budget**"), which Approved Budget is reasonably acceptable to the DIP Lenders in accordance with the DIP Loan Documents.  The DIP Secured Parties are relying upon the Approved Budget in entering into the DIP Loan Documents.

G.       <u>Certain Conditions to DIP Facility</u>. The DIP Lenders' willingness to make the DIP Loans is conditioned upon, among other things, (a) CCA obtaining Court approval to enter into the DIP Loan Documents and to incur all of its obligations thereunder, and to confer upon the DIP Secured Parties all rights, powers, and remedies thereunder and (b) the DIP Secured Parties being granted, as security for the prompt payment of the obligations under the DIP Facility and all other DIP Obligations, perfected security interests in and liens upon the

(Page | 9)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Collateral, and that such perfected security interests and liens have the priorities set forth herein and in the other DIP Loan Documents.

H.    <u>Service of Motion and Notice of Final Hearing</u>.  The affidavit and declaration of service on file with the Court (Docket No. [●]) demonstrate that CCA has served copies of the Motion (together with the copies of the proposed DIP Credit Agreement and Approved Budget annexed hereto as **<u>Annexes A and B</u>**, respectively), and notice of the Final Hearing by electronic mail, telecopy transmission, hand delivery, overnight courier, or first class United States mail upon (a) the Office of the United States Trustee for the District of New Jersey; (b) the entities listed on the *List of Creditors Holding the 20 Largest Unsecured Claims*; (c) the Internal Revenue Service; (d) the Office of the United States Attorney for the District of New Jersey; (e) the Initial DIP Lenders and their counsel Lowenstein Sandler LLP; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Court finds that the foregoing notice of the Motion, as it relates to this Final Order and the Final Hearing, is appropriate, due, and sufficient for all purposes under the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, including sections 102(1) and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c), and that no further notice of the relief sought at the Final Hearing and the relief granted herein is necessary or required.

I.    <u>Prior Liens</u>.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Prior Lien (as defined in the DIP Credit Agreement) is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing shall prejudice the rights of any party in interest, including CCA, the DIP Agent, or any statutory creditors' committee (if appointed), to

| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prior Lien. The right, if any, of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Prior Lien.

J.    <u>Finding of Good Cause</u>. Good cause has been shown for the entry of this Final Order and authorization for: (a) the DIP Lenders to provide CCA with the DIP Loans and (b) CCA to accept, incur, and undertake the DIP Obligations pursuant to the DIP Loan Documents during the Interim Period. CCA's need for financing of the type afforded by the DIP Loan Documents is critical. Entry of this Final Order will preserve the value of the assets of CCA's estate and is in the best interests of CCA, its creditors and its estate. The terms of the DIP Facility are fair and reasonable, including the interest rates and fees owed thereunder, reflect CCA's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

K.    <u>Finding of Good Faith</u>. Based upon the record presented at the Final Hearing, the DIP Facility has been negotiated in good faith and at arm's length between CCA, on the one hand, and the DIP Secured Parties, on the other. All of the DIP Obligations, including all DIP Loans made pursuant to the DIP Loan Documents and all other liabilities and obligations of CCA under this Final Order, owing to the DIP Secured Parties shall be deemed to have been extended by the DIP Secured Parties in "good faith," as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The DIP Secured Parties shall be entitled to the full protection of section

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

L.      <u>No Liability to Third Parties</u>. Subject to entry of the Final Order, CCA stipulates and the Court finds that in making decisions to advance DIP Loans to CCA, in administering any DIP Loans, in accepting the Approved Budget, or in taking any other actions permitted by this Final Order or the other DIP Loan Documents in their respective capacities as DIP Lenders or DIP Agent, none of the DIP Secured Parties shall be deemed to be in control of the operations of CCA or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of CCA.

M.      <u>Immediate Entry</u>. CCA has requested immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(c)(2) and the Local Rules. Absent the immediate grant by the Court of the relief sought by the Motion, CCA's estate will be immediately and irreparably harmed. The consummation of the DIP Facility in accordance with the terms of this Final Order and the other DIP Loan Documents, is in the best interest of CCA's estate, and is consistent with CCA's exercise of its fiduciary duties. Under the circumstances, the notice given by CCA of the Motion and Final Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(c) and the Local Rules. No further notice of the relief sought at the Final Hearing is necessary or required.

N.      <u>No Claims or Causes of Action</u>. Subject to entry of the Final Order, there exist no claims or causes of action against any of the DIP Agent or the other DIP Secured Parties with

(Page | 12)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

respect to, in connection with, related to, or arising from the DIP Loan Documents, or the DIP

Facility that may be asserted by the DIP Secured Parties or CCA or any other person or entity.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDICATED, AND**

**DECREED** as follows:

1.    <u>Grant of Motion; Authorization of Postpetition Financing; Use of Proceeds</u>.

