**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (*pro hac vice* pending)
Sidney P. Levinson (*pro hac vice* pending)
Elie J. Worenklein
Rory B. Heller (*pro hac vice* pending)
66 Hudson Boulevard
New York, NY 10001
Telephone:  (212) 909-6000
Facsimile:  (212) 909-6836
nlabovitz@debevoise.com
slevinson@debevoise.com
eworenklein@debevoise.com
rbheller@debevoise.com

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Felice R. Yudkin
Ryan T. Jareck
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone:  (201) 489-3000
Facsimile:  (201) 489-1536
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| CCA Construction, Inc.,[1] | Case No. 24-_____ (___) |
| Debtor. | |

**DECLARATION OF YAN WEI,
CHAIRMAN AND CHIEF EXECUTIVE OFFICER
OF THE DEBTOR, IN SUPPORT OF CHAPTER 11 PETITION**

I, Yan Wei, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct:

1.    I am the Chairman and Chief Executive Officer ("**CEO**") of CCA Construction, Inc. ("**CCA**" or the "**Debtor**").  CCA is organized under the laws of the State of Delaware, and is headquartered in Morristown, New Jersey.  CCA is an indirect subsidiary of China State

---

[1]    The last four digits of CCA's federal tax identification number are 4862.  CCA's service address for the purposes of this chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

Construction Engineering Corp. Ltd. ("**CSCEC**"), which is traded on the Shanghai Stock Exchange (SSE) and is one of the world's largest investment and construction companies. CCA directs its subsidiaries in performing construction and project management services on large-scale projects primarily in the New York and New Jersey metropolitan area.

2.      From 2003 to 2010, I served as Vice President of CCA, and I have served as Chairman and CEO of CCA since the beginning of this year. From 2010 to 2023, I served in various roles, such as Vice President and Deputy General Manager, at both CSCEC and other subsidiaries of CSCEC. In my current capacity as Chairman and CEO of CCA, I am familiar with CCA's day-to-day operations, business affairs and books and records, as well as the circumstances leading to the commencement of this chapter 11 case. I submit this Declaration to assist this Court and interested parties in understanding why CCA filed this chapter 11 case and in support of the chapter 11 petition.

3.      This chapter 11 case is one of last resort and was ultimately necessitated by a crippling $1.6 billion judgment (the "**Baha Mar Judgment**"), issued by the Supreme Court of New York and entered on October 31, 2024, against CCA and two non-debtor affiliates[2] and in favor of BML Properties Ltd. ("**BMLP**"). CCA's financial challenges, which began in 2015, were caused by several factors outside of its control, including a broad retreat from, and policy changes negatively impacting, Chinese investment in U.S.-based construction projects. These business headwinds were further exacerbated by the 2017 commencement of the Baha Mar Litigation (as further described and defined below) and the allegations made by BMLP therein, which undermined CCA's ability to win and execute new business. CCA's ongoing financial problems have now reached a tipping point with the entry of the Baha Mar Judgment.

---

[2]      CCA's affiliated codefendants are Bahamian entities CSCEC (Bahamas) Ltd. and CCA Bahamas, Ltd.

4.      CCA and its codefendants have strong legal bases for their appeal of the Baha Mar Judgment and, to that end, have noticed their appeal of the trial court's rulings to the Appellate Division, First Department, of the New York Supreme Court (the "**First Department**").  CCA and its codefendants do not, however, individually or collectively, have the financial wherewithal to obtain a supersedeas bond, and therefore appealed to the First Department for a discretionary stay pending the outcome of the appeal.  Although the First Department granted an interim stay on November 4, 2024, CCA's final request for a stay pending appeal was denied on December 19, 2024.  This left CCA no recourse but to commence this chapter 11 case.

5.      Like many other debtors who have sought chapter 11 protection in the face of a significant adverse judgment, CCA seeks a breathing spell to: (a) address its ongoing and deepening financial distress, which began before the Baha Mar Judgment was issued but was exacerbated and accelerated by that judgment and the litigation that preceded it, (b) preserve the value of its estate for the benefit of all stakeholders, (c) continue its business operations in the ordinary course (including the business operations of its non-debtor subsidiaries), (d) expeditiously pursue its meritorious appeal, and (e) ensure a fair and equitable resolution of all claims.

