**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (*pro hac vice* pending)
Sidney P. Levinson (*pro hac vice* pending)
Elie J. Worenklein
Rory B. Heller (*pro hac vice* pending)
66 Hudson Boulevard
New York, NY 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
nlabovitz@debevoise.com
slevinson@debevoise.com
eworenklein@debevoise.com
rbheller@debevoise.com

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Felice R. Yudkin
Ryan T. Jareck
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone: (201) 489-3000
Facsimile: (201) 489-1536
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>CCA Construction, Inc.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 24-_____ (___) |

**DECLARATION OF EVAN BLUM IN SUPPORT OF
FIRST DAY PLEADINGS AND DEBTOR IN POSSESSION FINANCING**

I, Evan Blum, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct:

1.  I am a Managing Director of BDO Consulting Group, LLC ("**BDO**"), which is the proposed financial advisor to CCA Construction, Inc. ("**CCA**" or the "**Debtor**").

2.  A detailed description of CCA, its business, the business operations of CCA's non-debtor operating subsidiaries (the "**Non-Debtor Subsidiaries**," and together with CCA, the "**CCA**

---

[1] The last four digits of CCA's federal tax identification number are 4862. CCA's service address for the purposes of this chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

Group"), and the facts and circumstances supporting CCA's chapter 11 case is set forth in greater detail in the *Declaration of Yan Wei, Chairman and Chief Executive Officer of the Debtor, in Support of Chapter 11 Petition*, filed concurrently herewith (the "**Wei Declaration**"). In the interest of commencing this chapter 11 case in a manner that preserves the value of its business while at the same time minimizes disruption and any potential harm, CCA has requested various forms of relief in "first day" motions and applications (each, a "**First Day Pleading**" and, collectively, the "**First Day Pleadings**"), filed concurrently herewith. A list of the First Day Pleadings is attached hereto as **Exhibit A**.

3.  I submit this declaration as an accompaniment to the Wei Declaration, in particular to describe certain prepetition and proposed postpetition transactions among CCA, its parent company, CSCEC Holding Company, Inc. ("**CSCEC Holding**"), and other affiliated non-debtor entities. As described in more detail in the Wei Declaration, Mr. Wei holds an officer position and a director position with CSCEC Holding and therefore has recused himself from decision-making related to the debtor-in-possession financing, as well as from negotiations with CSCEC Holding about the terms on which it would be willing to lend to CCA. Certain of the First Day Pleadings, including the motion to approve entry into debtor-in-possession financing and the motion to approve CCA's continued performance of intercompany transactions, involve matters as to which Mr. Wei has recused himself. I therefore submit this declaration in support of the relief requested in the First Day Pleadings.[2]

4.  I am familiar with the contents of each of the First Day Pleadings, and I am authorized to submit this declaration on behalf of CCA. Except where specifically noted, the statements in this declaration are based on: (a) my personal knowledge; (b) information obtained

---

[2] The facts set forth in each First Day Pleading are incorporated herein by reference.

2

from the BDO team working under my supervision or members of CCA's management team, employees or other advisors; (c) my review of relevant documents and information concerning CCA's operations, financial affairs and restructuring initiatives; or (d) my opinions based upon my restructuring experience and knowledge. If called upon to testify, I could and would testify competently to the facts set forth herein. I am not being specifically compensated for this testimony other than through payments proposed to be received by BDO as a professional retained by CCA.

## Background and Qualifications

5. I have over 20 years of experience as a restructuring adviser, and my roles have included chief restructuring officer, financial adviser and investment banker. I have experience in both in-court and out-of-court matters across a wide variety of industries as an advisor to companies, lenders, indenture trustees, and unsecured creditor committees. My practice is nationwide (including New Jersey, where I reside and work) and I have handled international matters in Asia, Europe and Latin America. Prior to BDO, I was a Managing Director at Alvarez & Marsal and a Principal at GlassRatner. Before my restructuring career, I spent over a decade as an investment banker and lender. My experience includes advisory assignments related to large-scale infrastructure construction projects, including in connection with the Tappan Zee Bridge ($4.5 billion), the Sands Singapore ($1.0 billion), and Sands Bethlehem ($330 million). In addition, I have represented a private equity fund in connection with the restructuring of its significant hotel and resort development portfolio.

