**GIBBONS P.C.**
Robert K. Malone, Esq.
Brett S. Theisen, Esq.
Christopher P. Anton, Esq.
Kyle P. McEvilly, Esq.
One Gateway Center
Newark, New Jersey 07102-5310
Telephone: (973) 596-4500
Email: rmalone@gibbonslaw.com
        btheisen@gibbonslaw.com
        canton@gibbonslaw.com
        kmcevilly@gibbonslaw.com

*Counsel for BML Properties, Ltd.*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | (Hon. Christine M. Gravelle) |
| CCA Construction, Inc.,[1] | Chapter 11 |
| Debtor. | Case No. 24-22548-CMG |

**MOTION OF BML PROPERTIES, LTD.
FOR ENTRY OF AN ORDER APPOINTING AN EXAMINER**

TO THE HONORABLE CHRISTINE M. GRAVELLE,
UNITED STATES BANKRUPTCY JUDGE:

BML Properties, Ltd. ("BMLP"), by and through its undersigned counsel, hereby moves by way of this motion (the "Motion")[2] for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), for the appointment of an independent examiner pursuant to section 1104(c) of title 11 of the United States Code (the "Bankruptcy Code"). In

---

[1] The last four digits of CCA's federal tax identification number are 4862. CCA's service address for the purposes of this chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

[2] All citations to documents filed on the docket cite to the relevant paragraph or page number assigned by the Court's electronic filing system.

support of the Motion, BMLP submits the *Declaration of Brett S. Theisen Pursuant to 28 U.S.C. § 1746 in Support of Motion of BML Properties, Ltd. for Entry of an Order Appointing an Examiner* (the "Theisen Declaration"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Less than three (3) months ago, a New York court awarded BMLP a judgment of over $1.6 billion.  The New York Court found, after a trial spanning two (2) weeks, that there was *clear and convincing evidence* that CCA Construction Inc., ("CCA" or the "Debtor") committed fraud.  This entailed CCA diverting resources for the construction of a resort in the Bahamas "*to buy a competing hotel development down the road*" and conducting an "*absolute sham and shakedown*" of BMLP to obtain $54 million to buy that competing hotel.[3]  The New York Court found that CCA further engaged in a "*massive misappropriation of funds*" and the "*active concealment of critical information*," among other acts of fraud.[4]  Repeatedly, the Court found the testimony of CCA's witnesses to be "*inconsistent with their own internal communications*" and "*simply not credible.*"[5]

2.      The New York Court also rejected CCA's feigned corporate separateness.  It found that CCA and its nominal affiliates "*conflated and blurred beyond independent recognition their purportedly separate corporate existences*" and "*operated as a single economic entity.*"[6]  In particular, CCA "*dominated the other entities*" and "*used that domination and commingling of assets and corporations to perpetrate a wrong on BMLP.*"[7]  Accordingly, the New York Court

---

[3] *See* Docket No. 54-1 at 6, 27 (New York Decision).

[4] *Id*. at 65; *id*. at 56.

[5] *Id*. at 3, 15, 32, 37, 54.

[6] *Id*. at 16, 69, 71.

[7] *Id*. at 71.

pierced the corporate veil and entered judgment jointly and severally against CCA and two other nominal affiliates.

3.        Now in bankruptcy, CCA remains inextricably linked to its affiliates and its Chinese state-owned parent, China State Construction Engineering Corp. Ltd. ("CSCEC").  CCA has sought a DIP loan from CSCEC Holding Company, Inc. ("CSCEC Holding"), its immediate parent and a subsidiary of CSCEC, of up to $40 million on a secured, super-priority basis—with the "unfettered ability" (in CCA's words) to make future draws outside of any Court-approved budget.[8]  It already appears abundantly clear that CCA does not need a $40 million loan—in fact, the proposed insider DIP loan will primarily be used to fund CCA's *non-Debtor* affiliates.[9]

4.        What's more, the insider DIP loan would give CSCEC Holding significant control (*e.g.*, consent rights over a chapter 11 plan and CCA's budget), while relinquishing important estate powers (*e.g.*, by pledging proceeds of avoidance actions—which may very well lie against other CSCEC affiliates—and waiving Section 506(c) surcharge rights).  CSCEC Holding would also be able to call a default under the DIP credit agreement if this Motion is approved and an examiner is appointed—a blatant attempt to sidestep any independent inquiry in this case.[10]

5.        Meanwhile, CCA has been outspoken with this Court about its belief that "BMLP is not entitled to its money back" and its confidence about its likelihood of success on appeal.[11] This hubris is remarkable in light of the 74-page post-trial decision rejecting CCA's position, the deferential standard of review on appeal, and the fact that, just days before making these

---

[8] *See* Docket No. 12 at ¶ 15 (Blum Decl.); Docket No. 4 at ¶ 23 (DIP Motion).

[9] *See* Docket No. 4 at ¶¶ 16, 18-20, 23 (DIP Motion).  The proposed DIP budget provides for $5.9 million of the initial $8 million in DIP draws to be used for Shared Services transfers, not Debtor-related expenses.  *See id*. at 132.

[10] *See id*. at 102.

[11] Docket No. 11 at ¶ 36 (Wei Decl.).

representations in its first day pleadings, the appellate court in New York had denied CCA's motion for an unbonded stay of enforcement pending appeal in which CCA argued it was likely to succeed on appeal.[12]

6.      Based on CCA's clear bias against BMLP—its largest creditor by orders of magnitude—it is apparent that CCA is not acting as a true fiduciary for its estate.  Although CCA appointed a purported "independent director" before the bankruptcy filing, she has no independent advisors and CCA's pre-petition management remains in control of the Debtor.[13]  In fact, BMLP understands that Ms. Abrams is represented by the same counsel as CCA, who also represented CCA and its co-defendants in the New York litigation.[14]  To date, there is no evidence that Ms. Abrams has considered, let alone investigated, CCA's historical relationship with its non-Debtor affiliates.[15]  Given the New York court's recent rulings, this is perplexing.

