**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (admitted *pro hac vice*)
Erica S. Weisgerber (admitted *pro hac vice*)
Elie J. Worenklein
66 Hudson Boulevard
New York, NY 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
nlabovitz@debevoise.com
eweisgerber@debevoise.com
eworenklein@debevoise.com

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Felice R. Yudkin
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone: (201) 489-3000
Facsimile: (201) 489-1536
msirota@coleschotz.com
wusatine@coleschotz.com
rjareck@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel to the Debtor and
Debtor in Possession*

*Co-Counsel to the Debtor and Debtor in
Possession*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>CCA Construction, Inc.,[1]<br><br>　　　　　　　　　　Debtor. | Chapter 11<br><br>Case No. 24-22548 (CMG) |

**DEBTOR'S OBJECTION TO MOTION OF BML
PROPERTIES, LTD. FOR ENTRY OF AN ORDER APPOINTING AN EXAMINER**

The above-captioned debtor and debtor in possession, CCA Construction, Inc. ("**CCA**" or

the "**Debtor**"), respectfully submits the following objection (the "**Objection**") to the *Motion of*

*BML Properties, Ltd. for Entry of an Order Appointing an Examiner* (the "**Examiner Motion**"),

filed on January 23, 2025 [Docket No. 88].

---

[1]　　　　The last four digits of the Debtor's federal tax identification number are 4862. The Debtor's service address
for the purposes of this chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

## Preliminary Statement

1.      The Examiner Motion filed by BML Properties, Ltd. ("**BMLP**") is a transparent attempt to rewrite the facts and circumstances leading up to and following CCA's chapter 11 filing, all in support of BMLP's ongoing prosecution of claims against CCA's litigation co-defendants in New York and The Bahamas.  This Court should resist BMLP's invitation to use CCA's good-faith chapter 11 filing as a springboard to pursue its non-bankruptcy enforcement efforts against non-debtors, circumventing the jurisdiction of the Bahamian court in which BMLP has already brought an enforcement action.

2.      BMLP claims that this Court has little discretion in determining whether or not an examiner should be appointed, citing section 1104(c) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") and *In re FTX Trading Ltd.*, 91 F.4th 148, 153 (3d Cir. 2024).  However, even if BMLP is right that its non-final judgment gives rise to a liquidated, non-contingent claim that is over the statutory value threshold for appointment of an examiner under section 1104(c), the Third Circuit reinforced in *FTX* that this Court retains broad discretion to determine the scope, duration and budget of the examiner to ensure that the investigation is "as is appropriate."

3.      Exercise of that discretion to appoint an examiner with a narrow, targeted focus is warranted in this case (if any examiner is appointed at all).  As described in this Objection, applicable case law is consistent and clear in cautioning that it is not appropriate for an examiner's mandate to result in the duplication of efforts of other independent investigations, thereby unnecessarily draining the resources of the estate – particularly where, as here, the examiner is requested to further a single party's parochial interests.  Viewed in that context, the breathtakingly

broad scope of examination that BMLP proposes would be wasteful, duplicative, unnecessary, and inappropriate.

4.       As BMLP knows, CCA's board of directors (the "**Board**") and its sole shareholder took action two months before the chapter 11 filing to appoint an independent director and create an independent and disinterested special committee of the board (the "**Special Committee**") with authority to, among other things, consider restructuring alternatives and, in connection therewith, conduct any investigations as might be necessary in evaluating or pursuing such an alternative. The Special Committee consists of the independent director, Ms. Elizabeth Abrams, who was appointed to the board on October 21, 2024, almost immediately after the entry of a decision in the Baha Mar Litigation.[2]

5.       The scope of investigation proposed in the Examiner Motion substantially overlaps with, and would duplicate, the mandate of the Special Committee, contrary to applicable case law and the requirement under Bankruptcy Code section 1104(c) that the scope of an examination be "appropriate."   BMLP has attempted to overcome this problem by claiming, without *any* evidentiary support, that Ms. Abrams, the Special Committee, and CCA's retained co-counsel firms lack independence, thus attempting to call into question the Special Committee's ability to decide when, whether and in what manner to conduct its own review of potential claims the Debtor may have, including any claims against current and former officers and directors, management, or affiliates.[3]

---

[2]     A copy of that decision (the "**Trial Decision**") is annexed as Exhibit 1 to the *Statement and Reservation of Rights of BML Properties, Ltd. to Debtor's Motion for Entry of an Order Granting Relief from the Automatic Stay to Prosecute an Appeal* [Docket No. 51].

[3]     In addition to maligning Ms. Abrams and the Debtor's professionals, BMLP includes a distorted recitation of the history of discovery in connection with the Debtor's motion to approve the DIP Motion (as defined below)

6.      Notably, BMLP chose to file the Examiner Motion before it had even *asked* Ms. Abrams whether she had begun to investigate any such claims (or, if not, why not) – despite CCA having agreed to provide Ms. Abrams for deposition in connection with BMLP's pending challenge to CCA's motion for debtor-in-possession financing (the "**DIP Motion**").  When BMLP finally did pose such questions to Ms. Abrams in her deposition on February 3, 2025, her response made clear that the Special Committee can and will conduct any investigation of estate causes of action that it deems appropriate, at the appropriate time.[4]  *See* Declaration of Elie J. Worenklein in Support of Debtor's Objection to Motion of BML Properties, Ltd. for Entry of an Order Appointing an Examiner (the "**Worenklein Declaration**"), Ex. A ("**Abrams Deposition**") at p. 61, 63 (including the statement from Ms. Abrams, in response to a question about a potential "investigation into any claims, fraud or ongoing misconduct that could provide potential recoveries to creditors," "I don't think it's ripe at this time and if it becomes ripe then I would").

7.      Equally tellingly, despite its professed concerns about the Special Committee, BMLP did not even include investigation of Ms. Abrams' appointment or the Special Committee's independence as a topic of investigation for the proposed examiner – which would be an ordinary first step in probing whether any further examination would be appropriate under Section 1104(c).[5]  Instead, the Examiner Motion attempts to pre-judge that question by making unsupported

---

and repeatedly mischaracterizes the Trial Decision in an effort to discredit CCA and its management team, all as described in more detail in this Objection.

[4]     As discussed further below, BMLP also filed the Examiner Motion before the date this Court had set for substantial completion of CCA's document production in connection with the DIP Motion, which BMLP knew would include documents related to the Special Committee's formation and process.  Consistent with Ms. Abrams' testimony, the resolutions appointing the Special Committee contain no restriction on investigations. Worenklein Declaration, Ex. B (the "**Special Committee Authorization**").

