**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (admitted *pro hac vice*)
Erica S. Weisgerber (admitted *pro hac vice*)
Elie J. Worenklein
66 Hudson Boulevard
New York, NY 10001
Telephone: (212) 909-6000
Facsimile:  (212) 909-6836
nlabovitz@debevoise.com
eweisgerber@debevoise.com
eworenklein@debevoise.com

*Proposed Co-Counsel to the Debtor and
Debtor in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Felice R. Yudkin
Ryan T. Jareck
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone: (201) 489-3000
Facsimile:  (201) 489-1536
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

*Co-Counsel to the Debtor and Debtor in
Possession*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>CCA Construction, Inc.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 24-22548 (CMG) |

## DECLARATION OF ELIE J. WORENKLEIN
## IN SUPPORT OF DEBTOR'S OBJECTION TO MOTION OF BML
## PROPERTIES, LTD. FOR ENTRY OF AN ORDER APPOINTING AN EXAMINER

I, Elie J. Worenklein, pursuant to section 1746 of title 28 of the United States Code, hereby

declare that the following is true and correct:

1.      I am counsel at the law firm Debevoise & Plimpton LLP ("**Debevoise**"), with an

office at 66 Hudson Boulevard, New York, New York 10001.[2]  I am a member in good standing

---

[1]   The last four digits of CCA's federal tax identification number are 4862.  CCA's service address for the purposes
      of this chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

[2]   Capitalized terms used but not immediately defined herein shall have the meanings ascribed to them elsewhere
      herein or in the Examiner Objection, as applicable.

of the Bar of the State of New Jersey and represent the above-captioned debtor and debtor in possession, CCA Construction, Inc. ("**CCA**") in this case.

2.      This declaration is submitted in support of the *Debtor's Objection to Motion of BML Properties, Ltd. for Entry of an Order Appointing an Examiner* (the "**Examiner Objection**"). The declaration is based on a review of relevant records and personal knowledge.

### Relevant Documents

3.      Attached hereto as <u>Exhibit A</u> are excerpts from a true and correct copy of the rough transcript of the February 3, 2025, deposition of Ms. Elizabeth Abrams, Director of CCA and sole member of the Special Committee of the Board of Directors of CCA.

4.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of the *Written Consent of the Sole Stockholder of CCA Construction, Inc.*, dated November 2, 2024.

5.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of the Brief for Defendants-Appellants and Counterclaim-Plaintiff-Appellants, *BML Properties, Ltd. v. China Construction America, Inc. n/k/a CCA Construction, Inc. et al.*, Nos. 2024-06623, 2024-06624 (New York Supreme Court, Appellate Division – First Department, Dec. 30, 2024), NYSEF Doc No. 30.

6.      Attached hereto as <u>Exhibit D</u> is a true and correct copy of the order of the New York Supreme Court, Appellate Division – First Department granting defendants-appellants and counterclaim-plaintiff-appellants' motion for an appellate calendar preference. *BML Properties, Ltd. v. China Construction America, Inc. n/k/a CCA Construction, Inc. et al.*, Nos. 2024-06623, 2024-06624 (New York Supreme Court, Appellate Division – First Department, Dec. 30, 2024), NYSEF Doc No. 36.

7.     Attached hereto as <u>Exhibit E</u> are excerpts from a true and correct copy of the rough transcript of the February 4, 2025, deposition of Mr. Evan Blum, Managing Director of BDO Consulting Group, LLC and financial advisor to CCA.

8.     Attached hereto as <u>Exhibit F</u> is a true and correct copy of the order of the New York Supreme Court, Appellate Division – First Department denying defendants-appellants and counterclaim-plaintiff-appellants' motion for a stay. *BML Properties, Ltd. v. China Construction America, Inc. n/k/a CCA Construction, Inc. et al.*, Nos. 2024-06623, 2024-06624 (New York Supreme Court, Appellate Division – First Department, Dec. 19, 2024), NYSEF Doc No. 8.

**<u>Facts Supporting the Examiner Objection</u>**

9.     As discussed in the Examiner Objection, the following timeline illustrates key points of engagement between CCA and BMLP:

- On December 26, 2024, BMLP requested from CCA two categories of information: (a) the same financial reporting provided to the DIP Lender under the DIP Credit Agreement and (b) a weekly report of all postpetition transfers made by CCA, including those to affiliates, subject to an appropriate protective order.  BMLP's counsel sent to CCA's counsel a draft stipulation to govern the exchange of the information requested by BMLP.  Attached hereto as <u>Exhibit G</u> is a true and correct copy of email correspondence between CCA's counsel and BMLP's counsel, from December 23, 2024, through January 6, 2025 regarding the financial reporting and stipulation.

- CCA's counsel reviewed the proposed requests and stipulation and discussed the same with CCA over the holidays.  CCA voluntarily agreed to provide the requested information on January 6, 2025.  On that same date, CCA's counsel provided comments on the draft stipulation, including a usage restriction consistent with this Court's precedent, and agreed to produce the two requested categories of documents, subject to an appropriate protective order. *See* Exhibit G.

- On January 6, 2025, BMLP also indicated that it had retained B. Riley Securities ("**B. Riley**") as its financial advisor in connection with CCA's chapter 11 case and requested a sit-down between CCA's financial advisor, BDO, CCA's business team, and B. Riley.  That same day, CCA agreed to such a meeting. *See* Exhibit G.

- On January 7, 2025, BMLP's newly retained financial advisor, B. Riley spoke with BDO and sent, for the first time, BMLP's informal discovery requests. Despite no formal obligation to do so, CCA voluntarily began engaging in discussions to facilitate information-sharing. Debevoise and Gibbons discussed the stipulation, and Gibbons acknowledged that the ball was in their court to respond to Debevoise's proposed changes. Attached hereto as <u>Exhibit H</u> is a true and correct copy of B. Riley's email dated January 7, 2025 to BDO and Debevoise and attached discovery requests.

- On January 9, 2025, at 9:00 am, CCA and BDO met with B. Riley to discuss CCA's financial condition and DIP Facility structure.

- On January 9, 2025, at 5:45 pm, BMLP served expansive document and deposition requests.  These demands sought broad categories of documents, including numerous requests unrelated to the DIP Financing, and included deposition notices for four individuals, including CCA's independent director, Ms. Elizabeth Abrams.  Most of the requested documents were only first requested two days earlier and many of the requested categories were not previously communicated to CCA's counsel. Attached hereto as <u>Exhibit I</u> is a true and correct copy of an email from BMLP's counsel containing BMLP's first requests for production of documents directed to CCA, dated January 9, 2025.

- On January 10, 2025, BMLP served identical document requests on the Debtor's DIP Lender.  CCA immediately reached out to BMLP's counsel, requesting clarification on the unexpectedly broad scope of the requests.  In response, BMLP insisted on an emergency meet-and-confer and demanded a court status conference—despite having served formal discovery less than one day earlier. Attached hereto as <u>Exhibit J</u> is a true and correct copy of an email from BMLP's counsel containing BMLP's first requests for production of documents directed to the DIP Lender, dated January 10, 2025.

- On January 12, 2025, Debevoise responded to BMLP's email to correct the record and refute BMLP's claims that CCA was withholding information and clarifying that CCA had been cooperating in good faith.  This email highlighted that BMLP had failed to acknowledge CCA's prior voluntary disclosures and informal discussions. Attached hereto as <u>Exhibit K</u> is a true and correct copy of email correspondence between CCA's counsel and BMLP's counsel, from January 9, 2025, through January 14, 2025 regarding BMLP's discovery.

- On January 13, 2025, during a meet-and-confer, BMLP acknowledged that certain discovery requests were not directly related to the DIP Motion and agreed to narrow the scope of its requests.  However, despite this concession, BMLP continued to demand an excessive volume of documents, much of which remained outside the scope of DIP Financing-related discovery.

- On January 13, 2025, BMLP provided its "revised" discovery requests, which were nearly identical to its original overbroad demands. Despite having agreed the day before to narrow the scope, BMLP's modifications withdrew merely two (2) of thirty-seven (37) discovery requests. *See* Exhibit K.

- On January 14, 2025, BMLP noticed the deposition of CCA's President and CEO, Yan Wei, even though CCA's counsel had emphasized to BMLP's counsel during its January 13 meet and confer that Mr. Wei had recused himself from negotiation, consideration and approval of the proposed DIP Financing and was not the declarant for any matters related to DIP Financing. Attached hereto as <u>Exhibit L</u> is an email from BMLP's counsel containing Yan Wei's deposition notice.

- On January 14, 2025, without having mentioned it in any meet-and-confers, BMLP began to serve broad Rule 2004 discovery requests on non-Debtor affiliates (totaling at least 36 non-Debtor entities to date).

- On January 14, 2025, BMLP continued to insist on a use provision in the proposed protective order to govern discovery in the case that would permit the use of documents produced in the chapter 11 case in other legal matters, including unrelated cases involving non-Debtors. *See* Exhibit K.

- On January 15, 2025, CCA served responses and objections to BMLP's document requests, agreeing to produce information in response to thirty-three (33) of the thirty-five (35) remaining requests, subject to entry of a protective order. Those responses and objections made clear that, other that certain discrete items that were specifically requested, CCA would produce responsive documents or communications that could "be located through targeted and reasonable efforts under the circumstances" and/or "located after a reasonable search." Attached hereto as <u>Exhibit M</u> is a true and correct copy of CCA's responses and objections to BMLP's first requests for production of documents directed to CCA.

- On January 16, 2025, CCA and BMLP met and conferred again, during which CCA raised concerns about BMLP's failure to meaningfully limit its requests. Despite this, CCA continued to cooperate and began to gather responsive documents and prepare for production, subject to resolution of the parties' disagreement over the terms of the protective order.

- On January 17, 2025, the Court held a status conference on discovery disputes related to discovery directed at CCA and rejected BMLP's most extreme demands, including its attempt to use the protective order to allow use of DIP-related discovery in BMLP's entirely separate judgment collection litigation in other courts.

- On January 21, 2025, consistent with the Court's rulings, CCA served its amended responses and objections to BMLP's document requests, reinforcing

5

its commitment to produce information in response to all but two of BMLP's requests. Attached hereto as <u>Exhibit N</u> is a true and correct copy of email correspondence between CCA's counsel and BMLP's counsel, from January 21, 2025, through January 28, 2025.

- On January 21, 2025, the parties finalized a protective order which was filed with the Court. [Docket No. 85].

- On January 21, 2025, as soon as CCA obtained BMLP's agreement to the protective order, CCA began to produce documents in a timely manner, despite BMLP's ongoing misrepresentations of the discovery process and continued efforts to litigate unnecessary disputes. *See* Exhibit N.

- On January 21, 2025, the Court held a status conference on discovery disputes related to discovery directed at the DIP Lender and clarified the DIP Lender's obligations thereunder.

- On January 21, 2025, almost one week after CCA served its responses and objections to BMLP's document requests, BMLP requested that CCA provide details regarding the search protocol it used in response to BMLP's requests. *See* Exhibit N.

- On January 22, 2025, the next morning, CCA provided BMLP with the requested search protocol, including the custodians from Debevoise, CCA, and BDO from whom documents were collected, date ranges, and search terms applied that resulted in CCA's initial review universe of approximately 13,000 documents. *See* Exhibit N.

- On January 22, 2025, BMLP filed the Examiner Motion, complaining that CCA's production was not yet complete (two days before the date requested by BMLP and set by the Court for substantial completion of CCA's document production) and that the DIP Lender had not yet produced documents (one day after the status conference with the Court regarding the DIP Lender discovery).

- On January 23, 2025, BMLP asked CCA to add four new custodians and 37 new search terms, including 32 search terms in Chinese, to its review protocol. The same day, CCA responded that several of the Chinese-language search terms were already included in its review protocol and agreed to run the remainder of BMLP's requested search terms to evaluate the potential burden. *See* Exhibit N.

- On January 24, 2025, CCA accepted each of BMLP's proposed Chinese-language search terms and noted that it is still assessing burden with respect to the remainder of BMLP's requests. *See* Exhibit N.

- On January 24, 2025, in compliance with the Court's deadline, CCA substantially completed its productions in response to BMLP's document

requests, excluding documents added to CCA's review universe by BMLP's newly requested search terms.

- Between January 24, 2025, and the present, CCA continued to make additional document productions and prepare and produce its privilege log.

- On January 27-28, 2025, CCA agreed to collect documents from one of BMLP's newly proposed custodians and to run the remainder of BMLP's new requested search terms against all of the data collected from CCA.  The total universe of emails reviewed by CCA in connection with BMLP's requests was more than 20,000 documents.  *See* Exhibit N.

- On January 31, 2025, CCA completed its production of documents added by BMLP's proposed search terms.

- On February 2, 2025, CCA served BMLP with its privilege log containing over 1,000 entries. Attached hereto as Exhibit O is a true and correct copy of an email from CCA's counsel regarding CCA's privilege log.


*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information, and belief.

Date:  February 6, 2025
New York, New York                              */s/ Elie J. Worenklein*
                                                Elie J. Worenklein

**Exhibit A**

```
 1         ROUGH DRAFT ONLY - NOT PROOFREAD

 2    - - - - - - - - - - - - - - - - - - - - - - -

 3    IN RE.

 4    CCA CONSTRUCTION , INC.

 5         Debtor.

 6    - - - - - - - - - - - - - - - - - - - - - - -

 7

 8    DEPOSITION OF:  ELIZABETH ABRAMS

 9    TAKEN ON:  MONDAY, FEBRUARY 3, 2025

10    LOCATION:  NEWARK, NEW JERSEY

11    REPORTER:  MICHELLE GALLO, CCR

12    - - - - - - - - - - - - - - - - - - - - - - -

13

14    ROUGH DRAFT ONLY - NOT PROOFREAD

15

16    - - - - - - - - - - - - - - - - - - - - - - -

17    DIRECT EXAMINATION

18    BY MR. THEISEN:

19         Q.   Good morning, Ms. Abrams.  Could you just

20    state your name for the record, please?

21         A.   Elizabeth Abrams.

22         Q.   And have you been deposed before?

23         A.   I have.

24         Q.   Okay.  About how many times?

25         A.   A couple.
```

1    Q.   Okay.  And you understand that you're here in

2    connection with the objections by BML Properties, I'll

3    call it BMLP, to various first day relief including

4    the DIP and the cash management motion?

5    A.   Yes.

6    Q.   Are there any others than those two?

7    A.   Those were the only two that I was aware of.

8    Q.   I believe those are the only two that are

9    contested, YES.

10   A.   Okay.

11   Q.   You understand that BMLP is a creditor of

12   CCA; correct?

13   A.   I understand there's a judgment in favor of

14   BMLP against CCA.

15   Q.   So if I refer to the BMLP judgment, you'll

16   know what I'm talking about.

17   A.   Yes.

18   Q.   Did you do anything to prepare for your

19   deposition today?

20   A.   I looked over the cash management motion and

21   the DIP motion related documents.

22   Q.   Okay.  Did you look over anything else?

23   A.   I looked at the charter for the special

24   committee, I don't know if it's called a charter, but

25   the outline of what special committee duties are.

1    A.   No.

2    Q.   Are you a lawyer?

3    A.   No.

4    Q.   After Penn, you just run through very briefly

5 your work history?

6    A.   After graduating from Penn I started my

7 career at a firm called Miller Buckfire.  Miller

8 Buckfire was a boutique investment banking firm

9 specializing in restructuring advisory.  I spent just

10 over nine years there, left there in 2012 and joined

11 another restructuring boutique called Millstein &

12 Company.  We started that from I think I was employee

13 number seven, grew that and sold it to Guggenheim in

14 2018.  At Millstein I served as investment banker, you

15 know, working on restructuring deals as well as

16 helping run the firm.  Joined Guggenheim in 2018 in

17 the restructuring group and stayed there until 2021.

18 In 2021 I left to become a CFO of a company called K

19 Health which is an AI driven healthcare startup.  I

20 was there until early 2022.  I took a year off and

21 then started being an independent director.

22    Q.   Okay.  And the company you're currently

23 employed by is Spruce Brook Partners?

24    A.   Spruce Brook Partners is my LLC.  Spruce

25 Brook is my corporate version of me.

1     Q.    Do you have any other employees?

2     A.    I don't.

3     Q.    Just you?

4     A.    Just me.

5     Q.    What percentage of your work for Spruce Brook

6  would you say involves serving as an independent

7  director?

8     A.    At the moment 100 percent.

9     Q.    Historically it was different?

10     A.    No.  But it entertained other more consulting

11  type engagements.  Nothing has come to fruition.

12     Q.    Can you tell me about some of the other cases

13  that you've been involved with as an independent

14  director?

15     A.    Sure.  I am currently an independent director

16  for a company called Heritage Power.  Heritage Power

17  is a group of power plants in primarily in

18  Pennsylvania and it filed for an exited Chapter 11 in

19  late 2023.  I became a director after it exited so a

20  little different than being a director in a Chapter

21  11.  We're, you know, looking to maximize value and

22  figure out an exit for the new owners of the company.

23  I am an independent director for a company called

24  Exactech which is in a Chapter 11 proceeding right

25  now.  That's a case where it's a sponsored-owned

 1    company subject to a large class action related to

 2    product recall and as a result of the sponsor's

 3    involvement and many relationships with the company

 4    was hired as and independent director to help them

 5    manage the distress process.  I could give you a

 6    couple more examples.  Last year --

 7         Q.   Do you know how many times overall you've

 8    been engaged as an independent director?

 9         A.   I want to say eight.  I don't have the

10    specific number, but I think it's eight.

11         Q.   What's your experience negotiating DIP

12    transactions?  If I say DIP, you understand I mean

13    debtor in possession?

14         A.   I do.  I was an investment banker for nearly

15    20 years before being independent director and DIPs

16    were a common part of my practice.  I was involved in

17    a number of bankruptcies as a banker so I don't

18    actually have an exact account of a number of DIPs but

19    it's many and I've been involved in DIPs as an

20    independent director although the role as an

21    independent director in a DIP is different than the

22    role as a banker.

23         Q.   When you say many, what's a ballpark?  More

24    than a dozen?

25         A.   Yeah.  Somewhere between a dozen and 20.

1      Q.   In the other instances where you've been an

2    independent director, did you have your own counsel in

3    those cases or did you rely on company counsel?

4      A.   It's really case dependent.  So I have had

5    independent counsel in other cases and I have relied

6    on company counsel.  It really depends on the facts

7    and circumstances of the case.

8      Q.   Is there a reason you didn't retain your own

9    counsel in this case?

10     A.   I would say that I would ask the question

11   differently.  I haven't retained my own counsel yet.

12   That doesn't mean that I won't, but it hasn't -- the

13   need to do so I don't think has presented itself here

14   as there's not a clear conflict.  You know, I'm not

15   conducting an investigation yet and so there's not a

16   need to have separate counsel.

17     Q.   In the prior cases where you've been an

18   independent director and there's a DIP transaction

19   involved, have you ever voted against a DIP

20   transaction that was proposed to you?

21          MS. WEISGERBER:  Objection to form.

22     A.   That's a tough question because it's not like

23   an up or down vote, right.  It's not just like someone

24   brings something to me fully baked and says, okay,

25   cool are you on board and I say yes or no.  So you're

1    involved all along the weighed.  So any objections

2    that come up or issues that arise are dealt with as we

3    go along so that we don't get to the end where we have

4    something that's -- you know, that everyone except for

5    me thinks is really baked and I say, oh, guys that

6    doesn't work.  It's just not how the process works.

7        Q.   Do you recall a time when you voted against

8    any transaction that was proposed to you?

9            MS. WEISGERBER:  Objection to form.

10       A.   That's really broad.  Again, there have been

11   -- there are elements of transactions that I routinely

12   push back on, right.  So while it's not at the stage

13   for a time -- you're calling it a vote.  It's not

14   really a vote, right.  It's being presented as here's

15   where we are in the terms and I could say that right

16   there I'm not agreeing to that.  There's no way so go

17   back and fix that.  And that happens all the time.

18       Q.   In how many of the cases where you've been an

19   independent director was Debevoise company counsel?

20       A.   This is the only one.

21       Q.   Have you ever been an independent director

22   for a state-owned entity?

23           MS. WEISGERBER:  Objection, form.

24       A.   No.

25       Q.   Can you flip to under tab two, it's the last

```
 1      Q.    And the Plaza.  Do you know if CCA has any
 2   other affiliates beyond the few subsidiaries?
 3      A.    There are many boxes on this page, so yes.
 4      Q.    Are you aware that some of those are located
 5   outside the US?
 6      A.    Yes.
 7      Q.    How would you describe, if you can, CCA's
 8   relationship with its subsidiaries?
 9           MS. WEISGERBER:  Objection, form.
10      A.    CCA is a shared service provider to its
11   subsidiaries so CCA provides IT, HR, legal, surety
12   bonds, other services to its subsidiaries and my
13   understanding is some of its affiliates as well.
14      Q.    Have you ever worked with CCA before this
15   engagement?
16      A.    No.
17      Q.    Any of its affiliates?
18      A.    No.
19      Q.    Any of its parent entities?
20      A.    No.
21      Q.    Have you worked with Chinese companies
22   generally in the past?
23      A.    No.
24      Q.    Do you speak Mandarin Chinese?
25      A.    I do not.
```

1    conflict itself had arisen as this document says.

2        Q.    You said a minute ago that you were not

3    exactly sure when the DIP discussions began with CSCEC

4    Holdings; is that right?

5        A.    That's right.

6        Q.    Was it before or after the special committee

7    was formed

8              MS. WEISGERBER:  Objection to form.

9        A.    I don't know.

10       Q.    In your own words, what were you tasked to do

11   on the special committee?

12       A.    Initially my job on the special committee was

13   to oversee the negotiation of the DIP between CCA and

14   CSCEC Holdings, not to do the negotiation but to

15   oversee it and that's what I did.

16       Q.    And you had the final approval on terms?

17       A.    Yes.

18       Q.    Where did you get the understanding of what

19   you were being asked to do?

20       A.    From this document primarily and from

21   counsel.

22       Q.    Counsel meaning Debevoise?

23       A.    Meaning Debevoise.

24       Q.    When the special committee was formed, did

25   you take any steps at that time to limit the

1      A.   No, I'm not aware.

2      Q.   Are you aware that he's actually CCA's

3   highest paid employee?

4           MS. WEISGERBER:  Same objections.

5      A.   I'm not aware of that.

6      Q.   Have you done any investigation into any

7   claims, fraud or ongoing misconduct that could provide

8   potential recoveries to creditors?

9           MS. WEISGERBER:  Objection to form.

10      A.   I have not yet.

11      Q.   You have not done that investigation?

12      A.   Yet.

13      Q.   Do you believe that that type of due

14   diligence into those -- let me rephrase it.

15           Do you believe that due diligence into

16   those types of claims is necessary to exercise your

17   fiduciary duties?

18           MS. WEISGERBER:  Objection to form.

19      A.   Again, I think you're glossing over some

20   nuance.  So to the extent that there are claims that

21   counterparty is seeking a release from, absolutely,

22   right.  Here at the moment we don't face that and so

23   there's nothing that's been done that is adverse to

24   the CCA estate by waiting to investigate those claims

25   until it's more of a ripe discussion in the bankruptcy

1    context.

2        Q.    So you don't think you need to do that sort

3    of due diligence in connection with an insider DIP

4    proposal?

5            MS. WEISGERBER:  Objection to form.

6        A.    The insider DIP is not seeking broad

7    releases, so no.

8        Q.    Do you think that if those types of claims

9    were to exist that it could undermine the approval of

10   a DIP?

11           MS. WEISGERBER:  Objection to form.

12   Hypothetical.

13       A.    Again, the DIP lender is not seeking releases

14   of those claims now.  If they were, we would have an

15   investigation underway but they're not.

16       Q.    Wouldn't you had been concerned or are you

17   concerned that seeking approval of a DIP if those

18   claims exist in the background is a waste of the

19   estate's resources?

20           MS. WEISGERBER:  Objection to form.

21       A.    I actually think it's the opposite.  I think

22   that investigating claims before they're ripe if

23   they're not seeking releases would be a waste of the

24   estate's resources.

25       Q.    Wouldn't you want to know if those claims are

1    exist.  A committee does not currently exist.  And I

2    was comfortable that there would be adequate resources

3    for me to complete an investigation.

4        Q.   Is that something that you asked for?

5        A.   It's something that was included in the

6    budget.  I don't think I specifically asked for it.

7        Q.   Do you intend to conduct an investigation?

8            MS. WEISGERBER:  Objection to form.  Also

9    to the extent it implicates privilege discussions, I

10   instruct you not to answer.

11       A.   I don't think it's ripe at this time and if

12   it becomes ripe then I would.

13       Q.   Flip to number seven, please.  Have you seen

14   this document before?

15          MS. WEISGERBER:  You could look through

16   it.  Are we marking it?

17          MR. THEISEN:  I'm not going to mark this

18   one.

19       A.   Yes.  I've seen it, although I haven't spent

20   time -- I haven't spent a lot of time with it.

21       Q.   Okay.  This is the debtor's amended responses

22   and objections to discovery from BMLP; is that your

23   understanding?

24       A.   Yes.

25       Q.   Did you review the discovery requests from

1        A.   Sorry.  If the judgment is affirmed and its

2    -- I'm confused.  Sorry, can you maybe read back the

3    question?

4        Q.   Why do they care, why do they care who the

5    DIP lender is?

6        A.   Why does CCA care?

7        Q.   Yes.

8        A.   CCA would not want its largest litigation

9    counterparty to be its DIP lender just like in my

10   other examples I wouldn't want a large strategic

11   competitor to be my DIP lender.

12       Q.   Is BMLP a strategic competitor?

13       A.   No.  But you could imagine that a strategic

14   competitor or BMLP might have interests that are not

15   aligned with the debtor's interests and when you have

16   parties that have interests that are potentially not

17   aligned with the debtor's interests, it's not unusual

18   to put them on a DQ list.

19       Q.   But as a director, an independent director,

20   don't you have fiduciary duty to BMLP as a

21   stakeholder?

22            MS. WEISGERBER:  Objection to form.

23       A.   My fiduciary duty runs to the estate, the CCA

24   estate as a whole, not solely to BMLP as a

25   stakeholder.

1       Q.   BMLP is included in the stakeholders to whom

2    you owe a duty; is that right?

3       A.   It is one of the stakeholders of CCA.

4       Q.   And do you think it's consistent to single

5    out one stakeholder?

6            MS. WEISGERBER:  Objection to form.

7       A.   In what context?

8       Q.   In the context we're talking about here.

9            MS. WEISGERBER:  Objection to form.  Asked

10   and answered numerous times.

11      A.   In the context of the DQ list?

12      Q.   Yes.

13      A.   I don't think it's unusual to include

14   specific parties that have potentially adverse

15   interests on a DQ list.

16      Q.   Let's go to tab 40, please.  Do you recall

17   having seen this document before?

18      A.   Yes.

19      Q.   What is it?

20      A.   It's the minutes of the October 28th board

21   meeting.

22      Q.   Do you remember that meeting?

23      A.   Not specifically.

24      Q.   Who attended it?

25      A.   The members of the board and our advisors

**<u>Exhibit B</u>**

## WRITTEN CONSENT OF THE SOLE STOCKHOLDER OF

## CCA CONSTRUCTION, INC.

Dated November 2, 2024

The undersigned, CSCEC HOLDING COMPANY, INC., a Delaware corporation, being the sole stockholder (the "Sole Stockholder") of CCA CONSTRUCTION, INC., a Delaware corporation (the "Company"), does hereby waive any required notice and consents to the following resolutions as if the same had been duly adopted at a meeting of the Sole Stockholder of the Company and does hereby declare that said action shall be effective as of the date hereof:

WHEREAS, as previously discussed and considered by the Company and the Sole Stockholder of the Company, it has been determined that the Company desires to consider and evaluate the liabilities and liquidity situation of the Company, the short and long term prospects of the Company, and the restructuring and strategic alternatives available to it, including, but not limited to: (i) an equity or debt (including debtor in possession) financing; (ii) a recapitalization or a refinancing, amendment or exchange of, or tender offer for, the Company's existing indebtedness or any of its capital stock, in each case, whether in-court or out-of-court and/or whether pursuant to a pre-negotiated or pre-planned restructuring plan or proposal or otherwise; (iii) seeking relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the filing of a voluntary petition pursuant thereto; and (iv) any other strategic alternatives available to the Company (collectively, the "Restructuring Alternatives");

WHEREAS, the Sole Stockholder has identified that, as the Company proceeds with evaluating the Restructuring Alternatives, certain directors of the Board of Directors (the "Board") may have, or may be deemed to have, an interest in the consummation of such Restructuring Alternatives that may conflict with, or be different from or in addition to, the interests of the Company and its stockholders, lenders and potential claims holders (a "Conflict", the existence of which shall, in each instance, be as determined by the Special Committee (as defined below) in its sole and absolute discretion);

WHEREAS, the Company has recommended, and the Sole Stockholder has determined that it is advisable and in the best interests of the Company to form a committee of the Board at the present time, and before any Conflict arises, consisting of directors not affiliated with the holders of substantial equity interests in, or funded debt claims against, the Company to evaluate the Restructuring Alternatives, determine whether one or more of the Restructuring Alternatives is in the best interest of the Company and its stakeholders and, if appropriate, negotiate, and recommend to the Board for its approval the terms of one or more of the Restructuring Alternatives;

WHEREAS, the Sole Stockholder has identified those directors who are independent and not affiliated with the substantial equity holders or the substantial claim holders of the Company for purposes of serving on such special committee;

**BE IT**

**RESOLVED,** that the Company hereby establishes, pursuant to Section 141(c) of the DGCL and the governing documents of the Company, a special committee of independent directors (the "Special Committee"), which shall have the powers and responsibilities set forth below and otherwise granted to it by the Board;

**RESOLVED,** that Section VI of the Board of Directors Governance Policy, dated as of April 25, 2016, is hereby amended to allow the Company to establish the Special Committee with no less than one member;

**RESOLVED,** that Elizabeth Abrams (the "Special Committee Member"), is the identified disinterested independent director who is hereby appointed as the member of the Special Committee, and Elizabeth Abrams is hereby appointed to serve as Chairman of the Special Committee;

**RESOLVED,** that, to the fullest extent permitted by law, the Sole Stockholder hereby delegates and transfers to the Special Committee the power and authority of the Board to: (1) review and evaluate the process and procedures related to the review and evaluation of the Restructuring Alternatives by management and the Board; (2) review and evaluate the terms and conditions and determine the advisability of the Restructuring Alternatives; (3) assess whether one or more of the Restructuring Alternatives is advisable and is fair to, and in the best interests of, the Company and its stakeholders and recommend to the Board (x) whether the Board should approve one or more of the Restructuring Alternatives (including, without limitation, documents setting forth the terms thereof), and (y) what other action, if any, should be taken by the Company with respect to the Restructuring Alternatives (it being understood that the Board shall have final approval rights over the Restructuring Alternatives); (4) review, analyze, evaluate and monitor all proceedings and activities of the Company related to the Restructuring Alternatives, including oversight of management in connection therewith; (5) review any and all documents and other instruments to be used in connection with the Restructuring Alternatives, including any and all materials to be filed in connection with any chapter 11 proceedings commenced by the Company, if any; (6) if deemed necessary, retain any necessary or advisable legal, financial or other advisors in connection with the execution of the Special Committee's powers and the satisfaction of the Special Committee's obligations, including in order to obtain any necessary or desirable analyses or opinions from the legal, financial and other advisors of its choosing, including, without limitation, fairness opinions; (7) provide reports and/or recommendations to the Board in regard to such matters at such time as the Special Committee deems appropriate and consistent with its activities; (8) establish the methods for calling and attending meetings (including telephonic meetings) of the Special Committee, (9) respond to any communications, inquiries or proposals regarding one or more of the Restructuring Alternatives, and (10) take any other actions as the Special Committee may deem to be necessary or appropriate with respect to the foregoing, all as may be determined by the Special Committee in its sole discretion — it being understood that (i) all decisions of the Special Committee shall be made with the unanimous consent of the members of the Special Committee, (ii) that any action that could be taken at a duly called meeting of the Special Committee can be taken by the unanimous written consent of the Special Committee and (iii) the Special Committee shall act for the benefit of the Company and its applicable stakeholders; provided, however, the Board shall retain the exclusive

power to approve and authorize the Restructuring Alternatives, subject to the following resolution;

**RESOLVED,** that the Board shall not approve the entering into of any Restructuring Alternative with any Conflict without the approval of any such transaction by the Special Committee, and the Special Committee shall have the power to reject any or all of the Restructuring Alternatives that arise in connection with any Conflict;

**RESOLVED,** that in the event one or more of the members of the Board are recused from any evaluation or approval of any Restructuring Alternative, the Special Committee Member shall constitute a quorum of the Board, with requisite power and authority to evaluate and approve any Restructuring Alternative;

**RESOLVED,** that the Special Committee be, and it hereby is, authorized to perform and cause to be performed any and all acts, on behalf of the Company, as the Special Committee may deem to be necessary or appropriate in connection with the exercise of its authority pursuant to these resolutions, and to negotiate, execute and deliver and cause to be negotiated, executed and delivered any agreements or other documents that the Special Committee may deem to be necessary or appropriate in connection therewith (including, without limitation, any engagement letter or confidentiality agreement) and to waive rights and conflicts under all such agreements and documents;

**RESOLVED,** that the Special Committee be, and it hereby is, authorized: (1) to obtain such information regarding the Company and any documents or other information as may be useful in the discharge of the Special Committee's duties as contemplated herein, and to obtain such assistance from the officers, employees and agents of the Company as the Special Committee may deem to be necessary or appropriate; (2) to direct the actions of the officers, other directors and employees of the Company, and the officers, directors and employees of each of its subsidiaries, in connection with the Restructuring Alternatives in such manner as the Special Committee shall determine to be reasonable and appropriate under the circumstances; and (3) to take such other actions to carry out its responsibilities as the Special Committee may deem to be necessary or appropriate;

**RESOLVED,** that the officers, employees and agents of the Company and each of the Company's subsidiaries, including the Authorized Persons (as defined below), are hereby directed to cooperate fully with the Special Committee and its advisors, agents, counsel and designees, in all respects related to the Restructuring Alternatives and to take direction from the Special Committee, and officers, employees and agents of the Company and its subsidiaries acting on behalf of the Special Committee, in connection with the Restructuring Alternatives, and are hereby directed to provide to the Special Committee and its advisors such information and materials as may be helpful in the discharge of the Special Committee's duties, and any other assistance as the Special Committee or its advisors, agents, counsel and designees may request;

**RESOLVED,** that the Company shall pay all expenses incurred by the Special Committee, including the fees and expenses of its financial, legal and other advisors, consultants and experts,

and each Special Committee Member shall be reimbursed by the Company for all out-of-pocket expenses incurred by such Special Committee Member in connection with his service on the Special Committee;

**RESOLVED,** that, without limiting any rights of any Special Committee Member under applicable law, under the Company's governing documents or under any indemnification agreement or other agreement to which any such Special Committee Member is a party or under which any such Special Committee Member has any rights, the Company (and its successors and assigns) shall indemnify and hold harmless each Special Committee Member (to the fullest extent permitted by applicable law) in connection with any action or failure to act on the part of such Special Committee Member in furtherance of or relating to the Restructuring Alternatives or otherwise in connection with his/her role or service as a Special Committee Member;

**RESOLVED,** that the Special Committee Members be, and each of them hereby is, authorized, empowered and directed, for and on behalf of the Company, to take and cause to be taken such actions, and to make, sign, execute, acknowledge and deliver and cause to be made, signed, executed, acknowledged and delivered such agreements, certificates, orders, directions, requests, receipts and other instruments, as the Special Committee may deem to be necessary or appropriate to give effect to the foregoing resolutions and to perform the terms and provisions of each document delivered pursuant to any of the foregoing resolutions;

**RESOLVED,** that the Special Committee shall keep minutes of the meetings of the Special Committee, and shall file a copy of such minutes in the corporate minutes of the Company at an appropriate time;

**RESOLVED,** that the foregoing resolutions are not intended to reflect a decision at this time by the Board to enter into a Restructuring Alternative or to take any other particular course of action; and

**RESOLVED,** that all actions previously taken by any Authorized Person or any of them (including any Special Committee Member) in connection with the matters referred to in the foregoing resolutions be, and they hereby are, approved, adopted, ratified and confirmed in all respects as fully as if such actions had been presented to the Board for its approval prior to such actions being taken;

**NOW, THEREFORE BE IT RESOLVED,** that the Authorized Persons be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to prepare all documentation and to effect all filings as may be necessary or advisable under the various securities laws, regulations and rules of the United States or any applicable state, local or foreign jurisdiction by and in connection with the foregoing resolutions, to execute personally or by attorney-in-fact such documentation and filings or amendments or supplements to any of the foregoing, and to cause such documentation and filings and any amendments and supplements thereto to become effective or otherwise approved;

**RESOLVED,** that the Authorized Persons of the Company be, and each of them hereby is, authorized and empowered, in the name and on behalf of the Company to make all such

arrangements, to take all such further action, to cause to be prepared and filed all such documents, to make all expenditures and incur all expenses and to execute and deliver, in the name of and on behalf of the Company, as applicable, all agreements, instruments, documents and certificates, as they may deem necessary, appropriate or advisable in order to fully effectuate the purpose of each and all of the foregoing resolutions and the execution by such Authorized Persons of any such agreement, instrument, document or certificate or the payment of any such expenditures or expenses or the doing by them of any act in connection with the foregoing matters shall conclusively establish their authority therefor from the Board, the approval and ratification by the Board of the agreement, instrument, document or certificate so executed, the expenses or expenditures so paid and the action so taken;

**RESOLVED,** that any and all actions heretofore taken by any Authorized Person or Authorized Persons in connection with the matters contemplated by the foregoing resolutions be, and they hereby are, Approved as fully as if such actions had been presented to the Board for its approval prior to such actions being taken;

**RESOLVED,** that for purposes of the foregoing resolutions, the term "Authorized Persons" shall mean and include with respect to the Company, the Chief Executive Officer, the President, the Secretary, the Treasurer, the Chief Financial Officer, the General Counsel, any Executive Vice President, any Vice President, any Assistant Secretary and any Assistant Treasurer of the Companies, any Special Committee Member, or any of them; and

**RESOLVED,** that, the Secretary and any other appropriate officer of the Company, are, and each of them acting alone hereby is, authorized, empowered and directed to certify and furnish such copies of these resolutions and such statements as to the incumbency of the Company's officers, under corporate seal if necessary, as may be requested, and any person receiving such certified copy is and shall be authorized to rely upon the contents thereof.

