UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

**LOWENSTEIN SANDLER LLP**
Andrew Behlmann
Michael A. Kaplan
Nicole M. Fulfree
Rasmeet K. Chahil
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2500
abehlmann@lowenstein.com
mkaplan@lowenstein.com
nfulfree@lowenstein.com
rchahil@lowenstein.com

-and-

Jeffrey L. Cohen (admitted *pro hac vice*)
1251 Avenue of the Americas, 17th Floor
New York, NY 10020
Telephone: (212) 262-6700
jcohen@lowenstein.com

*Counsel to CSCEC Holding Company, Inc.*

In re:

CCA Construction, Inc.,[1]

                Debtor.

Case No. 24-22548 (CMG)

Chapter 11

Judge: Christine M. Gravelle

**REPLY OF CSCEC HOLDING COMPANY, INC. TO
OMNIBUS OBJECTION OF BML PROPERTIES, LTD.**

CSCEC Holding Company, Inc. ("CSCEC Holding"), the parent company of and postpetition DIP lender to the debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), hereby files this reply (the "Reply") to the *Omnibus Objection of*

---

[1] The last four digits of the Debtor's (as defined herein) federal tax identification number are 4862. The Debtor's (as defined herein) service address for the purposes of this chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

*BML Properties, Ltd.* [Doc. No. 128] (the "BMLP Objection")[2] filed by BML Properties, Ltd. ("BMLP") and respectfully states as follows:

## REPLY

1. As the DIP lender, CSCEC Holding ordinarily would leave the filing of a reply to the BMLP Objection to the Debtor. Unfortunately, the lengthy string of scandalous and defamatory (albeit unsupported) allegations in the BMLP Objection necessitated this Reply.

2. Throughout the BMLP Objection, BMLP frivolously and vexatiously attempts to impugn not only the integrity of CSCEC Holding and the Debtor, but that of everyone else in BMLP's path, too. Incredibly, the targets of BMLP's fabricated ire include not just the personnel of CSCEC Holding and the Debtor, but also their respective outside counsel and advisors and the Debtor's independent director. CSCEC Holding cannot leave BMLP's baseless and reprehensible assertions unaddressed.

3. Even setting aside its rhetoric, BMLP's substantive arguments also lack any merit.

**A.    BMLP mischaracterizes the purpose and effect of the DIP Loan.**

4. At the outset of the BMLP Objection, BMLP leads by claiming that the $40 million new-money DIP financing facility (the "DIP Loan"), which CSCEC Holding is providing on terms well below market, is an attempt "to subvert the bedrock bankruptcy principle that creditors like BMLP take before equity holders" and that the DIP Loan would "leav[e] no value in CCA's estate

---

[2] BMLP filed the *Declaration of Brett S. Theisen in Support of Omnibus Objection of BML Properties, Ltd.* [Doc. No. 129] (the "Theisen Declaration") with the BMLP Objection and attached numerous exhibits thereto. This Reply cites to the following exhibits to the Theisen Declaration:
- Rough Transcript of Deposition of Elizabeth Abrams, taken February 3, 2025 (the "Abrams Transcript"), annexed to the Theisen Declaration as Exhibit 3;
- Rough Transcript of Deposition of Evan Blum, taken February 4, 2025 (the "Blum Transcript"), annexed to the Theisen Declaration as Exhibit 4; and
- Rough Transcript of Deposition of JiChao Xu, taken February 5, 2025 (the "Xu Transcript"), annexed to the Theisen Declaration as Exhibit 5.

for non-insider claims" such as BMLP's $1.6 billion state court judgment (the "BMLP Judgment") against the Debtor. BMLP Objection, ¶ 1. Particularly where, as BMLP repeatedly concedes, third-party financing is not available, it is not clear whether BMLP is being deliberately obtuse or simply dishonest. What is clear is that the BMLP Objection grossly mischaracterizes both the purpose and the effect of the DIP Loan.

5. The DIP Loan features a drastically lower interest rate (with interest paid in kind instead of in cash), lower fees, longer maturity, and more lenient covenants than a typical chapter 11 debtor-in-possession loan, and consists entirely of new money without any roll-up of existing indebtedness. The Debtor's financial advisor, Evan Blum of BDO, observed in a deposition taken by BMLP that the economic terms of the DIP Loan are "highly advantageous to" the Debtor—after BDO reviewed a data set of 54 comparable debtor-in-possession financings. *See* Blum Tr. at 118:18-119:21.

