**GIBBONS P.C.**
Robert K. Malone, Esq.
Brett S. Theisen, Esq.
Christopher P. Anton, Esq.
Kyle P. McEvilly, Esq.
One Gateway Center
Newark, New Jersey 07102-5310
Telephone: (973) 596-4500
Email: rmalone@gibbonslaw.com
btheisen@gibbonslaw.com
canton@gibbonslaw.com
kmcevilly@gibbonslaw.com

*Counsel to BML Properties, Ltd.*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | (Hon. Christine M. Gravelle) |
| CCA Construction, Inc.,[1] | Chapter 11 |
| Debtor. | Case No. 24-22548-CMG |

## <u>OMNIBUS OBJECTION OF BML PROPERTIES, LTD.</u>

---

[1] The last four digits of CCA's federal tax identification number are 4862. CCA's service address for the purposes of this Chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ................................................................................. 1

**BACKGROUND** ...................................................................................................... 7

I.  CCA relies on the CSCEC Group for unsecured financing. ............................... 7

II.  CCA prepares to enter bankruptcy with a secured
DIP Loan to avoid paying its judgment debt to BMLP....................................11

III.  The CSCEC Group controls the DIP Loan negotiations................................... 15

    A.  ██████████████████████ ...................................................... 20

    B.  CCA's marketing process confirms that it
cannot support a $40 million secured DIP Loan................................... 22

    C.  The Special Committee rubber stamps
the DIP Loan before CCA's advisors finish marketing......................... 25

    D.  Chronology of key events between the New York Decision and Petition Date.... 28

IV.  CCA commences this Chapter 11 case and
seeks approval of the secured $40 million insider DIP Loan. ......................... 29

**ARGUMENT** ......................................................................................................... 30

I.  CCA's proposed DIP Loan from its corporate parent
CSCEC Holding is an insider transaction subject to heightened scrutiny. ...................... 30

    A.  The DIP Loan is not entitled to the deferential business judgment standard........ 30

    B.  Approval of the DIP Loan by CCA's purported
Independent Director does not affect the standard of review............................... 32

II.  CCA's proposed DIP Loan fails to meet
the requirements of Section 364 of the Bankruptcy Code. ............................... 36

    A.  CCA never exhausted the possibility of
obtaining unsecured credit from CSCEC Holding............................... 36

    B.  The terms of the DIP do not meet the
heightened scrutiny standard applied to insider transactions............................... 39

        1.  The amount of the DIP Facility is excessive
given the purported value of CCA's assets and projected cash flows....... 40

2.    The prospective Section 506(c) waiver is inappropriate............................ 42

3.    The DIP Credit Agreement pre-wires
estate releases of CSCEC Holding and other insiders. ............................ 43

4.    CSCEC Holding should not be
entitled to an "unqualified right" to credit bid. ......................................... 44

5.    CCA unjustifiably excluded BMLP from the
marketing process and ███████████████████████ ...... 44

6.    The pledge of avoidance action proceeds to
the most likely target of such claims is plainly inappropriate. ................. 45

7.    CSCEC Holding should not be given any plan consent rights ................ 46

8.    The appointment of an examiner should not
be an event of default under the circumstances. ....................................... 46

9.    The budget for any third-party investigation is vastly insufficient. .......... 47

10.   There is no permitted variance from
CSCEC Holding's approved budget. ......................................................... 47

11.   BMLP's reservation of rights as to other terms of the DIP Facility ......... 48

III.   The DIP Loan is an impermissible *sub rosa* plan of reorganization. ................................ 48

IV.   CSCEC Holding should not be entitled to good faith findings in the DIP Order. ............ 49

V.    Unless the DIP Loan is provided on an unsecured basis,
CCA's cash management motion should be denied. ......................................................... 50

**CONCLUSION** ..................................................................................................... **51**

BML Properties, Ltd. ("BMLP"), by and through its undersigned counsel, hereby submits this omnibus objection (this "Objection") to (1) the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 4) (the "DIP Motion");[2] and (2) the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue its Bank Accounts and Maintain Existing Business Forms, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* (Docket No. 5) (the "Cash Management Motion") filed by CCA Construction, Inc. ("CCA" or the "Debtor").  In support of this Objection, BMLP submits the Declarations of Perry Mandarino (the "Mandarino Declaration") and Brett Theisen (the "Theisen Declaration") and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      CCA's proposed $40 million secured DIP Loan attempts to subvert the bedrock bankruptcy principle that creditors like BMLP take before equity holders.  Through the proposed DIP Loan, CCA's immediate parent CSCEC Holding, Inc. ("CSCEC Holding") looks to retain the complete control over CCA that it has exercised for years, leaving no value in CCA's estate for non-insider claims like BMLP's $1.6 billion New York judgment for fraud and breach of contract. If the DIP is approved, CCA's Chapter 11 case would be run for the sole benefit of CCA's equity holder:  CSCEC Holding and its own corporate parent, China State Construction Engineering Corporation, Ltd. ("CSCEC"), a Chinese state-owned enterprise.

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings in the DIP Motion.

2.      CCA's purported liquidity crisis is CSCEC Holding's own doing.  For the past

decade, CSCEC Holding and its affiliates (the "CSCEC Group") ████████████████████

███████████████████████████████████████████████████████████████████████████████████

████████████▌ ██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

████████████████████████████—squarely contradicting CCA's false claims that it

cannot obtain unsecured credit from its parent due to the judgment.[4]

3.      To obtain secured insider financing, CCA must make "exhaustive unsuccessful

efforts to obtain [unsecured] credit" and must have "exhausted" the potential of receiving funds

from its corporate parent.  *In re Crouse Grp., Inc.*, 71 B.R. 544, 550 (Bankr. E.D. Pa. 1987).  But

CCA barely even tried, and discovery has revealed ██████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ despite numerous examples of

insider unsecured DIP lending in other cases.  █████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

4.      Notwithstanding this attempt to create the illusion of arm's-length negotiating,

███████████████████████████████████████████████████████████████████████████████████

---

[3] The CSCEC Group attempts to portray these equity infusions as "loan[s,]" but the facts show
otherwise: ██████████████████████████████████████████████████████████████████████████
███████████████████████████ *See infra* ¶¶ 21-24.
[4] *See* Mandarino Declaration ¶¶ 7-8 (citing CCA-BK0012023 █████████████████████).  All
documents identified with bates numbers are attached to the Theisen Declaration.

██████████████████████████████████ [5] ████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████ [6]

Not only can CCA not meet its burden of exhausting its options for unsecured funding, but secured DIP financing should also be denied where a corporate parent "completely dominates the Debtor" and "manufactured" its subsidiary's need for credit. *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988). The DIP Facility should thus be denied or, at the very minimum, completely overhauled into an unsecured loan.

5.      The CSCEC Group's request for a secured DIP Loan is a transparent ploy to weaponize this Chapter 11 case against BMLP by transforming CSCEC Holding's ordinary course unsecured funding into a means of control over CCA and preventing BMLP from receiving a distribution on account of its judgment. ████████████████████████████████



████████ [7]

6.      That is why the CSCEC Group seeks to saddle CCA's estate with a $40 million loan that it has no ability to repay. Indeed, CCA generates no meaningful cash flow, and its

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ [8] There

---

[5] CCA-BK0012949 at 2958 (████████████████████████████████████████████████████
██████████████████████████).

[6] CCA-BK0012947 at 12947 (██████████████████████████████).

[7] CCA-BK0000975 at 0975.

[8] CCA-BK0000194 at 0195; CCA-BK0008953 at 8972 (████████████████████).

is no way CCA can repay the DIP Facility—and CCA's financial advisor conceded that ███

██████████████████████████████ ⁹

7.      What's more, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████ ¹⁰ ███████████████████████████████████████

███████████████████████████████████ ¹¹  In sum, ███████████████████████

██████████████████████████████, CCA seeks to incur a secured loan ███████

████████████████████████████████████████████████████████████████, so

that CSCEC Holding can retain control of CCA through a sale or plan.

