**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (admitted *pro hac vice*)
Erica S. Weisgerber (admitted *pro hac vice*)
Elie J. Worenklein
66 Hudson Boulevard
New York, NY 10001
Telephone:  (212) 909-6000
Facsimile:   (212) 909-6836
nlabovitz@debevoise.com
eweisgerber@debevoise.com
eworenklein@debevoise.com

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Felice R. Yudkin
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone:  (201) 489-3000
Facsimile:   (201) 489-1536
msirota@coleschotz.com
wusatine@coleschotz.com
rjareck@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel to the Debtor and Debtor in Possession*

*Co-Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| CCA Construction, Inc.,[1] | Case No. 24-22548 (CMG) |
| Debtor. | |

**DEBTOR'S REPLY TO OMNIBUS OBJECTION OF BML PROPERTIES, LTD.**

The above-captioned debtor and debtor in possession, CCA Construction, Inc. ("**CCA**" or the "**Debtor**"), respectfully submits the following reply (the "**Reply**") to the *Omnibus Objection of BML Properties, Ltd.* (the "**Objection**"), filed on February 7, 2025 [Docket No. 128].

---

[1]    The last four digits of the Debtor's federal tax identification number are 4862  The Debtor's service address for the purposes of this chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

**Preliminary Statement**

1.      The Objection filed by BML Properties, Ltd. ("**BMLP**") is not about the necessity or appropriateness of the DIP Facility.  Rather, it is a flimsy effort to dictate financing terms after weeks of scorched-earth litigation tactics, all aimed at advancing BMLP's parochial litigation agenda rather than preserving value for the estate.[2]  The Objection ultimately concedes that financing is required—it does not advocate for alternative funding or identify any potential lenders that CCA overlooked, nor does it propose any actionable substitute.  Instead, BMLP seeks to impose financing terms that are not available, makes other objections based on apparent misunderstandings that could have been clarified with a simple phone call, and attacks the very process that has resulted in the only available financing package.  This opposition, laden with mischaracterizations of both fact and law, should be rejected.

2.      At the core of its objection, BMLP claims that CCA's financing process was designed to allow CCA's immediate parent CSCEC Holding, Inc. ("**CSCEC Holding,**" or the "**DIP Lender**") to retain "complete control" over CCA.[3]  No such control exists.  As described further in CCA's motion for debtor-in-possession financing (the "**DIP Motion**")[4], the DIP Facility does not provide any benefits to the DIP Lender beyond what is customarily afforded to third-party lenders (and in fact is more favorable to CCA than most DIP financing packages are to debtors). The only release of claims _is_ limited to those arising under the DIP Loan (BMLP says otherwise

---

[2]      Based on preliminary billing records, responding to BMLP's sweeping discovery requests cost approximately $2 million in the month of January alone.

[3]      _See_ Objection at ¶ 1.

[4]      Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the DIP Motion.

because it ignores the relevant definition of "Lender" in the DIP Credit Agreement), there is no "roll-up" of the DIP Lender's prepetition debt, no milestones, no prepayment penalties, and the principal obligations under the DIP Facility are adjusted downward to account for any portion of expenses that do not directly benefit CCA and its wholly-owned subsidiaries.[5]

3.      After indulging in weeks of aggressive discovery—which involved 37 document requests, six deposition notices, Rule 2004 requests on 76 parties, review of more than 18,000 pages of documents, three "emergency" telephonic conferences with this Court and dozens of emails to Debevoise attorneys demanding the production of additional documents—BMLP has failed to produce a single viable alternative lender or any evidence of actual misconduct.  *See Debtor's Objection to Motion Of BML Properties, Ltd.  For Entry Of An Order Appointing An Examiner* (the "**Examiner Objection**").  BMLP's arguments rely on a series of fundamental contradictions: it argues that CCA should have pursued different financing, but failed to offer any constructive input; it claims that CCA had no legitimate need for DIP Facility at all, but then backs away from that point (as it must, since the financing is needed to pay for the response to BMLP's discovery requests, among other things).  These shifting positions are emblematic of BMLP's bad-faith litigation tactics, which prioritize obstruction over meaningful solutions.

4.      The reality is that the DIP Facility was the product of a structured, arms-length process overseen by an independent director working through experienced outside professionals, was approved after an appropriate market check, and remains the best financing available to CCA.  No third-party lender has proposed terms comparable to those offered by the DIP Lender.  There was, and is, no actionable alternative.  BMLP is not engaged in a constructive effort to improve

---

[5]     *See* DIP Motion ¶ 12.

the financing terms; rather, it is creating needless disputes to serve its own interests at the expense of the estate.

5.    BMLP's attack on the marketing process is baseless.  The record establishes that CCA, through its financial advisor, contacted multiple potential lenders, including both traditional and non-traditional DIP lenders.  These outreach efforts were extensive and yielded no viable alternative financing proposals.  BMLP itself, the estate's largest creditor, was at all times free to suggest alternate financing proposals or identify additional parties for CCA to reach out to, and neither BMLP itself nor its experienced financial advisor did so.  Instead, BMLP chose to expend estate resources litigating a process it declined to assist, only to now complain about the result.

6.    At its core, BMLP's objection amounts to an attempt to discredit CCA by finding fault with aspects of the financing process – all while entirely ignoring the better-than-market terms the DIP Lender is actually providing – and to dictate the precise terms of the financing in a way that serves BMLP's own litigation interests.  Most notably, while it finds fault based on process points, BMLP does not refute the extensive record demonstrating the fundamental necessity and reasonableness of the DIP Facility.  It objects to standard financing provisions such as a section 506(c) waiver, the lender's ability to credit bid, and the inclusion of a collateral pledge—all of which are commonly approved in DIP financing orders.  It mischaracterizes the pledge of avoidance action proceeds as an improper insider benefit when, in fact, such a pledge is consistent with precedent and, to the extent the claim in question is against the DIP Lender itself, would only amount to a setoff of any litigation proceeds against the DIP Lender's legitimate claim based on money it lent during this chapter 11 case.  In short, BMLP is seeking to the get the benefit of the DIP Facility (which will undeniably benefit BMLP by allowing CCA to continue to operate), while also seeking to cherry pick certain aspects of the DIP Facility terms that it would like to

strike.  However, the DIP Facility is the culmination of extensive negotiations and the various provisions flagged by BMLP are part and parcel of the bargain that the Special Committee negotiated to obtain the benefit of the $40 million of potential liquidity.

7.      Many other of BMLP's objections are based on simple misreadings (or mischaracterizations) of the DIP Credit Agreement terms: for example, BMLP claims that the DIP Lender has consent rights over a chapter 11 plan, but in fact the only requirement in the DIP Credit Agreement related to a chapter 11 plan is that it pay the DIP Obligations in full and in cash – which is required under Bankruptcy Code section 1129(a)(9) for *every* administrative priority claim. BMLP also claims that the DIP Credit Agreement provides broad releases for CSCEC Holding, but a careful read of the document shows that the referenced releases are for the DIP Lender *in its capacity as such*, a point which the parties are willing to make even more clear in the agreement given BMLP's apparent confusion.  Objections like these could have been easily resolved with a simple phone call—one BMLP failed to make, needlessly wasting estate resources.

8.      BMLP's objection assumes that CCA could have obtained unsecured financing, but the record definitively shows that was not a realistic option.  CCA inquired whether the DIP Lender would provide the DIP Facility on an unsecured basis, and the response was "no."  As this Court noted during the January 22, 2025, status conference, it is completely logical for the DIP Lender to be reluctant to provide unsecured financing "when there's a multi-billion dollar judgment against the company that has put them into bankruptcy."[6]  A secured structure is a common and necessary feature in DIP financing agreements and was a required component for securing the favorable terms offered by the DIP Lender.   Moreover, BDO conducted a comprehensive

---

[6]      *See* Jan. 22, 2025, Hr's Tr. 22: 6-11.

marketing process, reaching out to multiple potential lenders, yet none were willing to offer unsecured credit or financing on terms even remotely as favorable as those offered by the DIP Lender.  Notably, BMLP and its own financial advisor have failed to identify any lender willing to provide unsecured financing, further confirming that secured financing was the only viable path.  Given these circumstances, the Special Committee determined that a secured structure was essential to ensure access to liquidity on the best available terms, enabling CCA to maintain operations and maximize value for all stakeholders.

