**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (admitted *pro hac vice*)
Sidney P. Levinson (admitted *pro hac vice*)
Erica S. Weisgerber (admitted *pro hac vice*)
Molly Baltimore Maass (*pro hac vice*
   pending)
66 Hudson Boulevard
New York, NY 10001
Telephone:  (212) 909-6000
Facsimile:   (212) 909-6836
nlabovitz@debevoise.com
slevinson@debevoise.com
eweisgerber@debevoise.com
mbmaass@debevoise.com

*Co-Counsel to the Debtor and Debtor in
Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Felice R. Yudkin
Ryan T. Jareck
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone:  (201) 489-3000
Facsimile:   (201) 489-1536
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

*Co-Counsel to the Debtor and Debtor in
Possession*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>CCA Construction, Inc.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 24-22548 (CMG) |

**SUPPLEMENTAL DECLARATION AND WRITTEN DIRECT TESTIMONY OF YAN
WEI IN SUPPORT OF FIRST DAY PLEADINGS AND DEBTOR IN POSSESSION
FINANCING**

I, Yan Wei, pursuant to section 1746 of title 28 of the United States Code, hereby declare

that the following is true and correct:

**Introduction**

1.    I, Yan Wei, submit the following supplemental declaration in support of the relief

requested in the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor*

---

[1]   The last four digits of CCA's federal tax identification number are 4862.  CCA's service address for the purposes
of this chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

*to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 4] (the "**DIP Motion**") and the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue to Use Its Bank Accounts and Maintain Existing Business Forms, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* [Docket No. 5] (the "**Cash Management Motion**") filed by CCA Construction, Inc. ("**CCA**" or the "**Debtor**").  I have personal knowledge of the following facts and attest under penalty of perjury that they are true.

2.    On December 22, 2024, I submitted the *Declaration of Yan Wei, Chairman and Chief Executive Officer of the Debtor, in Support of Chapter 11 Petition* ("**First Wei Declaration**").[2]  This Declaration supplements the First Wei Declaration, and this Declaration together with the First Wei Declaration are submitted herewith as my written direct testimony for the February 13, 2025 hearing (the "**Second Day Hearing**").

3.    As explained in the First Wei Declaration, I am the Chairman and Chief Executive ("**CEO**") of CCA.

4.    I am authorized to submit this Declaration on behalf of CCA.  Except where specifically noted, the statements in this Declaration are based on: (a) my personal knowledge; (b) information obtained from other members of CCA's management team, employees or advisors; (c) my review of relevant documents and information concerning CCA's operations, financial affairs and restructuring initiatives; or (d) my opinions based upon my professional experience.  If called upon to testify, I could and would testify competently to the facts set forth herein.

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Wei Declaration.

2

### CCA's Appointment of Financial Advisor and Independent Director

5.　　As explained in the First Wei Declaration, this chapter 11 case was precipitated by an adverse judgment following a multi-year litigation by BMLP against CCA and two of its remote affiliates which exacerbated already eroding conditions; the litigation arose out of the construction of Baha Mar, a resort in the Commonwealth of The Bahamas (the "**Baha Mar Litigation**").  On October 18, 2024, following a bench-trial in August 2024, Justice Andrew Borrok of the New York Supreme Court, Commercial Division ruled in favor of BMLP and entered a judgment of over $1.6 billion on all three defendants, including CCA (the "**Baha Mar Judgment**").

6.　　In September and October 2024, prior to the issuance of the trial court's decision, it appeared to CCA that an adverse outcome in the Baha Mar Litigation was possible and, if it came to pass, would be devastating to CCA and all related stakeholders.  CCA therefore explored options to preserve value, potentially through a chapter 11 petition.  This work began with the engagement of a third-party financial advisor and the engagement of an independent director to assist with the restructuring, including potential debtor-in-possession financing (the "**DIP Financing**").  In light of their critical importance to CCA, as the company's CEO, I interviewed candidates for both roles in the beginning of October 2024.

7.　　CCA's external counsel, Debevoise & Plimpton LLP ("**Debevoise**"), provided financial advisor and independent director candidates for our consideration.[3]  Along with other CCA personnel, I met with each candidate.  While each was highly qualified, I was particularly impressed by the competence, integrity, and professionalism displayed by Evan Blum and Elizabeth Abrams, and felt that they were the right persons to guide CCA through any potential restructuring process.

---

[3]　*See* CCA-BK0013436, Email from Yan Wei to Rory Heller and James Mahon regarding "Meeting Scheduling."

