**GIBBONS P.C.**
Robert K. Malone, Esq.
Brett S. Theisen, Esq.
Christopher P. Anton, Esq.
Kyle P. McEvilly, Esq.
One Gateway Center
Newark, New Jersey 07102-5310
Telephone: (973) 596-4500
Email:  rmalone@gibbonslaw.com
         btheisen@gibbonslaw.com
         canton@gibbonslaw.com
         kmcevilly@gibbonslaw.com

*Counsel to BML Properties, Ltd.*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| In re: | (Hon. Christine M. Gravelle) |
|---|---|
| CCA Construction, Inc.,[1] | Chapter 11 |
| Debtor. | Case No. 24-22548-CMG |
| | **Related Dkt. No.: 266** |

**OBJECTION OF BML PROPERTIES, LTD. TO DEBTOR'S
MOTION FOR ENTRY OF AN ORDER GRANTING RELIEF FROM THE
AUTOMATIC STAY TO SEEK FURTHER APPELLATE REVIEW**

BML Properties, Ltd. ("BMLP"), by and through its undersigned counsel, submits this objection (the "Objection") to the *Debtor's Motion for Entry of an Order Granting Relief from the Automatic Stay to Seek Further Appellate Review* [Dkt. 266] (the "Motion"), filed by CCA

---

[1] The last four digits of CCA's federal tax identification number are 4862. CCA's service address for the purposes of this Chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

1

Construction, Inc. (the "Debtor" or "CCA") on April 23, 2025, and respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The Court should deny CCA's second request to modify the automatic stay both because it has not demonstrated even a remote possibility of succeeding in its attempt to further appeal BMLP's judgment, and because CCA is abusing the bankruptcy process through its dilatory tactics for the benefit of its non-Debtor shareholder and non-Debtor affiliates. If the Motion is granted, the estate will be prejudiced because CCA's pursuit of meritless further review is a pretense to oppose and delay a much-needed robust, independent investigation by the Court-appointed examiner, and because CCA will continue to waste valuable resources pursuing unrealistic and unnecessary "alternative" restructuring scenarios that the Debtor has yet to even describe to BMLP or to the Court. Rather than trying to re-litigate BMLP's judgment, CCA should focus its efforts on maximizing value by working with BMLP and cooperating with (rather than trying to limit or resist) the Examiner's investigation into misconduct and claims for the benefit of its estate.

2. CCA commenced this Chapter 11 case as a litigation tactic in the wake of BMLP's $1.6 billion judgment and after the New York Appellate Division (the "Appellate Division") denied its request for a stay of enforcement pending appeal. After obtaining the protections of Chapter 11, CCA immediately sought to modify the automatic stay to allow it to appeal the judgment, claiming that it had a "significant probability of success on the merits of the [a]ppeal."[2] Critically, CCA's initial motion to modify the stay *did not* authorize CCA to pursue any further review apart from completing its single appeal as of right to the Appellate Division. While BMLP consented to

---

[2] *Debtor's Motion for Entry of an Order Granting Relief from the Automatic Stay to Prosecute an Appeal* [Dkt. 14] ¶ 30.

2

that first request for stay relief, BMLP cautioned that CCA had "provide[d] a remarkably one-sided and incomplete picture of the litigation" and explained that "CCA's appeal is meritless."[3]

3.   BMLP was right.  Less than four (4) months later, the Appellate Division issued a unanimous decision categorically rejecting all of CCA's arguments and upholding, in a well-reasoned opinion, BMLP's judgment in full against all three defendants, including CCA.  For all of CCA's puffery, not *one* Justice sided with CCA on *any* issue.  And because the Appellate Division's decision was unanimous, CCA has no further appeal as of right; instead, it must make a (rarely granted) motion for leave for permission to pursue a discretionary appeal to the New York Court of Appeals.  Notwithstanding the thorough rejection of all of CCA's arguments by both the trial and appellate courts, CCA still incredibly maintains it has "meaningful chances" of reversing the judgment if allowed to seek permission to further appeal to New York's Court of Appeals.  But CCA's Motion omits the stringent criteria under which the New York Court of Appeals grants motions for leave, which are plainly not satisfied here.

