**GIBBONS P.C.**
Robert K. Malone, Esq.
Brett S. Theisen, Esq.
Christopher P. Anton, Esq.
Kyle P. McEvilly, Esq.
One Gateway Center
Newark, New Jersey 07102-5310
Telephone: (973) 596-4500
Email: rmalone@gibbonslaw.com
       btheisen@gibbonslaw.com
       canton@gibbonslaw.com
       kmcevilly@gibbonslaw.com

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
Eric D. Winston, Esq. (admitted *pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3600
Email: ericwinston@quinnemanuel.com

*Counsel for BML Properties, Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | (Hon. Christine M. Gravelle) |
| CCA Construction, Inc.,[1] | Chapter 11 |
| Debtor. | Case No. 24-22548-CMG |

**OMNIBUS REPLY OF BML PROPERTIES, LTD. TO OBJECTIONS TO MOTION FOR ENTRY OF AN ORDER (A) CONFIRMING DIRECT CLAIMS AGAINST CSCEC HOLDING COMPANY, INC., (B) GRANTING LIMITED RELIEF FROM THE AUTOMATIC STAY TO PURSUE POST-JUDGMENT RELIEF IN NEW YORK STATE COURT OR OTHER APPROPRIATE FORUM, (C) GRANTING DERIVATIVE STANDING TO PURSUE ESTATE ALTER EGO CLAIMS AGAINST CSCEC HOLDING COMPANY, INC., AND <u>(D) GRANTING RELATED RELIEF</u>**

---

[1] The last four digits of CCA's federal tax identification number are 4862. CCA's service address for the purposes of this chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

BML Properties, Ltd. ("BMLP"), by and through its undersigned counsel, respectfully submits this Omnibus Reply to the following objections to BMLP's motion (the "Motion") [Dkt 442][2] concerning its direct claims and the estate's claims for veil piercing:

- Debtor's Objection To Motion For Entry Of An Order (A) Confirming Direct Claims Against CSCEC Holding Company, Inc., (B) Granting Limited Relief From The Automatic Stay To Pursue Post-Judgment Relief In New York State Court Or Other Appropriate Forum, (C) Granting Derivative Standing To Pursue Estate Alter Ego Claims Against CSCEC Holding Company, Inc., And (D) Granting Related Relief (the "CCA Objection") [Dkt. 475];[3] and

- Brief of CSCEC Holding Company, Inc. in Opposition to Motion of BML Properties, Ltd. for Relief Related to Derivative Claims (the "Holdings Objection") [Dkt. 473].

## PRELIMINARY STATEMENT

1. The following facts are not disputed. The Debtor's estate:

   (a) has no operations;

   (b) produces no revenue;

   (c) loses money every month;

   (d) has no clear way to repay its DIP obligations other than resolving claims against Holdings—which also serves as a DIP Lender;

   (e) has concluded in a written report prepared by its Special Committee that ███████████████████████████████████;

   (f) is currently liable to BMLP for a $1.7 billion judgment (subject to a pending request to appeal to New York's highest court);

   (g) can avoid incurring any litigation costs for pursuing estate alter ego claims against Holdings because BMLP has offered to pay them (in addition to paying the costs of pursuing BMLP's own direct claims, which it intends to pursue);

   (h) has no creditors' committee incurring administrative expenses; and

---

[2] All terms not otherwise defined herein have the same meanings as defined in the Motion.

[3] CCA also submitted on September 20, 2025 a letter (the "CCA Letter" [Dkt. 485]) to this Court apprising the Court of the Third Circuit's September 10, 2025 decision in *In re Whittaker Clark & Daniels Inc.*, 2025 WL 2611753 (3d Cir. Sept. 10, 2025), which is addressed below.

(i) has virtually no other non-insider creditors ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

2. This Court might therefore be surprised that CCA's estate would not welcome an offer to undertake the cost and expense of maximizing recoveries to creditors by pursuing litigation against Holdings (and, if necessary, others). Yet, inexplicably, CCA has responded not by welcoming the offer of financial assistance and cooperation to maximize the estate's value, but by accusing BMLP of attempting to undermine the "chapter 11 process"—a process that cannot reorganize the Debtor's operations because there is nothing to reorganize. CCA's position is even more puzzling because the estate lacks the financial resources (not to mention the independence) to undertake such litigation against Holdings, its sole shareholder. Though CCA's existing counsel has expressed surprising negativity with respect to such claims, BMLP—*which already won a heavily contested veil piercing litigation against CCA and two non-debtor affiliates*—firmly believes in pursuing it. If BMLP is successful, it necessarily reduces CCA's obligations without impacting any of CCA's other assets, with CCA's estate incurring no additional expense.