(a)    The Motion is hereby granted as and to the extent provided herein, and the

Court hereby authorizes and approves CCA's execution and delivery of the DIP Loan

Documents, and CCA's execution and delivery of all instruments, security agreements,

assignments, pledges, mortgages, reaffirmations, and other documents referred to therein

or reasonably requested by the DIP Secured Parties to give effect to the terms thereof and

as will be drafted and executed as contemplated therein, in each case, in final form and

substance consistent with this Final Order and otherwise reasonably acceptable to the DIP

Secured Parties (collectively, this Final Order, the DIP Credit Agreement, the Collateral

Documents, the Approved Budget, and any other document delivered to any DIP Secured

Party in connection with any of the foregoing, in each case, as the same may be amended,

restated, or otherwise modified from time to time in accordance with the terms of this

Final Order and the DIP Credit Agreement, are referred to herein as the "**DIP Loan**

**Documents**").

(b)    CCA is hereby authorized to borrow under the DIP Loan Documents and

this Final Order up to an interim aggregate principal amount of $5,000,000 during the

Interim Period, subject to any conditions and limitations on availability in the DIP Loan

| (Page \| 13) | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Documents, plus all interest, fees, and other charges payable in connection with the DIP Loans as provided in the DIP Credit Agreement and other DIP Loan Documents; to incur any and all liabilities and obligations under the DIP Loan Documents; and to pay all principal, interest, fees, expenses, and other obligations provided for under the Approved Budget and the other DIP Loan Documents, including the obligations under the DIP Loan Documents to indemnify each Indemnitee (as defined in the DIP Credit Agreement);

(c)    No DIP Secured Party shall have any obligation or responsibility to monitor the use of the DIP Loans, and each DIP Secured Party may rely upon CCA's representations that the amount of the DIP Loans requested at any time, and the use thereof, are in accordance with the requirements of this Final Order, the Approved Budget, the DIP Loan Documents, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

(d)    CCA may obtain and use the DIP Loan Proceeds during the Interim Period only as permitted under the DIP Loan Documents.  For the avoidance of doubt, no DIP Loan Proceeds may be used to make any payment in settlement or satisfaction of any prepetition claim or administrative claim, unless such payment is (a) contemplated by the Interim Order, this Final Order, the DIP Credit Agreement, or an Acceptable Plan, (b) in compliance with the Approved Budget, (c) made with the prior written consent of the DIP Lenders in accordance with the terms of the DIP Credit Agreement, or (d) to the extent required by applicable law, separately approved or authorized by the Court upon notice to the DIP Agent.

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

2.     <u>Entry into, Execution, Delivery, and Performance of DIP Loan Documents</u>.  CCA is hereby authorized to (a) enter into the DIP Credit Agreement and the other DIP Loan Documents, (b) incur and perform the DIP Obligations arising from and after the date of the Interim Order under the DIP Facility, (c) repay amounts borrowed, together with interest, and (d) pay all fees, costs, and expenses contemplated therein (including but not limited to indemnification of the Indemnitees), as well as any other outstanding DIP Obligations to the DIP Secured Parties, in each case in accordance with and subject to the terms and conditions set forth in this Final Order, the other DIP Loan Documents, and such additional documents, instruments, and agreements as may reasonably be required by the DIP Secured Parties to implement the terms or effectuate the purpose of and transactions contemplated by the DIP Loan Documents, the terms of which are incorporated by reference.  The DIP Loan Documents may be executed and delivered on behalf of CCA by any officer, director, or agent of CCA, who by signing shall be deemed to represent himself or herself to be duly authorized and empowered to execute such DIP Loan Documents for and on behalf of CCA.  The DIP Secured Parties shall be authorized to rely upon any such person's execution and delivery of any of the DIP Loan Documents as having done so with all requisite power and authority to do so, and the execution and delivery of any of the DIP Loan Documents by any such person on behalf of CCA shall be conclusively presumed to have been duly authorized by all necessary corporate action of CCA.  Upon execution and delivery thereof, each of the DIP Loan Documents shall constitute valid and binding obligations of CCA, enforceable against CCA in accordance with its terms for all purposes during its chapter 11 case, any subsequently converted case of CCA under chapter 7 of the Bankruptcy Code

(Page | 15)

| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

(a "**Successor Case**"), and after the dismissal of any chapter 11 case. Subject to the provisions of paragraph 14, no obligation, payment, or transfer under the DIP Loan Documents or this Final Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including under sections 502(d), 544, 547, 548, 549, or 550 of the Bankruptcy Code or under any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.

3.    <u>DIP Liens</u>.  As security for CCA's payment and performance under the DIP Loan Documents, all principal, interest, costs, expenses, fees, and other charges at any time payable by CCA to the DIP Secured Parties in connection with the DIP Loan Documents, all reimbursement obligations, and all other indebtedness and obligations contemplated under any of the DIP Loan Documents (all of the foregoing being collectively called the "**DIP Obligations**"), the DIP Agent, for itself and for the benefit of the DIP Lenders, is hereby granted the following valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens upon all of the DIP Collateral (collectively, the "**DIP Liens**") in the priorities set forth in subparagraphs (a) and (b) below, each of which shall be subject to the Carve Out:

(a)    First priority liens pursuant to section 364(c)(2) of the Bankruptcy Code on all Collateral that was not encumbered by Permitted Senior Liens (as defined below), and

(b)    to the extent any Collateral is subject to any (i) liens perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code or (ii) liens on

(Page | 16)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (____) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

retainers held by professionals, to the extent such retainers are not prohibited under the Bankruptcy Code or any applicable orders of the Court (the foregoing clauses (i) and (ii) being referred to collectively as the "**Permitted Senior Liens**"), senior liens, pursuant to section 364(d) of the Bankruptcy Code, on such Collateral subject and subordinate only to Permitted Senior Liens.