6.      This Declaration is submitted pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and I am authorized to submit it on behalf of CCA.  Except where specifically noted, the statements in this Declaration are based on: (a) my personal knowledge; (b) information obtained from other members of CCA's management team, employees or advisors; (c) my review of relevant documents and information concerning CCA's operations, financial affairs and restructuring initiatives; or (d) my opinions based upon my experience and knowledge.  If called upon to testify, I could and would testify competently to the facts set forth herein.

**Situational Overview**

I.     **Overview of CCA, Its History and Its Corporate Structure**

7.     CCA was established in 1993 as a Delaware corporation, and it is a direct subsidiary of CSCEC Holding Company, Inc. ("**CSCEC Holding**"), also a Delaware corporation.  CSCEC Holding, CCA, and CCA's subsidiaries are discrete pieces of CSCEC's broader business, which is operated by more than 100 distinct entities located throughout the world, eight of which are publicly traded.  Together, the group of affiliated entities makes up the largest construction company in the world, operating in more than 100 countries and regions globally, covering investment, development, construction engineering, survey and design.  An overview of the current organizational structure of CCA and its affiliates is attached as **Exhibit A**.

8.     CCA and its non-debtor operating subsidiaries (the "**Non-Debtor Subsidiaries,**" and together with CCA, the "**CCA Group**") pursue business opportunities in the United States. Currently, the CCA Group focuses on construction activities primarily in the New York and New Jersey metropolitan area, Washington, D.C., the Carolinas and Texas.  CCA directs and provides shared services support to its Non-Debtor Subsidiaries as they deliver projects in the civil, commercial, residential, and public building sectors.  Historically, the CCA Group's projects have included hotels, office buildings, residential buildings, hospitals, transit stations, railroad extensions and bridges.

9.     CCA's primary assets are the equity interests it holds in the Non-Debtor Subsidiaries, as reflected in the organizational chart.  The Non-Debtor Subsidiaries are not part of this chapter 11 case and expect to continue operating in the ordinary course of business, which will be for the benefit of CCA and all stakeholders.

10.     The Non-Debtor Subsidiaries include:

(a)     Plaza Group Holdings LLC ("**Plaza**"): Plaza is organized under the laws of the State of Delaware and provides construction management and general contracting on urban development projects. Since Plaza was formed in 1986, it has become a multi-faceted firm with national presence in the construction industry. CCA acquired Plaza in 2014. Plaza is headquartered in New York and also does business in New Jersey and Washington DC; it also formerly had operations in Florida, California and other states. Among its noteworthy construction projects, Plaza was the general contractor or construction manager for the renovation of City Hall in Manhattan, the Nassau University Medical Center, the New York Blood Center, as well as the MTA's Fulton Street Transit Station in New York City's financial district. Other notable projects include Madison Square Park Tower in New York City, 99 Hudson Street (the tallest building in New Jersey) and One Thousand Museum (an expansive and unique residential tower in Miami, Florida). Currently, Plaza is working in the expanding market of office conversion, taking vacant office space and converting it into much-needed residential units. Since 2014, the majority of CCA's revenues has come from Plaza.

(b)     CCA Civil, Inc. ("**Civil**"): Civil is organized under the laws of the State of Delaware and specializes in large-scale construction and maintenance of heavy infrastructure facilities, such as transportation and utility projects. For 19 years, Civil has been an integral part of the public infrastructure contracting industry in the New York and New Jersey metropolitan area, performing public infrastructure work worth hundreds of millions of dollars. During that time, Civil has supported and employed hundreds of union workers and has been a key component in the improvement of public roadways, including almost half a billion dollars of work to reconstruct the Pulaski Skyway, a vital transportation and evacuation route in New Jersey. Civil has also been a critical part of the reconstruction of major thoroughfares across New York, including the Long Island Expressway and I-278 in Brooklyn and Staten Island. Civil also has a history of being one of the region's major contractors in the reconstruction and improvement of bridges, facilitating transportation throughout the region, including in projects like the Alexander Hamilton Bridge and the New Jersey Department of Transportation ("**NJDOT**")'s Route 7 Wittpenn Bridge, which when completed will be the largest lift span bridge in all of North America. This complex Wittpenn Bridge project, which was awarded the America Society of Civil Engineers New Jersey Section's 2023 Project of the Year, highlights the importance of Civil's operations. When this project was designed and advertised by NJDOT, Civil was the only company that was willing to take it on and submitted a qualified bid. Currently, most of Civil's projects are at a closing-out stage, and it is in the process of marketing itself for new contracts.