## BDO's Retention

6. CCA retained BDO in October 2024 to act as its financial advisor in connection with a potential restructuring to be completed either in court or outside of a chapter 11 process. I

3

lead the BDO team advising CCA. The BDO team, under my supervision, has worked closely with CCA's management and other professionals retained by CCA to understand CCA's capital structure, cash flows, liquidity needs, and business operations.

7. As part of an evaluation of CCA's liquidity position, BDO has assisted in the development of a rolling 13-week cash forecast, as well as a long-term forecast of CCA's liquidity needs. These forecasts take into account the expected effects of the chapter 11 filing and reflect anticipated disbursements during the projected 12-month period of the proposed debtor-in-possession financing.

**First Day Pleadings**

8. Contemporaneously with the filing of this declaration, CCA filed the First Day Pleadings seeking relief to minimize the adverse effects of the commencement of this chapter 11 case on its business and to ensure that its reorganization strategy can be implemented with limited disruptions to operations. Approval of the relief requested in the First Day Pleadings is critical to CCA's ability to continue operating its business with minimal disruption, thereby preserving value for CCA's estate and stakeholders. I have reviewed each of the First Day Pleadings, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11. I believe that CCA's estate would suffer immediate and irreparable harm absent the ability to make certain essential payments and otherwise continue its business operations as sought in the First Day Pleadings.

9. For a more detailed description of the relief sought in the First Day Pleadings, I respectfully refer the court and interested parties to the motions themselves. The facts stated in the First Day Pleadings are true and correct to the best of my knowledge, information and belief. The First Day Pleadings seek authority to, among other things, (a) obtain debtor-in-

possession financing, (b) maintain employee morale by satisfying certain prepetition employee related obligations, (c) maintain CCA's insurance programs to enable CCA to continue to operate, and (d) ensure the continuation of CCA's cash management system and other business operations without interruption to ensure that CCA can have a successful chapter 11 with minimal disruptions. Receiving court approval of all relief sought is essential to achieving these objectives.

10. Several of the First Day Pleadings request authority to pay certain prepetition claims. I am aware that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, CCA has limited its request for immediate authority to pay prepetition claims to those circumstances where both I and CCA believe a failure to pay would hinder CCA's operations and cause irreparable harm to it and its subsidiaries, to the detriment of all stakeholders. Other relief will be deferred for consideration at a later hearing.

### DIP Financing Process

11. CCA seeks interim and final orders to secure debtor-in-possession financing ("**DIP Financing**") to provide necessary liquidity to preserve the value of CCA. CCA's DIP Financing arrangement includes a total commitment of up to $40 million, with an initial $5 million available upon entry of the interim order to cover immediate liquidity needs, an additional $3 million available upon entry of the final order, and subsequent draws available thereafter as needed.

12. The proposed DIP Financing, to be provided by CSCEC Holding, will allow CCA to meet critical expenses, fund essential business functions, and address administrative costs associated with the restructuring process. This financing arrangement is structured with favorable

5

terms, including (a) providing for all interest to be "paid-in-kind", (b) excluding any obligation to pay commitment, exit or other similar fees, (c) allowing for multi-draws that preserve the commitment while reducing the accrual of interest, (d) adjusting downward the principal balance of the DIP Financing to account for payments by CCA that are allocable to CSCEC Holding and other affiliates outside of the CCA Group (in exchange for the right to pursue such claims directly against the applicable affiliate),[3] and (e) minimizing the conditions required for funding, thereby limiting execution risk.

13. In any chapter 11 case, it is critical for the debtor to have or obtain sufficient liquidity to finance its ongoing operations and administrative expenses. Access to the DIP Financing is essential to maintain CCA's business operations, including to fund working capital, meet payroll obligations, pay suppliers, cover overhead costs, and make other payments that are essential for the continued management, operation, and preservation of CCA's business. This will enable CCA to sustain the confidence of its vendors, employees and other stakeholders, and pursue a viable reorganization strategy that will maximize the value of CCA's estate for the benefit of all creditors and stakeholders. Without this financing, CCA and the other members of the CCA Group would face significant operational disruptions and potential erosion of its going-concern value.

14. In order to determine the amount of financing required by CCA, BDO worked closely with CCA's management and finance teams to develop a budget for a potential 12-month duration of this chapter 11 case. Based on management's forecast and applying BDO's experience on behalf of other chapter 11 debtors, BDO has concluded that CCA requires a loan commitment of approximately $40 million. (As discussed below, this amount does not include separate financing to be provided by CSCEC Holding directly to the Non-Debtor Subsidiaries).