7.      Exacerbating the situation, no official creditors' committee will be formed by the Office of the United States Trustee (the "U.S. Trustee") for this District,[16] and CCA has stonewalled BMLP's requests for information.  For weeks, CCA did not provide BMLP with *any documents*, despite agreeing in principle shortly after the first day hearing on December 23, 2024

---

[12] *See* Docket No. 54-3 at 12-14 (arguing a stay pending appeal should be granted because of the likelihood of success on the merits); Docket No. 54-5 at 2 (appellate court's denial of motion for stay pending appeal).

[13] *See* Theisen Decl. at ¶ 4.

[14] *Id*.

[15] And, when BMLP sought discovery from the Debtor regarding Ms. Abrams' investigation into such matters, the Debtor flatly refused to produce any such documents or information. *See* Theisen Decl., Ex. H at 37-38 (CCA's response to BMLP's request for materials related to Ms. Abrams' investigation stating "CCA will not produce documents in response to this Request").  CCA only reversed course after the Court ordered that such documents be produced.  *See* Theisen Decl., Ex. M at 37-38 (amended responses and objections agreeing to search for and produce documents related to Ms. Abrams' investigation).

[16] *See* Theisen Decl. at ¶ 5.

that BMLP would receive the same reporting as the DIP lender.[17]  This necessitated BMLP having to seek formal discovery to ensure it is able to timely evaluate and object, as necessary, to CCA's cash management and DIP motions.[18]  But even after being served with formal discovery, CCA resisted producing the most basic materials, including its general ledger, intercompany loan documents, and materials related to Ms. Abrams' work as an independent director, among other documents.[19]  For its part, CSCEC Holdings initially refused to search for and produce documents with respect to 31 out of 37 categories of documents requested, and objected on privilege grounds to a request for certain communications with CCA in relation to the DIP—even though it is the proposed DIP lender.[20]

8.      At the same time, CCA attempted to significantly restrict the time period it was required to search documents (it only wanted to search back to October 2024) and opposed the deposition of Mr. Wei, CCA's Chief Executive Officer and Chairman, who submitted a declaration in support of CCA's first day motions.[21]  CCA's counsel has also informed BMLP that, going forward, any information would only be produced through formal discovery processes, making it more difficult and costly for BMLP to obtain information about CCA.[22]

---

[17] *See* Theisen Decl., Ex. A at 7 (Dec. 26. email at 5:38 p.m. from Gibbons memorializing Debevoise's representation that "the Debtor does not, in principle, object to providing certain financial reporting to BMLP").

[18] *See* Theisen Decl., Ex. E (formal discovery requests served on CCA).

[19] *See* Theisen Decl., Ex. H at 33, 37-38, 40-43 (CCA's responses and objections refusing to produce materials related to intercompany loan documents (Request 25), Ms. Abrams' investigation (Request 29),and  the general ledger (Request 35)); *id.*, Ex. J at 2-3 (correspondence from BMLP's counsel identifying issues of dispute following meet and confer).

[20] *See generally*, Theisen Decl., Ex. I (CSCEC's responses and objections); *id.* at 17 (response to Request 33).

[21] *See* Theisen Decl., Ex. H at 7-8 (objecting to time period); Ex. J at 2-3 (noting CCA proposed to only search from October 2024 and that CCA resisted Mr. Wei's deposition).

[22] *See* Theisen Decl., Ex. D at 8 (Jan. 12 correspondence from CCA's counsel stating "[p]lease provide all future requests for information from the Debtor in the form of formal discovery requests, to which CCA will provide formal responses, and make clear to B. Riley that it should refrain from reaching out directly to BDO without the concurrent involvement of counsel.").

9.    CCA's insistence that all future requests for information go through formal discovery—rather than freely disclosing the information requested by the estate's largest creditor—bespeaks the level of obstruction that CCA (likely acting at the behest of CSCEC) will impose on these proceedings.  Rather than efficiently providing information, CCA insists on making BMLP's efforts to obtain information as complicated and costly as possible.

10.    For these reasons, BMLP seeks the appointment of an independent examiner to investigate, *inter alia*, the dealings between CCA and its nominal affiliates to identify instances of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of CCA's affairs in the lead up to, and throughout, this Chapter 11 case.

11.    An examiner will serve at least three (3) important functions: (1) allowing an independent investigation into claims that CCA's estate may possess that could significantly enhance creditor recoveries, including potential avoidance actions, alter ego claims, and breach of fiduciary duty claims, (2) protecting the interests of creditors and the public at large, and (3) providing stakeholders, the United States Trustee, and the Court with much needed transparency that the Debtor has resisted in this Chapter 11 case.

12.    Because CCA's fixed, liquidated, and unsecured debts well exceed $5 million, the appointment of an examiner is *mandatory* under binding Third Circuit precedent.  Moreover, an examiner is in the best interests of CCA's creditors given the history of serious—and *already proven*—allegations of fraud.  An examiner should thus be appointed, and BMLP respectfully requests that it be granted broad investigatory powers.

## JURISDICTION

13.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the *Standing Order of Reference* from the United States District Court for the District of New

Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).

14.     This is a core proceeding pursuant to 28 U.S.C. § 157(b).  BMLP consents to the

entry of a final order by the Court in connection with this Motion to the extent that it is later

determined that the Court, absent consent of the parties, cannot enter final orders or judgments in

connection herewith consistent with Article III of the United States Constitution.

15.     Venue is proper before this Court pursuant to 28 U.S.C. Sections 1408 and 1409.

16.     The bases for the relief requested herein are section 1104(c) the Bankruptcy Code

and Rule 2007.1(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

### A.  The New York Court awards BMLP a $1.6 billion judgment and denies CCA a stay pending appeal.

17.     On December 12, 2017, BMLP commenced an action in the Supreme Court of the

State of New York, New York County (the "New York Court") against CCA and two affiliated

entities, CSCEC Bahamas, Ltd. ("CSCECB") and CCA Bahamas Ltd. ("CCAB") styled *BML

Props. Ltd. v China Constr. Am., Inc.*, Index No. 657550/2017 (Sup. Ct., NY County, Commercial

Division) (the "New York Action"), alleging fraud, breach of contract, and other causes of action

in connection with the construction of the Baha Mar resort complex in the Bahamas.[23]

---

[23] *See* Docket No. 54-1 at 7 (New York Decision).