[5]     Examiner Motion ¶ 74.

allegations (now shown to be untrue) about CCA's corporate governance and gross misrepresentations about the Trial Decision. Rather than taking a step-by-step approach to first test the independence of the Special Committee and thereby determine whether any further work is needed, BMLP wants to rush directly to an investigation that would benefit its own ongoing litigation against CCA's non-debtor affiliates. Ironically, the Examiner Motion is a thinly-veiled attempt by BMLP to use estate resources and hijack the chapter 11 process for its own benefit – the very kind of behavior of which BMLP has baselessly accused CCA and the DIP Lender.

8.      The Court should decline to authorize BMLP's efforts to weaponize Section 1104(c) into an estate-funded "fishing expedition." BMLP should not be permitted to leverage CCA's legitimate need for bankruptcy protection as a means to pursue scorched-earth discovery tactics in pursuit of enforcing BMLP's judgment against non-debtors, at the expense of CCA's estate.

9.      The Debtor therefore respectfully requests that the Examiner Motion be denied. To the extent this Court determines that the appointment of an examiner is required or warranted, then the scope of the examiner's work should be limited, consistent with recent precedent, to probing the independence of the Special Committee. The examiner should be required to submit its report three weeks after its appointment so the Special Committee will be free to conduct any examination it deems appropriate, as soon as it thinks it appropriate, without any cloud of uncertainty that might be caused by an active examination into the Special Committee's role.[6] In addition to being the most efficient approach, this proposal would roughly align the timing of any examiner's work with that of the pending appeal of the Trial Court Decision (as defined and discussed in further below).

---

[6]      *Infra* at ¶¶ 58–62.

CCA further submits that a budget of $100,000 would be sufficient to satisfactorily complete the limited role described above.

## Factual Background

10.     BMLP tries to justify its request to appoint an examiner by cobbling together portions of quotes taken out of context and wholly unsupported allegations to create an alternate reality in which, according to BMLP, CCA committed a massive, intentional fraud, inappropriately sought chapter 11 protection in order to pursue a frivolous appeal, entered into an unnecessary debtor-in-possession financing agreement that gave unusual amounts of control to its insider lender, intends to divert money borrowed under that agreement to affiliates while leaving CCA on the hook to repay the funds, has inadequate corporate governance, and has acted in bad faith in response to BMLP's discovery demands – *every part of which is simply untrue*.

11.     The facts, as detailed below, paint a very different picture from BMLP's alternate reality.  In *fact*:

- "Following more than seven (7) years of litigation and an 11- day bench trial,"[7] the New York trial court made no finding that CCA engaged in any fraud (CCA's only liability was on an erroneously applied veil-piercing theory).

- The denial of CCA's motion for a stay of enforcement was *not* a ruling on the merits.

- CCA's grounds for appeal are strong.

- CCA's proposed debtor-in-possession financing ("**DIP Financing**") is on better-than-market terms and is needed to preserve CCA's business operations, fund the expenses of this chapter 11 case and create value for the subsidiaries that are CCA's main assets.

---

[7]      Examiner Motion ¶ 8

- The DIP terms do not give unusual or undue control to the DIP lender, and they have an explicit safeguard to protect against BMLP's concern about value being transferred away from CCA.

- The DIP was negotiated by external advisors under the auspices of an independent Special Committee, which also has the power to act independently to conduct the very types of investigations that BMLP says an examiner must undertake.

- Finally, CCA has responded robustly and in good faith to BMLP's sweeping DIP discovery requests, which went well beyond the scope of the actual contested motion, all while also complying with chapter 11 reporting obligations, including filing its schedules and statements of financial affairs.

For these reasons, despite BMLP's effort to manufacture facts and tell a story in which the relief it requests might be appropriate, the Examiner Motion should be denied.

## I.    BMLP's Distortion of the Trial Decision

12.    The Examiner Motion grossly mischaracterizes the Trial Decision in the Baha Mar Litigation, and intentionally understates the strength of the pending appeal.  As an initial matter, despite BMLP's sweeping accusations, the New York trial court did *not* find that CCA, any of its directors, or CCA's management team committed fraud.  Rather, the trial court only found that one co-defendant, CCA Bahamas, Ltd. ("**CCAB**"), had made fraudulent statements to BMLP.[8] Separate from the fact that this finding is contested on appeal, CCAB is CCA's distant corporate affiliate – not a parent, subsidiary, or sibling corporation to CCA.

13.    CCA was held liable in the Trial Decision, not based on *any* conduct of its own, but only on an erroneously applied veil-piercing theory, which CCA and its co-defendants have appealed and believe will be reversed.  As the defendants' appeal explains, piercing CCAB's

---

[8]    Even a cursory review of the Trial Decision makes this plain:  the heading of the Trial Decision's finding on fraud is titled, in relevant part "CCAB Committed At Least four Instances of Fraud" (ECF No. 51, Ex. 1, at 45) and each of those four instances related to statements by CCAB, not CCA (*Id*. at 45-56).

corporate veil to reach its remote affiliate, CCA, was plain error.[9]  To begin with, under New York choice-of-law principles, the trial court was required to apply Bahamian law, not New York law, because BMLP sought to pierce the veil of CCAB, a Bahamian company.[10]  If Bahamian law had been correctly applied, BMLP would have lost its suit against CCA:  in the Bahamas,  veil-piercing is allowed only if a plaintiff shows that the defendant created a shell entity to "deliberately evade[]" "an *existing* legal obligation" that the defendant *already* owed to the plaintiff.[11]  That fact pattern did not apply in the Baha Mar Litigation, and BMLP never argued it did.  To the contrary, CCA was never party to any contract with BMLP, and any liability CSCECB or CCAB incurred to BMLP only arose at the time of the alleged breaches or fraud in 2014-2015, years after those companies were incorporated in 2009.  For these straightforward reasons, the First Department is likely to reverse the trial court's erroneous decision to pierce the corporate veil.

14.    Veil-piercing was wrong under New York law, too:  BMLP's asserted evidence was entirely insufficient as a matter of law to pierce the corporate veil.  The trial court found that the Debtor and the non-debtor affiliates were all subsidiaries of one parent, but that is not enough for veil-piercing.  Indeed, if it were, any corporation could be held liable for any action of any other entity in its corporate family merely by virtue of their relationship – which of course is not the case.[12]  The trial court also found that CCA and the non-debtor co-defendants had some overlapping officers or directors, but that is very normal in the context of multi-entity corporate

---

[9]    *See* Worenklein Declaration, Ex. C (the "**Appellate Brief**"), at 53–58.

[10]    Appellate Brief, at 54 (citing *Flame S.A. v. Wordlink Int'l (Holding) Ltd.*, 107 A.D.3d 436, 438 (N.Y. App. Div. 2013) (New York courts apply the veil-piercing law of the jurisdiction whose veil the plaintiff seeks to pierce)).

[11]    Appellate Brief, at 54–55 (citing *In re Tyson*, 433 B.R. 68, 88-89 (Bankr. S.D.N.Y. 2010)).