IN WITNESS WHEREOF, the undersigned, being the sole stockholder of CCA CONSTRUCTION, INC., has duly executed this written consent to be effective as of October 21, 2024.

CSCEC HOLDING COMPANY, INC., a
Delaware corporation, Sole Stockholder

By: _____
Name: Yan Wei
Title: Authorized Representative

**Exhibit C**

FILED: APPELLATE DIVISION — 1ST DEPT 12/30/2024 07:42 PM

NYSCEF DOC. NO. 30

2024-06623

RECEIVED NYSCEF: 12/30/2024

*To be Argued by:*
MAURA KATHLEEN MONAGHAN
*(Time Requested: 15 Minutes)*

# New York Supreme Court

## Appellate Division—First Department

BML PROPERTIES LTD.,

*Plaintiff-Respondent,*

– against –

CHINA CONSTRUCTION AMERICA, INC., now known as CCA
Construction Inc., CSCEC BAHAMAS, LTD. and CCA BAHAMAS LTD.,

*Defendants-Appellants,*

– and –

DOES 1-10,

*Defendants.*

─────────────────────

*(For Continuation of Caption See Inside Cover)*

**Appellate
Case Nos.:
2024-06623
2024-06624**

## BRIEF FOR DEFENDANTS-APPELLANTS
## AND COUNTERCLAIM-PLAINTIFF-APPELLANT

DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000
mpgoodman@debevoise.com
mkmonaghan@debevoise.com
mdavis@debevoise.com
ajcostin@debevoise.com
rlzipursky@debevoise.com

*Attorneys for Defendants-Appellants and
Counterclaim-Plaintiff-Appellant*

New York County Clerk's Index No. 657550/17


(800) 4-APPEAL • (334296)

CSCEC (BAHAMAS), LTD.,

*Defendant/Counterclaim-Plaintiff-Appellant,*

v.

BML PROPERTIES LTD.,

*Plaintiff/Counterclaim-Defendant-Respondent.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF QUESTIONS PRESENTED ...................................... 7

STATEMENT OF THE CASE AND FACTS ......................................... 9

    A.    Plaintiff and CSCECB Invest in BML. ................................. 9

        1.    The Key Players ........................................................ 9

        2.    The Investors Agreement ........................................ 10

    B.    Plaintiff Mismanages Project Finances and Delays
        Construction ...................................................................... 11

    C.    CCAB and BML Meet in Beijing in November 2014 ........... 14

    D.    CCAB Accelerates and Nearly Achieves the March 27 Partial
        Opening ............................................................................ 15

    E.    BML and CCAB Miss the March 27, 2015 Partial Opening ... 17

    F.    CSCECB's Books-and-Records Demand Is Refused ............. 18

    G.    Plaintiff's Financial Mismanagement Renders Its Shares
        Worthless .......................................................................... 18

    H.    Plaintiff Secretly Causes BML to File for Bankruptcy in
        Delaware ........................................................................... 20

    I.    Fifteen Months Later, the Bahamian Supreme Court
        Liquidates BML, Causing Both Plaintiff and CSCECB to
        Lose Their Shares .............................................................. 21

PROCEDURAL HISTORY .................................................................. 22

STANDARD OF REVIEW ................................................................... 24

ARGUMENT ..................................................................................... 25

    POINT I

    New York Law Bars the Damages Award ................................. 25

i

A.    The Trial Court Erred in Awarding Prohibited Consequential Damages ............................................................25

B.    The Trial Court Erred in Awarding Fraud Damages When Plaintiff Admittedly Spent Nothing in Reliance on Any Defendant's Statements..........................................................29

C.    The Trial Court Failed to Hold Plaintiff to Its Burden of Proving Damages at the Time of Breach or Fraud and Erred by Awarding Damages That Put Plaintiff in a Better Position Than It Would Have Been Absent the Supposed Wrongdoing ..........32

D.    The Trial Court Erred in Awarding Plaintiff Damages for a Purely Derivative Harm .......................................34

POINT II

The Trial Court Erred in Holding CSCECB Liable for Breach of Contract....................................................................36

A.    The Trial Court Misread Section 4.7....................................36

B.    The Purported Breaches Did Not Cause Plaintiff's Loss....................41

POINT III

The Trial Court Erred in Holding CCAB Liable for Fraud...........................44

A.    There Was No Actionable Misrepresentation or Scienter .................45

B.    There Was No Reliance.......................................................49

C.    There Was No Causation....................................................51

D.    The Fraud Judgment Duplicated the Contract Judgment....................53

POINT IV

The Trial Court Erred in Piercing CSCECB's and CCAB's Corporate Veils..................................................................53

A.    Bahamian Law Applies and Bars Veil-Piercing Here .......................54

B.    Veil-Piercing Is Unwarranted Even under New York Law ...............56

POINT V

The Trial Court Erred in Dismissing CSCECB's Counterclaims ................59

CONCLUSION .....................................................................61

# TABLE OF AUTHORITIES

**Page[s]**

**Cases:**

*Abrahami v UPC Constr. Co.*,
224 AD2d 231 [1st Dept 1996] ...............................................................44

*Ackerman v D'Agostino Supermarkets, Inc.*,
96 AD3d 672 [1st Dept 2012] ..................................................... 41-42

*Alpert v Shea Gould Climenko & Casey*,
160 AD2d 67 [1st Dept 1990] ...............................................................34

*American List Corp. v U.S. News & World Report*,
75 NY2d 38 [1989] ................................................................................26

*Awards.com v Kinko's, Inc.*,
42 AD3d 178 [1st Dept 2007], *affd* 14 NY3d 791 [2010] ...................39

*Baby Phat Holding Co., LLC v Kellwood Co.*,
123 AD3d 405 [1st Dept 2014] .............................................................58

*Bagel Bros. Maple, Inc. v Ohio Farmers, Inc.*,
279 BR 55 [Bankr WD NY 2002] .........................................................58

*Bank of New York v Norilsk Nickel*,
14 AD3d 140 [1st Dept 2004] ...............................................................56

*Bi-Economy Mkt. v Harleysville Ins. Co. of N.Y.*,
10 NY3d 187 [2008] ....................................................................... 27, 28

*BML Props. Ltd. v China Constr. Am., Inc.*,
226 AD3d 582 [1st Dept 2024] ..................................................... *passim*

*BML Props. Ltd. v China Constr. Am., Inc.*,
78 Misc 3d 1242[A] [Sup Ct, NY County 2023] .................................23

*Bonacasa Realty Co. v Salvatore, LLC*,
109 AD3d 946 [2d Dept 2013] ..............................................................58

*Business Networks of N.Y. v Complete Network Solutions*,
265 AD2d 194 [1st Dept 1999] .............................................................39

*Camaiore v Farance*,
50 AD3d 471 [1st Dept 2008] ...............................................................36

*Cimen v HQ Capital Real Estate*,
   227 AD3d 587 [1st Dept 2024] ...........................................47

*Cobalt Partners v GSC Capital Corp.*,
   97 AD3d 35 [1st Dept 2012] ..............................................56

*Cole v Macklowe*,
   64 AD3d 480 [1st Dept 2009] ........................................ 32, 37

*Connaughton v Chipotle Mexican Grill, Inc.*,
   29 NY3d 137 [2017].................................................. 30, 52

*Continental Cas. Co. v PricewaterhouseCoopers, LLP*,
   15 NY3d 264 [2010]......................................................35

*Cortlandt St. Recovery Corp. v Bonderman*,
   226 AD3d 103 [1st Dept 2024] ...........................................57

*Cronos Group v XComIP, LLC*,
   156 AD3d 54 [1st Dept 2017] ............................................53

*Curiale v Peat, Marwick, Mitchell & Co.*,
   214 AD2d 16 [1st Dept 1995] ............................................47

*DaPuzzo v Reznick Fedder & Silverman*,
   14 AD3d 302 [1st Dept 2005] ........................................ 46-47

*DirectTV Latin Am., LLC. v RCTV Intl. Corp.*,
   38 Misc 3d 1212[A] [Sup Ct, NY County 2013], *affd*
   115 AD3d 539 [1st Dept 2014] ...........................................28

*Do Gooder Prods., Inc. v American Jewish Theatre, Inc.*,
   66 AD3d 527 [1st Dept 2009] ............................................58

*EED Holdings v Palmer Johnson Acquisition Corp.*,
   228 FRD 508 [SD NY 2005]...............................................56

*ERC 16W Ltd. v Xanadu Mezz Holdings*,
   46 Misc 3d 1210[A] [Sup Ct, NY County 2015], *affd*
   133 AD3d 444 [1st Dept 2015] ...........................................28

*F.A.S.A. Const. Corp. v Degenshein*,
   47 AD3d 877 [2d Dept 2008].............................................46

*Five Star Dev. Resort Communities, LLC v
   iStar RC Paradise Valley, LLC*,
   2012 WL 13069913 [SD NY, Dec. 10, 2012]............................ 28-29

iv

*Flame S.A. v Worldlink Int'l [Holding] Ltd.*,
107 AD3d 436 [1st Dept 2013] ...................................................................54

*Forum Ins. Co. v Worcester County Inst. for Sav.*,
219 AD2d 492 [1st Dept 1995] ...................................................................24

*FranPearl Equities Corp. v 124 W. 23rd St., LLC*,
164 AD3d 1190 [1st Dept 2018] ..............................................................42

*Georgia Malone & Co. v E&M Assocs.*,
163 AD3d 176 [1st Dept 2018] ...................................................................37

*Gerritsen v Glob Trading, Inc.*,
2009 WL 262057 [ED NY, Feb. 4, 2009] ...............................................29

*Greenwich Capital Fin. Prods., Inc. v Negrin*,
74 AD3d 413 [1st Dept 2010] ...................................................................37

*Gregor v Rossi*,
120 AD3d 447 [1st Dept 2014] ...........................................................51-52

*GSCP VI Edgemarc Holdings, L.L.C. v ETC Northeast Pipeline, LLC*,
2023 WL 6805946 [Sup Ct, NY County, Oct. 14, 2023]....................29

*Iberdrola Energy Projects v Oaktree Capital Mgt. L.P.*,
231 AD3d 33 [1st Dept 2024] ...................................................................31

*In re Northshore Mainland Servs., Inc.*,
537 BR 192 [Bankr D Del 2015]........................................................ 21, 28

*In re Stage Presence, Inc.*,
592 BR 292 [Bankr SD NY 2018] ...........................................................57

*In re Tyson*,
433 BR 68 [Bankr SD NY 2010] .........................................................54-55

*Interfilm, Inc. v Advanced Exhibition Corp.*,
249 AD2d 242 [1st Dept 1998] ...............................................................34

*Kenford Co. v County of Erie*,
67 NY2d 257 [1986]......................................................................... 32, 41, 44

*Kortright Capital Partners LP v Investcorp Inv. Advisers*,
392 F Supp 3d 382 [SD NY 2019] ............................................................32

*Lama Holding Co. v Smith Barney Inc.*,
88 NY2d 413 [1996].......................................................................................30

*Laub v Faessel*,
    297 AD2d 28 [1st Dept 2002] ....................................................... 51, 52

*Lefkara Group v First Am. Intl. Bank*,
    150 AD3d 450 [1st Dept 2017] ...............................................43

*MBIA Ins. Corp. v Credit Suisse Sec. [USA] LLC*,
    165 AD3d 108 [1st Dept 2018] ...............................................53

*Meshel v Resorts Intl. of N.Y., Inc.*,
    160 AD2d 211 [1st Dept 1990] ...............................................57

*Morris v N.Y.S. Dept. of Taxation & Fin.*,
    82 NY2d 135 [1993]..................................................................54

*Musman v Modern Deb, Inc.*,
    50 AD2d 761 [1st Dept 1975] ...............................................57

*N.B. v F.W.*,
    62 Misc 3d 1012 [Sup Ct, NY County 2019]....................................56

*NMR e-Tailing LLC v Oak Inv. Partners*,
    216 AD3d 572 [1st Dept 2023] ..................................... 29, 31

*Northern Westchester Professional Park Assoc. v Town of Bedford*,
    60 NY2d 492 [1983].................................................................24

*O'Neill v Warburg, Pincus & Co.*,
    39 AD3d 281 [1st Dept 2017] ...............................................35

*P & HR Solutions, LLC v Ram Capital Funding, LLC*,
    195 AD3d 473 [1st Dept 2021] ...............................................52

*P. Chimento Co. v Banco Popular de Puerto Rico*,
    208 AD2d 385 [1st Dept 1994] ...............................................45

*Palmer v WSC Riverside Dr., LLC*,
    61 AD3d 589 [1st Dept 2009] ...............................................24

*Pasternack v Laboratory Corp. of Am. Holdings*,
    27 NY3d 817 [2016]..................................................... 31, 50

*Paulicopter-Cia. v Bank of America, N.A.*,
    182 AD3d 458 [1st Dept 2020] ...............................................56

*Power Up Lending Group v Parallax Health Sciences, Inc.*,
    2023 WL 3006802 [ED NY, Apr. 19, 2023].......................................46

*Rising Sun Constr. L.L.C. v CabGram Dev. LLC*,
    202 AD3d 557 [1st Dept 2022] ....................................................... 47, 49

*RKA Film Fin., LLC v Kavanaugh*,
    171 AD3d 678 [1st Dept 2019] .............................................................30

*Safariland, LLC v H.B.A. Agencies*,
    198 AD3d 519 [1st Dept 2021] .............................................................45

*Sager v Friedman*,
    270 NY 472 [1936] .............................................................................34

*Scholem v Acadia Realty*,
    45 Misc 3d 562 [Sup Ct, Suffolk County 2014], *affd*,
    144 AD3d 1012 [2d Dept 2016] ...........................................................53

*Serino v Lipper*,
    123 AD3d 34 [1st Dept 2014] ..............................................................35

*Shear Enterprises, LLC v Cohen*,
    189 AD3d 423 [1st Dept 2020] .............................................................46

*Sony Ericsson Mobile Communications USA, Inc. v LSI Corp.*,
    102 AD3d 565 [1st Dept 2013] .............................................................51

*Srivatsa v Rosetta Holdings LLC*,
    213 AD3d 514 [1st Dept 2023] ..................................................... 47, 49

*Tannenbaum v Franck*,
    2003 WL 1956309 [1st Dept, Apr. 9, 2003] .........................................59

*TNS Holdings, Inc. v MKI Sec. Corp.*,
    92 NY2d 335 [1998] ............................................................................56

*US Pack Network Corp. v Travelers Prop. Cas.*,
    42 AD3d 330 [1st Dept 2007] ..............................................................41

*Warin v Wildenstein & Co.*,
    297 AD2d 214 [1st Dept 2002] ............................................................56

*World Wide Packaging, LLC v Cargo Cosmetics, LLC*,
    193 AD3d 442 [1st Dept 2021] ..................................................... 57, 58

## Statutes & Other Authorities:

CPLR 4511[b] ................................................................................. 53, 55

CPLR 5501[c] ......................................................................................24

## <u>PRELIMINARY STATEMENT</u>

Defendants-Appellants CSCECB (Bahamas), Ltd. ("CSCECB"), CCA Bahamas Ltd. ("CCAB"), and CCA Construction Inc. ("CCA" and, with CSCECB and CCAB, "Defendants") seek reversal of a deeply flawed decision that defied core principles of New York law, culminating in an indefensible $1.6 billion judgment for fraud and breach of an Investors Agreement ("IA") after a non-jury trial.

The case arises from the construction of Baha Mar, a mega casino-resort in The Bahamas ("Project"). Plaintiff-Respondent BML Properties, Ltd. ("Plaintiff" or "BMLP"), a Bahamian company owned by real-estate developer Sarkis Izmirlian, exchanged assets for 100% of the common shares of Baha Mar Limited ("BML"), Baha Mar's owner and developer in 2011. The crux of Plaintiff's claim was that it lost all its controlling shares in BML in fall 2016 because construction by Defendant CCAB was not far enough along to allow for a March 27, 2015 partial opening of Baha Mar.

There was no breach of contract and no fraud under New York law, and nothing any Defendant did or did not do caused Plaintiff's loss. _Plaintiff_ chose to put BML into bankruptcy in violation of the IA, setting a long chain of dominoes falling; the U.S. bankruptcy court and Bahamian Supreme Court thereafter made decisions that stripped BMLP of its BML shares.

1

Defendants are three separate companies.  CSCECB was a minority investor in the Project; it was a party to the IA and had no role in construction.  CCAB was Baha Mar's construction manager; it was not an investor and not a party to the IA.  CCA was not a party to the IA and had no role in construction.  It was just a distant corporate affiliate of CCAB and CSCECB.

In holding all three Defendants liable for Plaintiff's choices and actions by courts in two separate countries—and by awarding such staggering damages—the trial court made a series of legal errors that require complete reversal on each count of liability and damages.

_Under black-letter New York law, there can be no breach of contract by a non-party of a term nowhere found in that contract._  New York courts must give effect to the plain meaning of a contract between sophisticated parties.  CSCECB was the only Defendant party to the IA, the sole contract at issue.  The trial court erred by rewriting the IA to apply to conduct by Defendant CCAB, a non-party to that Agreement, and to impose obligations to meet construction staffing levels and deadlines that are found nowhere in IA's text.

The trial court also characterized events as breaches that in no way qualify— let alone justify a $1.6 billion judgment.  CSCECB did not breach the IA simply by appointing an executive of CCAB as its designated board member on BML's board,

an appointment in which Plaintiff fully acquiesced.  Nor was it a breach for the board

member not to read a particular section of the IA.

What _was_ a clear breach of the IA was Plaintiff's refusal to provide books and

records when CSCECB's board member requested them.  It was also a flagrant

breach of the IA for Plaintiff to cause BML to file for Chapter 11 behind CSCECB's

back without obtaining its consent.

_Under black-letter New York law, there can be no fraud without a knowingly_

_false statement of present fact on which the plaintiff relied to its financial detriment._

The trial court erred in holding CCAB liable for fraud based on CCAB's joining in

a "consensus"—reflected in minutes of a November 2014 meeting—to have the

resort ready for a partial opening by March 27, 2015.  Plaintiff conceded at trial that

in November 2014, CCAB fully intended to meet the deadline and came "very, very

close" to doing so, completing at least 97% of the massive resort by March 27.

CCAB thus made no knowingly false statement of fact, as required to find fraud.

There also was no reliance as a matter of law.  Plaintiff admitted it did not spend a

penny in reliance on the statements of any Defendant.

Additionally, what the trial court described as a "fraud" again simply does not

qualify.  For example, CCAB's purchase of a different hotel with its own money, as

it was perfectly free to make, does not remotely fit the definition of fraud under New

York law.

_Under black-letter New York law, there can be no recovery without actual and proximate causation of the claimed damages._  The resort was not ready to open on March 27, 2015 for reasons independent of Defendants.  BML, which Plaintiff 100% controlled, admittedly "bombed" its own deliverables and failed to meet its own responsibilities to ensure the resort could open on March 27.  Even if CCAB had completed 100% of its work, the resort would not have been ready to open because of BML's failures.

The missed partial opening also did not actually cause the loss of Plaintiff's shares.  Plaintiff's own expert evidence showed that even had the resort opened on March 27, 2015, it would have operated at a loss for years and Plaintiff could never have repaid the billions BML owed the bank.  BML would have been in a liquidity crisis regardless of the partial opening date.

Nor did the missed partial opening proximately cause Plaintiff to lose its shares.  Plaintiff's expert testified that Plaintiff did not lose its BML shares until fall 2016—after a long chain of events _Plaintiff_ set in motion by putting BML into bankruptcy, resulting in unfavorable decisions from courts in Delaware and The Bahamas.

_Under black-letter New York law, there can be no award of consequential damages under a contract that expressly prohibits such damages._  As this Court previously held in _this case_, the IA bars consequential damages, and damages that

4

depend on proceeds from third parties are consequential by definition.  But that was the entire basis of Plaintiff's damages theory, which the trial court accepted: Plaintiff contended that if the resort had opened as planned, hotel brands would have paid over key money; hotel guests and casino patrons would have spent money at the completed resort; and those revenues would eventually have given its ownership interest a positive value.  Plaintiff's damages are also plainly consequential under New York law because Plaintiff lost its shares only after an extended, attenuated series of events involving independent actors like the Delaware bankruptcy court and the Bahamian Supreme Court.

_Under black-letter New York law, damages are evaluated at the time of the breach or fraud and there can be no award of damages that puts a plaintiff in a better position than it would have been absent the wrongdoing._  It is axiomatic that damages are measured at the time of supposed fraud or breach.  The trial court found that time to be between May 2014 and March 2015.  Plaintiff offered no evidence of the value of its shares at that time.  The only evidence came from Defendants, and it established that even if the resort (BML's only meaningful asset) had been completed in 2014 or 2015 and stabilized after several years of consistent operations, it would have been worth no more than $943 million to $1.17 billion.  Defendants' evidence also showed that by May 2014, BML's debts far exceeded that asset value (something Plaintiff did not dispute).  Plaintiff's shares therefore had no value before

any supposed misconduct. The damages award instead returned to Plaintiff the deemed value of assets it used to acquire its BML shares *in 2011*, three years earlier.

New York law also forbids awarding damages that put a plaintiff in a better position than it would have been absent the fraud or breach. By rewinding the clock to 2011, the trial court acted as if Plaintiff owned its shares in a company that was free and clear of any debt in 2014 and 2015. But Plaintiff did not. The award put Plaintiff in a far better position than it would have been absent any breach or fraud. Had the resort been completed in March 2015, Plaintiff would have owned shares in a money-losing business that owed more than it was worth.

*Under black-letter New York law, there can be no award of damages that compensate an investor for a derivative harm.* Plaintiff's case at trial was that it lost the value of its ownership interest in BML because BML was liquidated. When an investor loses the value of its shares because the company has experienced financial distress, that is a paradigmatic unrecoverable derivative harm under New York law.

*Under black-letter New York law, the law of a company's state of incorporation governs veil-piercing.* Because there is no basis for liability or damages, veil-piercing should not even arise. Even if it did, veil-piercing should have been decided under Bahamian law because CCAB and CSCECB are both Bahamian entities. Plaintiff did not dispute that Bahamian law would not permit

6

veil-piercing here.  Even if New York law applied, the trial court did not find the facts required to pierce the veils.

The trial court's series of errors resulted in one of the largest civil judgments in New York history.  Neither the law, the facts, nor basic fairness supports that outcome.  The judgment should be reversed in its entirety.

## STATEMENT OF QUESTIONS PRESENTED

1.      Whether the trial court erred in awarding Plaintiff over $1.6 billion in damages and prejudgment interest, representing the consideration Plaintiff paid to acquire its BML shares over three years before the purported wrongdoing.

*Yes.  Damages should have been zero.  The damages award (i) violated a contractual consequential-damages bar that this Court enforced at summary judgment; (ii) awarded fraud damages even though Plaintiff invested in BML years before the alleged fraud and Plaintiff admittedly spent nothing in reliance; (iii) awarded damages based on the amount Plaintiff paid to acquire its BML shares in 2011 even though the unrebutted evidence was that Plaintiff's shares were worth nothing at the time of breach in 2014; and (iv) compensated Plaintiff for a derivative harm to BML.*

2.      Whether the trial court erred in holding CSCECB liable for breach of contract.

*Yes.  The trial court rewrote the IA to make CCAB a party and to create*

7

*timeline and staffing obligations that nowhere appear in the IA. The trial court expanded the IA's "best interests" provision beyond its express limitation to acts by CSCECB's representative on BML's board; none of the purported breaches amounted to a failure to act in BML's best interests; and there was no causation.*

3.      Whether the trial court erred in holding CCAB liable for fraud.

*Yes.   The fraud claim fails on every element.   CCAB's purported misstatements were non-actionable promises of performance that were true when made; the trial court applied the wrong scienter standard; the trial court erroneously found reliance based on spending by BML, whereas Plaintiff BMLP admittedly spent nothing in reliance; and there was no causation as a matter of law.*

4.      Whether the trial court erred in piercing CCAB's and CSCECB's corporate veils and holding all three Defendants liable for fraud and breach of contract under New York law.

*Yes.   The trial court erred in refusing to apply Bahamian law, which indisputably precludes veil-piercing here.   The trial court's findings did not meet the elements of veil-piercing even under New York law.*

5.      Whether the trial court erred in dismissing CSCECB's counterclaims for breach of contract.

*Yes.   The trial court's dismissal contradicted this Court's decision at summary judgment and disregarded the unrebutted trial evidence of Plaintiff's wrongdoing.*

## STATEMENT OF THE CASE AND FACTS

**A.     Plaintiff and CSCECB Invest in BML.**

This litigation concerns the construction of and investments in Baha Mar, a 1,000-acre mega casino-resort in The Bahamas with four hotels, 2,000 guest rooms, a casino, restaurants, shops, and a nightclub (R.26; R.1070:8-9; R.3082-R.3083).

### 1.     *The Key Players*

Non-party BML, a now-dissolved Bahamian corporation, was Baha Mar's owner and developer during the relevant time (R.20).  Plaintiff BMLP owned 100% of the common shares of BML, controlled its board, and was its day-to-day manager (R.25; R.3873; R.3905; R.4281-R.4282).   Izmirlian controlled Plaintiff (R.20; R.4282).

The three Defendants are distinct companies, were created for different purposes, and played different roles—or, in CCA's case, no role—on the Project. CSCECB, a Bahamian company, was BML's minority shareholder (R.28; R.4275; R.4312-R.4313).  CCAB, also a Bahamian company, was Baha Mar's construction manager (R.3012; R.3120).  CCA, a New Jersey-based distant affiliate of CCAB and

CSCECB, has never been a parent or a sibling of CCAB or CSCECB and was not

involved in Baha Mar's construction or investment (*infra* Point IV).

## 2. *The Investors Agreement*

Plaintiff sued and CSCECB counterclaimed under a single contract:  the 2011

Investors Agreement.  The IA was not a construction contract.  The Master

Construction Contract ("MCC") laid out developer BML's and construction

manager CCAB's obligations on construction timing, labor, and milestones

(R.3075).  The IA concerned the governance of BML by its two investors:  Plaintiff

and CSCECB.  Accordingly, the only signatories to the IA were Plaintiff, CSCECB,

and BML (R.28); CCAB and CCA were not parties (R.4270).

Under the IA, Plaintiff contributed to BML assets with, as the trial court

stated, a "deemed" value of $830 million in order to acquire all of BML's common

stock (R.29; R.3882; R.4275).  That gave Plaintiff 100% voting control over BML

and power to appoint four of five BML board members (R.25; R.4275; R.4282).

Meanwhile, CSCECB, BML's minority investor, invested $150 million in

exchange for preferred shares that came with no voting rights.  Instead, it got the

right to BML dividends and a single seat on BML's five-person board (R.25;

R.4275; R.4278-R.4279; R.4283).  The IA also gave CSCECB rights to protect its

minority investment, including (*i*) the right under §4.7 to be given "reasonable access

to the books [and] records" of BML to "monitor[] the . . . Project Works budget and

similar matters" and (*ii*) the right under §4.8(g) to consent to "any. . . reorganization or similar transaction" by BML (R.26; R.80; R.4283-R.4284).  These provisions form the basis of CSCECB's counterclaims.

Plaintiff based its contract claim on §4.7.  That section recites that "although the [CSCECB] Board Member . . . shall be appointed by [CSCECB], [he] shall be appointed to assist [BML] in furtherance of the Project and shall at all times act in the best interests of [BML]" (R.25-R.26; R.30-R.31; R.4283).  Beginning May 2014, CSCECB's board appointee was CCAB Vice President Taizhong Wu (R.32; R.2039:19-22).   Although §4.7 also mentioned CSCECB "Representatives," Plaintiff conceded at trial that there were no such relevant Representatives (R.910:10-11 ["MR. BUCHDAHL: We're withdrawing any claims of breach of contract with respect to China State representatives."]).

Importantly, §11.10 of the IA precluded Plaintiff from recovering "any [] consequential [] damages" for breach (R.4309-R.4310).  This provision "expressly waived" consequential damages (R.18, quoting *BML Props. Ltd. v China Constr. Am., Inc.*, 226 AD3d 582 [1st Dept 2024]).

### B.    Plaintiff Mismanages Project Finances and Delays Construction.

As Baha Mar's developer, BML was responsible for managing the Project's finances and producing the construction designs for CCAB, the construction

manager, to carry out (R.3084-R.3085).  From the outset, the Project suffered from Plaintiff's and BML's mismanagement.

Plaintiff's financial mismanagement began almost immediately.  In 2011, Plaintiff caused BML to take out a $2.45 billion loan ("EXIM Loan") from the Export-Import Bank of China ("EXIM").  To secure the EXIM Loan, BML agreed not to exceed a ratio of 70% debt to 30% equity; the trial court acknowledged this was the EXIM Loan's "main deal point" (R.27; R.3916; R.3950; R.4005).  To meet that obligation and pay off the loan, BML's budget depended on selling $570 million worth of condominium units before they were constructed and before the resort opened (R.4210; R.4215; R.11379-R.11380).

Although Plaintiff claimed the missed March 27 opening put BML into a liquidity crisis, the unrebutted evidence was that BML was in a liquidity crisis far earlier because of Plaintiff's financial mismanagement.  A year into the Project, BML had overspent on non-construction items and pressed EXIM to add hundreds of millions of dollars to its portion of the budget; meanwhile, CCAB was under its construction budget throughout the construction period (R.2725-R.2726; R.4436-R.4437; R.4444; R.5765; R.7793).  By May 2014, BML had drawn down $1.6 billion from the EXIM Loan (R.8688-R.8689).  By September 2014, BML's plan to repay that debt had failed.  It had sold only 20 of 207 planned condominium units, raising only $70 million of the $570 million originally budgeted (R.4864).  But BML

kept borrowing.  By November 2014, its debt ballooned to $2 billion (R.8688-R.8689).

By early 2015, BML was effectively out of money.  In a February 9, 2015 letter, EXIM informed Plaintiff it needed to invest an additional $70 million or "the Debt to Equity Ratio will immediately hit the limit of 7:3, leading to the [cessation] of disbursement [of loan drawdowns], which will be destructive for the completion of the Project" (R.7291).  By March 13, 2015, BML was over $2.3 billion in debt; EXIM told BML it needed at least $200 million more, over and above the total loan amount, just to finish construction (R.7803).  All those events occurred before the missed March 27, 2015 opening and wiped out the value of Plaintiff's common shares in BML.

BML fared no better in its construction obligations.  BML fired its architect (R.2320:21-2321:4; R.2325:9-13).  It delivered design drawings two years behind schedule (R.2320:21-25; R.2325:25-2326:21).  It issued hundreds of construction-change directives ("CCDs") requiring CCAB to advance payments to subcontractors and then seek reimbursement from BML (R.2326:21-2327:4; R.2327:17-23).  By November 2014, BML owed $98 million to CCAB solely for CCD reimbursements and related payments to subcontractors (R.5074; R.5276).

13

### C.    CCAB and BML Meet in Beijing in November 2014.

Representatives of CCAB, BML, and EXIM met in Beijing from November 17-18, 2014 ("Beijing Meeting") to solve BML's delayed construction and financial challenges (R.33-R.34; R.5274).  After days of negotiation (R.1783:6-24), CCAB, BML, and EXIM signed meeting minutes ("Meeting Minutes") that "reflect[ed] the consensus reached" between the attendees (R.5274; R.5277).  Although Plaintiff asserted a fraud claim based on the Meeting Minutes, it did not attend the meeting or sign the Meeting Minutes; neither did CSCECB or CCA (R.33-R.34).