6. BMLP's sweeping assertions conveniently ignore not only uncontroverted deposition testimony,[3] but also the obvious purpose of the DIP Loan. Without the DIP Loan, the Debtor would have been forced to liquidate in short order because no other source of financing is available. With the DIP Loan, the Debtor will be able to continue operating as a going concern in the ordinary course of business while prosecuting its (now fully briefed) appeal from the BMLP Judgment. The DIP Loan is not an effort by CSCEC Holding to grab value for itself. That is obvious, as the DIP Loan consists of entirely new money, not a roll-up. Rather, the DIP Loan represents an effort to *preserve* value for the benefit of all stakeholders. If the Debtor is successful on its appeal from the BMLP Judgment, that universe might not include BMLP. If BMLP prevails

---

[3] BMLP filed a declaration of its own financial advisor in support of the BMLP Objection, but solely to attempt to introduce excerpts from the Debtor's general ledger. BMLP has not submitted (nor could it credibly submit) any declaration purporting to rebut the fact that the terms of the new-money DIP Loan are more generous to the Debtor than the terms of similarly sized debtor-in-possession loans in other recent cases.

in the appeal, that universe might include BMLP. In either instance, though, the mere fact that the DIP Loan is secured is nothing more than a reasonable and customary protection that *any* reasonable lender—insider or otherwise—would require before agreeing to provide new money to a chapter 11 debtor staring down a potential ten-figure judgment. BMLP's wishful thinking that CSCEC Holding should or would provide the DIP Loan on an unsecured basis is of no moment. The Debtor asked for unsecured financing and CSCEC Holding, with the advice of its outside bankruptcy counsel, ultimately said no.[4]

7. Notwithstanding BMLP's latest self-serving efforts to distract the Court by casting unfounded aspersions on the parties, the people, and the process, only one thing matters: The below-market, new-money DIP Loan—the only financing available to the Debtor under the circumstances—is unquestionably fair to the Debtor and its estate under either the business judgment rule or, to the extent applicable, the entire fairness standard.

**B.    BMLP's accusations of impropriety have no basis in fact.**

8. The BMLP Objection is littered with contemptible cheap shots with no basis in reality or the record. A few examples:

- ". . . this attempt to create the illusion of arm's-length negotiating . . ." (¶ 4);

- "Despite the Debtor's attempts to portray the DIP Loan as an arm's-length bargain, the evidentiary records shows that CCA's 'negotiation' with CSCEC Holding was a sham." (¶ 10);

---

[4] The BMLP Objection selectively quotes from an e-mail from Lowenstein to Mr. Xu regarding intercompany funding being done on an unsecured or secured basis, and CSCEC Holding's intentions in that respect once the Debtor filed for bankruptcy. *See* BMLP Objection, ¶ 39. BMLP conveniently ignores the fact that the header, paragraphs, and question immediately preceding the two quoted questions made unequivocally clear that those questions pertained solely to funding being provided directly by CSCEC Holding *to the Debtor's non-debtor subsidiaries*, not to the DIP Loan. *See* Theisen Declaration, Ex. 56, at PDF Page 19 (Bates Number CCA-BK0012966). In fact, the header of that section was "CCA Non-Debtor Subsidiary Financing," the introductory paragraphs discussed the *non-debtor* financing facility, and the question immediately preceding those quoted in the BMLP Objection—which BMLP conveniently omitted—was "What subsidiaries does CSCEC [Holding] presently fund directly (i.e., not through CCA)?" *Id.*

- "Time and again, CSCEC Holding forwarded drafts of DIP Loan documents that it received from Lowenstein Sandler—*its nominal counsel*—to CCA's 'Shared Services Center' . . ." (¶ 10) (emphasis added);

- "The appointment of a ***purportedly independent director***, Elizabeth Abrams, cannot cleanse this deeply conflicted process." (¶ 12) (emphasis added);

- "Mr. JiChao Xu was ***supposedly designated*** to negotiate the DIP on behalf of CSCEC Holding . . . ." (¶ 34) (emphasis added);

- ". . . the ***purported*** independent director, Ms. Abrams . . ." (¶ 38) (emphasis added);

- ". . . the DIP and the CSCEC Group's circular negotiations . . ." (¶ 41);

- "Lowenstein knew that the 'fallback position' was irrelevant in this **rigged negotiation**." (¶ 49) (emphasis added);

- "The Special Committee rubber stamps the DIP Loan . . ." (§ C);

- "At the end of this charade . . ." (¶ 62);

- "This led to a 'stylized mockery of arm's length negotiation.'" (¶ 82) (citation omitted); and

- "The CSCEC Group's sham negotiation . . ." (¶ 89).