8.      While CCA conveniently asks the Court to evaluate the DIP Loan under the lenient

business judgment standard, this is an insider transaction that must be entirely fair, both in process

and result.  There is nothing at all fair about this DIP Loan, which is designed to give full control

to CSCEC Holding and disadvantage the estate's existing creditors.  Among other terms, CSCEC

Holding ensured that CCA has the "unfettered" ability to draw the entire $40 million DIP Loan

immediately upon entry of a final order and without further approval from this Court, which will

primarily be made to pay the expenses of *non-Debtors*.¹²

---

⁹ Rough Transcript of February 4, 2025 deposition of Evan Blum ("Blum Rough Dep. Tr.") 92:20-
93:1 (emphasis added). Given the expedited briefing schedule, all citations to deposition
transcripts are to the rough transcripts, which are attached to the Theisen Declaration. BMLP
reserves the right to amend this objection to the extent necessary to conform to official transcripts.
¹⁰ CCA-BK0000194 at 0195, 0207, 0210 (████████████████).
¹¹ ████ Rough Dep. Tr. 174:25-180:10; *See also* CCA-BK0014647 (████████████).
¹² Docket No. 12 (the "Blum Declaration") ¶ 15; *See also* CSCECHolding_0000000276 at 0276
(███████████████████████████).

9.      Although the DIP Motion fails to disclose it, the DIP Facility also pre-wires estate releases in favor of CSCEC Group affiliates and employees by making it an event of default for CCA to file a Chapter 11 plan that does not include such releases.[13]  The DIP Motion also contravenes Section 363(k) of the Bankruptcy Code by giving CSCEC Holding the "unqualified" right to credit bid the DIP Loan in any sale of CCA's assets.[14]  And, because the ultimate goal of this DIP Loan is to manipulate the Chapter 11 process so that CSCEC Group retains control of CCA, ████████████████████████████████████████████████████████████
████████████████████████████████████.[15]

10.     Despite the Debtor's attempts to portray the DIP Loan as an arm's-length bargain, the evidentiary record shows that CCA's "negotiation" with CSCEC Holding was a sham.  Time and again, ████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
█████████████████████████.

11.     And while CCA's Chief Executive Officer Yan Wei claimed to have "recused" himself from the DIP Loan because of his positions at CSCEC Holding, his presence loomed over the entire "negotiation."[16] ████████████████████████████████████████████
██████████████████████████████████████████████████████████████

---

[13] Annex A to the DIP Motion (the "DIP Credit Agreement") § 7.1(e).
[14] Exhibit B to the DIP Motion (proposed final order) § 11(e); *See also* DIP Credit Agreement §§ 7.4, 8.9.
[15] DIP Credit Agreement § 9.6. *See also* CCA-BK0000975 at 0992.
[16] *See, e.g., infra* ¶¶ 38, 60 (citing Wei Declaration ¶ 17 (recusal from DIP process)).

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ [17]

12.     The appointment of a purportedly independent director, Elizabeth Abrams, cannot cleanse this deeply conflicted process. ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████ [18] ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ [19]

13.     Despite the best efforts of the Debtor's and the proposed DIP Lender's advisors and professionals, the simple fact of the matter is that the CSCEC Group continues to be rife with the same mismanagement and dishonesty that led to the entry of the New York Judgment.  As just one example of the CSCEC Group's non-credible testimony, which the New York Court also noted in rejecting CCA's defenses to BMLP's claims, Mr. Xu stated ████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████ [20]

---

[17] *See infra* ¶¶ 34, 60 (citing CCA-BK0001927), 65, 85.

[18] Rough Transcript of February 3, 2025 deposition of Elizabeth Abrams ("Abrams Rough Dep. Tr."), 8:1-16.

[19] ████████ Rough Dep. Tr. 163:3-165:20; *infra* ¶ 83.

[20] *Compare* CCA-BK0012949 at 2958, *with* Rough Transcript of February 5, 2025 deposition of JiChao Xu ("Xu Rough Dep. Tr.") 65:7-17 (████████████████████████).

14. CCA's proposed DIP Loan presents so many problems that, according to ███████ ████████████████████████████, BMLP and the rest of CCA's non-insider creditors would be better served if CCA's estate was simply liquidated. Fortunately, this Court does not need to go down that path. ██████████████████████████████████████████ ████████████████, which would make the DIP worthwhile for both CCA's parent and its non-insider creditors by allowing CCA to maintain the *status quo* while pursuing its appellate rights in the New York Action. With this and other modifications, BMLP may be willing to consider CSCEC Holding's continued funding of CCA; as proposed, however, the DIP Motion must be denied.

## **BACKGROUND**

### I.    **CCA relies on the CSCEC Group for unsecured financing.**

15. CCA was established in 1993 as a Delaware corporation named "China Construction America, Inc." before changing its name to "CCA Construction, Inc." in 2017.[21] CCA describes itself as "a holding company that does not itself generate sufficient operating cash flow in the ordinary course of business."[22] CCA claims its "primary assets" are the equity interests in its non-Debtor subsidiaries.[23]

16. The proposed DIP lender, CSCEC Holding, is a Delaware corporation and the direct parent of CCA. CSCEC Holding is owned by CSCEC, which is publicly traded on the Shanghai Stock Exchange but is controlled and substantially owned by the Chinese government.[24]

---

[21] CCA-BK0014065 at 4068 (██████████████████████).
[22] *See* DIP Motion ¶ 22.
[23] Docket No. 11 (the "Wei Declaration") ¶ 9.
[24] ██████ Rough Dep. Tr. 11:10–12:13.

Just two months after CCA changed its name from "China Construction America, Inc.," CSCEC

Holding confusingly started using the trade name "China Construction America (CCA)."[25]

17.    CCA's non-Debtor subsidiaries include: Plaza Group Holdings LLC; CCA Civil,

Inc.; China Construction America of South Carolina, Inc.; and Strategic Capital (Beijing)

Consulting Co., Ltd. (the "Non-Debtor Subsidiaries").[26]  For years, CCA's and its Non-Debtor

Subsidiaries have been in steep financial decline. ███████████████████████████████

███████████████:

- ███████████████████████████████████████████████;
- ███████████████████████████████████████████████;
- ███████████████████████████████; and
- ███████████████████████████████████████████████
  ██████████████.[27]

18.    CCA claims that the financial decline is due to reduced contracts from Chinese

firms in the U.S. market driven by geopolitical tensions and China's 2017 investment policy

changes,[28].███████████████████████████████████████[29]  Curiously, CCA's

schedules of assets and liabilities include more than $96 million that appears to be largely

intercompany receivables owed by CSCEC Group entities but that are oddly listed under the

---

[25] Theisen Declaration ¶ 3 (press release dated October 19, 2017, stating that "'China Construction America (CCA)' has been adopted as the trade name for CSCEC Holding Company, Inc. as a part of an integrated branding effort effective as of August 10, 2017."), *available at* https://www.chinaconstruction.us/press-releases/cca-officially-adopts-china-construction-america-cca-as-trade-name/ (October 19, 2017).
[26] Wei Declaration ¶ 10.
[27] CCA-BK0000326 (███████████████████████) at 0328 (███████████████); *id.*at 0327 (██████████████████); *id.* at 0332 (███████████████████t); CCA-BK0008953 (███ ██████████████████████████) at 8972 (███████████████████████████).
[28] Wei Declaration ¶ 20.
[29] CCA-BK0000326 at 0327 ███████████████████).

category for "Other property of any kind not already listed[,] Examples: season tickets, country club membership."[30]

19.    Notwithstanding its financial distress, CCA continues to "support" the Non-Debtor Subsidiaries and other CSCEC Group affiliates with so-called "shared services."[31] ███████



[32] Indeed, it would make much more sense for CSCEC Holding to provide these services for all of its direct and indirect subsidiaries, rather than having CCA provide them to a mix of subsidiaries and affiliates.

[34]

20.    Pursuant to these shared services agreements, CCA provides the Non-Debtor Subsidiaries and other affiliates with financial services, IT support, legal advice, and other support in exchange for a services fee.[35]

---

[30] Docket No. 99 (Schedules of Assets and Liabilities) at 13; Docket No. 99 at 25 (Schedule A/B 77).
[31] Wei Declaration ¶ 8.
[32] *See, e.g.,* CCA-BK0003144 ████); CCA-BK0008953 at 8961 (███).
[33] CCA-BK0003110 at 3110 (███); CCA-BK0000104 at 0109 (███).
[34] CCA-BK0003122 (███) at 8961 (███); *See, e.g.,* CCA-BK0003144 (███). BMLP reserves all rights to challenge all assertions of privilege,



21.    Because CCA generates almost no revenue on its own, it primarily relies on CSCEC

Holding for liquidity in the form of intercompany financing to fund the ███████████.[37]

22.    These purported loans have ████████████████████████

████████████[39] In fact, ████████████████████████

███████████████[40] And, unsurprisingly, CSCEC Holding

_____

[36] CCA-BK0003173 (███████████████).

_See_ CCA-BK0003028 (████
███████).