9.      Simply put, BMLP's objection does not withstand scrutiny.  This financing is the result of a comprehensive marketing process and includes terms that are better than market for similar facilities.  This financing is necessary.  It is the only financing realistically available.  BMLP's efforts to delay or obstruct approval of the DIP Facility serve no purpose other than to advance its own creditor agenda at the expense of the broader estate.  The objection should be overruled, and the financing should be approved.

10.     CCA has organized and summarized each of BMLP's objections not discussed here, along with CCA's response to each objection, in the chart attached hereto **Exhibit A** (the "**Reply Chart**")[7].  CCA has proposed to the DIP Lender certain language adjustments in the credit agreement to address and clarify some of the points that could and should have been resolved long ago consensually if BMLP had only inquired; CCA hopes those points might be resolved before the hearing.  As noted in the Reply Chart, others of BMLP's concerns do not warrant changes, as they are based on a misreading of the DIP Credit Agreement, either intentional or unintentional.

---

[7] As mentioned here and detailed in the Reply Chart, CCA has initiated discussions with both the DIP Lender and BMLP to determine whether any compromise could be reached. To the extent there is any further progress in that regard, CCA will update the court at or before the hearing.

With respect to BMLP's remaining wish-list of objections, which related to terms that arguably would benefit the estate if available, CCA has reached out again to the DIP Lender's counsel to request modifications and will continue discussing that possibility through the time of the hearing. If the DIP Lender ultimately is not amenable to those changes, the DIP Facility overall is nevertheless beneficial to the estate and better than any alternative and therefore should be approved.

### Counterstatement of Facts

11.    In the Objection, BMLP admits that it does not oppose the fundamental need for financing. Access to the DIP Facility is essential for CCA's ability to continue its operations and preserve value for the benefit of all stakeholders.[8]  The proposed DIP Facility is structured to meet critical expenses, sustain business functions, and preserve estate value.  As explained in the BDO Declaration, the financing is structured with favorable terms, including multi-draw functionality to minimize interest accrual and avoid unnecessary costs, no commitment or exit fees, and an adjustment mechanism that prevents CCA from bearing the burden of expenses allocable to non-debtor affiliates.[9]

12.    CCA's financial advisor, BDO Consulting Group, LLP ("**BDO**"), conducted a thorough marketing process to secure the most favorable DIP financing available, including outreach, before and after the Petition Date, to multiple potential lenders.  Ultimately that process did not result in any actual financing proposals, underscoring that no party was willing to provide

---

[8]    *See Declaration of Evan Blum in Support of First Day Pleadings and Debtor-in-Possession Financing* (the "**Initial BDO Declaration**") ¶ 15 [Docket No. 12].

[9]    *See Id..*

financing on more favorable terms than those offered by the DIP Lender[10]; market feedback indicated that providing a DIP loan to a construction services company like CCA—particularly one without hard assets—was not viable under market conditions.  Notably, BMLP's own financial advisor has now had over a month to assess the situation and has yet to suggest a single viable alternative lender or financing proposal that the Debtor may have overlooked.  If a better financing opportunity existed, BMLP—whose primary strategy has been obstruction rather than constructive engagement—has had every opportunity to identify it but has failed to do so.  Moreover, the proposed DIP Facility does not preclude refinancing at a later stage; there are no prepayment penalties, meaning that even if the Court approves this facility on a final basis, it remains open for replacement should a superior alternative emerge—including one proposed by BMLP.[11]

13.    BMLP uses the Objection to make sweeping accusations about CCA and its handling of the DIP Facility that are either entirely false, gross exaggerations, or both.  These allegations are refuted in the forthcoming declarations of Yan Wei (CCA's Chairman and CEO), Elizabeth Abrams (CCA's independent director and member of the Special Committee of CCA's board), and Evan Blum (CCA's lead financial advisor at BDO).

14.    As just a couple of examples, in addition to BMLP's claim that Company's robust third-party marketing process described above was perfunctory, BMLP attempts to call Ms. Abrams' independence into question by criticizing her decision thus far not to hire her own separate counsel or initiate an investigation into potential claims against CSCEC Holding.[12]  This

---

[10]    *See* Initial Blum declaration ¶ 18;

[11]    *See* DIP Motion ¶ 13.

[12]    *See* Objection ¶ 12.

assertion has no basis in reality.  Ms. Abrams is a highly regarded professional with over 20 years of experience in the restructuring industry, including advising on complex distressed financing transactions.  Ms. Abrams had never worked with CCA, Debevoise, or BDO prior to this engagement.  As she explains in her declaration, Ms. Abrams has not hired independent counsel for the Special Committee nor initiated an investigation into potential claims because, in her view and consistent with her experience as restructuring investment banker and an independent director, neither has become necessary at this point, when no conflict exists as between CCA, its advisors, and the Special Committee, and would therefore be a wasteful expenditure of the estate's resources.  Should the need arise, Ms. Abrams would not hesitate to hire outside counsel to the Special Committee as necessary and/or undertake an investigation into potential claims against CSCEC Holding or other entities.[13]

15.    BMLP also claims that Mr. Wei did not recuse himself from the DIP Facility and that instead, his "presence loomed over the entire [DIP negotiation process]."[14]  This is, at best, a gross exaggeration.  In reality, Mr. Wei, along with the rest of the CCA board of directors, was kept apprised of developments in the structuring, marketing, and negotiation of the DIP (just as the Board is regularly kept abreast of many other issues impacting their company).  Additionally, BDO, Debevoise, and Ms. Abrams consulted Mr. Wei regarding factual matters related to CCA and its operations to ensure that such information was appropriately considered and accurately incorporated into aspects of the DIP financing process, such as the preparation of the teaser and Confidential Information Memorandum sent to potential third-party lenders.  Neither Mr. Wei nor

---

[13]    *See* Worenklein Declaration, Exhibit A (the "**Abrams Deposition**"), p. 8 [ECF No. 122].

[14]    *See* Objection at 11.

other CCA personnel exercised any decision-making over the DIP Facility, as that authority rests

solely with the Special Committee.

## **Reply**

### I.    **The Special Committee's Oversight Supports the Business Judgment Standard, and the DIP Facility Satisfies Any Applicable Level of Scrutiny**

16.    Under *any* standard of review, including the entire fairness standard advocated by

BMLP, the DIP Facility should be approved because no one disputes CCA needs financing, the

proposed financing terms are the best available, and they are both fair and appropriate.  That having

been said, BMLP's wild accusations about the Special Committee process are incorrect and call

out for a response.

#### A.    The Special Committee's Approval of the DIP Facility Is Entitled to Review Under the Business Judgment

17.    Courts grant a debtor considerable deference in exercising its sound business

judgment in obtaining postpetition credit.  In applying this standard, a court need only "examine

whether a reasonable business person would make a similar decision under similar

circumstances."[15]  As the Third Circuit has observed, "[o]vercoming the presumptions of the

business judgment rule on the merits is a near-Herculean task."[16]

18.    Accordingly, BMLP is challenging the applicability of the business judgment rule

to the DIP Facility.[17]  A party challenging the applicability of the business judgment standard must

"show one of four elements: (1) the directors did not in fact make a decision, (2) the directors'

decision was uninformed; (3) the directors were not disinterested or independent; or (4) the

---

[15]    *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

[16]    *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005)

[17]    *See* Objection ¶ 73.

directors were grossly negligent."[18]  BMLP fails to meet its burden with respect to any of the four

elements.