8.      CCA engaged BDO in approximately mid-October 2024.  Shortly thereafter, a team

from BDO led by Evan Blum began preparing CCA for a potential chapter 11 filing.  The BDO

team analyzed CCA's financial condition, frequently working onsite at CCA's office.  They also

commenced a months-long effort to help CCA obtain potential DIP Financing so that CCA could

have the liquidity it needed to maintain operations.  On October 21, 2024, acting as the authorized

representative of CCA's sole shareholder CSCEC Holding Company Inc. ("**CSCEC Holding**"), I

appointed Elizabeth Abrams to CCA's board of directors (the "**Board**") as an independent

director.[4]  On November 2, 2024, I acted in the same capacity and appointed Elizabeth Abrams as

the Chairman of the Special Committee, with ultimate approval authority over the DIP Financing.[5]

**My Recusal From Negotiations and Decision-Making Regarding the DIP Financing**

9.      Aside from identifying the right candidates, granting them the necessary authorities

to carry out their duties, and generally receiving updates as the process unfolded, I did not have

active involvement in the DIP Financing and refrained from playing any role as a negotiator or

decision-maker.  I also made it clear that, within CCA, the ultimate decision-making authority with

respect to DIP Financing and other restructuring alternatives rested in the Special Committee.

10.      I took this precaution for an important reason:  One potential source for DIP

Financing was CCA's parent, CSCEC Holding, which had provided financing to CCA under

different circumstances in the past and could be open to providing potential DIP Financing to CCA.

Like the chief executives at many other company groups, I not only serve as CCA's CEO and

Chairman, but also serve as President and CEO of CSCEC Holding.  I therefore recused myself

---

[4]      *See* CCA-BK0003098, October 21, 2024, Minutes of the Special Meeting of the Stockholder of CCA
        Construction, Inc.
[5]      *See* CCA-BK0003100, November 2, 2024, Written Consent of the Sole Stockholder of CCA Construction, Inc.

from CCA's negotiations for the potential DIP Financing to avoid any appearance of a conflict of interest.

11. My recusal from negotiations and decision-making, however, does not mean I was entirely oblivious to the DIP Financing. As CEO and Chairman of CCA and a member of the of Board, it was important that I understand and stay apprised of the company's readiness for chapter 11 petition, which in significant part depended on the progress toward securing DIP Financing. I kept myself apprised by attending board meetings, where I received reports regarding ongoing workstreams, including those related to the DIP Financing.[6] I was also occasionally copied in email threads, for visibility regarding general progress, where colleagues and advisors discussed DIP Financing.[7] While present in these meetings and discussions, I was a passive observer and did not interfere, whether by giving instructions or by interjecting myself in any decision-making process.

12. There were also times when I provided information to BDO that they required for the DIP Financing process. I was well positioned to do so as the CEO of CCA. For example, BDO carried out a marketing effort by contacting potential third-party lenders to gauge their interest in a DIP loan. Mr. Blum occasionally met me at my office to go over drafts of the "teaser" and the "Confidential Information Memorandum" prepared for marketing the potential DIP Financing to potential third-party lenders, to make sure that they were factually accurate. I also recall having occasional email exchanges with Blum for the same purpose. In each of these conversations, my involvement was strictly limited to providing information and ensuring that the teaser and the Confidential Information Memorandum accurately reflected the state of CCA's

---

[6] *See* CCA-BK0011988, Minutes of December 22, 2024 Board of Directors Meeting.
[7] *See* CCA-BK0012442, Email from Shefit Koboci to Wei Zhao and Mei Liu, copying Yan Wei, et al., regarding "CCA – DIP."

5

business.  I never interfered or sought to dictate how BDO marketed the DIP Financing and had

never been told by BDO who it had approached as potential DIP lenders.

### My Recusal from Negotiation and Decision-making at CSCEC Holding

13.     Guardrails were also implemented at CSCEC Holding to make sure that my roles

at both companies did not taint the integrity of the DIP Financing negotiation.  In late October

2024, CSCEC Holding engaged Lowenstein & Sandler ("**Lowenstein**") to act as counsel in the

negotiations with CCA.

14.     Additionally, in the second half of October 2024, I decided to have one CSCEC

Holding colleague, JiChao Xu, handle responsibilities related to the company's DIP Financing

negotiations with CCA.  Mr. Xu is a seasoned executive, with years of experience in project

management and business administration.  While serving as Vice President and a board member

at CSCEC Holding, Mr. Xu had no functional role at CCA.  I note that BMLP has made the

assertion that Mr. Xu was a "CCA Employee."  CCA provides certain shared services to its

subsidiaries and affiliates, including human resource and payroll services.  Because of this

arrangement, Mr. Xu's compensation was processed by CCA, but Mr. Xu was not actively

involved in the day-to-day operations of CCA.

15.     Tapping Mr. Xu to lead CSCEC Holding's negotiation with CCA had another

benefit:  Mr. Xu primarily works at CCA's affiliate in Panama.  Notwithstanding his role at CSCEC

Holding, Panama has continued to be Mr. Xu's focus.  Currently Mr. Xu spends more than 75%

of his time in Panama working on a number of projects.  As a result, Mr. Xu only had limited

familiarity with CCA's employees.  This reduces the risk of a pre-existing relationship tainting the

negotiation.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed on February 12, 2025.

By: */s/ Yan Wei*

Yan Wei
CEO and Chairman
CCA Construction Inc.