4.   Instead, CCA once again provides a biased narrative of the merits of its appeal that has been thoroughly discredited by the Appellate Division. This time, CCA even stoops to disparaging a panel of justices of the Appellate Division whose thorough review of the record is self-evident both from the video-recorded oral argument and their reasoned decision.  At this juncture, no true estate fiduciary would continue to dispute the merits of BMLP's underlying judgment, and there is no indication that the Special Committee has conducted any assessment regarding the likelihood of success of the appeal.

5.   Against CCA's unlikely success on appeal, BMLP will be prejudiced if the Motion is granted.  CCA and its affiliates have used this bankruptcy as a litigation tactic to stall BMLP's

---

[3] *Statement and Reservation of Rights of BML Properties, Ltd. to Debtor's Motion for Entry of an Order Granting Relief from the Automatic Stay to Prosecute an Appeal* [Dkt. 54] at 2–3.

3

efforts to satisfy its judgment after the Appellate Division denied the motion for a stay of enforcement pending appeal. What's more, this case is predominantly a two-party dispute, as evidenced by the timing and stated reasons of the bankruptcy filing, the lack of interest by general unsecured creditors in this case to enable the United States Trustee to form a creditors' committee, and the fact that no non-insider creditors, other than BMLP, have appeared at hearings in this case.

6. CCA and its affiliates have vigorously opposed BMLP's efforts to investigate the circumstances that led to this bankruptcy, including by CCA resisting discovery in advance of the second day hearing and opposing the appointment of a statutorily required examiner and by CCA's affiliates stonewalling Rule 2004 discovery. While BMLP agreed in good faith to pause those efforts while CCA pursued its appeal as of right, CCA should not be allowed to stall any longer. CCA has not proceeded in good faith, and it should not continue its abuse of the bankruptcy process.

7. For these reasons, CCA's Motion should be denied for lack of "cause" under 11 U.S.C. § 362(d)(1).

## BACKGROUND

**I. CCA commences this Chapter 11 case following BMLP's $1.6 billion judgment and immediately seeks relief from the stay to appeal.**

8. On October 18, 2024, the Supreme Court of the State of New York, New York County (the "New York Court") issued a comprehensive 74-page decision finding CCA liable, along with two affiliated co-defendants, CSCEC Bahamas, Ltd. ("CSCECB") and CCA Bahamas Ltd. ("CCAB"), in connection with a scheme to defraud and loot assets from BMLP, its former business partner. This decision followed years of discovery and extended litigation, including two earlier interlocutory appeals to the Appellate Division. On October 31, 2024, the New York Court entered a judgment in favor of BMLP and against CCA, CCAB, and CSCEB, jointly and severally,

4

in a total sum equal to $1,642,598,493.15, plus continuously accruing interest (the "New York Judgment"). The total owed, with interest, is now over $1.7 billion.

9. On December 22, 2024 (the "Petition Date"), shortly after the Appellate Division denied CCA's motion for a stay pending appeal, CCA commenced a voluntary Chapter 11 case under title 11 of the United States Code (the "Bankruptcy Code").

10. On the same date, December 22, 2024, CCA filed a motion seeking relief from the automatic stay [Dkt. 14] (the "First Stay Relief Motion") to permit CCA to prosecute the appeal of the New York Judgment. CCA represented to this Court that the "trial court committed reversible error as to every element of liability, including damages" and that CCA had "a significant probability of success on the merits of the Appeal." First Stay Relief Motion ¶ 30. CCA's First Stay Relief Motion could have sought this Court's permission to pursue all possible forms of further review, such as motions for reconsideration, motions for leave to appeal, or any further appeals as of right, but CCA chose not to seek that relief.

11. Given the limited relief sought by CCA, BMLP consented to stay relief but filed a reservation of rights, wherein it cautioned that CCA had provided a misleading, one-sided summary of the litigation and explained that CCA had a low likelihood of success on appeal. Dkt. No. 54 at 2–3. In particular, BMLP highlighted that "the Appellate Division [had] already considered CCA's self-serving claims that it is likely to succeed on appeal when it" denied the motion for a stay of enforcement pending appeal. *Id.* at 3–4.