3. But CCA's estate ignores this benefit and the opportunity to cooperate with its largest creditor (by a hundred-fold) to whom it owes a fiduciary duty. Instead, it objects, raising a grab bag of procedural arguments mixed in with a shocking statement that its own Special Committee's conclusion (the "Special Committee Report" [Dkt. 421]), ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[4]

---

[4] Even the Examiner noted ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Of course, the record compiled by the Special Committee and reviewed by the Examiner only scratches the surface, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

4. The Special Committee also apparently made no inquiry into the ███████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████.[5] Of course, BMLP *already is comfortable pursuing Holdings and is taking on the risk of collectability* so it is irrelevant whether the Debtor ████████████████████████████████.

5. Moreover, the Debtor argues that granting the Motion will be disruptive to plan settlement negotiations with Holdings. That makes no sense because the only possible way to obtain value from Holdings is to be prepared to sue Holdings and its affiliates; there is no other source of material value in these cases. Even the Special Committee recognizes it, but the CCA Objection, by emphasizing the downsides and risks of the alter ego claim, undermines—not helps—any effort to obtain an adequate settlement from Holdings. Inexplicably, CCA goes out of its way to try to ████████████████████████████████████████████████████, *see* CCA Objection ¶¶ 25-28, which is great for Holdings but terrible for CCA's estate in any settlement discussions led by CCA's estate.[6]

6. Further, CCA entirely ignores that other than BMLP and insiders of CCA, there are virtually no other creditors of CCA. ███████████████████████████████████████ ███████████████████████████████████████████████████████████████

---

[5] It may make the Court wonder why CCA and the Special Committee believed at the start of this case that Holdings could be a DIP lender with the ability to fund $40 million, especially when BMLP's counsel cross-examined CCA's representatives on this very issue and this Court no doubt only approved the DIP because there were assurances that Holdings had the financial capacity to perform.

[6] The clear inference is that CCA's estate is setting up to settle on the cheap by claiming that there is low likelihood of success on the merits. Of course, the Third Circuit in *Whittaker*—which CCA brought to this Court's attention on September 19 [Dkt. 485]—went out of its way to remind bankruptcy courts that debtor's estates controlling estate claims have fiduciary duties to creditors and any settlement with an insider is subject to "rigorous" scrutiny. *Whittaker Clark & Daniels Inc.*, 2025 WL 2611753 at *12, n. 16. This important limitation is left out of the CCA Letter.

███████████████████████████████████████████████████████████

███████████████████████████████████████[7] So, if BMLP is not on board with a settlement with Holdings, there is no settlement and there will be litigation *anyway* █████████

████████████████████████████████. The only difference with BMLP's proposal is that CCA's estate gets this pursuit of litigation for free from BMLP.

7. Even more bizarre is the Holdings Objection. Holdings does not object as the DIP lender or even the shareholder of CCA, but as a litigation target. For this reason alone, it lacks standing and this Court can and should disregard the Holdings Objection. But even if it had standing, Holdings makes the laughable statement that it is **BMLP, not Holdings**, trying to "exploit" the bankruptcy process. BMLP did not put CCA into bankruptcy; Holdings as the controlling shareholder made sure it happened. Holdings then provided a DIP loan (with full knowledge CCA produces no revenue) that may not be repayable absent "settling" with Holdings.[8] And now Holdings wants to ensure that a creditor owed $1.7 billion that has competent litigation counsel and an existing procedural mechanism cannot pursue Holdings to satisfy the BMLP Judgment even though doing so would benefit CCA and its (very few other) remaining creditors.