(c)    <u>Liens Senior to Certain Other Liens</u>. The DIP Liens shall be effective immediately upon the entry of this Final Order and shall not at any time be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of CCA or CCA's estate under section 551 of the Bankruptcy Code, (B) except to the extent the DIP Loan Documents expressly allow a postpetition lien to have priority over the DIP Liens, any postpetition liens granted by CCA to other persons or entities or otherwise arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board, or court for any liability of CCA, or (C) any intercompany or affiliate liens or security interests against CCA; (ii) subordinated to or made *pari passu* with any other lien or security interest on the Collateral under section 363 or 364 of the Bankruptcy Code; or (iii) subject to sections 510(c), 548, 549, or 550 of the Bankruptcy Code.  In no event shall any person or entity who pays (or, through the extension of credit to CCA, causes to be paid) any of the DIP Obligations be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens, or priorities granted to or in favor of, or conferred upon, any DIP Secured Party by the terms of any DIP Loan Documents or this Final

| (Page \| 17) | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Order unless such person or entity contemporaneously causes payment in full of all of the DIP Obligations.

(d)    <u>Right to Challenging Competing Liens</u>. The DIP Agent (at the direction of the DIP Lenders in accordance with the terms of the DIP Credit Agreement) shall have the right and the standing to challenge the validity, priority, perfection, extent, or amount of any lien or security interest filed or otherwise asserted against CCA that relates to DIP Collateral that purports to be senior or *pari passu* with to any DIP Lien, including any lien or security interest that, if found to be valid, enforceable, non-revocable, and perfected, would constitute a Prior Lien.

(e)    <u>Exclusion from Collateral</u>. Solely for the purposes of this Final Order, notwithstanding anything to the contrary herein or in the DIP Loan Documents, Collateral shall not include any of CCA's (i) leasehold interests in equipment leases or the equipment leased thereunder or (ii) equipment subject to financing arrangements (whether through secured loans, finance leases, or otherwise) and interests in the underlying financing agreements, in each case to the extent that the relevant lease or financing agreement prohibits or conditions the grant of a lien or the assignment of the lease or other financing agreement upon the consent of a non-debtor counterparty to the extent such consent (A) is not actually obtained (after the use of commercially reasonable efforts to obtain such consent) and (B) is required under applicable law to grant the applicable security interest.

4.    <u>Superpriority Claims</u>.

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

(a)    <u>Allowed Claims</u>. All DIP Obligations shall at all times constitute superpriority administrative expense claims against CCA (the "**DIP Superpriority Claims**") that will, in accordance with section 364(c)(1) of the Bankruptcy Code, have priority over any and all administrative expenses of and unsecured claims against CCA now existing or hereafter arising, of any kind or nature whatsoever, including but not limited to all administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code (including those resulting from the conversion of this chapter 11 case pursuant to section 1112 of the Bankruptcy Code), subject only to the Carve Out.  The DIP Superpriority Claims shall survive any conversion of this chapter 11 case to a case under chapter 7 of the Bankruptcy Code or the dismissal of this chapter 11 case.  Subject only to the Carve Out, the DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of CCA and its estate (excluding Avoidance Actions but, upon entry of the Final Order, including Avoidance Proceeds (as such terms are defined below)).

(b)    <u>Proceeds of Avoidance Actions</u>.  The DIP Superpriority Claims shall have recourse to all proceeds (the "**Avoidance Proceeds**") of all of CCA's claims and causes of action pursuant to sections 502(d), 544, 545, 547, 548, 549, 550, 551, 553(b), 732(2), or 742(2) of the Bankruptcy Code (the "**Avoidance Actions**"), including but not limited to all of CCA's claims and causes of actions pursuant to section 549 and 550 of the

| | |
|---|---|
| (Page | 19) | |
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Bankruptcy Code to avoid and recover any postpetition transfer of DIP Collateral or postpetition transfer of DIP Loan Proceeds.

5.      <u>Repayment of DIP Obligations</u>. The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Loan Documents and as provided herein, without defense, offset, or counterclaim.  Without limiting the generality of the foregoing, in no event shall CCA be authorized to offset or recoup any amounts owed, or allegedly owed, by any DIP Secured Party to CCA or any of its subsidiaries or affiliates against any of the DIP Obligations without the prior written consent of the DIP Secured Parties, if any, that would be adversely affected by any such offset or recoupment, and no such consent shall be implied from any action, inaction or acquiescence by any DIP Secured Party.

6.      <u>Payments Free and Clear</u>.  All payments or proceeds remitted to the DIP Agent by or on behalf of CCA pursuant to the DIP Loan Documents, the provisions of this Final Order, or any subsequent order of this Court or any other court exercising jurisdiction over this chapter 11 case or any Successor Case, shall be received free and clear of any claim, charge, assessment, or other liability, including any such claim or charge arising out of or based on, directly or indirectly, section 506(c).