(c)   <u>China Construction America of South Carolina, Inc. ("**CCASC**")</u>: CCASC is organized under the laws of the State of South Carolina, and it has a long and established history of supporting residents and communities of South and North Carolina.  Among other things, CCASC has worked on construction of nearly 20 educational facilities comprising more than 3 million square feet of space, including Santee High School and Technology Center, Dreher High School, Clinton High School, Chapin High School, River Bluff High School, Trident Tech Nursing School and a convention center and honors residence for the University of South Carolina.  In addition to its school construction, CCASC supports the vital need for construction of other public facilities, such as the Goose Creek Fire station in Charleston, South Carolina and the JW Clay Parking Garage for Charlotte, North Carolina's light rail system.  Most recently, CCASC has been involved in the residential building sector, constructing apartment complexes that will provide homes for hundreds of families, including one large new residential project contingent on obtaining the required performance and payment bond.

(d)   <u>Strategic Capital (Beijing) Consulting Co., Ltd. ("**SC Beijing**")</u>: SC Beijing is organized under the laws of China and provides administrative services to CCA. Specifically, SC Beijing maintains an administrative office in China that complies with certain regulatory requirements in order to, among other things, provide insurance to employees and provide other services associated with CCA's Shared Services Program, which is further described below and in the *Declaration of Evan Blum in Support of First Day Pleadings and Debtor-in-Possession Financing* (the "**BDO Declaration**").

11.    As of the date hereof, CCA has 39 full-time employees.  The Non-Debtor Subsidiaries employ 91 full-time employees and, as set forth above, manage significant and critical development projects in the United States.

12.    CCA plays an important role for its subsidiaries and other affiliates by providing operational support services including communications, accounting, information technology, insurance, human resources, legal and other general administration services, all according to an established program in which costs are allocated among affiliate participants to compensate CCA for the services it provides (the "**Shared Services Program**").[3]  Specifically, CCA employs staff and contracts with third-party providers who perform the identified shared services on a

---

[3]    In addition to my brief description here, the Shared Services Program is described in greater detail in the BDO Declaration, including an explanation of how it is anticipated to be maintained and funded during the chapter 11 case.

consolidated basis.  CCA is entitled to reimbursement of its costs from the applicable affiliate based on a cost allocation calculation for all overhead services, which amounts are reviewed and readjusted periodically.  CCA also charges its affiliates for any additional specific costs and expenses incurred on behalf of the applicable affiliates.  The cost savings and other synergies associated with the Shared Services Program thus assist the Non-Debtor Subsidiaries to reduce costs and improve their overall cash flow, which inures to the benefit of their sole owner, CCA.

13.     Historically, as a result of the Shared Services Program, shared services, cash and intercompany obligations have flowed between CCA, on the one hand, and each of its Non-Debtor Subsidiaries and certain other affiliates, on the other hand, on a regular basis and in the ordinary course of business.  The BDO Declaration contains additional information regarding the funding of CCA and its Non-Debtor Subsidiaries.

**II.     Corporate Governance and Financial Advisory Support**

14.     CCA's board of directors (the "**Board**") is comprised of the following members: Yan Wei (Chairman); Jingtao Yang; Lilin Cao; and Elizabeth Abrams.

15.     CCA engaged Ms. Abrams as an independent director of the Board on October 21, 2024, the first business day after the trial court's opinion was issued in the Baha Mar Litigation. Ms. Abrams has experience in a variety of industries and a strong history of experience working closely with boards, executive teams, and their advisors – including as an independent director – to optimize financial and operational outcomes.

16.     Following the appointment of Ms. Abrams, the Board and the Debtor's sole shareholder took action to create a special committee of the Board (the "**Special Committee**"), of which the sole member is Ms. Abrams, to, among other things, review and evaluate the terms and conditions and determine the advisability of potential restructuring alternatives.  The Special Committee must approve any transactions related to a restructuring alternative in which it

determines there is a conflict, and it has the power to reject any transactions related to a restructuring alternative that arise in connection with a conflict. Should other members of the Board recuse themselves due to a conflict, the Special Committee constitutes a quorum and can evaluate and approve any transaction in connection with a restructuring alternative.