---

[3] This downward adjustment is described in further detail in Paragraph 28 below.

6

15. Without immediate access to sufficient postpetition financing, CCA will be unable to continue its operations and pay administrative expenses throughout the pendency of this chapter 11 case. As of the Petition Date, CCA's total available cash balance was approximately $213,000. Based on CCA's financial forecasts, if CCA cannot quickly access the proposed $5 million interim draw on the DIP Financing, CCA will run out of cash almost immediately after and will be unable to continue to operate its business. The $5 million initial borrowing, which would be available prior to entry of a final order approving the DIP Financing, is tailored to reflect the amount of liquidity that will be necessary for CCA to operate and meet its postpetition obligations during the first 30-60 days of the chapter 11 case, with modest cushion to account for contingencies that may arise during that interim period. Likewise, if CCA does not have access to the additional $3 million draw upon entry of the final order, or access to additional draws during the 12-month term of the DIP Financing, it will not be able to continue operating in the ordinary course and administering this chapter 11 case. To be clear, CCA does not intend to draw the full balance of the $40 million commitment under the DIP Financing upon entry of the final order. Rather, CCA intends to draw a sufficient amount of cash each month to cover the expenses reflected in the DIP budget, with the unfettered ability to make additional draws as and when needed so that stakeholders have further assurance that there will be sufficient liquidity available at all times to account for unanticipated contingencies.

16. Based on CCA's financial forecasts, the liquidity provided by the DIP Financing will allow CCA and the other members of the CCA Group to continue operating their businesses during the chapter 11 case. Perhaps as importantly, the availability of that liquidity will powerfully signal to key stakeholders that CCA will be able to operate. Among those key stakeholders are the sureties who issue bonds for existing and new projects and whose bonds are required to obtain

7

new business; customers who carefully consider the liquidity and financial condition of contractors as a factor in deciding which one to engage; subcontractors who, if faced with the risk of nonpayment, might not continue to work on behalf of the CCA Group; and vendors who provide goods and services that may be withheld if the risk of nonpayment persists.

17. As previously noted, CSCEC Holding is the parent company of CCA. As described in the Wei Declaration, CCA and its board of directors, with the consent of CSCEC Holding, implemented procedures to address potential conflicts of interests, including most notably the creation of a special committee of the board of directors (the "**Special Committee**") and the appointment of an independent director, Elizabeth Abrams, to serve as the sole member of the Special Committee. I understand the role of the Special Committee to include evaluating and approving matters that might arise in the context of a potential restructuring, including the need to seek and obtain DIP financing. Based upon my observations and involvement in the negotiation of the DIP Financing in this matter, the negotiations with the potential lenders have been conducted at arm's length and in good faith.

18. In evaluating potential sources of DIP financing, BDO identified CSCEC Holding as a potential source of financing, based on, among other factors, CSCEC Holding's prior history of providing financing to CCA and CSCEC Holding's obvious interest, as the sole equity holder of CCA, in preserving CCA's value. CSCEC Holding indicated a potential willingness to finance CCA's restructuring. In anticipation of negotiations with CSCEC Holding over the terms of potential DIP Financing, BDO assembled and reviewed information regarding the terms and conditions under which comparable chapter 11 debtors have obtained DIP financing, which were used to formulate and benchmark proposals. All of the terms and conditions of the DIP Financing were negotiated by CCA and its advisors, acting at the direction of the Special Committee.

8

CSCEC Holding is represented by Lowenstein Sandler LLP, and negotiations over the terms and conditions of the DIP Financing with CSCEC Holding have been primarily conducted through advisors for CCA and CSCEC Holding.[4]

19. As a result of those negotiations, I believe that CCA has in fact succeeded in negotiating highly favorable economic and other terms and conditions, superior to what CCA would have obtained from unaffiliated, third-party lenders. Among those highly favorable economic terms are the following: (a) an interest rate in the fixed amount of 9.5% which shall be paid-in-kind or, at the option of CCA, in cash, and (b) an absence of any commitment, exit or comparable fees payable under the DIP Financing, with CCA only required to reimburse CSCEC Holding for its reasonable, documented out-of-pocket expenses such as attorney's fees. I believe that the interest rate and fees to be paid under the DIP Financing are favorable and appropriate, particularly in light of the circumstances of this chapter 11 case.