18.    On October 18, 2024, following more than seven (7) years of litigation and an 11-day bench trial, the New York Court issued a comprehensive 74-page decision detailing its analysis and conclusions of law (the "New York Decision").

19.    Further background information regarding the facts and circumstances underlying the New York Action is set forth in the New York Decision, a true and correct copy of which is attached as Exhibit 1 to the *Statement and Reservation of Rights of BML Properties, Ltd. to Debtor's Motion for Entry of an Order Granting Relief from the Automatic Stay to Prosecute an Appeal* (Docket No. 54) (the "BMLP Reservation").

20.    The New York Decision highlights that CCA's liability arose from a scheme perpetrated with affiliates (or alter egos) to defraud and loot assets from BMLP, its former business partner, in connection with developing the Baha Mar resort complex in the Bahamas. Consequently, CCA is obligated to pay BMLP over $1.6 billion, plus still-accruing interest, under the enforceable New York Judgment.

21.    On October 31, 2024, the New York Court entered a judgment in favor of BMLP and against CCA and its affiliated non-debtor co-defendants, CCAB and CSCEB, jointly and severally, in a total sum equal to $1,642,598,493.15, plus interest (the "New York Judgment"). A true and correct copy of the New York Judgment is attached as Exhibit 2 to the BMLP Reservation.

22.    On November 1, 2024, CCA filed a motion with the Supreme Court of New York, Appellate Division, First Department seeking to stay enforcement of the New York Judgment pending its appeal. On November 13, 2024, BMLP opposed that motion. On December 19, 2024, the Appellate Division denied CCA's motion in its entirety.

23.     True and correct copies of CCA's pleadings in support of its motion for stay pending appeal, BMLP's opposition thereto, and the New York Court's Order denying a stay of enforcement are attached as Exhibits 3-5 to the BMLP Reservation.

### B. CCA commences this Chapter 11 case and seeks a secured $40 million insider DIP loan from CSCEC Holding and other relief with respect to its affiliates.

24.     On December 22, 2024 ("Petition Date**"), CCA commenced a voluntary chapter 11 case under title 11 of the United States Code (the "Bankruptcy Code").  CCA's petition lists BMLP as the largest unsecured creditor with a claim of $1,642,598.43.[24]

25.     No trustee has been appointed, and CCA continues in possession of its property and manages its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

26.     No official committee of unsecured creditors has been formed, and BMLP understands from the U.S. Trustee that none will be formed.[25]

27.     On the Petition Date, CCA filed a suite of motions, including, among others:

(a)     **The Insider DIP Motion**.  The *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 4) (the "DIP Motion"), seeking, among other things, a debtor-in-possession financing loan from CSCEC Holding, its corporate parent, in an amount of up to $40 million on a secured, super-priority basis (the "Insider DIP Loan");

(b)     **The Cash Management Motion.**  The *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue its Bank Accounts and Maintain Existing Business Forms, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* (Docket No. 5) (the "Cash Management Motion"), seeking, among other things, authority "to continue to perform intercompany transactions, whether relating to the

---

[24] *See* Docket No. 1 at 8.

[25] *See* Theisen Decl. at ¶ 4.

prepetition or postpetition period, in the ordinary course of business." Cash Mgmt. Mot. at 5; and

(c)      **The Automatic Stay Modification Motion.**   The *Debtor's Motion for Entry of an Order Granting Relief from the Automatic Stay to Prosecute an Appeal* (Docket No. 14) (the "Automatic Stay Modification Motion") seeking entry of an order granting CCA limited relief from the automatic stay to permit CCA to appeal the New York Judgment.

28.     Along with its first day pleadings, CCA submitted declarations from Mr. Yan Wei (Docket No. 11) (the "Wei Declaration"), CCA's Chairman and CEO, who is also an officer of CSCEC Holding, and Mr. Evan Blum of BDO Consulting Group LLC (Docket No. 12) (the "Blum Declaration" and together with the Wei Declaration, the "First Day Declarations").[26]

29.     According to its first day pleadings, "CCA is a holding company that does not itself generate sufficient operating cash flow in the ordinary course of business" but rather "CCA's liquidity comes either from CSCEC Holding in the form of intercompany financing or, in certain instances, from payments received from its subsidiaries."[27]

30.     The First Day Declarations claim that CCA engaged Ms. Elizabeth Abrams as an "independent director" on October 21, 2024, which was just three (3) days after the New York Decision was entered but several *years* after serious allegations of fraud were raised.[28]  Following Ms. Abrams' appointment, CCA's Board of Directors purportedly created a "Special Committee,"

---

[26] At the first day hearing, BMLP's counsel all reserved all rights with respect to the First Day Declarations, including as to their admissibility. The statements in this section are drawn entirely from those Declarations, but BMLP is currently seeking discovery from CCA and CSCEC on many of these matters and reserves all rights, including to object to their admissibility and to disavow any statements below that are later proven to be inaccurate or unsubstantiated.

[27] *See* Docket No. 4 at ¶ 22 (DIP Motion).

[28] Docket No. 11 at ¶ 15 (Wei Declaration).

with its sole member being Ms. Abrams, that would supposedly "review and evaluate the terms and conditions and determine the advisability of potential restructuring alternatives."[29]

31.    In Mr. Wei's declaration, he claims that he recused himself from decisions related to the DIP financing and "negotiations with CSCEC Holding about the terms" of the DIP loan when "it became clear that CCA would request a financial proposal from its parent, CSCEC Holding."[30]  Mr. Wei also purportedly recused himself with respect to certain matters regarding "approv[al] of CCA's continued performance of intercompany transactions."[31]  Thereafter, CCA self-servingly claims that "[a]ll of the terms and conditions of the DIP Financing were negotiated by CCA and its advisors, acting at the direction of the Special Committee."[32]

32.    Notably, the Special Committee apparently has the same legal and financial advisors as CCA's management,[33] and Ms. Abrams has not submitted a declaration detailing her direction of the Insider DIP Loan negotiations or otherwise providing details of her involvement.

33.    CCA has not submitted any evidence that there has been (or will be) any independent investigation, and CCA initially refused to produce documents concerning any investigation by Ms. Abrams.[34]

---

[29] *Id.* at ¶ 16.

[30] *Id.* at ¶ 17.