[12]    Appellate Brief, at 57 (citing *Meshel v. Resorts Int'l of N.Y., Inc.*, 160 A.D.2d 211, 213 (N.Y. App. Div. 1990)).

groups, and is not grounds for veil-piercing.[13]  BMLP never alleged, and the trial court did not

find, that the hallmark factors courts *do* use to justify veil piercing—such as abuse of the corporate

form in order to avoid existing liabilities—were present here.

15.     As with the veil-piercing finding, the trial court's finding that CCA's non-debtor

affiliate committed fraud is wrong as a matter of law and highly vulnerable on appeal.  As just a

few examples:  The trial court applied the wrong standard for scienter, and it ignored that BMLP's

counsel admitted that BMLP could not satisfy the correct scienter standard.  The trial court also

awarded damages for fraud even though applicable law says a plaintiff may recover only what it

was induced to spend because of its reliance on a claimed misrepresentation, and BMLP outright

admitted it did not spend a cent in reliance on any statement by any defendant.

16.     Nothing BMLP points to in the Examiner Motion amounts to fraud or wrongful

conduct on anyone's part, much less that of CCA.  As but one example, BMLP makes much of

$54 million that a non-debtor defendant, CCAB, received from BMLP's subsidiary, BML, in

November 2014.  But there was no misrepresentation:  BML and CCAB agreed in writing that the

$54 million payment was a "settlement for unresolved financial disputes," namely, a partial

reimbursement for $98 million in expenses that CCAB had already incurred during the Project.[14]

17.     BMLP likewise makes out-of-context statements in the Examiner Motion

emphasizing CCAB's employees' purchases supposedly "for personal use," but – despite BMLP's

insinuations – the trial court did not find any deception related to those purchases and

---

[13]     Appellate Brief, at 57 (citing *In re Stage Presence, Inc.*, 592 B.R. 292, 304 (Bankr. S.D.N.Y. 2018) ("[For] closely-held corporations," such overlaps "are not uncommon" and not a basis for veil-piercing)).

[14]     *See* Appellate Brief, at 48.

acknowledged that the evidence was that such purchases may merely have been "de minimis."[15] In any event, the unrebutted evidence at trial was that the purchases were made at CCAB's own expense from its own bank account.[16]

18.      The Debtor and its co-defendants have good grounds to believe these errors, along with many others not detailed here but fully described in the appellate briefing, will result in a reversal on appeal.  Indeed, in an interlocutory appeal that preceded trial, the trial court's summary judgment decision was reversed on five separate grounds.[17]  Among other things, the Appellate Division dismissed a $700 million unjust enrichment claim and a $1.3 billion lost profits claim, both of which were barred by bedrock New York law that the trial court had ignored.[18]  There is strong reason to believe that the damages awarded in the Trial Decision are similarly vulnerable.

19.      Further, BMLP is wrong that the Appellate Division must apply a "deferential standard of review" to these errors.[19]  "[T]he power of the Appellate Division" following a non-jury trial (like the trial at issue here) one "is as broad as that of the trial court."[20]  Thus, while the Appellate Division may decide for CCA and its co-defendants based solely on the trial court's purely legal errors, the Appellate Division will also be empowered to correct the trial court's factual errors based on "uncontradicted documentary evidence."[21]

---

[15]   Trial Decision at 49.

[16]   *See id.*

[17]   *BML Props. Ltd. v. China Constr. Am., Inc.*, 226 A.D.3d 582, 584–85 (N.Y. App. Div. 2024).

[18]   *Id.* at 584.

[19]   *Contra* Examiner Motion ¶ 5.

[20]   *N. Westchester Pro. Park Assoc. v. Town of Bedford*, 60 N.Y.2d 492, 499 (1983); N.Y. C.P.L.R. 5501(c).

[21]   *Forum Ins. Co. v. Worcester Cnty. Inst. For Sav.*, 219 A.D.2d 492, 492 (N.Y. App. Div. 1995).

20.     BMLP calls CCA's confidence in its appeal "hubris" given the New York appellate court's denial of CCA's motion for a stay of enforcement pending appeal.[22]  But that one-page order has no bearing on the pending appeal.  It was not a decision on the merits, and indeed made no analytical statements or factual findings about the appeal at all.[23]

## II.     BMLP's Mischaracterization of the DIP Facility

21.     In the Examiner Motion, BMLP charges that CCA's proposed DIP Financing is unnecessary and will give excessive control to the lender, CCA's immediate parent, CSCEC Holding Company, Inc. (the "**DIP Lender**").  These allegations are simply false, as CCA has explained from the beginning and as the extensive information provided to BMLP in its discovery on the DIP Motion has borne out.

22.     As detailed in the BDO Declaration, CCA's business is not cash-flow positive, and CCA will require financing to support its operations and the administrative expense of this chapter 11 case.  For this reason, CCA and its financial advisor, BDO Consulting Group LLC ("**BDO**"), under the auspices of the Special Committee, engaged in a process to secure debtor-in-possession financing.  BDO sought financing from the Dip Lender, who had been a prepetition lender to CCA.  In addition, as previously disclosed, the Special Committee also directed BDO to run a marketing process to search for other potential third-party lenders that could provide funding on comparable or more favorable terms.[24]  BDO has continued its marketing efforts postpetition to solicit

---

[22]     Examiner Motion ¶ 5.

[23]     *See* Worenklein Declaration, Ex. G.

[24]     *Id*. at ¶ 21.

proposals for potential alternative DIP financing that could replace that provided by the DIP Lender.

23.    Simply put, there is no actionable alternative to the proposed DIP Financing: BDO's efforts have found no other lender willing to provide the funding that CCA needs – and certainly no alternative that would match the favorable pricing, structural flexibility, and certainty of execution provided by the DIP Lender.

24.    The Examiner Motion's attacks on the proposed DIP Financing are off-base and are particularly disingenuous upon consideration that this loan, and its corollary direct funding to CCA's subsidiaries, are the lifeline keeping the CCA Group's operations afloat, which presumably would benefit BMLP more than any other party if its claim holds up on appeal.  BMLP's accusations ring particularly hollow given that, despite the passage of more than 6 weeks since the chapter 11 filing and approximately a month since its financial advisor was hired, BMLP hasn't even suggested to this Court or to CCA that there is any viable financing alternative.

25.    In criticizing the DIP financing and the process that led to it, BMLP points to certain covenants, such as consent rights over certain chapter 11 filings, or a termination of the DIP Lender's funding obligation if a trustee or examiner with enlarged powers is appointed, as giving the lender undue control over CCA's chapter 11 case.  BMLP is ignoring the reality that these are standard terms in any DIP financing, and is overlooking the equally important point of what terms are *not* included here that are often present in other DIP agreements, such as milestones that would require CCA to take specific actions in the chapter 11 case by a specific time, single-draw provisions that would require CCA to borrow (and pay interest on) more cash than needed at any given time, or fees and other prepayment protections that would prevent CCA from replacing this facility with a third-party facility if one ever becomes available.