In the Meeting Minutes, CCAB "agree[d] to achieve Substantial Completion" of a portion of the resort "by March 27th, 2015 on condition that CCA[B] and BML each provides necessary assistance and cooperation" (R.34-R.35; R.5274).  The parties further agreed the "Schedule Compliance and Milestones" to achieve the March 27 date would be "conducted [] by CCA[B] with best efforts" (R.5274-R.5275).  To facilitate this partial opening, CCAB also agreed to maintain "sufficient manpower," add "a minimum of 200 new Chinese workers within 30 days," and "enhance [] on-site management" (R.35-R.36; R.58; R.5275).

BML agreed to release $54,622,114.70 to CCAB (R.35; R.5275).  As the trial court found, this payment was a "partial settlement of certain commercial" disputes (R.35; R.5275)—namely, the $98 million BML *already* owed CCAB (R.5074).

14

BML, not Plaintiff, made that payment.  And BML did not pay the $54 million from its own funds; it "ma[de] an emergency utilization request on its credit facility with CEXIM to" fund the payment (R.35; R.42; R.5278), which it never repaid.

CCAB and BML reconvened on November 27, 2014 to refine the Meeting Minutes (R.5287).  They agreed CCAB could source new workers from "anywhere in the world" (R.5287).  CCAB "stated its concerns [about BML's] obligation to complete its own works such as the nightclub," and Izmirlian acknowledged those were "the respective duties of BML and CCA[B]" to prepare for the March 27 partial opening (R.5287).

## D.    CCAB Accelerates and Nearly Achieves the March 27 Partial Opening.

CCAB and its principals fully intended to meet the March 27 date (R.12; R.1770:3-18;  R.2030:21-2031:5;  R.2184:5-25;  R.5069;  R.5162)—something Plaintiff did not dispute (R.799:1-2 ["It's not that [CCAB] intentionally knew that they were not going to open on March 27th"]).

There was also no dispute CCAB nearly got there.  Izmirlian testified: "[A]bout a week before the [planned] opening, construction was doing really well. *We were very, very close*" (R.941:22-23 [emphasis added]).  Wu testified CCAB was "very, very close.  Tremendous progress that we made from November to March 27th" (R.2095:6-7).  Plaintiff agreed that by March 27, 2015, CCAB completed

around 97% of the Project and finished and handed over 1,600 rooms—many times more than needed for the March 27 partial opening (R.8247; R.8263).

CCAB delivered on its commitment to add workers. Unrebutted documentary evidence showed CCAB increased its total workforce on net by over 1,000 workers, peaking at over 6,000 by February 2015 (R.5283; R.7425; R.7254). CCAB promised to add 200 Chinese workers; it added 347 within a month of the Beijing Meeting (R.5281). BML's own survey confirmed CCAB added nearly 600 net additional workers between November 2014 and January 2015 (R.6935). When 700 workers with expiring contracts wanted to go home for Chinese New Year, CCAB could not force them to stay against their will (R.1815:22-1816:10). But CCAB convinced 800 other Chinese workers with expiring contracts to remain on the Project voluntarily, by offering financial incentives at CCAB's own expense (R.7242; R.1815:22-1816:10). CCAB did all this even though BML stopped paying CCAB for its work in February 2015 (R.7793; R.8568). Although the MCC entitled CCAB to stop work for nonpayment (R.3060), CCAB kept working (R.2097:24-2098:11).

The unrebutted documentary evidence showed that CCAB consistently kept BML informed of its progress with respect to labor and other issues. It is undisputed that CCAB gave Plaintiff and BML weekly workforce participation reports (*e.g.* R.5282; R.5298; R.6932; R.7250; R.7771; R.8021). It is also undisputed that

Izmirlian and BML President Tom Dunlap were attendees at a January 29, 2015 presentation in which CCAB outlined "key challenges" facing the Project (R.7050; R.11760; R.11762-R.11763). Those "key challenges" included (*i*) the risk that the Project would not get a temporary certificate of occupancy ("TCO") in time to open and (*ii*) that 600 Chinese workers would leave for Chinese New Year. CCAB said it intended to bring in 250 new Chinese workers (beyond the hundreds of Bahamian workers already added) to help offset the departures (R.7049-R.7050). CCAB fulfilled that promise (R.7059; R.7254).

### E.    BML and CCAB Miss the March 27, 2015 Partial Opening.

Despite CCAB's best efforts, Baha Mar did not open on March 27, 2015. BML's failures to meet its own commitments and provide the "necessary assistance and cooperation" it promised in the Meeting Minutes (R.5274) independently prevented the resort from being ready to welcome guests as planned.

BML "bombed" its own deliverables for the opening, including on construction outside CCAB's scope, as BML's Dunlap stated in an April 2015 email (R.8350). Dunlap admitted his team failed to complete amenities "mission-critical" to opening, including the nightclub, restaurants, and spa (R.8350; R.1173:10-16; R.1195:1-4). BML admittedly failed to obtain the certificate of suitability needed to open the casino—even though the only hotel slated to open March 27 was the Baha Mar Casino Hotel (R.70-R.71; R.1195:1-4). As a letter from the Bahamian

government to BML explained, that was because Izmirlian and his father refused to "submit[] to repeated requests by the [Gaming] Board for the[ir] [] individual personal history disclosures" (R.8520).

### F.    CSCECB's Books-and-Records Demand Is Refused.

In March 2015, while the March 27 target loomed, Wu, CSCECB's appointed BML board member, exercised CSCECB's books-and-records rights under IA §4.7 to understand the cause of BML's financial problems (R.4283; R.7806).  On March 13, 2015, by letter to Dunlap, Wu asked for BML's financial records, including "a complete budgetary analysis as to initial and projected budgets" and "a thorough analysis and assurances that [BML] ha[s] the resources committed and available to pay all outstanding obligations" (R.7806).  There was no dispute that the records were never provided.  Dunlap's letter response refused to provide any of the requested documents or information (R.7981).

### G.    Plaintiff's Financial Mismanagement Renders Its Shares Worthless.

Had Dunlap responded to CSCECB's request, as required, CSCECB might have learned that not only was BML out of money, but it also had no way to repay the $2.3 billion it had borrowed from EXIM.  Plaintiff's plan to repay BML's debt (and thereby allow Plaintiff to recoup the value of its own 2011 investment) depended on pre-selling condominium units, but that plan had failed (*supra* at 12). In March 2015, as Izmirlian and Dunlap testified, Plaintiff's plan was to solve the

liquidity crisis by raising tens of millions in "key money" from hotel companies (R.940:13-20; R.1207:17-1209:9).   Dunlap testified that this plan also failed (R.1207:17-1209:9).

Thus, even if the resort had opened on March 27, 2015, BML still would not have been able to repay its debt to EXIM.  In fact, Plaintiff's damages expert projected that, *even if Baha Mar opened as planned on March 27, BML would have consistently operated at a loss*, leaving no money for loan repayment, which would cause a default (R.4011; R.4019; R.11378-R.11379).

The unrebutted evidence thus was that Plaintiff's equity in BML still would have been worthless because BML's debt overwhelmed the value of its assets. Although Plaintiff proffered no evidence of the value of its BML shares in 2014 or 2015, Defendants introduced two 2016 reports by independent valuation firms based on data from 2014 and 2015.  Both firms independently concluded that *even if* Baha Mar were completed and operational, its assets would only be worth $943 million to $1.17 billion (R.9112; R.9139).  At the same time, BML's loan summary showed that by May 2014, BML owed EXIM $1.6 billion, which became nearly $2.3 billion by March 2015 (R.8688-R.8689).  Both damages experts agreed on the "pretty basic formula Accounting 101" that share value equals assets minus liabilities (R.2437:13-15 [Defendants' expert]; *accord* R.1589:3-7 [Plaintiff's expert]).  Accordingly, as Defendants' damages expert testified unrebutted, Plaintiff's shares in 2014 were in

19

a "substantial deficit equity position[]"—that is, BML's debt was so much greater than its asset value that any ownership interest in BML was underwater (R.2457:12-2458:10).

### H.    Plaintiff Secretly Causes BML to File for Bankruptcy in Delaware.

With no realistic prospect of ever seeing a return on its investment, Plaintiff made a high-risk strategic choice.  On June 29, 2015, the BML board members Plaintiff controlled voted secretly to file for bankruptcy in Delaware (R.81; R.8608-R.8609).  They did so without informing CSCECB or Wu, let alone getting CSCECB's contractually required consent under IA §4.8 (R.1046:9-20; R.4284). Wu and CSCECB learned of the bankruptcy only after Plaintiff and BML locked the Project site (R.2119:7-19) and shut down construction (R.2120:7-8).

BML's bankruptcy filing triggered an immediate default under the EXIM Loan (R.4014).  With the Project facing foreclosure, the Bahamian government initiated involuntary liquidation proceedings in The Bahamas against BML on July 16, 2015 (R.70).

Stakeholders, including CSCECB and CCAB, pursued an out-of-court resolution to BML's financial peril (R.8640-R.8642).  By late July, they nearly had a deal (R.8642).  As security for its new loan, EXIM required Plaintiff to provide a $175 million guarantee (R.8641).  Plaintiff refused, despite its contractual

responsibility for cost overruns, causing negotiations to collapse (R.2728-R.2729; R.8641).

Plaintiff's refusal backfired.  On September 15, 2015, Bankruptcy Judge Carey of the District of Delaware dismissed BML's bankruptcy.  The court held it was in "the best interests of the Debtors," including BML, to adjudicate the insolvency in The Bahamas (*In re Northshore Mainland Servs., Inc.*, 537 BR 192, 208 [Bankr D Del 2015]).  Judge Carey explicitly held that Plaintiff and BML were treated "fairly and impartially" in the Bahamian Supreme Court (*id.*).

The trial court's suggestion that CCAB's engagement with a private consulting firm, Notarc Management, was an effort to "curry favor with the Bahamian Government" (R.68) was entirely unfounded.  There were no payments to anyone in the Bahamian government.  Notarc was a private firm that CCAB engaged to help establish the CCA Panama office and develop business there (R.4869).  Plaintiff never even attempted to argue that Defendants unduly influenced the Bahamian Supreme Court, which presided over BML's liquidation and which the Delaware bankruptcy court found to be "fair[] and impartial[]" (*Northshore* at 208).

## I.    Fifteen Months Later, the Bahamian Supreme Court Liquidates BML, Causing Both Plaintiff and CSCECB to Lose Their Shares.

The Bahamian Supreme Court ordered that BML be wound up, extinguishing the corporation in fall 2016 (NYSCEF 60).  Thus, CSCECB lost its $150 million

preferred shares in BML and over $50 million in dividends it would have been entitled to under the IA (R.4278-R.4279).   Plaintiff also lost its BML shares (R.1617:9-23).  At trial, Plaintiff's damages expert testified that this 2016 liquidation order, not anything that came before, caused Plaintiff's loss (R.1619:13-16 [winding-up proceedings "caused [Plaintiff] to lose its ownership interest"]).

The Bahamian Supreme Court also placed the Project in a special-purpose vehicle (R.70) that hired CCAB to finish construction (R.10621).  CCAB was paid $700 million to finish construction and cover _BML_'s outstanding obligations, including $145 million for backpay to CCAB and to remobilize the workforce and other resources;  nearly $300 million to finish the remaining work, including remediating hurricane and mold damage from the Project's hiatus; and $188.9 million to cover BML's debts to its own subcontractors, vendors, and the Bahamian government (R.80; R.2125-R.2128; R.10623).  Including all the extra work and payments, CCAB still completed construction close to its initial $1.9 billion contract sum (R.1831:3-9; R.10625).

Neither Plaintiff nor BML repaid one cent of the EXIM Loan (R.1204:6-7).

## **PROCEDURAL HISTORY**

Plaintiff filed this action in 2017.  It eventually narrowed its claims to alleged fraud by CCAB and alleged breach of contract by CSCECB in 2014 and 2015 (R.527).  CSCECB counterclaimed for breach of the IA, alleging Plaintiff violated:

(*i*) the books-and-records provision (§4.7) by refusing Wu's March 2015 request; and (*ii*) the major-decisions provision (§4.8[g]) by secretly filing BML for bankruptcy (R.365).

On cross-motions for summary judgment, the trial court dismissed all but one of CSCECB's counterclaims and declined to dismiss any of Plaintiff's claims (*BML Props. Ltd. v China Constr. Am., Inc.*, 78 Misc 3d 1242[A] [Sup Ct, NY County 2023]). On April 25, 2024, this Court reversed the trial court on five grounds (*BML Props.*, 226 AD3d 582). Relevant here, this Court struck Plaintiff's lost-profits claim because "Section 11.10 of the [IA] expressly waived consequential damages" (*id.* at 584). It also revived CSCECB's books-and-records counterclaim given plain evidence "of at least one unanswered request" (*id.* at 585). Finally, it revived CSCECB's §4.8(g) counterclaim because it was "undisputed that plaintiff breached this provision by filing for reorganization" (*id.*).

Trial was held August 1-15, 2024. The trial court issued its decision on October 18, 2024 (R.9). It held CSCECB liable for breach of the IA and CCAB liable for fraud (R.41-R.64), then pierced both companies' corporate veils to hold all Defendants liable on both counts (R.74-R.78). It awarded damages of $845 million, the sum of the 2011 "deemed value" of the assets Plaintiff exchanged for its BML shares ($830 million) plus the $15 million equity-shortfall contribution Plaintiff was

23

contractually required by EXIM to make in March 2015 (R.82). It dismissed CSCECB's counterclaims (R.79-R.81).

On October 31, 2024, judgment of $1,642,598,493.15 was entered (R.93). Defendants immediately noticed this appeal (R.88).[1]

## STANDARD OF REVIEW

On review of a judgment after a non-jury trial, this Court reviews "questions of law and questions of fact" and may "render the judgment it finds warranted" (CPLR 5501[c]; *Northern Westchester Professional Park Assoc. v Town of Bedford*, 60 NY2d 492, 499 [1983]). "[T]he power of the Appellate Division . . . is as broad as that of the trial court" (*Northern Westchester* at 499). While this Court may decide for Defendants based solely on the trial court's numerous legal errors, the Court may also correct the trial court's factual errors based on "uncontradicted documentary evidence" (*Forum Ins. Co. v Worcester County Inst. for Sav.*, 219 AD2d 492, 492 [1st Dept 1995]) and "substitute [this Court's] own judgment where the evidence fails to support an important element of the trial court's findings" (*Palmer v WSC Riverside Dr., LLC*, 61 AD3d 589, 589 [1st Dept 2009]).

---

[1] On October 28, 2024, the trial court entered a supplemental order correcting a miscalculation in its post-trial decision (R.86).

# ARGUMENT

## POINT I
## New York Law Bars the Damages Award.

Even if this Court did not reach any other issue, the judgment must be vacated because, as a matter of law, Plaintiff was not entitled to the damages awarded. The trial court erred in awarding consequential damages for breach of contract because, as this Court recognized in the summary judgment appeal, the Investors Agreement prohibits such damages. The trial court also erred in awarding fraud damages because Plaintiff admitted at trial it did not spend a single penny in reliance on an alleged misrepresentation by any Defendant. The trial court compounded those errors by awarding damages based on the value of Plaintiff's shares in 2011, not 2014, when the trial court found the supposed wrongdoing first occurred. Had the trial court looked at the correct time period, damages would have been zero. Finally, the trial court erred in awarding damages to Plaintiff for a derivative injury to BML. Each of these errors independently requires reversal. Cumulatively, they demonstrate Plaintiff received a windfall judgment bearing no relationship to any alleged harm caused by any Defendant.

### A.    The Trial Court Erred in Awarding Prohibited Consequential Damages.

As this Court previously recognized, "Section 11.10 of the [IA] expressly waived consequential damages" (*BML Props.*, 226 AD3d at 584). Consequential

damages are harms that "do not [] directly flow from the breach" (*American List Corp. v U.S. News & World Report*, 75 NY2d 38, 43 [1989]).  This Court reversed the trial court's summary judgment decision and dismissed Plaintiff's claim for lost profits, holding that such damages were consequential because they "stem[med] from collateral business arrangements—*i.e.*, the loss of contracts with potential hotel guests" (*BML Props.*, 226 AD3d at 584).  The same is true of the damages Plaintiff sought at trial, which also did <u>*not*</u> flow from any breach and are prohibited by the IA's consequential-damages bar.

*First*, Plaintiff's damages expert's testimony was crystal clear that the damages are consequential.  He testified that the main impact of a March 27, 2015 opening would be significant "net operating income in 2015 and 2016" (R.1636:18-19), all generated by projected future payments by third parties.  His evaluation was that the harm to Plaintiff occurred because it "had no revenue coming in" and had "no cash flow coming in" in the form of hotel guest payments and "key money" payments by hotel brands like Hyatt (R.1636:18-1637:6).  Plaintiff's expert further testified that without such future revenues, Plaintiff also could not access further credit from EXIM, which triggered a liquidity crisis (R.1636:14-25).   Izmirlian likewise testified that BML was harmed because it could not raise "key money from the hotel partners" (R.940:13-20), and Dunlap pointed to the loss of $37 million in key money from Hyatt (R.1207:17-1209:9).  These are exactly the types of harms

this Court recognized in this very case are by definition consequential: they "stem[] from collateral business arrangements" with third parties like hotel guests, hotel brands, and EXIM (*see BML Props.*, 226 AD3d at 584).

*Second*, the claimed damages are consequential because the loss of Plaintiff's shares in 2016 did not by any stretch "directly flow" from the purported breaches in 2014 and 2015 (*see Bi-Economy Mkt. v Harleysville Ins. Co. of N.Y.*, 10 NY3d 187, 192 [2008]). Once again, Plaintiff's damages expert made this clear. He testified that Plaintiff only lost its BML shares because of the Chapter 11 filing and the liquidation ordered by the Bahamian Supreme Court, over a year after March 27, 2015. (R.1619:13-16 ["Anything that happens after that[,] in the bankruptcy process, [] that ultimately caused [Plaintiff] to lose its ownership interest"]).

According to the trial court's own findings, that loss was at least 10 steps removed from the missed partial opening date:

1. The purported "breaches [] caused [] the Project to miss the [] March 27, 2015 opening" (R.64-R.65).

2. "[I]f [Izmirlian] had known the Project would not open [] BML would have conserved its cash" (R.65).

3. Had BML conserved cash, it "would not have entered into a liquidity crisis" (R.65).

4. BML filed for bankruptcy in Delaware (R.66).

5. Izmirlian blew up a negotiated resolution when he declined "to make a $175 million guarantee requested by CEXIM as a precondition to its lending more money" (R.66).

6. The Delaware bankruptcy court dismissed the bankruptcy (R.70; *Northshore* at 208).

7. The Bahamian Supreme Court appointed liquidators in Bahamian insolvency proceedings (R.70).

8. The Bahamian court-appointed receiver-managers did not accept Izmirlian's bid to keep control of the Project (R.70).

9. The receiver-managers sold BML's assets to a third party (R.70).

10. The Bahamian Supreme Court ordered BML's liquidation, thereby causing Plaintiff (and CSCECB) to lose their BML shares (R.70).

Neither Plaintiff nor the trial court identified *any* New York case involving such an attenuated series of events leading to damages—let alone one where the court held damages were direct.  In fact, New York courts have repeatedly held damages to be consequential where the link between a claimed breach and the loss of an investment, like Plaintiff's, was far less attenuated than here (*see e.g. Bi-Economy* at 196 [defendant breached contract to provide business-interruption insurance but damages for loss of business following business interruption were consequential]; *DirectTV Latin Am., LLC. v RCTV Intl. Corp.*, 38 Misc 3d 1212[A], *6 [Sup Ct, NY County 2013], *affd* 115 AD3d 539 [1st Dept 2014] [defendant breached licensing contract but damages for decline in asset value were consequential]; *ERC 16W Ltd. v Xanadu Mezz Holdings*, 46 Misc 3d 1210[A], *3-*7 [Sup Ct, NY County 2015], *affd* 133 AD3d 444 [1st Dept 2015] [developer's damages for breach of construction-loan agreement, resulting in foreclosure on project, were consequential]; *Five Star Dev. Resort Communities, LLC v iStar RC*

28

*Paradise Valley, LLC*, 2012 WL 13069913, *2, *4-*5 [SD NY, Dec. 10, 2012] [damages under a project investment agreement deemed consequential where plaintiff sought damages reflecting value of "cash equity [that developer] spent to acquire the property for the [p]roject"]).

The only cases the trial court cited are simply inapposite (R.73-R.74; R.780). Two of the three did not analyze consequential damages at all (*NMR e-Tailing LLC v Oak Inv. Partners*, 216 AD3d 572, 573 [1st Dept 2023]; *Gerritsen v Glob Trading, Inc.*, 2009 WL 262057, *8 [ED NY, Feb. 4, 2009]).   The third, which merely identified a factual issue as to *whether* damages were consequential, is distinguishable (*see GSCP VI Edgemarc Holdings, L.L.C. v ETC Northeast Pipeline, LLC*, 2023 WL 6805946, *5 [Sup Ct, NY County, Oct. 14, 2023]).   There, the plaintiff sought to recover $100 million it paid in reliance on the defendant's representation that a contractual condition to that payment was satisfied (*id.*).   Plaintiff is not seeking to recover any money it paid CSCECB or any other Defendant in reliance on any provision of the IA.

### B.    The Trial Court Erred in Awarding Fraud Damages When Plaintiff Admittedly Spent Nothing in Reliance on Any Defendant's Statements.

The trial court also erred in awarding Plaintiff the very same $845 million as fraud damages.  That $845 million consisted of $830 million Plaintiff exchanged for its common shares in BML in 2011 plus a $15 million equity-shortfall contribution

it made in March 2015.  Indisputably, neither amount was paid in reliance on CCAB's November 2014 expression of its intent to achieve substantial completion of part of the resort by March 27, 2015.

Fraud damages must reflect the "actual pecuniary loss" a plaintiff sustains by detrimentally relying on a misrepresentation (*Connaughton v Chipotle Mexican Grill, Inc.*, 29 NY3d 137, 142 [2017]).  A plaintiff may recover only the "out-of-pocket" costs it was induced to expend because of its reliance (*Lama Holding Co. v Smith Barney Inc.*, 88 NY2d 413, 421 [1996]).  As Plaintiff spent nothing in reliance on CCAB's statements in 2014 about using best efforts to achieve partial completion by March 27, 2015, or on any of the other alleged misstatements the trial court identified, Plaintiff has no fraud damages.

Plaintiff's transfer of assets with a deemed value of $830 million *in 2011* to acquire BML's common shares self-evidently cannot have been made in reliance on purported misstatements made *three years later* (*see Lama Holding* at 422 [no damages where loss resulted from law passed before alleged fraud]; *RKA Film Fin., LLC v Kavanaugh*, 171 AD3d 678, 679 [1st Dept 2019] ["[M]isrepresentations made after plaintiff had already invested the funds are insufficient to give rise to fraud"]). Plaintiff *expressly disclaimed* that Plaintiff was fraudulently induced to make its 2011 payment (R.806:7-14; R.811:6-11; R.2572:2-2573:1).  Yet the sole authority

the trial court relied on in awarding fraud damages was an irrelevant fraudulent-inducement case (R.74, quoting *NMR E-Tailing* at 573).

The remainder of the award—the $15 million equity-shortfall contribution Plaintiff made in March 2015—also was not made in reliance on any purported misstatement. Plaintiff was *contractually required* under the EXIM Loan to make that payment once it had drawn down a certain amount of the credit facility (R.3919-R.3920; R.4276; R.7989). A "plaintiff cannot claim to have been defrauded into doing what it already was legally bound to do" (*Iberdrola Energy Projects v Oaktree Capital Mgt. L.P.*, 231 AD3d 33, 44 [1st Dept 2024]).

Instead, fraud damages should have been zero because Plaintiff indisputably spent no money in reliance on the purported misstatements (R.1041:1-5). Plaintiff's corporate representative testified that Plaintiff did not spend anything to prepare for the March 27 partial opening (R.2732-R.2734).

Nor can Plaintiff rely on unquantified amounts it claims *BML* spent to prepare for the opening or the $54 million *BML* paid to CCAB for past-due construction costs after the November 2014 meeting. New York law is clear: A plaintiff may not recover amounts spent by a different entity in alleged reliance on the fraud (*see Pasternack v Laboratory Corp. of Am. Holdings*, 27 NY3d 817, 827-829 [2016] [no fraud based on third-party reliance]). Moreover, not only were those payments made by BML, not by Plaintiff, they were made using funds BML borrowed from EXIM

but never repaid (R.887:23-888:1; R.928:11-15; R.933:14-21; R.937:14-21; R.2732-

R.2734).

### C.    The Trial Court Failed to Hold Plaintiff to Its Burden of Proving Damages at the Time of Breach or Fraud and Erred by Awarding Damages That Put Plaintiff in a Better Position Than It Would Have Been Absent the Supposed Wrongdoing.

New York law requires proof of damages at the time of the alleged breach or

fraud. Plaintiff had the burden to prove its damages with "reasonable certainty"

(*Kenford Co. v County of Erie*, 67 NY2d 257, 261 [1986]) and its shares' "market

value _at the time of the" alleged wrongdoing_ in 2014-2015 (*Cole v Macklowe*, 64

AD3d 480, 480 [1st Dept 2009] [breach] [emphasis added]; *see also Kortright*

*Capital Partners LP v Investcorp Inv. Advisers*, 392 F Supp 3d 382, 399 [SD NY

2019] [fraud]). The trial court held the earliest wrongdoing occurred in May 2014,

when CSCECB appointed Mr. Wu to the BML board (R.41). The other events the

trial court pointed to as triggering liability occurred in October 2014 (the purchase

of the Hilton), November 2014 (the Beijing Meeting), and March 2015 (the missed

partial opening) (R.42; R.53; R.64-R.65).

But Plaintiff offered no evidence of the value of its BML shares at any of

those times, and the trial court made no finding of the value of the shares at those

times. Instead, the trial court awarded Plaintiff the "deemed value" of the assets it

exchanged for its shares of BML *in 2011* plus its $15 million equity-shortfall

contribution (R.29; R.73). But between 2011 and May 2014, BML indisputably

32

borrowed $1.6 billion secured by those assets; by March 2015, when the partial opening date was missed, BML owed $2.3 billion secured by those assets (R.8688-R.8689). Neither Plaintiff nor the trial court accounted for the impact of BML's enormous debt on the value of Plaintiff's shares.

Defendants introduced the _only_ evidence of the value of BML at the relevant time. In the Bahamian insolvency proceeding, two reputable third-party valuation firms (CBRE Group and FTI Consulting) hired by the court-appointed receiver-managers used 2014 and 2015 market data to independently assess Baha Mar's value "as completed" after several years of consistent operations (R.9085; R.9112; R.9139). These were not distressed-asset valuations; they were going-concern valuations assuming the property was free and clear of debt. The valuations concluded BML was worth between $943 million and $1.17 billion, far less than needed to repay the $2.3 billion EXIM Loan (R.9112; R.9139). The value of Plaintiff's BML shares was therefore _negative_ even if the resort had been completed by March 2015. BML had simply borrowed more than the property was worth.

It is as if Plaintiff contributed a house worth $830 million in 2011 and put in $15 million of improvements in 2015—but mortgaged that house for $2.3 billion by March 2015. Because the evidence showed the "house" would sell for only $943 million to $1.17 billion when completed, Plaintiff's ownership interest was hopelessly underwater even if the resort had been completed by March 2015.

Indeed, it would still have been underwater after several years of projected operations; *Plaintiff's own expert's report showed Baha Mar running at a substantial cumulative loss for the first five years after completion* (R.11378-R.11379).

The trial court erased the impact of BML's multi-billion-dollar debt on the value of Plaintiff's BML shares.  The judgment is premised on the counterfactual assumption that Plaintiff owned shares in a company that was debt-free.  The trial court's damages award thus violated the core principle of New York law that forbids placing a plaintiff in a better position than it would have been in if no misconduct had occurred (*Alpert v Shea Gould Climenko & Casey*, 160 AD2d 67, 72 [1st Dept 1990] [no recovery of damages that "would place plaintiffs in a better position than had" the misconduct not occurred]); *Interfilm, Inc. v Advanced Exhibition Corp.*, 249 AD2d 242, 242 [1st Dept 1998] [no recovery that "would place plaintiff[] in a better position" than if no wrongdoing had occurred]; *Sager v Friedman*, 270 NY 472, 483-484 [1936] [no recovery where damages from alleged fraud "would be reflected in the unpaid balance of the loan, and [] the plaintiff would suffer no loss"]).

### D.   The Trial Court Erred in Awarding Plaintiff Damages for a Purely Derivative Harm.

By compensating Plaintiff for the loss of its BML shares following BML's liquidation, the trial court impermissibly awarded Plaintiff derivative damages when Plaintiff did not (and could not) recover for derivative harm.

Defendants acknowledge that this Court previously ruled Plaintiff could assert claims under IA §4.7 directly on its own behalf (*BML Props.*, 226 AD3d at 583). Nonetheless, at trial, Plaintiff had to prove not only a breach but also direct damages stemming from that breach—that is, damages unique to *Plaintiff* and not derived entirely from BML's losses. "[E]ven where an individual harm" like breach of contract is properly claimed, "if it is confused with or embedded in the harm to the corporation, it cannot separately stand" as direct damages (*Serino v Lipper*, 123 AD3d 34, 40 [1st Dept 2014]).

The damages award, however, compensated Plaintiff for the liquidation of BML and Plaintiff's resulting loss of its investment in *BML*.  Per Plaintiff's own damages expert, Plaintiff suffered *no* harm until the Bahamian Supreme Court's order liquidating BML because that is when Plaintiff lost its shares (R.1617:17-23; R.1619:13-16).  Thus, whatever damages Plaintiff suffered are solely "attributable to [Plaintiff's] pro rata share of [BML's] losses" (*Continental Cas. Co. v PricewaterhouseCoopers, LLP*, 15 NY3d 264, 272 [2010]).  That is the paradigmatic derivative harm (*see id.* [barring as derivative a claim based on "diminution in value of their limited partnership interests at liquidation"]; *O'Neill v Warburg, Pincus & Co.*, 39 AD3d 281, 281 [1st Dept 2017] [A "claim for diminution of the value of stock holdings is [] derivative"]; *Serino* at 41 [same]).

For all these reasons, the damages award must be vacated.

## POINT II
## The Trial Court Erred in Holding CSCECB Liable for Breach of Contract.

### A.    The Trial Court Misread Section 4.7.

The trial court erred in holding CSCECB liable for breach of the Investors
Agreement based on things that neither CSCECB nor its BML board appointee did.
By relying on supposed breaches by CCAB, a non-party to the IA, and imposing
obligations as to the construction timeline and staffing levels that nowhere appear in
the plain text of that agreement, the trial court rewrote the contract in violation of
New York law.  "In adjudicating the rights of parties to a contract, courts may not
fashion a new contract under the guise of contract construction . . . . Nor may they
imply a condition which the parties chose not to insert in their contract" (*Camaiore v
Farance*, 50 AD3d 471, 471-472 [1st Dept 2008]).

The IA was negotiated at arm's-length between sophisticated parties
represented by high-end counsel.  It is the document under which CSCECB made its
$150 million minority investment in BML.   Construction timeline, staffing
requirements, and provisions for the impact of delay are contained in a *different*
contract, the MCC, between *different* parties, CCAB and BML.  Notably, the MCC
capped damages for delay at $50 million—the *sole* remedy for construction delay
(R.3095-R.3096).  In basing liability on CCAB's actions as construction manager,
the trial court not only disregarded the IA's plain language but also allowed Plaintiff

to escape that agreed-upon damages cap.  And BML released CCAB from all its obligations under the MCC long before this case (*BML Props.*, 226 AD3d at 585).

But somehow the trial court read the IA to subject CCAB, a non-party, and CSCECB, a minority investor with no role in construction, to a $1.6 billion judgment (30 times the MCC maximum) for CCAB's conduct, finding it failed to ensure "sufficient manpower," slowed construction, or diverted resources (R.49-R.53). Those are MCC obligations having nothing to do with the text of the IA.

"[A] contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties" (*Cole* at 596).  Instead, the court's role is to find the parties' intent "within the four corners of the contract," give a "practical interpretation to the language employed" and "ensure that excessive emphasis is not placed upon particular words or phrases" (*Georgia Malone & Co. v E&M Assocs.*, 163 AD3d 176, 185 [1st Dept 2018]; *Greenwich Capital Fin. Prods., Inc. v Negrin*, 74 AD3d 413, 415 [1st Dept 2010]). The trial court misconceived all these principles of contract construction when it read IA §4.7—a routine governance provision meant to _protect_ CSCECB—so broadly that it led to an absurd result.

Section 4.7 is titled "China State Oversight" (R.4283).[2]  True to title, it details BML's obligations to CSCECB considering CSCECB's $150 million minority

---

[2] The IA defines "China State" as CSCECB, not CCAB or CCA (R.4274).

investment in BML. Those obligations included giving CSCECB the right to appoint one of BML's five board members and to "reasonable access to the books, records, communications and other documents" (R.4283).    Section 4.7 recites that CSCECB's board member "shall at all times act in the best interests of [BML]" (*id*.). That single clause, with its basis in the ordinary duties of a corporate director, is the source of Plaintiff's entire contract case.

Interpreting that clause, this Court previously stated that the question for trial was whether the "*representatives of* . . . [CSCECB] failed to act in the best interests of" BML (*BML Props.*, 226 AD3d at 583 [emphasis added]).    That was consistent with the IA's plain language, which applies only to actions against BML's interests (not Plaintiff's) by the "*China State Representatives*" and "*China State Board Member*" (R.4283 [emphasis added]).    Both sides, and the trial court, agreed at trial that there were no relevant China State Representatives and the only China State board member during the relevant period was Wu (R. 32 n.8; R.910:4-11).

But the trial court disregarded this Court's direction and the IA's plain language.    Only one of the purported "breaches" (the first) involved CSCECB at all, and that was not a breach.    The trial court held that CSCECB's appointment of Wu was a failure by the CSCECB board member to act in BML's "best interests" (R.41). That is tautological.    And Wu's appointment could not be an actionable breach.    The trial court never found his appointment harmed BML; no evidence supported such a

finding.  Moreover, Plaintiff waived that claim (*see Awards.com v Kinko's, Inc.*, 42 AD3d 178, 188 [1st Dept 2007], *affd* 14 NY3d 791 [2010]).  It _never_ objected to Wu's appointment.  Indeed, Plaintiff never claimed during this litigation that Wu's appointment was a breach until Plaintiff's closing trial argument (R.2559:9-10).  As to the finding that Wu breached by failing to read the IA (R.41), the trial court cited no authority for the proposition that not reading a contract is an automatic breach of contract, nor found the failure harmed BML.

The remaining purported breaches have nothing to do with CSCECB or the IA.  Only two even concern acts by Wu, neither of which was against BML's best interests.  _First_, the trial court found Wu attended two meetings concerning an unrelated project in Panama and sent one of CCAB's schedulers there for "several days" (R.45; R.47).  BML did not suffer.[3]  And the trial court's interpretation of §4.7 to preclude Wu from doing anything unrelated to BML during his waking hours would make the IA a draconian noncompete agreement, which Plaintiff never bargained for and which are highly disfavored under New York law (*see Business Networks of N.Y. v Complete Network Solutions*, 265 AD2d 194, 195 [1st Dept 1999]).