9. Not only is BMLP's incessant polemic baseless, BMLP *knows* it to be. On three consecutive days last week, BMLP took the depositions of the Debtor's independent director, Elizabeth Abrams; its financial advisor, Evan Blum of BDO; and the Vice President of CSCEC Holding, Mr. JiChao Xu. In those depositions, BMLP heard a consistent, truthful explanation of how the DIP Loan negotiations proceeded: Debevoise (on behalf of the Debtor) and Lowenstein (on behalf of CSCEC Holding)[5] negotiated the DIP Loan in good faith and at arm's length notwithstanding the affiliation of lender and borrower. Ms. Abrams, an experienced independent

---

[5] As BMLP knows from the deposition testimony it has heard and the documents it has reviewed—including many documents *that BMLP cites in the BMLP Objection*—Lowenstein was very actively engaged in the DIP Loan negotiations as outside counsel to CSCEC Holding, not as "nominal counsel."

director who was engaged <u>by the Debtor</u>, comprised a special committee with sole authority to approve or disapprove the DIP Loan on behalf of the Debtor as borrower. Mr. Xu had sole authority to approve or disapprove the DIP Loan on behalf of CSCEC Holding as lender. They did not collude, because they *did not interact at all*. Rather, they each relied on the advice and guidance of their outside counsel to lead the negotiations. Nowhere is the parties' reliance on counsel more evident than in the fact that CSCEC Holding ultimately followed the advice of its outside counsel in declining the Debtor's request to provide the DIP Loan on an unsecured basis.

10. In stark contrast to BMLP's unfounded tirade, the uncontroverted record of the many hours of deposition testimony given in this case paints a crystal-clear picture of what *really* happened in the negotiation and documentation of the DIP Loan. By way of example:

- You can envision a scenario where a lawyer that is an employee of a shared service provider can represent a subsidiary, a parent, and, you know, provide legal advice and have that backed up, and this is where I get comfort by external legal advisors. CSCEC Holding has Lowenstein, CCA has Debevoise and Cole S[c]hotz. ***I derive a fair amount of comfort and I would imagine everyone else around the table would, too, that there's not anything nefarious going on given that you have very qualified external legal counsel on both sides.***

  Abrams Tr. at 22:9-19 (emphasis added).

- I don't know which management directly interacted with external legal counsel on either side. I took advice from external legal counsel and comfort from the fact that CSCEC Holding had its own counsel that was not Debevoise, that was Lowenstein, so I was not focused on which management was interacting with external counsel on either side.

  *Id.* at 24:10-16

- Q. And so it would be fair to say then that Mr. McMahon was advising CCA on the Chapter 11 case, Chapter 11 related issues overall?
  A. He's not a Chapter 11 guy, right. The Debevoise and Cole S[c]hotz people are the people that I was taking or that the company was taking advice from on Chapter 11 matters.

  *Id.* at 25:3-5

- Ultimately *I relied on the fact that we had external counsel on both sides* and on the result of the process itself, right. We have a very attractive DIP that we couldn't get from anyone else. Not for lack of trying, right. BDO marketing this thing to a number of external parties and i*t did not result in not only a better term sheet but had any term sheet at all*.

    *Id.* at 31:21-32:2 (emphasis added).

- Q. If the debtor were supplying terms to the lender, that would be favorable to the lender but not favorable to the borrower, would that be an issue in your mind?
    A. No, but there's a nuance to it, right. So you have to take it in the context that we're in, right. So in this instance the debtor did supply terms, right, based on what the market was. It's in the eye of the beholder if you think they're favorable or not favorable. But it's what the market is for these types of loans. *And we didn't get a proposal from anyone else on these terms.* So it's sort of the most favorable we could have gotten in the context of, you know, we also had to borrow the money to keep the company afloat. *And I'll just add, the terms that the debtors supply to the lender were based on a market study that was done by BDO.*

    *Id.* at 32:21-33:13 (emphasis added).