[37] Docket No. 99-1 (Statement of Financial Affairs for CCA) at 2 (listing "Gross revenue from business" as $106,675.58 in 2024 through the December 22, 2024 Petition Date; $270,727.00 in 2023; and $96,845.00 in 2022); DIP Motion ¶ 17.

[38] CCA-BK0000143 at 0150 (████████████████
████).

[39] CCA-BK0012490 at 2490 (███████████████████).

[40] Blum Rough Dep. Tr. 117:7-15.

███████████████████████████████████████████████████████.[41]   Tellingly,  CSCEC

Holding ████████████████████████████████████████████████████████████████

██████████████████.

23.      This led to ████████████████████████████████████████████

██████████████████████████████████████████████████████[42]   In

the subsequent years, CCA's debt to its parent ███████████████████████

██████████████████████████████[43]

24.      ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████[4]

## II.   CCA prepares to enter bankruptcy with a secured DIP Loan to avoid paying its judgment debt to BMLP.

25.      On December 12, 2017, BMLP commenced an action in the Supreme Court of the

State of New York, New York County (the "New York Court") against CCA and two affiliated

entities, CSCEC Bahamas, Ltd. ("CSCECB") and CCA Bahamas Ltd. ("CCAB," and together

---

[41] CCA-BK0000143  at  0159  (███████████████████████); CCA-BK0000001  at  0019
(████████████).
[42] *Compare* CCA-BK0000032 at 0039, *with id.* at 0056.
[43] CCA-BK0000194 at 0195 (████████████████).
[44] Mandarino Declaration ¶¶ 7-8 (citing CCA-BK0012023 (██████████████)).

with CCA and CSCECB the "New York Defendants") styled *BML Props. Ltd. v China Constr. Am., Inc.*, Index No. 657550/2017 (N.Y. Sup Ct, NY County) (the "New York Action"), alleging fraud, breach of contract, and other causes of action in connection with the construction of the Baha Mar resort complex in the Bahamas.  From August 1 to 11, 2024, the New York Court held a bench trial to determine the merits of BMLP's claims.

26.    While the parties were engaged in post-trial briefing, the New York Defendants signed an engagement letter with its New York trial counsel Debevoise & Plimpton LLP ("Debevoise") on September 12, 2024 to also represent CCA "in connection with evaluating and implementing a potential restructuring of its financial obligations[.]"[45]  In October, CCA engaged Cole Schotz P.C. as bankruptcy co-counsel.[46]  Despite claiming that CCA's "historical month-end balances over the past six months rang[ed] from $45,000 to $825,000," CCA purportedly provided Debevoise with a $2.5 million advance payment retainer in the months prior to the bankruptcy.[47]



[48].

27.    [redacted]

[redacted]

[redacted]

[49]. [redacted]

- "[redacted]";

---

[45] Docket No. 98 at 23 (Debevoise Engagement Letter).
[46] Docket No. 95 at 16 (Declaration of Michael D. Sirota).
[47] *Compare* Cash Management Motion at 5, *with* Docket No. 98 at 10 (Debevoise Retention Application).
[48] Blum Rough Dep. Tr. 45:7-46:1.
[49] CCA-BK0000194 at 0194 ([redacted]).



- ██████████████████████████████████████████████████████;

- ██████████████████████████████████████████████████████;

- ████████████████████████████████████████████████;

- ████████████████████████████████████████████████;

- ██████████████████████████████████████████████████████; and

- ████████████████████████████████████████████.[50]

28.     Just a few weeks later, on October 2, 2024, CCA retained BDO as its financial advisor to, among other things: "[p]repare, monitor, and update the … Debtor in Possession … financing budget and other financial and cash flow forecasts" and "[a]ssist in negotiating and implementing DIP financing[.]"[51] ████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████"[52]

29.     ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████[53]

---

[50]CCA-BK0000194  at 0195, 0203, 0206, 0208, 0210 (emphases added).
[51] Docket No. 97 (BDO Retention Application) at 5.
[52] CCA-BK0012722 at 2724.
[53] ████████ Rough Dep. Tr. 36:6-37:24.

13

███████████████████████████████████████████████████████

████████ [54]

30.     A little over two weeks later, on October 18, 2024, the New York Court issued a comprehensive 74-page decision detailing its findings of fact and conclusions of law (the "New York Decision"). [55]  The New York Decision explains that CCA's liability arose from a scheme perpetrated with affiliates (or alter egos) to defraud and loot assets from BMLP, its former business partner, in connection with developing the Baha Mar resort complex in the Bahamas.  The New York Decision found CCA liable based not only on veil piercing but based on numerous false statements that Ning Yuan—CCA's then-President—either made or directed others to make. [56]  In reaching these conclusions, the New York Court found the CSCEC Group's witnesses to be "simply not credible." [57]

31.     ████████████████████████████████████████████

██████████████████ [58] ████████████████████████████

████████████████████████████████ [59] ██████████████████

████████████████████████████████████████████████████

███████████ [60] █████████████████████████████████████

---

[55] Further background information regarding the facts and circumstances underlying the New York Action is set forth in the New York Decision.  *See* Docket No. 54-1.
[56] New York Decision ¶ 166 (piercing corporate veil); *compare, e.g., id.* ¶ 118 (Yuan's internal messaging), *with id.* ¶ 103 (messaging BMLP received).
[57] New York Decision ¶¶ 60, 123.
[58] *See* CCA-BK0003088.
[59] *Id.* at 3088.
[60] ████████ Rough Dep. Tr. 8:1-16.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████[61]

32.    In summary, the following individuals were involved in the DIP negotiations on behalf of the CSCEC Group:

| Role | CCA | CSCEC Holding |
|------|-----|---------------|
| **Outside Counsel** | Debevoise<br>Cole Schotz | Lowenstein |
| **Financial Advisor** | BDO | ██ |
| **Independent Director** | Ms. Elizabeth Abrams | ██ |
| **Executive** | Mr. Yan Wei (Officer and Director) | ███████████ |
| **In-House Counsel** | ███████████ | █████████ |
| | ██████████ | █████████ |
| **In-House Finance** | ████████████ | ███████████ |
| | ██████ | ████████ |

## III.    The CSCEC Group controls the DIP Loan negotiations.

33.    ███████████████████████████████████████████████████

███████████████████████████████████████[62]  Just days later, Justice Borrok signed the judgment against CCA and the other New York Defendants in the New York Action, which was entered on October 31, 2024 and which provided that "BMLP shall have judgment and *immediate execution* on the judgment therefor."[63]

---

[61] Abrams Rough Dep. Tr. 59:2-60:5; CCA-BK0003173 (███████████████).
[62] CCA-BK0011968 at 1968.
[63] Docket No. 54-2 at 4 ("New York Judgment") (emphasis added).

34. 

---

[64] *See* CCA-BK0014294.

[65] CCA-BK0014214 at 4214 (

); *see also* Xu Rough Dep. Tr. 31:11-15.

[66] *See* CCA-BK0003173 ( ).

[67] *Compare* Xu Rough Dep. Tr. 17:11-13, *with id.* 17:23-25.

[68] Xu Rough Dep. Tr. 27:19-25.

[69] *See e.g.*, CCA-BK0011954.  CSCEC Holding's counsel previously represented to BMLP's counsel that Mr. McMahon was designated as CSCEC Holding's in-house legal advisor, but neither CSCEC Holding nor CCA have produced any documents concerning Mr. McMahon's role.

[70] Xu Rough Dep. Tr. 44:11-45:12.

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████ .[71]

36.     On October 29, 2024, ████████████████████████

████ .[72] ███████████████████████████████████████████

████████████████████████████████████ [73] ██████████████

█████████████████████████████████████████████ [74] ████

█████████████████████████████████████████ [75]

37.     On October 31, 2024, the New York Court entered a judgment in favor of BMLP and against CCA and its affiliated non-debtor co-defendants, CCAB and CSCEB, jointly and severally, in a total sum equal to $1,642,598,493.15, plus interest.[76]  This was ███████████

█████████████████████████████████████████████████████

███████ ."[77]

38.     On November 1, 2024, ██████████████████████ [78] ████████

█████████████████████████████████████████████████████

---

[71] *See, e.g.,* CCA-BK0011972 (██████████████████████████ ████████████████ ); CCA-BK0011985 (████ ████████ ); CCA-BK0004523 (███████████████ ).
[72] CCA-BK0002722 at 2735.
[73] CCA-BK0012949 at 2966 (████████████████████████ ) (emphasis added).
[74] *See* CCA-BK0007977 (████████████████ ); ██████ Rough Dep. Tr. 123:22-124:20; *see also* ████ Rough Dep. Tr. 148:5-149:3.
[75] ████ Rough Dep. Tr. 125:14-16; *id.*127:25.
[76] *See* New York Judgment at 4.
[77] CCA-BK0012949 at 2966 (██████████████████████ ).
[78] CSCECHolding_0000000099.