19.      Here, the Special Committee made a decision, in consultation with CCA's advisors,

that was more than adequately informed with respect to the process of negotiations of, and terms

of, the DIP Facility.  Ms. Abrams reviewed numerous drafts of the DIP Credit Agreement before

approving it.  Her decades-long experience as a restructuring investment banker meant that she

was more than capable of understanding what she was reading and its consequences for CCA.

Indeed, Ms. Abrams' judgment that CCA was unlikely to obtain an unsecured loan was informed

by her experience and proved to be accurate. BMLP tries to argue that Ms. Abrams did not have

adequate knowledge of the process and facility terms because she did not *personally* engage with

the DIP Lender's personnel, and was not aware of details about any business-level discussions

between the lender representative and finance personnel at the Debtor.  If that were the standard

of care required for a director, it would be the rare case in which DIP financing (or any other

transaction) would be entitled to review under the business judgment rule.  Directors are not

required to participate in negotiations personally, and they are entitled to rely on the judgment and

advice of experienced professionals as part of their exercise of the duty of care. [19]  Nor did Ms.

---

[18]      *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011); *See In re Autobacs Strauss, Inc.*, 473 B.R. 525, 562 (Bankr. D. Del. 2012) (a party "must allege sufficient facts to support a reasonable inference that the directors breached their fiduciary duties … to change the standard of review from business judgment to entire fairness.")

[19]      8 Del. § 141(e) ("A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon … such information, opinions, reports or statements presented to the corporation by … any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.")

Abrams lack independence.  Ms. Abrams had no prior business dealings with CCA or its affiliates prior to joining the board.[20]

20.    BMLP seizes upon the fact that Ms. Abrams did not retain separate counsel from CCA, but this does not undermine her independence.  None of the cases cited by BMLP require that an independent director retain separate counsel in order to remain independent, and they are otherwise readily distinguishable.  *Gesoff v. IIC Industries, Inc.* involved an independent director, who while nominally able to retain independent advisors, was in reality blocked from doing so by the conflicted directors.[21]  In *In re Tele-Commc'ns, Inc. S'holders Litig.*, the court pointed most especially to the independent director's choice to not retain an independent financial advisor even though the incumbent financial advisor's success fee compensation structure created "serious issues of material fact" whether it could provide independent advice.[22]  2005 WL 3642727 at *10 (Del. Ch. Dec. 21, 2005).  None of these factors are present here.  There was no *sotto voce* attempt to block Ms. Abrams from retaining her own independent legal or financial advisors.  Nor is CCA's financial advisor being paid through a contingent fee structure that might have led to its advice being improperly biased.[23]  In sum, therefore, Ms. Abrams' choice to avail herself of CCA's legal and financial advisors did not undermine her independence and does not warrant entire fairness review.

---

[20]    Abrams Deposition at p. 13.

[21]    902 A.2d 1130, 1138 (Del. Ch. 2006) (special committee "had no real authority to choose" independent advisors)

[22]    No. Civ.A. 16470, 2005 WL 3642727 (Del. Ch. Dec. 21, 2005)

[23]    *Debtor's Application for Entry of an Order Authorizing the Debtor to Retain and Employ BDO Consulting Group, LLC as Financial Advisor Effective as of the Petition Date* ¶ 25 [Docket No. 97].

### B. Even If Evaluated Under the Entire Fairness Standard, the DIP Facility Meets the Requirements to Be Approved

21.    As noted above, even if the DIP Facility is evaluated under the entire fairness standard, it still meets the requirements for approval by the Court.  Under the entire fairness standard, the burden is on the corporation to prove "that the transaction was the product of both fair dealing and fair price."[24] In evaluating whether a process involved "fair dealing," focus is on "when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[25]  Fair price "relates to the economic and financial considerations of the proposed [transaction], including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of [the company]."[26]   "Fair price can also be established by demonstrating that no better alternatives were available."[27]   A real-world market test is "is overridingly important evidence of value …."[28]

22.    Here, two features of the negotiation process in particular highlight the extent to which the process was characterized by fair dealing.  First, throughout the entirety of the DIP Facility negotiation with the would-be DIP Lender, CCA's financial advisor continued to reach out to alternative lenders.  The DIP Facility was not a rigged negotiation, nor a "sham" as BMLP

---

[24]   *In re Opus E., LLC*, 528 B.R. 30, 67 (Bankr. D. Del. 2015), *aff'd sub nom. In re: Opus E., LLC*, No. 09-12261, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd sub nom. In re Opus E. LLC*, 698 Fed. Appx. 711 (3d Cir. 2017) (unpublished).

[25]   *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[26]   *Id.*

[27]   *In re LATAM Airlines Group S.A.*, 620 B.R. 722, 791 (Bankr. S.D.N.Y. 2020) (citations omitted).

[28]   *Union Ill.1995 Inv. Ltd. P'ship v. Union Fin. Gp., Ltd.,* 847 A.2d 340, 350 (Del. Ch. 2004).

alleges.[29]  BDO contacted over a dozen third-party lenders in a matter of weeks to try to secure

alternative funding and continued to do so even after the Petition Date.  Second, Ms. Abrams

remained actively engaged in the negotiation and took her fiduciary duties seriously.  She reviewed

drafts, pushed back against the DIP Lender's proposed terms, and consulted with her legal and

financial advisors.

23.      In addition to what was present, as important is what *was not* present in the

negotiations.  At no point did the DIP Lender try to coerce a better deal from CCA using its

preexisting contractual position or its affiliate status; to the contrary, the DIP Lender is providing

financing on better-than-market terms.  *Compare* Transcript of Hearing, *In re UCI International,*

*LLC, et al.* No. 16-11354 (MFW) (Bankr. D. Del. July 12, 2016), at 200:4-11.  Nor did Ms. Abrams

select CSCEC Holding as the lender because she stood to gain personally from using that lender

as opposed to better alternatives. *Compare In re L.A. Dodgers*, 457 B.R. at 313 ("The evidence

shows that if Debtors, controlled by Mr. McCourt, did not seek court approval for the [proposed

DIP loan], Mr. McCourt would personally owe $5.25 million to [the proposed DIP lender].").

24.      Finally, the DIP Facility reflects a fair price insofar as, after diligent search, there

was no viable alternative financing available, particularly on anywhere similar terms.  If anything,

the lack of potential alternative lenders on even the same, let alone better, terms affirms that the

DIP Facility incorporates better-than-market terms and thus reflects much more than merely

fairness to CCA.

---

[29]    *See* Objection at ¶89 [Docket No. 128].

## II.     The DIP Loan is Not an Impermissible *Sub Rosa* Plan of Reorganization

25.     BMLP's argument that the DIP Loan is a *sub rosa* plan relies on a daisy-chain theory in which BMLP links multiple unrelated attacks on the proposed financing terms to arrive at the tidy (but incorrect) conclusion that, all tied together, the financing terms tie CCA's hands and render the outcome of this chapter 11 case a foregone conclusion.  That would be a problem, if it were true:  CCA agrees that so-called "*sub rosa* plans" are barred.[30]  But that isn't what is happening here, because most of the links in BMLP's daisy-chain analysis are broken.

26.     *Sub rosa* plans, as they have been rejected in this circuit and others, are not subtle.[31] In the *In re LATAM Airlines Grp. S.A.* case, cited by BMLP, for example, the DIP lenders (who were a portion of existing shareholders) were guaranteed equity in the reorganized debtor at a 20% discount to plan value in the event the debtor issued stock in lieu of paying cash in satisfaction of its DIP obligation. 620 B.R. 722, 819 (Bankr. S.D.N.Y. 2020).  The proposed LATAM DIP facility also contained several bankruptcy related milestones, which the objectors argued effectively prevented alternative plan structures.  The court rejected the associated DIP financing as a *sub rosa* plan because it impermissibly locked in at least one key economic term of the plan of reorganization. *Id.*

27.     BMLP tries to liken this case to *LATAM* by dramatically accusing the DIP Lender of pre-baking a plan of reorganization for CCA, but the proposed DIP Financing do nothing of the sort.  For one, there is no locked-in discount-to-plan-value equity offering for the DIP lender as there was in *LATAM*, nor anything like it.  The *only* requirement for a plan of reorganization in the

---

[30]     *See In re Energy Future Holdings Corp.*, 648 F. App'x 277, 284–85 (3d Cir. 2016).