II. **The New York Appellate Division unanimously upholds BMLP's judgment.**

12. On March 18, 2025, the Appellate Division heard oral argument on CCA's appeal from BMLP's judgment. The oral argument is available to view online at the following link: https://www.youtube.com/live/HXjbuNaf5hA?si=Ac7t4a8x2pFHCuIg&t=3868 (starting at 1:04:29). As seen in the video, all four sitting justices actively participated in the oral argument

and asked detailed, well-informed questions about the appellate record and the legal issues that CCA raised on appeal.

13. On April 8, 2025, the Appellate Division unanimously affirmed the New York Judgment [Dkt. 247-1] (the "<u>Appellate Division Decision</u>").  The Appellate Division found that there was "no basis to disturb the trial court's award" because, among other reasons: (i) the evidence adduced at trial "is sufficient to support a finding of fraud"; (ii) "the trial court properly awarded plaintiff the value of its investment" as damages; and (iii) "the trial court properly found that under New York law," which the trial court correctly applied, "defendants' corporate veils should be pierced."  Appellate Division Decision at 2, 4.

14. Notwithstanding the Appellate Division's unanimous and unequivocal rejection of CCA's arguments, CCA filed the present Motion on April 23, 2025, requesting relief from the automatic stay to pursue discretionary leave to appeal to the New York Court of Appeals.  Although the Motion does not specify how CCA intends to seek this relief, CCA presumably seeks permission to make a motion directly to the New York Court of Appeals.[4]

15. It has now been more than four (4) months since the Petition Date, and as stated above no official committee of unsecured creditors has been appointed.  The Court did, however, enter an order granting the motion by BMLP for the Appointment of an Examiner, which provided that an examiner would be appointed after the affirmance of BMLP's judgment by the Appellate Division.  Dkt. 211 (the "<u>Examiner Order</u>").

---

[4] CCA could potentially make its motion for leave to appeal to the Appellate Division in the first instance and then make another such motion to the Court of Appeals if the Appellate Division denies the first motion, but the Motion's proposed order does not refer to multiple motions.  *See generally* Motion at 18–23 (the "<u>Proposed Order</u>").  Similarly, the Proposed Order does not appear to contemplate any motions for reargument.  *Id.*  To the extent that the Motion sought permission to make these further motions, there would be additional grounds for denial.

6

16. On April 29, 2025, in accordance with the Examiner Order, the United States Trustee appointed Todd Harrison, Esq., a partner at McDermott, Will & Emery LLP, to be the examiner (the "Examiner"). Dkt. 280. The scope and budget for the Examiner's investigation will be determined at a hearing scheduled for May 22, 2025.

**OBJECTION**

I. **The automatic stay should not be lifted again.**

17. CCA seeks relief under the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code, which permits the Court to grant relief from the automatic stay "for cause." 11 U.S.C. § 362(d)(1); *see* Motion ¶¶ 23–25. Whether to grant relief from an automatic stay is a decision committed to the Bankruptcy Court's discretion. *In re Myers*, 491 F.3d 120, 128 (3d Cir. 2007); *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997). The party seeking to modify the automatic stay has the burden to establish "cause." *In re RNI Wind Down Corp.,* 348 B.R. 286, 299 (Bankr. D. Del. 2006).

18. "Cause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *In re Trump Ent. Resorts, Inc.,* 526 B.R. 116, 120 (Bankr. D. Del. 2015) (citation omitted). In the Third Circuit, courts look to the three-pronged *Rexene* balancing test: (1) whether the movant has some probability of prevailing on the merits; (2) prejudice suffered by the debtor and the estate if the stay is lifted; and (3) the balancing of hardships between the parties. *In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (citation omitted); *see also In re SCO Grp., Inc.*, 395 B.R. 852, 857 (Bankr. D. Del. 2007) (citation omitted). All three factors weigh against lifting the automatic stay again.