8. In this Reply, BMLP first addresses the derivative standing issue. The Third Circuit test is clear and BMLP easily satisfies it. The Reply then addresses the direct claims and the recent *Whittaker* decision, including why BMLP requests confirmation and stay relief to ensure that

---

[7] The Debtor's counsel informed BMLP more than a month ago that BDO was undertaking a claims reconciliation process, and the Debtor is apparently now aware that ████████████████████████████████████
███████████████████ Yet the Debtor has provided neither BMLP nor the Court with any updated information about the estate's creditors. As of the date of this filing, and despite requests, CCA has neither filed revised schedules nor answered questions posed by BMLP about the status of claims against the estate, including the surety bonds. The last word by the Debtor was on September 19, promising to revert with more information. That was 17 days ago.

[8] It is thus unclear ████████████████████████████████████████████████████████
████████████████████████████.

BMLP does not get accused of violating the automatic stay by pursuing its own direct claims against Holdings.

9. BMLP ends this preliminary statement with the following observations. As set forth in the Motion and not disputed, this chapter 11 case is not the typical "mega" chapter 11 case filed in this district. CCA is not reorganizing in any normal sense. CCA operates only as a "cost-center" for Holdings and its affiliates, and it is in no way seeking to restructure its operations because it has no intention of doing anything other than being an affiliated cost center. CCA has only a few dozen employees with shrouded roles and responsibilities, all of whom apparently also work for non-debtor affiliates including Holdings. This is a United States bankruptcy proceeding commenced defensively by a subsidiary of a Chinese state-owned enterprise to avoid the consequences of a judgment entered after a bench trial found that CCA had abused the corporate form to defraud BMLP. This case is a poor template for the Court to proceed as if it were equivalent to other recent chapter 11 cases filed in this District such as *Bed Bath & Beyond, WeWork, Powin*, *Del Monte*, *Invitae*, or *David's Bridal*.

10. This Court should not set the precedent of denying derivative standing in a case like this, where the single largest creditor is ready, willing and able to litigate but the Debtor's estate (being ultimately directed by its sole shareholder who is also the target of such litigation) is not. In the Third Circuit and elsewhere, the circuit and bankruptcy courts have cracked down on debtors using clever bankruptcy strategies to favor their parent companies at the expense of third-party creditors.[9] The Third Circuit does not give any deference to settlements with insiders. While the

---

[9] *See, e.g., In re LTL Mgmt., LLC*, 64 F.4th 84, 110-11 (3d Cir. 2023) (affirming dismissal of subsidiary's bankruptcy filing for lack of good faith—"when the backstop provides ample financial support to a debtor who then seeks shelter in a system designed to protect those without it, we see this perceived incongruity dispelled); *In re Red River Talc LLC*, 670 B.R. 251, 277, 307 (Bankr. S.D. Tex. 2025) (dismissing the subsidiary's case for cause, which was sought to "obtain a discharge of its solvent parent"); *In re Aearo Tech., LLC*, 2023 WL 3938436, at *20 (Bankr. S.D. Ind. June 9, 2023) (dismissing the filings which "were not prompted by concerns over financial distress or impending insolvency" but "a litigation management tactic and not a rehabilitative effort"); *In re Bedmar, LLC*, 2025 WL 2496260, at *9 (Bankr. D. Del. 2025) (dismissed the Chapter 11 case as "the Debtor's financial condition was

specifics of this case differ, the theme is the same. Debtors' estates cannot favor out-of-the-money insiders to the detriment of creditors. One tool to protect against this exact risk is derivative standing.

11. For the reasons set forth herein, this Court should overrule the Objections and grant the Motion.

## REPLY ARGUMENT

12. BMLP is entitled to all of the relief requested. The arguments the Objectors raise lack merit in law and fact and especially ignore the fundamental facts that there are virtually no other non-insider general unsecured creditors (other than BMLP) and it makes no sense to try to "settle" (prior to starting litigation) with Holdings. Any attempted settlement without BMLP's direct involvement and consent would never survive rigorous scrutiny, and it would only waste estate resources to try, so BMLP may as well now proceed at its own cost.

### BMLP Easily Satisfies the Third Circuit Test for Derivative Standing.

13. This is an easy case. As described in the Motion, the test in the Third Circuit has three elements: (1) a colorable claim exists that (2) the debtor-in-possession has unjustifiably refused to pursue (or, alternatively, where demand that the debtor pursue the claim would be futile) and (3) the bankruptcy court has authorized the creditor to initiate the action. *See, e.g., In re Optim Energy, LLC*, 2014 WL 1924908, at *6 (Bankr. D. Del. May 13, 2014) (citing *Offic. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003)); *see also In re Pursuit Cap. Mgmt., LLC,* 595 B.R. 631, 664 (Bankr. D. Del. 2018).