7.      <u>Fees and Expenses of Estate Professionals</u>. Subject to paragraphs 12 and 13 below, CCA is authorized to use DIP Loan Proceeds to pay such compensation and expense reimbursement (collectively, "**Professional Fees**") of professional persons (including attorneys, financial advisors, accountants, investment bankers, appraisers, and consultants, in each case to the extent such professional person's retention is subject to court approval) retained pursuant to

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

section 327, 330, 331, 363, or 1103 of the Bankruptcy Code, as applicable, by CCA (such retained professionals, the "**Debtor's Professionals**") or a statutory creditors' committee, (such retained professionals, the "**Committee Professionals**" and, collectively with CCA's Professionals, the "**Professionals**"), to the extent that such compensation and expense reimbursement is authorized and approved by the Court at any time.

8.  <u>Section 506(c) Claims</u>. Except to the extent of the Carve Out, no costs or expenses of administration shall be imposed upon any DIP Secured Party or on any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of such DIP Secured Party, and no such consent shall be implied from any action, inaction, or acquiescence by any DIP Secured Party. Further, CCA waives, and shall not assert in this chapter 11 case or any Successor Case, any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise with respect to the DIP Obligations or the DIP Liens.

9.  <u>Carve Out</u>.

(a)    Notwithstanding anything to the contrary in this Final Order, any other DIP Loan Document, or any other order of this Court to the contrary, the rights and claims of the DIP Lenders, including the DIP Liens and DIP Superpriority Claims, shall be subject and subordinate in all respects to the payment of the Carve Out. As used in this Final Order, "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under sections 156(c) and 1930(a) of title 28 of the United States Code plus interest, if any, as set forth in section 3717 of title

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

31 of the United States Code (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (as defined below), whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) accrued or incurred by the Professionals (such fees and expenses, the "**Allowed Professional Fees**") at any time before or on the first business day following the day on which a Carve Out Trigger Notice is delivered by the DIP Agent in accordance with this paragraph 9 (such date of delivery, the "**Termination Declaration Date**"); and (iv) Allowed Professional Fees incurred after the first business day following the Termination Declaration Date, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, in an aggregate amount not to exceed $3,000,000 less the amount of any prepetition retainers received by the Professionals and not applied to the fees, disbursements, costs, and expenses set forth in clause (iii) above (the amount set forth in this clause (iv), the "**Post-Carve Out Trigger Notice Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the DIP Lenders) to CCA, its lead restructuring counsel, the U.S. Trustee, and counsel to any statutory creditors' committee, which notice may be delivered following the occurrence and during the continuation of

| Debtor: | CCA Construction, Inc. |
| --- | --- |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

an Event of Default (as defined in any DIP Loan Document), stating that the Post-Carve

Out Trigger Notice Cap has been invoked.

(b)     On the Termination Declaration Date, the Carve Out Trigger Notice shall

constitute a demand to CCA to utilize all cash on hand as of such date to fund a reserve in

an amount equal to the then-unpaid amounts of the Allowed Professional Fees within one

business day of the Termination Declaration Date; *provided* that in the event that a

Termination Declaration Date occurs, each Professional shall have two business days to

deliver to CCA such Professional's good faith estimate of the Allowed Professional Fees

incurred through the Termination Declaration Date, and CCA shall fund into the Carve

Out Account (as defined below) such amounts within one business day of receipt of such

estimates.   CCA shall deposit and hold such amounts (the "**Pre-Carve Out Trigger**

**Notice Reserve**") in the Carve Out Account in trust to pay such then-unpaid Allowed

Professional Fees prior to any and all other Allowed Professional Fees.   On the

Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a

demand to CCA to utilize all cash on hand as of such date and any available cash

thereafter held by CCA, after funding the Pre-Carve Out Trigger Notice Reserve, to fund

a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.   CCA shall

deposit and hold such amounts (the "**Post-Carve Out Trigger Notice Reserve**" and,

together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") in a

segregated account (the "**Carve Out Account**") at an institution reasonably designated

by the DIP Agent (at the direction of the DIP Lenders) in trust to pay such Allowed

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap prior to any and all other Allowed Professional Fees.  For the avoidance of doubt, the Carve Out Account and all funds on deposit therein from time to time, including but not limited to the Carve Out Reserves, shall continue to constitute Collateral, subject only to the terms of the Carve Out as described in this paragraph 9.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**") until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to repay the DIP Obligations, unless the DIP Obligations have been indefeasibly paid in full and all DIP Commitments have been terminated, in which case such remaining funds shall be retained by CCA.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "**Post-Carve Out Amounts**") until paid in full, and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to repay the DIP Obligations, unless the DIP Obligations have been indefeasibly paid in full and all DIP Commitments have been terminated, in which case such remaining funds shall be retained by CCA.

(c)　　　Notwithstanding anything to the contrary in this Final Order or the other DIP Loan Documents, following delivery of a Carve Out Trigger Notice, none of the DIP Secured Parties shall be permitted to sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of CCA in the Carve Out Account

| Debtor: | CCA Construction, Inc. |
|---|---|
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

unless and until the Pre-Carve Out Amounts (with respect to the Pre-Carve Out Trigger Notice Reserve) or Post-Carve Out Amounts (with respect to the Post-Carve Out Trigger Notice Reserve), as applicable, are paid in full as described in paragraph 9(b) above. Further, notwithstanding anything to the contrary in this Final Order or the other DIP Loan Documents, (i) disbursements by CCA from the Carve Out Account shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, (iii) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by CCA, and (iv) the Carve Out as provided for and capped by this Final Order shall be senior to and have priority over all liens securing the DIP Obligations and the DIP Superpriority Claims.  Notwithstanding the foregoing, subject to the terms of any applicable retention orders entered by the Court, the DIP Secured Parties reserve all of their rights to challenge or otherwise object to any of the fees or expenses sought to be approved by any of the Professionals.