17.     In October 2024, CCA retained BDO Consulting Group, LLC ("**BDO**") as financial advisors to review CCA's financial systems and assist CCA with chapter 11 compliance and procedures.  Importantly, BDO assumed a lead role in seeking and evaluating options for debtor-in-possession financing, as it became clear that CCA would request a financing proposal from its parent, CSCEC Holding, of which I am also an officer.  I have therefore recused myself from decision-making related to the debtor-in-possession financing, as well as negotiations with CSCEC Holding about the terms on which it would be willing to lend.  A detailed description of both the process to obtain debtor-in-possession financing and the terms of the proposed debtor-in-possession financing can be found in the BDO Declaration.

**III.     Events Leading to this Chapter 11 Case**

     **A.     Business Challenges and Policy Headwinds**

18.     As reflected in <u>Table 1</u> below, over the past decade, the value of the CCA Group's new contracts and related revenues has dropped precipitously.

Table 1



19.     This reduction in value of new contracts and revenues has, in turn, generated losses for the Non-Debtor Subsidiaries and rendered the operations of the CCA Group unprofitable on a consolidated basis.  Several factors explain the decline in the CCA Group's financial condition, particularly during the past five years.

20.     Historically, a significant portion of the CCA Group's revenues were derived from construction contracts awarded by Chinese companies operating in the United States, especially in the real estate development and manufacturing sectors.  In recent years, this category of contracts has substantially diminished due to a broader retreat of Chinese firms from the U.S. market, driven by, among other things, changes in geopolitical relations between China and the United States, as well as overseas direct investment policy changes enacted in China in 2017.

21.     As the CCA Group's revenue base has declined, its aggregate general and administrative expenses increased as a proportion of revenue.  The presence of these fixed costs

in the face of declining revenue has caused sustained negative cash flows, as set forth in <u>Table 2</u> below:

<u>Table 2</u>



22.    With the end of the pandemic, more and more Chinese companies – including those in solar cells, EV components, and traditional manufacturing – are investing in building factories in the United States, driven by high tariffs on Chinese products.  As the CCA Group is well-versed in the U.S. construction contracting market and understands the needs of Chinese clients, it now faces potential new market opportunities.  As such, I believe there is a viable path for the CCA Group's operations to regain profitability in the future.  In the near term, however, that growth is constrained by the Baha Mar Litigation.

**B.    Overview of Largest Claims Against CCA**

23.    The largest claim against CCA is the Baha Mar Judgment, as described elsewhere in this Declaration.  At the time of filing the chapter 11 case, CCA has no funded debt obligations outstanding.  CCA is, however, one of the indemnitors with respect to potentially significant surety

bond obligations associated with certain construction projects of its Non-Debtor Subsidiaries, which could become crystallized claims if the Non-Debtor Subsidiaries are unable to complete those projects or pay costs associated with them. Currently, the total amount of surety bond obligations to the various sureties is approximately $700 million. While CCA believes it is unlikely that these contingent claims will crystallize as long as the Non-Debtor Subsidiaries and the Shared Services Program continue to operate in the ordinary course, claims would likely result if ongoing operations were interrupted.

24.     Periodically, CSCEC Holding loaned CCA funds and as of the petition date there is approximately $124.8 million outstanding.

### C.     Surety Coverage For Construction Operations

25.     As construction managers and providers, the ability of the Non-Debtor Subsidiaries in the CCA Group to win and perform projects depends in part on providing bonds to their clients to ensure performance and progress on construction contracts.  For many years, the CCA Group worked with American International Group Inc. ("**AIG**"), a leading global insurance company, as its surety bond provider.  At the outset of the CCA Group's operations, AIG provided a surety bond in the amount of $2.5 billion that was available to support the construction projects of the Non-Debtor Subsidiaries in the CCA Group.  Being able to access this substantial bond was integral to the Non-Debtor Subsidiaries' ability to successfully bid for and take on a number of large, complex and profitable projects simultaneously.  AIG exited the surety bond business in 2020, however, which caused an unexpectedly early termination of this needed bond capacity. Obtaining replacement coverage proved quite challenging: the Non-Debtor Subsidiaries ultimately secured surety coverage only after a period of lapse and in a substantially smaller amount ($575 million), limiting the volume of projects the CCA Group can currently undertake.