20. Importantly, the DIP Financing does not provide any benefits to CSCEC Holding beyond those generally afforded to third-party lenders. To that end, (a) the DIP Credit Agreement and proposed DIP orders do not provide for release of claims (if any) against CSCEC Holding on account of its prepetition claims (the only release is limited to claims arising under or related to the DIP Financing), (b) the DIP Financing does not provide for any "roll- up" of CSCEC Holding's prepetition debt, and (c) as further explained in Paragraph 28 below, the amount of CCA's principal obligation under the DIP Financing will be adjusted downward to account for any portion of shared services or other expenses paid by CCA that are allocated to CSCEC Holding or any of its affiliates outside of the CCA Group (in exchange for the right to pursue such claims directly against the applicable affiliate). Further, in order to ensure that CSCEC Holding will not use the

---

[4] CCA did request that CSCEC Holding agree to provide the DIP Financing on an unsecured basis. CSCEC Holding declined this request, and insisted that any DIP Financing be secured.

9

DIP Financing to leverage the bankruptcy process, many of the negative covenants or milestones that would ordinarily be contained in a DIP facility provided by a third-party lender are not included here.

21. In addition to the work that BDO performed to review comparable market data in advance of the negotiations with CSCEC Holding, the Special Committee also directed BDO to engage in a marketing process to determine whether other potential third-party funding sources might exist that would provide comparable or more favorable terms. To date, BDO has engaged with representatives of potential funding sources to confirm whether there was, in fact, any market interest in providing postpetition financing. Potential lenders who expressed interest were provided with a "teaser" and invited to execute a non-disclosure agreement ("**NDA**") to obtain more detailed information. As of the Petition Date, certain potential lenders have executed an NDA and received confidential information. To date, none of the parties contacted by BDO (or, to my knowledge, any other party) have expressed a firm willingness to provide financing on equivalent or more favorable terms as the DIP Financing. None were willing to provide financing on an unsecured basis or without the grant of a priming lien under section 364(d) of the Bankruptcy Code.

22. In order to ensure that CCA obtains the most favorable terms for financing, BDO intends to continue marketing efforts to solicit proposals for potential alternative DIP financing prior to final court approval of the DIP Financing. Importantly, the DIP Financing to be provided by CSCEC Holding does not provide for payment of any premium or exit fee if alternative financing is obtained prior to entry of a final order approving the DIP Financing.

**Funding for Non-Debtor Subsidiaries**

23. As part of the negotiations with CSCEC Holding regarding the DIP Financing, CCA also sought to obtain adequate funding of the Non-Debtor Subsidiaries during the chapter 11 case. Historically, in the ordinary course of business, CSCEC Holding has from time to time provided intercompany loans directly to the Non-Debtor Subsidiaries to support their operations. As part of the arm's length negotiations with CSCEC Holding regarding the DIP Financing, CCA requested, and CSCEC Holding has agreed, to offer credit support to CCA's Non-Debtor Subsidiaries, in the form of a $20 million commitment to provide unsecured financing, in order to demonstrate and ensure that those entities' project, vendor and employee obligations can be met. These loans, while not to a debtor and not subject to authorization or approval in this chapter 11 case, will stabilize the non-debtor operations of the CCA Group, improving value and reducing claims against the Non-Debtor Subsidiaries, all of which will benefit CCA and its stakeholders.

24. By obtaining a commitment from CSCEC Holding to provide financing directly to the Non-Debtor Subsidiaries outside of the DIP Financing, CCA was able to minimize the size and cost of the DIP Financing, for the benefit of CCA and its stakeholders.

**Shared Services Program**

25. As discussed in the Wei Declaration, CCA plays an important role for its subsidiaries and other affiliates by providing operational support services, including communications, accounting, information technology, insurance, human resources, legal and other general administration services, all according to an established program in which costs are allocated among affiliate participants to compensate CCA for the services it provides (the "**Shared Services Program**"). The Shared Services Program, which is administered pursuant to

11

documented shared services agreements (the "**Shared Services Agreements**") between CCA[5] and each participating affiliate, is necessary and beneficial to the business operations of CCA and the participating affiliates, and generally provides the CCA Group and other affiliates with material savings in respect of general administrative and corporate overhead costs. By aggregating their purchases of goods and services, CCA's Non-Debtor Subsidiaries and other program participants are able to recognize economies of scale, resulting in lower costs than would be the case if each individual participant hired employees or contracted with third parties to perform the same administrative functions on its own. The cost savings associated with the Shared Services Program thus enable the Non-Debtor Subsidiaries to reduce costs and improve their overall cash flow, which inures to the benefit of their sole owner, CCA.