[31] Docket No. 12 at ¶ 3 (Blum Decl.)

[32] *Id.* at ¶ 18.

[33] *See* Theisen Decl. at ¶ 5.

[34] *See* Theisen Decl., Ex. H at 37-38 (CCA's Response to Document Request 29 refusing to produce documents related the investigation of claims against CSCEC Holding or affiliates).

## C. Following interim approval of the first day motions, CCA stonewalls BMLP's attempts to obtain information.

34. On December 23, 2024, the Court held a hearing and approved CCA's requested first day relief on an interim basis. During and after that hearing, which was scheduled less than twenty-four hours after the filing on a Sunday evening, BMLP's counsel requested information necessary to evaluate the DIP Motion, Cash Management Motion and other first day relief that was requested by CCA.[35]

35. On Christmas Eve, CCA's counsel agreed in principle to provide certain financial information as part of an agreement between the parties to consensually resolve the Automatic Stay Modification Motion.[36]

36. The day after Christmas, BMLP's counsel sent a proposed financial reporting stipulation to CCA's counsel.[37] Having received no response from CCA's counsel, BMLP's counsel followed up on December 30, 2024.[38]

37. On January 6, 2025, over a week after BMLP's counsel sent the proposed stipulation and after the Court entered an order modifying the automatic stay, CCA's counsel sent its response to the proposed stipulation.[39] This response added a new, previously unmentioned

---

[35] *See* First Day H'rg Tr. at 42:6-12 ("And so this case for the creditors and for the Court, the committee, if and when one is appointed, it really calls for a lot of extra diligence, vigilance, diligence as to those insider transactions, particularly here where you've got management still in place…[w]e'll likely be asking for some discovery."); *id.* at 43:13-15 ("we intend to get more information on that marketing process, the different funding sources and the costs in addition to just what's been presented here.").

[36] *See* Theisen Decl., Ex. A at 7 (Dec. 26 email at 5:38 p.m. agreeing to a consensual order being submitted "based on your representations to me (and the previous representations made to us on Tuesday by you and your colleagues) that (a) the Debtor does not, in principle, object to providing certain financial reporting to BMLP, and (b) that you will work with us in good faith to get a written agreement on the same executed in short order").

[37] *See id.* at 9 (Dec. 26 email at 4:26 p.m. from Gibbons stating "as previously discussed, we request that the Debtor agree to certain financial reporting to BMLP, which we have memorialized in a simple stipulation (attached hereto)").

[38] *See id.* at 6 (Dec. 30 email from Gibbons stating "[f]ollowing up on the financial reporting stip…").

[39] *See* Theisen Decl., Ex. B (Debevoise's Jan. 6 response email and attached markup of the proposed stipulation).

"use restriction" that information disclosed by CCA could be used solely in connection with the Chapter 11 Proceeding and that such information would not be used, "directly or indirectly," for any other purpose.[40]

38.     On January 7, 2025, BMLP's financial advisor sent informal requests for information to CCA's financial advisor.[41]   Among other documents, these requests sought financial statements and organizational charts for all the defendants in the New York Action.[42]

39.     On January 9, 2025, BMLP's financial advisor met with CCA's financial advisor and two individuals employed by CCA, but—without receiving any documents in advance of the meeting—BMLP's financial advisor learned little.[43]

40.     By that date, however, the deadline to object to the proposed Insider DIP Loan was a little over two (2) weeks away, on January 28, and BMLP still had not received any documents, even the ones that CCA had promised to provide before Christmas.  Faced with this deadline, BMLP served formal requests for production on CCA and CSCEC Holding.[44]

41.     On January 16, 2024, CCA and CSCEC Holdings served its responses and objections to BMLP's document requests.[45]  Later that evening, BMLP's counsel held a meet and confer with CCA's and CSCEC's counsel to discuss various discovery issues based on BMLP's

---

[40] *Id.*

[41] *See* Theisen Decl., Ex. C. at 2-4.

[42] *Id.* at 4. (items #1 and #2).

[43] *See* Theisen Decl., Ex. D at 9 (Jan. 10 email to CCA's counsel at 1:57 p.m. stating "[a]part from one zoom meeting with [y]our financial advisor—which seemed to contradict a number of representations that were made in the First Day Hearing and supporting declarations—we have no information whatsoever from CCA").

[44] *See* Theisen Decl., Exs. E and F (document requests served on CCA and CSCEC Holdings, respectively).   An amended set of document requests was subsequently served on CSCEC Holding on January 13, 2025.  *See* Theisen Decl., Ex. G.

[45] *See* Theisen Decl., Exs. H and I (CCA's and CSCEC's responses and objections, respectively).

initial review of those responses and objections.[46]  BMLP also sent correspondence to the Court regarding these issues that day.[47]

42.    On January 17, 2024, this Court held a conference on discovery issues in which it ruled that CCA would have to search for and produce numerous documents it had resisted in its responses and objections, including, among other things, (i) relevant, non-privileged documents from May 1, 2024 onward (CCA had proposed a time range starting only on October 1, 2024), (ii) its general ledger, (iii) intercompany loan documents, (iv) materials related to Ms. Abrams' work as a purported independent director.[48]  In addition, the Court ruled that Mr. Wei be present at the second day hearing for cross-examination on his First Day Declaration following CCA's counsel attempts to shield him from being deposed.

43.    Following the conference, BMLP's counsel sent a revised draft of a protective order to CCA's counsel, which implemented a use restriction consistent with the Court's January 17 conference that discovery could not, by default, be used outside of this Chapter 11 Case, but that BMLP could seek the Court's permission to do so.[49]  The draft expressly prohibited BMLP from using discovery in any other proceedings without this Court's express permission, while providing

---

[46] *See* Theisen Decl., Ex. J (correspondence following meet and confer identifying areas of dispute).

[47] *See* Theisen Decl., Ex. N.

[48] *See* Jan. 17 H'rg. Tr. at 24:24-25:2 (the Court: "[i]t's not so confusing to me … the order will say, produce anything back to May"); 54:18-19 (the Court: "I'm not sure why the general ledger wouldn't be produced"); 54:8-9 (the Court: intercompany loans "certainly" relate to cash management and "should be produced"); 50:8-8 (the Court: "any communications between Ms. Abrams … regarding claims that she is investigating or maybe looking into, that the Debtor may have against CSCEC need to be produced").