26.     BMLP also levels the charge that "the proposed insider DIP loan will primarily be used to fund CCA's non-Debtor affiliates."[25]  Once again, this statement is misleading, in that it ignores the reality that *all* borrowings under the DIP Financing are proposed to be used to fund CCA's operations and the administrative expenses of this case.  Stated differently, no funds from the DIP Financing will be distributed to CCA's non-debtor affiliates.[26]  The DIP Lender has agreed to provide a $20 million line of credit to CCA's non-debtor subsidiaries that is wholly separate and apart from the DIP Facility, and CCA has no obligations whatsoever under that agreement.

27.     By referring to the DIP loan being used to benefit non-debtor affiliates, BMLP might be referencing the Shared Services Program that was extensively described in the BDO Declaration.  There is nothing inappropriate about CCA continuing the Shared Services Program in the ordinary course of business, particularly because the costs of providing the shared services are allocated to each of the shared services participants, resulting in either cash payments to CCA or the accrual of an intercompany claim owing from the participant to CCA (thus, it would be incorrect for BMLP to suggest that value is being leaked from the Debtor's estate).  Importantly, the DIP Credit Agreement (as attached to the DIP Motion) includes a highly unusual and very debtor-friendly safeguard to ensure against value leakage:  if CCA's allocated costs for shared services provided to any affiliate outside the CCA Group (i.e any affiliate that is not CCA's direct or indirect subsidiary) are not reimbursed in cash, then the principal balance of the DIP will be *reduced dollar-for-dollar* in the amount of those allocated costs, and the DIP Lender will look to the resulting intercompany receivable for payment instead.  In other words, if funds borrowed

---

[25]     Examiner Motion at ¶3.

[26]     *See* Worenklein Declaration, Ex. E Deposition at 167.

under the DIP Credit Agreement are used to procure or provide value to any affiliate outside the CCA Group, CCA doesn't have to repay those funds.[27]  Simply put, BMLP's concern about value leakage is wrong.

28.     More broadly, BMLP's claim that the DIP Facility is structured to benefit non-Debtor affiliates is equally false.  The DIP Facility ensures CCA access to the liquidity required to efficiently maintain its business functions, including maintaining services essential to the value of itself and to the subsidiaries that make up most of the value of its estate.  No third-party lender presented a viable DIP financing proposal at all, let alone on terms remotely comparable to what the Debtor secured in the DIP Credit Agreement.

### III.    BMLP's Incorrect Mistrust of the Special Committee

29.     As previously described, the Examiner Motion was filed midway through the period this Court set for CCA to respond to discovery in connection with the DIP Motion.  Had BMLP waited to learn more facts before filing, it would have become clear that the Special Committee did direct CCA's legal and financial advisors in an arms-length negotiation of the DIP, did instruct and oversee BDO in conducting a reasonable marketing process to search for other lenders, did exercise its independent judgment in approving entry into the DIP and filing this chapter 11 case, had authority to conduct investigations of the topics BMLP identified as necessary for investigation in the Examiner Motion, and had exercised its business judgment with respect to such claims.

30.     On October 21, 2024, Ms Abrams was appointed to the Board as an independent director, and, almost immediately thereafter, the Board formed the Special Committee and

---

[27]     *See* DIP Credit Agreement §1.5(d); BDO Declaration at ¶29.

appointed Ms. Abrams as its sole member.  Ms. Abrams is an experienced fiduciary and investment professional with nearly 20 years of experience as an investment banker, focused on advising stressed and distressed companies and their investors.[28]  Ms. Abrams has no connection at all to any conduct BMLP alleges in the Baha Mar Litigation.  She also had no relationship with the Debtor or any of its Board members before she was appointed to the Board.[29]

31.    In its November 2, 2024, resolution forming the Special Committee,[30] the Board granted the Special Committee full authority to (a) "review and evaluate" the terms and conditions of, and determine the advisability of, restructuring alternatives including authorization "to perform and cause to be performed any and all acts, on behalf of the Company, as the Special Committee may deem to be necessary or appropriate in connection with the exercise of its authority[]" and (b) over any transactions for which other directors had a conflict, including the negotiation of the DIP with CCA's parent, thus ensuring that all decisions were made independently of the Debtor's existing management team.

32.    Contrary to the implication in the Examiner Motion, the Special Committee conducted a careful and independent process to arrive at the proposed DIP Financing.  In addition to the marketing process previously described, the DIP Credit Agreement was negotiated through a structured, multistage process, with counsel for the Debtor and counsel for the Dip Lender exchanging multiple drafts of the DIP Credit Agreement and key financing documents.

---

[28]    *See* Abrams Deposition p. 5–8.

[29]    *See id.* at p. 3.

[30]    *See* Special Committee Authorization.

Throughout the process, the Special Committee maintained oversight and regularly communicated with CCA's advisors.[31]

33.     Likewise, while BMLP's Examiner Motion calls it "perplexing" that CCA's Special Committee has not conducted an investigation of potential claims against non-Debtor affiliates,[32] Ms. Abrams readily explained her rationale in her deposition:  it would be premature at this stage of the chapter 11 case.  In response to repeated questions regarding the timing and necessity of investigation, Ms. Abrams responded that due diligence is necessary "to the extent that there are claims that counterpart[ies] [are] seeking a release from …. [but] [h]ere at the moment we don't face that" and "investigating claims before they're ripe if [a counterparty is] not seeking releases would be a waste of the estate's resources."[33]

34.     Ms. Abrams appropriately noted in her deposition that she would have a fiduciary duty to the estate to conduct due diligence on the compromise of any claim of the estate (which has not at this time been proposed or even contemplated).[34]  The fact that she hasn't begun an investigation of potential claims at this stage – particularly where CCA is pursuing a fast-track appeal of the Trial Decision that is likely to result in an appellate opinion within a matter of weeks if not months – is unsurprising.  Ms. Abrams has made very clear that she will investigate any claims she deems appropriate, at the appropriate time: when asked about a potential "investigation into any claims, fraud or ongoing misconduct that could provide potential recoveries to creditors,"

---

[31]    *See* Abrams Deposition p. 47.

[32]    *See* Examiner Motion ¶ 6.

[33]    Abrams Deposition p. 60.

[34]    *See id*. at p. 51, 60, 141–142.

Ms. Abrams said, "I don't think it's ripe at this time and if it becomes ripe then I would").[35]

Appointment of an examiner investigating such claims would only duplicate these efforts, and

would not supersede the Special Committee's duty to conduct its own appropriate investigation.