---

[3] The trial court cited the scheduler's email that he had not updated the TCO schedule (R.47), but it was unrebutted the TCO schedule was being updated daily by the TCO working group (R.2182:15-19; R.2195:5-23; R.7983).

*Second*, the trial court found Wu "approved [] the departure" of "700 workers from the Project" to return to China for Chinese New Year (R.48-R.49). But Wu could not legally force these workers to stay in The Bahamas when their contracts had expired (R.1815:22-1816:10). Holding workers against their will was not in BML's best interests. Plus, CCAB hired hundreds of additional Bahamian workers and convinced 800 other contract-expiring Chinese workers to stay (R.7242), for a total net increase of over *1,000* workers between November 2014 and March 2015 (R. 5283; R.7254). All these actions served BML's interests.

The other supposedly breaching acts were by nonparty CCAB. They were neither actionable under the IA nor wrongful. *First*, no Defendant "[d]ivert[ed] Project [r]esources to the Hilton Development" (R.42). CCAB bought the Hilton with its own money, and there was no evidence Project workers were diverted there (R.1934:7-10). And, contrary to the trial court's finding, CCAB *did* "disclose the acquisition to" BML (*contra* R.44); CCAB indisputably invited Izmirlian and Dunlap to the signing ceremony (R.5155-R.5157). *Second*, no Defendant "[d]ivert[ed] Project [r]esources to CCAB [b]usiness [o]pportunities in Panama" (R.45). As with the Hilton, CCAB permissibly used its own funds to expand its business in Panama. There was no active construction in Panama before the Chapter 11 halted Baha Mar's construction (R.1932:16-18; R.1934:3-6). *Third*, there was no evidence CCAB purposely delayed work (R.49). The trial court pointed to a

40

November 2014 email in which BML's Dunlap told CCAB's Wang a subcontractor

had turned off lights on the Project (R.50), but it omitted that Wang immediately

responded by asking his team to "find out what is going [on]" and resolve these

"significant safety concerns" (R.5254).  As to the trial court's citation to Izmirlian's

uncorroborated, hearsay letter claiming Wu told the Bahamian prime minister

"during an April 7, 2015 meeting" "that CCAB was deliberately slowing the work"

(R.52; R.8354), that meeting was after the missed March 27 opening that the trial

court found was caused by the breaches (R.64-R.65) and so cannot be a basis for

breach.  It was also untrue.  Even though CCAB was entitled under the MCC to stop

work because it had not been paid (R.3060), it never did until it was locked out of

the Project by Plaintiff and BML in conjunction with the Chapter 11 filing

(R.2097:24-2098:11).

### B.    The Purported Breaches Did Not Cause Plaintiff's Loss.

The trial court further erred in finding causation.  Plaintiff was required to

prove that its damages are "directly traceable to the breach, not remote" (*Kenford*

*Co. v County of Erie*, 67 NY2d 257, 261 [1986]).  And if Plaintiff's loss of shares

"would have been suffered in any event" regardless of whether the March 27 opening

was achieved, there can be no causation (*US Pack Network Corp. v Travelers Prop.*

*Cas.*, 42 AD3d 330, 331 [1st Dept 2007]; *accord Ackerman v D'Agostino*

*Supermarkets, Inc.*, 96 AD3d 672, 673-674 [1st Dept 2012] [no causation absent proof that performance would have prevented damages]).

Neither Plaintiff nor the trial court identified—or attempted to identify—any causal nexus between the purported breaches and Plaintiff's loss of its BML shares because of BML's 2016 liquidation.  Even if one were to attempt to string together the trial court's factual findings into a semblance of a chain of events, the purported breaches were at least 10 steps (and 18 months) removed from the liquidation (*supra* at 27).  That is far too remote a connection to support liability.  Moreover, the unrebutted evidence shows that causation breaks down at each of those steps.

The causal chain fails at the very first step.  The unrebutted trial evidence proved that, regardless of CSCECB's actions, Baha Mar would not have achieved the planned partial opening.  Plaintiff admittedly "bombed" its own deliverables, including by failing to secure the necessary approvals to open the casino or complete the nightclub, spa, and restaurants (*supra* at 17).  Izmirlian expressly recognized those amenities were necessary for the opening (*supra* at 17), and BML's failure to deliver them would have prevented the resort from welcoming paying guests even if the Bahamian government had issued a TCO (R.8346; R.1195:1-4; *FranPearl Equities Corp. v 124 W. 23rd St., LLC*, 164 AD3d 1190, 1190 [1st Dept 2018] [failure to obtain TCO did not support causation absent proof plaintiff would have constructed and profited from building if TCO were granted]).

42

Causation further collapses at the next step. Plaintiff did not rebut the evidence that even *before* the missed opening, BML was nearly $200 million over budget, could not draw more funds to pay for construction, and could not repay its $2.45 billion loan even once Baha Mar opened (*supra* at 18, 33), making it clear that Defendants did not cause BML's liquidity crisis. As this Court held in *Lefkara Group v First Am. Intl. Bank*, unrebutted evidence that there were "insufficient funds available under the loan and line of credit to complete construction"—not to mention unrebutted evidence that BML's liquidity crisis was inevitable—means any purported breaches are "not a proximate cause of [P]laintiff's damages" (150 AD3d 450, 451 [1st Dept 2017]).

Next, Plaintiff chose to put BML into bankruptcy, and it did so without CSCECB's required consent (*supra* at 20). The trial court's finding that the filing was "foreseeable" ignores the IA's plain language and this Court's prior holding: Plaintiff could not lawfully file BML for reorganization without CSCECB's consent. A party cannot foresee an event it has an unqualified right to prevent. Absent the bankruptcy filing, none of the ensuing events would have occurred, as Plaintiff's own damages expert confirmed (R.1640:15-21).

What followed was a series of decisions by *Plaintiff*, plus the American and Bahamian courts—not Defendants—that ultimately resulted in BML's liquidation. Plaintiff refused to provide a guarantee to secure financing needed to get BML out

43

of bankruptcy, despite its "irrevocabl[e] and unconditional[]" obligation to fund "any Cost Overrun" under the EXIM Loan (R.4278).   Then the Delaware court dismissed BML's bankruptcy filing, the Bahamian government commenced insolvency proceedings, and the Bahamian Supreme Court oversaw the sale of BML's assets and its liquidation (*supra* at 21, 26-27).   The trial court did not and could not connect this lengthy sequence of events to any action by any Defendant. Plaintiff's loss of its shares was far too remote to support causation (*see Kenford* at 261).

## POINT III
### The Trial Court Erred in Holding CCAB Liable for Fraud.

The trial court's fraud ruling against CCAB was contrary to law.  Plaintiff's case was that CCAB made statements at the Beijing Meeting reflecting its sincere intent to work diligently to achieve a partial opening on March 27, 2015, and Plaintiff admitted CCAB came "very, very close" to that goal.  *That is not fraud*. CCAB spent its own money to buy a hotel.  *Not fraud*.  CCAB employees spent an insignificant fraction of CCAB's money on trivial items.  *Not fraud*.  In holding otherwise, the trial court failed to apply the correct legal standard for every element of fraud under New York law:  misrepresentation, scienter, reliance, and causation (*Abrahami v UPC Constr. Co.*, 224 AD2d 231, 232-233 [1st Dept 1996]).  The fraud judgment also duplicated the contract judgment both in the factual bases for the

finding of liability and the damages awarded. Each of these errors independently requires reversal.

## A.    There Was No Actionable Misrepresentation or Scienter.

None of the four purported "frauds" the trial court identified satisfies the elements of fraud under New York law.

*The "First Fraud" Fails.* Per the trial court, CCAB's principal misrepresentation was a supposedly unequivocal guarantee in the Meeting Minutes that "substantial completion would occur by March 27, 2015" (R.11). That is not what CCAB said. The Meeting Minutes state that CCAB was "to achieve Substantial Completion [] by March 27, 2015 *on condition that* CCA[B] and BML each provides necessary assistance and cooperation," and further conditioned on CCAB's qualification that it would use its "*best efforts*" to meet "Schedule . . . Milestones" like March 27 (R.5274-R.5275 [emphasis added]). The Meeting Minutes also expressly caution that while they "reflect a consensus" they do not "waive or amend any of the executed project documents" (R.5274; R.5276).

These statements did not misrepresent any material existing fact, as required for fraud. Simply put, "promissory future statements [] are not actionable" (*Safariland, LLC v H.B.A. Agencies*, 198 AD3d 519, 521 [1st Dept 2021]; *see also e.g. P. Chimento Co. v Banco Popular de Puerto Rico*, 208 AD2d 385, 385 [1st Dept 1994] ["[I]t is the general rule that fraud cannot be predicated upon statements which

are promissory in nature at the time they are made and which relate to future actions or conduct"]).  Indeed, the statements as to future intent could not have been false when made because substantial completion indisputably depended on factors outside CCAB's control: not only the vagaries of construction procurement and logistics—especially for a project of its magnitude, complexity, and remote location—but also BML's promised assistance and cooperation and the Bahamian government's independent decision whether to grant a TCO (which it did not on March 27, because of BML's failures) (*supra* at 17; *F.A.S.A. Const. Corp. v Degenshein*, 47 AD3d 877, 879 [2d Dept 2008] [no fraud where statement was not "an assertion of facts exclusively within" the defendants' knowledge or control]).  Moreover, CCAB was never responsible for "open[ing] the Project," nor did it ever promise to do so.  <u>*BML*</u>, not CCAB, was responsible for opening Baha Mar under the MCC (R.3097-R.3100).[4]

The trial court compounded these errors by applying a scienter standard applicable only to auditors, not construction managers like CCAB.  The trial court found CCAB acted with "reckless disregard" by "fail[ing] to verify its ability to meet the promised deadline," citing *DaPuzzo v Reznick Fedder & Silverman*, 14 AD3d

---

[4] The only case the trial court cited is inapposite (*see* R.56, citing *Shear Enterprises, LLC v Cohen*, 189 AD3d 423, 424 [1st Dept 2020]).  In *Shear*, unlike here, "it was <u>*certain*</u> that the defendants[]" could not fulfill their promise (*Power Up Lending Group v Parallax Health Sciences, Inc.*, 2023 WL 3006802, *9 [ED NY, Apr. 19, 2023]), making the statement objectively false when made.

302, 303 [1st Dept 2005], and *Curiale v Peat, Marwick, Mitchell & Co.*, 214 AD2d 16, 28 [1st Dept 1995] (R.56). But *DaPuzzo* and *Curiale* involved auditors, and this Court has been clear that the "reckless disregard" standard cannot be applied to future-intention cases outside the auditor context (*Cimen v HQ Capital Real Estate*, 227 AD3d 587, 589 [1st Dept 2024] ["None of the cases in which we have cited *DaPuzzo* have extended its statement about gross negligence/recklessness to non-auditors."]).

Rather, to show fraud based on CCAB's statements, Plaintiff had to prove CCAB "never intended to honor or act on [the] statement" (*Rising Sun Constr. L.L.C. v CabGram Dev. LLC*, 202 AD3d 557, 559 [1st Dept 2022]; *accord Srivatsa v Rosetta Holdings LLC*, 213 AD3d 514, 516 [1st Dept 2023] [defendant must have "present intention that [promise] would not be carried out"]). But Plaintiff *expressly disclaimed* this argument, acknowledging, "[i]t's not that [CCAB] intentionally knew that they were not going to open on March 27th" or that CCAB "did not intend to meet that date" (R.799:1-2; R.1027:15-1028:15). Those admissions standing alone preclude a finding of fraud.

*The "Second Fraud" Fails.* The trial court made no findings on *any* element in connection with the second "fraud," which was CCAB's purported "use [of] the

$54 million [] to purchase the Hilton" rather than pay subcontractors (R.56).[5]  CCAB

never told Plaintiff it would use the $54 million to pay subcontractors in the future.[6]

To the contrary, the Meeting Minutes made clear the payment was a "settlement for

unresolved financial disputes" (R.5275-R.5276)—namely, a partial reimbursement

for $98 million CCAB had *already* incurred for the execution of CCDs (*supra* at 13-

14).    There was no deception as to the Hilton purchase either, which CCAB

indisputably notified Izmirlian and Dunlap about in October 2014 (R.5158).

    *The "Third Fraud" Fails*.  The trial court likewise found no element of fraud

as to CCAB employees' purchases "for personal use" (R.57).  The purchases were

made at *CCAB's own expense* from its bank account (R.2092:3-209319; R.3103).

They did not harm BML or Plaintiff.  As the trial court conceded, "the amounts of

these expenses may [be] *de minimis*" and were "not calculated at trial" (R.57).

    *The "Fourth Fraud" Fails*.  CCAB's statements in the Meeting Minutes that

it would add "a minimum of 200 new Chinese workers within 30 days," enhance its

"on-site management," and "provide sufficient workers to be able to achieve

Substantial Completion" were true, not misrepresentations (R.58; R.5275).  Plaintiff

never argued, and the trial court never found, that CCAB lacked "inten[t] to honor

---

[5] CCAB's bank statements contradict that CCAB used this settlement to purchase the Hilton.  Cash is fungible, and CCAB had the money to purchase the Hilton with or without BML's payment (R.2471:24-2472:4; R.5304-R.5305).

[6] The only statement the trial court cited on the second "fraud" is a litigation discovery response from 2022 (R.42), on which Plaintiff cannot have detrimentally relied in 2014 and 2015.

or act on" these statements when it made them in November 2014 (*Rising Sun Constr.* at 559).  Indeed, the evidence showed CCAB worked hard to meet these commitments, adding 347 new Chinese workers and 16 new managers within a month of the meeting and increasing the total workforce by over 1,000 (*supra* at 15).

Instead, the trial court impermissibly found fraud-by-hindsight that ignored unrebutted evidence that CCAB *did* disclose its concerns to Plaintiff.  The trial court determined that months after the Beijing Meeting, CCAB became concerned that "the TCO and March 27, 2015 deadlines were in danger" (R.61).  CCAB shared these concerns with BML and Plaintiff (*supra* at 16-17).  But even if it had not, CCAB's post hoc concerns cannot make the Meeting Minutes knowingly false when made (*see Srivatsa* at 516).

## B.     There Was No Reliance.

The fraud claim also should have been dismissed because Plaintiff failed to prove it actually, detrimentally, or justifiably relied on CCAB's statements.

There was no actual or detrimental reliance.  The trial court found Plaintiff relied on the Meeting Minutes projection of a March 27 partial completion date (R.62-R.64).  But Plaintiff cannot have relied on the Meeting Minutes because it did not attend the Beijing Meeting, sign the Meeting Minutes, or spend a single dollar based on the supposed misstatements (R.5274; *supra* at 32).  Instead, the trial court found reliance because Plaintiff "directed BML" to spend an unquantified sum of

*BML's money* to prepare for opening (R.63). But even that finding was wrong: BML's pre-opening expenditures came from the EXIM Loan, and multiple Plaintiff witnesses—including BML's President—testified that "BML never repaid" the EXIM Loan (R.1204:6-7; R.2732-R.2734). None of this comes close to establishing *Plaintiff's* reliance under New York law (*see Pasternack* at 827-829).

The trial court further erred in finding reliance would have been justified: The unrebutted evidence, which the trial court ignored, showed Plaintiff was on notice of the issues it claims led to the missed opening.

CCAB repeatedly disclosed to BML every single challenge the trial court found "caused" the missed March opening. It sent weekly updates listing the number of workers on-site (R.5282-R.5284; R.7421-R.7425). On January 29, 2015, it reported on "Key Challenges," including specifically the planned departure of 600 workers for Chinese New Year and potential delays to getting a TCO in time to open. It also disclosed its plan to bring in 250 more workers (R.5561-R.5562; R.7049-R.7050; R.11762).

Multiple sophisticated third parties also told Plaintiff by December 2014 that the March 27 date was unachievable (R.5296; R.5580; R.5621). In a February 2015 update, BML *itself* expressed doubt that the Project would open on March 27 (R.7063 [noting "the lack of supporting evidence" to "achieve such an objective" of "receiv[ing] paying guests by March 27, 2015"]). As BML's Dunlap admitted in an

internal email shortly after the missed opening: "There were many smart individuals advising that we were not going to make it. I believe that I fell into the trap of seeing what would be, and not what was actually there." (R.8346).

That evidence defeats justifiable reliance as a matter of law (*Sony Ericsson Mobile Communications USA, Inc. v LSI Corp.*, 102 AD3d 565, 565 [1st Dept 2013] [plaintiff cannot "reasonably have relied on any alleged misrepresentations by [defendant] about the completion dates" where it "was aware of delays" and "hearing from its own representatives" that delays were likely]).

### C.    There Was No Causation.

The trial court also erred as a matter of law in finding causation on fraud. Plaintiff was required to prove two things: _First_, that the "misrepresentation[s] induced [P]laintiff to engage in the transaction in question (transaction causation)," meaning that Plaintiff was induced to transfer assets in 2011 in exchange for BML shares, and made the equity shortfall contribution in reliance on CCAB's purported misrepresentations (*Laub v Faessel*, 297 AD2d 28, 31 [1st Dept 2002]). _Second_, that Plaintiff's reliance "directly caused the loss about which [P]laintiff complains (loss causation)" (*id.*). The trial court did not address either element, and Plaintiff did not prove either one.

On transaction causation, the _2011_ investment cannot possibly have been made in reliance on statements in _2014 and 2015_ (*supra* at 31; *Gregor v Rossi*, 120

AD3d 447, 448 [1st Dept 2014] [finding no causation where the Plaintiff invested before the alleged wrongdoing]).  The $15 million equity-shortfall contribution in March 2015 also cannot have been made in reliance because Plaintiff was contractually obligated by EXIM to make it (*supra* at 30-31).

There also was no loss causation because any reliance did not cause Plaintiff's loss of its shares.  Loss causation—which is equivalent to proximate causation (*Laub* at 31)—requires that "reliance on the false representation" resulted in the claimed injury (*Connaughton* at 142).  Neither Plaintiff nor the trial court explained—or attempted to explain—how Plaintiff's purported reliance (its direction to BML to prepare for opening) caused the Bahamian Supreme Court to liquidate BML in 2016, triggering the loss of Plaintiff's BML shares.  Plaintiff's failure to affirmatively prove causation is fatal to its fraud claim.  And the unrebutted evidence showed that Baha Mar would not have opened on March 27 and BML would have been insolvent regardless of anything CCAB purportedly said or did (*supra* at 18-19).  Plaintiff would have suffered the same loss of the value of its shares because of its own operational and financial mismanagement (*see P & HR Solutions, LLC v Ram Capital Funding, LLC*, 195 AD3d 473, 474 [1st Dept 2021]) [no fraud where "plaintiff[] would still have suffered loss due to the onerous terms of the contracts they signed"]).

### D.    The Fraud Judgment Duplicated the Contract Judgment.

Finally, the fraud claim should have been dismissed because it "simply duplicate[s], in the facts alleged and damages" awarded, the contract claim (*Cronos Group v XComIP, LLC*, 156 AD3d 54, 62 [1st Dept 2017] [fraud claim that duplicates contract claim must be dismissed]; *see also MBIA Ins. Corp. v Credit Suisse Sec. (USA) LLC*, 165 AD3d 108, 114 [1st Dept 2018] [same]).  The trial court awarded "the very same principal dollar amount, to the penny," as fraud and contract damages (*Cronos* at 65), based on the exact same set of underlying facts: (*i*) the Meeting Minutes; (*ii*) the purchase of the Hilton; (*iii*) the workforce size and adequacy; and (*iv*) supposed work slowdowns (*compare* R.53-R.62, *with* R.41-R.53).  The fraud claim was "plainly redundant" of the contract claim and should have been dismissed (*see Cronos* at 64).[7]

### POINT IV
### The Trial Court Erred in Piercing CSCECB's and CCAB's Corporate Veils.

The trial court compounded its errors on damages, breach, and fraud by piercing CSCECB's corporate veil on contract and CCAB's corporate veil on fraud.

*First*, the trial court erred in refusing to apply Bahamian law, which it was required to take judicial notice of (*see* CPLR 4511[b]), and which Plaintiff did not dispute

---

[7] It makes no difference that, at summary judgment, this Court allowed both claims to be tried (*BML Props.*, 226 AD3d at 583).  That ruling merely established a question of fact for trial (*see Scholem v Acadia Realty*, 45 Misc 3d 562, 566 [Sup Ct, Suffolk County 2014], *affd*, 144 AD3d 1012 [2d Dept 2016]).  Plaintiff still had to present a non-duplicative fraud case at trial.

barred veil-piercing here.  *Second*, even if New York law applied, the trial court erred in piercing CSCECB's and CCAB's veils.  Plaintiff failed to meet its high burden to prove that CSCECB or CCAB "abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice" against Plaintiff (*Morris v N.Y.S. Dept. of Taxation & Fin.*, 82 NY2d 135, 142 [1993]).  This veil-piercing ruling must be reversed; that is, only CSCECB could theoretically be liable in contract and only CCAB could theoretically be liable in fraud.  As CCA was only held liable based on veil-piercing, all claims against CCA must be dismissed.

### A.    Bahamian Law Applies and Bars Veil-Piercing Here.

The trial court erred in not applying Bahamian law.  New York courts apply the law of the jurisdiction of the entity whose veil the plaintiff seeks to pierce (*see Flame S.A. v Worldlink Int'l (Holding) Ltd.*, 107 AD3d 436, 438 [1st Dept 2013]).  Plaintiff sought to disregard the corporate form of CSCECB and CCAB, both Bahamian entities (R.3378; R.3404).  Thus, Bahamian law applied.

No one disputed that Bahamian law bars veil-piercing here.  Bahamian law requires a plaintiff to satisfy the "extremely limited" "evasion principle" by showing that the defendant created a shell entity to "deliberately evade[]" "an *existing* legal obligation" that the defendant *already* owed to the plaintiff (R.11853-R.11854; R.11910 [emphasis added]; *see also In re Tyson*, 433 BR 68, 88-89 [Bankr SD NY

2010]).[8]  Undisputedly, no Defendant created another Defendant to "deliberately evade [] an existing legal obligation" to Plaintiff.  CCA did not incur _any_ legal obligation to Plaintiff at any time, as CCA was never party to the IA or any other contract with Plaintiff.  And any liability CSCECB or CCAB incurred to Plaintiff only arose at the time of the alleged breaches or fraud in 2014-2015, years after those companies were incorporated in 2009 (R.3378; R.3404).

There was no basis for the trial court to ignore these undisputed principles of Bahamian law.  "Judicial notice _shall_ be taken" of "the laws of foreign countries" if "a party requests it, furnishes the court sufficient information to enable it to comply with the request, and has given each adverse party notice of his intention to request it" (CPLR 4511[b] [emphasis added]).  Defendants met these requirements.  _First_, Defendants stated in the pre-trial Joint Proposed Questions to the Court that Bahamian law applied to veil-piercing (R.767; R.772).  Defendants gave this notice "prior to the presentation of any evidence at the trial," as CPLR 4511[b] requires.  _Second_, Defendants introduced an affidavit by Sean N.C. Moree, K.C., an expert on Bahamian veil-piercing law, detailing the bedrock principles above (R.11851-R.11855).  That affidavit "furnishe[d] the court sufficient information to enable" it to take judicial notice of Bahamian law (CPLR 4511[b]).  This case is therefore

---

[8] Plaintiff submitted no evidence regarding the substance of Bahamian law, and the trial court had no response to these principles.

nothing like those the trial court relied on, in which parties never supplied the content of foreign law (*see* R.74 [citing *Bank of New York v Norilsk Nickel*, 14 AD3d 140, 148-149 [1st Dept 2004] ["'total failure' to prove foreign law" because defendant "never gave the requisite notice or established the substance of Soviet law at any [] stage"]; *Paulicopter-Cia. v Bank of America, N.A.*, 182 AD3d 458, 460 [1st Dept 2020] [no proof of "the substance of Brazilian law"]; *N.B. v F.W.*, 62 Misc 3d 1012, 1018 [Sup Ct, NY County 2019] [failure to "offer either substantive French law, an analysis of French law by an expert, [or] analysis of why French choice of law would apply"]; *Warin v Wildenstein & Co.*, 297 AD2d 214, 215 [1st Dept 2002] [French-law expert "did not explain" the relevant issues]]).  Thus, the trial court was required to take judicial notice of Bahamian law.[9]

### B.    Veil-Piercing Is Unwarranted Even under New York Law.

Even under New York law, however, the trial court's findings were insufficient for veil-piercing as a matter of law.  "New York law disfavors disregard of the corporate form" (*Cobalt Partners v GSC Capital Corp.*, 97 AD3d 35, 40, [1st Dept 2012]), and "permit[s] veil-piercing only under extraordinary circumstances" (*EED Holdings v Palmer Johnson Acquisition Corp.*, 228 FRD 508, 512 [SD NY 2005]).  Plaintiffs must overcome a "heavy burden" (*TNS Holdings, Inc. v MKI Sec. Corp.*, 92 NY2d 335, 339 [1998]), proving that a Defendant (*i*) exercised "complete

---

[9] Even if a lower standard applied, the trial court abused its discretion by ignoring Bahamian law.

56

domination of" CSCECB or CCAB *and* (*ii*) used that domination "for the purpose of defrauding" Plaintiff, which "caus[ed] it an injury" (*World Wide Packaging, LLC v Cargo Cosmetics, LLC*, 193 AD3d 442, 442-443 [1st Dept 2021]).[10]  The trial court did not find either of those things.

*First*, the trial court did not find any of the kinds of facts required to prove domination.  It is commonplace for affiliated private companies to have shared services and overlapping personnel.  That Defendants—including CSCECB, a special-purpose vehicle created to make the $150 million preferred investment in BML—"were all subsidiaries of one parent" is not domination (R.75):  "The distant relationship, through the parent company, is insufficient to effect a transfer of liability" between Defendants (*Meshel v Resorts Intl. of N.Y., Inc.*, 160 AD2d 211, 213 [1st Dept 1990]).  Neither is the "overlap between the officers and directors," which is not surprising for a closely held special-purpose entity like CSCECB (*compare* R.76, *with In re Stage Presence, Inc.*, 592 BR 292, 304 [Bankr SD NY 2018] ["[For] closely-held corporations" such overlaps "are not uncommon" and not a basis for veil-piercing]; *see Musman v Modern Deb, Inc.*, 50 AD2d 761, 762 [1st Dept 1975] ["Stock control, interlocking directors and officers, and the like are in and of themselves insufficient"]).  Use of other corporations' "letterhead, emails,

---

[10] Alter-ego and veil-piercing liability are treated interchangeably (*Cortlandt St. Recovery Corp. v Bonderman*, 226 AD3d 103, 104 [1st Dept 2024]).

and signatures for [p]roject related documents and communications" is likewise both routine and insufficient (*compare* R.76, *with Bagel Bros. Maple, Inc. v Ohio Farmers, Inc.*, 279 BR 55, 67 [Bankr WD NY 2002] [common trade name cannot support disregarding the corporate form]).

<u>Second</u>, veil-piercing is improper because the trial court found <u>no</u> harm to Plaintiff resulting from the purported domination itself.  No Defendant was "created for an improper purpose of cutting off [P]laintiff's ability to collect on the contract, or that corporate funds were purposefully diverted to make any of the three companies judgment proof" (*World Wide Packaging*, *LLC* at 443; *accord Baby Phat Holding Co., LLC v Kellwood Co.*, 123 AD3d 405, 407-408 [1st Dept 2014]).  Nor was any Defendant undercapitalized to avoid then-existing obligations (*see Do Gooder Prods., Inc. v American Jewish Theatre, Inc.*, 66 AD3d 527, 528 [1st Dept 2009]).  Finally, the trial court's finding that CSCECB breached the IA does not warrant veil-piercing, because any alleged breach did not result from the purported misuse of CSCECB's corporate form (*see Bonacasa Realty Co. v Salvatore, LLC*, 109 AD3d 946, 947 [2d Dept 2013] ["simple breach of contract" insufficient for veil-piercing]).  To hold otherwise would collapse the bases for veil-piercing and underlying liability, and permit veil-piercing in practically any contract case involving a corporate affiliate.

**POINT V**
**The Trial Court Erred in Dismissing CSCECB's Counterclaims.**

Finally, the trial court erred in dismissing CSCECB's counterclaims. The trial court disregarded not only the evidence at trial but also this Court's prior decision reversing the trial court's dismissal of CSCECB's counterclaims on summary judgment.

The trial court contravened this Court's unequivocal holding that Wu's March 13, 2015 letter was a "request for books and records" that went "unanswered" in violation of §4.7 (*BML Props.*, 226 AD3d at 585). Reverting to the same logic it had applied on summary judgment (disregarding this Court's reversal), the trial court again held, in disregard of this Court's prior reversal, that the March 13 letter was _not_ a books-and-records request under §4.7 because it did not use the words "books and records" (R.80).

The trial court likewise flouted this Court's holding that it was "undisputed that plaintiff breached [§4.8(g)] by filing for reorganization without CSCECB's consent" (*BML Props.*, 226 AD3d at 585). Although Plaintiff conceded at trial that "nobody at BML or BMLP sought CSCEC[]B's consent to file the bankruptcy" (R.1046:5-20; R.1051:4-11), the trial court ignored that evidence (*see Tannenbaum v Franck*, 2003 WL 1956309, *1 [1st Dept, Apr. 9, 2003] [reversing "conclusory" decision devoid of specific factual findings]). Rather than address the unrebutted evidence of Plaintiff's breaches, the trial court erroneously suggested that

Plaintiff's performance "appear[ed]" to be excused because of CSCECB's purported
prior breaches (R.81).  But CSCECB did not breach (*supra* Point II).

Finally, the trial court erred in holding that Plaintiff's breaches did not harm
CSCECB.  The consequences of Plaintiff's failure to provide CSCECB with an
understanding of BML's dire financial circumstances or to seek CSCECB's consent
to put BML in bankruptcy are obvious:  Plaintiff mired BML in debt and squandered
the Project budget (*supra* at 11-13), blindsiding CSCECB when it learned of the
equity shortfall in <u>*March 2015*</u> (R.7788-R.7789; R.7805-R.7806) and preventing
CSCECB from taking steps to protect its $150 million preferred investment.
Moreover, BML's improper bankruptcy filing was specifically designed to—and
did—deprive CSCECB of its right to protect its preferred investment in BML (*see
In re Northshore Mainland Servs., Inc.*, No. 15-11402-KJC [Bankr D Del, Aug. 26,
2015], ECF No. 442 at 22-23).

The trial court further erred in holding that "Defendants," collectively, "were
[] made whole" because CCAB received $700 million from the Bahamian receiver-
managers in 2017 to fund the resort's completion (R.81), despite this Court's
rejection of Plaintiff's unjust enrichment claim related to this same payment (*see
BML Props.*, 226 AD3d at 584).  The trial court again conflated different corporate
entities and confused the relevant contracts.  CCAB, not CSCECB, received the
payment, which was made under the MCC, not the IA (R.10621-R.10644).  As

described above, that payment was no windfall; it covered the cost of completing Baha Mar, including paying BML's unpaid obligations, after Plaintiff's bankruptcy filing shut down the Project (*supra* at 21-22).

## CONCLUSION

For the foregoing reasons, Defendants-Appellants respectfully request this Court (*i*) reverse the trial court's post-trial decision in its entirety; (*ii*) vacate the judgment; and (*iii*) grant CSCECB judgment on its counterclaims.

Dated:  December 30, 2024

Respectfully submitted,

_____
DEBEVOISE & PLIMPTON LLP
Mark P. Goodman
Maura Kathleen Monaghan
Morgan A. Davis
Alexander Costin
Rebecca Zipursky
66 Hudson Boulevard
New York, New York 10001
212-909-6000
mpgoodman@debevoise.com
mkmonaghan@debevoise.com
mdavis@debevoise.com
ajcostin@debevoise.com
rlzipursky@debevoise.com

*Attorneys for Defendants-Appellants*

# PRINTING SPECIFICATIONS STATEMENT

I hereby certify pursuant to 22 NYCRR 1250.8(j) that the foregoing brief was

prepared on a computer using Microsoft Word.

*Type.* A proportionally spaced typeface was used, as follows:

      Name of typeface:      Times New Roman
      Point size:      14
      Line spacing:      Double

*Word Count.* The total number of words in this brief, inclusive of point headings and

footnotes and exclusive of pages containing the table of contents, table of citations,

proof of service and this Statement is 13,989.

**STATEMENT PURSUANT TO CPLR § 5531**

# New York Supreme Court

## Appellate Division—First Department

BML PROPERTIES LTD.,

*Plaintiff-Respondent,*

– against –

CHINA CONSTRUCTION AMERICA, INC., now known
as CCA Construction Inc., CSCEC BAHAMAS, LTD.
and CCA BAHAMAS LTD.,

*Defendants-Appellants,*

– and –

DOES 1-10,

*Defendants.*

_____

CSCEC (BAHAMAS), LTD.,

*Defendant/Counterclaim-Plaintiff-Appellant,*

v.

BML PROPERTIES LTD.,

*Plaintiff/Counterclaim-Defendant-Respondent.*

1.  The index number of the case in the court below is
    657550/17.

2.  The full names of the original parties are as set forth
    above. There have been no changes.

3.   The action was commenced in Supreme Court, New York County.

4.   The action was commenced on or about December 26, 2017, by filing of a Summons and Verified Complaint. Issue was joined on or about May 13, 2019, by service of a Verified Answer and Counterclaims.

5.   The nature and object of the action involves a contractual relationship.

6.   This appeal is from a Judgment, entered October 31, 2024, and from the Post-Trial Decision and Order of the Honorable Andrew Borrok, dated October 18, 2024, and supplemented on October 28, 2024.

7.   This appeal is on the full reproduced record.

**<u>Exhibit D</u>**

FILED: APPELLATE DIVISION - 1ST DEPT 01/23/2025 09:18 AM   2024-06623
NYSCEF DOC. NO. 36                                        RECEIVED NYSCEF: 01/23/2025

# Supreme Court of the State of New York

## Appellate Division, First Judicial Department

Present – Hon.   Sallie Manzanet-Daniels,        Justice Presiding,
                 Cynthia S. Kern
                 Lizbeth González
                 John R. Higgitt
                 Llinét M. Rosado,                Justices.

---

BML Properties LTD.,                    Motion No.   **2025-00066**
        Plaintiff-Respondent,           Index No.    657550/17
                                        Case Nos.    2024-06623
        -against-                                    2024-06624

China Construction America, Inc., now known
as CCA Construction Inc., CSCEC Bahamas,
Ltd., and CCA Bahamas Ltd.,
        Defendants-Appellants,

Does 1-10,
        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - -
        [And Another Action]

---

Appeals having been taken to this Court from an order of the Supreme Court, New York County, entered on or about October 21, 2024 (Case No. 2024-06623), and from a judgment of the same Court, entered on or about October 31, 2024 (Case No. 2024-06624), and said appeals having been perfected,

And defendants-appellants having moved for an appellate calendar preference in which to maintain and hear the appeals within the March 2025 Term of this Court,

Now, upon reading and filing the papers with respect to the motion, and due deliberation having been had thereon,

Case Nos. 2024-06623                           -2-                    Motion No. 2025-00066
       2024-06624

     It is ordered that the motion is granted.