- Q. Who handled the negotiations over the DIP for CCA?
    A. It was primarily Debevoise.
    Q. And for CSCEC Holding?
    A. Primarily Lowenstein.

    *Id.* at 121:12-16

- [Q:] Are you aware of any discussions that were held between CCA and CSCEC Holding to continue providing funding on an unsecured basis?
    A. There were conversations between the lawyers on both sides around CSCEC Holding providing funding on an unsecured basis. Mr. Levinson, from Debevoise, raised that early on in conversations with the attorneys from Lowenstein. Lowenstein did not immediately respond.

    Later on in the negotiations, in other words, after some period of time had elapsed, Mr. Levinson repeated the request -- that phone call I was on. I was not on every phone call, just for total clarity, but that phone call I was on -- *where he asked Lowenstein attorneys as to whether [their] client would do this on an unsecured basis, and the answer was no*.

    Blum Tr. at 94:23-95:16 (emphasis added); *see also id.* at 118:18-120:24 (discussing negotiations between Debevoise and Lowenstein regarding the terms of the DIP loan, with input from BDO)

- My understanding is that *the negotiations were largely between Debevoise and Lowenstein*, but I -- I can't speak to, like, her interaction with Mr. Levinson in regard to, like, what she knew or -- or didn't know. I wasn't really part of those -- any conversations like that.

  Blum Tr. at 129:14-19 (emphasis added).

- As I said earlier, I had conversations with Sid [Levinson, of Debevoise] around secured versus unsecured, and he had conversations with Lowenstein that -- many of which I was not part of -- but at some point -- and I do not remember the date -- he specifically asked Lowenstein counsel on a call that I was on whether he had gone back and discussed -- whether Lowenstein counsel had gone back and discussed with their client at CSCEC Holding whether they could do this on an unsecured basis, and the answer was no. But the back-and-forth documents here are -- are not something I produced.

  *Id.* at 146:18-147:3.

- There were calls -- there was a -- there were calls early on where Sid raised the issue of CSCEC Holding doing this on an unsecured basis. The response from Lowenstein counsel was that they would speak to their client and revert. Sid then followed up sometime later and said, Have you -- on a call that I was on, that -- you know, Have you spoken to your client about doing this on a secured -- on an unsecured basis, and Lowenstein responded that they -- that they had spoken, and that CSCEC Holding was -- was not -- not okay with doing it on an unsecured basis, but I didn't write this email.

  *Id.* at 155:3-15.

- Q. What was Lowenstein's role with respect to the DIP transaction?
  A. Our advisor [to] help me with my decision.

  Xu Tr. at 54:11-13.

- Q. Did you lead the negotiations for CSCEC Holding?
  A. Lowenstein negotiated on behalf of me.
  Q. And then you were the ultimate decisionmaker; is that right?
  A. Yes.

  *Id.* at 59:12-17.

11. This uncontroverted testimony, in response to which BMLP offers no more than deliberate mischaracterizations and baseless innuendo, describes in clear detail a negotiation that was conducted in good faith, at arm's length, through separate outside counsel. The byproduct of

-8-

that negotiation, and the subsequent approval by the Debtor's unquestionably independent director, was a DIP Loan with economic terms vastly more favorable than what otherwise might be available from a third-party lender, if financing had been available from a third party at all. The Court should disregard all of BMLP's spurious assertions of impropriety and approve the DIP Loan on a final basis.

## CONCLUSION

**WHEREFORE**, CSCEC Holding respectfully submits that the Court should overrule the BMLP Objection in its entirety and approve the DIP Loan on a final basis.

Respectfully submitted,

Dated: February 11, 2025

*/s/ Andrew Behlmann*
Andrew Behlmann
Michael A. Kaplan
Nicole M. Fulfree
Rasmeet K. Chahil
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
abehlmann@lowenstein.com
mkaplan@lowenstein.com
nfulfree@lowenstein.com
rchahil@lowenstein.com

-and-

Jeffrey L. Cohen (admitted *pro hac vice*)
1251 Avenue of the Americas, 17th Floor
New York, NY 10020
Telephone: (212) 262-6700
jcohen@lowenstein.com

*Counsel to CSCEC Holding Company, Inc.*