39.     Meanwhile, as the CSCEC Group negotiated the terms of the DIP, ███████████

40.     ███████████

---

[79] Abrams Rough Dep. Tr. 146:11-22.
[80] Xu Rough Dep. Tr. 74:4-14.
[81] Xu Rough Dep. Tr. 74:4-75:21.
[82] *See generally* ████ Rough Dep. Tr. (████████████████████
████████████████████).
[83] CCA-BK0012949 at 2966 (emphasis added).
[84] CCA-BK0008578 at 8579. Mr. Xu could not explain what the difference was between the Shared Services Center and CCA. Xu Rough Dep. Tr. 26:5-28:3.



41. [REDACTED]

[REDACTED], November 1, 2024, CCA filed a motion to stay enforcement of the New York Judgment pending its appeal.

42. [REDACTED]

43. On November 4, 2024, the New York Court granted an interim stay of the enforcement of BMLP's judgment.[90]  Even with the [REDACTED]

---

[85] CCA-BK0008578 at 8578. [REDACTED]

[86] *Id.*
[87] CCA-BK0008244 at 8245.
[88] CCA-BK0003100.
[89] Abrams Rough Dep. Tr. 22:1-23:11.
[90] Wei Declaration ¶ 4.
[91] CCA-BK0002722 at 2727.
[92] CCA-BK0004880 at 4880.

44.



45.    During this time and throughout the whole process, Mr. Xu would continue to instruct Mr. McMahon to send documents from Lowenstein—including drafts of the DIP Credit Agreement, issues list, revolver facility, and interim order—to the Shared Services Center for input from CCA.[96]

**A.**

46.



47.

<hr/>

[93] CCA-BK0000975 at 0992.
[94] Abrams Rough Dep. Tr. 138:15-142:15.
[95] *Id.* 53:15-16 ( ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ).
[96] *See, e.g.,* CSCECHolding_0000000282 ( ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ); *See also* CSCECHolding_0000000002 (similar request).
[97] CCA-BK0012949 at 2961 ( ▮▮▮▮▮▮▮▮▮ ); *see also* CCA-BK0002257.
[98] CCA-BK0012949 at 2961.



48.

49.

50.

---

[99] CCA-BK0012949 at 2959 (emphasis added).
[100] CCA-BK0012949 at 2958.
[101] CCA-BK0012949 at 2958 (emphasis added).
[102] CCA-BK0012949 at 2956 (" ▮").
[103] CCA-BK0012949 at 2955.
[104] CCA-BK0012949 at 2956 (emphasis added).
[105] CCA-BK0012949 at 2955 (emphasis added).



███████████████████████ ,106 ██████████████████████████████

██████████████████████████ 107

51.  ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████ 108

52.  ██████████████████████████████████████████████

████████████████████████████████████████████

**B.**     **CCA's marketing process confirms that it cannot support a $40 million secured DIP Loan.**

53.  ████████████████████████████████ ,109 ████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ "110

54.  ██████████████████████████████ 111 ████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ 112

---

[106] BMLP reserves the right to challenge any assertion of privilege over this call and all other Lowenstein communications given the privilege waiver over prior emails on the same subject matter.

[107] *See* CCA-BK0012947 at 2947 (██████████) attaching CCA-BK0012949 (████████████).

[108] CCA-BK0002286 at 2286.

[109] CCA-BK0003222.

[110] CCA-BK0011972 at 1972.

[111] Abrams Rough Dep. Tr. 116:15.

[112] CCA-BK0000527 at 0527 (" ████████████████████████████████ ██████████████████████).



56. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████ Even after CCA commenced its bankruptcy, BDO only had one meeting with BMLP's financial advisor, B. Riley, after which time BDO was instructed by Debevoise not to provide further information to BMLP except through formal discovery.[121]

57. ████████████████████████████████

████████████████████████████████████

---

[113] CCA-BK0001913 at 1913 (████████████████).
[114] CCA-BK0014647 (███████████).
[115] CCA-BK0001922 (██████████████████████ ████████████).
[116] CCA-BK0000322 (█████████████).
[117] CCA-BK0001938 (███████████████████ █████████).
[118] CCA-BK0014647 (███████████████████ █████████).
[119] CCA-BK0001929 at 1929 (████████████████).
[120] *Id.*
[121] Docket No. 89-4 at 8.



58.

59.

60.

---

[122] CCA-BK0007230.
[123] *See* CCA-BK0008824; CCA-BK0014638.
[124] ▮▮▮ Rough Dep. Tr. 180:11-24; ▮ Rough Dep. Tr. 53:21-54:10.
[125] CCA-BK0014647.
[126] CCA-BK0014647; CCA-BK0000305 (▮▮▮▮▮▮▮▮).
[127] CCA-BK0000519 at 0519.
[128] ▮▮▮ Rough Dep. Tr. 178:9-179:2.
[129] CCA-BK0011954 at 1955.



### C. The Special Committee rubber stamps the DIP Loan before CCA's advisors finish marketing.

61.

---

[130] Wei Declaration ¶ 17 (recusal from DIP process); CCA-BK0001927 (████████████████")

[131] CCA-BK0007818 at 7818.

[132] CCA-BK0013396 at 3397 (emphasis added).

[133] CCA-BK0004523 at 4528.

[134] *See* CCA-BK0002272 at 2272; CCA-BK0001164 at 1164-5 (████████████).

[135] *See* CCA-BK0012717.

[136] CCA-BK0012717 at 2717 (emphasis added).



[137] CCA-BK0012717 at 2717.
[138] CCA-BK0002722 at 2722.
[139] CCA-BK0011954 at 1955.
[140] *See* CCA-BK0003174.
[141] Abrams Rough Dep. Tr. 163:3-165:20.



[142]

65.

[143]

[144]

66.

[145]

67.

---

[142] Blum Rough Dep. Tr. 92:20-93:1 (emphasis added).
[143] CCA-BK0011991 at 1991.
[144] *See* CCA-BK0012947 at 2947 (██████) attaching CCA-BK0012949 (██ ████).
[145] CCA-BK0011985 at 1985.

████████████████████████████████████████████████████

███████████████████████████████ [146]

### D.    Chronology of key events between the New York Decision and Petition Date.

| Date | Event | Citation |
|------|-------|----------|
| October 18 | New York Court's post-trial decision finds CCA liable for breach of contract and fraud. | ¶30 |
| ██████ | ███████████████████████████ | ¶¶ 24, 89 |
| October 21 | Purportedly "independent" director appointed | ¶31 |
| █████ | █████████████████████ | ¶36 |
| October 31 | New York Court enters judgment against CCA | ¶37 |
| ██████ | ████████████████████████ | ¶38 |
| November 2 | CCA's board forms Special Committee, comprising only the "independent" director | ¶42 |
| █████ | ████████████████████████ | ¶46 |
| ██████ | ████████████████████████████████████ | ¶¶47-48 |
| █████ | █████████████████████████ | ¶51 |
| ████████ | ████████████████████████ | ¶65 |
| █████ | ████████████████ | ¶66 |
| ████████████████████ | ████████ | ¶66 |
| December 22 | CCA files for protection under Chapter 11 and seeks interim and final approval of the insider secured DIP | ¶¶68-72 |

---

[146] CCA-BK0011988 at 1989.

IV.     **CCA commences this Chapter 11 case and seeks approval of the secured $40 million insider DIP Loan.**

68.     On December 22, 2024 (the "Petition Date"), finding itself supposedly unable to post the bond required to stay enforcement pending appeal, and as a litigation tactic to stall its payment pursuant to the judgment, CCA commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). CCA's bankruptcy petition lists BMLP as CCA's largest creditor with a claim of over $1.6 billion. BMLP's claim is several orders of magnitude larger than the next non-insider creditor with a liquidated claim on the petition, which is for $486,917.[147]

69.     On the Petition Date, CCA filed a suite of motions (collectively, the "First Day Motions"), including, among others:

- **The DIP Motion.** The Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief (Docket No. 4) (the "DIP Motion"), seeking, among other things, a debtor-in-possession financing loan from CSCEC Holding, its corporate parent, in an amount of up to $40 million on a secured, super-priority basis (the "DIP Loan"); and

- **The Cash Management Motion.** The Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue its Bank Accounts and Maintain Existing Business Forms, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief (Docket No. 5) (the "Cash Management Motion"), seeking, among other things, authority "to continue to perform intercompany transactions, whether relating to the prepetition or postpetition period, in the ordinary course of business." Cash Management Motion at 2.