[31]     *Id.*

DIP Credit Agreement is that the DIP Obligations (and no other claims of the DIP Lender[32] or anyone else) be paid in full, in cash, as part of the plan. This provision is a mere restatement of Bankruptcy Code requirements;[33] that does not come anywhere close to being a *sub rosa* plan.[34]

28.     Further, the DIP Credit Agreement provides CCA with full flexibility to repay the loan at any time without penalty, does not impose milestones on the Chapter 11 case, does not mandate the treatment of any other creditor classes, and does not impose any other plan-related provisions. There is, for example, no locked-in discount-to-plan-value equity offering for the DIP lender as there was in *LATAM*. 620 B.R. at 819. CCA has full control over the timing and terms of a chapter 11 plan, and the Special Committee has the ability to investigate any causes of action including claims against insiders (with the sole exception of claims arising from or related to the DIP Facility itself).[35] In short, contrary to BMLP's manufactured narrative, the proposed DIP Facility here does not in any way lock in the terms of any eventual plan of reorganization or impact the recovery of other creditors; the *only* constraints on the future path of this chapter 11 case relate to the treatment of the DIP Loan itself, which is entirely appropriate and does not constitute a *sub rosa* plan.

---

[32]    As described above in paragraph 6, BMLP's charge that the DIP Facility requires releases unrelated to the DIP Loan is false.

[33]    *See* 11 U.S.C. § 1129(a)(9); *see also In re Molycorp, Inc.*, 562 B.R. 67, 77 (Bankr. D. Del. 2017) ("section 1129(a)(9)(A) of the Bankruptcy Code requires that, unless agreed otherwise, each holder of an administrative claim will receive cash equal to the allowed amount of such claim on the effective date of the plan; this is true regardless to the existence of unencumbered assets.").

[34]    Under BMLP's logic, every DIP Credit Agreement would qualify as a *sub rosa* plan simply because it includes a requirement for repayment in full—a standard feature in DIP financing and literally every loan.

[35]    *See* Abrams Deposition at p. 8; DIP Credit Agreement 9.16(b).

## III.   CCA's Proposed DIP Loan Meets the Requirements of Section 364 of the Bankruptcy Code.

### A.   CCA exhausted the possibility of obtaining unsecured credit

29.    Section 364 of Bankruptcy Code provides in relevant part that:

> Unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business *allowable under section 503(b)(1) of this title as an administrative expense.*

> [t]he court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, *allowable under section 503(b)(1) of this title as an administrative expense.*

> If the trustee is unable to obtain *unsecured credit allowable under section 503(b)(1) of this title as an administrative expense*, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt…

(emphasis added).  BMLP is correct that, under this circuit's precedent, a court may not approve any credit transaction under subsection (c) of Section 364 unless the debtor demonstrates that it has attempted, but failed, to obtain *unsecured credit under section 364(a) or (b)*.  And that is exactly what CCA did, and has continued to do, even postpetition.

30.    What BMLP is apparently missing is that, even assuming BMLP's counterfactual scenario that the Debtor could have obtained debtor-in-possession financing on an unsecured basis, which the evidence makes clear was not available as described above in paragraph 8, the Bankruptcy Code would still afford it administrative priority treatment making it senior to BMLP's potential claims as a matter of law.  Section 364 of the Bankruptcy Code does not require, nor contemplate, unsecured financing that is *not* afforded administrative priority status.  The "meaning of the text is clear[]" and accordingly the Court should therefore "enforce [the statute] according

to its terms[]" and reject BMLP's attempt to read "administrative expense" out of the section 364 of the Bankruptcy Code. [36]

31.    The hand-selected cases BMLP relies on underscore this point.   With one exception, in each of the cases BMLP cites as examples of unsecured DIP financing, the debtor-in-possession financing was provided on an administrative expense priority or super-administrative expense priority basis.[37]  The one exception is easily distinguishable.  In *In re Barretts Minerals Inc.*, after an initial debtor-in-possession financing facility was approved on conventional terms, the debtors needed additional liquidity to fund (a) the chapter 11 cases through the successful completion of meditation of the terms of a consensual plan of reorganization or (b) litigation regarding whether debtors' talc caused harm to claimants.[38]  The debtors' ultimate parent and its non-debtor affiliates were the beneficiaries of a bankruptcy court injunction barring litigation against them and, presumably would receive the benefit of a channeling injunction under section 524(g) of the Bankruptcy Code pursuant to the consensual plan.[39]  In this context, the debtors' ultimate parent via a completely controlled subsidiary agreed to provide the debtors postpetition financing on an unsecured, non-administrative priority basis subject to usage restrictions pending the status of mediation.[40]  The scenario in *Barretts Minerals* is essentially the *opposite* of the fact pattern here, where CCA's affiliates have no guarantee of releases under a

---

[36]    *In re FTX Trading Ltd.*, 91 F.4th 148, 153 (3d Cir. 2024) (quotations omitted).

[37]    *See* Objection at ¶ 92 (citing cases).

[38]    *In re Barretts Minerals Inc., et al.*, No. 23-90794 (Bankr. S.D. Tex. May 14, 2024) [Docket No. 898].

[39]    *Id; In re Barretts Minerals Inc., et al., No. 23-90794 (Bankr. S.D. Tex. May 14, 2024) [Docket No. 92].*

[40]    *In re Barretts Minerals Inc., et al.*, No. 23-90794 (Bankr. S.D. Tex. May 14, 2024) [Docket No. 898]; *In re Barretts Minerals Inc., et al.*, No. 23-90794 (Bankr. S.D. Tex. May 14, 2024) [Docket No. 917].

chapter 11 plan (other than as directly related to the DIP Loan) and where BMLP is actively using the chapter 11 case to get information to then share with litigation counsel actively pursuing claims against affiliates outside this court. The ultimate parent in *Barretts Minerals* apparently made a knowing decision, in the context of an ongoing mediation, to provide a remarkable *pari passu* unsecured loan to its debtor subsidiary.[41] That isolated instance, in a very different scenario, doesn't create a "market" term, and it certainly doesn't make it a requirement to be considered a "fair" financing here.

B. The terms of the DIP Facility are entirely appropriate

32.     As described in detail herein, many of BMLP's objections arise from a fundamental misreading of the DIP Credit Agreement, resulting in misplaced concerns about the DIP Facility. Many of these issues could have been efficiently addressed through open and constructive dialogue. However, instead of seeking clarification or engaging in meaningful discussions, BMLP has chosen a more adversarial approach, raising objections that distort the plain language of the agreement. In doing so, BMLP ignores standard provisions that align with established bankruptcy law and financing practices, creating unnecessary disputes that could have been avoided.

33.     CCA has reviewed and considered each of the issues raised by BMLP, and has included a point-by-point response in Exhibit A. In certain instances, BMLP raises points that CCA had already unsuccessfully raised in pre-petition negotiations, such as the requirement to pledge proceeds of avoidance actions. In response to BMLP's objection, CCA has once again asked the DIP Lender if it is willing to modify those terms (as explained and detailed in Exhibit A), and if the DIP Lender is willing to make any more changes CCA will apprise BMLP and the

---

[41]     *In re Barretts Minerals Inc., et al.*, No. 23-90794 (Bankr. S.D. Tex. May 14, 2024) [Docket No. 898]

Court as soon as practicable.   If the terms of the DIP Loan cannot be improved, however, CCA asserts that the existing proposed financing terms more than meet the standards set forth in section 364 of the Bankruptcy Code, are beneficial to the estate, have been appropriately approved by the Special Committee under any standard of review, and should be approved.

[*Remainder of page intentionally left blank*]

**Conclusion**

34.     For the reasons set forth herein, the Debtor respectfully requests that the Court grant

the DIP Motion and Cash Management Motion in their entirety and grant such other relief as the

Court deems just and proper.