7

### A. CCA has not demonstrated a probability of success of prevailing on its discretionary appeal.

19. To obtain relief from the automatic stay, CCA must demonstrate at least "some probability of success on the merits." *In re Cont'l Airlines, Inc.*, 152 B.R. at 426 (D. Del. 1993). While CCA argues that it only needs to make a "slight" showing of probability of success, Motion ¶¶ 32–34, such a slight showing can only support lifting the stay in an "appropriate case." *Cont'l Airlines*, 152 B.R. at 425. In these circumstances—where CCA's arguments here have been rejected by the trial court and twice by the Appellate Division, both in denying CCA's motion to stay enforcement pending appeal and again in a unanimous decision on the merits after briefing and oral argument (in addition to rejecting CCA's arguments in two earlier interlocutory appeals)—CCA must offer the Court some concrete reason that, this time, it has an actual probability of success that would justify further relief from the automatic stay. *See e.g.*, *PNY Techs., Inc. v. Netac Tech. Co.*, 2020 WL 3056306, at *2 (D.N.J. June 9, 2020) (denying motion to stay enforcement where movant "failed conclusively to prevail on the merits in this litigation . . . [t]he Third Circuit has issued a final Judgment against [movant] and [movant] has no possibility of success on the merits at this point.").

20. But even if only a "slight" showing of success were required, CCA cannot meet that low bar. CCA's speculative arguments do not come close to the showing that other parties have made to obtain stay relief. For example, in *Rexene*, the moving party established at least a slight probability of success by prevailing in opposing a motion for summary judgment. *In re Rexene Prods. Co.*, 141 B.R. at 578. Similarly, in *Continental Airlines*, the court found the movant had "at least some probability" of succeeding because the movant had provided evidence to support the merits of its arguments and the opposing party produced no evidence to the contrary. *In re Cont'l Airlines, Inc.*, 152 B.R. at 426 ("At the bankruptcy hearing Mr. Burcham testified for

8

American that the settlement agreement arguably precludes Continental's use of the conversation. Continental produced no evidence to the contrary.").

21.     Here, CCA does not come close to demonstrating *even* a "slight" probability of success in further pursuing the appeal.  To succeed on its appeal, CCA must show *both* that there is some probability that the New York Court of Appeals would—in its sole discretion—grant CCA's motion for leave to appeal *and* that, if the motion is granted, the appeal would be decided in CCA's favor on the merits.  It can show neither.  To start, CCA fails to explain even the standard for granting a motion for permission to appeal, let alone why it would be met here.  As explained below, this appeal does not fit any of the criteria that the New York Court of Appeals looks for when considering motions for leave to appeal.  And even if leave were granted, CCA's prospects of prevailing on the merits of its appeal are virtually nonexistent, given the trial court's detailed factual findings and well-reasoned decision, which were affirmed in full by a unanimous Appellate Division here, and the fact that two prior appellate panels had previously rejected the same legal arguments CCA now apparently seeks to assert again.

22.     CCA tellingly does not cite a single case in which relief from the automatic stay was granted to allow a debtor to pursue a *discretionary* appeal after a unanimous intermediate appellate court decision affirming a reasoned post-trial opinion.  The absence of any such precedent underscores the impropriety of CCA's request.

                *i.*     ***CCA has no realistic chance of obtaining discretionary leave to appeal.***

23.     As CCA concedes, it has no appeal as of right to the New York Court of Appeals, because the Appellate Division Decision was unanimous.  Motion, ¶ 4; *see also* CPLR § 5601(a) (requiring two Appellate Division justices to dissent on a question of law to permit an appeal as of right, which did not occur here ).  Consequently, CCA must seek permission to appeal, which is granted only on a discretionary basis.  *See* CPLR § 5602(a).

9

24. The probability that CCA's leave application will be granted is clearly remote. In recent years, only about 4% of civil motions for leave to appeal to the New York Court of Appeal were granted.[5] The chances of CCA's motion being granted here are even lower because CCA's proposed appeal does not raise issues of law that typically "merit review" by the New York Court of Appeals pursuant to its Rules of Practice, which include those of "novel or of public importance," those that "present a conflict with prior decisions of this [Court of Appeals]," or those "involv[ing] a conflict among the departments of the Appellate Division." *See* 22 NYCRR § 500.22(b)(4) (listing questions meriting review by the New York Court of Appeals).

25. CCA ignores these Rules of Practice and fails to explain why its Motion for leave to appeal would satisfy any of the criteria that will be applied by the New York Court of Appeals in deciding such a motion.