14. Here, a colorable claim for veil piercing exists. ███████████████████
████████████████████████████████████

---

'manufactured,' and therefore, the financial distress is not bona fide and does not meet the good faith standard"). In each case, the debtor's parent company was the intended beneficiary of the bankruptcy filing to the detriment of creditors.

▇▇▇ In the CCA Objection (which was not filed by the Special Committee but by CCA), CCA asserts that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ And, to the extent CCA, and not the Special Committee, is making this argument, the Court should simply ignore it.

15. The term "colorable" means that the claim, on appropriate proof, would support a recovery. In other words, the relevant inquiry is whether a veil piercing claim against Holdings has **any** merit such that it would survive a motion to dismiss and should be pursued absent a consensual resolution.[10] *See Pursuit Cap. Mgmt.*, 595 B.R. at 665. Nowhere did the Special Committee conclude that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. The Debtor points to certain factual findings from the Special Committee's investigation that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, but this raises precisely the sort of factual dispute that would not be decided on a motion to dismiss. Getting to the bottom of these facts would require documents and deposition discovery compelled under penalty of perjury and other sanctions, not ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Nor could potential collectability issues lead to dismissal on the pleadings; ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ collectability issues would only further support claims against Holdings' sole shareholder, CSCEC Ltd., that the Special Committee was charged with investigating ▇

---

[10] As opposed to being abandoned and letting any applicable statute of limitations run.

███████████████████████████████████████

██████████████████ Examiner Report at 19-20.

16. Judge Goldblatt from the District of Delaware recently issued a lengthy memorandum opinion concerning a request of a creditors' committee for derivative standing to pursue fiduciary duty claims. *See In re Pack Liquidating, LLC*, 658 B.R. 305 (Bankr. D. Del. 2024). The debtor in that case was proceeding with an orderly liquidation after failing to sell itself as a going concern. Objecting parties challenged the committee's standing to pursue the fiduciary duty claims. The court denied standing for breach against an LLC's managers but did authorize standing as against officers because a claim could be stated, stating "[t]he usual formulation of the standard equates 'colorable' with sufficient to survive a motion to dismiss." *Id.* at 335.

17. The answer here to the first element, colorability, is obviously yes. Indeed, CCA argues (in connection with the second element of the standing test) that if there is no settlement it will vigorously pursue such claims. Whether the Special Committee is the right party to pursue that claim is discussed below, but the fact it would do so confirms that the Court should conclude there is a colorable claim. The first element is satisfied.

18. The second element is whether CCA has unjustifiably refused to pursue the claim, or else demand would be futile. Here, BMLP easily satisfies the element again. CCA has refused to sue and, even worse, refused to work with BMLP to make *any* appropriate settlement demand on Holdings. Rather, **CCA is working with Holdings—the litigation target**—to pursue a plan that has Holdings' support but not BMLP's. This may be what Holdings would desire (any target of a $1.7 billion lawsuit who could buy a release on the cheap would favor this) but CCA's non-insider

creditors (of which BMLP is virtually the only one) would lose out on value that would otherwise be available to satisfy their claims.[11]

19. But even worse, unlike the vast majority of the cases discussing this element where a creditors' committee seeks derivative standing for litigation to be paid for by the estate, here BMLP is taking on all of the risk itself. CCA's estate will not incur additional litigation fees and expenses. This makes the refusal to proceed unjustified.

20. CCA relies heavily on the Special Committee as the fiduciary to take on Holdings, devoting over eight full pages of its objection to discuss the details of the investigation conducted by its Independent Director, Elizabeth Abrams, in an attempt to convince the Court that granting derivative standing to BMLP is not necessary because Ms. Abrams is "pursuing" the veil piercing claims herself.[12] But this provides little comfort.