(d)      Any payment or reimbursement made prior to the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.  Any payment or reimbursement made on or after the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

| | |
|---|---|
| (Page \| 25) | |
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

(e)     None of the DIP Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional incurred in connection with the chapter 11 case or any Successor Case.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional or to guarantee that CCA has sufficient funds to pay such compensation or reimbursement.

10.     <u>DIP Loan Proceeds Restrictions</u>. Neither the Carve Out nor any DIP Loan Proceeds or Collateral shall be used to, among other things (any of the following each a "**Prohibited Purpose**"): (a) object to, seek subordination of, or contest the validity, extent, perfection, priority, or enforceability of the DIP Facility or the amount due thereunder and the superpriority claims granted thereby, the DIP Liens; (b) investigate, initiate, assert, or prosecute any claim, defense, demand, or cause of action against the DIP Agent or the DIP Lenders or any of their respective officers, directors, employees, agents, attorneys, representatives, subsidiaries, affiliates, or shareholders, under or relating to the DIP Facility, including, in each case, any action, suit or other proceeding for breach of contract or tort or pursuant to sections 105, 506, 510, 544, 547, 548, 549, 550, 551, 552, or 553 of the Bankruptcy Code, or under any other applicable law (state, federal, or foreign), or otherwise; (c) prevent, hinder, or delay, whether directly or indirectly, any DIP Secured Party's assertion or enforcement of its liens and security interests, or its efforts to realize upon any DIP Collateral or the claims authorized or granted under the DIP Loan Documents or exercise any other rights and remedies under the DIP Loan Documents or applicable law; (d) seek to modify any of the rights granted under this Final Order

| Debtor: | CCA Construction, Inc. |
|---|---|
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

to any DIP Secured Party; (e) assert any defense, counterclaim, or offset any DIP Obligations or any other rights or claims granted by this Final Order or the Other DIP Loan Documents; or (f) object to, contest, delay, prevent, or interfere in any way with the exercise of rights or remedies by any DIP Secured Party with respect to any Collateral unless as specifically permitted by the DIP Loan Documents.

11.    <u>Reservation of Rights</u>.

(a)    <u>Protection from Subsequent Financing Order</u>.  Prior to the payment in full of all DIP Obligations and the termination of all funding commitments under the DIP Facility in accordance with the terms of the DIP Loan Documents, there shall not be entered in this chapter 11 case or in any Successor Case any order other than with the consent of the DIP Agent and the requisite DIP Lenders (as provided for in the DIP Loan Documents) that authorizes the obtaining of credit or the incurrence of indebtedness by CCA (or any trustee or examiner) that is: (i) secured by a security interest, mortgage, or other lien on all or any part of the DIP Collateral that is equal or senior to the DIP Liens or (ii) entitled to claims with payment priority that is equal or senior to the DIP Superpriority Claims; *provided, however*, that nothing herein shall prevent the entry of an order that specifically provides for, as a non-waivable condition to the granting of the benefits of clauses (i) and (ii) above, (1) the indefeasible payment in full and in cash of all of the DIP Obligations and (2) the termination of any funding commitments under the DIP Loan Documents.

(Page | 27)

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

(b)    <u>Rights Upon Dismissal, Conversion, or Consolidation</u>. The dismissal, conversion, transfer of venue, or substantive consolidation of this chapter 11 case shall not affect the rights or remedies of any DIP Secured Party under the DIP Loan Documents or this Final Order, and all of the respective rights and remedies hereunder and thereunder of each DIP Secured Party shall remain in full force and effect as if such chapter 11 case had not been dismissed, converted, transferred, or substantively consolidated.

(c)    <u>Survival of Final Order</u>.  This Final Order, and any actions taken pursuant hereto, shall survive the entry of and shall not be modified, superseded, impaired, discharged, or in any way altered, without the consent of the DIP Secured Parties, by any order that may be entered: (i) confirming any plan of reorganization or liquidation in CCA's chapter 11 case; (ii) converting CCA's chapter 11 case to a case under chapter 7 of the Bankruptcy Code; (iii) dismissing CCA's chapter 11 case or any Successor Case; (iv) transferring venue of CCA's chapter 11 case to another court; or (iv) pursuant to which the Court abstains from hearing the chapter 11 case or any Successor Case.  The terms and provisions of this Final Order, including the claims, liens, security interests, and other protections granted to the DIP Secured Parties pursuant to this Final Order or the other DIP Loan Documents, shall continue in full force and effect notwithstanding the entry of any such order, and such rights, claims and liens shall maintain their priority as provided by this Final Order and the other DIP Loan Documents to the maximum extent

| Debtor: | CCA Construction, Inc. |
|---|---|
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

permitted by law until all of the DIP Obligations are indefeasibly paid in full in accordance with the DIP Loan Documents.