### D.    The Baha Mar Litigation

26.    In 2017, while managing the operational headwinds described above, CCA was dragged into a litigation regarding a Bahamas-based dispute involving CCA's remote affiliates in the Bahamas, CCA Bahamas ("**CCAB**") and CSCEC (Bahamas), Ltd. ("**CSCECB**," and together with CCA and CCAB, the "**Defendants**").    On December 26, 2017, BMLP filed a complaint against the Defendants in *BML Props. Ltd. v. China Construction America, Inc., et al.*, No. 657550/2017 (Sup. Ct., N.Y. County), in the New York Supreme Court, Commercial Division (the "**Baha Mar Litigation**").    The Baha Mar Litigation arose from the construction of Baha Mar, a resort in the Commonwealth of The Bahamas (the "**Project**").    Following a two-week bench trial, on October 18, 2024, Justice Andrew Borrok issued a decision finding liability for all three Defendants and awarding BMLP $845 million, plus statutory pre-judgment interest accruing as of May 1, 2014 (the "**Trial Decision**").    On October 31, 2024, the clerk of court entered the Baha Mar Judgment against the Defendants in the amount of $1,642,598,493.15.    On October 29, 2024, the Defendants filed a notice of appeal of the Trial Decision and, on November 1, 2024, once the clerk of court entered the Baha Mar Judgment, the Defendants filed a notice of appeal of the Baha Mar Judgment.    It is my understanding that non-Debtors CCAB and CSCECB intend to perfect the appeal by filing an appeal brief no later than December 30, 2024, and CCA intends to seek leave of this Court to join that brief.

27.    The Baha Mar Litigation is far from a run-of-the-mill construction dispute, and it has nothing to do with the CCA Group's operations.    It is instead an effort by the plaintiff, BMLP, to use a 3-month delay in construction by CCAB to hold all three the Defendants liable for the entire collapse of Baha Mar's financing and the failure of BMLP's business plan, which stemmed from BMLP's decision to borrow over $2.45 billion against Baha Mar's assets.

28.     BMLP was the 100% controlling shareholder and day-to-day manager of the resort's owner, Baha Mar, Ltd. ("**BML**").  CSCECB made a minority preferred investment of $150 million in BML pursuant to the terms of an Investors Agreement by and among CSCECB, BML and BMLP.  BML engaged CCAB as the project's construction manager under a separate contract, and BML later released all claims arising under that contract.  CCA  had no contractual relationship to BMLP or BML and no role in the Project.  The only alleged basis for recovery against CCA was BMLP's convoluted theory of veil-piercing liability, which the trial court erroneously accepted.

29.     At trial, BMLP sought as damages the purported value of assets it had contributed to BML in 2011 — land and assets deemed by contract to be worth $745 million, plus an $85 million equity contribution — in order to acquire 100% of the common voting stock in BML. Between 2011 and the end of 2014, BMLP had caused BML to borrow over $2 billion from the China Export-Import Bank with $108 million in interest coming due in 2015 (the "**EXIM Loan**"). BML failed to repay a single cent of the principal or interest on the EXIM Loan, which was secured against BML's assets.  In fact, following BML's bankruptcy and insolvency proceedings (as further described below), the EXIM Loan has $1 billion that, to this day, remains unpaid.

30.     By 2014, the Project was significantly delayed because of BMLP's mismanagement of BML, which fired its architect years into construction and delivered design drawings over two years behind schedule.  And BML issued hundreds of change orders through the life of the project, further compounding delays.  By the summer of 2014, all parties were projecting an opening date in the summer of 2015, and, by the fall of 2014 BML owed tens of millions in unpaid construction invoices to CCAB.  In November 2014, BMLP, BML and CCAB met in Beijing.  Non-contractual minutes of the meeting reflect that BML promised to pay CCAB

$54 million as a settlement of CCAB's claim to approximately $98 million in unpaid construction invoices. CCAB stated that it would add Chinese workers to the project and use its best efforts to achieve a limited partial opening on March 27, 2015, on the condition that BML "provide necessary assistance and cooperation."