26.  In accordance with the Shared Services Agreements, CCA is generally entitled to reimbursement for its costs from the participating affiliates under an allocation mechanism based upon whether such costs are directly or indirectly incurred by CCA on behalf of the participating affiliate. Direct costs, such as amounts paid to CCA's employees engaged in specific, project-related work for participating affiliates (e.g., overseeing a safety program at Plaza Construction LLC; IT software provisioning at CCA International Group, Inc.), and third-party expenses that are directly attributable to participating affiliates (e.g,. insurance; software licenses), are allocated to the applicable affiliates at the time of payment by CCA. CCA's direct employee cost allocation is reviewed and adjusted periodically. CCA's direct third-party costs are generally allocated by usage or based upon revenue at each participating affiliate. Indirect costs, such as CCA employee costs related to providing general shared services to affiliates and third-party expenses that are not directly attributable to participating affiliates (e.g., tax and audit preparation) are allocated to the

---

[5] CCA's rights and obligations under the Shared Services Agreements were delegated to CCA by CSCEC Holding on March 10, 2021.

12

applicable affiliates at year-end despite these costs being paid by CCA at the time incurred. Indirect employee costs are allocated based upon headcount at each entity. Indirect third party expenses are allocated by shared services department based on the percentage of time that each respective department allocates to participating affiliates. Certain of these third party expenses remain CCA's responsibility. CCA records journal entries documenting all Intercompany Transactions under the Shared Services Agreements.

27. During the course of this chapter 11 case, CCA will continue to maintain records of these intercompany transfers of cash and bookkeeping entries on a postpetition basis and will implement other internal mechanisms as needed to permit it, with the assistance of its advisors, to accurately track the balance of and account for on demand, all prepetition and postpetition intercompany transactions.

28. Related to the Shared Services Program, in the ordinary course of business, CCA pays for certain services from a Non-Debtor Subsidiary, Strategic Capital (Beijing) Consulting Co., Ltd., that enable CCA to meet certain insurance and regulatory requirements in China that are essential to support the Shared Services Program. These costs are likewise allocated among participating affiliates based on their actual usage and benefit, with CCA seeking reimbursement for the amounts attributable to each affiliate.

29. As noted above, in order to account for the portion of the costs of the Shared Services Program that are allocable to affiliates that are not within the CCA Group, the DIP Credit Agreement includes a mechanism to ensure that CCA is not burdened with DIP obligations, including any corresponding interest accrual, on account of that portion of funding. Specifically, the DIP Credit Agreement provides that the principal amount outstanding of the DIP Financing will be adjusted downward to account for any portions of shared services paid by CCA postpetition

that are allocable to its affiliates outside of the CCA Group. In lieu of including advances used to pay portions of shared services allocable outside of the CCA Group in the calculation of CCA's DIP obligations, CSCEC Holding will instead be assigned any intercompany claim that would otherwise be payable to CCA on account of the allocation of the cost of shared services to entities outside of the CCA Group. CSCEC Holding will recover those allocated costs directly from the participating affiliates.

## Conclusion

30. I believe that each First Day Pleading constitutes a critical and necessary first step in achieving a successful and smooth transition through chapter 11 for CCA.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief. Executed on December 22, 2024.

By: */s/ Evan Blum*
Evan Blum
Managing Director
BDO Consulting Group, LLC

## Exhibit A

## First Day Pleadings

1. Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief;

2. Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue to Use its Bank Accounts and Maintain Existing Business Forms, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief;

3. Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Its Prepetition Insurance and (B) Pay All Prepetition Obligations Related Thereto, and (II) Granting Related Relief;

4. Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay and Honor Certain Prepetition Wages, Benefits and Other Obligations, and (II) Granting Related Relief;

5. Debtor's Application for Entry of an Order Authorizing the Debtor to Appoint Kurtzman Carson Consultants, LLC dba Verita Global as Claims and Noticing Agent Effective as of the Petition Date; and

6. Debtor's Motion Seeking Entry of an Order Extending Time to File Schedules, Statements and Rule 2015.3 Financial Reports.