[49] *See* Theisen Decl., Ex. K at 14-15 (Jan. 18 email from Gibbons to Debevoise and Lowenstein attaching a revised draft of the protective order).

a means to seek such permission.[50]  CCA's counsel, however, insisted "that only advisors retained in the chapter 11 should benefit from documents received in the chapter 11."[51]

44.      When BMLP pointed out that this would require it to decide whether or not to seek the Court's permission to use documents in a foreign proceeding without even being allowed to obtain advice from the relevant outside counsel, CCA switched course and offered a new roadblock, baselessly asserting that BMLP's outside professionals would fail to adhere to the order.[52]   Finally, three (3) days after the conference, CCA agreed to allow BMLP to share discovery information, including Confidential and Highly Confidential material, with any outside counsel that signed an acknowledgment and consent, to be provided to the Court *in camera* to protect BMLP's litigation strategy.[53]

45.      It is now more than four (4) weeks since BMLP requested documents at the first day hearing and more than two (2) weeks since BMLP's financial advisor sent informal requests, but to date, CCA has received only two productions of less than 200 documents in total from CCA.[54]  Of the 88 documents in CCA's first production, all but two (2) have been marked as

---

[50] *See id*. at 13 (Jan. 19 email from Debevoise at 1:19 p.m. (agreeing with BMLP's "language making clear you can seek to use documents in other "Permitted Proceedings" without filing a motion or noticing a hearing")

[51] *See id*. at 11 (Jan. 19 email from Debevoise at 10:35 p.m.).

[52] *See id*. at 10 (Jan. 20 email from Gibbons at 10:52 a.m.); 8 (Jan. 20 email from Debevoise at 4:46 p.m.); 6-7 (Jan. 20 email from Gibbons at 11:29 p.m.).

[53] *See id*. at 26 (Paragraph I (2) of protective order permitting the sharing of information with outside counsel whose signed consents were delivered to the Court *in camera*); *id*. (Paragraph J, permitting Highly Confidential Information from being shared with those persons listed in Paragraph I(2), among others); *see also id*. 6-7 (Jan. 20 email at 11:29 p.m. from Gibbons "this new provision is yet another transparent attempt to manipulate the protective order to prejudice BMLP's enforcement efforts, not to protect confidential information" and proposing that outside counsel consents be provided to the Court *in camera*.)

[54] *See* Theisen Decl., Ex. L (CCA's first production letter); Theisen Decl., Ex. P (CCA's second production letter).

confidential or highly confidential.[55]    For its part, CSCEC Holdings has continued to resist

discovery and has not produced *any* documents.

## **RELIEF REQUESTED**

46.    By this Motion, BMLP seeks entry of the Proposed Order directing the immediate

appointment by the U.S. Trustee of an examiner (the "Examiner") pursuant to section 1104(c) of

the Bankruptcy Code and Bankruptcy Rule 2007.1(a) to investigate and report on (a) the historical

and ongoing relationship, including any conflicts of interest, between CCA and its non-Debtor

affiliates (including but not limited to CSCEC Holding and CSCEC), (b) potential claims and

causes of action that CCA's estate may hold against current and former officers and directors,

management, and/or its affiliates, including, but not limited to, fraudulent transfer, breach of

fiduciary duty, alter ego/veil piercing, recharacterization, equitable subordination, preferential

transfer, and other claims; (c) pre-petition transfers or dissipation of assets, (d) potential

destruction of documents, and (e) any other any other such matters determined to be appropriate

by the Examiner.

## **ARGUMENT**

47.    Section 1104(c) of the Bankruptcy Code governs the appointment of an examiner

in Chapter 11 proceedings.  The statute provides that:

> (c)  If the court does not order the appointment of a trustee under
> this section, then at any time before the confirmation of a plan, on
> request of a party in interest or the United States Trustee, and after
> notice and a hearing, the court ***shall order the appointment of an
> examiner to conduct such an investigation of the debtor*** as
> appropriate, including an investigation of any allegations of fraud,
> dishonesty, incompetence, misconduct, mismanagement, or

---

[55] BMLP has not yet reviewed the 84 documents in CCA's second production.

irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, *if-*

(1) *such appointment is in the interests of creditors*, any equity security holders, and other interests of the estate; or

(2) *the debtor's fixed, liquidated, unsecured debts*, other than debts for goods, services, or taxes, or owing to an insider, *exceed $5,000,000.*

11 U.S.C. § 1104(c) (emphasis added).

48.     Based on the language of section 1104(c), courts have found that the request to appoint an examiner must satisfy four requirements: (a) no trustee has been appointed; (b) no plan has been confirmed; (c) a party in interest or the United States Trustee has requested an examiner; and (d) either (1) appointment of the examiner must be in the interests of the estate, or (2) specified unsecured debts must exceed $5 million.  *See In re FTX Trading Ltd.*, 91 F.4th 148, 153-55 (3d Cir. 2024); *In re UAL Corp.*, 307 B.R. 80, 84 (Bankr. N.D. Ill. 2004) ("[A]ppointment of an examiner is mandatory if the four conditions are met").

49.     Here, there should be no dispute that the first three (3) requirements are satisfied: no trustee has been appointed, no plan has been confirmed, and BLMP has requested an examiner. As to the last requirement, the appointment of an examiner is not only *mandatory* in this case under the statutory $5 million debt requirement, but it is also warranted because it is in the best interests of creditors and the estate.

**A.  Under Section 1104(c)(2), the Appointment of an Examiner is mandatory.**

50.     Following the Third Circuit's decision in *FTX*, it is settled law that where the debtor's total fixed, liquidated, unsecured debt exceeds $5 million, "the appointment of the examiner is mandatory under the Code."  *FTX*, 91 F.4th 148 at 156.  This accords with the law in other circuits.  *See In re Revco D.S., Inc.*, 898 F.2d 498 (6th Cir. 1990); *In re Loral Space & Commc'ns, Ltd.*, No. 04 Civ. 8645RPP, 2004 WL 2979785 (S.D.N.Y. Dec. 23, 2004); *In re*

*Erickson Ret. Comtys., LLC*, 425 B.R. 309 (Bankr. N.D. Tex. 2010) (all holding that appointment of an examiner is mandatory once the statutory debt threshold is met).