## IV.    BMLP's Baseless Accusations About the Discovery Process

35.    BMLP's assertion that CCA has obstructed discovery is demonstrably false.  The

record shows that CCA has actively engaged in good-faith discovery efforts, provided responsive

documents in a timely manner, and worked to address BMLP's concerns—despite BMLP's own

delay tactics and shifting demands.  CCA voluntarily engaged in informal information-sharing

even before BMLP abruptly elected to pursue formal discovery and continued to cooperate

throughout the process.  Far from obstructing discovery, CCA consistently responded to requests,

participated in meet-and-confer discussions, and complied with reasonable obligations—while

appropriately objecting to requests that were irrelevant, overbroad, or unduly burdensome.

36.    Without attempting to fully catalogue the numerous written exchanges, email

correspondence, and ongoing discussions between the parties regarding discovery, the following

timeline illustrates key points of engagement between CCA and BMLP, demonstrating CCA's

transparency and BMLP's unreasonable demands, presumably all in an effort to burden CCA and

further BMLP's false narrative that CCA is obstructionist:

- On December 26, 2024, BMLP requested from CCA two categories of information: (a) the same financial reporting provided to the DIP Lender under the DIP Credit Agreement and (b) a weekly report of all postpetition transfers made by CCA, including those to affiliates, subject to an appropriate protective order.  BMLP's counsel sent to CCA's counsel a draft stipulation to govern the exchange of the information requested by BMLP.

- CCA's counsel reviewed the proposed requests and stipulation and discussed the same with CCA over the holidays.  CCA voluntarily agreed to provide the

---

[35]    *Id*. at p. 63.

requested information on January 6, 2025.  On that same date, CCA's counsel provided comments on the draft stipulation, including a usage restriction consistent with this Court's precedent, and agreed to produce the two requested categories of documents, subject to an appropriate protective order.

- On January 6, 2025, BMLP also indicated that it had retained B. Riley Securities ("**B. Riley**") as its financial advisor in connection with CCA's chapter 11 case and requested a sit-down between CCA's financial advisor, BDO, CCA's business team, and B. Riley.  That same day, CCA agreed to such a meeting.

- On January 7, 2025, BMLP's newly retained financial advisor, B. Riley spoke with BDO and sent, for the first time, BMLP's informal discovery requests.  Despite no formal obligation to do so, CCA voluntarily began engaging in discussions to facilitate information-sharing.  Debevoise and Gibbons discussed the stipulation, and Gibbons acknowledged that the ball was in their court to respond to Debevoise's proposed changes.

- On January 9, 2025, at 9:00 am, CCA and BDO met with B. Riley to discuss CCA's financial condition and DIP Facility structure.

- On January 9, 2025, at 5:45 pm, BMLP served expansive document and deposition requests.  These demands sought broad categories of documents, including numerous requests unrelated to the DIP Financing, and included deposition notices for four individuals, including CCA's independent director, Ms. Elizabeth Abrams.  Most of the requested documents were only first requested two days earlier and many of the requested categories were not previously communicated to CCA's counsel.

- On January 10, 2025, BMLP served identical document requests on the Debtor's DIP Lender.  CCA immediately reached out to BMLP's counsel, requesting clarification on the unexpectedly broad scope of the requests.  In response, BMLP insisted on an emergency meet-and-confer and demanded a court status conference—despite having served formal discovery less than one day earlier.

- On January 12, 2025, Debevoise responded to BMLP's email to correct the record and refute BMLP's claims that CCA was withholding information and clarifying that CCA had been cooperating in good faith.  This email highlighted that BMLP had failed to acknowledge CCA's prior voluntary disclosures and informal discussions.

- On January 13, 2025, during a meet-and-confer, BMLP acknowledged that certain discovery requests were not directly related to the DIP Motion and agreed to narrow the scope of its requests.  However, despite this concession,

BMLP continued to demand an excessive volume of documents, much of which remained outside the scope of DIP Financing-related discovery.

- On January 13, 2025, BMLP provided its "revised" discovery requests, which were nearly identical to its original overbroad demands. Despite having agreed the day before to narrow the scope, BMLP's modifications withdrew merely two (2) of thirty-seven (37) discovery requests.

- On January 14, 2025, BMLP noticed the deposition of CCA's President and CEO, Yan Wei, even though CCA's counsel had emphasized to BMLP's counsel during its January 13 meet and confer that Mr. Wei had recused himself from negotiation, consideration and approval of the proposed DIP Financing and was not the declarant for any matters related to DIP Financing.

- On January 14, 2025, without having mentioned it in any meet-and-confers, BMLP began to serve broad Rule 2004 discovery requests on non-Debtor affiliates (totaling at least 36 non-Debtor entities to date).

- On January 14, 2025, BMLP continued to insist on a use provision in the proposed protective order to govern discovery in the case that would permit the use of documents produced in the chapter 11 case in other legal matters, including unrelated cases involving non-Debtors.

- On January 15, 2025, CCA served responses and objections to BMLP's document requests, agreeing to produce information in response to thirty-three (33) of the thirty-five (35) remaining requests, subject to entry of a protective order. Those responses and objections made clear that, other that certain discrete items that were specifically requested, CCA would produce responsive documents or communications that could "be located through targeted and reasonable efforts under the circumstances" and/or "located after a reasonable search."

- On January 16, 2025, CCA and BMLP met and conferred again, during which CCA raised concerns about BMLP's failure to meaningfully limit its requests. Despite this, CCA continued to cooperate and began to gather responsive documents and prepare for production, subject to resolution of the parties' disagreement over the terms of the protective order.

- On January 17, 2025, the Court held a status conference on discovery disputes related to discovery directed at CCA and rejected BMLP's most extreme demands, including its attempt to use the protective order to allow use of DIP-related discovery in BMLP's entirely separate judgment collection litigation in other courts.

- On January 21, 2025, consistent with the Court's rulings, CCA served its amended responses and objections to BMLP's document requests, reinforcing

its commitment to produce information in response to all but two of BMLP's requests.

- On January 21, 2025, the parties finalized a protective order which was filed with the Court. [Docket No. 85].

- On January 21, 2025, as soon as CCA obtained BMLP's agreement to the protective order, CCA began to produce documents in a timely manner, despite BMLP's ongoing misrepresentations of the discovery process and continued efforts to litigate unnecessary disputes.

- On January 21, 2025, the Court held a status conference on discovery disputes related to discovery directed at the DIP Lender and clarified the DIP Lender's obligations thereunder.

- On January 21, 2025, almost one week after CCA served its responses and objections to BMLP's document requests, BMLP requested that CCA provide details regarding the search protocol it used in response to BMLP's requests.

- On January 22, 2025, the next morning, CCA provided BMLP with the requested search protocol, including the custodians from Debevoise, CCA, and BDO from whom documents were collected, date ranges, and search terms applied that resulted in CCA's initial review universe of approximately 13,000 documents.

- On January 22, 2025, BMLP filed the Examiner Motion, complaining that CCA's production was not yet complete (two days before the date requested by BMLP and set by the Court for substantial completion of CCA's document production) and that the DIP Lender had not yet produced documents (one day after the status conference with the Court regarding the DIP Lender discovery).