ENTERED: January 23, 2025

Susanna Molina Rojas
Clerk of the Court

**Exhibit E**

1    the cash flows fund employees at CCA for providing

2    shared services to subsidiaries and affiliates, and

3    they're funding third-party providers of services --

4    that are providing services to subsidiaries and

5    affiliates.  That's where the funds are going.

6         Q.     All right.  But the critical expenses

7    and the essential business functions relate to the

8    non-debtors, correct?

9              MS. WEISGERBER:  Objection to form.

10        A.     No.  The funding is -- no.  The funding

11   is going to the individuals at CCA and to third

12   parties who are providing shared services.  And they

13   are benefitting -- they are -- the funding is not

14   going to any subsidiary or affiliate.

15             Now, the shared services, as I explained

16   earlier, are benefitting subsidiaries and affiliates,

17   which inures certainly at the subsidiary side, to the

18   benefit of CCA.  As it relates to any question

19   vis-a-vis the affiliates and the value inuring to the

20   benefit of CCA vis-a-vis the affiliates, that is

21   answered by the explanation I provided earlier in

22   regard to how the DIP doc works and the credit, if

23   you will, for allocations to affiliates.

24        Q.     Can you identify, then, for me, what are

25   the, quote, critical expenses at the CCA level?

**Exhibit F**

FILED: APPELLATE DIVISION - 1ST DEPT 12/19/2024 09:32 AM    2024-06624

NYSCEF DOC. NO. 8    RECEIVED NYSCEF: 12/19/2024

# Supreme Court of the State of New York

# Appellate Division, First Judicial Department

PRESENT Hon. Troy K. Webber,                              Justice Presiding,
              Lizbeth González
              Julio Rodriguez III
              Marsha D. Michael,                              Justices.

---

| | |
|---|---|
| BML Properties Ltd., | Motion No.  2024-05394 |
|     Plaintiff-Respondent, | Index No.  657550/17 |
| | Case Nos.  2024-06623 |
|     -against- | 2024-06624 |

China Construction America, Inc., now
known as CCA Construction Inc., CSCEC
Bahamas, Ltd., CCA Bahamas Ltd., and Does
1-10,
          Defendants-Appellants.

[And Another Action]

---

An appeal having been taken from an order of the Supreme Court, New York County, entered on or about October 21, 2024 (Case No. 2024-06623) and from a judgment of the same Court entered on or about October 31, 2024 (Case No. 2024-06624),

And defendants-appellants having moved for a stay of all proceedings including enforcement of the aforesaid order and judgment pending hearing and determination of the appeal taken therefrom,

Now, upon reading and filing the papers with respect to the motion, and due deliberation having been had thereon,

It is ordered that the motion is denied.  The interim relief granted by a Justice of this Court on November 4, 2024, is hereby vacated.

ENTERED: December 19, 2024

*Susanna M Rojas*
Susanna Molina Rojas
Clerk of the Court

**Exhibit G**

**Koboci, Shefit**

| | |
|---|---|
| **From:** | Worenklein, Elie J. |
| **Sent:** | Monday, January 6, 2025 5:19 PM |
| **To:** | 'Theisen, Brett S.'; Labovitz, Natasha |
| **Cc:** | Malone, Robert K.; Goodman, Mark P.; Costin, Alexander; Felice Yudkin; McEvilly, Kyle P. |
| **Subject:** | RE: CCA - BMLP Stay Motion |
| **Attachments:** | Redline - CCA - Stipulation on Financial Reporting to BMLP-v1 and CCA - Stipulation on Financial Reporting to BMLP-v2.pdf; CCA - Stipulation on Financial Reporting to BMLP-v2.docx |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hi Brett,

Related to the below, attached please find our comments to the stipulation you previously shared.  Regarding paragraph 1(a), the language was revised just to make it clear that the reporting will be the same as provided to the DIP lender and was not intended to modify/limit what BMLP will receive.  We believe that the other comments should be self-explanatory, but please let us know if you have any questions.

Thank you

## Debevoise **&**Plimpton

**Elie Jonathan Worenklein**

eworenklein@debevoise.com
+1 212 909 6239 (Tel)

66 Hudson Boulevard
New York, NY 10001
www.debevoise.com

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

**From:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Sent:** Monday, January 6, 2025 3:40 PM
**To:** Labovitz, Natasha <nlabovitz@debevoise.com>
**Cc:** Worenklein, Elie J. <eworenklein@debevoise.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Costin, Alexander <ajcostin@debevoise.com>; Felice Yudkin <FYudkin@coleschotz.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Subject:** RE: CCA - BMLP Stay Motion

**\*EXTERNAL\***

Yes, Perry and Evan can connect directly. We did not envision lawyers participating – business to business only.  Perry wanted to do it in person over in Morristown.

**BRETT S. THEISEN** | Director
Vice Chair, Financial Restructuring & Creditors' Rights Group
**t:** 212-613-2065 | **c:** 917-524-5987 | **f:** 212-554-9697
btheisen@gibbonslaw.com | bio

**Gibbons P.C.** | One Pennsylvania Plaza | 45th Floor, Suite 4515 | New York, NY 10119
**m:** 212-613-2000 | **f:** 212-290-2018 | office | map



gibbonslaw.com | gibbonslawalert.com 

---

**From:** Labovitz, Natasha <nlabovitz@debevoise.com>
**Sent:** Monday, January 6, 2025 2:55 PM
**To:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Cc:** Worenklein, Elie J. <eworenklein@debevoise.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Costin, Alexander <ajcostin@debevoise.com>; Felice Yudkin <FYudkin@coleschotz.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Costin, Alexander <ajcostin@debevoise.com>; Felice Yudkin <FYudkin@coleschotz.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Subject:** Re: CCA - BMLP Stay Motion

Thanks, Brett.  We have let BDO know about this request and they are trying to work out timing.  It may end up being most efficient for Evan Blum and Perry to connect directly.  A couple of questions Evan asked:  did you anticipate lawyers would attend this session?  And did Perry want this to be in person or by zoom?

— Natasha

On Jan 6, 2025, at 1:41 PM, Theisen, Brett S. <BTheisen@gibbonslaw.com> wrote:

**\*EXTERNAL\***

Sorry, one correction – Perry has a hard stop at 10am on Thursday (to catch a flight).  Wednesday is the better day.  Thanks.

**BRETT S. THEISEN** | Director
Vice Chair, Financial Restructuring & Creditors' Rights Group
**t:** 212-613-2065 | **c:** 917-524-5987 | **f:** 212-554-9697
btheisen@gibbonslaw.com | bio

**Gibbons P.C.** | One Pennsylvania Plaza | 45th Floor, Suite 4515 | New York, NY 10119
**m:** 212-613-2000 | **f:** 212-290-2018 | office | map



gibbonslaw.com | gibbonslawalert.com 

---

**From:** Theisen, Brett S.
**Sent:** Monday, January 6, 2025 12:26 PM
**To:** Worenklein, Elie J. <eworenklein@debevoise.com>
**Cc:** Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Labovitz,

Natasha <nlabovitz@debevoise.com>; Costin, Alexander <ajcostin@debevoise.com>; 'Yudkin, Felice'
<FYudkin@coleschotz.com>; McEvilly, Kyle P. <kmcevilly@gibbonslaw.com>
**Subject:** RE: CCA - BMLP Stay Motion

Elie and Debevoise Team:

Good afternoon.  BMLP has retained Perry Mandarino at B. Riley as its financial advisor in connection with the Chapter
11 case.

In order to get a better understanding of the Debtor and its operations, Perry has asked for a sit down with CCA's
business folks and the BDO team.  Please let us know if you are amenable to that.

Timing-wise, and given the January 30 hearing date, we'd like to get that set up as soon as possible.  Perry is available
this week on Wednesday 1/8 any time after 10:30am, or on Thursday 1/9 up until 12:30pm.

Thanks,
Brett

**BRETT S. THEISEN** | Director
Vice Chair, Financial Restructuring & Creditors' Rights Group
**t:** 212-613-2065 | **c:** 917-524-5987 | **f:** 212-554-9697
btheisen@gibbonslaw.com | bio

**Gibbons P.C.** | One Pennsylvania Plaza | 45th Floor, Suite 4515 | New York, NY 10119
**m:** 212-613-2000 | **f:** 212-290-2018 | office | map



gibbonslaw.com | gibbonslawalert.com  

---

**From:** Worenklein, Elie J. <eworenklein@debevoise.com>
**Sent:** Thursday, January 2, 2025 11:45 AM
**To:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Cc:** Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Labovitz,
Natasha <nlabovitz@debevoise.com>; Costin, Alexander <ajcostin@debevoise.com>; 'Yudkin, Felice'
<FYudkin@coleschotz.com>
**Subject:** RE: CCA - BMLP Stay Motion

> **External Email:** Use caution with links and attachments.

---

Hi Brett,

Sorry for the delayed response. In light of the holidays and vacations, we are still reviewing the stipulation with our
client but we hope to send you any comments shortly for your review.

Thanks so much

**Debevoise
&Plimpton**

**Elie Jonathan Worenklein**

3

eworenklein@debevoise.com
+1 212 909 6239 (Tel)

66 Hudson Boulevard
New York, NY 10001
www.debevoise.com

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

**From:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Sent:** Monday, December 30, 2024 5:03 PM
**To:** Worenklein, Elie J. <eworenklein@debevoise.com>
**Cc:** Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Costin, Alexander <ajcostin@debevoise.com>; 'Yudkin, Felice' <FYudkin@coleschotz.com>
**Subject:** RE: CCA - BMLP Stay Motion

## *EXTERNAL*

Elie,

Following up on the financial reporting stip.  If you have edits, please let us know.  Likewise, if you need an NDA from us, please send one over.  We would like to get the financial reporting agreed to sooner than later.

Thanks,
Brett

**BRETT S. THEISEN** | Director
Vice Chair, Financial Restructuring & Creditors' Rights Group
**t:** 212-613-2065 | **c:** 917-524-5987 | **f:** 212-554-9697
btheisen@gibbonslaw.com | bio

**Gibbons P.C.** | One Pennsylvania Plaza | 45th Floor, Suite 4515 | New York, NY 10119
**m:** 212-613-2000 | **f:** 212-290-2018 | office | map



gibbonslaw.com | gibbonslawalert.com 

**From:** Worenklein, Elie J. <eworenklein@debevoise.com>
**Sent:** Thursday, December 26, 2024 7:39 PM
**To:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Cc:** Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Costin, Alexander <ajcostin@debevoise.com>; 'Yudkin, Felice' <FYudkin@coleschotz.com>
**Subject:** RE: CCA - BMLP Stay Motion

**External Email:** Use caution with links and attachments.

Hi Brett,

We are OK with your proposed revisions to the draft order and will agree to negotiate in good faith regarding a stipulation with respect to the reporting requirements during the chapter 11 case. We will aim to get back to you shortly regarding the stipulation after speaking to BDO and CCA.

We will file a further revised proposed order and also inform that the court that we believe that the hearing can be canceled (and we expect that the court will agree to cancel the hearing).   Thanks so much for your cooperation.

**Debevoise**
**&Plimpton**

**Elie Jonathan Worenklein**

eworenklein@debevoise.com
+1 212 909 6239 (Tel)

66 Hudson Boulevard
New York, NY 10001
www.debevoise.com

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

**From:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Sent:** Thursday, December 26, 2024 5:38 PM
**To:** Worenklein, Elie J. <eworenklein@debevoise.com>
**Cc:** Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Costin, Alexander <ajcostin@debevoise.com>; 'Yudkin, Felice' <FYudkin@coleschotz.com>
**Subject:** RE: CCA - BMLP Stay Motion

**\*EXTERNAL\***

Elie,

Thanks.  Please let me know if you have any issues with our proposed edits to the Order.

Second, as you and I just discussed with respect to the Stipulation, I understand it may be difficult for you to get approval on the terms tonight (in order to avoid a hearing tomorrow on the Lift Stay Motion), and as such, and based on your representations to me (and the previous representations made to us on Tuesday by you and your colleagues) that (a) the Debtor does not, in principle, object to providing certain financial reporting to BMLP, and (b) that you will work with us in good faith to get a written agreement on the same executed in short order (whether in the form of a stipulation or something else mutually agreeable to the parties), BMLP will agree to the revised proposed Stay Relief Order being submitted to the Court tonight, without formal execution of the Stipulation as a pre-condition.

-Brett

**BRETT S. THEISEN** | Director
Vice Chair, Financial Restructuring & Creditors' Rights Group
**t:** 212-613-2065 | **c:** 917-524-5987 | **f:** 212-554-9697
btheisen@gibbonslaw.com | bio

**Gibbons P.C.** | One Pennsylvania Plaza | 45th Floor, Suite 4515 | New York, NY 10119
**m:** 212-613-2000 | **f:** 212-290-2018 | office | map

gibbonslaw.com | gibbonslawalert.com

**From:** Worenklein, Elie J. <eworenklein@debevoise.com>
**Sent:** Thursday, December 26, 2024 5:22 PM
**To:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Cc:** Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Costin, Alexander <ajcostin@debevoise.com>; 'Yudkin, Felice' <FYudkin@coleschotz.com>
**Subject:** RE: CCA - BMLP Stay Motion

> **External Email:** Use caution with links and attachments.

Hi Brett,

We sent the revised order for filing before receiving your email.  We are reviewing your markup and will revert.  Thank you

# Debevoise & Plimpton

**Elie Jonathan Worenklein**

eworenklein@debevoise.com
+1 212 909 6239 (Tel)

66 Hudson Boulevard
New York, NY 10001
www.debevoise.com

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

**From:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Sent:** Thursday, December 26, 2024 4:38 PM
**To:** Worenklein, Elie J. <eworenklein@debevoise.com>
**Cc:** Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Costin, Alexander <ajcostin@debevoise.com>; 'Yudkin, Felice' <FYudkin@coleschotz.com>
**Subject:** RE: CCA - BMLP Stay Motion

**\*EXTERNAL\***

Elie,

Cole Schotz just filed the prior version of the Order (without our edits)….please confirm you will replace it with the agreed form of order that I just circulated.

Thank you,

Brett

**BRETT S. THEISEN** | Director
Vice Chair, Financial Restructuring & Creditors' Rights Group
**t:** 212-613-2065 | **c:** 917-524-5987 | **f:** 212-554-9697
btheisen@gibbonslaw.com | bio

**Gibbons P.C.** | One Pennsylvania Plaza | 45th Floor, Suite 4515 | New York, NY 10119
**m:** 212-613-2000 | **f:** 212-290-2018 | office | map



gibbonslaw.com | gibbonslawalert.com

---

**From:** Theisen, Brett S.
**Sent:** Thursday, December 26, 2024 4:26 PM
**To:** Worenklein, Elie J. <eworenklein@debevoise.com>
**Cc:** Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Costin, Alexander <ajcostin@debevoise.com>; 'Yudkin, Felice' <FYudkin@coleschotz.com>
**Subject:** RE: CCA - BMLP Stay Motion

Elie,

On the Order, we have a couple redlines, which hopefully are not controversial – see attached.

With that, we are agreed on the proposed Order, subject to one condition: as previously discussed, we request that the Debtor agree to certain financial reporting to BMLP, which we have memorialized in a simple stipulation (attached hereto).  Please let us know your thoughts, comments, edits on the stip.  We are comfortable with the Stipulation not being filed on the docket at this time, to the extent that was a concern on your end.

Thanks,
Brett

**BRETT S. THEISEN** | Director
Vice Chair, Financial Restructuring & Creditors' Rights Group
**t:** 212-613-2065 | **c:** 917-524-5987 | **f:** 212-554-9697
btheisen@gibbonslaw.com | bio

**Gibbons P.C.** | One Pennsylvania Plaza | 45th Floor, Suite 4515 | New York, NY 10119
**m:** 212-613-2000 | **f:** 212-290-2018 | office | map



gibbonslaw.com | gibbonslawalert.com 

---

**From:** Worenklein, Elie J. <eworenklein@debevoise.com>
**Sent:** Thursday, December 26, 2024 2:25 PM
**To:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Cc:** Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Costin, Alexander <ajcostin@debevoise.com>; 'Yudkin, Felice'

<FYudkin@coleschotz.com>
**Subject:** RE: CCA - BMLP Stay Motion

> **External Email:** Use caution with links and attachments.

---

Hi Brett,

We would love to hear your response to our proposed language that we shared on Tuesday to address your client's concerns. We thought we would circulate the compiled revised order with redline in the meantime.  In light of the Court's comments during Monday's first day hearing, we would like to update the court as soon as possible so the court could know if we have a resolution or if there is a need for a hearing tomorrow morning.  We are around to discuss if helpful.

Thanks so much

# Debevoise
# &Plimpton

**Elie Jonathan Worenklein**

eworenklein@debevoise.com
+1 212 909 6239 (Tel)

66 Hudson Boulevard
New York, NY 10001
www.debevoise.com

---

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

---

**From:** Worenklein, Elie J.
**Sent:** Thursday, December 26, 2024 1:02 PM
**To:** 'Theisen, Brett S.' <BTheisen@gibbonslaw.com>
**Cc:** Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Costin, Alexander <ajcostin@debevoise.com>
**Subject:** RE: CCA - BMLP Stay Motion

Thanks so much, Brett. We look forward to your response to our proposed language.

Best,
Elie

# Debevoise
# &Plimpton

**Elie Jonathan Worenklein**

eworenklein@debevoise.com
+1 212 909 6239 (Tel)

66 Hudson Boulevard
New York, NY 10001
www.debevoise.com

---

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-

mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

---

**From:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Sent:** Thursday, December 26, 2024 10:48 AM
**To:** Worenklein, Elie J. <eworenklein@debevoise.com>
**Cc:** Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Costin, Alexander <ajcostin@debevoise.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Costin, Alexander <ajcostin@debevoise.com>
**Subject:** Re: CCA - BMLP Stay Motion

We are addressing your proposed changes with our client and will get back to you shortly. May not need a call.


Brett S. Theisen
Director
Gibbons P.C.
T 212-613-2065
M 917-524-5987


On Dec 26, 2024, at 10:36 AM, Worenklein, Elie J. <eworenklein@debevoise.com> wrote:


> **External Email:** Use caution with links and attachments.

---

Hi Brett, Bob,

We wanted to follow-up on the below and see if we could have a call this morning to discuss our proposed language to address your client's concerns and whether we could submit a consensual order to the court. Can you please let us know your availability this morning for a call?

Thanks so much

**Debevoise
&Plimpton**

**Elie Jonathan Worenklein**
eworenklein@debevoise.com
+1 212 909 6239 (Tel)

66 Hudson Boulevard
New York, NY 10001
www.debevoise.com

---

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

**From:** Worenklein, Elie J.
**Sent:** Tuesday, December 24, 2024 8:45 PM
**To:** 'Theisen, Brett S.' <BTheisen@gibbonslaw.com>
**Cc:** 'Malone, Robert K.' <RMalone@gibbonslaw.com>; Goodman, Mark P.
<mpgoodman@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Costin, Alexander
<ajcostin@debevoise.com>
**Subject:** RE: CCA - BMLP Stay Motion

Brett, Bob,

Following up from this afternoon's call, below are the two provisions that we propose to add to the order that we mentioned during our call to address the concerns you raised.  Please let us know if these provisions address your client's concerns or if you have any questions. Thanks so much

    1.    Consistent with prepetition practices, the fees incurred in connection with the Appeal are to be paid by the non-Debtor Defendants, and not CCA.
    2.    For the avoidance of doubt, the automatic stay under 11 U.S.C. § 362 does not apply to the non-Debtor Defendants and this Order is not required for the Appeal to move forward with respect to the non-Debtor Defendants.

## Debevoise
## &Plimpton

**Elie Jonathan Worenklein**

eworenklein@debevoise.com
+1 212 909 6239 (Tel)

66 Hudson Boulevard
New York, NY 10001
www.debevoise.com

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

**From:** Worenklein, Elie J.
**Sent:** Monday, December 23, 2024 11:40 PM
**To:** 'Theisen, Brett S.' <BTheisen@gibbonslaw.com>
**Cc:** Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P.
<mpgoodman@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Zipursky, Rebecca
<rlzipursky@debevoise.com>
**Subject:** RE: CCA - BMLP Stay Motion

Thanks, Brett. 1pm works for us. I will send an invite now. Thanks so much

## Debevoise
## &Plimpton

**Elie Jonathan Worenklein**

eworenklein@debevoise.com
+1 212 909 6239 (Tel)

66 Hudson Boulevard
New York, NY 10001

[www.debevoise.com](www.debevoise.com)

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at [www.debevoise.com](www.debevoise.com).

**From:** Theisen, Brett S. <[BTheisen@gibbonslaw.com](BTheisen@gibbonslaw.com)>
**Sent:** Monday, December 23, 2024 7:46 PM
**To:** Worenklein, Elie J. <[eworenklein@debevoise.com](eworenklein@debevoise.com)>
**Cc:** Malone, Robert K. <[RMalone@gibbonslaw.com](RMalone@gibbonslaw.com)>; Goodman, Mark P. <[mpgoodman@debevoise.com](mpgoodman@debevoise.com)>; Labovitz, Natasha <[nlabovitz@debevoise.com](nlabovitz@debevoise.com)>; Malone, Robert K. <[RMalone@gibbonslaw.com](RMalone@gibbonslaw.com)>; Goodman, Mark P. <[mpgoodman@debevoise.com](mpgoodman@debevoise.com)>; Labovitz, Natasha <[nlabovitz@debevoise.com](nlabovitz@debevoise.com)>
**Subject:** Re: CCA - BMLP Stay Motion

Elie,

Nice meeting you as well.

I am tied up tomorrow morning until around 12:30, if something near that works?  I have a hard stop around 3pm.

Thanks,
Brett


Brett S. Theisen
Director
Gibbons P.C.
T 212-613-2065
M 917-524-5987


On Dec 23, 2024, at 5:04 PM, Worenklein, Elie J. <[eworenklein@debevoise.com](eworenklein@debevoise.com)> wrote:

> **External Email:** Use caution with links and attachments.

Hi Brett,

It was nice meeting you virtually during the first day hearing.  Following up where the hearing ended, we thought it would be helpful to set up a call to discuss the items you flagged and see if we could resolve the stay motion consensually without requiring the court and all parties to have another hearing this week.

Are you available tomorrow for a call either at 9 or 10 am? If those times do not
work, please let us know what works best for you so we could try to reach a
resolution and let the court know sooner rather than later. Thanks so much

# Debevoise
# &Plimpton

**Elie Jonathan Worenklein**

eworenklein@debevoise.com
+1 212 909 6239 (Tel)

66 Hudson Boulevard
New York, NY 10001
www.debevoise.com

_____

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may
contain information that is privileged, confidential and exempt from disclosure. If you are not the intended
recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead,
please notify us immediately by return e-mail (including the original message in your reply) and by telephone
(you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail.
Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect
personal data, is at www.debevoise.com.

**Disclaimer**

The contents of this message, together with any attachments, may contain information that is legally
privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby
notified that any dissemination, distribution, printing, or copying of this message, or any attachment, is
strictly prohibited. If you have received this message in error, please do not read this message or any
attachments and please notify me immediately by reply e-mail or call Gibbons P.C. at 973-596-4500 and
delete this message, along with any attachments, from your computer.

**<u>Exhibit H</u>**

**Koboci, Shefit**

---

| | |
|---|---|
| **From:** | Perry Mandarino <pmandarino@brileyfin.com> |
| **Sent:** | Tuesday, January 7, 2025 10:47 AM |
| **To:** | Evan Blum |
| **Cc:** | Igor Belov; Yasmi Tang; William Gladstone; Theisen, Brett S.; Robert K. Malone; Labovitz, Natasha |
| **Subject:** | CCA Next Steps |
| **Attachments:** | CCA - Initial Diligence Request List (2025.01.07)[45].xlsx |

**\*EXTERNAL\***

---

Evan:

Thanks for the call this morning.  As discussed, attached please find our initial information request list. Given our schedules, having a kick-off Zoom call on Thursday (business people only, not counsel), followed by an in-person meeting at the Debtors office on Monday, would be great. It would also give you more time to put together our data requests.

For the Zoom call, would 9am on Thursday, January 9, 2025 work? At the end of the call, we can then pick a time for Monday. Here is our proposed agenda:

- Discuss Debtor Operations
- Discuss Non-Debtor Affiliates and Other Affiliates Operations
- DIP Marketing Process
- DIP Budget and Reporting
- Information Requests Status

My team is copied, so assuming 9am works, can you please send a calendar invite?

We look forward to working with you.

Best Regards,

Perry



**www.brileyfin.com**
**NASDAQ: RILY**

**Perry Mandarino**
Senior Managing Director

**Email: pmandarino@brileyfin.com**
**Direct:** (646) 367-2402
**Mobile:** (201) 522-5497

299 Park Avenue, 21st Floor
New York, New York 10171

1

©2021 Fortune Media IP Limited. All rights reserved. Used under license.

PLEASE VISIT <https://brileyfin.com/disclosures/> FOR LEGAL DISCLOSURES.

**China Construction America**                                                                                                    2/7/2025

*Initial Due Diligence Request List*

| Item # | Description | Items Received | Status | Comments/Questions |
|---|---|---|---|---|
| 1 | A current organizational chart showing ownership of all defendant entities up to CSCEC and all entities owned directly or indirectly by defendants; please include ownership percentages | | Outstanding | |
| 2 | Audited financial statements (FY 2017 - present) of all defendant entities and their subsidiaries as well as FY 2025 budgets and three-year projections | | Outstanding | |
| 3 | Produce unaudited statements if audited financials are not available for any given year:<br><br>For the most recent completed fiscal period (if audited financials are not yet available) – annual and quarterly unaudited/internal financial statements for the Debtor and its subsidiaries and affiliates<br><br>For the current fiscal period – YTD internal financial statements for the Debtor and its subsidiaries and affiliates | | Outstanding | |
| 4 | Current project pipeline for each of the debtor's operating subsidiaries (Include current projects, projects awarded, outstanding bids, prospective bids on expected future projects) | | Outstanding | |
| 5 | All board minutes, board consents/resolutions, and shareholder resolutions of the Debtors and its subsidiaries and affiliates from FY 2017 to present | | Outstanding | |
| 6 | A register of related party transactions by the Debtors and all its subsidiaries and affiliates from FY 2017 to present | | Outstanding | |
| 7 | A register of sales of assets with a value greater than $2M USD by the Debtors and all its subsidiaries and affiliates from FY 2017 to present | | Outstanding | |
| 8 | 12-month DIP budget referenced in the Blum Declaration, with assumptions and detailed breakdown for the disbursement line items similar to the 13-Week Cash Flow | | Outstanding | |
| 9 | Detailed breakdown of all the disbursement line items in the 13-week cash flow projections, including CCA payroll (by employee and include employee function description), health insurance, visa fees and other expenses (breakdown by employee), IT, employee reimbursement, other office expenses, Beijing subsidiary funding, and professional expenses | | Outstanding | |
| 10 | Breakdown of allocation amounts by expense line item to subsidiary and affiliated companies provided under the shared services program | | Outstanding | |
| 11 | All valuations or appraisals concerning CCA's investments in its subsidiaries | | Outstanding | |
| 12 | Current active employee census for the Debtors and all its subsidiaries and affiliates, including information regarding employee title, department, employee function description, salary, annual bonus, start date, employee type, full-time/part-time, visa status, visa-related annual legal fees | | Outstanding | |
| 13 | A breakdown of the percentage of time spent by CCA employees on activities for CCA as opposed to its subsidiaries and affiliates over the past 3 years | | Outstanding | |
| 14 | Brief description of current employee benefits programs in place, with annual costs by program | | Outstanding | |
| 15 | Provide descriptions of current IT systems, including vendor, functions, and annual costs | | Outstanding | |
| 16 | Breakdown of insurance programs in place, including annual costs | | Outstanding | |
| 17 | Main components (categories) of employee reimbursements | | Outstanding | |
| 18 | Materials used in connection with attempts to secure a bond to stay enforcement of the New York judgment | | Outstanding | |
| 19 | Materials used in connection with the DIP marketing process, including Teaser, CIM, Management Presentation, and Dataroom Index | | Outstanding | |
| 20 | Listing of all insurance policies (including D&O Policies) under which the Debtor or its officers, directors, and/or employees are covered beneficiar(ies) | | Outstanding | |
| 21 | Listing of potential third-party lenders approached in connection with the DIP financing process | | Outstanding | |
| 22 | Listing of contingent liabilities of the Debtor and its subsidiaries and affiliates, including:<br><br>1. Surety bonds, including issuer and terms<br>2. All litigation<br>3. Other | | Outstanding | |

## Exhibit I

**Koboci, Shefit**

| | |
|---|---|
| **From:** | McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com> |
| **Sent:** | Friday, January 10, 2025 10:13 AM |
| **To:** | JCohen@lowenstein.com; ABehlmann@lowenstein.com |
| **Cc:** | Theisen, Brett S.; Malone, Robert K.; Labovitz, Natasha; Goodman, Mark P.; Worenklein, Elie J.; FYudkin@coleschotz.com |
| **Subject:** | CCA Construction, Inc. (Case No. 22548) - BML Properties, Ltd.'s Discovery Requests - CSCEC Holding Company, Inc. |
| **Attachments:** | BML Proeprties, Ltd.'s First Request for Production - CSCEC Holding.pdf |

**\*EXTERNAL\***

Jeffrey, Andrew,

Pursuant to Federal Rules of Civil Procedure 26 and 34, made applicable to the above-referenced bankruptcy case by Federal Rules of Bankruptcy Procedure 7026, 7034, and 9014, BML Properties, Ltd., in connection with the Debtor's Motion for Entry of Interim and Final Order (i) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief [ECF No. 4], hereby serves BML Properties, Ltd.'s First Requests for Production of Documents from CSCEC Holding Company, Inc. Pursuant to Federal Rules of Civil Procedure 26 and 34.

In the interest of time, we would like to schedule a "meet and confer" to discuss BML Properties, Ltd.'s requested discovery at 10:00 a.m. (ET) on Monday, January 13, 2025.  Please let us know if you are available.

Thank you,
Kyle

**KYLE P. MCEVILLY** | Associate
Financial Restructuring & Creditors' Rights Group
**t:** 973-596-4677 | **c:** 862-390-3619 | **f:** 973-639-8304
kmcevilly@gibbonslaw.com | bio

**Gibbons P.C.** | One Gateway Center | Newark, NJ 07102-5310
**m:** 973-596-4500 | **f:** 973-596-0545 | office | map



gibbonslaw.com | gibbonslawalert.com  

**Disclaimer**
The contents of this message, together with any attachments, may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, printing, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please do not read this message or any attachments and please notify me immediately by reply e-mail or call Gibbons P.C. at 973-596-4500 and delete this message, along with any attachments, from your computer.

**<u>Exhibit J</u>**

**Mishkin, Benjamin**

| | |
|---|---|
| **From:** | McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com> |
| **Sent:** | Friday, January 10, 2025 10:13 AM |
| **To:** | JCohen@lowenstein.com; ABehlmann@lowenstein.com |
| **Cc:** | Theisen, Brett S.; Malone, Robert K.; Labovitz, Natasha; Goodman, Mark P.; Worenklein, Elie J.; FYudkin@coleschotz.com |
| **Subject:** | CCA Construction, Inc. (Case No. 22548) - BML Properties, Ltd.'s Discovery Requests - CSCEC Holding Company, Inc. |
| **Attachments:** | BML Proeprties, Ltd.'s First Request for Production - CSCEC Holding.pdf |

**\*EXTERNAL\***

Jeffrey, Andrew,

Pursuant to Federal Rules of Civil Procedure 26 and 34, made applicable to the above-referenced bankruptcy case by Federal Rules of Bankruptcy Procedure 7026, 7034, and 9014, BML Properties, Ltd., in connection with the Debtor's Motion for Entry of Interim and Final Order (i) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief [ECF No. 4], hereby serves BML Properties, Ltd.'s First Requests for Production of Documents from CSCEC Holding Company, Inc. Pursuant to Federal Rules of Civil Procedure 26 and 34.

In the interest of time, we would like to schedule a "meet and confer" to discuss BML Properties, Ltd.'s requested discovery at 10:00 a.m. (ET) on Monday, January 13, 2025.  Please let us know if you are available.

Thank you,
Kyle

**KYLE P. MCEVILLY** | Associate
Financial Restructuring & Creditors' Rights Group
**t:** 973-596-4677 | **c:** 862-390-3619 | **f:** 973-639-8304
kmcevilly@gibbonslaw.com | bio

**Gibbons P.C.** | One Gateway Center | Newark, NJ 07102-5310
**m:** 973-596-4500 | **f:** 973-596-0545 | office | map



gibbonslaw.com | gibbonslawalert.com

**Disclaimer**
The contents of this message, together with any attachments, may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, printing, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please do not read this message or any attachments and please notify me immediately by reply e-mail or call Gibbons P.C. at 973-596-4500 and delete this message, along with any attachments, from your computer.

**Exhibit K**

**Koboci, Shefit**

| | |
|---|---|
| **From:** | Theisen, Brett S. <BTheisen@gibbonslaw.com> |
| **Sent:** | Tuesday, January 14, 2025 6:50 PM |
| **To:** | Weisgerber, Erica; Labovitz, Natasha; McEvilly, Kyle P. |
| **Cc:** | Goodman, Mark P.; Levinson, Sidney P.; Worenklein, Elie J.; FYudkin@coleschotz.com; Malone, Robert K.; Malone, Robert K.; CCA Restructuring; Davis, Morgan; Michael Sirota; Behlmann, Andrew D.; McEvilly, Kyle P.; Cohen, Jeffrey L.; Nicole Fulfree - Lowenstein Sandler, PC (nfulfree@lowenstein.com); wusatine@coleschotz.com |
| **Subject:** | RE: CCA Construction, Inc. (Case No. 22548) - BML Properties, Ltd.'s Discovery Requests |
| **Attachments:** | 2025 01 14 (Redline) Protective Order.pdf |

**\*EXTERNAL\***

Erica,

We have reviewed your proposed protective order and have included our proposed changes in the attached redline.  While a use restriction may be appropriate in more conventional bankruptcy cases, it is inappropriate here.  Your clients have not paid the judgment, and BMLP is thus required to pursue its enforcement against CCA's non-debtor co-defendants CCAB and CSCECB in proceedings outside of the bankruptcy case. As you know, those enforcement proceedings against non-debtors CCAB and CSCEB are not stayed by virtue of CCA's bankruptcy filing.  *See In re Uni-Marts, LLC*, 399 B.R. 400, 415 (Bankr. D. Del. 2009) ("In general, only the debtor is afforded the protections of the automatic stay under section 362; conversely, third-parties do not receive the protection of the automatic stay … [a]s a consequence, it is universally acknowledged that [the] automatic stay … may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the debtor.") (citing *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 509–510 (3d Cir.1997)). While BMLP is willing to agree to the same use restriction we previously proposed, which limits the use of information to proceedings to enforce the judgment, there is no good cause to impose a more heightened restriction that would preclude BMLP from using discovery material in enforcement proceedings against CCAB and CSCEB that are not subject to the automatic stay.