70.     Along with its First Day pleadings, CCA submitted declarations from Mr. Yan Wei (Docket No. 11) (the "Wei Declaration"), CCA's Chairman and CEO, and Mr. Evan Blum of BDO

---

[147] Docket No. 1 at 8.

Consulting Group LLC (Docket No. 12) (the "Blum Declaration").  Tellingly, CCA did not submit

a declaration from Ms. Abrams.

71.     Consistent with the DIP negotiations, the DIP Motion seeks approval of up to a

$40 million secured loan from CSCEC Holding on a super-priority basis.  *See* DIP Motion at 10.

CSCEC Holding also committed to provide $20 million in unsecured direct financing to CCA's

non-Debtor subsidiaries.[148]  As detailed below, the proposed DIP Credit Agreement includes

various provisions that will allow CSCEC Holding to leverage CCA's bankruptcy process with

the ultimate goal of retaining its equity—even if BMLP's judgment is upheld—including by

having an unqualified right to credit bid the DIP Loan and converting it to equity under a Chapter

11 plan.  And, though not disclosed or highlighted in the DIP Motion, the DIP Credit Agreement

pre-wires broad releases in favor of CSCEC Holding and its affiliates and makes the DIP Loan

non-assignable to BMLP.[149]

72.     On December 23, 2024, this Court granted interim relief on these First Day Motions

at the First Day hearing and scheduled a second-day hearing to evaluate the requested relief on a

final basis, currently set for February 13, 2025.  On January 23, 2025, BMLP filed a motion seeking

the appointment of an examiner in this case.[150]

## ARGUMENT

I.    **CCA's proposed DIP Loan from its corporate parent CSCEC Holding is an insider transaction subject to heightened scrutiny.**

A.    **The DIP Loan is not entitled to the deferential business judgment standard.**

73.     CCA urges this Court to defer to its decision to obtain the DIP Loan because it is

"a reasonable exercise of CCA's business judgment."   DIP Motion at 23.   But "the business

---

[148]CCA-BK0003202.

[149] DIP Credit Agreement § 7.1(e)(xii).

[150] *See* Docket No. 88 (BMLP's examiner motion).

judgment rule ***is not applicable to transactions among a debtor and an insider of the debtor***" because such transactions are "***rife with the possibility of abuse***." *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) (emphasis added, citations and quotations omitted). Moreover, a debtor can avail itself of the business judgment standard *only so long* as "a request for financing does not '***leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest***." *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (emphasis added). That is precisely what the CSCEC Group seeks here, and the DIP Motion should be denied for that reason.

74.    The Supreme Court has long held that a controlling shareholder's "dealings with the corporation are subjected to rigorous scrutiny[.]" *See Pepper v. Litton*, 308 U.S. 295, 306-307 (1939). Bankruptcy courts thus analyze a debtor's transactions with insiders, such as CSCEC Holding here, using the "heightened scrutiny standard." *In re AIG Fin. Prods. Corp,* 651 B.R. 463, 476 (Bankr. D. Del. 2023), *aff'd sub nom. In re AIG Fin. Prods. Corp.*, No. BR 22-11309-MFW, 2024 WL 3967465 (D. Del. Aug. 28, 2024) ("The Court finds that, as the parent of the Debtor, AIG was an insider of the Debtor … [t]herefore, the Court concludes that AIG's actions vis a vis the Debtor are subject to the heightened scrutiny standard."); *see also In re Summit Glob. Logistics, Inc.,* No. 08-11566, 2008 WL 819934, at *9 (Bankr. D.N.J. Mar. 26, 2008) (debtors must satisfy the "heightened scrutiny standard required by non-bankruptcy law for insider transactions.").

75.    Heightened scrutiny requires that the Court assess "the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *LATAM Airlines*, 620 B.R. at 769 (citing *In re Innkeepers USA Tr.*, 442 B.R. 227,

231 (Bankr. S.D.N.Y. 2010)).  As the Supreme Court has explained, this standard "is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders." *Pepper*, 308 U.S. at 307.

76.    Here, there is no dispute that CCA is seeking the DIP Loan from its direct corporate parent, CSCEC Holding.  *See* DIP Motion at 4.  As CCA's parent, CSCEC Holding is a statutory insider under the Bankruptcy Code.[151]  Accordingly, the DIP Facility is subject to heightened scrutiny under well-established bankruptcy law principles.

**B.    Approval of the DIP Loan by CCA's purported Independent Director does not affect the standard of review.**

77.    CCA cannot avoid a higher standard of review by asserting that the DIP Loan was approved by the Special Committee.  Although the approval of an insider transaction by a special committee can sometimes restore the presumption of business judgment under Delaware law, those circumstances are not met here.[152]

78.    The problem starts with the composition of CCA's single-member committee, as courts place more trust in "a multiple-member committee than in a committee where a single member works free of the oversight provided by at least one colleague."  *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1146 (Del. Ch. 2006).  The special committee must also "act with informed diligence" and cannot simply "orchestrat[ate] a stylized mockery of arm's-length negotiation." *Id*. at 1148.  Importantly, the special committee must have "the 'critical power' to say 'no' to the

---

[151] Section 101(31)(E) of the Bankruptcy Code explicitly defines "insider" to include an "affiliate". Moreover, under Section 101(2)(A), an "affiliate" includes any "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor[.]"

[152] Delaware corporate law principles have "vitality by analogy in Chapter 11, especially where, as here, the debtor … is a Delaware Corporation."  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

transaction" and "the controller's commitment to leave the essential fate of the transaction in the hands of the special committee is a significant one." *Id* at 1146.

79.     As Delaware courts have repeatedly held, "special committee members should have access to knowledgeable and independent advisors, including legal and financial advisors." *Id* at 1147. This is because "[t]he effectiveness of a Special Committee often lies in the quality of the advice its members receive from their legal and financial advisors." *In re Tele-Commc'ns Litig.*, 2005 WL 3642727 at *10 (Del. Ch. Dec. 21, 2005). Thus, when a special committee uses the legal and financial advisors already advising the company, this "alone raises questions regarding the quality and independence of the counsel and advice received." *Id*. In the Chapter 11 context, courts likewise note the significance of "the Special Committee also receiv[ing] advice from its own independent advisors." *In re Bos. Generating, LLC*, 440 B.R. 302, 313 (Bankr. S.D.N.Y. 2010) (approving sale of the debtor's assets blessed by the debtor's sole independent director).

80.     CCA's Special Committee fails on all fronts. CCA formed the Special Committee on November 2, 2024—███████████████████████████████████████████████ ████████████████████████████████████████[153] Once formed, the Special Committee contained just one director, Ms. Abrams.[154] ████████████████████████ ████████████████████████████████, Ms. Abrams relied *exclusively* on the same counsel as CCA—who also represents CCA in the litigation with BMLP—and CCA's financial advisor, BDO.[155] Her reliance on CCA's entrenched advisors corrupted the process from the outset, fostering Ms. Abrams's unfounded view of BMLP ████████████████, despite it having the

---

[153] *See supra* ¶¶ 34, 36, 42.
[154] *See supra* ¶ 42.
[155] ████    Rough Dep. Tr. 89:24-90:6; 168:2-7; *see also* CCA-BK0003100 (████████ ████).

most substantial interest maximizing the estate's value.[156] ████████████████████████

████████████████████████████████ [157]

81.    Not only did the Special Committee lack sufficient independence, but Ms. Abrams

also was not fully informed. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ [158]

82.    This led to a "stylized mockery of arm's length negotiation." *Gesoff*, 902 A.2d at

1148. ████████████████████████████████████████

████████████████████████████████████████ [159]

83.    Ms. Abrams also approved the DIP Loan without getting basic information

necessary to determine whether the incurrence of so much secured debt would be appropriate for

CCA's estate.  As CCA's financial advisor readily admitted in his deposition,[160] ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ In doing so, she

approved a DIP that, ████████████████████, would leave the Debtor's unsecured

creditors with nothing at the conclusion of bankruptcy case, give CSCEC Holding the power to

veto a plan, and ensure the release of estate's causes of action against CSCEC Holding.

---

[156] Abrams Rough Dep. Tr. 51:23-53:25.
[157] Abrams Rough Dep. Tr. 42:11-21.
[158] Abrams Rough Dep. Tr. 19:16-20:3.
[159] ████████████████████████████████████████████████████████
████████████████████████████████████████ Rough Dep.
Tr. 29:3-7. (emphasis added).  *See, e.g., supra* ¶¶ 34-35, 61-67.
[160] Blum Rough Dep. Tr. 164:19-167:23; 93:20-93:1.