 Dated:      February 12, 2025

*/s/  Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Felice R. Yudkin
Ryan T. Jareck
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone:  (201) 489-3000
Facsimile:   (201) 489-1536
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

-and-

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (*admitted pro hac vice*)
Erica S. Weisgerber (*admitted pro hac vice*)
Elie J. Worenklein
66 Hudson Boulevard
New York, NY 10001
Telephone:  (212) 909-6000
Facsimile:   (212) 909-6836
nlabovitz@debevoise.com
eweisgerber@debevoise.com
eworenklein@debevoise.com

*Co-Counsel for the Debtor and Debtor in Possession*

**Exhibit A**
**Summary and Reply Chart**

## Summary of Omnibus Objection of BML Properties, Ltd [Docket 128]

**Objections**

1.  **The proceeds of the DIP Facility will indirectly benefit non-Debtors.**
2.  **The DIP Credit Agreement includes a prospective Section 506(c) waiver.**
3.  **The DIP Credit Agreement references estate releases of the DIP Lender and related parties.**
4.  **The DIP Credit Agreement provides the DIP Lender a right to credit bid.**
5.  **There was discussion about designating BMLP as a Disqualified Lender.**
6.  **The DIP Credit Agreement provides for a pledge of avoidance action proceeds.**
7.  **The DIP Credit Agreement includes a restriction on a plan of reorganization.**
8.  **The DIP Credit Agreement includes an event of default related to appointment of an examiner.**
9.  **The Approved Budget included a line item for $40,000 for a creditors' committee investigation.**
10. **The Approved Budget does not include permitted variances.**
11. **BMLP asserts that the DIP Facility should be provided on an unsecured basis.**
12. **BMLP asserts that the DIP Lender should not be entitled to good faith findings in the DIP Order.**

- ..........................................................................................................................................................................................................

1

| ITEM | OBJECTION | BMLP ARGUMENT | CREDIT AGREEMENT SECTION | RESPONSE | STATUS OF OBJECTION |
|---|---|---|---|---|---|
| 1. | **The proceeds of the DIP Facility will indirectly benefit non-Debtors.** | *[Objection p. 101]*<br><br>"The proceeds of the DIP Facility will be used to continue to pay expenses of non-Debtors. While CCA touts the DIP Facility's "downward adjustment" mechanism, which reduces the outstanding balance of the DIP Loan by shared services payments made on behalf of CCA's affiliates (see DIP Motion at 27), this mechanism applies only to payments that will be made on behalf of affiliates outside of the CCA Group. This mechanism does not account for the payments that CCA will make for or on behalf of CCA's Non-Debtor Subsidiaries, and any adjustment will only be applied after the funds are borrowed and the expenses eventually allocated to a non-Debtor affiliate." | *[DIP Credit Agreement § 1.5(d)].*<br><br>(d) The Obligations of the Borrower under this Agreement shall be adjusted downward by an amount equal to any portion of Shared Services paid by the Debtor on or after the Petition Date that, consistent with pre-petition ordinary course practice, are allocable to any entity that is not a member of the CCA Group. Such adjustments shall be made on the last day of each calendar month, and any amount of Obligations attributable to such adjustments shall not accrue interest; provided that to the extent that the adjustment is not made with respect to any such portion of Shared Services paid by the Debtor within 60 days of the date that the applicable Obligations are incurred by the Borrower, such Obligations shall accrue interest from the date that such Obligations are incurred until such adjustment is made. The Agent shall be assigned any Intercompany Claim that exists on account of such allocation of the cost of Shared Services to any entity that is not a member of the CCA Group, and the Agent shall be entitled to seek payment of such Intercompany Claims directly from any entity that is not a member of the CCA Group. Notwithstanding anything herein to the contrary, in calculating the available amount of Term Loan Commitments, the dollar amount of such adjustments shall be included, as if such amounts remained Obligations, in making such calculation. | The downward adjustment mechanism reduces the balance of the DIP Obligations to ensure that CCA does not have repayment obligations for value provided to non-subsidiary shared services participants. Specifically, if CCA's allocated costs for shared services benefiting affiliates outside the CCA Group are not reimbursed in cash, the principal balance of the DIP will be reduced dollar-for-dollar in the amount of those allocated costs, and the DIP Lender will look to the resulting intercompany receivable for payment instead.<br><br>There is no need for a downward adjustment to reduce the DIP Obligations on account of value that flowed to CCA's direct and indirect wholly-owned subsidiaries, because any services provided to the subsidiaries directly helps maintain their value – which directly benefits CCA and its stakeholders (including BMLP, if its claim holds up on appeal) because the subsidiaries are core assets of the chapter 11 estate.<br><br>It is ironic that BMLP argues that CSCEC Holding will indirectly benefit from the DIP because supporting CCA will preserve CCA's value, while at the same time disregarding that the very same principle applies to CCA providing support to its own subsidiaries, which is accrued as an intercompany loan obligation. | **Rejected by CCA;**<br><br>This provision is beneficial to CCA. |

| ITEM | OBJECTION | BMLP ARGUMENT | CREDIT AGREEMENT SECTION | RESPONSE | STATUS OF OBJECTION |
|---|---|---|---|---|---|
| 2. | **The DIP Credit Agreement includes a prospective Section 506(c) waiver.** | *[Objection p. 103-104]*<br><br>"Waiving Section 506(c) here allows CSCEC Holding to shift the costs of preserving its equity interests onto the estate's creditors. … It is wholly inappropriate as a matter of equity, and wholly impermissible as a matter of law, to allow CSCEC Holding to force CCA's unsecured creditors to bear the costs of CCA's shared services program to preserve CSCEC Holding's equity value—all of which ought to be surcharged to CSCEC Holding under Section 506(c). The prospective waiver must be stricken." | *[DIP Credit Agreement § 6.5]*<br><br>Subject to and effective upon entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration shall be imposed upon any DIP Secured Party or on any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of such DIP Secured Party, and no such consent shall be implied from any action, inaction, or acquiescence by any DIP Secured Party. | BMLP mischaracterizes the shared services payments—CCA is not preserving equity value for CSCEC Holding, nor is 506(c) applicable to preserving equity interests. By maintaining the shared services program that is its primary prepetition function, CCA is providing critical operational services to support its own operating subsidiaries, thus preserving the going-concern value of CCA's estate.<br><br>The inclusion of a 506(c) waiver is a typical requirement in DIP financing agreements and was a necessary component for securing the favorable terms of the DIP facility. Without this waiver, the DIP Loan would not be available (or the lender would have likely imposed additional safeguards and restrictions that could have been less beneficial to the estate). It is clear from the Supreme Court that debtors are the only parties that can bring claims under section 506(c). *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000) (holding that "the trustee is the only party empowered to invoke" section 506(c)). They are also therefore entitled to settle or trade these claims, in their business judgment, in exchange for appropriate consideration as part of a DIP negotiations. | **Rejected by the DIP Lender**<br><br>Notwithstanding that this waiver is common in DIP loans and was required by the DIP Lender in arms-length prepetition negotiations, in light of BMLP's objection, CCA asked the DIP Lender on February 11, 2025, to agree to remove the provision. The DIP Lender did not agree to the removal. Accordingly, CCA is not able to modify this provision and submits that the DIP Facility overall is nevertheless beneficial to the estate and should be approved. |