26. Instead, CCA asserts that the trial court and the Appellate Division erred in applying settled law to the facts of this case. But even if there were such error—there is not—such argument would not typically justify discretionary review by the New York Court of Appeals. Indeed, as that Court has expressly recognized, it turns away hundreds of cases each year where the underlying outcome may be "wrong, unfair or questionable" (although this decision is not) because deciding them would have no significant statewide import. *See In re Seawright v. Board of Elections*, 35 N.Y.3d 227, 252 (2020) (Wilson, J., dissenting) (quoting *Arthur Karger, Powers of the New York Court of Appeals* § 10:3) ("the primary, though not the sole, function of the Court of Appeals is conceived to be that of declaring and developing an authoritative body of decisional

---

[5] Lisa LeCours, *Annual Report of the Clerk of the Court of Appeals*, 46 (2023), https://www.nycourts.gov/ctapps/news/annrpt/AnnRpt2023.pdf (showing 153 out of 3,915 motions for leave to appeal granted between 2019 and 2023).

law for the guidance of the lower courts, the bar and the public, rather than merely correcting errors committed by the courts below").

27. CCA suggests that the brevity of the Appellate Division's ruling establishes its likelihood of reversal by the New York Court of Appeals, but this argument has no basis whatsoever in the reality of New York appellate practice. The Appellate Division's rulings are almost always just a handful of pages, and the four-page opinion here is actually longer than many of that court's decisions. For example, of the two dozen decisions rendered by the Appellate Division on April 8, 2025, twenty of them were shorter than the decision here.[6] And while CCA asks this Court to draw an inference from the length of the decision that the Appellate Division failed to consider the issues CCA raised on appeal, the video recording of the March 18, 2025, oral argument conclusively refutes that theory. *See supra* ¶ 10. All of the sitting justices on the panel asked detailed questions based on the extensive appellate record and the parties' submissions at oral argument. CCA also ignores that a number of the arguments CCA raised were considered and rejected in prior interlocutory appeals to the same court.

### ii. *Even if leave were granted, CCA cannot realistically prevail on appeal.*

28. Even in the unlikely event that the New York Court of Appeals were to grant CCA leave to appeal, CCA would still face substantial hurdles on the merits of its appeal. CCA must prevail on multiple issues, and CCA has provided no valid basis to overcome any, let alone all, of them. Even a reduction in the damages awarded is highly unlikely in these circumstances.

29. **First,** CCA must overcome the trial court's application of New York law—which CCA itself advocated in this case for more than 6 years until the eve of trial—rather than Bahamian law in connection with BMLP's veil piercing claims. As the trial court found and the Appellate

---

[6] New York Official Reports, Appellate Division, First Department, New York State Law Reporting Bureau (April, 2025), https://nycourts.gov/reporter/slipidx/aidxtable_1.shtml (providing links to decisions sorted by date).

11

Division affirmed, CCA waived this argument by providing notice of its intent to invoke foreign law only on the eve of trial and then failing to supply the court with "sufficient information" under CPLR § 4511 to enable it to rule on or apply Bahamian law. Appellate Division Decision at 4. Contrary to CCA's assertion, this straightforward application of well-settled rules and waiver principles neither created a "new rule" nor raised due process concerns. Motion ¶ 33.

30. *Second*, CCA would also have to convince New York's highest court to reverse the extensive factual findings by the trial court—affirmed on appeal—that established CCA's own direct liability for fraud. Specifically, the trial court found—based upon substantial evidence presented over an 11-day bench trial—that CCA was liable both independently for fraud *and* liable through piercing the corporate veils of CSCECB and CCAB. As the Appellate Division emphasized, these factual findings cannot be disturbed unless it is obvious that they could not have been reached under any fair interpretation of the evidence. Although CCA now claims that this standard is "incorrect," the Appellate Division applied a correct and well-established standard. *See Lehman Bros. Int'l (Europe) v. AG Fin. Prods., Inc.*, 225 A.D.3d 474, 475 (1st Dep't 2024); *Watts v. State of New York*, 25 A.D.3d 324, 324 (1st Dep't 2006); *Thoreson v. Penthouse Int'l*, 179 A.D.2d 29, 31 (1st Dep't 1992), *aff'd* 80 N.Y.2d 490 (1992).

31. CCA's claims regarding damages are equally without merit. CCA alleges that the trial court and Appellate Division "improperly calculated both fraud and contract damages" and "wrongly awarded consequential damages". Motion ¶ 33. Yet these assertions lack any basis in law and merely reflect disagreements with how the trial court and Appellate Division weighed and interpreted the evidence, and these arguments have been repeatedly rejected. Likewise, CCA's repeated assertion that BMLP's claims are derivative has been considered and rejected three times by the New York courts. There is no reason to expect that a fourth attempt will fare any better.