21. First, the Special Committee has no practical ability to actually pursue litigation. CCA has no funding other than the DIP funding provided by Holdings, and Holdings can simply turn off the spigot if it knows it is going to be sued. There is no evidence whatsoever that CCA has contacted contingency fee counsel,[13] but even if it had, CCA has likely sabotaged any such engagement by the positions it has taken in its objection. In any event, BMLP's pursuit of the claims would be the most efficient path for the estate, as it would avoid incurring any further costs, not only of litigation but also of bringing on new counsel. Even the estate's objection to the Motion

---

[11] For the first time in its Objection, CCA claims to have made a demand on Holdings, but it offers no details whatsoever except to implicitly concede that its value is less than ten figures. But that means that the Debtor's opening demand *already reflects* a discount of more than 40% on the face value of the claim.

[12] *See* CCA Objection at 8–17.

[13] It is safe to assume that the two estate firms, including the one that litigated against BMLP for years and lost, are not going to litigate against Holdings at all, much less on a contingency fee basis, especially when they filed the CCA Objection that undermines the claims against Holdings.

is, in that sense, a waste of resources that only benefits the target of the alter ego litigation, who is (not coincidentally) the DIP lender.

22. Second, the CCA Objection gives Holdings a blueprint to hold out for the cheapest settlement possible, confirming that CCA is not the right party to bring the claims. The Debtor expresses its own lack of confidence in the merits of the claims ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[14] and CCA and the Special Committee have now publicly committed CCA's estate to a "settlement first" (and perhaps settlement only) path. The Debtor, as a fiduciary of the estate, has undermined any meaningful negotiation by an unspecified discount on the face value of the claim, which is *at least* 40%, given the Debtor's refusal to abide by BMLP's proposed ten-figure demand. It is extraordinary that a debtor's estate would ever argue against the merits of its claims to oppose a derivative standing motion when it is supposedly trying to settle such claims.[15]

23. Third, this Court cannot ignore the fact that, no matter Ms. Abrams' intentions, ability, and integrity (and to be clear, BMLP is questioning none of those things), she remains a single director and the sole member of the Special Committee. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[16] Despite Ms. Abrams' mandate over CCA's restructuring matters, she can

---

[14] Notably, despite repeatedly claiming that the Special Committee undertook a robust and complete investigation ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[15] It is cold comfort that CCA claims it does not want to undermine the claims, *see* CCA Objection ¶ 2. In any other case, CCA's decision could dramatically harm creditors' recoveries. In this case, since BMLP is prepared to proceed at its own cost and over is 99.99% of the non-insider creditor pool, that misstep can be corrected by granting standing.

[16] *See* Special Committee Report at 26.

be terminated and removed as a director at any time, without cause, by Holdings—a fact undisputed and admitted by Ms. Abrams during her testimony in connection with the final DIP hearing.[17] As such, it is not credible to believe Holdings will allow itself to be sued by CCA's estate at the direction of Ms. Abrams. Indeed, if Holdings were to allow that to happen, it would amount to a breach of its directors' own fiduciary duties to its shareholder, CSCEC Ltd.[18] This situation presents the exact sort of corporate governance morass and conflict of interest that the derivative standing doctrine is designed to address.

24. Fourth, BMLP uniquely can take advantage of the post-judgment enforcement mechanism in New York state court. This expedited process allows for a much faster means to obtain discovery and relief, which benefits all non-insider stakeholders. The Special Committee never considered this possibility, and the Debtor's estate cannot pursue it.

25. *Pack Liquidating* is helpful on establishing the second element as well. In that case, the debtor refused to proceed after demand. The court held that demand would be futile because "to date, many of the named defendants still act as managers on the board for the debtors, and the debtors have already declined to consent to the Committee's standing." *Pack Liquidating*, 658 B.R. at 336.

26. Here, CCA has declined to consent to making a demand (at least one BMLP would expect to be made) and Holdings, the litigation target, remains in a position of control: it is the shareholder, appoints board members, can fire Ms. Abrams, and controls CCA's liquidity. The opinion cited two cases for support, both of which add weight to the conclusion that BMLP has

---

[17] See Final DIP Hr'g Tr. 46:16-24, Feb. 13, 2025.