(d)     <u>No Discharge</u>. None of the DIP Obligations shall be discharged by the entry of any order confirming a plan of reorganization or liquidation in this chapter 11 case unless such obligations have been indefeasibly paid in full and in cash in accordance with the DIP Loan Documents on or before the effective date of such plan, or each of the DIP Secured Parties has otherwise agreed in writing, and, pursuant to section 1141(d)(4) of the Bankruptcy Code, CCA has waived such discharge.

(e)     <u>Credit Bid Protection</u>. The DIP Secured Parties shall have, pursuant to section 363(k) of the Bankruptcy Code, the unqualified right to credit bid, or purchase, up to the full amount of the DIP Obligations and the DIP Superpriority Claims, without the need for further Court order authorizing the same, in connection with any sale of any of the DIP Collateral, whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.  CCA shall not object to or support any objection to any DIP Secured Party credit bidding up to the full amount of its outstanding DIP Obligations in accordance with the applicable DIP Loan Documents in any sale of any DIP Collateral, whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

(f)      No Marshaling.  In no event shall any DIP Secured Party be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any DIP Collateral.

(g)      No Requirement to File Claim for DIP Obligations. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, no DIP Secured Party shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Loan Documents applicable thereto without the necessity of filing any such proof of claim or request for payment of administrative expenses; and the filing of or failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Loan Documents or of any DIP Obligations arising at any time thereunder, or prejudice or otherwise adversely affect any DIP Secured Party's rights, remedies, powers, or privileges under any of the DIP Loan Documents, this Final Order, or applicable law.

12.      Automatic Perfection of Liens. The DIP Liens are effective, valid, binding, enforceable, and duly perfected upon entry of this Final Order.  None of the DIP Secured Parties shall be required to file any UCC-1 financing statement, mortgage, deed of trust, assignment, pledge, security deed, notice of lien, or any similar document or instrument in any jurisdiction or

| Debtor: | CCA Construction, Inc. |
|---|---|
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

take any other action (including taking possession of any of the DIP Collateral) in order to validate the perfection of any DIP Liens, but all of such filings and other actions are hereby authorized by the Court. If the DIP Agent, in its discretion, chooses to file or record any such mortgage, deed of trust, assignment, pledge, security deed, notice of lien, or UCC-1 financing statement, or take any other action in any jurisdiction to evidence the perfection of any part of the DIP Liens, CCA and its respective officers are authorized and directed to use commercially reasonable efforts to execute, file, and record any documents or instruments as the DIP Agent may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of the Interim Order. The DIP Agent may, in its reasonable discretion, file a certified copy of this Final Order in any filing office in any jurisdiction in which CCA is organized or has or maintains any DIP Collateral or an office, and each filing office is directed to accept such certified copy of this Final Order for filing and recording. The DIP Agent or the DIP Lenders may require CCA to enter into non-U.S. security documentation with respect to any Collateral located in non-U.S. jurisdictions, and CCA and its respective officers are authorized and directed to use commercially reasonable efforts to execute, file, and record any documents or instruments as the DIP Agent or the DIP Lenders may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Final Order.

13.    <u>Reimbursement of Fees, Costs, and Expenses of DIP Secured Parties</u>. CCA shall reimburse the DIP Secured Parties for their reasonable and documented out-of-pocket fees, costs, and expenses, whether accrued on, prior to, or after the Closing Date, in connection with (a) the

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

preparation, negotiation, execution, and administration of the DIP Loan Documents and any

other document prepared in connection therewith or the consummation and administration of any

transaction contemplated therein, including any amendment or waiver of the DIP Loan

Documents, (b) the funding of the DIP Loans, (c) the creation, perfection, or protection of the

DIP Liens (including all search, filing and recording fees), (d) internal audit reviews and field

examinations, (e) the enforcement or preservation of any right or remedy under any DIP Loan

Document, any DIP Obligation, or with respect to the DIP Collateral, (f) the commencement,

defense, conduct of, intervention in, or the taking of any other action (including preparation for

and/or response to any subpoena or request for document production relating thereto) with

respect to, any proceeding related to CCA, any DIP Loan Document or DIP Obligation, (g) the

review of pleadings and other filings made with the Bankruptcy Court, (h) attendance at hearings

in respect of the chapter 11 case, (i) any refinancing or restructuring of the DIP Loans in the

nature of a "work-out," and (j) defending and prosecuting any actions or proceedings arising out

of or relating to the DIP Obligations or any transactions related to arising in connection with the

DIP Loan Documents; *provided* that, in the case of each of the foregoing clauses (a)-(j), such

fees, costs, and expenses of counsel shall be limited to one law firm on behalf of all DIP Secured

Parties and, to the extent necessary, one local counsel in each relevant jurisdiction (and in the

case of an actual or perceived conflict of interest, one additional law firm on behalf of the

affected DIP Secured Party).   Each professional or party shall provide copies of applicable

invoices (which invoices may be redacted or summarized for protection of an applicable

privilege or the work product doctrine) (the fees thereunder, the "**Invoiced Fees**") to lead

| Debtor: | CCA Construction, Inc. |
|---|---|
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

restructuring counsel to CCA, counsel to any statutory creditors' committee, and the