31.     CCAB took extraordinary measures to achieve the March 27 opening date. It brought in hundreds of workers from China, hired even more in the Bahamas, and worked diligently towards the March 27, 2015 date. Far from providing necessary assistance and cooperation, BML, by its president's own admission, continued to make design changes and "bombed" its own deliverables, including failing to get a certificate of suitability to activate the license to operate the casino at the Casino Hotel—the only hotel they were attempting to open at that time. The Project did not open on March 27, 2015, although construction was—by BML's own admission—approximately 97% complete at that time. After March 27, CCAB continued to move the construction forward, even after BML stopped paying.

32.     Instead of collaborating with CCAB and its lender to complete the resort, BMLP hatched a secret plot to place BML into a chapter 11 bankruptcy. BMLP sought to strip CSCECB of its minority investment and deprive CCAB of payment, using the debtor-in-possession lender on the project (which was another entity owned by BMLP's principal, Sarkis Izmirlian) to gain total control. It was undisputed at trial that BMLP placed BML in bankruptcy without first obtaining the required consent of CSCECB, the minority investor, as contractually required. *In re Northshore Mainland Services Inc.*, Case No. 15-11402 (KJC) (Bankr. D. Del.). BMLP even plotted to exclude, and successfully excluded, CSCECB's appointed director from the boardroom when the decision to file chapter 11 was voted on.

33.    BMLP caused BML to file chapter 11 in the Bankruptcy Court for the District of Delaware on June 29, 2015.  This decision to commence an improper chapter 11 case brought the project to a crashing halt with the erection of a chain link fence around the project, which precluded CCAB and BML from completing the project.  Bankruptcy Judge Carey ultimately dismissed the chapter 11 case, holding that it was in BML's best interest, as well as the interests of international comity, for BML's insolvency to be addressed in the Bahamas.  Judge Carey specifically held that the Bahamas would provide BML with a fair and impartial forum for determination of the relevant issues.

34.    Through BML's liquidation proceedings, the court in the Bahamas appointed independent receiver managers to oversee the sale and completion of the Baha Mar resort.  The sale did not generate enough money to pay off the EXIM Loan, let alone leave value for an equity stakeholder. Thus, on September 30, 2016, the Bahamian Supreme Court ordered the winding up of BML, thereby causing both BMLP and CSCECB to lose the entirety of their investments.  The independent receiver managers, under Bahamian court supervision, rehired CCAB to complete the resort.  CCAB did so in short order and within 4% of the original budget for construction, even though CCAB took over BML's scope of work, paid hundreds of millions of dollars to BML's own subcontractors and vendors that BML had failed to pay, and paid BML's substantial back taxes and fees owed to the Bahamian government.

35.    In the Baha Mar Litigation, BMLP claimed it was entitled to the return of the initial investment of $830 million it made in 2011 (plus $15 million it had contributed as an equity shortfall in March 2015) with prejudgment interest accruing at 9% per annum.  The Defendants have noted and will continue to argue that, in essence, BMLP asked the trial court to undo and

reverse the outcome of the bankruptcy process BMLP set in motion when it caused BML to file for chapter 11 in 2015.

36.     The Defendants have also asserted in the Baha Mar Litigation, and will argue on appeal, that as a matter of black-letter New York law, BMLP is not entitled to its money back. First, long before any alleged breach or misrepresentation by CSCECB or CCAB, BMLP's equity was underwater because BML had borrowed over $2 billion against its assets.  Equity is the value of a company's assets less its liabilities.  There has never been any valuation of BML's assets as of the time immediately before the alleged breach, showing that the assets exceeded the balance of the outstanding loan, or immediately after the alleged breach, showing that the alleged breach caused any damages.  To the contrary, independent third-party valuations commissioned by the receiver managers showed that, even had the resort been completed and enjoyed a period of stable operations in 2015, the value of BMLP's shares would still have been far below the loan balance. That was as a result of BMLP's own operating and leverage decisions, not anything CSCECB or CCAB did.

37.     Second, the Defendants have noted that, independent of whatever BMLP's common shares may have been worth in 2015, BMLP lost the value of its equity in BML because of its own decision to cause BML to file for chapter 11 and the independent decisions taken by the U.S. Bankruptcy Court and the Bahamian court thereafter.  The Defendants have argued, and will continue to argue on appeal, that these subsequent intervening events broke any chain of causation and certainly rendered any damages consequential (indeed, utterly attenuated).