51.    An examiner is mandatory because the $5 million unsecured debt threshold is satisfied in this case.  BMLP's judgment itself constitutes a fixed, liquidated, unsecured debt that far exceeds $5 million.  The judgment is "fixed" because it is not a contingent claim, "which is a claim that has not accrued and that is dependent upon a future event."  *Matter of Elsub Corp.*, 66 B.R. 172, 179 (Bankr. D.N.J. 1986).  Unlike a contingent debt, which "does not become an obligation until the occurrence of a future event," the debt here is fixed (or "noncontingent") because "all of the events giving rise to liability for the debt occurred prior to the debtor's filing for bankruptcy."  *In re Mazzeo*, 131 F.3d 295, 303 (2d Cir. 1997).  In other words, a debt is contingent only if it has not yet been established at the time of the bankruptcy filing that the debtor actually owes the creditor.  *See In re Baird*, 228 B.R. 324, 331 (Bankr. M.D. Fla. 1999).

52.    As explained by this Court in *Elsub*:

> The classic examples of contingent debts are the guarantor/surety situations and a tort claim on which no judgment has been entered. The guarantor situation is obvious—there liability is dependent on a future uncertain event—the default of the primary obligor. Tort claims have been considered contingent because they require proof by the plaintiff creditor of the debtor's liability and the amount of damages are, by their very nature, not fixed unless and until a judgment is entered setting the debtor's liability.

*Elsub Corp.*, 66 B.R. 172 at 179.

53.    There is no dispute that the New York Court entered a judgment on October 31, 2024 against CCA in BMLP's favor that set the amount of CCA's liability.  *See* Wei Decl. at ¶ 26 (acknowledging that "Justice Andrew Borrok issued a decision finding liability for all three Defendants" and that the clerk of the court entered the [judgment] in the amount of $1,642,598,493.15").  Accordingly, BMLP's claim became a fixed debt immediately upon entry

of the judgment.  Indeed, the debt was not only due upon entry, but it could be enforced prior to the petition date: although an interim stay of enforcement had been granted, it was lifted on December 19, 2024.  CCA filed for bankruptcy three days later.

54.     The judgment is "liquidated" because its value is "readily ascertainable."  *See In re Digit. Networks N. Am., Inc.*, No. 15-11535 (KG), 2018 WL 3869599, at *6 (Bankr. D. Del. Aug. 13, 2018) (quotations and citations omitted); *see also In re Dow Corning Corp.*, 215 B.R. 346, 356 (Bankr. E.D. Mich. 1997) ("[A] liquidated debt is one that 'has been made certain as to amount due by agreement of the parties or by operation of law") (citation omitted).  The New York Court determined the quantum of CCA's liability to BMLP, and the New York Judgment sets the dollar amount for which CCA is jointly and severally liable to BMLP to for a "total sum of $1,642,598,493.15" with interest accruing "at the rate of 9%".  *See* Docket No. 54-2 at 4.

55.     The mere fact that the Debtor disputes the merits of the judgment and is pursuing an appeal is of no relevance: a debt is counted for purposes of 1104(c)(2) even if it is disputed. *See In re Vision Dev. Grp. of Broward Cnty., LLC*, 2008 WL 2676827 at * 3 (Bankr. S.D. Fla. June 30, 2008) ("Though the Debtor has objected to the Mezzanine Lenders' claims … these objections only render the claims 'disputed'—not unfixed or unliquidated such that section 1104(c)(2) would be inapplicable.").

56.     That is because "a contingent debt is not the same thing as a disputed debt[.]" *In re Albano*, 55 B.R. 363, 366 (N.D. Ill. 1985).  And, a debt "is liquidated when its value is capable of ready ascertainment, ***irrespective of whether the validity of the claim is in dispute***." *In re G-I Holdings, Inc.*, 323 B.R. 583, 612 (Bankr. D.N.J. 2005) (emphasis added).  Thus, as the Eleventh Circuit observed in reaching the same conclusion nearly thirty years ago, "the vast majority of courts have held that the existence of a dispute over either the underlying liability or the amount

of a debt does not automatically render the debt either contingent or unliquidated." *United States v. Verdunn*, 89 F.3d 799, 802 (11th Cir. 1996) (quoting *In re Jordan*, 166 B.R. 201, 202 (Bankr. D. Me. 1994)).

### B. The Appointment of an Examiner is in the Best Interests of Creditors.

57.    Not only are the conditions for mandatory appointment of an examiner under section 1104(c)(2) of the Bankruptcy Code satisfied, but discretionary appointment is also warranted because it would be "in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. 1104(c)(1). The Court has discretion to order the appointment of an examiner where, as here, "such appointment allows for a thorough, independent, and expeditious examination to be made into serious allegations." *In re JNL Funding Corp.*, 2010 WL 3448221, at *3 (Bankr. E.D.N.Y. Aug. 26, 2010).

58.    As set forth in the New York Decision, there are numerous and *proven* allegations of financial fraud and misappropriation. As just a few examples, the New York Court found that CCA, along with its alter ego co-defendants:

- engaged in an "absolute sham and shakedown" of BMLP to induce BMLP to release $54 million of funds so that CCA could purchase a competing hotel. Docket No. 54-1 at 27 (New York Decision); *see also id*. at 54, 59 (finding additional unjustified "shakedown[s]" of BMLP for money).

- promised completion dates to BMLP that were "just phony." *Id*. at 47.

- engaged in a "massive misappropriation of funds," *id*. at 65, including "[u]ncontradicted evidence that Defendants' corporate officers misappropriated project funds for personal use," *id*. at 50.

- engaged in a "fraudulent course of dealing and disrespect for the observation of corporate formalities." *Id*. at 50; *see also id*. at 14 (the defendant entities operated "without regard to corporate form" and "to further the[ir] scheme by commingling their financial and corporate obligations and rights").

- engaged in "active concealment of critical information" and provided "simply false assurances" to BMLP. *Id*. at 56.