- On January 23, 2025, BMLP asked CCA to add four new custodians and 37 new search terms, including 32 search terms in Chinese, to its review protocol. The same day, CCA responded that several of the Chinese-language search terms were already included in its review protocol and agreed to run the remainder of BMLP's requested search terms to evaluate the potential burden.

- On January 24, 2025, CCA accepted each of BMLP's proposed Chinese-language search terms and noted that it is still assessing burden with respect to the remainder of BMLP's requests.

- On January 24, 2025, in compliance with the Court's deadline, CCA substantially completed its productions in response to BMLP's document requests, excluding documents added to CCA's review universe by BMLP's newly requested search terms.

- Between January 24, 2025, and the present, CCA continued to make additional document productions and prepare and produce its privilege log.

- On January 27–28, 2025, CCA agreed to collect documents from one of BMLP's newly proposed custodians and to run the remainder of BMLP's new requested search terms against all of the data collected from CCA.  The total universe of emails reviewed by CCA in connection with BMLP's requests was more than over 20,000 documents.

- On January 31, 2025, CCA completed its production of documents added by BMLP's proposed search terms.

- On February 2, 2025, CCA served BMLP with its privilege log containing over 1,000 entries.

37.    Indeed, to date, CCA has reviewed more than 20,000 documents, resulting in 14 separate productions totaling over 18,000 pages of discovery.  In response to BMLP's ever-increasing demands, CCA's legal and financial teams have been working around the clock to identify and produce responsive documents, ensuring that no unnecessary delays occur.  The scope and complexity of these productions – which far exceed typical contested DIP financing discovery – underscore the extraordinary diligence with which CCA has approached the process.  Despite the significant volume of material requiring review, translation, and processing, CCA has continued to make rolling productions without delay, fully complying with its discovery obligations.

<u>Objection</u>

**I.    Necessity of Appointment of an Examiner**

38.    Section 1104(c)(2) of the Bankruptcy Code provides that, if the Court does not appoint a Trustee:

> then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty,

incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—(1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

39.     The Third Circuit recently interpreted this provision to find a bankruptcy court is required "to appoint an examiner, if requested by the U.S. Trustee or a party in interest, and if 'the debtor's total fixed, liquidated, unsecured debt' exceeds $5 million."[36]

40.     BMLP contends that the Court is required to appoint an examiner because "(a) no trustee has been appointed; (b) no plan has been confirmed; (c) a party in interest or the United States Trustee has requested an examiner" and "the statutory $5 million debt requirement" has been met and appointment of an examiner is "in the bests interests of creditors and the estate."[37]

41.     In support of its contention that the $5 million debt requirement has been met BMLP appears to rely upon only the Trial Decision.  Examiner Motion ¶ 51 ("BMLP's judgment itself constitutes a fixed, liquidated, unsecured debt that far exceeds $5 million.").  CCA contends that it is unclear whether the Trial Decision is a "fixed, liquidated, unsecured debt" within the meaning of Section 1104(c) of the Bankruptcy Code.  *See In re Dewey & LeBoeuf*, 478 B.R. 627, 637 (Bankr. S.D.N.Y. 2012) (observing in reliance on *Black's Law Dictionary* that "fixed debt" is "[g]enerally, a permanent form of a debt commonly evidenced by a bond or debenture . . . ." and is not a "contingent" debt, which is "[a] debt that is not presently fixed but that may become fixed

---

[36]     *In re FTX*, 91 F.4th at 153 (3d Cir. 2024) (quoting 11 U.S.C. § 1104(c)(2)).

[37]     Examiner Motion ¶¶ 48–49.

in the future with the occurrence of some event" or "one which the debtor will be called upon to pay upon the occurrence or happening of an extrinsic event which will trigger ... liability . . . .").

42.     To the extent this Court is not required to appoint an examiner, the Debtor asserts that there is no merit to doing so, because such an appointment, particularly with the scope of investigation proposed by BMLP, would not be in the "best interests of creditors and the estate" as BMLP contends (or its shareholders as required by section 1104(c) of the Bankruptcy Code).[38] Examiner Motion ¶ 49.   However, if the Court determines an examiner must or should be appointed, then – consistent with Bankruptcy Code section 1104(c) – the Court should consider the best interests of CCA and all stakeholders in determining the appropriate scope of the examiner's investigation.

## II.     The Scope of Examination Proposed by BMLP Is Not Appropriate

43.     "[W]hile a bankruptcy court must appoint an examiner if the statutory requirements are met, the phrase 'as is appropriate' in Section 1104(c) means the court 'retains broad discretion to direct the examiner's investigation,' including its scope, degree, duration, and cost."  *In re FTX*, 91 F.4th at 156 (quoting 5 Norton Bankr. L. & Prac. § 99:25 (3d ed. 2023)); *see also In re Spansion, Inc.*, 426 B.R. 114, 126 (Bankr. D. Del. 2010) ("[I]t is well-established that the bankruptcy court has considerable discretion in designing an examiner's role.") (citation omitted).   Accordingly, this Court can "set[] the investigation's parameters" to "ensure that the examiner is not duplicating the other parties' efforts and the investigation is not unnecessarily disrupting the reorganization process."[39]

---

[38]   If CCA is successful in its pending appeal of the Trial Decision, equity may have a meaningful recovery in this case.

[39]   *In re FTX*, 91 F.4th at 156.

A.    <u>The Examiner Motion Proposes a Limitless Scope and Overbroad Powers</u>.

44.    BMLP specifies four specific topics of investigation which, as discussed in further detail below, completely overlap with the Special Committee's investigatory powers. Appointing an examiner to investigate claims that are already within the Special Committee's scope would result in the needless waste of estate time and resources.

45.    In addition to being duplicative of the Special Committee's powers, as Ms. Abrams explained, the investigation BMLP proposes is premature.  The appellate court is reviewing the Trial Decision, and a reversal would fundamentally change both the viability of the claims BMLP focuses on and the value CCA might obtain from pursuing them.  As set forth above, the Debtor and its co-defendants believe strongly that the trial court's clear errors make reversal highly likely. In any event, the parties will not have long to wait for a decision:  briefing on the appeal will be complete on February 7, 2025, and argument is scheduled for the March term, meaning that oral argument will occur in February or March and a decision is likely within six to eight weeks thereafter.[40]  It would be wasteful and unnecessary for *anyone* to start the investigation BMLP proposes at this time, and it would be duplicative for an examiner to conduct such an investigation at all.  In short, the time for an investigation like the one BMLP proposes has not arrived now and may never come.  In the interim, the Court should reject BMLP's attempt to replace the Special Committee's business judgment regarding timing with its own conflicted point of view.