While few litigants are so intent on obstructing discovery that a Court must resolve a preemptive attempt to block the use of discovery in plainly relevant related proceedings, at least one federal court in Pennsylvania (within the Third Circuit) recently rejected exactly such gamesmanship.  *See Clarity Sports Int'l LLC v. Redland Sports*, No. 1:19-CV-00305(YK), 2020 WL 13729657 (M.D. Pa. Nov. 30, 2020).  That  decision relied on an earlier District of New Jersey decision, which noted that, in  order to overcome the presumption that discovery can be used in other related proceedings, CCA must show "that substantial rights will be so tangibly prejudiced that injustice will result unless the discovery obtained in this litigation is limited to it." *Cipollone v. Liggett Grp., Inc.*, 113 F.R.D. 86, 91 (D.N.J. 1986).  The mere fact that BMLP "intend[s] to use these materials outside of this litigation is not 'good cause' to support the protective order, unless defendants can establish that the discovery was not procured in good faith for the purposes of this litigation." *Id*. at 93.

Finally, we note that there was no "highly confidential" category in the New York protective order, so we do not think one is needed here.

We look forward to discussing this further and to CCA's responses and objections.  BMLP reserves all rights.

-Brett

**BRETT S. THEISEN** | Director
Vice Chair, Financial Restructuring & Creditors' Rights Group
**t:** 212-613-2065 | **c:** 917-524-5987 | **f:** 212-554-9697

btheisen@gibbonslaw.com | bio

**Gibbons P.C.** | One Pennsylvania Plaza | 45th Floor, Suite 4515 | New York, NY 10119
**m:** 212-613-2000 | **f:** 212-290-2018 | office | map



gibbonslaw.com | gibbonslawalert.com

---

**From:** Weisgerber, Erica <eweisgerber@debevoise.com>
**Sent:** Tuesday, January 14, 2025 1:35 PM
**To:** Theisen, Brett S. <BTheisen@gibbonslaw.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Cc:** Goodman, Mark P. <mpgoodman@debevoise.com>; Levinson, Sidney P. <slevinson@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; FYudkin@coleschotz.com; Malone, Robert K. <RMalone@gibbonslaw.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; CCA Restructuring <CCARestructuring@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Michael Sirota <MSirota@coleschotz.com>; Behlmann, Andrew D. <ABehlmann@lowenstein.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>; Cohen, Jeffrey L. <JCohen@lowenstein.com>; Nicole Fulfree - Lowenstein Sandler, PC (nfulfree@lowenstein.com) <nfulfree@lowenstein.com>; wusatine@coleschotz.com
**Subject:** RE: CCA Construction, Inc. (Case No. 22548) - BML Properties, Ltd.'s Discovery Requests

> **External Email:** Use caution with links and attachments.

---

Brett –

In response to your questions about timing:  On behalf of CCA, we are planning to serve formal responses and objections by mid-day tomorrow.  We can begin document productions following that, provided that the parties have agreement on a protective order to govern such productions.  To that end, can you please let us know if you have any comments on the draft that we sent, or if we can proceed with that draft?

On behalf of CCA we continue to reserve all rights and waive none.

Thanks,

Erica

**Erica S. Weisgerber** (she/her) | Partner | Debevoise & Plimpton LLP | eweisgerber@debevoise.com | +1 212 909 6998 | 66 Hudson Boulevard, New York, NY 10001 | www.debevoise.com

---

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

**From:** Weisgerber, Erica <eweisgerber@debevoise.com>
**Sent:** Monday, January 13, 2025 12:31 PM
**To:** 'Theisen, Brett S.' <BTheisen@gibbonslaw.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Cc:** Goodman, Mark P. <mpgoodman@debevoise.com>; Levinson, Sidney P. <slevinson@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; FYudkin@coleschotz.com; Malone, Robert K. <RMalone@gibbonslaw.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; CCA Restructuring <CCARestructuring@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Michael Sirota <MSirota@coleschotz.com>; Behlmann, Andrew D. <ABehlmann@lowenstein.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>; Cohen, Jeffrey L. <JCohen@lowenstein.com>; Nicole Fulfree - Lowenstein Sandler, PC (nfulfree@lowenstein.com) <nfulfree@lowenstein.com>; wusatine@coleschotz.com
**Subject:** RE: CCA Construction, Inc. (Case No. 22548) - BML Properties, Ltd.'s Discovery Requests

Brett –

We do not believe it is appropriate or a respectful use of the Court's time to raise issues seriatim with the Court in a piecemeal fashion.  Accordingly, we do not believe the parties should approach the Court today on one discrete issue, particularly when you have sent us your proposed language an hour before the proposed hearing time with the Court.

Attached is our proposed protective order for the case, which would govern any discovery exchanged among the parties relating to the DIP and other matters.  The proposed use provision is the same provision that the Court approved in the *Thrasio* bankruptcy – and which is standard in most chapter 11 cases:

> All Materials disclosed pursuant to this Order, whether or not containing Confidential Information or Highly Confidential Information, shall be used solely in connection with the Chapter 11 Case (including any adversary proceeding or contested matter in the Chapter 11 Case) and not for any other legal, business, commercial, competitive, personal, or other purpose. Any summary, compilation, notes, memoranda, analysis, copy, electronic image, or database containing Confidential Information or Highly Confidential Information, and any electronic image or database containing Confidential Information or Highly Confidential Information shall be subject to the terms of this Order to the same extent as the Materials from which such summary, compilation, notes, copy, memoranda, analysis, electronic image, or database is derived. No Confidential or Highly Confidential Information shall be used for any other purpose, including business, governmental, commercial, administrative, or other judicial proceedings. Notwithstanding the foregoing, nothing in this Order shall prevent a receiving Party from using or disclosing its own Materials in any way or from using in any way any Materials to the extent such Materials (i) were already in the receiving Party's possession when the same Materials are received from a producing Party and are not subject to any other obligation of confidentiality to any other person; (ii) are received or become available to a receiving Party on a non-confidential basis that does not violate this Order or any other obligation of confidentiality to any other person; (iii) were independently developed by such receiving Party without reference to any Confidential or Highly Confidential Information; or (iv) are published or become publicly available in a manner that is not in violation of this Order or of any obligation of confidentiality to any other person.

We do not agree that it is appropriate to use the chapter 11 case as a means to get discovery for "any proceeding in furtherance of enforcing, executing, or otherwise satisfying the Baha Mar Judgment and/or BMLP's creditor rights."  Although you contend this case is "unique," there are many chapter 11 cases that are set against the backdrop of litigation—involving the debtor and/or other parties.  The protective order language that we are proposing is typical and is what we will agree to in this case.

Thanks,

Erica

**Erica S. Weisgerber** (she/her) | Partner | Debevoise & Plimpton LLP | eweisgerber@debevoise.com | +1 212 909 6998 | 66 Hudson Boulevard, New York, NY 10001 | www.debevoise.com

___

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

___

**From:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Sent:** Monday, January 13, 2025 11:49 AM
**To:** Weisgerber, Erica <eweisgerber@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Cc:** Goodman, Mark P. <mpgoodman@debevoise.com>; Levinson, Sidney P. <slevinson@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; FYudkin@coleschotz.com; Malone, Robert K. <RMalone@gibbonslaw.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; CCA Restructuring <CCARestructuring@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Michael Sirota <MSirota@coleschotz.com>; Behlmann, Andrew D. <ABehlmann@lowenstein.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>; Cohen, Jeffrey L. <JCohen@lowenstein.com>; Nicole Fulfree - Lowenstein Sandler, PC (nfulfree@lowenstein.com) <nfulfree@lowenstein.com>; wusatine@coleschotz.com
**Subject:** RE: CCA Construction, Inc. (Case No. 22548) - BML Properties, Ltd.'s Discovery Requests

___

**\*EXTERNAL\***

___

Counsel,

Below is the use restriction that BMLP is willing to agree to:

> *BMLP agrees that the discovery will be used solely in connection with the Chapter 11 Case and that such information will not be used, directly or indirectly, for any purpose other than in connection with the Chapter 11 Case, any associated adversary proceeding, or any proceeding in furtherance of enforcing, executing, or otherwise satisfying the Baha Mar Judgment and/or BMLP's creditor rights*

While we remain willing to discuss the details of the protective order, we think that we will need the Court's guidance sooner rather than later if CCA will require a more restrictive provision.  Likewise, we are willing to accept the documents you have ready to send to us subject to this limitation.

**Further to our discussion, and as a matter of priority for the Second Day Hearing, we propose narrowing the time period for the initial production to August 1, 2024 to the present for all of the requests except #3, #4, #7, and #8.  For #3 and #4, which pertain to financial statements, we request documents going back to 2014.  For #7 and #8, we are willing to defer these to Rule 2004 discovery.**

Please let us know the documents that you are willing to produce to us by the middle of this week, and when you plan to serve formal responses and objections.

We agree that it may be more productive to bring disputes as to scope to the Court on Wednesday, but (absent agreement) we feel strongly that we need the Court's guidance today on the use restriction so that we can get the documents as quickly as possible given that our objections are due in just two weeks.

Thanks,
Brett

**BRETT S. THEISEN** | Director
Vice Chair, Financial Restructuring & Creditors' Rights Group
**t:** 212-613-2065 | **c:** 917-524-5987 | **f:** 212-554-9697
btheisen@gibbonslaw.com | bio

**Gibbons P.C.** | One Pennsylvania Plaza | 45th Floor, Suite 4515 | New York, NY 10119
**m:** 212-613-2000 | **f:** 212-290-2018 | office | map



gibbonslaw.com | gibbonslawalert.com

---

**From:** Theisen, Brett S.
**Sent:** Sunday, January 12, 2025 9:21 PM
**To:** 'Weisgerber, Erica' <eweisgerber@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; McEvilly, Kyle P. <kmcevilly@gibbonslaw.com>
**Cc:** Goodman, Mark P. <mpgoodman@debevoise.com>; Levinson, Sidney P. <slevinson@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; FYudkin@coleschotz.com; Malone, Robert K. <RMalone@gibbonslaw.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; CCA Restructuring <CCARestructuring@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Michael Sirota <MSirota@coleschotz.com>; Behlmann, Andrew D. <ABehlmann@lowenstein.com>; McEvilly, Kyle P. <kmcevilly@gibbonslaw.com>; Cohen, Jeffrey L. <JCohen@lowenstein.com>
**Subject:** RE: CCA Construction, Inc. (Case No. 22548) - BML Properties, Ltd.'s Discovery Requests

Erica,

Nice to meet you as well. I will circulate an invite and we look forward to addressing your various complaints tomorrow morning.  Obviously, we disagree with your version of events and characterizations. Suffice it to say that CCA filed for bankruptcy three weeks ago, yet we still have not received any documents that our side has requested—even documents CCA agreed to provide as part of the automatic stay stipulation. That is prejudicial to BMLP, which will have to make any objection to final approval of CCA's first day pleadings (including a $40 million insider DIP loan) in approximately ten days. BMLP reserves all rights.

-Brett

**BRETT S. THEISEN** | Director
Vice Chair, Financial Restructuring & Creditors' Rights Group
**t:** 212-613-2065 | **c:** 917-524-5987 | **f:** 212-554-9697
btheisen@gibbonslaw.com | bio

**Gibbons P.C.** | One Pennsylvania Plaza | 45th Floor, Suite 4515 | New York, NY 10119
**m:** 212-613-2000 | **f:** 212-290-2018 | office | map

[×]

gibbonslaw.com | gibbonslawalert.com  [img] [img]

---

**From:** Weisgerber, Erica <eweisgerber@debevoise.com>
**Sent:** Sunday, January 12, 2025 3:23 PM
**To:** Theisen, Brett S. <BTheisen@gibbonslaw.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Cc:** Goodman, Mark P. <mpgoodman@debevoise.com>; Levinson, Sidney P. <slevinson@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; FYudkin@coleschotz.com; Malone, Robert K. <RMalone@gibbonslaw.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; CCA Restructuring <CCARestructuring@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Michael Sirota <MSirota@coleschotz.com>; Behlmann, Andrew D. <ABehlmann@lowenstein.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>; Cohen, Jeffrey L. <JCohen@lowenstein.com>
**Subject:** RE: CCA Construction, Inc. (Case No. 22548) - BML Properties, Ltd.'s Discovery Requests

> **External Email:** Use caution with links and attachments.

---

Brett,

Serving 37 discrete document requests and four deposition notices on Thursday evening, and then on Friday demanding a meet and confer on Monday morning is not well taken; nor is complaining on January 9 about not yet receiving documents when your financial advisor – as you acknowledge – only sent requests for documents on January 7, before the parties had finalized the stipulation and a protective order.  It is similarly disappointing that you would preemptively and prematurely schedule a court hearing on the assumption that the parties will have disputes – possibly because you recognize that BMLP's discovery requests are absurdly broad, seeking documents and testimony that go well beyond what is conceivably necessary in relation to the DIP motion.  It now is clear that the meetings between our advisors and any suggestion that BMLP wanted to proceed consensually were a charade and that BMLP's preference is for a contentious process that will waste estate assets on legal fees and diminish value.  While BMLP's approach is unfortunate, it also sends a clear message as to BMLP's approach and intent, and CCA will proceed accordingly.

I would be remiss if I did not respond to and correct your email's false, error-ridden narrative, which is further evidence of the unfortunate approach BMLP has chosen to  take. Your email purports to complain that BMLP "still [has] not received any documents from CCA." This ignores that the parties have been negotiating a stipulation to allow for the sharing of certain requested documents (which, to be clear, are only two of the requested categories while the remaining categories were not requested until at the earliest January 7th), and indeed, that you personally spoke directly with Debevoise on Tuesday, January 7 regarding that stipulation.  During that meeting, you not only indicated that you understood our client's concerns regarding the remaining issues to be resolved to finalize the stipulation, but you also acknowledged that the ball was in your court as to next steps.  You were explicit in stating that you would get back to us after B. Riley and BDO met on Thursday morning, but you failed to do so and instead served extensive discovery requests—requests seeking discovery that goes well beyond what was first requested on January 7 and discussed with BDO on Thursday morning.  In light of BMLP's conduct, CCA will in the future have no choice but to provide information pursuant to formal discovery requests and attendant formal responses and objections, followed by a meet and confer process. The one exception to this is the documents covered by the stipulation, which we collected once they were created by BDO on January 3 and were prepared to produce subject to hearing from you on the two open items.  If BMLP wishes to finalize the stipulation to receive those requested documents, we are prepared to do so.

6

To further clarify the record, on January 9, BDO met with B. Riley in an additional show of good faith and a genuine effort to get B. Riley up to speed quickly and to provide BMLP with information relating primarily, but not exclusively, to CCA and the DIP motion.  As an additional sign of good faith, two CCA employees joined that meeting to make it as informative and efficient as possible.  Under the heading of no good deed going unpunished, BMLP followed up on that meeting later the same day by serving deposition notices on the two employees who had voluntarily agreed to assist, instead of recognizing CCA's good-faith efforts to be transparent and forthcoming.  Only hours after what our side thought was a productive meeting, including agreeing to provide BMLP documents and discussing an in-person meeting with BDO at CCA's offices for this week – and without any indication from BMLP that it thought otherwise – you dropped BMLP's discovery requests on us, which, as indicated above, not only sought information that CCA had agreed to provide, but sought information that is plainly well beyond the outer boundaries of what is reasonable.  The sequence of events obviously calls in question BMLP's intent and motive in having the January 9 meeting, and suggests that any substantive communications between the financial advisors in the future should be made through formal discovery.  Going back to your email, we were completely puzzled by your claim that the meeting with our financial advisor "seemed to contradict a number of representations that were made in the First Day Hearing and supporting declarations," as we are not aware of any such inconsistency (nor did B. Riley raise any during the meeting).  Moreover, during that meeting, B. Riley stated explicitly its recognition that documents were not yet being exchanged because the stipulation was not finalized and acknowledged that the next step was to finalize the stipulation (which, as noted, was in BMLP's court), so that BMLP could promptly begin to receive documents.

In all events, CCA understands that, with the exception of the documents covered by the stipulation, the consensual exchange of information is off the table based on BMLP's preferred litigation approach.  CCA would have preferred a less contentious approach, but BMLP appears to be focused on obtaining discovery for purposes that go beyond the issues before the parties in the bankruptcy and turning this into an expensive, value-destructive exercise, to the detriment of CCA and its stakeholders.  Please provide all future requests for information from the Debtor in the form of formal discovery requests, to which CCA will provide formal responses, and make clear to B. Riley that it should refrain from reaching out directly to BDO without the concurrent involvement of counsel.

With respect to BMLP's current discovery requests, the CCA team will make itself available for the requested meet and confer tomorrow at 10:00.  Please circulate a calendar invite and link.

The gamesmanship and self-serving (and inaccurate) email at the outset of the process are unfortunate.  CCA will proceed accordingly and reserves all rights.

Thanks,
Erica

**Erica S. Weisgerber** (she/her) | Partner | Debevoise & Plimpton LLP | eweisgerber@debevoise.com | +1 212 909 6998 | 66 Hudson Boulevard, New York, NY 10001 | www.debevoise.com

---

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

---

**From:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Sent:** Friday, January 10, 2025 1:57 PM
**To:** Labovitz, Natasha <nlabovitz@debevoise.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>

**Cc:** Goodman, Mark P. <mpgoodman@debevoise.com>; Levinson, Sidney P. <slevinson@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; FYudkin@coleschotz.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Levinson, Sidney P. <slevinson@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; CCA Restructuring <CCARestructuring@debevoise.com>; Weisgerber, Erica <eweisgerber@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Michael Sirota <MSirota@coleschotz.com>; Behlmann, Andrew D. <ABehlmann@lowenstein.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>; Cohen, Jeffrey L. <JCohen@lowenstein.com>

**Subject:** RE: CCA Construction, Inc. (Case No. 22548) - BML Properties, Ltd.'s Discovery Requests

**\*EXTERNAL\***

Dear Natasha,

I am adding the Lowenstein folks to this email so we are all coordinated.

While we appreciate your willingness to discuss consensual information sharing with us, and are not abandoning those efforts to the extent it is still workable, the reality is we are faced with a looming final DIP hearing and a tremendous amount of unanswered questions.  As you know, we requested information on the record at the First Day Hearing on December 22, and then sent the proposed stipulation on December 26 to memorialize the commitment that Debevoise made on behalf of CCA to provide information to BMLP as part of our agreement to the modification of the stay.  The stipulation was our attempt, in good faith based on representations that the Debtor wanted to be transparent and cooperative, to resolve this important issue so CCA could meet its December 30 appellate deadline, and also to avoid burdening the Court and all of our teams and clients over the holidays.  Subsequently, our financial advisor then sent informal requests on January 7.

To date, however – almost three full weeks since the First Day Hearing -- we still have not received ***any documents*** from CCA (including many that should have been readily available; for example, copies of the DIP marketing materials).  Moreover, when we received your client's position on our proposed stipulation (more than a week after we sent our draft), your client insisted on adding a new, previously unmentioned, and entirely unworkable use restriction.  Apart from one zoom meeting with our financial advisor—which seemed to contradict a number of representations that were made in the First Day Hearing and supporting declarations—we have no information whatsoever from CCA, and the deadline for our objections in advance of the Second Day hearing is now only 13 days away.

While we understand that you may be traveling, we are under a tight schedule and have no choice but to move the ball forward.  We are available to meet and confer whenever convenient, but **we suggest holding it on Monday morning (Jan. 13) at 10:00 am ET, with the Debtor and DIP Lender teams together**.  We made the same request to Lowenstein earlier today, and that will give everyone the rest of today and the weekend to review and consider our requests.

Given the time constraints, we also intend to reach out to the Court this afternoon to ask Judge Gravelle to set aside some time on Monday afternoon for a telephonic scheduling conference to address any areas of dispute and confirm deadlines for the production of documents and depositions sufficiently in advance of the Second Day Hearing.  If we can reach a consensual agreement Monday morning, then we can inform the Court that the conference is no longer needed.

If you or your team have any questions, please do not hesitate to reach out to me or Bob.

Thank you,
Brett

**BRETT S. THEISEN** | Director
Vice Chair, Financial Restructuring & Creditors' Rights Group
**t:** 212-613-2065 | **c:** 917-524-5987 | **f:** 212-554-9697
btheisen@gibbonslaw.com | bio

**Gibbons P.C.** | One Pennsylvania Plaza | 45th Floor, Suite 4515 | New York, NY 10119
**m:** 212-613-2000 | **f:** 212-290-2018 | office | map



gibbonslaw.com | gibbonslawalert.com

---

**From:** Labovitz, Natasha <nlabovitz@debevoise.com>
**Sent:** Friday, January 10, 2025 10:09 AM
**To:** McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Cc:** Goodman, Mark P. <mpgoodman@debevoise.com>; Levinson, Sidney P. <slevinson@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; FYudkin@coleschotz.com; Malone, Robert K. <RMalone@gibbonslaw.com>; Theisen, Brett S. <BTheisen@gibbonslaw.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Levinson, Sidney P. <slevinson@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; Theisen, Brett S. <BTheisen@gibbonslaw.com>; CCA Restructuring <CCARestructuring@debevoise.com>; Weisgerber, Erica <eweisgerber@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Michael Sirota <MSirota@coleschotz.com>
**Subject:** Re: CCA Construction, Inc. (Case No. 22548) - BML Properties, Ltd.'s Discovery Requests

All,

We were surprised to receive these discovery requests when we have been in the process of negotiating a stipulation with your firm that would govern consensual information-sharing as between CCA and BMLP, and when CCA and BMA gave the courtesy of hosting an informal informational meeting with BMLP's financial advisor yesterday morning, even before that stipulation was finalized.

Your email arrived when I was at the airport preparing to board a trans-continental flight in preparation for meetings today.  We will discuss the email and its contents with our clients today and will revert to you with a response when ready.

Thank you,

— Natasha Labovitz

On Jan 9, 2025, at 2:46 PM, McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com> wrote:


**\*EXTERNAL\***

---

Counsel,

Pursuant to Federal Rules of Civil Procedure 26, 30, and 34, made applicable to the above-referenced bankruptcy case by Federal Rules of Bankruptcy Procedure 7026, 7030, 7034, and 9014, BML Properties, Ltd., in connection with the Debtor's Motion for Entry of Interim and Final Order (i) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief [ECF No. 4], hereby serves:

1. BML Properties, Ltd.'s First Requests for Production of Documents Pursuant to Federal Rules of Civil Procedure 26 and 34;
2. Notice of Deposition of Evan Blum By BML Properties, Ltd.;
3. Notice of Deposition of Elizabeth Abrams By BML Properties, Ltd.;
4. Notice of Deposition of Mei Liu By BML Properties, Ltd.; and
5. Notice of Deposition of Wei Zhao By BML Properties, Ltd.

Please advise whether you accept service of the Notice of Deposition of Evan Blum By BML Properties, Ltd. and Notice of Deposition of Elizabeth Abrams By BML Properties, Ltd.  If Mr. Blum or Ms. Abrams is represented by separate counsel, please advise.

In the interest of time, we would like to schedule a "meet and confer" to discuss BML Properties, Ltd.'s requested discovery any time after 2:30 p.m. (ET) tomorrow, January 10, 2025.  Please provide your availability.

Thank you,
Kyle

**KYLE P. MCEVILLY** | Associate
Financial Restructuring & Creditors' Rights Group
**t:** 973-596-4677 | **c:** 862-390-3619 | **f:** 973-639-8304
kmcevilly@gibbonslaw.com | bio

**Gibbons P.C.** | One Gateway Center | Newark, NJ 07102-5310
**m:** 973-596-4500 | **f:** 973-596-0545 | office | map



gibbonslaw.com | gibbonslawalert.com

**Disclaimer**
The contents of this message, together with any attachments, may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, printing, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please do not read this message or any attachments and please notify me immediately by reply e-mail or call Gibbons P.C. at 973-596-4500 and delete this message, along with any attachments, from your computer.

**Exhibit L**

**Koboci, Shefit**

| | |
|---|---|
| **From:** | McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com> |
| **Sent:** | Tuesday, January 14, 2025 6:48 PM |
| **To:** | Labovitz, Natasha; Goodman, Mark P.; Levinson, Sidney P.; Worenklein, Elie J.; FYudkin@coleschotz.com |
| **Cc:** | Malone, Robert K.; Theisen, Brett S. |
| **Subject:** | RE: CCA Construction, Inc. (Case No. 22548) - BML Properties, Ltd.'s Discovery Requests |
| **Attachments:** | Yan Wei Deposition Notice.pdf |

**<span style="color:red">*EXTERNAL*</span>**

Counsel,

As indicated on yesterday's call, attached is the Notice of Deposition of Yan Wei by BML Properties, Ltd.

Best,
Kyle

**KYLE P. MCEVILLY** | Associate
Financial Restructuring & Creditors' Rights Group
**t:** 973-596-4677 | **c:** 862-390-3619 | **f:** 973-639-8304
kmcevilly@gibbonslaw.com | bio

**Gibbons P.C.** | One Gateway Center | Newark, NJ 07102-5310
**m:** 973-596-4500 | **f:** 973-596-0545 | office | map



gibbonslaw.com | gibbonslawalert.com

---

**From:** McEvilly, Kyle P.
**Sent:** Thursday, January 9, 2025 5:45 PM
**To:** 'nlabovitz@debevoise.com' <nlabovitz@debevoise.com>; 'mpgoodman@debevoise.com' <mpgoodman@debevoise.com>; 'slevinson@debevoise.com' <slevinson@debevoise.com>; 'eworenklein@debevoise.com' <eworenklein@debevoise.com>; 'FYudkin@coleschotz.com' <FYudkin@coleschotz.com>
**Cc:** Malone, Robert K. <RMalone@gibbonslaw.com>; Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Subject:** CCA Construction, Inc. (Case No. 22548) - BML Properties, Ltd.'s Discovery Requests

Counsel,

Pursuant to Federal Rules of Civil Procedure 26, 30, and 34, made applicable to the above-referenced bankruptcy case by Federal Rules of Bankruptcy Procedure 7026, 7030, 7034, and 9014, BML Properties, Ltd., in connection with the Debtor's Motion for Entry of Interim and Final Order (i) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief [ECF No. 4], hereby serves:

    (i)   BML Properties, Ltd.'s First Requests for Production of Documents Pursuant to Federal Rules of Civil Procedure 26 and 34;

    (ii)  Notice of Deposition of Evan Blum By BML Properties, Ltd.;

(iii)  Notice of Deposition of Elizabeth Abrams By BML Properties, Ltd.;

(iv)  Notice of Deposition of Mei Liu By BML Properties, Ltd.; and

(v)  Notice of Deposition of Wei Zhao By BML Properties, Ltd.

Please advise whether you accept service of the Notice of Deposition of Evan Blum By BML Properties, Ltd. and Notice of Deposition of Elizabeth Abrams By BML Properties, Ltd.  If Mr. Blum or Ms. Abrams is represented by separate counsel, please advise.

In the interest of time, we would like to schedule a "meet and confer" to discuss BML Properties, Ltd.'s requested discovery any time after 2:30 p.m. (ET) tomorrow, January 10, 2025.  Please provide your availability.

Thank you,
Kyle


**KYLE P. MCEVILLY** | Associate
Financial Restructuring & Creditors' Rights Group
**t:** 973-596-4677 | **c:** 862-390-3619 | **f:** 973-639-8304
kmcevilly@gibbonslaw.com | bio

**Gibbons P.C.** | One Gateway Center | Newark, NJ 07102-5310
**m:** 973-596-4500 | **f:** 973-596-0545 | office | map



gibbonslaw.com | gibbonslawalert.com

**Disclaimer**
The contents of this message, together with any attachments, may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, printing, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please do not read this message or any attachments and please notify me immediately by reply e-mail or call Gibbons P.C. at 973-596-4500 and delete this message, along with any attachments, from your computer.

**Exhibit M**

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Felice R. Yudkin
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Facsimile: (201) 489-1536
msirota@coleschotz.com
wusatine@coleschotz.com
rjareck@coleschotz.com
fyudkin@coleschotz.com

-and-

**DEBEVOISE & PLIMPTON LLP**
Erica S. Weisgerber (*pro hac vice* pending)
M. Natasha Labovitz
Sidney P. Levinson
Elie J. Worenklein
Shefit Koboci
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
eweisgerber@debevoise.com
nlabovitz@debevoise.com
slevinson@debevoise.com
eworenklein@debevoise.com
skoboci@debevoise.com

*Proposed Co-Counsel for the Debtor and Debtor in Possession*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re:<br><br>CCA CONSTRUCTION, INC.,<br><br>DEBTOR.[1] | (Hon. Christine M. Gravelle)<br><br>Chapter 11<br><br>Case No. 24-22548 (CMG) |

### DEBTOR'S RESPONSES AND OBJECTIONS TO BML PROPERTIES, LTD.'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 26 AND 24

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, as incorporated into

Rules 7026, 7034, and 9014 of the Federal Rules of Bankruptcy Procedure, and pursuant to the

corresponding Local Rules of the United States Bankruptcy Court for the District of New Jersey

(the "**Local Rules**"), Debtor CCA Construction, Inc. (the "**Debtor**" or "**CCA**"), by and through

its undersigned counsel, hereby serves the following responses and objections (the "**Responses**

---

[1] The last four digits of CCA's federal tax identification number are 4862. CCA's service address for the purposes of this chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

1

**and Objections**") to BML Properties, Ltd.'s ("**BMLP**") First Requests for Production of Documents ("**Requests**" and each a "**Request**") in connection with the DIP Motion (as defined in the Requests) filed in the above-captioned chapter 11 case (the "**Chapter 11 Case**").

<u>**GENERAL OBJECTIONS AND RESERVATION OF RIGHTS**</u>

1.      The following General Objections and Objections to Definitions and Instructions ("**General Objections**") apply to, and shall have the same force and effect as if set forth in full in response to, each specific Request, to the Definitions, and to the Instructions.  No objection, or lack thereof, made in these Responses and Objections or in the production of documents or information in response to the specific Requests, shall be deemed an admission by CCA that such documents or information are relevant, material, or admissible, nor deemed a waiver of CCA's rights to raise further objections.  CCA's investigation and discovery are ongoing as to all matters referred to in these Responses and Objections.  CCA's Responses and Objections reflect its investigation to date.  CCA reserves the right to modify and supplement its Responses and Objections as appropriate and to produce, introduce, or rely upon additional or subsequently acquired or discovered information, evidence, documents, facts, and/or other things in any proceedings or at any trial held hereafter.  CCA is willing to meet and confer with BMLP to discuss its Responses and Objections to the Requests.

2.      CCA objects to the Requests on the ground that the timing and scope of the Requests, and the requested response times, are unduly burdensome and unreasonable.  The Requests were served on January 9, 2025, but requested production of an unduly burdensome and voluminous amount of materials by January 15, 2025.  This is less than the time provided for under Rule 34 of the Federal Rules of Civil Procedure (applicable through Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure), which provides a party with 30 days to respond to

document requests.    Nevertheless, in the interest of productively handling these expedited Requests, CCA has undertaken to identify, collect, review, and produce non-privileged documents that may be responsive to the Requests using targeted and reasonable efforts under the circumstances and subject to the Responses and Objections herein.

3.      CCA objects to the Requests, to each specific Request, to the Definitions, and to the Instructions to the extent that they purport to impose requirements different than, or beyond those specified in, the Federal Rules of Bankruptcy Procedure, the Federal Rules of Civil Procedure, as incorporated into Rules 7026, 7034, and 9014 of the Federal Rules of Bankruptcy Procedure (including Rules 26 and 34 of the Federal Rules of Civil Procedure), the Local Rules, and/or any other applicable rules, laws, regulations, or court orders (collectively, the "**Applicable Rules**") of the bankruptcy court overseeing this Chapter 11 Case (the "**Court**").  To the extent any Definition, Instruction, or Request does not comport with the Applicable Rules, or the ordinary meaning of any word itself, CCA will follow the Applicable Rules or apply the ordinary meaning of the word.

4.      CCA objects to the Requests, to each specific Request, to the Definitions, and to the Instructions to the extent that they seek Electronically Stored Information ("**ESI**") that is not proportional to the needs of the case or to the extent that they are inconsistent with the parameters regarding production of ESI set forth in the Applicable Rules and/or any other orders of the Court overseeing this Chapter 11 Case.

5.      CCA objects to the Requests, to each specific Request, to the Definitions, and to the Instructions to the extent that they purport to impose burdens or obligations on CCA that exceed, differ from, or purport to supersede those imposed by the Applicable Rules.

3

6.      CCA objects to the Requests, to each specific Request, to the Definitions, and to the Instructions to the extent that they are vague and ambiguous, overbroad, unduly burdensome, duplicative, vexatious, harassing, oppressive, and/or seek information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, or that is not likely to lead to the discovery of admissible evidence.

7.      CCA objects to the Requests, to each specific Request, to the Definitions, and to the Instructions to the extent they call for disclosure of information or documents protected by the attorney-client privilege, work-product doctrine, mediation privilege, or any other applicable privilege, doctrine, law, rule or protection from disclosure (collectively, "**Privileged Information**").  CCA specifically reserves the right to not produce such documents or information and reserves the right to redact such information from any otherwise responsive document produced in a response to any Request.  CCA further reserves the right, consistent with Federal Rules of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26, to demand the return of any documents or information that inadvertently may be produced during discovery if CCA determines that such documents or information contain privileged information.  Consistent with Federal Rule of Evidence 502(b) and the forthcoming proposed confidentiality stipulation and protective order in this Chapter 11 Case, if any privileged information is inadvertently disclosed by CCA, such disclosure shall not constitute a waiver of any Privileged Information.  CCA also specifically reserves the right to demand the return, destruction, or segregation of any documents that may be produced during discovery, if CCA determines, in its sole discretion, that such documents contain Privileged Information and CCA has not consented to their production.

8.      CCA objects to the Requests to the extent they purport to call for the production of documents about entities, topics, or information that are not related to the *Motion for Entry of*

4

*Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [ECF No. 4] (the "**DIP Motion**") in the Chapter 11 Case.

9.      CCA objects to the Requests, to each specific Request, to the Definitions, and to the Instructions to the extent that they seek documents or information that are not in CCA's possession, custody, or control, including requests for documents or information that are in the possession, custody, or control of entities or persons other than CCA.

10.     CCA objects to the Requests, to each specific Request, to the Definitions, and to the Instructions to the extent that they seek the production of documents or information that are (a) already in the possession, custody, or control of BMLP; (b) publicly available or otherwise equally available to BMLP; or (c) more appropriately obtained from other sources or by other means of discovery.

11.     CCA objects to the Requests, to each specific Request, to the Definitions, and to the Instructions to the extent that they seek commercially sensitive, proprietary, or otherwise confidential information.  CCA reserves the right to object to the production of highly sensitive and proprietary information in responding to the Requests.  To the extent that any such material is responsive to the Requests, CCA will only provide it subject to these Responses and Objections and in accordance with a protective order entered in this Chapter 11 Case.  CCA will not produce any confidential or highly confidential information prior to entry of such protective order.

12.     CCA objects to the Requests, to each specific Request, to the Definitions, and to the Instructions to the extent that they purport to require CCA to search for and produce ESI from sources that are not reasonably accessible because of undue burden, time constraints, or cost or not otherwise proportional to the needs of the case.