84.     Ms. Abrams assumed her role shortly after the New York Court found CCA liable for numerous instances of fraud and pierced the corporate veil of its affiliates, ████████████ ███████████████████████████████████████████████████████████████████████████ ████████████████████.[161] ████████████████████████████████████████████████████ ████████████████████████████[162] but the proposed DIP Credit Agreement makes it an *event of default* if "a Chapter 11 plan is confirmed that does not provide for … ***releases, exculpations, waivers and indemnifications for [CSCEC Holding] and [its] officers, directors, employees, attorneys, and agents***."[163] Ms. Abrams's failure to perform even basic diligence on these claims would be unusual even in the most ordinary circumstances; in the context of CCA's history of wrongdoing proven in the New York action, it is egregious.

85.     Finally, the Special Committee cannot cleanse the approval of the DIP because insiders remained deeply involved throughout the entire DIP process.  As discussed above, ████ ██████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████[164]; ███████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████

---

[161] Abrams Rough Dep. Tr. 61:6-62:10.
[162] Abrams Rough Dep. Tr. 61:6-7.
[163] DIP Credit Agreement § 7.1(e) (emphasis added).
[164] Xu Rough Dep. Tr. 31:11-15; 46:15-47:8.

████████████████████████████████████████████[165]   While Ms. Abrams might have

thought the fate of the transaction was in her hands, the CSCEC Group rigged the outcome from

the start.

## II.   CCA's proposed DIP Loan fails to meet the requirements of Section 364 of the Bankruptcy Code.

86.     To obtain a loan secured by unencumbered property under section 364(c), CCA

must demonstrate: (1) it is unable to obtain unsecured credit; (2) the transaction is necessary to

preserve the assets of the estate; and (3) the terms of the transaction are fair, reasonable, and

adequate, given the circumstances of the debtor-borrower and the proposed lender.  *See In re Aqua*

*Assocs.,* 123 B.R. 192, 195-99 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores, Inc*., 115 B.R. 34,

37-40 (Bankr. S.D.N.Y. 1990).  CCA cannot carry its burden on any of these elements.

### A.   CCA never exhausted the possibility of obtaining unsecured credit from CSCEC Holding.

87.     CCA asks this Court to authorize secured indebtedness under sections 364(c) and

(d) of the Bankruptcy Code, *see* DIP Motion at 23-24, but CCA's own authority cautions against

debtors who, like CCA, seek secured credit "when funds are readily available from insiders or

others without providing the lender with the benefits of any priority."  *Aqua Assocs.,* 123 B.R. at

199; *see also Crouse Grp.*, 71 B.R. at 550; *see also* DIP Motion at 24 (citing *Aqua Assocs.*).  In

those situations, the debtor "***must first exhaust the possibility***" of obtaining unsecured credit from

insiders.  *Aqua Assocs.*, 123 B.R. at 199 (emphasis added).  The debtor must, therefore, convince

the Court that it has "made the requisite exhaustive unsuccessful efforts to obtain [unsecured]

credit" and that "***the potential of receiving funds from [its] Parent have been exhausted***."*Crouse*

*Grp.*, 71 B.R. at 550 (emphasis added).

---

[165] Abrams Rough Dep. Tr. 134:2-135:19; 146:11-147:3.

88.     Moreover, the Court must look at the Debtor's position holistically because corporate parents should not be allowed to extend secured credit if they "completely dominate[d] the Debtor and … the particular crisis requiring the infusion of [additional credit] was manufactured by the [the parent]." *St. Mary Hosp.*, 86 B.R. at 401-402.  Ultimately, "[t]he burden is clearly upon the debtor" to show that a secured insider DIP is appropriate.  *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).

89.     The CSCEC Group's sham negotiation falls far short of "exhaust[ing] the possibility" of obtaining unsecured credit from insiders.  To the contrary, CCA ***squandered*** that possibility by ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████ ▬

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████

90.     But even without these glaring red flags, CSCEC Holding still should not be entitled to liens on the estate's collateral because █████████████████████████

---

[166] CCA-BK0012949 at 2961.



92.     But this is demonstrably false and underscores how ill-informed CCA's Special Committee was.  Bankruptcy courts in this District and elsewhere repeatedly authorize Chapter 11 debtors to obtain unsecured financing, *especially from a debtor's corporate parent*.  *See Presperse Corp.*, No. 24-18921 (Bankr. D.N.J. Oct. 2, 2024) (Docket No. 95) (authorizing debtor to obtain over $4.7 million in unsecured DIP financing); *Cinemex USA Real Est., et al*, No. 20-14695-LMI (Bankr. S.D.Fl. June 5, 2020) (Docket No. 249) (authorizing $1.92 million unsecured DIP Loan from *corporate parent*); *Westlake Surgical, L.P., D/B/A The Hospital at Westlake Medical Center*, Case No. 23-10747 (Bankr. W.D.T.X. Oct. 23, 2024) (Docket No. 554) (authorizing $1 million in unsecured DIP financing).

---

[167] *See supra* ¶¶ 2-14.
[168] *See supra* ¶¶ 2-14.
[169] Blum Rough Dep. Tr. 148:13-23.
[170] Abrams Rough Dep. Tr. 124:14-16 (emphasis added).

93.     In fact, just a few months before █████████████████████████, a premier national bankruptcy intelligence platform—*Octus* (formerly *ReOrg Research*)—reported on a $30 million unsecured DIP financing from a corporate parent approved in the Southern District of Texas.  *See In re Barretts Minerals Inc., et al.*, No. 23-90794 (Bankr. S.D.T.X. May 1, 2024) (Docket No. 898).[171]

94.     CCA should have—and could have—likewise insisted on unsecured DIP financing from its corporate parent.

**B.     The terms of the DIP do not meet the heightened scrutiny standard applied to insider transactions.**

95.     As detailed above, the DIP Loan is from an insider and is thus subject to heightened scrutiny.  This requires CCA to carry the burden of establishing that both the process leading to the transaction and the terms of the transaction "not only appear fair but *are* fair."  *In re Innkeepers USA Tr.*, 442 B.R. at 231 (emphasis added).  Regardless of the standard of review, "a debtor in possession's fiduciary obligation to its creditors includes refraining from acting in a manner that could damage the estate or waste its assets."  *In re Chief Exec. Officers Clubs, Inc.*, 359 B.R. 527, 540 (Bankr. S.D.N.Y. 2007) (citations omitted).

96.     The record adduced in discovery reveals not only a deeply flawed process, as discussed above, but that the terms of the DIP Loan are unfair and detrimental to CCA's non-insider creditors.  While the DIP Motion asserts that the terms are "fair and reasonable," CCA only briefly discusses the interest rate, the "downward adjustment" for shared services, and the carve-out.  DIP Motion at 26-27.  These cherry-picked terms are entirely insufficient to support the fairness of the DIP Loan, particularly when considering the plethora of other provisions that are inherently unfair to CCA's non-insider creditors, discussed in more detail below.

---

[171] *See* Theisen Declaration ¶ 4 (May 21, 2024 *Octus* Article).

97.     Most concerning, the DIP Motion failed to disclose that it is an event of default if CCA does not file a plan containing releases for CSCEC Holding and its affiliates, *see* DIP Credit Agreement § 7.1(e)(xii), though this should have been disclosed under the Bankruptcy Rules.[172] Instead of explaining the pre-wired release, the DIP Motion misrepresents that the DIP Facility does not "provide for any release of claims (if any) against the DIP Secured Parties except with respect to claims arising under or related to the DIP Facility." DIP Motion at 19.

98.     Nor does the DIP Motion disclose that ███████████████████████ ████████████████████████████████████ This does not appear anywhere in the DIP Credit Agreement and was only later learned during discovery. This backroom agreement between CCA and CSCEC Holding regarding the estate's largest creditor should have been revealed to the Court and all parties in interest.

99.     More fundamentally, a secured DIP that ████████████████████████ █████████████ under these circumstances subverts the bankruptcy process, particularly where the Debtor claims to have filed the case to preserve the status quo while CCA pursued its appellate rights. Even if in a vacuum the terms could be described as "the best available," they are far from entirely fair as required for an insider DIP.