| ITEM | OBJECTION | BMLP ARGUMENT | CREDIT AGREEMENT SECTION | RESPONSE | STATUS OF OBJECTION |
|---|---|---|---|---|---|
| 3. | **The DIP Credit Agreement references estate releases of the DIP Lender and related parties.** | *[Objection p. 105 -107]*<br><br>"What CCA fails to disclose is that the DIP Credit Agreement pre-wires releases for the benefit CSCEC Holding and its affiliates by making it an event of default if "a Chapter 11 plan is confirmed that does not provide for … releases, exculpations, waivers and indemnifications for the Lenders and their officers, directors, employees, attorneys, and agents." | *[DIP Credit Agreement § 7.1 (e)(xii); 10.1]*<br><br>(xii) a chapter 11 plan is confirmed that does not provide for the payment in full in cash of all Obligations on the effective date thereof, together with releases, exculpations, waivers and indemnifications for the Lenders and their officers, directors, employees, attorneys, and agents.<br><br>"Lender" means each Lender that has a Term Loan or Term Loan Commitment (in its capacity as such). | As repeatedly stated, CCA and its professionals only ever understood this language to refer to releases of the DIP Lender in its capacity as such (and therefore not to contemplate any releases at all of CSCEC Holding for prepetition avoidance actions or any other causes of action unrelated to the DIP Facility. In light of BMLP's objection, CCA does believe that it would be appropriate to add a simple clarifying phrase, "each solely in their capacity as such," at the end of section 7.1 (e)(xii) of the Credit Agreement. | **Subject to a Settlement Proposal**<br><br>While CCA believes the DIP Credit Agreement is clear that it a qualifying plan only needs to release the DIP Lender (and its officers, directors, employees, attorneys, and agents) in its capacity as the DIP Lender, CCA has no objection to adding an additional clarification as described herein. In light of BMLP's objection, CCA asked the DIP Lender on February 11, 2025, to agree to insert that clarification. The DIP Lender agreed to that change (and two others described herein) on the condition that BMLP entirely withdraw its objection to the DIP Motion. CCA has relayed that proposal to BMLP's counsel and awaits a response. |

| ITEM | OBJECTION | BMLP ARGUMENT | CREDIT AGREEMENT SECTION | RESPONSE | STATUS OF OBJECTION |
|---|---|---|---|---|---|
| 4. | **The DIP Credit Agreement provides the DIP Lender a right to credit bid.** | *[Objection p. 108]*<br><br>"The proposed Final DIP Order provides CSCEC Holding the ***unqualified right*** to credit bid in any sale. But "the right to credit bid is not absolute" and can be limited for cause under Section 363(k) of the Bankruptcy Code. *See In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 59 (Bankr. D. Del. 2014). CSCEC Holding should not be allowed to circumvent the Bankruptcy Code, and its credit bid needs to remain subject to Section 363(k)." | *[DIP Credit Agreement § 7.4]*<br><br>Credit Bidding. The Borrower acknowledges that any Lender may, either directly or indirectly through one or more entities, (a) credit bid or purchase all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, (b) credit bid or purchase all or any portion of the Collateral at any other sale or foreclosure conducted in accordance with applicable law in any judicial action or proceeding or by the exercise of any legal or equitable remedy. In connection with any such credit bid, the Obligations shall be entitled to be, and shall be, credit bid by such entity or entities designated by any such Lender for the purpose of the consummation of such sale or foreclosure transaction without further action by such Lender, and any such credit bid amount may be applied by such Lender to payment of the Obligations under this Agreement. | Credit bidding is a well-established right of secured lenders that is expressly provided under section 363(k) of the Bankruptcy Code and, based on arms-length prepetition negotiations, was a necessary component of securing the DIP Facility. Given the circumstances, in which the DIP Facility was the only financing available, and the Special Committee determined that, on balance, accepting this term was in the best interest of the estate.<br><br>Credit bidding is routinely permitted in DIP Orders. It ensures that the lender retains the ability to protect its collateral position in any potential sale, which is a standard protection afforded to secured lenders under 11 U.S.C. § 363(k). *See also RadLAX Gateway Hotel v. Amalgamated Bank*, 132 S.Ct. 2065, 2070, n. 2 (2012) ("The ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price. It enables the creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan."). Courts have consistently upheld this right as a critical safeguard for DIP lenders, recognizing that it incentivizes financing while maintaining competitive bidding in any sale process. | **Rejected by the DIP Lender**<br><br>Notwithstanding that the unqualified right to credit bid is common in DIP loans and was required by the DIP Lender in arms-length prepetition negotiations, in light of BMLP's objection, CCA asked the DIP Lender on February 11, 2025, to agree to remove the provision. The DIP Lender did not agree to the removal. Accordingly, CCA is not able to modify this provision and submits that the DIP Facility overall is nevertheless beneficial to the estate and should be approved. |

| ITEM | OBJECTION | BMLP ARGUMENT | CREDIT AGREEMENT SECTION | RESPONSE | STATUS OF OBJECTION |
|---|---|---|---|---|---|
| 5. | **There was discussion about designating BMLP as a Disqualified Lender.** | *[Objection p. 109]*<br><br>"BMLP is not a competitor of CCA, and the only rationale for disqualification is a bald assertion that BMLP is "adverse" to CCA's estate. This is both unfounded and illogical: BMLP is the estate's largest creditor and only stands to benefit from CCA's estate maximizing its value.<br><br>The estate does not benefit from limiting the potential sources of DIP financing, especially when CCA in unlikely to be meritorious in its appeal. Rather, the DIP Loan should be expressly assignable to BMLP, or BMLP should have a right to "takeout" the DIP Loan." | *[DIP Credit Agreement § 9.6]*<br><br>The rights and obligations of each Lender under this Agreement (including all or a portion of its Term Loan Commitment(s) and the Loans at the time owing to it) shall be assignable by such Lender without any consent or notice to the Borrower; provided that (a) the parties to each assignment shall execute and deliver to the Agent an assignment and assumption agreement in such form approved by the Agent acting reasonably, and (b) if the assignee is not a Lender, then the assignee shall deliver to the Agent all documentation and other information about such assignee that the Agent reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering laws, and following the receipt by the Agent of the foregoing, it shall record the assignment in the Register. Notwithstanding the foregoing, no such assignment by a Lender shall be made (a) to any competitors of the Company or its Subsidiaries that have been specified to the Administrative Agents by the Company in writing from time to time, (b) any Persons designated in writing by the Borrower Representative or the Sponsor to the Administrative Agents on or prior to the Closing Date and (c) any Affiliates, of any Persons referenced in the foregoing clauses (a) and (b) that are either known Affiliates or are readily identifiable as Affiliates on the basis of such Affiliates' names or identified in writing by the Company or the Borrower Representative from time to time (any such Person described in subclauses (a) through (c), a "Disqualified Lender"). | BMLP is not on the Disqualified Lender "(DQ)" List, contrary to its assertions. BMLP learned in discovery that there had been some discussion about treating BMLP as a disqualified lender but never followed up to inquire whether there was such a DQ List as referenced in Section 9.6 of the DIP Credit Agreement, or otherwise clarify this point before raising it as an objection. For the avoidance of doubt, there ultimately were *no parties*, including BMLP, included on any DQ List. | **No Change Required**<br><br>This objection is based on an incorrect assumption about the DQ List. |