12

32. *Finally*, CCA's exaggerated assertion that the Appellate Division created "a precedent so absurd as to harm New York's reputation as a sophisticated forum for commercial disputes," Motion ¶ 33, underscores the emptiness of its appellate arguments. This type of hyperbolic rhetoric highlights the lack of substantive merit. Far from creating an unprecedented ruling, the Appellate Division decision is entirely routine: a unanimous affirmance following a multi-day bench trial that resulted in a comprehensive written ruling, which was firmly grounded in factual findings, credibility determinations, and legal conclusions repeatedly affirmed by different panels of the Appellate Division.

33. In sum, even if CCA somehow obtained discretionary leave to appeal, it faces insurmountable factual and legal hurdles that eliminate any realistic possibility of success in reversing the trial court judgment.

**B.     Granting stay relief would prejudice CCA's estate.**

   **i.     *CCA will use the appeal as a pretense to further resist the Examiner.***

34. In considering the competing interests of the parties, the Court should consider whether there will be "great prejudice" to the bankruptcy estate. *In re W.R. Grace & Co.*, 2007 WL 1129170, at *2 (Bankr. D. Del. Apr. 13, 2007). "Even slight interference with the administration [of the estate] may be enough to preclude relief in the absence of a commensurate benefit." *Id*. at *2 n.7 (citing *In re Curtis,* 40 B.R. 795, 806 (Bankr. D.Utah 1984)).

35. CCA's continued pursuit of the appeal will be prejudicial to CCA's estate because CCA will continue to use it as a pretense to try to postpone CCA's reckoning with BMLP's $1.7 billion claim and to try to resist a thorough investigation by the Examiner, which will likely uncover colorable claims that will maximize the value of CCA's estate. *See* Dkt. 88 (the "Examiner Motion"). Indeed, after obtaining its initial relief from the automatic stay, CCA used its pending Appellate Division appeal to resist an examiner, arguing that "[t]he appellate court is

13

reviewing the Trial Decision, and a reversal would fundamentally change both the viability of the claims BMLP focuses on and the value CCA might obtain from pursuing them." Dkt No. 120 ¶ 45. CCA also claimed that "there is no pressing need to appoint an examiner to investigate [CCA's past] activity particularly when it is subject to a *pending appeal*." *Id*. ¶¶ 53-56 (emphasis added).

36. CCA's continued efforts to oppose the Examiner may hinder the Examiner's ability to timely investigate and pursue viable claims. This is problematic because, as shown by the New York Judgment and subsequent discovery, the fraudulent conduct among CCA and its affiliates dates back many years, and there is a complex web of past and continuing intercompany activity that needs to be investigated.[7] CCA also readily admits that its affiliates will be funding its further appeal efforts (just as they funded its meritless appeal to the Appellate Division), raising glaring conflicts of interest and further underscoring CCA's inability to properly investigate claims against affiliates.

37. What's more, the limited discovery that BMLP has taken or attempted to take to date, and the limited responses received, reveal several areas where further rigorous investigation by the Examiner is warranted, including, but not limited to, the following:

- CCA experienced deepening insolvency for the better part of the last decade while, at the same time, continuing to incur hundreds of millions in purported "loans" from CSCEC Holding, Inc. ("CSCEC Holding") that are undocumented and have rarely been repaid;

- CCA inexplicably assumed obligations under shared services agreements from CSCEC Holding *after* the commencement of the New York litigation; and

---

[7] Although Bankruptcy Code § 108(a) tolls the statute of limitations for claims belonging to CCA's estate, it does not extend to claims belonging to individual creditors or third parties, including claims against affiliates arising from transactions or conduct that may be uncovered through the examiner's investigation.

14

- at least one high-ranking CCA executive potentially used corporate funds to make tens of thousands in personal purchases during the litigation and leading up to the Petition Date, as revealed in recent third-party productions.