[18] For this reason, the installation of Ms. Abrams as an Independent Director and Special Committee of CCA cannot be the "cure all" that the Debtor has portrayed it to be. This situation is far different from the typical case where debtors, facing fraud or mismanagement at the top level in a corporate organization, install independent directors at the "TopCo" who report only to non-targets of the potential litigation. Here, because prepetition management remains in place and Holdings can terminate the sole Independent Director at will, CCA has done nothing more than set up the proverbial situation of the fox guarding the hen house.

satisfied this element. *See VGS, Inc. v. Castiel*, 2003 WL 723285, at *11 (Del. Ch. Feb. 28, 2003) ("A demand is considered futile when a reasonable doubt exists as to whether the LLC managers were disinterested or independent, or the challenged transaction was the product of a valid exercise of business judgment") (internal quotations omitted); *see also In re First Capital Holdings Corp.*, 146 B.R. 7, 9-11 (Bankr. C.D. Cal. 1992) (holding that bankruptcy courts have "discretion to excuse the requirement of a demand upon a [debtor-in-possession] as futile when the creditors' committee's complaint is brought against the debtor's present officers, directors, insiders, and principal shareholders" and relying on the law of futility outside of bankruptcy to determine whether it applied in bankruptcy).

27. CCA relies heavily on Judge Kaplan's rulings in the *Invitae Corp.* chapter 11 case but fails to address the facts of that chapter 11 case as compared to the facts here. In *Invitae*, the creditors' committee filed a motion seeking derivative standing. In denying the committee's motion, the court leaned heavily on the fact that on a cost-benefit analysis, the benefits of the settlement with the litigation target firmly justified the debtors' refusal to proceed with litigation. 2025 Bankr. LEXIS 1959, at *24-25.

28. Denial of standing in *Invitae* made sense, but its facts demonstrate that why derivative standing *should* be granted here. The table below compares the two; notably, the CCA Objection simply ignores these facts:[19]

---

[19] In addition to Judge Kaplan's decision on remand, BMLP attaches Invitae's last Form 10-Q filing before it filed for bankruptcy and its approved disclosure statement. *See* Reply Appendices "A" and "B".

| *INVITAE* FACTS | CCA FACTS |
|---|---|
| Debtor with an operating business | Non-operative debtor with no revenues |
| Plan on file at time of motion/confirmed one week later that had significant creditor support | No proposed plan filed; only plan concept shared with BMLP (the estate's largest creditor by a hundred-fold) is not acceptable |
| Publicly traded company | Wholly owned by Holdings |
| Funded debt | No funded debt |
| Significant trade debt | No significant trade debt |
| No finding claims were colorable | ▮▮▮▮▮ |
| Settlement with target paid most general unsecured creditors in full | No settlement exists to pay BMLP's judgment in full and CCA refuses to even make a demand |
| Committee did not propose to handle litigation on contingency | BMLP proposes to pay for all litigation costs |

29. The Objectors complain that BMLP did not attach a form of complaint. This Court should reject that argument. First, there is no requirement to attach a proposed form of complaint. Second, when parties do attach such a form, it is usually for the purpose of demonstrating that a claim is colorable—that does not apply here since ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In any event the Special Committee Report ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Third, this circumstance is unique because BMLP is not going to pursue any claim until after the New York Court of Appeals decides whether to take CCA's appeal, and also

because BMLP intends to use New York's post-judgment enforcement mechanism, CPLR 5225, which is commenced by petition rather than complaint.

30. CCA's estate complains about settlement authority. This is a red herring. BMLP is not opposed at all to having the Special Committee participate in settlement discussions but the reality is that there is virtually no chance that BMLP would settle with Holdings for *less* than what the Special Committee would accept. Indeed, the opposite has occurred—CCA's estate is apparently in "settlement discussions" with Holdings but has *not* invited BMLP to participate and has refused to make a demand on Holdings commensurate with BMLP's request.

31. Moreover, given that BMLP is offering to pay for pursuing the claims and constitutes 99.99% of the non-insider creditor pool, it should have paramount settlement authority. It would be completely unfair for BMLP to take the laboring oar to pursue Holdings and then for CCA's estate to settle out from underneath BMLP.