U.S. Trustee, and any other party as directed by the Court, which invoices shall, for any law firm

or other counsel, include (i) a general, brief description of the nature of the matters for which

services were performed, (ii) a list of the relevant attorneys and total hours billed by each for the

relevant period, and (iii) such other detail regarding the Invoiced Fees as the U.S. Trustee may

reasonably request to be provided on a confidential basis.  Any objections raised by CCA, the

U.S. Trustee, or any statutory creditors' committee, or any other party provided invoices as

directed by the Court challenging any portion of the Invoiced Fees (such portion, the "**Disputed**

**Invoiced Fees**") must be in writing and state with particularity the grounds therefor and must be

submitted to the applicable professional or party within 10 business days of receipt (the "**Review**

**Period**") and, if after the Review Period an objection remains unresolved, such objection will be

subject to resolution by the Court.  After the Review Period, the undisputed portion of Invoiced

Fees will be paid promptly by CCA, without the necessity of filing formal fee applications,

regardless of whether such amounts arose or were incurred before or after the Petition Date.

Notwithstanding the foregoing, CCA is authorized to pay any such costs, fees, and expenses

required as a condition precedent to the obligations of the DIP Lenders pursuant to the DIP

Credit Agreement without the need to provide notice to any other party or otherwise comply with

the procedures set forth in this paragraph 13 and without any further application to or order of

this Court.  CCA shall pay any Disputed Invoiced Fees promptly upon resolution of the

objection, including to the extent resolved through approval by the Court, to the extent of such

approval.  In no event shall any invoice or other statement submitted by any DIP Secured Party

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

to CCA, any statutory creditors' committee, the U.S. Trustee, or any other interested person (or any of their respective Professionals) with respect to fees or expenses incurred by any professional retained by such DIP Secured Party operate to waive the attorney/client privilege, the work-product doctrine, or any other evidentiary privilege or protection recognized under applicable law.

14.     <u>Amendments and Waivers</u>. CCA and the DIP Secured Parties are hereby authorized to enter into, in accordance with the terms of the applicable DIP Loan Documents and without further order of the Court, any amendments to, modifications of, or waivers with respect to any of such DIP Loan Documents (and the payment of any fees, expenses, or other amounts payable in connection therewith) on the following conditions: (a) the amendment, modification, or waiver must not constitute a material change to the terms of such DIP Loan Document; and (b) copies of the amendment, modification, or waiver must be served upon counsel for any statutory creditors' committee and the U.S. Trustee.  Any amendment, modification, or waiver that constitutes a material change, to be effective, must be approved by the Court.  For purposes hereof, a "material change" shall mean a change to a DIP Loan Document that operates to shorten the term of the DIP Facility or the maturity of the DIP Obligations, to increase the aggregate amount of the DIP Commitments, to increase the rate of interest other than as currently provided in or contemplated by such DIP Loan Documents, to add specific Events of Default, or to enlarge the nature and extent of remedies available to the DIP Agent following the occurrence of an Event of Default.  Without limiting the generality of the foregoing, no amendment of a DIP Loan Document that postpones or extends any date or deadline therein or herein (including the

| (Page | 34) | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

expiration of the term of a DIP Facility), nor any waiver of an Event of Default, shall constitute a "material change" and any such amendment or waiver may be effectuated by CCA and the applicable DIP Secured Parties without the need for further approval of the Court.

15.    Events of Default; Remedies.

(a)    Notice of Default.  Upon the occurrence of an Event of Default under (and as defined in) any DIP Loan Document and during the continuance thereof: (i) the DIP Lenders may declare, on a pro rata basis, all or any portion of the DIP Facility and DIP Commitments to be suspended or terminated, whereupon such DIP Facility and DIP Commitments shall forthwith be suspended or terminated; (ii) CCA shall have no right to request any extension of credit under the DIP Facility or to use DIP Loan Proceeds or any Collateral or proceeds of Collateral other than towards the satisfaction of the DIP Obligations and the Carve Out pursuant to this Final Order and the other DIP Loan Documents, and (iii) subject to the terms of the DIP Credit Agreement, the DIP Agent may in its discretion serve upon counsel for CCA, counsel for any statutory creditors' committee, and the U.S. Trustee a written notice (a "**Default Notice**") setting forth the Events of Default, in which event (unless the Court determines that no Event of Default exists or continues to exist, after notice and a hearing) effective five business days after the Default Notice is filed (the "**Remedies Notice Period**"), the DIP Agent shall be deemed to have received complete relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code (and any other stay then in effect) and shall be authorized, without further notice to CCA or any other interested party or any further order of this

| Debtor: | CCA Construction, Inc. |
|---|---|
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Court, to (A) declare all or any portion of the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other DIP Obligations and other amounts owing or payable under any of the DIP Loan Documents, to be immediately due and payable, (B) demand payment and enforce collection of all DIP Obligations, and (C) otherwise exercise all rights and remedies available to them under the DIP Loan Documents, as applicable.  During the Remedies Notice Period, CCA and any statutory creditors' committee shall be entitled to seek an emergency hearing with the Court (such hearing, a "**Remedies Hearing**").  In any Remedies Hearing, CCA shall waive its right to and shall not be entitled to seek relief, including under section 105 of the Bankruptcy Code, to the extent that such relief would impair or restrict the rights and remedies of the DIP Agent as set forth in this Final Order or in any of the other DIP Loan Documents, and the only issue that may be raised by CCA is whether an Event of Default has in fact occurred.  Prior to the adjudication of the Remedies Hearing, CCA may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of an Event of Default) solely to fund essential operations in accordance with past practice, the DIP Loan Documents, and the Approved Budget.  Upon the effectiveness of any relief from the automatic stay granted or deemed to have been granted pursuant to this paragraph 15(a), the DIP Agent may, in its discretion, take all actions and exercise all other rights and remedies under this Final Order, the other DIP Loan Documents, and applicable law that may be necessary or deemed appropriate to collect any of the DIP Obligations, and otherwise enforce any of the provisions of this Final Order and the other DIP Loan