38.     CCA believes the Trial Decision was wrong as to all Defendants, but CCA has an additional compelling basis for appeal.  CCA will argue that the trial court's veil-piercing decision — its only basis for holding CCA liable — applied the wrong jurisdiction's law and reached the

wrong conclusion, even under the law that it did apply.  The Defendants have argued, and will continue to argue on appeal, that Bahamian law applies, given that both CCAB and CSCECB are Bahamian entities and the entirety of the events at issue occurred in The Bahamas.  Bahamian law would unquestionably preclude any liability, but even under New York law there is no basis for veil piercing because, *inter alia*, the trial court identified no harm to BMLP resulting from the alleged domination.

39.    For all these reasons and others, CCA believes the decision below will be reversed on appeal. Previously, on interlocutory appeal of the trial court's summary judgment, the First Department reversed in substantial part the trial court's decision. CCA believes the First Department will once again recognize that the trial court erred in providing BMLP with a recovery that is irreconcilable with basic principles of New York law.

**IV.    Prepetition Initiatives**

40.    Leading up to the Baha Mar Judgment, CCA began considering its options to preserve value for all stakeholders in light of a potential large, adverse judgment that could be devastating for not only CCA, but all of the entities in the CCA Group and their respective operations and stakeholders.  In October 2024, CCA retained BDO as financial advisor and Cole Schotz P.C. as co-restructuring counsel to complement its existing engagement of Debevoise & Plimpton LLP, which serves as litigation counsel and co-restructuring counsel to CCA.

41.    Moreover, the Board and CCA's management team proactively sought to pursue all restructuring initiatives available to preserve CCA's assets while at the same time positioning CCA to pursue its meritorious appeal.  In that regard, the Board and CCA's management team undertook the following.

### A.    Pursuit of a Bond and Stay Pending Appeal

42.    Along with the other Defendants, CCA retained Pedersen & Sons Surety Bond Agency ("**Pedersen**"), a highly regarded surety bond agency firm.  With Pedersen's help, the Defendants attempted to obtain supersedeas bonds to secure the Judgment from several different surety providers.  No surety bond provider was willing to provide a bond, given the size of the Defendants' combined assets.  Defendants instead sought a stay within the court's discretionary authority under N.Y. C.P.L.R. §5519.  The First Department ultimately rejected the Defendants' request for a stay pending the appeal,[4] leaving CCA vulnerable to enforcement, which would harm all of its stakeholders.

43.    In light of the denial of the stay pending appeal, and without the ability to post a bond, CCA is at risk of immediate enforcement of the Baha Mar Judgment.  Enforcement would require CCA to turn over or hastily liquidate its operating subsidiaries, effectively forfeiting its right to an appeal, and would cause disastrous consequences for CCA, all of the Non-Debtor Subsidiaries (who would themselves be immediately insolvent) and other affiliates who are dependent on CCA for shared services and funding, and the employees, creditors and various construction projects in-process for the entire CCA Group.

### B.    Other Contingency Planning

44.    Taking into account the negative consequences of a litigation judgment on CCA and the Non-Debtor Subsidiaries that are its primary assets, CCA worked with its advisors to consider whether chapter 11 relief could provide the necessary breathing room to pursue the appeal, continue business operations and provide services to Non-Debtor Subsidiaries and other affiliates, while at the same time ensuring a fair and equitable resolution of claims.  After extensive

---

[4]    The First Department issued a temporary stay on November 4, 2024, but it was vacated on December 19, 2022, when the First Department declined to issue a stay pending appeal.

discussion with CCA's advisors, and after engagement of the Independent Director and formation of the Special Committee, the Board (through the Special Committee) concluded that a chapter 11 filing represented the optimal path forward for CCA, as it would allow for the meritorious appeal to proceed, as described herein, and would otherwise position CCA and the entire CCA Group for long-term success.

## V.      Chapter 11 Objectives

### A.      Pursuit of CCA's Meritorious Appeal

45.      Contemporaneous with the filing of this declaration, CCA is filing a motion asking this Court to modify the automatic stay and authorize CCA to swiftly join its co-defendants in pursuing the appeal of the Baha Mar Judgment, including filing an opening brief in support of the appeal on or before December 30, 2024 and seeking a preference to proceed to oral argument during the First Department's March 2025 term.