59.     Moreover, the New York Court found that "[t]he Defendants' witnesses' testimony

… was often inconsistent with their own internal communications or otherwise confirmed their

many instances of breach and fraud."  *Id*. at 3; *see also id*. at 15, 33, 37, 54 (finding CCA's

witnesses not credible).  Repeatedly, the Court found the testimony of CCA's witnesses, which

included former members of management, to be "simply not credible."  *Id*. at 32, 54.

60.     With respect to CCA's purported separateness from its affiliates, the New York

Court found that:

> (i) the Defendants shared ownership, officers, and directors; (ii) the
> Defendants shared offices and addresses; (iii) CCA, Inc., acting
> through Mr. Yuan, controlled CCAB and CSCECB; (iv)
> commingled assets; (v) paid or guaranteed obligations of one
> another; (vi) were not treated as separate profit centers; (vii) did not
> deal with one another at arm's length; and (viii) otherwise conflated
> their corporate identities.

*Id*. at 70.

61.     In fact, the New York Court found that CCA, "in particular, dominated the other

entities and … used that domination and commingling of assets and corporations to perpetrate a

wrong on BMLP."  *Id*.  Accordingly, the New York Court pierced CCA's corporate veil.  *Id*.

62.     In light of these findings of fact by Justice Borrok, appointing an examiner to

investigate CCA is warranted for numerous reasons.

**1.   Without a creditors' committee, an examiner is needed to investigate other potential claims against non-Debtor affiliates stemming from its fraudulent history.**

63.     In most Chapter 11 cases, a creditors' committee "plays a pivotal role in the

bankruptcy process" by ensuring "the unsecured creditors' views are heard and their interests are

promoted and protected."  *In re Refco Inc.*, 336 B.R. 187, 195 (Bankr. S.D.N.Y. 2006).  Among

other things, committees "provide supervision of the debtor and execute an oversight function;

they may investigate the debtor's assets and affairs; and they may perform such other services as are in the interest of the unsecured creditor body." *Id.*

64.    Here, no committee will be appointed, but an examiner can play a similar function when it is broadly empowered to investigate the debtor.  *See* 11 U.S.C. 1104(c) ("the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor"); *In re Gordon Props., LLC*, 514 B.R. 449, 458 (Bankr. E.D. Va. 2013) ("The mandate of [1104(c)] is to conduct appropriate investigations.").

65.    A "textbook case calling for the appointment of an examiner" is to determine whether the estate should pursue claims and causes of action involving the debtor's affiliates.  *In re Keene Corp.*, 164 B.R. 844, 856 (Bankr. S.D.N.Y. 1994) (citations omitted).

66.    Numerous courts have thus empowered examiners to investigate such claims.  *See*, *e.g.*, *In re St. Marie Clinic PA*, 2013 WL 5221055, *1 (Bankr. S.D. Tex. Sept. 17, 2013) (appointing an examiner to "investigate the Debtor's relationship, loans and other transactions with any non-debtor insider"); *In re Residential Cap., LLC*, No. 12-12020, 2012 WL 2328223 (Bankr. S.D.N.Y. June 20, 2012) (appointing examiner to conduct broad investigation on debtors' transactions with their non-debtor parent company, potential claims against officers and directors, and any claims the debtors proposed to release); *In re Gilman Serv., Inc.,* 46 B.R. 322, 327-328 (Bankr. Mass. 1985) ("debtor's sale of assets to a related corporation before the commencement

of the bankruptcy case warrants an investigation by an examiner where there are unanswered questions concerning the transaction and interrelationships of the parties involved").[56]

67.     Without a committee, an examiner is needed to investigate CCA's dealings with affiliates that may support colorable claims that CCA's estate holds against affiliates (including the proposed DIP lender), including, without limitation, potential fraudulent transfer, recharacterization, alter ego, and equitable subordination claims.  The New York Court's findings of fraud concerned events that occurred in 2014 and 2015 with respect to a single (albeit substantial) project, but little is known about CCA's affairs thereafter.  The pervasiveness of fraud, the abuse of the corporate form, and the lack of credibility on the part of CCA's witnesses that were all proven in the New York trial, however, indicates a high likelihood that CCA's misconduct in the Baha Mar project was no aberration.

### 2.    An examiner is needed to protect the interests of creditors.

68.     In addition to investigating claims, an examiner will also help ensure the interests of creditors are protected in the absence of a committee.  This is particularly necessary because CCA remains inextricably linked to its non-Debtor affiliates.  CCA has sought a proposed $40 million secured DIP loan from its immediate parent, but the proceeds of the loan appear to be primarily for the benefit of CCA's non-Debtor affiliates—including those outside of this Court's jurisdiction.  Indeed, the proposed DIP budget shows that through March 28, 2024 *CCA intends to transfer nearly three-quarters of the proceeds* ($6 million of its proposed initial $8 million) to non-Debtors for purported "Shared Services."  *See* Docket No. 4 at 132 (Proposed DIP Budget).

---

[56] *See also In re Patton's Busy Bee Disposal Service Inc.,* 182 B.R. 681 (Bankr. W.D.N.Y. 1995) (authorizing examiner to investigate and prosecute actions to recover avoidable transfers); M. Bienenstock, Bankruptcy Reorganization 299 (1987) ("Often, appointment of an examiner is warranted when the debtor's transactions with affiliates should be investigated.")

69.     The proposed DIP facility will also give CSCEC Holding significant control over this Chapter 11 case, and it will require CCA to relinquish important estate rights, including by, among other things: (1) making it an event of default for CCA to file any plan unacceptable to CSCEC (DIP Credit Agmt. 7.1(e)(x)); (2) pledging liens on proceeds of avoidance actions to CSCEC Holding (DIP Credit Agmt. 6.1)—even though those avoidance actions may very well be against CSCEC Holding or other affiliates; and (3) waiving the estate's Section 506(c) surcharge rights (DIP Credit Agmt. 6.5).