46.    BMLP's proposed fifth topic for examination, "any other such matters determined to be appropriate by the Examiner[,]" is particularly overbroad.[41]  BMLP asks this Court to

---

[40]    *See* Worenklein Declaration, Ex. F (order granting CCA's unopposed motion for argument in the March Term).

[41]    Proposed Order ¶ 3.

delegate to a non-judicial appointee the discretion, that the Third Circuit has found rests with this Court, to determine the appropriate nature of the examination.  This proposed limitless scope is illustrative of BMLP's underlying goal, to seek broad, self-serving discovery to advance its own Bahamas-based litigation strategy at the expense of all other parties in interest to this case and the Bankruptcy Code itself.[42]

47.     The proposed grant of unlimited investigatory scope is even broader than it appears on its face, when considered in conjunction with what else is (and isn't) included in the Proposed Order.  Specifically, the Proposed Order

- lacks any budgetary restriction or limitation;

- lacks any timeline or milestones for completion of the investigation;

- lacks any requirement for the examiner to inform or seek approval from the Court or any other party when it determines another matter "appropriate" to investigate;

- empowers the examiner to appear as a "party in interest" under section 1109(b) of the Bankruptcy Code with respect to any "matters that are within the scope of the Authorized Investigations" (including those that the examiner has unilaterally determined to be appropriate); and

- authorizes the examiner "to retain professionals (including his or her professional services firm, if applicable)" subject to Court approval without any reference to the expense thereof.

48.     In *Off. Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, the court observed "the basic job of an examiner is to examine, not to act as a protagonist in the proceedings."[43]  The Proposed Order ignores this wisdom and seeks to make the examiner the star of this case, thereby violating established Third Circuit law regarding powers an

---

[42]     *See id.* at ¶ 3.

[43]     285 B.R. 148, 156 (Bankr. D. Del. 2002).

examiner may exercise.  *See Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 578 (3d Cir. 2003) ("Th[e] independent role [of the examiner] would likely be jeopardized by an examiner's litigation against a debtor, and we therefore do not believe that an examiner can serve as a substitute for either a trustee or a creditors' committee for the purpose of avoiding fraudulent transfers.").

49.     In considering the propriety of the Examiner Motion and the relief it requests, the Court should take into account the parochial nature of BMLP's goals.  No party in interest has joined BMLP's motion, filed a motion in support of BMLP's motion, or filed a separate motion seeking appointment of an examiner.  *See In re Gliatech Inc.*, 305 B.R. 832, 836 (Bankr. N.D. Ohio 2004) (consideration of whether other parties had joined movant's request for an examiner was appropriate in determining the propriety of an examiner's investigation).  Nothing prevents BMLP from seeking reasonable discovery in this case, but such discovery should come at BMLP's own expense rather than that of the Debtor's estate.  *See In re Silvergate Corp.*, No. 24-12158 (KBO) at 47:24 (Bankr. D. Del. Dec. 20, 2024) (Docket No. 408) ("I see no reason to shift the costs of this adversarial process onto the estate and its stakeholders, especially where … no other priority creditor has joined in [movant for examiner's] efforts today."); *In re Gliatech Inc.*, 305 B.R. 832 ("[movant for examiner] may have a legitimate objection but, if so, [movant for examiner] can investigate the facts that would support such an objection on its own nickel, not that of the other creditors.").  Indeed, BMLP is already ably represented by counsel in this matter who have shown their ability to zealously pursue information BMLP believes would benefit it through the discovery process.  It is inappropriate to allow BMLP to try to take another bite at the apple (or take the apple in its entirety) via appointment of an examiner.

B.    <u>The Special Committee Can Independently Investigate Claims as Appropriate</u>.

50.    It would contravene the terms of Section 1104 of the Bankruptcy Code, which mandates appointment of an examiner to conduct only "such an investigation of the debtor as is appropriate," to appoint an examiner to conduct an investigation that is entirely duplicative of the Special Committee's work.  In order to justify this extraordinary request, BMLP seeks to cast doubt upon whether the Special Committee and Ms. Abrams are "truly independent."[44]  As detailed at length above, BMLP provides no factual support for these irresponsible allegations, because it cannot do so.  There simply is no basis to question Ms. Abrams' independence, much less to determine that she is not independent and, on that basis, seek to usurp the Debtor's prerogatives as a debtor in possession with an examiner holding a near limitless mandate.

51.    In casting doubt on the independence of Ms. Abrams and, accordingly, the Special Committee, BMLP points to the fact that Ms. Abrams currently is represented by "the same counsel as CCA, who also represented CCA and its co-defendants in the New York litigation."[45] This is a red herring. The Special Committee is fully empowered to "retain any necessary or advisable legal, financial or other advisors in connection with the execution of [its] powers and the satisfaction of [its] obligations, including in order to obtain any necessary or desirable analyses or opinions from the legal, financial and other advisors of its choosing . . .", and  Ms. Abrams indicated that she will exercise that power if appropriate.[46]  As with BMLP's other concerns, this one is misguided.

---

[44]    Examiner Motion at ¶¶ 30, 42.

[45]    Examiner Motion at ¶¶ 6, 7, 32, 33.

[46]    Special Committee Authorization; Abrams Deposition at 9.

52.     Given all of the concerns raised in the Examiner Motion regarding the Special Committee's independence and the extremely broad scope of the proposed investigation, it seems surprising that one thing BMLP did *not* request as part of the examiner's scope is to review the independence of Ms. Abrams or the Special Committee.  This absence is particularly notable given the grant of similar relief in recent high-profile cases including within the Third Circuit.[47]  The best explanation of this absence is either (a) BMLP does not actually doubt the independence of any of the foregoing parties, or (b) investigation of these factors would obviate the need for the examiner to engage in the extensive investigation BMLP believes would assist it in its ongoing litigation against the Debtor and third parties before other courts.  Either explanation is strong support for disregarding BMLP's proposed scope of an examiner's duties.

C.     <u>Examiner Investigation of CCA's Dealings with its Affiliates Is Inappropriate</u>.

53.     BMLP claims "an examiner is needed to investigate CCA's dealings with affiliates,"[48] but BMLP offers no basis to suggest Debtor has abused the corporate form.

54.     BMLP points to no evidence of fraud or abuse of the corporate form outside the New York trial court's erroneous findings based on conduct a decade ago.  As elaborated in Debtor's appellate briefs, the New York trial court did not find Debtor liable for fraud.  And the trial court was flatly wrong that piercing CSCECB's and CCAB's corporate veils was appropriate.

55.     As explained above, *supra* ¶ 13, uncontested New York choice-of-law rules required the trial court to apply Bahamian veil-piercing law, not New York law; and equally

---

[47]    *See In re Silvergate Corp.*, No. 24-12158 (KBO) (Bankr. D. Del. Dec. 20, 2024) (Docket No. 402); *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Mar. 20, 2024) (Docket No. 9883); *In re Purdue Pharma L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. June 21, 2021) (Docket No. 3048).