5

13.     CCA objects to the Requests to the extent they impose an obligation on CCA to produce documents that are created or received after receipt of the Requests.

14.     CCA reserves the right to produce documents on a rolling basis.

15.     CCA objects to the Requests, to each specific Request, to the Definitions, and to the Instructions as overbroad and unduly burdensome to the extent they seek "all" documents that exist or have existed relating to a given subject matter where production of a subset would be sufficient.

16.     CCA objects to the Requests, to each specific Request, to the Definitions, and to the Instructions as overbroad and unduly burdensome to the extent that they purport to require CCA to produce "all" documents or information responsive to any Request.  CCA's responses that state that non-privileged documents or communications will be produced do not constitute a representation that such documents exist, but only that responsive documents or communications will be produced if they exist and can be located through targeted and reasonable efforts under the circumstances, and will produce responsive, non-privileged documents or communications appropriate for production, subject to the responses and objections contained herein.

17.     Any documents which CCA produces in response to the Requests is produced without waiving any objections regarding the use of those documents in any subsequent proceeding or trial in this or any other action, including, but not limited to, objections based on relevance, privilege, or admissibility.

18.     CCA objects to Instruction 3 as unduly burdensome to the extent it indicates that these Requests are continuing in nature.  Unless otherwise stated in the Responses and Objections to the specific Requests below, as part of its search protocol, CCA will undertake targeted and

reasonable efforts under the circumstances to identify non-privileged responsive documents for the time period October 1, 2024 through the present (the "**Applicable Time Period**").

19.    CCA objects to the Requests, to each specific Request, to the Definitions, and to the Instructions to the extent they assume or state disputed facts; call for interpretations of, or otherwise characterize, contracts and other documents, the terms of which speak for themselves; or purport to require CCA to draw, or are predicated on, legal conclusions or arguments.  By responding to the Requests, CCA does not agree to any assumption, factual predicate, contractual interpretation, characterization, or legal conclusion contained therein, and any response or provision of information in response to the Requests is not intended to provide, and shall not constitute or be construed as providing, a legal conclusion or admission.

20.    The Responses and Objections herein are based on CCA's present knowledge, information, and belief.  CCA reserves the right to amend, revise, correct, supplement, or clarify any of the Responses and Objections herein for any reason, including the discovery of additional evidence, or following any court order that affects the nature or scope of appropriate discovery.

## OBJECTIONS TO DEFINITIONS

1.    Unless specified otherwise, CCA does not adopt Defendants' definitions of words and phrases.  CCA objects to the "Definitions" stated in the Requests to the extent they are susceptible to more than one distinct interpretation, or are inconsistent with the ordinary and customary meaning of such words and phrases or the rules governing the permissible scope of discovery.

2.    CCA objects to the definitions of "Communication" (Paragraph 2), "Concerning" (Paragraph 3), "Document(s)" (Paragraph 8), and "Relating to" (Paragraph 11) insofar as such

definitions seek to impose obligations on CCA greater than those imposed by Applicable Rules.

CCA further objects to these definitions on the grounds that they are overbroad, unduly

burdensome, seek to impose burden and expense that outweigh their benefits, are not proportional

to the needs of this Chapter 11 Case, are not relevant to the claims or defenses of any party in

connection with the DIP Motion or reasonably calculated to lead to the discovery of admissible

evidence, and are inconsistent with Rule 34(a) of the Federal Rules of Civil Procedure, made

applicable to this proceeding by Rule 7034 of the Federal Rules of Bankruptcy Procedure. CCA

will interpret the terms "Communication" and "Document" consistently with Rule 34(a), and will

limit its responses and objections accordingly.

3.      CCA objects to the definitions "CSCEC Affiliate," (Paragraph 5) and "CSCEC

Holdings" (Paragraph 6) as vague, ambiguous, overly broad, and unduly burdensome because they

define these terms to include any of CSCEC, Ltd.'s "affiliates" and any of CSCEC, Ltd.'s or

CSCEC Holdings, Ltd.'s "subsidiaries, branches, predecessors, successors, assigns, managers,

officers, directors, employees, agents, attorneys and any and all persons acting on behalf of any of

them, as well as to any entity under its direction or control." CCA will interpret the terms to mean

CSCEC Holding Company, Inc.

4.      CCA objects to the definition of "You," and "Your" (Paragraph 12) on the grounds

that these terms are defined so broadly as to purport to require CCA to collect and produce

documents or information that is not within CCA's possession, custody, or control. CCA further

objects to this definition to the extent it purports to encompass CCA affiliates as unduly

burdensome to the extent that such affiliates are not relevant to the DIP Motion other than CSCEC

Holding Company, Inc and to the extent relevant to the Shared Services Agreements and Shared

Services Program (as each is defined in the DIP Motion). CCA further objects to these definitions

insofar as they purport to include CCA's attorneys and/or yield requests that purport to call for the production of Privileged Information.  CCA will construe the terms "You" and "Your" to mean CCA.

## OBJECTIONS TO INSTRUCTIONS

1.      CCA objects to the Instructions on the grounds that they are overly broad and unduly burdensome, seek discovery that is not proportional to the needs of the case, and to the extent they purport to impose on CCA obligations that are different than or exceed those imposed by the Applicable Rules.

2.      CCA objects to Instruction No. 1 because it requests that CCA respond to the Requests using information and knowledge that is in the possession of third parties, including agents and other representatives.  CCA further objects to Instruction 1 to the extent it requires CCA to search through its attorneys' files on the basis that it would be unduly burdensome to search through such files to identify responsive, non-privileged materials.  CCA will not search the files of its internal or external counsel.  CCA will respond to the Requests using sources and non-privileged information in its own possession, custody and control, and reasonably available to CCA.

3.      CCA objects to Instruction No. 2 as overly broad, unduly burdensome, and not reasonably tailored to the needs of the case.  As stated above, CCA will undertake targeted and reasonable efforts under the circumstances to identify non-privileged responsive documents for the Applicable Time Period.

4.      CCA objects to Instruction No. 4 on the grounds that the Instruction is overly broad, unduly burdensome, not reasonably tailored to the needs of the case, and imposes burdens or

obligations on CCA that exceed, differ from, or purport to supersede those imposed by the Applicable Rules.  CCA will construe the Requests pursuant to the Applicable Rules or apply the ordinary meaning of the words contained in the Requests, including but not limited to the words "and," "or," "any," and "all."

5.      CCA objects to Instruction No. 5 as unduly burdensome.  CCA will produce copies of documents in the manner in which they are kept, to the extent reasonably feasible and practicable under the circumstances.

6.      CCA objects to Instruction No. 6 as unduly burdensome and not reasonably tailored to the needs of the case.  CCA is willing to meet and confer with BMLP on the scope and format of privilege logs.

7.      CCA objects to Instruction No. 7 as unduly burdensome and inconsistent with the Applicable Rules.  This Instruction, on its face, would require CCA to produce documents that are not responsive to the Requests.  CCA will not produce any such documents.

8.      CCA objects to Instruction No. 8 to the extent the Instruction calls for the disclosure of Privileged Information.  CCA specifically reserves the right to not produce such documents or information and reserves the right to redact such information from any otherwise responsive document produced in a response to any Request.  CCA further objects to Instruction No. 8 to the extent that the Instruction calls for the disclosure of commercially sensitive, proprietary, or otherwise confidential information.  CCA reserves the right to object to the production of highly sensitive and proprietary information in responding to the Requests.  To the extent that any such material is responsive to the Requests, CCA will only provide it subject to these Responses and Objections and in accordance with a protective order entered in this Chapter 11 Case.  CCA will not produce any confidential or highly confidential information prior to entry of such protective

order.

9.      CCA objects to Instruction Nos. 9 and 10 on the grounds that the Instructions are unduly burdensome, not reasonably tailored to the needs of the case, and impose burdens or obligations on CCA that exceed, differ from, or purport to supersede those imposed by the Applicable Rules.  In the event BMLP requests production of an original of any document, CCA will consider the request to the extent reasonable and practicable, while reserving the right to object to and oppose any such request, if made.

10.      CCA objects to Instruction Nos. 11 and 12 to the extent the Instructions impose burdens or obligations on CCA that exceed, differ from, or purport to supersede those imposed by the Applicable Rules.  CCA further objects to Instruction No. 12 to the extent it would require production of metadata that does not exist.  CCA is willing to meet and confer with BMLP regarding a mutually agreeable ESI protocol governing production of documents that is reasonable and practicable under the circumstances.

11.      CCA objects to Instruction No. 13 as unduly burdensome and inconsistent with the Applicable Rules.  This Instruction, on its face, would require CCA to provide information about each document it reviews and withholds for any reason including, among others, that it is non-responsive to any Request.  CCA will not attempt to identify any such documents.

## SPECIFIC RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION

Each of the foregoing General Objections and Objections to Definitions and Instructions is incorporated into each of the Responses below to the specific Requests as though fully set forth therein:

## REQUEST NO. 1:

A current organizational chart showing ownership of all entities owned in whole or in part by CSCEC, including ownership percentages.

**RESPONSE TO REQUEST NO. 1:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence, including to the extent it seeks an organizational chart showing "ownership of all entities owned in whole or in part by CSCEC, including ownership percentages." CCA further objects to this Request to the extent it calls for the production of documents and communications outside of CCA's possession, custody, and control. CCA further objects to this Request to the extent that it seeks information that is readily available to BMLP from alternative sources. CCA further objects to this Request to the extent it seeks an organizational chart showing ownership of all entities owned in whole or in part by any entity other than those relevant to the DIP Motion.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, including without limitation, the common interest and joint defense doctrines, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce the organizational chart reflecting CSCEC Ltd.'s Americas subsidiaries in CCA's possession, custody, and control and that can be located after a reasonable search.

**REQUEST NO. 2:**

A current employee organizational chart, for all CSCEC Affiliates, showing (a) employee names and titles, and (b) direct and indirect reporting obligations for each employee (including, if

applicable, reporting obligations between or to persons employed or affiliated with different CSCEC Affiliates).

**RESPONSE TO REQUEST NO. 2:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects to this Request to the extent it calls for the production of documents and communications outside of CCA's possession, custody, and control. CCA further objects to this Request to the extent that it seeks information that is readily available to BMLP from alternative sources. CCA further objects and incorporates its objection to the definition of "CSCEC Affiliate" and will interpret such term to mean CSCEC Holding Company, Inc. CCA further objects to this Request to the extent it seeks an organizational chart for any entity other than CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce a chart identifying CCA employees and including their title, department, hire year and compensation amounts.[2] CCA also refers to and incorporates the information contained in *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay and*

---

[2] As with any multi-entity corporate enterprise, and consistent with the Shared Services Agreements and similar arrangements, employees' duties and functions are not always limited to the entity at which they are employed.

13

*Honor Certain Prepetition Wages, Benefits and Other Obligations, and (II) Granting Related Relief* [ECF No. 7].

**REQUEST NO. 3:**

Audited financial statements for the financial year 2017 through the present for You and for all CSCEC Affiliates, as well as Your and all CSCEC Affiliates' 2025 budgets and three-year projections.

**RESPONSE TO REQUEST NO. 3:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects to this Request to the extent it calls for the production of documents and communications outside of CCA's possession, custody, and control. CCA further objects to this Request to the extent that it seeks information that is readily available to BMLP from alternative sources. CCA further objects and incorporates its objection to the definition or "You" and "Your" and will interpret such terms to mean CCA. CCA further objects and incorporates its objection to the definition of "CSCEC Affiliate" and will interpret such term to mean CSCEC Holding Company, Inc. CCA further objects to this Request to the extent it seeks audited financial statements, budgets, and three-year projections for any entity other than CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce CCA's available audited financials for the financial year 2017 through the present.

## REQUEST NO. 4:

Unaudited financial statements for all You and all CSCEC Affiliates for any years for which audited financial statements are not available. For the most recent completed fiscal period, if audited financial statements are not yet available, annual and quarterly unaudited/internal financial statements for You and all CSCEC Affiliates. For the current fiscal period, year-to-date internal financial statements for all You and all CSCEC Affiliates.

## RESPONSE TO REQUEST NO. 4:

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence.  CCA further objects to this Request to the extent it calls for the production of documents and communications outside of CCA's possession, custody, and control.  CCA further objects to this Request to the extent that it seeks information that is readily available to BMLP from alternative sources.  CCA further objects and incorporates its objection to the definition or "You" and will interpret such term to mean CCA.  CCA further objects and incorporates its objection to the definition of "CSCEC Affiliate" and will interpret such term to mean CSCEC Holding Company, Inc.  CCA further objects to this Request to the extent it seeks unaudited financial statements for any entity other than CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product

doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce CCA's available unaudited financial statements for the financial years for which audited financial statements are unavailable (2022, 2023, and 2024).

**REQUEST NO. 5:**

Documents sufficient to show the current project pipeline for each of Your operating subsidiaries, including current projects, projects awarded, outstanding bids, and prospective bids on expected future projects.

**RESPONSE TO REQUEST NO. 5:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects to this Request to the extent it calls for the production of documents and communications outside of CCA's possession, custody, and control.  CCA further objects to this Request to the extent that it seeks information that is readily available to BMLP from alternative sources.  CCA further objects and incorporates its objection to the definition or "You" and will interpret such term to mean CCA.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce the CCA Confidential Information Memorandum and back-up material relating to the "Subsidiary Cash Flow Overview" therein.

**REQUEST NO. 6:**

All board minutes, board consents/resolutions, and shareholder resolutions of You and all CSCEC Affiliates.

**RESPONSE TO REQUEST NO. 6:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects to this Request to the extent it calls for the production of documents and communications outside of CCA's possession, custody, and control. CCA further objects to this Request to the extent that it seeks information that is readily available to BMLP from alternative sources. CCA further objects and incorporates its objection to the definition or "You" and will interpret such term to mean CCA. CCA further objects and incorporates its objection to the definition of "CSCEC Affiliate" and will interpret such term to mean CSCEC Holding Company, Inc. CCA further objects to this Request to the extent it seeks board minutes, board consents/resolutions, and shareholder resolutions of any entity other than CCA. CCA further objects to this Request to the extent it is duplicative of other Requests, including Request No. 28.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA

will produce board consents/resolutions and shareholder resolutions relating to the appointment of

Elizabeth Abrams, the formation of the Special Committee, the filing of this Chapter 11 Case and

the entry into the DIP Credit Agreement referenced in the DIP Motion.

**REQUEST NO. 7:**

Documents sufficient to show all related party transactions by You and all CSCEC

Affiliates from the financial year 2017 to the present.

**RESPONSE TO REQUEST NO. 7:**

Pursuant to Mr. Thiesen's January 13, 2025 e-mail, this Request was withdrawn.

**REQUEST NO. 8:**

Documents sufficient to show sales of assets by You and all CSCEC Affiliates with a value

greater than US $2 million from the financial year 2017 to the present.

**RESPONSE TO REQUEST NO. 8:**

Pursuant to Mr. Thiesen's January 13, 2025 e-mail, this Request was withdrawn.

**REQUEST NO. 9:**

All Documents and Communications concerning the development of the 12-month DIP

budget, including the assumptions and detailed breakdown for the disbursement line items similar

to the 13-Week Cash Flow.

**RESPONSE TO REQUEST NO. 9:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome,

calls for information that is not relevant to the claims or defenses of any party in connection with

the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely

to lead to the discovery of admissible evidence.

CCA further objects to this Request, which requests "detailed breakdown for the

18

disbursement line items similar to the 13-Week Cash Flow" on the grounds that such term is vague, ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence. CCA further objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, including without limitation, the common interest and joint defense doctrines.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce the model underlying the 12-month DIP budget.

**REQUEST NO. 10:**

All Documents and Communications concerning the development of the rolling 13-Week Cash Flow and any subsequent rolling 13-week budget, including documents sufficient to show all the disbursement line items in the 13-Week Cash Flow projections, including Your payroll (broken down by employee and including employee function description), health insurance, visa fees and other expenses (broken down by employee), IT, employee reimbursement, other office expenses, Beijing subsidiary funding, and professional expenses.

**RESPONSE TO REQUEST NO. 10:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects and incorporates its objection to the definition or "Your" and will interpret such term to mean CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including

documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce the model underlying the 13-week cash flow.

**REQUEST NO. 11:**

Documents sufficient to show the allocation of amounts by expense line item to subsidiary and affiliated companies provided under the Shared Services Program.

**RESPONSE TO REQUEST NO. 11:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce documents sufficient to show CCA's Shared Services allocation referenced in the DIP Motion.

**REQUEST NO. 12:**

All valuations or appraisals concerning Your investments in Your subsidiaries.

**RESPONSE TO REQUEST NO. 12:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence.  CCA objects to the terms "investments" and "subsidiaries" on the grounds that such terms are vague, ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.  CCA further objects and incorporates its objection to the definition or "Your" and will interpret such term to mean CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce the Brattle Group's valuation of CCA dated September 2024 and any CCA valuations prepared during the Applicable Time Period.

**REQUEST NO. 13:**

Current active employee census for You and all CSCEC Affiliates, including information regarding employee title, department, employee function description, salary, annual bonus, start date, employee type, full-time/part-time, visa status, visa-related annual legal fees.

**RESPONSE TO REQUEST NO. 13:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome,

calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence.  CCA further objects and incorporates its objection to the definition or "You" and will interpret such term to mean CCA.  CCA further objects and incorporates its objection to the definition of "CSCEC Affiliate" and will interpret such term to mean CSCEC Holding Company, Inc.  CCA further objects to this Request to the extent it seeks a census for any entity other than CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce a chart identifying CCA employees and including their title, department, hire year and compensation amounts.[3]  CCA also refers to and incorporates the information contained in *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay and Honor Certain Prepetition Wages, Benefits and Other Obligations, and (II) Granting Related Relief* [ECF No. 7].

**REQUEST NO. 14:**

Documents sufficient to show the breakdown of the percentage of time spent by Your employees on activities for You compared to activities for all CSCEC Affiliates over the past three years.

---

[3] As with any multi-entity corporate enterprise, and consistent with the Shared Services Agreements and similar arrangements, employees' duties and functions are not always limited to the entity at which they are employed.

**RESPONSE TO REQUEST NO. 14:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects and incorporates its objection to the definition or "You" and will interpret such term to mean CCA. CCA further objects and incorporates its objection to the definition of "CSCEC Affiliate" and will interpret such term to mean CSCEC Holding Company, Inc. CCA further objects to this Request to the extent it seeks documents sufficient to show the breakdown of the percentage of time spent by employees of any entity other than CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce a chart depicting CCA's 2024 payroll allocated by pay period and by entities that were beneficiaries of the Shared Services Program.

**REQUEST NO. 15:**

Documents sufficient to show Your current employee benefits programs in place, with annual costs by program.

**RESPONSE TO REQUEST NO. 15:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome,

calls for information that is not relevant to the claims or defenses of any party in connection with

the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely

to lead to the discovery of admissible evidence.  CCA further objects and incorporates its objection

to the definition or "You" and will interpret such term to mean CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including

documents protected from disclosure by the attorney-client privilege, attorney work product

doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information

that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific

objections as well as the General Objections and Objections to Definitions and Instructions, CCA

will produce a health insurance summary used by BDO in connection with the *Debtor's Motion*

*for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay and Honor Certain*

*Prepetition Wages, Benefits and Other Obligations, and (II) Granting Related Relief* [ECF No. 7].

**REQUEST NO. 16:**

Documents sufficient to show Your current IT systems, including vendor, functions, and

annual costs.

**RESPONSE TO REQUEST NO. 16:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome,

calls for information that is not relevant to the claims or defenses of any party in connection with

the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely

to lead to the discovery of admissible evidence.  CCA further objects and incorporates its objection

to the definition or "Your" and will interpret such term to mean CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including

documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce a summary of 2024 IT-related costs related to the Shared Services Program.

**REQUEST NO. 17:**

Documents sufficient to show Your insurance programs, including annual costs.

**RESPONSE TO REQUEST NO. 17:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects and incorporates its objection to the definition or "Your" and will interpret such term to mean CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will provide a chart with details regarding its insurance program, including annual premiums. CCA also refers to and incorporates the information contained in the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue its Prepetition Insurance*

*Programs and (B) Pay All Prepetition Obligations Related thereto, and (II) Granting Related Relief* [ECF No. 6].

**REQUEST NO. 18:**

Documents sufficient to show the main components (by categories) of Your employee reimbursements.

**RESPONSE TO REQUEST NO. 18:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence.  CCA further objects to the term "main components" on the grounds that such term is vague, ambiguous, and not reasonably likely to lead to the discovery of admissible evidence.  CCA further objects and incorporates its objection to the definition or "Your" and will interpret such term to mean CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce a chart detailing the categories and amounts of CCA's employee reimbursement for financial year 2024.

**REQUEST NO. 19:**

Materials used in connection with attempts to secure a bond to stay enforcement of the

New York judgment.

**RESPONSE TO REQUEST NO. 19:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

CCA will not produce documents in response to this Request.

**REQUEST NO. 20:**

All Documents and Communications concerning BDO's engagement with representatives of potential funding sources to confirm whether there was any market interest in providing postpetition financing, including (i) the "teaser" materials and non-disclosure agreement that was provided to potential lenders, (ii) copies of all executed non-disclosure agreements with potential lenders, and (iii) all materials provided to potential lenders under a non-disclosure agreement, including but not limited to any management presentations and any dataroom index.

**RESPONSE TO REQUEST NO. 20:**

CCA objects to this Request, and specifically to the extent it requests "[a]ll Documents and Communications," on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery

of admissible evidence.  CCA further objects to the term "representatives of potential funding sources" on the grounds that such term is vague, ambiguous, and not reasonably likely to lead to the discovery of admissible evidence.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce the "teaser" materials and non-disclosure agreement that was provided to potential lenders, executed non-disclosure agreements with potential lenders, and the CCA Confidential Information Memorandum provided to potential lenders, and CCA will undertake targeted and reasonable efforts under the circumstances to identify, review, and produce non-privileged emails constituting BDO's engagement with representatives of potential funding sources to confirm whether there was any market interest in providing postpetition financing.

**REQUEST NO. 21:**

Documents sufficient to show all insurance policies (including director and officer insurance policies) under which You or Your officers, directors, and/or employees are covered beneficiaries.

**RESPONSE TO REQUEST NO. 21:**

CCA objects to this Request, and specifically to the extent it requests documents sufficient to show "all insurance policies," on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the

DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects and incorporates its objection to the definition or "You" and "Your" and will interpret such term to mean CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

CCA will not produce documents in response to this Request.

**REQUEST NO. 22:**

All Documents and Communications concerning the marketing process to obtain postpetition financing conducted by BDO at the direction of the Special Committee to determine whether other potential third-party funding sources might exist that would provide comparable or more favorable terms, including documents sufficient to show (i) all potential financing sources that BDO considered, (ii) all parties that BDO contacted, (iii) all parties that entered into nondisclosure agreements, (iv) a timeline of the marketing process, and (v) any reasons that any party declined to enter into a non-disclosure agreement or to provide financing.

**RESPONSE TO REQUEST NO. 22:**

CCA objects to this Request, and specifically to the extent it requests "[a]ll Documents and Communications," on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence.

CCA objects to this Request to the extent it seeks Privileged Information, including

documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce the "teaser" materials and non-disclosure agreement that was provided to potential lenders, executed non-disclosure agreements with potential lenders, and the CCA Confidential Information Memorandum provided to potential lenders, and CCA will undertake targeted and reasonable efforts under the circumstances to identify, review, and produce BDO's non-privileged emails with third-parties relating to the marketing process to obtain postpetition financing conducted by BDO.

**REQUEST NO. 23:**

Documents sufficient to show contingent liabilities of You and all CSCEC Affiliates, including surety bonds (including issuer and terms), all litigation, and other contingent liabilities.

**RESPONSE TO REQUEST NO. 23:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects and incorporates its objection to the definition or "You" and will interpret such term to mean CCA. CCA further objects and incorporates its objection to the definition of "CSCEC Affiliate" and will interpret such term to mean CSCEC Holding Company, Inc. CCA further objects to this Request to the extent it seeks documents sufficient to show contingent liabilities of any entity other than CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

CCA is willing to meet and confer regarding BMLP's position as to why this Request seeks documents that are relevant to the DIP Motion.

**REQUEST NO. 24:**

All Documents and Communications concerning BDO's and/or Elizabeth Abrams' conclusion(s) that You require a loan commitment of US $40 million, including all financial and forecasts prepared by management of You, management of any CSCEC Affiliate, and/or BDO.

**RESPONSE TO REQUEST NO. 24:**

CCA objects to this Request, and specifically to the extent it requests "[a]ll Documents and Communications," on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects and incorporates its objection to the definition or "You" and will interpret such term to mean CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA

will produce the documents identified in response to other Requests, including Request Nos. 9, 10, 20, and 22.

**REQUEST NO. 25:**

All Documents and Communications concerning CSCEC Holdings' commitment to provide US $20 million of unsecured financing directly to non-Debtor subsidiaries, including documents and communications concerning (i) Your negotiation with CSCEC Holdings or any CSCEC Affiliates, (ii) CSCEC Holding's historical intercompany loans to non-Debtor subsidiaries, (iii) the statement in Paragraph 23 of the Blum Declaration that "[t]hese loans …will stabilize the non-debtor operations of the CCA Group, improving value and reducing claims against the Non-Debtor Subsidiaries, all of which will benefit CCA and its stakeholders," and (iv) all budgets, forecasts, and/or other financial information containing information regarding the use of such loans by non-Debtor subsidiaries.

**RESPONSE TO REQUEST NO. 25:**

CCA objects to this Request, and specifically to the extent it requests "[a]ll Documents and Communications," on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence.  CCA further objects and incorporates its objection to the definition or "You" and will interpret such term to mean CCA.  CCA further objects and incorporates its objection to the definition of "CSCEC Holdings" and will interpret such term to mean CSCEC Holding Company, Inc.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product

doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce Subsidiary Cash Flows as contained in the CCA Confidential Information Memorandum.

**REQUEST NO. 26:**

All Documents and Communications concerning the reasons that the US $20 million commitment from CSCEC Holdings to non-Debtor subsidiaries is in addition to the US $40 million DIP Commitments.

**RESPONSE TO REQUEST NO. 26:**

CCA objects to this Request, and specifically to the extent it requests "[a]ll Documents and Communications," on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects and incorporates its objection to the definition of "CSCEC Holdings" and will interpret such term to mean CSCEC Holding Company, Inc.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA

will produce Subsidiary Cash Flows as contained in the CCA Confidential Information Memorandum.

**REQUEST NO. 27:**

All Documents and Communications concerning the statement in Paragraph 16 of the Blum Declaration that the available liquidity under the DIP Facility "will powerfully signal to key stakeholders that CCA will be able to operate", including Documents and Communications concerning: (i) the sureties who issue bonds for existing and new projects and whose bonds are required to obtain new business, (ii) the customers who carefully consider the liquidity and financial condition of contractors as a factor in deciding which one to engage, (iii) the subcontractors who, if faced with the risk of nonpayment, might not continue to work on behalf of any CSCEC Affiliate; and (iv) the vendors who provide goods and services that may be withheld if the risk of nonpayment persists.

**RESPONSE TO REQUEST NO. 27:**

CCA objects to this Request, and specifically to the extent it requests "[a]ll Documents and Communications," on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects and incorporates its objection to the definition of "CSCEC Holdings" and will interpret such term to mean CSCEC Holding Company, Inc. CCA further objects to this Request to the extent it is duplicative of other Requests, including Request Nos. 9, 10, 20, 22, and 24.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product

doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA directs BMLP to the Blum Declaration and states that in response to this Request it will produce the materials being produced in response to other Requests, including Request Nos. 9, 10, 20, 22, and 24.

**REQUEST NO. 28:**

All Documents and Communications concerning (i) the formation of the Special Committee, (ii) the appointment of Elizabeth Abrams as the Special Committee's sole member (including the selection process for Ms. Abrams and the parties involved in that process), (iii) the Special Committee's negotiation of DIP financing with potential lenders, (iv) the Special Committee's evaluation and approval of the DIP, (v) the specific advisors who advised her in connection with the DIP.

**RESPONSE TO REQUEST NO. 28:**

CCA objects to this Request, and specifically to the extent it requests "[a]ll Documents and Communications," on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information

that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce board consents/resolutions and shareholder resolutions relating to the appointment of Elizabeth Abrams, the formation of the Special Committee, the filing of this Chapter 11 Case and the entry into the DIP Credit Agreement referenced in the DIP Motion, and CCA will undertake targeted and reasonable efforts under the circumstances to identify, review, and produce non-privileged documents constituting the Special Committee's negotiation of DIP financing with potential lenders and the Special Committee's evaluation and approval of the DIP.

**REQUEST NO. 29:**

All Documents and Communications concerning Elizabeth Abrams' and/or the Special Committee's investigation into or due diligence concerning potential claims that You have or may have against CSCEC Holdings and/or CSCEC Affiliates.

**RESPONSE TO REQUEST NO. 29:**

CCA objects to this Request, and specifically to the extent it requests "[a]ll Documents and Communications," on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects and incorporates its objection to the definition of "You" and will interpret such term to mean CCA. CCA further objects and incorporates its objection to the definitions of "CSCEC Affiliate" and "CSCEC Holdings" and will interpret such terms to mean CSCEC Holding Company, Inc.

CCA objects to this Request to the extent it seeks Privileged Information, including

documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

CCA will not produce documents in response to this Request.

**REQUEST NO. 30:**

All documents and communications concerning BDO's identification of CSCEC Holdings as a potential source of financing, including documents and communications concerning CSCEC Holdings' (i) prior history of providing financing to You, (ii) "obvious interest, as the sole equity holder of CCA, in preserving CCA's value," *see* Blum Decl. ¶ 18, and (iii) indication of its potential willingness to finance Your restructuring.

**RESPONSE TO REQUEST NO. 30:**

CCA objects to this Request, and specifically to the extent it requests "[a]ll documents and communications," on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects to the term "potential source of funding" on the grounds that such term is vague, ambiguous, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects and incorporates its objection to the definition of "CSCEC Holdings" and will interpret such term to mean CSCEC Holding Company, Inc. CCA further objects to this Request to the extent it is duplicative of other Requests, including Request Nos. 9, 10, 20, 22, and 24.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product

doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce the materials being produced in response to other Requests, including Request Nos. 9, 10, 20, 22, and 24.

## REQUEST NO. 31:

All information reviewed and assembled by BDO regarding the terms and conditions under which comparable Chapter 11 debtors have obtained DIP financing that were used to formulate and benchmark proposals.

## RESPONSE TO REQUEST NO. 31:

CCA objects to this Request, and specifically to the extent it requests "[a]ll information reviewed and assembled by BDO," on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence.  CCA objects to this Request and its use of the term "comparable Chapter 11 debtors" on the grounds that such term is vague, ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific

objections as well as the General Objections and Objections to Definitions and Instructions, CCA

will produce documents sufficient to show BDO's DIP financing and default rate comparisons.

**REQUEST NO. 32:**

All Documents and Communications concerning the negotiation of the terms and

conditions of the DIP Financing between Your advisors and any other CSCEC Affiliate's advisors,

including all communications with CSCEC Holding's counsel, Lowenstein Sandler.

**RESPONSE TO REQUEST NO. 32:**

CCA objects to this Request, and specifically to the extent it requests "[a]ll Documents and

Communications," on the grounds that it is overly broad, unduly burdensome, calls for information

that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not

proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery

of admissible evidence.  CCA further objects and incorporates its objection to the definition of

"Your" and will interpret such term to mean CCA.  CCA further objects and incorporates its

objection to the definition of "CSCEC Affiliate" and will interpret such term to mean CSCEC

Holding Company, Inc.

CCA objects to this Request to the extent it seeks Privileged Information, including

documents protected from disclosure by the attorney-client privilege, attorney work product

doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information

that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific

objections as well as the General Objections and Objections to Definitions and Instructions, CCA

will undertake targeted and reasonable efforts under the circumstances to identify, review, and

produce non-privileged documents constituting the negotiation of the terms and conditions of the

DIP Financing between CCA's advisors and any other CSCEC Affiliate's advisors, including all communications with CSCEC Holding's counsel, Lowenstein Sandler.

**REQUEST NO. 33:**

All Documents and Communications concerning any indication of interest, term sheet, proposal, or any other binding or non-binding offer made by any potential third party lender.

**RESPONSE TO REQUEST NO. 33:**

CCA objects to this Request, and specifically to the extent it requests "[a]ll Documents and Communications concerning . . . any other binding or non-binding offer made by any potential third party lender," on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects to this Request to the extent it is duplicative of other Requests, including Request Nos. 20 and 22.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, in addition to the materials being produced in response to Request Nos. 20 and 22, CCA will produce any indication of interest, term sheet, proposal, or any other binding or non-binding offer made by any potential third party lender.

**REQUEST NO. 34:**

40

All Documents and Communications concerning the Shared Services Program, including (i) copies of all Shared Services Agreements, (ii) documents sufficient to show cost savings associated with the Shared Services Program, (iii) documents sufficient to show the allocation mechanism used to reimburse You for costs under the Shared Services Program, and (iv) all records of Intercompany Transactions.

**RESPONSE TO REQUEST NO. 34:**

CCA objects to this Request, and specifically to the extent it requests "[a]ll Documents and Communications," on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence. CCA further objects and incorporates its objection to the definition of "You" and will interpret such term to mean CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will produce documents sufficient to show CCA's Shared Services allocation referenced in the DIP Motion.

**REQUEST NO. 35:**

Your general ledger.

**RESPONSE TO REQUEST NO. 35:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence.  CCA further objects and incorporates its objection to the definition of "You" and will interpret such term to mean CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

CCA will not produce documents in response to this Request.

**REQUEST NO. 36:**

The same financial reporting that You are required to provide to CSCEC Holdings under the DIP Motion.

**RESPONSE TO REQUEST NO. 36:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence.  CCA further objects and incorporates its objection to the definition of "You" and will interpret such term to mean CCA.  CCA further objects and incorporates its objection to the definition of "CSCEC Holdings" and will interpret such term to mean CSCEC Holding Company, Inc.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product

doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will provide to BMLP the same financial reporting that it is required to provide to CSCEC Holdings under the DIP Credit Agreement referenced in the DIP Motion.

**REQUEST NO. 37:**

For each week from the date hereof onward, a weekly report of all postpetition cash transfers made by You to any entity, including cash transfers to any non-Debtor affiliate, which will be provided each Friday for the week ending the prior Friday.

**RESPONSE TO REQUEST NO. 37:**

CCA objects to this Request on the grounds that it is overly broad, unduly burdensome, calls for information that is not relevant to the claims or defenses of any party in connection with the DIP Motion, not proportional to the needs of this Chapter 11 Case, and not reasonably likely to lead to the discovery of admissible evidence.  CCA further objects and incorporates its objection to the definition of "You" and will interpret such term to mean CCA.

CCA objects to this Request to the extent it seeks Privileged Information, including documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege or protection, and to the extent it seeks information that is proprietary, confidential, and/or subject to confidentiality agreements.