**1.     The amount of the DIP Facility is excessive given the purported value of CCA's assets and projected cash flows.**

100.    CCA seeks approval for a DIP Loan that it simply cannot support. CCA's financial advisor offers no basis for thinking otherwise: Mr. Blum projects that CCA will generate negative cash flow over the term of the loan, ██████████████████████████████ ████████████████████████████████████████████████

---

[172] Bankruptcy Rule 4001(c)(1)(B)(viii) requires that a motion to obtain credit must disclose any "release, waiver, or limitation on a claim or other cause of action belonging to the estate or the trustee."

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████[173]  Notwithstanding this, the DIP Credit Agreement gives CCA the "unfettered" ability to draw the *full* amount of the DIP Facility without further court approval upon entry of a final order, *see* DIP Motion at 2, 18.  █████████████████████████

████,[174] CSCEC Holding ensured that it would have the right to lend the full $40 million immediately upon final approval.[175]

101.    Most concerning, the proceeds of the DIP Facility will be used to continue to pay expenses of *non-Debtors*.    While CCA touts the DIP Facility's "downward adjustment" mechanism, which reduces the outstanding balance of the DIP Loan by shared services payments made on behalf of CCA's affiliates (*see* DIP Motion at 27), this mechanism applies only to payments that will be made on behalf of affiliates *outside of the CCA Group*.  This mechanism does not account for the payments that CCA will make for or on behalf of CCA's Non-Debtor Subsidiaries, and any adjustment will only be applied after the funds are borrowed and the expenses eventually allocated to a non-Debtor affiliate.  While CCA will likely continue claiming that shared services will maximize value of the Non-Debtor Subsidiaries for the estate, these subsidiaries *already owe* CCA tens of millions of dollars, █████████████████████████████ ████, and are most likely already *insolvent*.  At bottom, these shared services payments will not maximize value but instead *deplete* the estate for the benefit of the broader CSCEC Group.

---

[173] *See, e.g.,* CCA-BK0001929 at 1929 (" ████████████████████████████████████ ").
[174] Abrams Rough Dep. Tr. 152:5-153:14 (████████████████████████████████████████).
[175] CSCECHolding_0000000276 at 0276.

102.    CCA's non-Debtor Subsidiaries are not before the Court, and their financial
interests should not be elevated over those of CCA's non-insider creditors.  *Aqua Assocs.*, 123
B.R. at 196 ("credit should not be approved when it is sought for the primary benefit of a party
other than the debtor").

### 2.    The prospective Section 506(c) waiver is inappropriate

103.    Section 506(c) of the Bankruptcy Code allows a debtor to recover from property
securing a claim "the reasonable, necessary costs and expenses of preserving, or disposing of, such
property."  11 U.S.C. § 506(c). The DIP Motion seeks to waive this right, contravening the
essential purpose of section 506(c): "to prevent a windfall to a secured creditor."  *In re Visual
Indus., Inc.*, 57 F.3d 321, 325 (3d Cir. 1995).

104.    Waiving Section 506(c) here allows CSCEC Holding to shift the costs of preserving
its equity interests onto the estate's creditors.  Indeed, Ms. Abrams's deposition testimony ███
███████████████████████████████████████████████████████████████████████.[176]
Here, the Debtor proposes to borrow tens of millions of dollars to pay the expenses of Non-Debtor
Subsidiaries and affiliates for the purpose of protecting CSCEC Holding's indirect equity interests
in those entities while CCA pursues its appellate rights.  It is wholly inappropriate as a matter of
equity, and wholly impermissible as a matter of law, to allow CSCEC Holding to force CCA's
unsecured creditors to bear the costs of CCA's shared services program to preserve CSCEC
Holding's equity value—all of which ought to be surcharged to CSCEC Holding under Section
506(c).  The prospective waiver must be stricken.

---

[176] Abrams Rough Dep. Tr. 32:18-33:13; *id.* 158:10-24.

### 3. The DIP Credit Agreement pre-wires estate releases of CSCEC Holding and other insiders.

105.    CCA claims that "the DIP Facility and proposed Interim Order and Final Order do not provide for any release of claims against the DIP Secured Parties on account of their prepetition claims (the only release is limited to claims arising under or related to the DIP Facility)."  DIP Motion at 7.  What CCA fails to disclose is that the DIP Credit Agreement *pre-wires releases for the benefit CSCEC Holding* and its affiliates by making it an event of default if "a Chapter 11 plan is confirmed that does not provide for … releases, exculpations, waivers and indemnifications for the Lenders and their officers, directors, employees, attorneys, and agents." *See* DIP Credit Agreement § 7.1(e)(xii).

106.    As a threshold matter, BMLP does not consent to the release of *any of its direct claims* against CSCEC Holding or any other insiders (including the two other New York Defendants), thereby making any third-party release impermissible under Supreme Court precedent.  *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 204, 144 S. Ct. 2071, 2074 (2024) ("The bankruptcy code does not authorize a release and injunction that . . . effectively seek to discharge claims against a nondebtor without the consent[.]").  Any release of *estate claims*, moreover, will need to comport with Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") by showing: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).

107.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████    The Debtor's pre-agreement to file a plan that will

provide these releases is thus ill-informed and detrimental to the interests of its estate, particularly given that the estate may very well hold valuable claims against insiders given the CSCEC Group's troubled history of fraud and misconduct. CSCEC Holding should not be allowed to hold CCA's estate hostage with the DIP Loan to leverage releases that deprive creditors of this value.

        **4.**      **CSCEC Holding should not be entitled to an "unqualified right" to credit bid.**

108.    The proposed Final DIP Order provides CSCEC Holding the ***unqualified right*** to credit bid in any sale. But "the right to credit bid is not absolute" and can be limited for cause under Section 363(k) of the Bankruptcy Code. *See In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 59 (Bankr. D. Del. 2014). CSCEC Holding should not be allowed to circumvent the Bankruptcy Code, and its credit bid needs to remain subject to Section 363(k). The bankruptcy process should not be used solely to benefit CSCEC Holding by allowing it to transform its normal course unsecured funding of CCA into a vehicle to credit bid for CCA's assets in a blatant attempt to chill competition from non-insiders and give it the upper hand in any future sale of CCA's assets.

        **5.**      <u>**CCA unjustifiably excluded BMLP from the marketing process**</u> █

109.    BMLP is CCA's largest creditor, yet BMLP was wholly excluded from the marketing process. █████████████████████████████████████████████

█████████████████████████████████████████████████████.[177]

BMLP is not a competitor of CCA, ██████████████████████████████

████████████████████████ This is both unfounded and illogical: BMLP is the estate's largest creditor and only stands to benefit from CCA's estate maximizing its value. The

_____

[177] ██████ Rough Dep. 138:22-139:2 (████████████████████████████

██████████████). *See also* CCA-BK0000975 at 0992.

estate does not benefit from limiting the potential sources of DIP financing, especially when CCA

in unlikely to be meritorious in its appeal.  Rather, the DIP Loan should be expressly assignable to

BMLP, or BMLP should have a right to "takeout" the DIP Loan.

> **6.    The pledge of avoidance action proceeds to the most likely target of such claims is plainly inappropriate.**

110.    This Court should also not permit a DIP facility or adequate protection package that

grants CSCEC Holding liens on avoidance action proceeds.   Among a debtor's fiduciary

obligations is to exercise its avoidance powers to maximize recoveries "for the benefit of all

unsecured creditors*." See Buncher Co. v. Off. Comm. of Unsecured Creditors of GenFarm Ltd.

P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000); *Off. Comm. of Unsecured Creditors of Cybergenics

Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003) (explaining that the intent of the avoidance

powers is the recovery of valuable assets for the benefit of the estate).

111.    In its efforts to ensure that BMLP and other non-insider unsecured creditors are

denied any potential avenue for a recovery in these cases, however, the proposed final DIP Order

seeks to give CSCEC Holding a lien on proceeds of avoidance actions.  But "[a]voidance actions

can only be brought for the benefit of creditors."  *In re Morawski*, No. 20-12079, 2022 WL

1085739, at *3 (Bankr. D.N.J. Apr. 11, 2022).  To that end, "avoidance actions have historically

been aimed at (among other things) deterring overreaching by insiders of a debtor." *In re Texas

Rangers Baseball Partners*, 498 B.R. 679, 709 (Bankr. N.D. Tex. 2013).  ██████████████

████████████████████████████████████████████████████████████████

██████████████████████[178]  Such a pledge cannot be reconciled with the fiduciary duties

she owes to the estate's creditors.   Allowing CCA, as a fiduciary debtor in possession, to

effectively assign the benefits of avoidance actions and their proceeds to its corporate parent rather

---

[178] Abrams Rough Dep. Tr. 158:10-24.

than to preserve them for the benefit of unsecured creditors turns bankruptcy law on its head and "pervert[s] the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit" of CSCEC Holding.  *In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989).