| 6. | The DIP Credit Agreement provides for a pledge of avoidance action proceeds. | *[Objection p. 111]*<br><br>[T]he proposed final DIP Order seeks to give CSCEC Holding a lien on proceeds of avoidance actions. But "[a]voidance actions can only be brought for the benefit of creditors." *In re Morawski*, No. 20-12079, 2022 WL 1085739, at *3 (Bankr. D.N.J. Apr. 11, 2022). To that end, "avoidance actions have historically been aimed at (among other things) deterring overreaching by insiders of a debtor." *In re Texas Rangers Baseball Partners*, 498 B.R. 679, 709 (Bankr. N.D. Tex. 2013). Here, Ms. Abrams acknowledged that CSCEC Holding and other insiders are the likely targets of avoidance actions, yet she approved the liens anyway." | *[DIP Credit Agreement, § 6.1]*<br><br><u>Grant of Security.</u> To secure the prompt payment and performance of any and all Obligations, the Borrower hereby pledges, assigns, and grants to the Agent, for the benefit of the Lenders, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, effective as of the date of entry of the Interim DIP Order, a valid and automatically perfected first priority Lien and security interest in the Collateral (the "<u>DIP Liens</u>"). The DIP Liens shall exclude avoidance actions under Chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>"), provided that, upon entry of the Final DIP Order, Collateral shall include a senior lien on the proceeds of such Avoidance Actions. The DIP Liens granted herein shall be junior and subordinate in all respects to, but only to, (i) the Carve-Out, (ii) any Permitted Senior Liens, and (iii) shall otherwise be senior to any Prior Liens. | To be clear, there is no lien on avoidance actions. Rather, the lien is on <u>proceeds</u> of avoidance actions and is appropriately included in the DIP collateral. The DIP Lender made clear during negotiations that a lien on the proceeds of avoidance actions is a required term of its financing. Such provisions are granted routinely by bankruptcy courts in this district and elsewhere. On a practical level, whether the DIP Lender has an express lien on such proceeds or not, any DIP lender will be entitled to receive payment out of such proceeds as an administrative priority claimant prior to general unsecured creditors.<br><br>Under the express terms of sections 541(a)(3) and (a)(4) of the Bankruptcy Code, the proceeds of Avoidance Actions are property of the Debtor's bankruptcy estate that may be utilized in the Debtor's business judgment, including to secure postpetition financing. Despite BMLP's assertions to the contrary, unencumbered assets, including proceeds from avoidance actions, are not solely reserved for the benefit of unsecured creditors (as BMLP suggests), but rather more broadly inure to the benefit of the estate. *See* 11 U.S.C. § 550(a) (preserving avoidance action recoveries "for the benefit of the estate").<br><br>In addition to numerous courts in this district granting similar relief, Judge David S. Jones in *Revlon* rejected the official committee of unsecured creditors' objection to a DIP motion that challenged the propriety of granting DIP liens on avoidance proceeds. In doing so, Judge Jones concluded there is "***no serious legal basis***" for arguing that avoidance proceeds are legally required to be preserved for unsecured creditors and cannot be pledged to a DIP lender. *In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. Aug. 1, 2022), Docket No. 332, Tr. 29:23-30:7 (emphasis added).<br><br>Ultimately, the proceeds of Avoidance Actions are unencumbered assets like any other and, as such, can be pledged as collateral to induce lenders to provide postpetition funding. Liens on unencumbered assets are expressly contemplated by Bankruptcy Code section 364(c)(2). Accordingly, liens on the proceeds of avoidance actions are routinely granted by this Court. *See, e.g., In re Sam Ash Music Corp.*, No. 24-14727 (SLM) (June 2, 2024) [Docket No. 203]; *In re Thrasio Holdings, Inc.*, No 24-11840 (CMG) (April 4, 2024) [Docket No. 297]; *In re WeWork, Inc.* No. 23- | **Rejected by the DIP Lender**<br><br>Notwithstanding that the grant of a lien in the proceeds of avoidance actions is common in DIP loans and was required by the DIP Lender in arms-length prepetition negotiations, in light of BMLP's objection, CCA asked the DIP Lender on February 11, 2025, to agree to remove the provision. The DIP Lender did not agree to the removal. Accordingly, CCA is not able to modify this provision and submits that the DIP Facility overall is nevertheless beneficial to the estate and should be approved. |

| ITEM | OBJECTION | BMLP ARGUMENT | CREDIT AGREEMENT SECTION | RESPONSE | STATUS OF OBJECTION |
|---|---|---|---|---|---|
| | | | | 19865 (JKS) (Dec. 11, 2023) [Docket No. 427]; *In re David's Bridal, LLC*, No. 23- 13131 (CMG) (Bankr. D.N.J. May 24, 2023) [Docket No. 285]; *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 24, 2023) [Docket No. 729]. | |
| 7. | **The DIP Credit Agreement includes a restriction on a plan of reorganization.** | *[Objection p. 113]*<br><br>The votes of insiders like CSCEC Holding are not supposed to be counted for determining whether a debtor has an impaired accepting class under a plan of reorganization. *See* 11 U.S.C. § 1129(a)10). But the DIP Credit Agreement seeks to give CSCEC Holding a backdoor consent right by making it an event of default for CCA to file anything other than an "Acceptable Plan" that provides for repayment in full of the DIP Obligations. (DIP Credit Agreement § 7.1(e)(x)). CSCEC Holding should not have any backdoor plan consent right. | *[DIP Credit Agreement § 7.1(e)(x); 10.1]*<br><br>(x) without the prior written consent of the Required Lenders in their sole discretion, (A) if a plan of reorganization or liquidation is filed by the Borrower in the Chapter 11 Case, or an order shall be entered by the Bankruptcy Court confirming any plan in the Chapter 11 Case, that is not an Acceptable Plan, or (B) the Borrower withdraws any Acceptable Plan after having been filed in the Chapter 11 Case;<br><br>("Acceptable Plan") means a plan of reorganization or liquidation that provides for the indefeasible payment in full and in cash, of all DIP Obligations. | BMLP misreads the DIP credit agreement. There is no veto right over the plan. Rather, the sole requirement for an "Acceptable Plan" is for the payment in full in cash of DIP Obligations (as adjusted downward in connection with the shared-services downward adjustment mechanism). It is a requirement of the Bankruptcy Code for all administrative priority claims (whether or not secured) to be paid in full under a plan, so the requirement under the Credit Agreement merely requires compliance with applicable law. See section 1129(a)(9). | **No change required;**<br><br>This objection is based on a misreading of the DIP Credit Agreement. |
| 8. | **The DIP Credit Agreement includes an event of default related to appointment of an examiner.** | *[Objection p. 114]*<br><br>"This provision clearly aims to limit the ability of an independent investigation into CCA. But such investigation may uncover valuable estate causes of action, and thus this event of default is not in the best interests of CCA's non-insider creditors. The removal of this provision is particularly important here because no creditors' committee has been appointed in this case to serve as an independent fiduciary to creditor interests." | *[DIP Credit Agreement § 7.1(e)(iv)]*<br><br>(iv) the Bankruptcy Court shall enter any order (A) appointing a chapter 11 trustee under section 1104 of the Bankruptcy Code in the Chapter 11 Case or (B) appointing an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code in the Chapter 11 Case or otherwise, in each case without the prior written consent of the Required Lenders in their sole discretion; | BMLP is misreading the DIP Credit Agreement. There is no event of default whatsoever if an examiner is appointed to conduct an "independent investigation." This point has already been clearly confirmed by the CSCEC Holding statement in response to BMLP's motion to appoint an examiner, *See* CSCEC Holding Statement p. 4 [Docket 118], which was filed *prior* to the Objection, so it is unclear why BMLP is pursuing this argument. | **No Change Required**<br><br>This objection is based on a misreading of the DIP Credit Agreement. |

| ITEM | OBJECTION | BMLP ARGUMENT | CREDIT AGREEMENT SECTION | RESPONSE | STATUS OF OBJECTION |
|------|-----------|---------------|--------------------------|----------|---------------------|
| 9. | **The approved Budget included a line item for $40,000 for a creditors' committee investigation.** | *[Objection p. 115]*<br><br>The DIP Budget originally allocated only $40,000 for a creditors' committee to investigate claims through the end of March 2025.<br><br>An independent estate fiduciary's investigation for the benefit of the Debtor's estate cannot be so restricted, particularly because CSCEC Holding stands to benefit from a shoddy investigation. No creditors' committee has been appointed in this case, but an appropriate budget should still be allocated for an examiner given BMLP's examiner motion. | *See DIP Motion Annex B ("Approved Budget") [Docket. 4]* | BMLP's objection regarding the budget is entirely misplaced. No creditors' committee was appointed, and therefore the proposed limitation on available funds is not relevant.<br><br>As BMLP is aware, CCA has proposed a $100,000 (which would be increased even further pursuant to any agreed upon variance discussed in item 10, below) budget for an examiner, if this Court determines to appoint one. If that occurs, CCA agrees that this cost should be reflected in the Approved Budget, including through an amendment thereto to the extent necessary. | **No Change Currently Required**<br><br>The $40,000 allocation of fees for a creditors' committee investigation is not relevant. To the extent that this Court appoints an examiner t the upcoming hearing, CCA will request a modification to the Approved Budget to reflect the associated budget requirements. |