38. Indeed, CCA's own disclosures further raise numerous questions that need to be investigated, including:

- why CCA has incurred more than $96 million of apparent outstanding intercompany debt to its subsidiaries and affiliates (which it scheduled under a line item for country club memberships) while it was most likely insolvent,[8]

- CCA's relationship to its sureties and the fact that the approximately $700 million surety bond obligations[9] could be partially or wholly cross-collateralized and back-stopped by CSCEC Holding and CCA's ultimate parent in China through their indemnity agreements with the sureties (which was glossed over in CCA's initial filings but elicited through discovery),[10] and

- how CCA claims to be a holding company that does not know the value of its equity interests in subsidiaries and generates almost no cash flow.[11]

### ii. *CCA will waste estate resources on exploring unnecessary Chapter 11 scenarios, without input from BMLP.*

39. Modifying the automatic stay is also inappropriate where it "would place a substantial burden on the [debtor's] reorganizational efforts." *In re Trump Ent. Resorts, Inc.*, 526 B.R. 116, 121 (Bankr. D. Del. 2015). At this juncture, there should be no dispute over the merits of BMLP's judgment, and CCA should be focused on cooperating with BMLP rather than litigating against it.

40. Instead, CCA continues its campaign to keep BMLP in the dark while at the same time apparently expending significant resources exploring "alternative strategies" to account for

---

[8] *Schedules of Assets and Liabilities and Statement of Financial Affairs for CCA Construction, Inc.* [Dkt. 99] at 13, 25 (Schedule A/B 77).
[9] *Declaration of Yan Wei, Chairman and Chief Executive Officer of the Debtor, in Support of Chapter 11 Petition* [Dkt. 11] ("Wei Declaration") ¶ 23.
[10] It is crucial for construction managers and providers, such as CCA and its subsidiaries and affiliates, to secure performance bonds and similar guarantees for their clients in order to win and perform construction projects. Wei Declaration ¶ 25.
[11] *Omnibus Objection of BML Properties, Ltd.* [Dkt. 128] ¶¶ 6, 15, 17.

the unrealistic scenario where BMLP's judgment is overturned. This purportedly includes "a transactional alternative premised on the existence of the BMLP claim," Motion at 11, although the Debtors have conspicuously failed to tell BMLP or the Court anything of substance about any of the "alternative strategies" under consideration. Exploring numerous hypothetical restructuring scenarios without BMLP's input is imprudent and, based on fee estimates provided to BMLP by CCA's lead bankruptcy counsel, may have resulted in CCA's professionals incurring substantial legal fees (during the period when this case was supposed to be on pause pending the outcome of the appeal).

41. Denying the Motion will thus focus CCA's efforts, preserve estate resources, and enhance value for its estate. On the other hand, granting the Motion will lead to CCA expending unnecessary resources on purely hypothetical scenarios where BMLP's claim does not exist.

**C.    Balance of the hardships favors denial.**

42. When deciding whether to lift the automatic stay, courts must balance the potential prejudice to the debtor's estate and creditors against any hardships imposed upon the party seeking relief from the stay if relief is denied. *See In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992); *In re Telegroup, Inc.*, 237 B.R. 87, 91 (Bankr. D.N.J. 1999); *see also Robbins v. Robbins (In re Robbins)*, 964 F.2d 342, 345 (4th Cir. 1992) (recognizing the importance of balancing relative hardships when considering stay relief). The automatic stay "is a shield and not a sword designed to afford a party with a litigation advantage." *In re Cracked Egg, LLC*, 624 B.R. 84, 88–89 (Bankr. W.D. Pa. 2021). Where "[t]he debtor file[s] its petition … to avoid the consequences of adverse state court decisions while it continues litigating[, the Bankruptcy Court] should not … act as a substitute for a supersedeas bond of state court proceedings. *In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. 849, 851 (Bankr. S.D.N.Y. 1984) (dismissing chapter 11 petition for being filed in bad faith). Where a debtor seeks to abuse the bankruptcy process, as

16

here, "[o]ne of the ways a bankruptcy court preserves its processes is by refusing to condone [such] abuse." *In re Uvaydov*, 354 B.R. 620, 624 (Bankr. E.D.N.Y. 2006) (denying stay pending appeal where debtor had no success on the merits of its appeal and was seeking to strategically use bankruptcy as litigation "ploy").