**BMLP Holds Direct Claims, Consistent with *Emoral* and *Whittaker*.**

32. BMLP has direct alter ego claims because Holdings stripped CCA down to a mere cost center for the very *purpose* of making CCA judgment proof if BMLP prevailed in the New York Action. The Objectors overlook this critical context, which is dispositive of the direct standing issue. Indeed, as the Debtor's own authority acknowledges, these circumstances are the hallmark of the very type of "individualized harm" that confers a plaintiff direct standing. *See In re TPC Grp. Inc.*, 2023 WL 2168045, at *7 (Bankr. D. Del. Feb. 22, 2023) (observing that where "conduct that gives rise to the alleged liability was directed at a particular creditor," direct standing exists).

33. Here, Holdings, as the Debtor's sole shareholder, abused the Debtor's corporate form to commit a wrong on BMLP specifically: it kept the Debtor undercapitalized to avoid paying liabilities owed to BMLP. After BMLP's commencement of the New York Action on December

12, 2017, Holdings began assigning its function of providing "shared services" to the Debtor, making the Debtor the cost-center that bore the expenses of the Non-Debtor Subsidiaries' and other CSCEC subsidiaries' financial services, IT support, legal advice, and other support fees.[20]

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[21]

34.     Under this arrangement, the Debtor generated almost no revenue on its own,[22] was kept severely undercapitalized, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[23] and relied on Holdings and CSCEC Ltd.'s credit support ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[24] More egregiously, the Debtor ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[25] Such evidence all suggests that Holdings used its control over the Debtor to shift assets and starve the Debtor of liquidity to ensure that BMLP could not satisfy any judgment it obtained.

35.     Moreover, it was only *after* Holdings commenced this scheme to render CCA judgment proof that the Debtor began to incur the other debts that compose the less than .01% of

---

[20] Omnibus Objection, Dkt 147, at 7–10.  CCA-BK0008953 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at 8961 (CCA Shared Services Overview); CCA-BK0003144 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[21] Special Committee Report at 33 & n.7.

[22] Special Committee Report at 70 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[23] Special Committee Report at 70.

[24] Examiner Scope Motion, Dkt 309, at 3.  See, e.g., May 15 Theisen Declaration, Ex. 18 ▮▮▮▮▮▮ (listing CSCEC Holding as co-obligor); *id.*, Ex. 22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[25] Special Committee Report at 67 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (emphasis added).

the non-BMLP unsecured creditor claim pool. *See, e.g.*, Claim No. 1, at 12–19 (FTI's claim showing June 2024 engagement letter); Claim No. 6, at 4–15 (CDW Direct's claim, resting on unpaid invoices from November 2024 and later). ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. BMLP expects to find additional information supporting the direct claims, but the Special Committee's four-year lookback means that the report failed to consider key events between 2018 and 2021.

36. Significantly, the Objectors fail to acknowledge that alter ego claims against Holdings are estate claims *only* if other creditors could have brought them. *See In re Maxus Energy Corp.*, 571 B.R. 650, 657 (Bankr. D. Del. 2017) (explaining that both "other creditors *and* the debtor" must be able to pursue the theory of liability for the claim to be property of the estate (emphasis in original)).²⁶ Given that other creditors could not have asserted the allegations that Holdings' machinations were in response to *BMLP's* claims against the Debtor—since their claims post-date such machinations—████████████████████████████████████████████, it is *only* BMLP who can make these assertions. Thus, the Objectors cannot demonstrate—as they must—that any creditor could have established BMLP's alter ego theory.

37. *Emoral* and its progeny also demonstrate that BMLP suffered from the type of "particularized injury" that necessitates a finding that direct standing exists. "As *Emoral* makes clear, allegations based on 'direct, particularized conduct and injury' in contrast to a mere continuation theory *are not* generalized and *do not* belong to the debtors' estate." *In re Caribbean Petroleum Corp.*, 512 B.R. 774, 779–80 (Bankr. D. Del. 2014) (emphases added). Judge Gross,

---

²⁶ Moreover, Delaware law recognizes veil-piercing as a direct creditor remedy because the injury is the creditor's own inability to collect on its judgment, not harm to the corporation. *See Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 709-10 (Del. Ch. 2021).

in *In re Caribbean*, underscored that the reason why the successor liability theory was "general" to all creditors in *Emoral* was because it involved the litigation target's status as the acquiror of the debtors' business. *See id.* at 780 (citing *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014)).