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

Documents. The DIP Agent's delay or failure to exercise rights and remedies under any DIP Loan Documents, this Final Order, or applicable law shall not constitute a waiver of any of its rights and remedies hereunder, thereunder, or otherwise, unless any such waiver is pursuant to a written instrument executed by the DIP Agent.

(b)    Rights Cumulative. The rights, remedies, powers, and privileges conferred upon any DIP Secured Party pursuant to this Final Order shall be in addition to and cumulative with those contained in the other applicable DIP Loan Documents and created under applicable law.

16.    Modification of Automatic Stay. The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to implement the provisions of this Final Order and the other DIP Loan Documents, thereby permitting the DIP Agent, as and to the extent provided herein, to receive proceeds of the Collateral for application to the DIP Obligations, to file or record any UCC-1 financing statements, mortgages, deeds of trust, assignments, pledges, security deeds, or other instruments and documents evidencing or validating the perfection of any DIP Liens, and to enforce any DIP Liens.

17.    Effect of Appeal. Consistent with section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Final Order are hereafter modified or reversed, such modification or reversal on appeal shall not affect the validity of any debt so incurred, or any liens or priorities granted by CCA to any DIP Secured Party, prior to the effective date of such modification or reversal, whether or not any such entity knew of the appeal, unless the authorization and incurring of such debt, or the granting of such lien or priority, were stayed pending appeal.

| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

18.    <u>Service of Final Order</u>. Promptly after the entry of this Final Order, CCA shall serve copies of this Final Order to the parties having been given notice of the Final Hearing.

19.    <u>No Deemed Control; Exculpation</u>.

(a)    In determining to make any DIP Loans under the DIP Loan Documents, or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the other DIP Loan Documents, no DIP Secured Party shall be deemed to be in control of CCA or its operations with respect to the operation or management of such Debtor, nor shall the DIP Secured Parties (in their respective capacities as such) owe any fiduciary duty to CCA, its creditors, shareholders, or estate.

(b)    None of the DIP Loan Documents or any other document related to the DIP Facility shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Secured Party any liability for any claims arising from the prepetition or postpetition activities of CCA in the operation of its business or in connection with its restructuring efforts. So long as a DIP Secured Party complies with its obligations under the applicable DIP Loan Documents and applicable law: (i) such DIP Secured Party shall not, in any way or manner, be liable or responsible for (A) the safekeeping of the DIP Collateral, (B) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (C) any diminution in the value thereof, or (D) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person or entity; and (ii) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by CCA.

| | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

20.    <u>Binding Effect; Successors and Assigns</u>.  The provisions of this Final Order shall be binding upon all parties in interest in this chapter 11 case and any Successor Case, including but not limited to CCA, the DIP Secured Parties, and their respective successors and assigns (including any chapter 11 or chapter 7 trustee hereafter appointed for the estate of CCA, any examiner appointed pursuant to section 1104 of the Bankruptcy Code, any statutory creditors' committee, or any other fiduciary appointed as a legal representative of CCA or with respect to any property of the estate of CCA), and shall inure to the benefit of CCA, the DIP Secured Parties, and each of their respective successors and assigns.  In no event shall any DIP Secured Party have any obligation to make DIP Loans to, or permit the use of the Collateral by, any chapter 7 trustee, chapter 11 trustee, or similar responsible person appointed or elected for the estate of CCA.

21.    <u>Objections Overruled</u>. Any and all objections to the relief requested in the Motion, to the extent that such objections are to entry of this Final Order and that have not otherwise been withdrawn, waived, or resolved by consent at or before the Final Hearing, and all reservations of rights included therein, are hereby OVERRULED and DENIED.

22.    <u>Conditions Precedent</u>.  No DIP Lender shall have any obligation to make any DIP Loans, or otherwise fulfil any obligation of such DIP Lender set forth in the DIP Loan Documents, unless the conditions precedent to making such extensions of credit or fulfilling any such obligation under the DIP Loan Documents have been satisfied in full or waived in accordance with the DIP Loan Documents.

| (Page \| 39) | |
|---|---|
| Debtor: | CCA Construction, Inc. |
| Case No.: | 24-_____ (___) |
| Caption of Order: | Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief |

23. <u>Effectiveness; Enforceability</u>. This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Final Order; and any stay of the effectiveness of this Final Order that might otherwise apply is hereby waived for cause shown.

24. <u>Inconsistencies</u>. To the extent that any provisions in the other DIP Loan Documents are inconsistent with any of the provisions of this Final Order, the provisions of this Final Order shall govern and control.

25. <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.