46.      I believe a resolution of the claims asserted by BMLP in the Baha Mar Litigation is a gating issue to resolve this chapter 11 case and is therefore in the best interest of all stakeholders, including BMLP.  As described in further detail above, CCA believes its appeal will be successful on the merits, including because (a) the evidence at trial was insufficient to meet BMLP's burden of proof on necessary elements of its claims, (b) BMLP was not damaged by the Defendants' conduct and the damages awarded are unrecoverable as a matter of law, and (c) piercing the corporate veil of CSCECB, which is a Bahamian entity, to reach CCA (which is not CSCECB's or CCAB's parent, subsidiary, or sibling corporation) is contrary to New York law.

### B.      Development of Strategic Restructuring Alternatives

47.      During the appeal and any subsequent remand, the CCA Group will work to preserve the value of its businesses, which will benefit all constituents.  In the unhoped-for event that the Baha Mar Judgment is not reversed or modified by the First Department, this chapter 11

19

case will give CCA time to develop alternate strategies, including exploring an orderly sale or other transactional alternatives.

48.     CCA has determined that commencing this chapter 11 case is prudent, necessary and in the best interests of all constituents, because the case permits CCA to preserve value while it pursues an appeal of the Baha Mar Judgment and presents the best opportunity to finally, fairly and equitably resolve all claims against CCA.  The chapter 11 process is the only pathway through which CCA can preserve value with the goal of emerging as a reorganized and stronger enterprise for the benefit of all of its stakeholders.

49.     In the interest of commencing this chapter 11 case in a manner that preserves the value of its business while at the same time minimizes disruption and any potential harm, CCA has requested various forms of relief in "first day" motions and applications (each, a "**First Day Pleading**" and, collectively, the "**First Day Pleadings**"), filed concurrently herewith.  The BDO Declaration describes the relief sought in the First Day Pleadings and why it is necessary to facilitate an effective and smooth transition into chapter 11.  Like BDO, I believe the relief requested in the First Day Pleadings is necessary to continue the business operations and preserve the value of CCA.

<u>**Conclusion**</u>

50.     The foregoing account describes CCA's business and corporate structure, the factors that precipitated the commencement of this chapter 11 case, and the critical need for CCA to continue to preserve value for the benefit of all stakeholders while it appeals the Baha Mar Judgment.  Being granted relief while CCA pursues an appeal will help preserve the CCA Group's value for the benefit of all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct to the best of my knowledge, information, and belief.

Executed on December 22, 2024.

By:   _/s/ Yan Wei_____
Yan Wei
Chairman and CEO
CCA Construction Inc.

**<u>Exhibit A</u>**

**Current Organizational Structure**

CHINA CONSTRUCTION AMERICA

# Organizational Chart
## Legal
(As of November 2024)

Notes:

1. CCA Civil, Inc. holds 51% and Halmar International LLC holds 49%.
2. CCA Civil, Inc. holds 99% and Daidone Electric Inc. holds 1%.
3. CCA Civil, Inc. holds 27%, Dragados USA, Inc. holds 27%, John P. Picone Inc. holds 23%, and Halmar International LLC holds 23%.
4. CCA Civil, Inc. holds 65% and Plaza Construction LLC holds 35%.
5. Plaza Contracting Company LLC holds 99% and Plaza FL Contracting, LLC holds 1%.
6. Plaza Construction LLC holds 50% and Times Square Construction, Inc. holds 50%.
7. Plaza Construction LLC holds 60% and Schiavone Construction holds 40%.
8. CCA Development Panama S.A. holds 50% and The Attie Group holds 50%.
9. CCA Building Panama S.A. holds 59%, China State Construction Engineering Corp. Ltd. holds 1%, and Construcciones Civiles Generales S.A. holds 40%.
10. CCA Civil Panama S.A. holds 60% and CCA Building Panama S.A. holds 40%.
11. CCA Civil Panama S.A. holds 51% and Green S.A. holds 49%.
12. Strategic Hudson South, LLC holds 98.9% as Managing Member and Collins Holding Sub, LLC holds 1.1% as Non-Managing Member.
13. Strategic Hudson Towers, LLC holds 98.9% as Managing Member and Hudson North Partner LLC holds 1.1% as Non-Managing Member.
14. Strategic EB-5 LLC holds 51% and American Regional Center for Entrepreneurs Inc. holds 49%.