70.     At the same time, CCA has attempted to stonewall BMLP's attempts to obtain even the most basic, non-privileged, and easily accessible information on the basis of tenuous relevance objections, such as CCA's general ledger and intercompany loan documents.   CCA also vehemently opposed the deposition of Mr. Wei—who submitted a First Day Declaration—and the Court had to order that Mr. Wei be present for cross-examination at the second day hearing at counsel's suggestion to the contrary.   Indeed, as of the date of this Motion, BMLP has received only limited productions from CCA, and no production from CSCEC Holding.   CCA's counsel has also informed BMLP's counsel that CCA would only provide information through "formal" discovery processes, rather than "informal" (and less costly) requests. *See* Theisen Decl., Ex. D at 8.   To that end, CCA's financial advisor will not provide any information to BMLP's financial advisor, even though such informal exchanges of information are customary in complex Chapter 11 cases. *Id*.

71.     CCA's actions in resisting BMLP's information requests is a clear signal of things to come, and BMLP's future attempts to obtain information will likely be met with the same costly obstruction.   An examiner will help break through this barrier, and the appointment of one is

necessary to obtain much-needed information and transparency for the benefit of creditors, the

United States Trustee, and this Court.

### 3. An examiner is in the best interests of the public.

72.     Lastly, an examiner will enhance the interests of the public at large.  As the Third

Circuit has explained, Chapter 11 is designed to ensure "special protection for the large cases

having great public interest." *In re FTX Trading Ltd*., 91 F.4th 148, 155 (3d Cir. 2024) (quotation

and citation omitted).  As part of this protection, the bankruptcy code provides for the appointment

of an examiner to "preserve[] and enhance[]" debtors' and creditors' interests, 'as well as the public

interest.'" *Id*. (citation omitted).  In contrast to an investigation undertaken by a debtor or statutory

committee, an examiner has an obligation to make their findings public.  *Id*. at 157 ("Requiring a

public report furthers Congress's intent to protect the public's interest as well as those creditors

and debtors directly impacted by the bankruptcy.").

73.     According to its First Day Declarations, CCA and its affiliated entities "makes up

the largest construction company in the world, operating in more than 100 countries and regions

globally, covering investment, development, construction engineering, survey and design."  Wei

Decl. at ¶ 7.  The conglomerate has pursued business opportunities the United States, including

"construction activities primarily in the New York and New Jersey metropolitan area, Washington,

D.C., the Carolinas and Texas."  *Id*. at ¶ 8.  Thus, the public at large has an interest in uncovering

any further misconduct or mismanagement involving CCA and its affiliates, particularly in the

wake of a public $1.6 billion judgment.

### C. The Examiner should be given powers commensurate with the gravity of CCA's historic wrongdoing and with the magnitude of the debt it owes.

74.     Section 1104(c) of the Bankruptcy Code contemplates an examiner's appointment

to investigate "allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or

irregularity in the management of the affairs of the debtor." 11 U.S.C. 1104(c).  This investigation is "supposed to be a 'fishing expedition,' as exploratory and groping as appears proper to the Examiner."  *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (S.D.N.Y. 1993) (citing *In re Vantage Petroleum Corp.*, 34 B.R. 650, 651 (Bankr. E.D.N.Y. 1983)).  Accordingly, the Court has broad flexibility in appointing an examiner for any investigatory function it deems appropriate.  *See In re Gordon Props., LLC*, 514 B.R. 449, 458 (Bankr. E.D. Va. 2013) ("The mandate of [section 1104(c)] is to conduct appropriate investigations. The list merely illustrates some, but not all, that are appropriate.").

75.     The examination required here is substantial.  CCA's entanglement with affiliates, history of fraud and abuse of the corporate form, and lack of independence from its corporate parent warrant an examiner being given broad investigatory powers.  While CCA now characterizes itself as nothing more than a back office providing "shared services" to affiliates, it may very well be that assets were dissipated to intentionally hinder its creditors.

76.     Accordingly, the examiner should be given broad authority—commensurate with the gravity of the fraud that has occurred—to investigate CCA's dealings with its affiliates since the events underlying the judgment (*i.e.*, from 2015) up through and including CCA's bankruptcy filing.

77.     By seeking chapter 11 relief, CCA agreed to play by the rules of this Court and the United States Bankruptcy Code, including the obligation to be transparent and forthcoming with its creditors.  Under the circumstances here, the appointment of an examiner is the best mechanism the Bankruptcy Code provides to ensure such compliance.

**NOTICE**

78.     Notice of the Motion has been provided to: (a) counsel for the Debtor (Debevoise & Plimpton LLP, Attn: M. Natasha Labovitz, Esq., Sidney P. Levinson, Esq., Elie J. Worenklein, Esq., and Rory B. Heller, Esq., and Cole Schotz P.C., Attn: Michael D. Sirota, Esq., Warren A. Usatine, Esq., Felice R. Yudkin, Esq., and Ryan T. Jereck, Esq.); (b) the Office of the U.S. Trustee for the District of New Jersey (Attn: Fran B. Steele, Esq. and Peter J. D'Auria, Esq.); (c) counsel for the DIP Lender (Lowenstein Sandler LLP, Attn: Jeffrey Cohen, Esq. and Andrew Behlmann, Esq.); via first class mail, postage pre-paid and via electronic mail and (d) any party that has requested notice pursuant to Bankruptcy Rule 2002 electronically via the Court's CM/ECF system. Accordingly, no further notice of the Motion is necessary.

**WAIVER OF MEMORANDUM OF LAW**

79.     BMLP respectfully requests that the Court waive the requirement to file a separate memorandum of law pursuant to Rule 9013-1(a)(3) of the Local Rules for the United States Bankruptcy Court for the District of New Jersey because the legal bases upon which BMLP relies are set forth herein.

**NO PRIOR REQUEST**

80.     No prior request for the relief sought herein has been made to this Court or any other court.

**CONCLUSION**

**WHEREFORE**, BMLP respectfully requests the Court approve the Motion and enter the Proposed Order.

Dated: January 23, 2025          **GIBBONS P.C.**
Newark, New Jersey

                               */s/ Brett S. Theisen*
                               Robert K. Malone, Esq.
                               Brett S. Theisen, Esq.

Christopher P. Anton, Esq.
Kyle P. McEvilly, Esq.
One Gateway Center
Newark, New Jersey 07102-5310
Telephone: (973) 596-4500
Email: rmalone@gibbonslaw.com
  btheisen@gibbonslaw.com
  canton@gibbonslaw.com
  kmcevilly@gibbonslaw.com

*Counsel for BML Properties, Ltd.*