[48]    Examiner Motion ¶ 67

uncontested Bahamian veil-piercing principles categorically bar piercing the veil in these circumstances.

56.    Moreover, the supposed "abuse of the corporate form" BMLP points to in the Trial Decision[49] was anything but recent.  The Trial Decision concerned conduct ending in 2015; none of the evidence at trial concerned *any* conduct by the defendants, including Debtor, since then.  Accordingly, there is no pressing need to appoint an examiner to investigate such activity particularly when it is subject to a pending appeal.[50]

57.    It is commonplace for affiliated private companies like Debtor, CCAB, and CSCECB to have shared services and overlapping personnel.  The "overlap between the officers and directors" of affiliated closely-held corporations is neither surprising nor a basis for veil-piercing.  *Compare* Trial Decision at 68, *with In re Stage Presence, Inc.*, 592 B.R. at 304 ("[For] closely-held corporations," such overlaps "are not uncommon" and not a basis for veil-piercing), *and Musman v. Modern Deb, Inc.*, 50 A.D.2d 761, 762 (N.Y. App. Div. 1975) ("Stock control, interlocking directors and officers, and the like are in and of themselves insufficient.").  Similarly, use of other corporations' "letterhead, emails, and signatures for [p]roject related documents and communications," is similarly both routine and insufficient to pierce the corporate veil.  *Compare* Trial Decision at 68, *with Bagel Bros. Maple, Inc. v. Ohio Farmers, Inc.*, 279 B.R. 55, 67 (Bankr. W.D.N.Y. 2002) (common trade name cannot support disregarding the corporate form).

---

[49]    *see* Examiner Motion ¶ 67

[50]    *See supra* ¶ 45.

### III.    The Scope of Any Examinership Should Be Narrowly Tailored

58.    To the extent this Court determines that appointment of an examiner is mandatory or appropriate, its scope, duration and budget should be narrowly tailored to ensure that it is not unnecessarily duplicating the Special Committee's efforts and not serving as an unnecessary drain on the Debtor's estate.  Specifically, the Debtor proposes that, should an examiner investigation be necessary, it should be limited to review of the Special Committee's independence.

59.    BMLP contends, without factual support, that "CCA's entanglement with affiliates, history of fraud and abuse of the corporate form, and lack of independence from its corporate parent warrant an examiner being given broad investigatory powers" and that the "examiner should be given broad authority—commensurate with the gravity of the fraud that has occurred." Examiner Motion ¶¶ 75, 76.  This argument is fundamentally inconsistent with recent Third Circuit precedent including *In re Silvergate Corp.* and *FTX*, in which the debtors were found guilty of large scale fraud[51] and yet nevertheless an examiner with only limited scope was appointed.

60.    In *In re Silvergate Corp.*, the Bankruptcy Court for the District of Delaware, after holding a contested hearing on the appropriate scope of an examiner, limited the examiner's role to investigation of "[t]he independence of Ivona Smith [the sole director on the SIC (as subsequently defined)] and the Debtors' Special Investigation Committee ("SIC") including but not limited to its investigation, the SIC's use and reliance on the Debtors' professionals, the thoroughness of the SIC's investigation, and reasonableness of its conclusions with respect to potential claims of the estates[,]" and "[i]f the SIC investigation [wa]s found not to be reasonable

---

[51]    In that regard, the cited cases are distinct from that of CCA, because (as described in more detail above) the trial court in the Baha-Mar Litigation did not find that CCA had committed any fraud at all; the only fraud findings related to a distant affiliate of CCA.

or adequate with respect to any specific issue, the Examiner [would] report its findings to the Court and, to the extent the Court approves, expand its investigation as appropriate."[52]  The court also granted the examiner the ability to retain counsel and other professionals to the extent "such retention [was] necessary to discharge his or her duties" subject to court approval under standards equivalent to those set forth in Section 327 of the Bankruptcy Code.[53]  The Court gave the examiner a budget of $250,000, including the cost of professionals, and sixty days from appointment to complete its investigation.[54]

61.     Likewise, in *FTX*, the bankruptcy court limited the examiner's investigation to "review[ing] the investigations that have already been concluded or that are currently underway by the debtors, the [Unsecured Creditors] Committee, and any third parties . . . and provid[ing] a report that outlines those investigations and what their findings were and mak[ing] recommendations for any additional investigations, if any, that the examiner believes would be necessary or helpful to the Court or the estate."[55]  The court explained that it did so because an examiner should not be "reinvent[ing] the wheel," given the numerous investigations already completed or underway by the parties—including the debtors' postpetition management, whom the bankruptcy court had determined to be disinterested.[56]

---

[52]    No. 24-12158 (KBO) (Bankr. D. Del. Dec. 20, 2024) (Docket No. 402).

[53]    *Id*. at ¶ 9.

[54]    *Id*. at ¶ 10.

[55]    *In re FTX Trading Ltd.*, No. 22-11068 (JTD) at 25:16-24 (Bankr. D. Del. Jan. 24, 2024) (Docket No. 6552); *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Mar. 20, 2024) (Docket No. 9883).

[56]    *In re FTX Trading Ltd.*, No. 22-11068 (JTD) at 26:13 (Bankr. D. Del. Jan. 24, 2024) (Docket No. 6552).

62.     Given the limited scope of an examiner's investigation, if any, that would be appropriate here, a limited duration and a limited budget is appropriate as well.  CCA respectfully submits that if an examiner is appointed, it be required to submit its report three weeks after its appointment so the Special Committee will be free to conduct any examination it deems appropriate, as soon as it thinks it appropriate, without any cloud of uncertainty that might be caused by an active examination into the Special Committee's role.  CCA further submits that a budget of $100,000 would be sufficient to satisfactorily complete the limited role described above. *See In re Purdue Pharma L.P.*, No. 19-23649 (RDD) (Docket No. 3048) (Bankr. S.D.N.Y. June 21, 2021) (limiting the scope of the examiner's investigation to reviewing whether a special committee of the board acted independently when negotiating the bankruptcy plan, with a budget of $200,000).

*[Remainder of page intentionally left blank]*

## Conclusion

63.    For the reasons set forth herein, the Debtor respectfully requests that the Court deny

the Examiner Motion in its entirety and grant such other relief as the Court deems just and proper.

Dated:      February 6, 2025

*/s/ Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Felice R. Yudkin
Ryan T. Jareck
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone:  (201) 489-3000
Facsimile:   (201) 489-1536
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

-and-

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (*admitted pro hac vice*)
Erica S. Weisgerber (*admitted pro hac vice*)
Elie J. Worenklein
66 Hudson Boulevard
New York, NY 10001
Telephone:  (212) 909-6000
Facsimile:   (212) 909-6836
nlabovitz@debevoise.com
eweisgerber@debevoise.com
eworenklein@debevoise.com

*Proposed Co-Counsel for the Debtor and Debtor in Possession*