Notwithstanding the foregoing, and subject to and without waiving these specific objections as well as the General Objections and Objections to Definitions and Instructions, CCA will provide a weekly report of all postpetition cash transfers made by CCA to any entity, including

cash transfers to any non-Debtor affiliate, which will be provided to counsel for BMLP each Friday

for the week ending the prior Friday.

Dated: January 15, 2025

By: */s/ Erica S. Weisgerber*

**DEBEVOISE & PLIMPTON LLP**
Erica S. Weisgerber (*pro hac vice* pending)
M. Natasha Labovitz
Sidney P. Levinson
Elie J. Worenklein
Shefit Koboci
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
eweisgerber@debevoise.com
nlabovitz@debevoise.com
slevinson@debevoise.com
eworenklein@debevoise.com
skoboci@debevoise.com

-and-

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Felice R. Yudkin
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Facsimile: (201) 489-1536
msirota@coleschotz.com
wusatine@coleschotz.com
rjareck@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel for the Debtor and
Debtor in Possession*

**Exhibit N**

**Koboci, Shefit**

| | |
|---|---|
| **From:** | Weisgerber, Erica |
| **Sent:** | Tuesday, January 28, 2025 11:37 PM |
| **To:** | 'Theisen, Brett S.'; Anton, Christopher P.; Maass, Molly Baltimore |
| **Cc:** | Levinson, Sidney P.; Labovitz, Natasha; Davis, Morgan; Goodman, Mark P.; Worenklein, Elie J.; 'Sirota, Michael'; 'Usatine, Warren'; 'FYudkin@coleschotz.com'; Malone, Robert K.; McEvilly, Kyle P. |
| **Subject:** | RE: In re CCA Construction Inc./Case No. 24-22548 |

Brett,

We can confirm that we have added your requested search term **Jichao Xu OR "徐继超"** to our review set.  We have also run all search terms across Yan Wei's emails and will be reviewing such materials as well.

We are currently assessing whether CCA custodians from whom we've agreed to collect data used non-email messaging services to communicate regarding issues relevant to the instant discovery (if at all), and if so, we will assess burden relating to any such review and production and revert.

Regarding the shared services agreement at CCA-BK0003127, it does not reference any changes to the shared services agreement; it states that it is a formal affirmation of a shared services arrangement.  Our production included non-privileged documents concerning shared services arrangements from the applicable time period and if there are additional materials relating to this affirmation in our ongoing review, we will include in future productions.

Regarding the intra-company loan policy, we again note that, as the document itself makes clear, the policy was in effect as of April 2024, which is before the start of the overly broad time period BMLP requested.  We see no basis to search for any policies in effect earlier.

To be clear, at this juncture, CCA has undertaken to review more than 20,000 documents in connection with BMLP's requests.  We are very comfortable that we have gone above and beyond what is reasonable and appropriate given the circumstances.

Lastly, regarding the documents in Production 8 containing a technical issue (CCA-BK0009205 to CCA-BK0009219), we point you to CCA-BK0009394 through CCA-BK0009600, which are the same parent email and attachments that were caught by a recipient's security system causing the technical issue in the documents you flagged.

We reserve all rights.

**Erica S. Weisgerber** (she/her) | Partner | Debevoise & Plimpton LLP | eweisgerber@debevoise.com | +1 212 909 6998 | 66 Hudson Boulevard, New York, NY 10001 | www.debevoise.com

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

**From:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Sent:** Tuesday, January 28, 2025 12:06 PM

**To:** Weisgerber, Erica <eweisgerber@debevoise.com>; Anton, Christopher P. <CAnton@gibbonslaw.com>; Maass, Molly Baltimore <mbmaass@debevoise.com>
**Cc:** Levinson, Sidney P. <slevinson@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; 'Sirota, Michael' <MSirota@coleschotz.com>; 'Usatine, Warren' <WUsatine@coleschotz.com>; 'FYudkin@coleschotz.com' <FYudkin@coleschotz.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Subject:** RE: In re CCA Construction Inc./Case No. 24-22548

**\*EXTERNAL\***

Erica,

We will try to keep Mr. Blum's deposition under the allotted time period (not accounting for breaks), so for planning purposes roughly around 5 or earlier.

With respect to search terms, please confirm that you have added **Jichao Xu OR "徐继超"** as he is apparently the only person at CSCECH who has responsibility for the DIP.  If you will not do so on the basis of burden, please provide a hit report in the custodian's emails, text messages (e.g., WeChats), and chats (e.g., MS Teams).

To that end, we are also awaiting your confirmation that you are searching the custodians' WeChat, Skype, Tencent QQ, and Ding Talk accounts, in addition to emails.  We are also awaiting your confirmation as to whether CCA or its affiliates use Skype, Slack, Microsoft Teams, or Bloomberg, and if so whether those have been searched as well.  If you are not producing these documents, we need to know as soon as practical your basis for not doing so, given the deposition scheduled for February 3 of a company witness.

With respect to the shared services agreement, we refer you to CCA-BK0003127.

With respect to the intra-company loan policy, the documents reflect substantial intercompany transactions.  If there were written policies prior to the one dated August 27, 2024, they should be produced, notwithstanding the purported backdating of that policy.

Separately, we noted that there are 16 docs in the 8th production with an image that only says "Technical issue" (CCA-BK0009205 to CCA-BK0009219). Can you please provide a replacement production?

Thanks, Brett

**BRETT S. THEISEN** | Director
Vice Chair, Financial Restructuring & Creditors' Rights Group
**t:** 212-613-2065 | **c:** 917-524-5987 | **f:** 212-554-9697
btheisen@gibbonslaw.com | bio

**Gibbons P.C.** | One Pennsylvania Plaza | 45th Floor, Suite 4515 | New York, NY 10119
**m:** 212-613-2000 | **f:** 212-290-2018 | office | map



gibbonslaw.com | gibbonslawalert.com

---

**From:** Weisgerber, Erica <eweisgerber@debevoise.com>
**Sent:** Monday, January 27, 2025 11:12 PM
**To:** Theisen, Brett S. <BTheisen@gibbonslaw.com>; Anton, Christopher P. <CAnton@gibbonslaw.com>; Maass, Molly

Baltimore <mbmaass@debevoise.com>
**Cc:** Levinson, Sidney P. <slevinson@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; 'Sirota, Michael' <MSirota@coleschotz.com>; 'Usatine, Warren' <WUsatine@coleschotz.com>; 'FYudkin@coleschotz.com' <FYudkin@coleschotz.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Subject:** RE: In re CCA Construction Inc./Case No. 24-22548

> **External Email:** Use caution with links and attachments.

Brett,

Mr. Blum is available for deposition starting at 10 am on Thursday 1/30.  For Mr. Blum's planning purposes, could you please let us know approximately how long you expect to spend with him?

With respect to Mr. Yuan:  Mr. Wei has been in his role since well before the "relevant" time period requested by BMLP (and ordered by the Court) for the DIP or cash management motions (*i.e.*, after May 1, 2024).  We therefore do not see basis to add Mr. Yuan as a custodian at this time.

We do confirm, however, that we have added your other requested search terms to our review set:

- **"Plaza funding" OR OR "Plaza集资" OR "Plaza融资"**
- **"CCA Civil funding" OR "中建美国发展基金"**
- **"CCA South Carolina funding" OR "中建美国南卡基金"**

With regard to your questions about CCA's document productions:

1. As to the meeting minutes contained in our prior productions, we produced any responsive and nonprivileged materials relied upon during those meetings that could be located after a reasonable search under the circumstances, based upon the search terms we provided.  We will produce the minutes of a few additional meetings (and supporting materials, if any).  Finally, there was not a board meeting held on Friday October 25, 2024, as is clear from the document you cited.

2. We are not sure what you mean by a "new shared services agreement."  Could you please let us know which document(s) you are referencing?

3. The policy you reference states that it was in effect as of April 1, 2024, which is before the agreed-upon start date for document collection.

We can confirm that CCA has issued document hold notices to employees that include communications on ephemeral messaging applications or platforms.

**Erica S. Weisgerber** (she/her) | Partner | Debevoise & Plimpton LLP | eweisgerber@debevoise.com | +1 212 909 6998 | 66 Hudson Boulevard, New York, NY 10001 | www.debevoise.com

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us

collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.

The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

**From:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Sent:** Sunday, January 26, 2025 9:34 PM
**To:** Weisgerber, Erica <eweisgerber@debevoise.com>; Anton, Christopher P. <CAnton@gibbonslaw.com>; Maass, Molly Baltimore <mbmaass@debevoise.com>
**Cc:** Levinson, Sidney P. <slevinson@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; 'Sirota, Michael' <MSirota@coleschotz.com>; 'Usatine, Warren' <WUsatine@coleschotz.com>; 'FYudkin@coleschotz.com' <FYudkin@coleschotz.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Subject:** RE: In re CCA Construction Inc./Case No. 24-22548

**\*EXTERNAL\***

Erica,

The Abrams and Blum deposition dates work for us.  Please confirm start time for Mr. Blum.

With respect to Ning Yuan, we understand that he served in Yan Wei's role during the relevant time period before Wei took on the position.  Your client knows the exact dates of their respective service under various titles, but his documents should be searched for the same reasons as Yan Wei's documents.

We are still reviewing the productions, but we note that the fourth volume, containing board materials, raises a few questions on which we would appreciate your assistance.

First, the volume does not include any materials relied upon at those meetings, nor do they include the minutes of a meeting that apparently took place on October 25 regarding the anticipated restructuring.  See CCA-BK0003248.  Please let us know where it can be found in the production, or produce it.  Second, we note that CCA apparently entered into a new shared services agreement shortly before the bankruptcy. The documents concerning the change to the shared services agreement should be produced, and they should identify the custodians involved in that change.  Please confirm that these will be produced.

We also note that the productions include a policy purporting to govern intercompany loans dated August 2024.  If there was a version in effect prior to that one, please let us know where it can be found in the production, or produce it.

Finally, we understand that CCA is considering our request that they search for and produce documents from messaging apps and chat platforms.  They should confirm that they are and have been preserving all messages on these platforms, including by ensuring that any auto-deletion and ephemeral messaging functions are disabled, and by ensuring that any former employees documents and devices are retained.

We look forward to reviewing the statement of financial affairs that will be filed tomorrow, pursuant to the extension requested along with the Debtor's other first day relief.

Thanks,
Brett

**BRETT S. THEISEN** | Director
Vice Chair, Financial Restructuring & Creditors' Rights Group
**t:** 212-613-2065 | **c:** 917-524-5987 | **f:** 212-554-9697
btheisen@gibbonslaw.com | bio

**Gibbons P.C.** | One Pennsylvania Plaza | 45th Floor, Suite 4515 | New York, NY 10119
**m:** 212-613-2000 | **f:** 212-290-2018 | office | map



gibbonslaw.com | gibbonslawalert.com

---

**From:** Weisgerber, Erica <eweisgerber@debevoise.com>
**Sent:** Friday, January 24, 2025 11:36 PM
**To:** Theisen, Brett S. <BTheisen@gibbonslaw.com>; Anton, Christopher P. <CAnton@gibbonslaw.com>; Maass, Molly Baltimore <mbmaass@debevoise.com>
**Cc:** Levinson, Sidney P. <slevinson@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; 'Sirota, Michael' <MSirota@coleschotz.com>; 'Usatine, Warren' <WUsatine@coleschotz.com>; 'FYudkin@coleschotz.com' <FYudkin@coleschotz.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Subject:** RE: In re CCA Construction Inc./Case No. 24-22548

> **External Email:** Use caution with links and attachments.

---

Brett –

First, I can confirm that we have accepted all of the Chinese language proposals that you sent with respect to our original search terms; accordingly, I confirm that for CCA's e-mails we have run the full set:

1. **DIP OR "持有财产的债务人" OR "债务人自行管理" OR "融资" OR "借贷"**
2. **Bankruptcy OR "破产" OR "倒闭" OR "清算" OR "清盘" OR "资不抵债" OR "无力偿债" OR "关门"**
3. **Chapter 11 OR "第十一章" OR "第11章"**
4. **Lowenstein OR "洛文斯坦"**
5. **Shared services OR "共享服务" OR "服务共享" OR "共享资源" OR "资源共享"**
6. **Confidential information memorandum OR "保密信息备忘录" OR "CIM"**
7. **Teaser OR "投资概要" OR "项目介绍" OR "摘要" OR "简要"**
8. **Abrams OR "艾布拉姆斯"**
9. **Special committee OR "特别委员会" OR "特委会"**

With respect to the additional aspects/proposals of your email this afternoon, we are still reviewing and assessing; due to today's ongoing review and production process, we were not able to finish assessing burden of your new proposals. We will revert soon. In the meantime, can you please explain the relevance of Ning Yuan to the DIP Motion and/or Cash Management Motion?

On deposition scheduling:
- Please schedule Ms. Abrams' deposition for Wednesday, January 29, starting at 11am. Please note she has a hard stop at 5pm.
- Please schedule Mr. Blum's deposition for Thursday, January 30. We are consulting Mr. Blum regarding start time and will revert.
- Ms. Liu is available for deposition on February 3. We will revert regarding start time.

Thanks,
Erica

**Erica S. Weisgerber** (she/her) | Partner | Debevoise & Plimpton LLP | eweisgerber@debevoise.com | +1 212 909 6998 | 66 Hudson Boulevard, New York, NY 10001 | www.debevoise.com

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

**From:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Sent:** Friday, January 24, 2025 1:05 PM
**To:** Weisgerber, Erica <eweisgerber@debevoise.com>; Anton, Christopher P. <CAnton@gibbonslaw.com>; Maass, Molly Baltimore <mbmaass@debevoise.com>
**Cc:** Levinson, Sidney P. <slevinson@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; 'Sirota, Michael' <MSirota@coleschotz.com>; 'Usatine, Warren' <WUsatine@coleschotz.com>; 'FYudkin@coleschotz.com' <FYudkin@coleschotz.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Subject:** RE: In re CCA Construction Inc./Case No. 24-22548

**\*EXTERNAL\***

Erica,

Thank you for informing us that your search terms were already translated into Chinese-language searches.  We have reviewed your translated terms, and they are acceptable to us for purposes of the DIP and Cash Management discovery, but we reserve all rights as to any future discovery under Rule 2004 or in any other contested matters.

As to the scope of your search terms, however, we must reiterate our request that you include **Jichao Xu OR "徐继超"** as search terms within the discovery for the current contested first day matters.  Again, we reserve all rights as to future discovery.

As to custodians, we must also reiterate our request that Yan Wei and Ning Yuan be included.  That CCA would omit both from discovery here is remarkable, given their roles within the organization, and particularly your refusal to make Yan Wei available for a deposition, notwithstanding he is a first day declarant.

To avoid any further delays in going forward with depositions next week, we propose that you produce the additional materials from these custodians by the end of next week, January 31, 2025, so that even if we are unable to use such materials in our depositions of Mr. Blum and Ms. Abrams, we will have them available for use in our objection to the DIP and Cash Management motions, and such materials may be introduced at the hearing.

We reject the assertion that BMLP has unduly delayed its identification of search terms or custodians.  You only disclosed them to us on January 22 – not with your written responses and objections – and only after we specifically asked you to do so on January 21.  As to Jichao Xu, we only learned of his identity the evening of January 21 during a meet and confer call with counsel to CSCEC.

Last, as to scheduling depositions, we can either do both of them on Wednesday, January 29, or we can take Ms. Abrams first that day and Mr. Blum on Thursday, January 30.

Thanks,
Brett

**BRETT S. THEISEN** | Director
Vice Chair, Financial Restructuring & Creditors' Rights Group
**t:** 212-613-2065 | **c:** 917-524-5987 | **f:** 212-554-9697
btheisen@gibbonslaw.com | bio

**Gibbons P.C.** | One Pennsylvania Plaza | 45th Floor, Suite 4515 | New York, NY 10119
**m:** 212-613-2000 | **f:** 212-290-2018 | office | map



gibbonslaw.com | gibbonslawalert.com 

---

**From:** Weisgerber, Erica <eweisgerber@debevoise.com>
**Sent:** Thursday, January 23, 2025 11:57 PM
**To:** Theisen, Brett S. <BTheisen@gibbonslaw.com>; Anton, Christopher P. <CAnton@gibbonslaw.com>; Maass, Molly Baltimore <mbmaass@debevoise.com>
**Cc:** Levinson, Sidney P. <slevinson@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; 'Sirota, Michael' <MSirota@coleschotz.com>; 'Usatine, Warren' <WUsatine@coleschotz.com>; 'FYudkin@coleschotz.com' <FYudkin@coleschotz.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Subject:** RE: In re CCA Construction Inc./Case No. 24-22548

---

> **External Email:** Use caution with links and attachments.

---

Brett,

While we are evaluating your proposed search terms and custodians, overall the proposal has come far too late for the documents that we have been producing in connection with discovery requests served on the Debtor on January 9.  As you are well aware, the substantial completion deadline for that discovery is *tomorrow*, January 24.  BMLP itself insisted upon that deadline during the parties' conference with the Court, and the Debtor team has been working around the clock to meet it.  Moreover, the custodians and search terms that Debevoise selected resulted in well more than 13,000 documents in our review pool – an exceedingly generous and good-faith review set for a review and production occurring within a two-week period.

Your eleventh-hour request for 4 additional custodians and more than 35 additional search terms (as well as review of additional types of documents/platforms) is unreasonable and inconsistent with BMLP's obligations to negotiate in good faith.  You have had CCA's responses and objections for over a week.  Those responses and objections made clear (as is always the case in a document review) that we would apply reasonable search parameters in an effort to collect and review documents responsive to BMLP's requests.  Despite meeting and conferring twice and having a conference with the Court on the scope of CCA's production, you did not ask for a list of custodians and search terms until two days ago, on January 21, at 7:24pm.  We provided that list promptly the following morning, January 22.  Moreover, when we explicitly discussed custodians with you during multiple meet and confers, you (*i*) did not object when we stated that the Debevoise custodian would be Sidney Levinson

and (*ii*) seemingly agreed that Elizabeth Abrams was not a necessary custodian at this time based upon our representation that Ms. Abrams does not have any relevant emails that Debevoise and BDO were not on.  Nor is it appropriate to add Mr. Goodman, who as you know has served as CCA's lead litigation and trial counsel, as a custodian for discovery focused on the DIP loan and/or cash management issues.

You have now proposed numerous new search terms, including dozens of Chinese-language search terms even though BMLP never asked about Chinese language search terms during any of the parties' meet and confers or during the first conference with the Court.  Indeed, rather than engaging with us about potential search terms, you raised the issue of Chinese-language searches for the very first time in a conference with the Court yesterday, January 22.  (In any event, Debevoise had <u>already</u> translated and run the Chinese-language translations of our identified search terms.)

Simply put – the Debtor has undertaken herculean efforts to accommodate BMLP's discovery requests to date, notwithstanding BMLP's gamesmanship.  Sending a slew of new custodians and search terms the evening before our substantial production deadline is not consistent with good faith.  It is difficult to avoid the conclusion that what BMLP really wants is not relevant discovery but, rather, to manufacture a basis to falsely accuse CCA of resisting discovery.

In any event, as noted, BMLP's proposed Chinese search terms are unnecessary, as we have already run the terms set forth below, some of which are duplicative of those you requested:

- 债务人持有资产融资 OR ((债务 OR 重整 OR 重组 OR 破产) AND 融资)
- 破产
- 第十一章
- 洛温斯坦
- 共享服务
- 保密信息备忘录 OR (密 w/5 信息 w/5 备忘)
- 简介 OR 简报 OR 摘要
- 艾布拉姆斯
- (特OR 专) AND 委员会

Nevertheless, in a good-faith effort to accommodate your burdensome and highly belated request, we are running certain additional search terms that you have suggested to evaluate the burden associated with doing so and will revert if we are able to add additional terms to the review set.  Of course, any additional review cannot be completed in time for tomorrow's production.  Notwithstanding, at minimum, I confirm that we will run and review the hits associated with:

- In BDO documents:  CSCEC (for the May 1, 2024 through September 2, 2024 time period)
- In CCA documents:
  - <span style="color:red">"持有财产的债务人" OR "债务人自行管理"</span>
  - <span style="color:red">"破产" OR "倒闭" OR "清算" OR "清盘" OR "资不抵债" OR "无力偿债" OR "关门"</span>
  - <span style="color:red">"第十一章" OR "第11章"</span>
  - <span style="color:red">"洛文斯坦"</span>
  - <span style="color:red">"共享服务" OR "服务共享" OR "共享资源" OR "资源共享"</span>
  - <span style="color:red">"保密信息备忘录"</span>
  - <span style="color:red">"投资概要" OR "项目介绍"</span>
  - <span style="color:red">"艾布拉姆斯"</span>
  - <span style="color:red">"特别委员会" OR "特委会" (we separately had already run a much broader Chinese language search than these terms)</span>

Finally, following up on our discussion yesterday regarding **depositions**:

- o Mr. Blum is available for deposition <u>either</u> Wednesday January 29 or Thursday January 30.
- o Ms. Abrams is available or deposition Wednesday January 29.  We can discuss an earlier date (Tuesday, January 28) if Wednesday does not work for BMLP.  However, Ms. Abrams is out of town January 30-February 2.
- o We will revert soon regarding any further scheduling.

Thanks,

Erica

---

**Erica S. Weisgerber** (she/her) | Partner | Debevoise & Plimpton LLP | eweisgerber@debevoise.com | +1 212 909 6998 | 66 Hudson Boulevard, New York, NY 10001 | www.debevoise.com

---

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.

The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

**From:** Theisen, Brett S. <BTheisen@gibbonslaw.com>
**Sent:** Thursday, January 23, 2025 3:52 PM
**To:** Weisgerber, Erica <eweisgerber@debevoise.com>; Anton, Christopher P. <CAnton@gibbonslaw.com>; Maass, Molly Baltimore <mbmaass@debevoise.com>
**Cc:** Levinson, Sidney P. <slevinson@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; 'Sirota, Michael' <MSirota@coleschotz.com>; 'Usatine, Warren' <WUsatine@coleschotz.com>; 'FYudkin@coleschotz.com' <FYudkin@coleschotz.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Subject:** RE: In re CCA Construction Inc./Case No. 24-22548

**<span style="color:red">*EXTERNAL*</span>**

---

Erica,

Thank you for your email.  We have copied your message from yesterday below and included our proposed changes below in <span style="color:red">red text.</span>  For the Company custodians, can you please confirm that you are searching their WeChat, Skype, Tencent QQ, and Ding Talk accounts, in addition to emails?  And can you please confirm whether CCA or its affiliates use Skype, Slack, Microsoft Teams, or Bloomberg, and if so whether those have been searched as well?

Source: BDO

We searched BDO's emails using the following parameters:

1. Custodians:
   1. Evan Blum
   2. James Schwartz
2. Date range:
   1. September 1, 2024 through date of collection
3. Search terms:

1. **CCA**
2. **China Construction**
3. **CSCEC**
4. **Baha Mar**
5. **BML**
6. **BMLP**
7. **Abrams**
8. **Shared services**
9. **Debevoise**
10. **Lowenstein**
11. **Yan**

Additionally, even though BDO was retained in early October 2024 (and we therefore began our comprehensive review starting on September 1, 2024), we also ran the following searches to confirm whether there are relevant emails prior to September 2024:

1. Custodians:
   1. Evan Blum and James Schwartz
2. Date range:
   1. May 1, 2024 through September 2, 2024
3. Search terms:
   1. <span style="color:red">CSCEC</span>
   2. **CCA**
   3. **Debevoise**
   4. **@debevoise.com**
   5. **@cca.us**

That review confirmed that there were no responsive materials prior to September 2024 (since BDO was not retained until October 2024).

<u>Source:  CCA</u>

We searched CCA's emails using the following parameters:

1. Custodians:
   1. Wei (Vivian) Zhao
   2. Mei Liu
   3. <span style="color:red">Yan Wei</span>
   4. <span style="color:red">Ning Yuan</span>
   5. <span style="color:red">Liz Abrams</span>
2. Date range:
   1. October 1, 2024 through date of collection (collected)
   2. May 1, 2024 through September 30, 2024 (in process of collecting)
3. Search terms:
   1. **DIP** <span style="color:red">OR "持有财产的债务人" OR "债务人自行管理" OR "融资" OR "借贷"</span>
   2. **Bankruptcy** <span style="color:red">OR "破产" OR "倒闭" OR "清算" OR "清盘" OR "资不抵债" OR "无力偿债" OR "关门"</span>
   3. **Chapter 11** <span style="color:red">OR "第十一章" OR "第11章"</span>
   4. **Lowenstein** <span style="color:red">OR "洛文斯坦"</span>
   5. **Shared services** <span style="color:red">OR "共享服务" OR "服务共享" OR "共享资源" OR "资源共享"</span>
   6. **Confidential information memorandum** <span style="color:red">OR "保密信息备忘录" OR "CIM"</span>

7. **Teaser OR "投资概要" OR "项目介绍" OR "摘要" OR "简要"**

8. **Abrams OR "艾布拉姆斯"**

9. **Special committee OR "特别委员会" OR "特委会"**

10. **Jichao Xu OR "徐继超"**

11. **"Plaza funding" OR OR "Plaza集资" OR "Plaza融资"**

12. **"CCA Civil funding" OR "中建美国发展基金"**

13. **"CCA South Carolina funding" OR "中建美国南卡基金"**

Source: Debevoise

As discussed during our meet and confer last week, we collected and are reviewing all of Sid Levinson's **and Mark Goodman's** emails from his**/their** CCA-specific Outlook folder**s and any other Outlook folders related to his representation of any CSCEC Affiliates**.

In sum, we are using our best efforts to diligently collect, review, and produce documents to BMLP in response to the January 9, 2025 discovery requests.  CCA reserves all rights.

**BRETT S. THEISEN** | Director
Vice Chair, Financial Restructuring & Creditors' Rights Group
**t:** 212-613-2065 | **c:** 917-524-5987 | **f:** 212-554-9697
btheisen@gibbonslaw.com | bio

**Gibbons P.C.** | One Pennsylvania Plaza | 45th Floor, Suite 4515 | New York, NY 10119
**m:** 212-613-2000 | **f:** 212-290-2018 | office | map

gibbonslaw.com | gibbonslawalert.com

---

**From:** Weisgerber, Erica <eweisgerber@debevoise.com>
**Sent:** Wednesday, January 22, 2025 11:25 AM
**To:** Anton, Christopher P. <CAnton@gibbonslaw.com>; Maass, Molly Baltimore <mbmaass@debevoise.com>
**Cc:** Levinson, Sidney P. <slevinson@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; 'Sirota, Michael' <MSirota@coleschotz.com>; 'Usatine, Warren' <WUsatine@coleschotz.com>; 'FYudkin@coleschotz.com' <FYudkin@coleschotz.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; Theisen, Brett S. <BTheisen@gibbonslaw.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Subject:** RE: In re CCA Construction Inc./Case No. 24-22548

---

> **External Email:** Use caution with links and attachments.

---

Counsel,

CCA has been working around-the-clock toward our target production date of Friday, January 24, which is just over two weeks after BMLP served its extremely broad discovery requests and just one week after receiving the Court's guidance on the scope of such requests.

We have already collected and have been reviewing/are continuing to review approximately 13,000 documents collected from CCA, BDO, and Debevoise.  We are continuing to collect certain documents from those sources, so our review numbers are likely to increase today; we reserve all rights with respect thereto.  We believe this is above-and-beyond what would be a reasonable review set given the circumstances, but in good faith, we have made an effort to be overinclusive.

In addition to gathering certain specific requested and/or "go get" materials for the requests, below is a more detailed overview of our collection and review parameters for e-mails:

Source: BDO
We searched BDO's emails using the following parameters:
1. Custodians:
    1. Evan Blum
    2. James Schwartz
2. Date range:
    1. September 1, 2024 through date of collection
3. Search terms:
    1. CCA
    2. China Construction
    3. CSCEC
    4. Baha Mar
    5. BML
    6. BMLP
    7. Abrams
    8. Shared services
    9. Debevoise
    10. Lowenstein
    11. Yan

Additionally, even though BDO was retained in early October 2024 (and we therefore began our comprehensive review starting on September 1, 2024), we also ran the following searches to confirm whether there are relevant emails prior to September 2024:
1. Custodians:
    1. Evan Blum and James Schwartz
2. Date range:
    1. May 1, 2024 through September 2, 2024
3. Search terms:
    1. CCA
    2. Debevoise
    3. @debevoise.com
    4. @cca.us

That review confirmed that there were no responsive materials prior to September 2024 (since BDO was not retained until October 2024).

Source:  CCA
We searched CCA's emails using the following parameters:
1. Custodians:

1. Wei (Vivian) Zhao
2. Mei Liu
2. Date range:
    1. October 1, 2024 through date of collection (collected)
    2. May 1, 2024 through September 30, 2024 (in process of collecting)
3. Search terms:
    1. DIP
    2. Bankruptcy
    3. Chapter 11
    4. Lowenstein
    5. Shared services
    6. Confidential information memorandum
    7. Teaser
    8. Abrams
    9. Special committee

Source: Debevoise

As discussed during our meet and confer last week, we collected and are reviewing all of Sid Levinson's emails from his CCA-specific Outlook folder.

In sum, we are using our best efforts to diligently collect, review, and produce documents to BMLP in response to the January 9, 2025 discovery requests.  CCA reserves all rights.

**Erica S. Weisgerber** (she/her) | Partner | Debevoise & Plimpton LLP | eweisgerber@debevoise.com | +1 212 909 6998 | 66 Hudson Boulevard, New York, NY 10001 | www.debevoise.com

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.

The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

**From:** Anton, Christopher P. <CAnton@gibbonslaw.com>
**Sent:** Tuesday, January 21, 2025 7:24 PM
**To:** Maass, Molly Baltimore <mbmaass@debevoise.com>
**Cc:** Weisgerber, Erica <eweisgerber@debevoise.com>; Levinson, Sidney P. <slevinson@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; 'Sirota, Michael' <MSirota@coleschotz.com>; 'Usatine, Warren' <WUsatine@coleschotz.com>; 'FYudkin@coleschotz.com' <FYudkin@coleschotz.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; Theisen, Brett S. <BTheisen@gibbonslaw.com>; McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>
**Subject:** RE: In re CCA Construction Inc./Case No. 24-22548

**\*EXTERNAL\***

Counsel,

I am writing with regard to the Debtor's Amended Responses and Objections to BML Properties, Ltd.'s First Request of the Production of Documents.  CCA has stated in its responses to a number of the Requests that it will "undertake targeted and reasonable efforts under the circumstances" to identify, review and produce non-privileged, responsive documents and/or communications.  See CCA's responses to Request Nos. 20, 22, 28, 29, 30 and 32.  Similarly, General Objection Nos. 2 and 17 and CCA's Objection to Instruction No. 2 reference CCA's undertaking of such "targeted and reasonable efforts."  Additionally, CCA's alludes to its "search protocol" in General Objection No. 18.

Please provide a detailed description of the search protocol that CCA is using to undertake its search for responsive documents and communications including the identity of its document/email custodians, the keyword searches or other search methodology employed, and any other responsiveness criteria used in the document collection, review and production process.

Chris

**CHRISTOPHER P. ANTON** | Counsel
Financial Restructuring & Creditors' Rights Group
**t:** 973-596-4417 | **c:** 973-558-0858 | **f:** 973-639-6328
canton@gibbonslaw.com | bio | vCard

**Gibbons P.C.** | One Gateway Center | Newark, NJ 07102-5310
**m:** 973-596-4500 | **f:** 973-596-0545 | office | map



gibbonslaw.com | gibbonslawalert.com 

---

**From:** Maass, Molly Baltimore <mbmaass@debevoise.com>
**Sent:** Tuesday, January 21, 2025 8:36 AM
**To:** McEvilly, Kyle P. <KMcEvilly@gibbonslaw.com>; Malone, Robert K. <RMalone@gibbonslaw.com>; Theisen, Brett S. <BTheisen@gibbonslaw.com>; 'jcohen@lowenstein.com' <jcohen@lowenstein.com>; 'mkaplan@lowenstein.com' <mkaplan@lowenstein.com>; 'abehlmann@lowenstein.com' <abehlmann@lowenstein.com>; 'nfulfree@lowenstein.com' <nfulfree@lowenstein.com>; 'mberliner@lowenstein.com' <mberliner@lowenstein.com>
**Cc:** Weisgerber, Erica <eweisgerber@debevoise.com>; Levinson, Sidney P. <slevinson@debevoise.com>; Labovitz, Natasha <nlabovitz@debevoise.com>; Davis, Morgan <mdavis@debevoise.com>; Goodman, Mark P. <mpgoodman@debevoise.com>; Worenklein, Elie J. <eworenklein@debevoise.com>; 'Sirota, Michael' <MSirota@coleschotz.com>; 'Usatine, Warren' <WUsatine@coleschotz.com>; 'FYudkin@coleschotz.com' <FYudkin@coleschotz.com>
**Subject:** In re CCA Construction Inc./Case No. 24-22548

> **External Email:** Use caution with links and attachments.

---

Counsel,

Please see the attached regarding the Debtor's first production of documents in response to BMLP's First Requests for Production of Documents in the above-captioned case. The password to the production will be sent separately.

Also attached are the Debtor's Amended Responses and Objections to BMLP's Requests for Production of Documents.

Thanks,
Molly

**Debevoise
&Plimpton**

**Molly Maass** (she/her)

14

Associate

mbmaass@debevoise.com
+1 212 909 6075 (Tel)
+1 929 255 0659 (Mobile)

66 Hudson Boulevard
New York, NY 10001

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

**Disclaimer**

The contents of this message, together with any attachments, may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, printing, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please do not read this message or any attachments and please notify me immediately by reply e-mail or call Gibbons P.C. at 973-596-4500 and delete this message, along with any attachments, from your computer.

**<u>Exhibit O</u>**

**Mishkin, Benjamin**

| | |
|---|---|
| **From:** | Maass, Molly Baltimore |
| **Sent:** | Sunday, February 2, 2025 9:18 PM |
| **To:** | 'McEvilly, Kyle P.'; 'Malone, Robert K.'; 'Theisen, Brett S.'; 'jcohen@lowenstein.com'; 'mkaplan@lowenstein.com'; 'abehlmann@lowenstein.com'; 'nfulfree@lowenstein.com'; 'mberliner@lowenstein.com' |
| **Cc:** | Weisgerber, Erica; Levinson, Sidney P.; Labovitz, Natasha; Davis, Morgan; Goodman, Mark P.; Worenklein, Elie J.; 'Sirota, Michael'; 'Usatine, Warren'; 'FYudkin@coleschotz.com' |
| **Subject:** | In re CCA Construction Inc./Case No. 24-22548 |
| **Attachments:** | In re CCA Construction, Inc. - Debtor Privilege Log 2.2.25.pdf |

Counsel,

Please see attached for the Debtor's privilege log in connection with its document productions to date in response to BMLP's First Requests for Production of Documents.

Thanks,
Molly

# Debevoise
# &Plimpton

**Molly Maass** (she/her)
Associate

mbmaass@debevoise.com
+1 212 909 6075 (Tel)
+1 929 255 0659 (Mobile)

66 Hudson Boulevard
New York, NY 10001

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.