112.    Given the web of CCA's prepetition intercompany transfers and history of fraud and mismanagement, there are almost certainly valuable estate avoidance actions against CSCEC Holding and its affiliates.[179]  Realizing this, CSCEC Holding and CCA attempt to keep those proceeds within their corporate group and never make it to non-insider general unsecured creditors. They should not be allowed to do so.

### 7.    CSCEC Holding should not be given any plan consent rights

113.    The votes of insiders like CSCEC Holding are not supposed to be counted for determining whether a debtor has an impaired accepting class under a plan of reorganization.  *See* 11 U.S.C. § 1129(a)10).  But the DIP Credit Agreement seeks to give CSCEC Holding a backdoor consent right by making it an event of default for CCA to file anything other than an "Acceptable Plan" that provides for repayment in full of the DIP Obligations. (DIP Credit Agreement § 7.1(e)(x)).  CSCEC Holding should not have any backdoor plan consent right.

### 8.    The appointment of an examiner should not be an event of default under the circumstances.

114.    As detailed in BMLP's examiner motion, the appointment of an examiner is mandatory in this case because CCA's has fixed, liquidated unsecured debts of over $5 million.  *See* 11 U.S.C. § 1104(c).  In likely anticipation of BMLP's examiner motion, the DIP Credit Agreement makes it an event of default if an examiner is appointed with enhanced

---

[179] *See* Docket No. 99-1 at 28-33 (listing payments to insiders within 1 year of the bankruptcy case).  CCA's avoidance powers would allow it to avoid transfers dating back several more years.

powers. *See* DIP Credit Agreement § 7.1(e)(iv). This provision clearly aims to limit the ability of an independent investigation into CCA. But such investigation may uncover valuable estate causes of action, and thus this event of default is not in the best interests of CCA's non-insider creditors. The removal of this provision is particularly important here because no creditors' committee has been appointed in this case to serve as an independent fiduciary to creditor interests.

**9.    The budget for any third-party investigation is vastly insufficient.**

115.    In a similar vein, the DIP Budget is completely insufficient in terms of funding of an independent investigation. The DIP Budget originally allocated only $40,000 for a creditors' committee to investigate claims through the end of March 2025. In contrast, CCA budgeted $1.7 million for Debevoise, Cole Schotz, and BDO for the same period. In other words, the proposed budget for a creditor's committee's investigation is just 2.3% of that allocated to other estate professionals for the first 13 weeks of the case, which is plainly insufficient. An independent estate fiduciary's investigation for the benefit of the Debtor's estate cannot be so restricted, particularly because CSCEC Holding stands to benefit from a shoddy investigation. No creditors' committee has been appointed in this case, but an appropriate budget should still be allocated for an examiner given BMLP's examiner motion.

**10.    There is no permitted variance from CSCEC Holding's approved budget.**

116.    While CCA touts that the DIP Facility contains "customary" terms, it does not permit *any* variance from CSCEC Holding's approved budget. Instead, CCA must strictly comply with the budget CSCEC Holding approves or CSCEC Holding can call an event of default. *See* Credit Agreement § 4.15 (covenant to comply with Approved Budget); § 7.1(d) (other covenant events of default). The provision gives CSCEC Holding yet another tool to call a default for any foot-fault.

117.    DIP financing agreements in bankruptcy routinely provide for permitted variances from the agreed budget to account for unavoidable swings in a debtor's cash flow—customarily up to 10% or higher.  But here, incredibly, CSCEC Holding has strictly required CCA to comply with the Approved Budget—enabling it to retain absolute control over CCA's cash flow and use any foot-fault in spending to terminate the DIP Loan.

### 11.    BMLP's reservation of rights as to other terms of the DIP Facility

118.    The terms highlighted above are meant to illustrate how unfair and unreasonable the proposed DIP Facility is.  It is, by no means, an exhaustive list of all terms and provisions that BMLP finds objectionable and BMLP reserves the right to object to any other provisions of the DIP Facility at the Final Hearing.

## III.    The DIP Loan is an impermissible *sub rosa* plan of reorganization.

119.    As the Supreme Court has explained, debtors in Chapter 11 are not permitted to enter into transactions that "circumvent the [Bankruptcy] Code's procedural safeguards."  *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 986 (2017).  Thus, when a transaction in bankruptcy has the effect of dictating terms of any future reorganization plan, that transaction is impermissible because it "short circuits the requirements of Chapter 11 ... by establishing the terms of the plan *sub rosa*."  *See In re Energy Future Holdings Corp.,* 648 F. App'x 277, 284-85 (3d Cir. 2016) (citations and quotations omitted).  "DIP financings sometimes trigger sub rosa plan issues" and the Court cannot, "under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements."  *LATAM Airlines*, 620 B.R. at 815-16.

120.    The proposed DIP Loan is a *sub rosa* plan.  Under the guise of a feigned liquidity crisis that it created, CSCEC Holding asks this Court to approve financing that would cede full control of the case and ensure all of CCA's value goes to an insider.  This contravenes the

fundamental principles of the Bankruptcy Code and circumvents the absolute priority rule, which

mandates that equity should not receive any distributions ahead of creditors. *See* 11 U.S.C.

§ 1129(b)(2)(B).

121.    The CSCEC Group created this result by saddling CCA's estate with more money

than it could ever hope to repay to ensure that CCA's entire value is unencumbered by the DIP

Loan.  CCA then makes it easy for CSCEC Holding to foreclose on this value by giving it the

unqualified right to credit bid and a consent right over an "Acceptable Plan," while at the same

time hamstringing the estate's ability to investigate and pursue valuable avoidance actions targeted

at the CSCEC Group, among other things.  To clear the path for CSCEC Holding's getaway, the

DIP Credit Agreement pre-wires releases into any future plan.  This all ensures that there can be

only one outcome in this Chapter 11 case: that CSCEC Holding retains control regardless of the

outcome of CCA's appeal of BMLP's judgment.  CCA cannot subvert the bankruptcy process by

using the DIP Loan as a backdoor to ensure its existing equity holder retains all value of CCA's

estate and that BMLP and other non-insiders get nothing.

## IV.    CSCEC Holding should not be entitled to good faith findings in the DIP Order.

122.    Good faith cannot be found where there is fraud, collusion, actions for an improper

purpose, or knowledge of illegality in the transaction. *See In re Gen. Growth Props., Inc.*, 423

B.R. 716, 722 (S.D.N.Y. 2010) (finding good faith absent in cases of fraud, collusion, or grossly

unfair advantage).  In assessing good faith, courts should "look to the integrity of an actor's

conduct during the proceedings." *Id*.

123.    The sham DIP "negotiation" process was fraught with collusion between CCA and

CSCEC Holding, as discussed above, with the improper purpose of designing an inherently unfair

DIP Loan that will only serve to enrich CSCEC Holding at the benefit of CCA's non-insider

creditors.  Accordingly, CSCEC Holding should not be entitled to any good faith findings.

**V.**      **Unless the DIP Loan is provided on an unsecured basis, CCA's cash management motion should be denied.**

124.      Through its Cash Management Motion, CCA seeks to continue its cash management system in the "ordinary course of business."  This includes authority to continue Intercompany Transfers to the Non-Debtor Subsidiaries and other CSCEC Group affiliates. Section 363(c)(1) of the Bankruptcy Code provides that a debtor in possession "may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).

125.      As the record has established, CCA has historically relied on unsecured financing from CSCEC Holding to fund its shared services and Intercompany Transfers. ███████████

███████████████████████████████████████████████████████████████

███████████      Thus, CCA's ordinary course of business was to rely on unsecured credit from CSCEC Holding, and the CSCEC group should be required to continue this unsecured funding during the pendency of this Chapter 11 case.


*[Remainder of Page Left Intentionally Blank]*

## <u>CONCLUSION</u>

126.    For the foregoing reasons, the Court should deny the DIP Motion and Cash

Management Motion and grant such other relief as is appropriate.

Dated: February 7, 2025                    **GIBBONS P.C.**
Newark, New Jersey

<u>*/s/ Brett S. Theisen*</u>
Robert K. Malone, Esq.
Brett S. Theisen, Esq.
Christopher P. Anton, Esq.
Kyle P. McEvilly, Esq.
One Gateway Center
Newark, New Jersey 07102-5310
Telephone: (973) 596-4500
Email: rmalone@gibbonslaw.com
          btheisen@gibbonslaw.com
          canton@gibbonslaw.com
          kmcevilly@gibbonslaw.com


*Counsel for BML Properties, Ltd.*