| ITEM | OBJECTION | BMLP ARGUMENT | CREDIT AGREEMENT SECTION | RESPONSE | STATUS OF OBJECTION |
|---|---|---|---|---|---|
| 10. | **The approved Budget does not include permitted variances.** | *[Objection p. 116]*<br><br>CCA must strictly comply with the budget CSCEC Holding approves or CSCEC Holding can call an event of default. The provision gives CSCEC Holding yet another tool to call a default for any foot-fault. DIP financing agreements in bankruptcy routinely provide for permitted variances from the agreed budget to account for unavoidable swings in a debtor's cash flow— customarily up to 10% or higher. But here, incredibly, CSCEC Holding has strictly required CCA to comply with the Approved Budget— enabling it to retain absolute control over CCA's cash flow and use any foot-fault in spending to terminate the DIP Loan. | *[DIP Credit Agreement § 4.15; 7.1 (d)]*<br><br><u>Approved Budget</u>. The Borrower shall comply with the Approved Budget.<br><br>(d) <u>Other Covenant Defaults</u>. The Borrower fails to perform or observe any term, covenant or agreement contained in this Agreement (other than as provided in paragraphs (a) through (c) of this <u>Section 7.1</u>) or any other Loan Document, and such default shall continue unremedied for a period of ten (10) days after the earlier to occur of (x) the date upon which a Responsible Officer of the Borrower becomes aware of such default and (y) the date upon which notice thereof is given to the Borrower by the Agent. | The current budget framework, which is a required term of the financing, does not include express permitted variances. Given the circumstances in which no alternate financing is available, as well as the overall amount of the DIP Facility, which is sufficient to cover anticipated costs, the Special Committee has determined that, on balance, accepting this term is in the best interest of the estate.<br><br>BDO worked with CCA to ensure that the overall scope of the financing, as well as the delayed-draw mechanism that allows interest costs to be minimized, is sufficient to meet projected financing needs. Nevertheless, CCA has initiated discussions with the DIP Lender to explore the potential inclusion of language that allows for reasonable modifications to the Approved Budget within certain agreed-upon limits. | **Subject to a Settlement Proposal**<br><br>While CCA believes the $40 million DIP Facility is sufficient to meet the needs of the chapter 11 case, the very significant costs of discovery and in the first several weeks of the case may result in a timing variance from the current Approved Budget (which is also outdated because it contemplated a creditors' committee). CCA asked the DIP Lender on February 11, 2025 to agree to update the current Approved Budget to reflect recent developments and to add a provision for a 20% variance overall.  The DIP Lender did not agree to that request in full, but did agree to permit a 5% variance from the Approved Budget (and two other changes described herein) on the condition that BMLP entirely withdraw its objection to the DIP Motion. CCA has relayed that proposal to BMLP's counsel and awaits a response. |

| ITEM | OBJECTION | BMLP ARGUMENT | CREDIT AGREEMENT SECTION | RESPONSE | STATUS OF OBJECTION |
|---|---|---|---|---|---|
| 11. | **BMLP asserts that CSCEC Holding should not be entitled to good faith findings in the DIP Order.** | *[Objection p. 89- 93]*<br><br>"Good faith cannot be found where there is fraud, collusion, actions for an improper purpose, or knowledge of illegality in the transaction. *See In re Gen. Growth Props., Inc.*, 423 B.R. 716, 722 (S.D.N.Y. 2010) (finding good faith absent in cases of fraud, collusion, or grossly unfair advantage). In assessing good faith, courts should "look to the integrity of an actor's conduct during the proceedings." *Id.*"<br><br>"The sham DIP "negotiation" process was fraught with collusion between CCA and CSCEC Holding, as discussed above, with the improper purpose of designing an inherently unfair DIP Loan that will only serve to enrich CSCEC Holding at the benefit of CCA's non-insider creditors. Accordingly, CSCEC Holding should not be entitled to any good faith findings." | N/A | BMLP's objection is based on a mischaracterization of the DIP negotiation process. The Special Committee oversaw the negotiation of the DIP Facility to ensure that the process was fair and in the best interests of the estate. BDO conducted an extensive marketing process, reaching out to multiple lenders, but no alternative lender was willing to provide financing on better terms, let alone an unsecured basis. The DIP Facility includes fewer restrictive provisions than typical DIP financings, does not impose case milestones, and provides full flexibility for CCA to repay the loan at any time. Courts routinely grant good faith findings in DIP orders absent a clear showing of fraud, collusion, or bad faith—none of which exist here.<br><br>BMLP fails to present any evidence that the DIP Lender engaged in improper conduct or received an unfair advantage. To the contrary, the Special Committee's independent oversight and the robust marketing process confirm that the DIP Lender is entitled to the protections of Section 364(e). The good faith finding is a necessary and appropriate term of the DIP Facility, and this objection should be rejected. | **Rejected by CCA and the DIP Lender**<br><br>CCA believes the good faith finding is proper. It is appropriate, however, for the DIP Lender to provide argument and factual support in connection with the requested finding. |

| ITEM | OBJECTION | BMLP ARGUMENT | CREDIT AGREEMENT SECTION | RESPONSE | STATUS OF OBJECTION |
|---|---|---|---|---|---|
| 12. | **BMLP asserts that the DIP Facility should be provided on an unsecured basis.** | *[Objection p. 89- 93]*<br><br>The CSCEC Group's sham negotiation falls far short of "exhaust[ing] the possibility" of obtaining unsecured credit from insiders.<br><br>"Bankruptcy courts in this District and elsewhere repeatedly authorize Chapter 11 debtors to obtain unsecured financing, *especially from a debtor's corporate parent. See Presperse Corp.*, No. 24-18921 (Bankr. D.N.J. Oct. 2, 2024) (Docket No. 95) (authorizing debtor to obtain over $4.7 million in unsecured DIP financing); *Cinemex USA Real Est., et al*, No. 20-14695-LMI (Bankr. S.D.Fl. June 5, 2020) (Docket No. 249) (authorizing $1.92 million unsecured DIP Loan from *corporate parent*); *Westlake Surgical, L.P., D/B/A The Hospital at Westlake Medical Center*, Case No. 23-10747 (Bankr. W.D.T.X. Oct. 23, 2024) (Docket No. 554) (authorizing $1 million in unsecured DIP financing)."<br><br>"In fact, just a few months before CCA made its secured DIP proposal, a premier national bankruptcy intelligence platform—*Octus* (formerly *ReOrg Research*)—reported on a $30 million unsecured DIP financing from a corporate parent approved in the Southern District of Texas. *See In re Barretts Minerals Inc., et al.*, No. 23-90794 (Bankr. S.D.T.X. May 1, 2024) (Docket No. 898).171" | N/A | CCA inquired whether the DIP Lender would be willing to provide the DIP Facility on an unsecured basis, and the response was "no".<br><br>The requirement for a secured structure is a common and routine feature in DIP financing agreements and was a necessary component for securing the favorable terms of the DIP Facility.<br><br>BDO conducted a full marketing process, reaching out to multiple lenders, but none were willing to offer an unsecured loan. BMLP and its financial advisor have likewise not identified any lender that would be willing to provide unsecured financing. Given these circumstances, the Special Committee determined that a secured structure was necessary to ensure the availability of funding on the most favorable terms possible. | **Rejected by the DIP Lender**<br><br>Notwithstanding the arms-length prepetition negotiations on this topic, in light of BMLP's objection, CCA asked the DIP Lender on February 11, 2025, if they would agree to modify the DIP Credit Agreement to be on an unsecured basis. The DIP Lender did not agree to CCA's request. Accordingly, CCA is not able agree to this request and submits that the DIP Facility overall is nevertheless beneficial to the estate and should be approved. |

12