43. In this case, CCA has effectively conceded that it used the bankruptcy process as a litigation tactic against BMLP. It admittedly filed its Chapter 11 petition to stay BMLP's enforcement efforts after it was unable to post a supersedeas bond and after its motion for stay pending appeal was denied. Wei Declaration ¶ 4. After obtaining the protections of Chapter 11, CCA immediately sought to modify the stay to permit it to continue its appeal. *See* First Stay Relief Motion ¶ 22. And now that it has lost the appeal that it sought permission to pursue, it requests modification of the stay *again* so that it can try to get a third bite at the apple by continuing its meritless appellate efforts instead of satisfying its creditor's claim.

44. All the while, BMLP has faced significant hardship. "Chapter 11 vests petitioners with considerable powers—the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.—that can impose significant hardship on particular creditors." *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999). And, here, the hardship is particularly significant because this case is predominantly a two-party dispute between the Debtor (and its affiliates) and BMLP, as evidenced by the tactical filing of this case and the lack of any creditors' committee. *In re Milstein*, 304 B.R. 208, 212 (Bankr. E.D. Pa. 2004) (the case was a two-party dispute because "it was a filing initiated by the Debtor for the sole purpose of avoiding the need to post a bond in order to obtain a stay of proceedings while prosecuting her appeal."); *In re Sparkle Stor-All Eaton Twp., LLC*, 2011 WL 4542709, at *1 (Bankr. N.D. Ohio Sept. 28, 2011) ("This case is thus a two party dispute, as evidenced by the facts that no other claims have been filed,

17

there are no unsecured creditors' committees and the Bank is the only creditor party that has appeared at the numerous hearings held in this case.").

45. But, critically, it is not just delay that continues to prejudice BMLP, because CCA has apparently attempted to render itself judgment proof since the New York litigation commenced. Given the myriad jurisdictions in which CCA and its affiliates operate, it is impossible to state whether BMLP's rights under the varying applicable laws could be extinguished by such delay. What is clear, however, is that CCA's contention that there will be "no prejudice" to BMLP is flatly incorrect. Motion ¶ 28.

46. And while CCA purportedly is exploring potential Chapter 11 plan "alternatives," it has not discussed any potential reorganization with BMLP—its largest creditor by orders of magnitude—whose support will be required for CCA to reorganize. At bottom, it is "evident that the debtor seeks to use this court not to reorganize, but to relitigate" underscoring CCA's bad faith. *In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. 849, 851 (Bankr. S.D.N.Y. 1984). Indeed, CCA has shut BMLP out of its reorganization process and is not acting in good faith, to the detriment of its estate and BMLP.

47. For these reasons, the stay should not be modified.

## II. To the Extent the Automatic Stay is Modified, the Court Should Order Appropriate Protections to Minimize Prejudice.

48. To the extent the Court is inclined to grant the automatic stay, appropriate safeguards should put in place to ensure that the estate is not prejudiced. BMLP submits that these safeguards include:

- because BMLP's consent would be required for any Chapter 11 plan, that CCA does not expend additional estate resources developing any such plan without fully involving BMLP in that process;

- CCA does not oppose, or seek to restrict, the Examiner's investigation based on any argument that the merits of BMLP's judgment are being appealed; and

18

- CCA's relief is limited only to making a motion to the New York Court of Appeals for leave to appeal, and to bSriefing and arguing that appeal if such motion is granted.

## NOTICE

49. Copies of the within Objection have been provided to: (a) Debevoise & Plimpton LLP and Cole Schotz P.C., co-counsel for the Debtor; (b) The Office of the United States Trustee, Region Three, and (c) all parties having formally requested notice in this case electronically via the Court's CM/ECF system.

## CONCLUSION

**WHEREFORE**, For the foregoing reasons, the Court should deny the Motion and grant such other relief as is appropriate.

Dated: May 2, 2025
Newark, New Jersey

**GIBBONS P.C.**

*/s/ Brett S. Theisen*
Robert K. Malone, Esq.
Brett S. Theisen, Esq.
Christopher P. Anton, Esq.
Kyle P. McEvilly, Esq.
One Gateway Center
Newark, New Jersey 07102-5310
Telephone: (973) 596-4500
Email: rmalone@gibbonslaw.com
         btheisen@gibbonslaw.com
         canton@gibbonslaw.com
         kmcevilly@gibbonslaw.com

*Counsel for BML Properties, Ltd.*