38.  The operative test is "whether the conduct that gives rise to the alleged liability was directed at a *particular* creditor rather than at the *debtor*." *In re Aliera Cos., Inc.*, 2025 WL 2091090, at *6 (Bankr. D. Del. July 24, 2025) (emphasis added and internal quotation marks omitted); *see also In re Whittaker Clark & Daniels Inc*, 2025 WL 2611753, at *11 (3d Cir. Sept. 10, 2025) ("The talc claimants' injuries do not stem from the nucleus of facts that underlay Brenntag's status as a successor to the Debtors [but instead] trace only to the exposure to asbestos-contaminated products manufactured by the Debtors at a time before Brenntag was even in the picture."). That is precisely what happened here. BMLP's theory of liability does not rest on Holdings passively acquiring the business of the Debtor (as in *Emoral* and *Whittaker*) after the underlying claims against the Debtor arose, but instead that Holdings engaged in a deliberate scheme to ensure the Debtor would not pay BMLP for the liability now embodied in the $1.7 billion judgment.

39.  Because only BMLP could marshal the specific allegations giving rise to its alter ego claims against Holdings, and because those allegations demonstrate that Holdings' intent was to harm BMLP's ability to collect against the Debtor, BMLP's claims meet both requirements for direct standing.[27]

---

[27] None of the Objectors' authority is to the contrary, since those facts are distinguishable. *In re Buildings by Jamie*—which involved a purported direct claim in which all creditors were co-plaintiffs who had already conceded at a hearing that alter ego claims were property of the estate, 230 B.R. 36, 44 (Bankr. D.N.J. 1998)—is plainly unavailing. Meanwhile, the *TPC, Maxus* and *Aliera* plaintiffs did not allege a nexus between the way in which the litigation targets dominated the debtors and the injury they suffered. *See In re TPC Grp. Inc.*, 2023 WL 2168045, at *7 (no direct standing when environmental claims did not have "anything to do with any of the claimants' direct interactions with any of the Supporting Sponsors."); *In re Maxus Energy Corp.*, 571 B.R. at 656 (claim related to environmental clean-up with general alter ego allegations); *In re Aliera Companies, Inc.*, 2025 WL 2091090, at *7 (plaintiffs alleged, among other things, fraud, negligence and breach of fiduciary duty but alter ego allegations centered on commingling of funds with no allegations of a nexus). And, in *Wilton Armetale,* the claims for which direct standing was sought

**BMLP Prudently Requested Relief from Stay and Cause Necessarily Exists**

40. The Motion requests relief from stay for BMLP to be able to pursue its direct claims, yet even here the opposing parties throw up roadblocks. If BMLP has direct claims—as BMLP submits it does—there is no automatic stay impediment at all as to that claim against Holdings. But it is unclear whether proceeding with a post-judgment enforcement proceeding against a non-debtor flowing from a judgment against a chapter 11 debtor could be construed as subject to the automatic stay. BMLP knows that if it had first proceeded in New York state court without coming to this Court first, CCA's estate—supported by Holdings—would run to this Court arguing BMLP intentionally violated the automatic stay.

41. BMLP should not be penalized for doing the prudent thing of making sure there is no automatic stay violation. If direct claims exist, the automatic stay does not apply to those claims. If using the expedited post-judgment enforcement process does somehow implicate section 362(a), cause necessarily exists.

---

there—unlike here—were "not tied to the harm done to the creditor by the debtor." *In re Wilton Armetale, Inc.*, 968 F.3d 273, 282 (3d Cir. 2020) (plundering that merely disproportionately impacted the creditor insufficient).

## CONCLUSION

**WHEREFORE**, BMLP respectfully requests the Court grant the Motion and enter the Proposed Order.

Dated: October 6, 2025
Newark, New Jersey

**GIBBONS P.C.**

*/s/ Brett S. Theisen*
Robert K. Malone, Esq.
Brett S. Theisen, Esq.
Christopher P. Anton, Esq.
Kyle P. McEvilly, Esq.
One Gateway Center
Newark, New Jersey 07102-5310
Telephone: (973) 596-4500
Email: rmalone@gibbonslaw.com
　　　　btheisen@gibbonslaw.com
　　　　canton@gibbonslaw.com
　　　　kmcevilly@gibbonslaw.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

Eric D. Winston, Esq. (admitted *pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3600
Email: ericwinston@quinnemanuel.com

*Counsel for BML Properties, Ltd.*