**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| CCA Construction, Inc.,[1] | Case No. 24-22548 (CMG) |
| Debtor. | |

**DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF (A) FINAL APPROVAL
OF THE DISCLOSURE STATEMENT AND (B) CONFIRMATION OF THE PLAN**

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (admitted *pro hac vice*)
Sidney P. Levinson (admitted *pro hac vice*)
Erica S. Weisgerber (admitted *pro hac vice*)
Elie J. Worenklein
Rory B. Heller (admitted *pro hac vice*)
66 Hudson Boulevard
New York, NY 10001
Telephone:  (212) 909-6000
Facsimile:   (212) 909-6836
nlabovitz@debevoise.com
slevinson@debevoise.com
eweisgerber@debevoise.com
eworenklein@debevoise.com
rbheller@debevoise.com

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Felice R. Yudkin
Ryan T. Jareck
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone: (201) 489-3000
Facsimile:   (201) 489-1536
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

*Counsel to the Debtor and Debtor in Possession*

Dated:  February 9, 2026

---

[1]     The last four digits of the Debtor's federal tax identification number are 4862.  The Debtor's service address for the purposes of this chapter 11 case is 445 South Street, Suite 310, Morristown, NJ 07960.

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 4

    I.     General Background Regarding the Chapter 11 Case .................................................. 4

    II.    The Plan and the Disclosure Statement ..................................................................... 4

    III.   The Notice and Solicitation of the Plan ...................................................................... 6

THE DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" AS
REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE, AND THE DEBTOR
COMPLIED WITH APPLICABLE NOTICE REQUIREMENTS ............................................ 7

THE PLAN MEETS ALL APPLICABLE CONFIRMATION REQUIREMENTS ................... 12

    I.     Section 1129(a) of the Bankruptcy Code .................................................................. 12

    II.    Section 1129(b) of the Bankruptcy Code .................................................................. 28

    III.   Section 1129(c) of the Bankruptcy Code .................................................................. 31

    IV.   Section 1129(d) of the Bankruptcy Code .................................................................. 31

    V.    Section 1129(e) of the Bankruptcy Code .................................................................. 31

OTHER PLAN PROVISIONS ARE NECESSARY AND APPROPRIATE ........................... 32

    I.     The Sale Should be Approved .................................................................................... 32

    II.    The Plan Appropriately Incorporates Settlements of Claims and Interests ................. 34

    III.   The Plan's Releases, Exculpation, and Injunction Provisions Are Appropriate and
Should Be Approved .................................................................................................. 35

WAIVER OF STAY ........................................................................................................... 50

CONCLUSION ................................................................................................................... 51

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999)..................................................................................................22

*Berkley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden
   Motel & Apartments)*,
   195 B.R. 294 (D.N.J. 1996) ......................................................................................26

*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
   764 F.2d 406 (5th Cir. 1985) ....................................................................................19

*Century Glove, Inc. v. First Am. Bank N.Y.*,
   860 F.2d 94 (3d Cir. 1988)...................................................................................8, 37

*Crestar Bank v. Walker (In re Walker)*,
   165 B.R. 994 (E.D. Va. 1994)...................................................................................26

*Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp.* (*In re
   Montgomery Ward Holding Corp.*),
   242 B.R. 147 (D. Del. 1999)......................................................................................33

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans
   Ltd. P'ship)*,
   116 F.3d 790 (5th Cir. 1997) ....................................................................................19

*Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra)*,
   590 B.R. 75 (D. Del. 2018), aff'd, 834 F. App'x 729 (3d Cir. 2021), *as
   amended* (Feb. 2, 2021) ............................................................................................30

*Harrington v. Purdue Pharma L.P.*,
   144 S. Ct. 2071 (2024)........................................................................................40, 41

*In re 710 Long Ridge Rd. Operating Co., II, LLC*,
   No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014) ..................37

*In re Abbotts Dairies of Pa., Inc.*,
   788 F.2d 143 (3d Cir. 1986).................................................................................19, 33

*In re Aegean Marine Petroleum Network, Inc.*,
   599 B.R. 717 (Bankr. S.D.N.Y. 2019).......................................................................47

*In re Armstrong World Indus., Inc.*,
   348 B.R. 136 (D. Del. 2006).........................................................................13, 21, 31

*In re Arsenal Intermediate Holdings, LLC,*
No. 23-10097 (CTG), 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023)...........................42

*In re Azul S.A.,*
2026 WL 40912 (Bankr. S.D.N.Y. Jan. 6, 2026)............................................................45, 46

*In re Bed Bath & Beyond Inc.,*
No. 23-13359 (VFP) (Bankr. D.N.J. Sept. 14, 2023) ...............................................41, 42, 47, 50

*In re Careismatic Brands, LLC,*
No. 24-10561 (VFP) (Bankr. D.N.J. May 30, 2024) .............................................................42

*In re Chapel Gate Apartments, Ltd.,*
64 B.R. 569 (Bankr. N.D. Tex. 1986)...................................................................................20

*In re Congoleum Corp.,*
362 B.R. 167 (Bankr. D.N.J. 2007) ......................................................................................47

*In re Coram Healthcare Corp.,*
315 B.R. 321 (Bankr. D. Del. 2004) .....................................................................................30

*In re Cypresswood Land Partners, I,*
409 B.R. 396 (Bankr. S.D. Tex. 2009) ..................................................................................22

*In re Cyxtera Techs., Inc.,*
No. 23 14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023).....................................................41, 42, 50

*In re Diocese of Camden, New Jersey,*
No. 20-21257 (JNP), 2023 WL 5605156 (Bankr. D.N.J. Aug. 29, 2023) ...............................19

*In re DirectBuy Home Improvement*
No. 23-19159 (SLM) (Bankr. D.N.J. Apr. 19, 2024) ......................................................41, 42

*In re Eagle-Picher Indus., Inc.,*
203 B.R. 256 (S.D. Ohio 1996) ...................................................................................12, 13, 21

*In re EV Energy Partners,*
No. 18-10814 (CSS)..............................................................................................................41

*In re Future Energy Corp.,*
83 B.R. 470 (Bankr. S.D. Ohio 1988)...................................................................................20

*In re G-1 Holdings Inc.,*
420 B.R. 216 (D.N.J. 2009) ............................................................................................13, 26

*In re Gol Linhas Aerea Inteligentes S.A.,*
2025 WL 3456675 (S.D.N.Y. Dec. 1, 2025) ..................................................................45, 46

*In re Greate Bay Hotel & Casino, Inc.*,
  251 B.R. 213 (Bankr. D.N.J. 2000) ..................................................................13

*In re Hercules Offshore, Inc.*,
  565 B.R. 732 (Bankr. D. Del. 2016) ................................................................38

*In re Indianapolis Downs*,
  486 B.R. ......................................................................................................37, 49

*In re Invitae Corporation,*
  No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024) .................................41, 42

*In re Jersey City Med. Ctr.*,
  817 F.2d 1055 (3d Cir. 1987) .........................................................................13

*In re Lavie Care Centers*,
  2024 WL 4988600 (Bankr. N.D. Ga. Dec. 5, 2024) ........................................42

*In re Mallinckrodt PLC*,
  639 B.R. ...........................................................................................................41

*In re Martin*,
  66 B.R. 921 (Bankr. D. Mont. 1986) ...............................................................25

*In re Master Mortg. Inv. Fund, Inc.*,
  168 B.R. 930 (Bankr. W.D. Mo. 1994)..............................................................37

*In re Motors Liquidation Company*,
  829 F.3d 135 (2d Cir. 2016)..............................................................................33

*In re Murray Metallurgical Coal Holdings, LLC*,
  623 B.R. 444 (Bankr. S.D. Ohio 2021)..............................................................47

*In re Nickels Midway Pier*,
  No. 03-49462, 2010 WL 2034542 (Bankr. D.N.J. May 21, 2010) ........................48

*In re NII Holdings, Inc.*,
  288 B.R. 356 (Bankr. D. Del. 2002) ................................................................19

*In re Ocean View Motel, LLC*,
  No. 20-21165-ABA, 2022 WL 243213 (Bankr. D.N.J. Jan. 25, 2022) ...................30

*In re Phx. Petroleum*,
  278 B.R. 385 (Bankr. E.D. Pa. 2001) ................................................................9

*In re Premier Int'l Holdings, Inc.*,
  2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010).......................................12, 48

v

*In re Prussia Assocs.*,
   322 B.R. 572 (Bankr. E.D. Pa. 2005) ...................................................................26

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000).............................................................17, 19, 48, 49

*In re Robertshaw US Holding Corp.*,
   662 B.R. 300 (Bankr. S.D. Tex. 2024) ...............................................................42

*In re S B Bldg. Assocs.*,
   621 B.R. 330 (Bankr. D.N.J. 2020) ...........................................26, 27, 30, 34, 36

*In re Sam Ash,*
   No. 24-14727 (SLM) (Bankr. D.N.J. Aug. 30, 2024)....................................41, 42

*In re Scioto Valley Mortg. Co.*,
   88 B.R. 168 (Bankr. S.D. Ohio 1988).....................................................................9

*In re Sea Oaks Country Club, LLC,*
   2020 WL 6588412 (Bankr. D. N.J. Nov. 10, 2020)..............................................32

*In re SLT Holdco, Inc.*,
   No. 20-18368 (MBK), Docket No. 548 (Bankr. D.N.J. Oct. 22, 2020)..................41

*In re Spansion, Inc.*,
   426 B.R. 114 (Bankr. D. Del. 2010) .....................................................................36

*In re Spirit Airlines, Inc.,*
   668 B.R. 689 (Bankr. S.D.N.Y. 2025)..................................................................42

*In re TCI 2 Holdings, LLC,*
   428 B.R. 117 (Bankr. D.N.J. 2010) ...........................................12, 19, 30, 34, 36

*In re Tranel*,
   940 F.2d 1168 (8th Cir. 1991) .............................................................................21

*In re Tribune Co.*,
   464 B.R. 126 (Bankr. D. Del. 2011), *overruled in part on other grounds*, 464
   B.R. 208 (Bankr. D. Del. 2011) ...........................................................................26

*In re Tribune Co.*,
   476 B.R. 843 (Bankr. D. Del 2012) ......................................................................13

*In re U.S. Brass Corp.*,
   194 B.R. 420 (Bankr. E.D. Tex. 1996) ...................................................................9

*In re Voyager Digital Holdings, Inc*.,
   649 B.R. 111 (Bankr. S.D.N.Y. 2023)..................................................................47

vi

*In re Washington Mutual., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ..................................................................36, 37, 47

*In re WebSci Technologies, Inc.*,
    234 Fed. Appx. 26 (3d Cir. 2007) .........................................................................34, 36

*In re WeWork, Inc.*,
    No. 2319865 (JKS) (Bankr. D.N.J. May 30, 2024) ....................................................42

*In re Wiersma*,
    227 F. App'x 603 (9th Cir. 2007) .................................................................................12

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) .........................................................36, 37, 38, 39

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
    337 F.3d 314 (3d Cir. 2003) ..........................................................................................8

*Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*,
    329 B.R. 491 (Bankr. D.N.J. 2005), *aff'd*, 241 Fed. App'x. 1 (3d Cir. Aug. 2,
    2007) .........................................................................................................................8, 20

*Myers v. Martin (In re Martin)*,
    91 F.3d 389 (3d Cir. 1996).......................................................................................34, 36

*Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*,
    258 F.3d 180 (3d Cir. 2001)..........................................................................................51

*Official Comm. of Unsecured Creditors v. Michelson (In re Michelson)*,
    141 B.R. 715 (Bankr. E.D. Cal. 1992)...........................................................................17

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988)............................................................................................8

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968)......................................................................................................34

*SEC v. Drexel Burnham Lambert Grp. (In re Drexel Burnham Lambert Grp.)*,
    960 F.2d 285 (2d Cir. 1992)..........................................................................................49

*Su v. Offshore Inv. Ltd. (In re Vantage Drilling Int'l)*,
    603 B.R. 538 (D. Del. 2019).........................................................................................38

*Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*,
    157 B.R. 100 (S.D. Tex. 1993) .......................................................................................9

*Will v. Nw. Univ. (In re Nutraquest, Inc.)*,
    434 F.3d 639 (3d Cir. 2006)......................................................................................34, 36

**Statutes**

11 U.S.C. § 105(a) ..................................................................................................................33

11 U.S.C. § 363(b) ..................................................................................................................32

11 U.S.C. § 363(f) ...................................................................................................................32

11 U.S.C. § 1122(a) .................................................................................................................13

11 U.S.C. § 1123(a) .................................................................................................................14

11 U.S.C. § 1123(a)(5)(D) .......................................................................................................32

11 U.S.C. § 1123(a)(7) .............................................................................................................16

11 U.S.C. §§ 1123(b)(1)-(2) ....................................................................................................16

11 U.S.C. §§ 1123(b) (1-4), (6) ...............................................................................................16

11 U.S.C. § 1125(a) ...................................................................................................................8

11 U.S.C. § 1125(b) ..............................................................................................................7, 18

11 U.S.C. § 1125(e) .................................................................................................................11

11 U.S.C. § 1126(c) .................................................................................................................22

11 U.S.C. § 1126(d) .................................................................................................................22

11 U.S.C. § 1129(a)(1) .............................................................................................................12

11 U.S.C. § 1129(a)(3) .............................................................................................................19

11 U.S.C. § 1129(a)(4) .............................................................................................................20

11 U.S.C. § 1129(a)(5)(A)(i) ....................................................................................................20

11 U.S.C. § 1129(a)(5)(A)(ii) ...................................................................................................20

11 U.S.C. § 1129(a)(6) .............................................................................................................21

11 U.S.C. § 1129(a)(8) .............................................................................................................22

11 U.S.C. § 1129(a)(9)(A) ........................................................................................................23

11 U.S.C. § 1129(a)(9)(B) ........................................................................................................24

11 U.S.C. § 1129(a)(9)(C) and (D) ...........................................................................................24

11 U.S.C. § 1129(a)(10)..............................................................................................25

11 U.S.C. § 1129(a)(11)..............................................................................................26

11 U.S.C. § 1129(a)(12)..............................................................................................27

11 U.S.C. § 1129(a)(14)..............................................................................................28

11 U.S.C. § 1129(a)(15)..............................................................................................28

11 U.S.C. § 1129(a)(16)..............................................................................................28

11 U.S.C. § 1129(b)(1) ...............................................................................................29

11 U.S.C. § 1129(b)(2)(B)(ii) .....................................................................................29

**Rules**

Fed. R. Bankr. P. 3020(e) ...........................................................................................50

**Hearing Transcripts & Dockets**

*In re Aceto Corp.*,
   Case No. 19-13448 (VFP)........................................................................................44

*In re BlockFi Inc.*,
   Case No. 22-19361 (MBK)...........................................................................42, 44, 47

*In re New Rite Aid, LLC, et al.*,
   No. 25-14861 (MBK) (Bankr. D.N.J. Nov. 24, 2025)................................41, 42, 43

*In re Thrasio Holdings, Inc.*,
   No. 24-11840 (CMG) (Bankr. D.N.J. June 13, 2024) .......................................42, 44

**Other Authorities**

7 Alan N. Resnick et al., COLLIER ON BANKRUPTCY ¶ 1123.01[7] (16th ed. rev.
   2010). ....................................................................................................................16

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 (1977)..........13, 17

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 (1978) .............13, 17

## INTRODUCTION

The above-captioned debtor and debtor-in-possession ("**CCA**" or the "**Debtor**") submits this memorandum of law (the "**Memorandum**") in support of (i) final approval of the *Disclosure Statement for the Chapter 11 Plan of CCA Construction, Inc.  (Solicitation Version)* [Docket No. 648] (as further modified, supplemented, and amended, the "**Disclosure Statement**"), pursuant to section 1125 of title 11 of the United States Code (as amended or modified, the "**Bankruptcy Code**") and (ii) confirmation of the *Chapter 11 Plan of CCA Construction, Inc. (Technical Modifications)* [Docket No. 690] (as further modified, supplemented, and amended, the "**Plan**"),[1] pursuant to section 1129 of the Bankruptcy Code.  In addition, as set forth herein, the Debtor requests a waiver of the 14-day stay of the order confirming the Plan imposed by Rule 3020(e) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  In further support of confirmation of the Plan, the Debtor filed (i) on February 9, 2026, the *Amended Declaration of Michael Paque Regarding the Solicitation and Tabulation of Ballots Cast on the Chapter 11 Plan of CCA Construction, Inc. Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 688] (the "**Voting Declaration**"), and (ii) the *Declaration of Evan Blum In Support of Confirmation of the Chapter 11 Plan of CCA Construction, Inc.* simultaneously herewith (the "**Blum Declaration**").

## PRELIMINARY STATEMENT

1.       The Plan is not only the culmination of a contentious chapter 11 case, but also the conclusion of a restructuring that resolved a gating litigation with BML Properties, Ltd. ("**BMLP**") that has hampered and distracted the Debtor, and certain of its affiliates, for the past decade.  The Plan will enable the Debtor to emerge as a financially healthy company that will work with its

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or Solicitation Procedures Order, as applicable. The rules of interpretation set forth in the Plan shall apply to the Memorandum.

1

affiliates to continue to provide high-quality construction projects for customers in a range of industries, with the distraction of the BMLP litigation behind it.

2.      The Debtor is pleased to be in a position to present the Court with the Plan that has been unanimously approved by voting creditors and did not receive any objections from an economic stakeholder.  The Plan reflects certain significant concessions and benefits being provided by the DIP Lender to enable payment in full of all Allowed Claims (or otherwise deem them Unimpaired) and post-emergence financing for the benefit of all stakeholders.  This is a monumental achievement that as recently as November was outside the realm of feasible outcomes. Rather, the case was at a critical juncture in November when the Debtor was faced with a motion from BMLP who was seeking derivative standing to pursue claims on behalf of the Debtor against a wide range of affiliated entities [Docket No. 444], while the Debtor was simultaneously engaging in negotiations with the DIP Lender and other affiliates in connection with monetizing the Causes of Action identified in the Special Committee's report [Docket No. 421].  With much appreciation to the hard work of the mediators, the Debtor was able to reach a comprehensive settlement that resolved the various disputes in the chapter 11 case, as well as certain ancillary litigations pending in New York state court and The Bahamas.  [Docket No. 591].  Thereafter, the Debtor and its advisors expeditiously turned their attention to formulating and proposing the Plan to enable the Debtor to promptly emerge from chapter 11.

3.      The Plan is supported by the sole Voting Class and all economic parties.  The only objecting party is the Office of the United States Trustee for the District of New Jersey (the "**U.S. Trustee**"), which has raised its standard objections to the provisions governing third party releases, exculpation and injunctions. *See* Docket No. 677 (the "**U.S. Trustee Objection**"). However, even as to those objections, the Debtor believes that it has resolved most (though not all) of the objections

2

and other informal comments and responses received from the U.S. Trustee with respect to the Disclosure Statement, the Plan and the Proposed Confirmation Order (as defined below). Contemporaneous with the filing of this Memorandum, the Debtor has filed certain technical modifications to the Plan which address certain of the U.S. Trustee's concerns. For the reasons set forth in Section III of why the Other Plan Provisions are Necessary and Appropriate, the remainder of the U.S. Trustee Objection should be overruled.

4.      Among other things, the Plan provides for the payment (or otherwise satisfaction in accordance with the terms of the Plan) of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed General Unsecured Claims, and U.S. Trustee Fees in full in Cash from the Debtor's assets. If confirmed, the Plan will fairly and appropriately distribute the value of the Debtor's estate to the Debtor's creditors. The Plan also contemplates the sale of certain assets to the Purchasing Entity, which is a wholly owned subsidiary of the DIP Lender, in order to better align the business of the Reorganized Debtor to focus exclusively on providing critical shared services for the benefit of its affiliates. Upon the Effective Date, the Reorganized Debtor will have access to an unsecured Exit Financing Facility and an unsecured line of credit being provided by the DIP Lender, in its role as the new equityholder, to ensure the Reorganized Debtor has ample liquidity to satisfy all Plan related obligations and future operating expenses.

5.      Holders of Claims in Class 2 (General Unsecured Claims), the only class entitled to vote on the Plan, voted unanimously (100% in number and 100% in dollar amount, with two abstentions) to accept the Plan.

6.      As set forth herein, in the Blum Declaration, Voting Declaration, and as will be demonstrated by the Confirmation Hearing, the Disclosure Statement and Plan meet all applicable elements of sections 1125 and 1129 of the Bankruptcy Code and otherwise comply with the

3

applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and non-bankruptcy law. Accordingly, the Debtor requests that the U.S. Trustee Objection, be overruled, the Disclosure Statement be approved on a final basis, and the Plan be confirmed.

## STATEMENT OF FACTS

### I.     GENERAL BACKGROUND REGARDING THE CHAPTER 11 CASE

7.     On the Petition Date, the Debtor commenced this chapter 11 case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The factual background regarding the Debtor including its business operations and the events leading to the filing of this chapter 11 case is set forth in the First Day Declarations.

8.     The Debtor continues to operate its businesses and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee has been appointed in this chapter 11 case.  On May 7, 2025, the U.S. Trustee appointed an examiner.

### II.     THE PLAN AND THE DISCLOSURE STATEMENT

9.     The solicitation versions of the Plan and Disclosure Statement were filed on January 8, 2026.  *See* Docket Nos. 648 and 649.  The Plan with technical modifications was filed on February 9, 2026.

10.     The Disclosure Statement is the product of the Debtor's extensive review and analysis of its business, assets and liabilities, and circumstances leading to this chapter 11 case.  It provides information regarding: (a) the terms of the Plan, including a summary of the classifications and treatment of all Classes of Claims and Interests; (b) the distributions to holders of Allowed Claims; (c) the effect of the Plan on holders of Claims and Interests and other parties in interest thereunder; (d) the estimated amount of Claims that ultimately will be Allowed; (e) certain risk

4

factors to consider that may affect the Plan; (f) certain tax consequences related to the Plan and distributions; and (g) the means for implementation of the Plan.

11.     The Plan classifies holders of Claims and Interests into three Classes for all purposes, including with respect to voting rights, if any, as follows:

| Class | Description | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 2 | General Unsecured Claims | Impaired | Yes |
| 3 | Interests | Impaired | No (deemed to reject) |

12.     As set forth in the chart above, Class 2 (General Unsecured Claims) was the only class of Claims or Interests that was entitled to vote on the Plan (the "**Voting Class**").  All other holders of Claims or Interests were not entitled to vote on the Plan because each such holder holds a Claim or Interest deemed to accept or deemed to reject the Plan.  As such, the Debtor did not solicit votes from holders of Claims or Interests in Classes 1 and 3.

13.     On January 29, 2026, the Debtor filed an initial supplement to the Plan [Docket No. 676], and on February 9, 2026, the Debtor filed the *Notice of Filing Amendment to Plan Supplement* [Docket No. 689] (collectively, the "**Plan Supplement**"), which identified the Purchasing Entity, attached the proposed Stock Transfer Agreements, the Amended Charter of the Reorganized Debtor, the Purchased Asset Allocation, Exit Financing Facility and Schedule of Rejected Contracts and Leases, and identified the Reorganized Debtor's New Board of Directors and Officers.

14.     The deadline to object to confirmation of the Plan and final approval of the adequacy of the Disclosure Statement was February 6, 2026, at 4:00 p.m. (prevailing Eastern Time). As noted earlier, the only formal objection to confirmation of the Plan was the U.S. Trustee Objection.

15.     In accordance with the *Order (I) Approving the Disclosure Statement on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement and*

*Plan Confirmation and Deadlines Related Thereto; (III) Approving the Solicitation, Notice and Tabulation Procedures and the Forms Related Thereto; and (IV) Granting Related Relief* [Docket No. 647] (the "**Solicitation Procedures Order**"), the combined hearing on final approval of the Disclosure Statement and confirmation of the Plan is scheduled for February 11, 2026, at 10:00 a.m. (prevailing Eastern Time) (the "**Confirmation Hearing**").  On February 6, 2026, the Debtor filed the proposed *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Chapter 11 Plan of CCA Construction, Inc.* [Docket No. 686] (the "**Proposed Confirmation Order**"), which contemplates, among other things, confirmation of the Plan.

## III.    THE NOTICE AND SOLICITATION OF THE PLAN

16.     On December 30, 2025, the Debtor filed the *Debtor's Motion for Entry of an Order (I) Approving the Disclosure Statement on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement and Plan Confirmation and Deadlines Related Thereto; (III) Approving the Solicitation, Notice and Tabulation Procedures and the Forms Related Thereto; and (IV) Granting Related Relief* [Docket No. 629], which sought, among other things, approval of the Disclosure Statement on an interim basis, noticing of the Confirmation Hearing, certain procedures for soliciting votes to accept or reject the Plan, and certain procedures to opt out of the third-party releases.

17.     On January 7, 2026, the Court entered the Solicitation Procedures Order.

18.     On the Opt-Out Form attached to the Non-Voting Notice, the Debtor included the following language directly above the box: "**IF YOU DO NOT OPT OUT OF THE CONSENSUAL THIRD-PARTY RELEASE, IT WILL BE BINDING ON YOU.**"

19.     Notably, as to the Ballots, the box to opt-out is in close proximity on the same page as the box requesting a claimant's vote to accept or reject the Plan.

20.     The Debtor solicited votes on the Plan from the Voting Class in accordance with the Solicitation Procedures Order. The deadline for the Voting Class to cast their Ballots was February 6, at 4:00 p.m. (prevailing Eastern Time). As set forth in the Voting Declaration, 100% in number and 100% in dollar amount of the votes submitted by Class 2 voted to accept the Plan.

21.     The stakeholders in the Voting Class had notice and opportunity to opt out of the Third-Party Release (defined below) by checking the applicable box on the Opt-Out Form. All non-voting stakeholders were also given the opportunity to opt out of the Third-Party Release by checking the applicable box on the Opt-Out Form and received notice and instructions for doing so in their applicable Non-Voting Notice. The Debtor received six affirmative opt outs from the various voting parties.

**THE DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION"
AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE, AND
THE DEBTOR COMPLIED WITH APPLICABLE NOTICE REQUIREMENTS**

**I.      THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION**

22.     The Debtor requests that the Court approve the Disclosure Statement as containing "adequate information" in accordance with section 1125 of the Bankruptcy Code on a final basis. Section 1125(b) of the Bankruptcy Code states that "[a]n acceptance or rejection of a plan may not be solicited . . . unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). In turn, section 1125(a) of the Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would

7

enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a).

23.     The primary purpose of a disclosure statement is to provide information that is "reasonably practicable" to permit an "informed judgment" by creditors and interest holders entitled to vote on the plan.  *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003); *see also Century Glove, Inc. v. First Am. Bank N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote.").

24.     Bankruptcy courts have broad discretion in determining whether a disclosure statement contains adequate information based on the unique facts and circumstances of each case. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 507 (Bankr. D.N.J. 2005), *aff'd*, 241 Fed. App'x. 1 (3d Cir. Aug. 2, 2007) ("Section 1125 affords the Bankruptcy Court substantial discretion in considering the adequacy of a disclosure statement.").

25.     In making a determination as to whether a disclosure statement contains adequate information as required by section 1125 of the Bankruptcy Code, courts look for disclosures in topics such as:

(i)     the events which led to the filing of a bankruptcy petition;
(ii)    the relationship of a debtor with the affiliates;
(iii)   a description of the available assets and their value;

8

(iv)    the anticipated future of the company;
(v)     the source of information stated in the disclosure statement;
(vi)    the present condition of a debtor while in chapter 11;
(vii)   the claims asserted against a debtor;
(viii)  the estimated return to creditors under a chapter 7 liquidation;
(ix)    the future management of a debtor;
(x)     the chapter 11 plan or a summary thereof;
(xi)    the financial information, valuations, and projections relevant to the claimants' decision to accept or reject the chapter 11 plan;
(xii)   the information relevant to the risks posed to claimants under the plan;
(xiii)  the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;
(xiv)   the litigation likely to arise in a nonbankruptcy context; and
(xv)    the tax attributes of a debtor.

*In re U.S. Brass Corp.*, 194 B.R. 420 at 424–25 (Bankr. E.D. Tex. 1996) (listing factors courts have considered in determining the adequacy of information provided in a disclosure statement); *Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993) (same); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (same).  Importantly, disclosure regarding all topics "is not necessary in every case." *In re U.S. Brass Corp.*, 194 B.R. at 425; *see also In re Phx. Petroleum*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ("[C]ertain categories of information which may be necessary in one case may be omitted in another . . . .").

26.     Here, the Disclosure Statement contains adequate information and was previously approved on a conditional basis on January 7, 2026 [Docket No. 647]. The Disclosure Statement contains descriptions and summaries of, among other things:

(i)     ***Overview of the Debtor, Its History, and Its Corporate Structure***. An overview of the Debtor, its history, and its organizational structure, which are described in detail in Section III. A. of the Disclosure Statement;

(ii)    ***Events Leading to this Chapter 11 Case***. An overview of the events leading to the commencement of this chapter 11 case in Section III. B. of the Disclosure Statement.

(iii)   ***Notable Events During this Chapter 11 Case***. An overview of key events in this chapter 11 case, which are described in detail in Section III.C. of the Disclosure Statement;

(iv)     ***Terms of the Plan***. A detailed summary of the classification and treatment of all Classes of Claims and Interests in Section IV. A. and B.  of the Disclosure Statement;

(v)     ***Means for Plan Implementation and Distributions.*** A description of the means of implementing the Plan and funding distributions thereunder, which are described in Section IV. C. and D. of the Disclosure Statement;

(vi)     ***Procedures for Resolving Claims.*** A description of procedures for resolving claims, which are described in Section IV. E. of the Disclosure Statement;

(vii)     ***Treatment of Executory Contracts and Unexpired Leases.*** A description of treatment of executory contracts and unexpired leases, which are described in Section IV. F. of the Disclosure Statement;

(viii)     ***Notice of the Injunction, Exculpation, and Release Provisions of the Plan***. A description of the entities subject to an injunction under the Plan and the acts that they are enjoined from pursuing, including bolded language related to the Debtor Release, Third-Party Release, Exculpation, and Injunction, which are described in Section IV. H. of the Disclosure Statement;

(ix)     ***Risk Factors***. Certain risks associated with the satisfaction of Claims, certain bankruptcy considerations and an overall disclaimer as to the information provided by and set forth in the Disclosure Statement, which are described in Section VI of the Disclosure Statement;

(x)     ***Voting Procedures***. A description of the procedures for soliciting votes to accept or reject the Plan and voting on the Plan, which are described in Section V of the Disclosure Statement;

(xi)     ***Liquidation Analysis.*** A detailed description of why the Plan provides for a recovery greater than or at least as much as a creditor would receive in a chapter 7 liquidation in Section V. H. of the Disclosure Statement;

(xii)     ***Estimated Recovery.*** A table summarizing the estimated amount of Claims that will ultimately be Allowed and estimated percentage recoveries in the Executive Summary of the Disclosure Statement;

(xiii)     ***Confirmation of the Plan.*** Confirmation procedures and statutory requirements for confirmation of the Plan, which are described in Section V of  the Disclosure Statement;

(xiv)     ***Certain U.S. Federal Income Tax Consequences of the Plan.*** A description of certain U.S. federal income tax law consequences of the Plan, which are described in Section VII of the Disclosure Statement; and

(xv)   ***Recommendation of the Debtor***. A recommendation by the Debtor that Holders of Claims in the Voting Class should vote to accept the Plan, provided in Section VIII of the Disclosure Statement.

27.     As discussed above, section 1125(a) of the Bankruptcy Code requires only "adequate information" sufficient for parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.  Here, the Disclosure Statement meets all of the necessary criteria to provide adequate information as required under section 1125 of the Bankruptcy Code. The Disclosure Statement is the product of extensive review and analysis by the Debtor and its professionals of CCA's business, assets, and liabilities, and the circumstances leading to this chapter 11 case.   Additionally, the Disclosure Statement contains detailed information regarding the foregoing categories.  Moreover, no party has opposed the adequacy of the Disclosure Statement.  The Debtor respectfully submits that the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code and should be approved on a final basis.

**II.     SOLICITATION OF THE PLAN COMPLIED WITH THE BANKRUPTCY CODE AND WAS IN GOOD FAITH**

28.     In addition to conditionally approving the adequacy of the Disclosure Statement, the Solicitation Procedures Order granted final approval of, among other things:  (a) certain opt out, solicitation, and voting procedures; (b) the Confirmation Hearing; (c) the solicitation package; and (d) certain dates and deadlines with respect to the Plan and Disclosure Statement.

29.     Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.  11 U.S.C. § 1125(e).  As demonstrated by the Debtor's compliance with the Solicitation Procedures Order, the Debtor at all

11

times conducted the solicitation process in good faith and in compliance with section 1125 of the

Bankruptcy Code and the Court-approved solicitation and voting procedures. Therefore, the Debtor

requests that the Court grant the protections afforded under section 1125(e) of the Bankruptcy Code.

### THE PLAN MEETS ALL APPLICABLE CONFIRMATION REQUIREMENTS

30. To obtain confirmation of the Plan, the Debtor must demonstrate that the Plan

satisfies the applicable provisions of section 1129 of the Bankruptcy Code by a preponderance of

the evidence. *See In re TCI 2 Holdings, LLC,* 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("The plan

proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter

11 plan has a reasonable probability of success, and is more than a visionary scheme") (citing *In re*

*Wiersma*, 227 F. App'x 603, 606 (9th Cir. 2007)) (internal quotation marks omitted); *In re Premier*

*Int'l Holdings, Inc.*, 2010 WL 2745964, at *4 (Bankr. D. Del. Apr. 29, 2010) (holding that the plan

proponent must prove each element of section 1129(a) and 1129(b) of the Bankruptcy Code by a

preponderance of the evidence). As set forth below and based on the record and filings in this

chapter 11 case and as will be demonstrated at the Confirmation Hearing, the Plan meets all

applicable requirements of section 1129 of the Bankruptcy Code and should be confirmed.

### I. SECTION 1129(a) OF THE BANKRUPTCY CODE

#### A. Section 1129(a)(1) of the Bankruptcy Code

31. The Plan complies with section 1129(a)(1) of the Bankruptcy Code, which provides

that a plan may be confirmed only if "[t]he plan complies with the applicable provisions of this

title." 11 U.S.C. § 1129(a)(1); *see also In re Eagle-Picher Indus., Inc.*, 203 B.R. 256, 270-73 (S.D.

Ohio 1996) (examining each requirement of chapter 11 to demonstrate that section 1129(a)(1) of

the Bankruptcy Code was satisfied).

32. The legislative history of section 1129(a)(1) of the Bankruptcy Code indicates that

the primary focus of this requirement is to ensure that a plan complies with sections 1122 and 1123

of the Bankruptcy Code, which govern classification of claims and interests and the contents of a plan, respectively. *See* S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368 (1977); *see also In re G-1 Holdings Inc.*, 420 B.R. 216, 258 (D.N.J. 2009); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 233 (Bankr. D.N.J. 2000).

**1.    Section 1122 of the Bankruptcy Code – Classification of Claims and Interests**

33.    Section 1122 of the Bankruptcy Code provides that the claims or interests within a given class must be "substantially similar" to the other claims or interests in that class. *See* 11 U.S.C. § 1122(a) ("Except as provided in subsection (b) of this Section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."). Courts consistently have held that section 1122(a) of the Bankruptcy Code is satisfied so long as similar claims are classified together. *See, e.g.*, *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 160 (D. Del. 2006) (holding that section 1122(a) of the Bankruptcy Code was satisfied where similar claims were classified together); *Eagle-Picher Indus.*, 203 B.R. at 270 (same).

34.    Accordingly, the sole mandatory obligation of section 1122(a) of the Bankruptcy Code is that substantially similar claims may be classified together. *In re Tribune Co.*, 476 B.R. 843, 854 (Bankr. D. Del 2012). Section 1122(a) is, in fact, permissive inasmuch as "it does *not* provide that *all* similar claims must be placed in the same class." *Id.* at 855 (emphasis in original); *see also In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) ("[W]e agree with the general view which permits the grouping of similar claims in different classes").

35.    The Plan classifies Claims and Interests in accordance with section 1122(a) of the Bankruptcy Code, as each of the Plan's Classes contains Claims or Interests that share the same

13

priority status, contractual rights, and enforcement rights against the Estate.  In particular, Article III of the Plan segregates into three separate Classes:[2] Class 1 (Priority Non-Tax Claims), Class 2 (General Unsecured Claims), and Class 3 (Interests). The legal rights under the Bankruptcy Code of each of the holders of Claims or Interests within a particular Class are substantially similar to other holders of Claims or Interests within the same Class.  In addition, valid business, factual and legal reasons exist for the separate classification of Claims and Interests.

36.     Accordingly, the classification of Claims and Interests under the Plan is appropriate and should be approved.

### 2. Compliance with Section 1123(a) of the Bankruptcy Code – Mandatory Contents of the Plan

37.     Section 1123(a) of the Bankruptcy Code requires that a chapter 11 plan: (a) designate classes of claims and interests; (b) specify unimpaired classes of claims and interests; (c) specify treatment of impaired classes of claims and interests; (d) provide for equality of treatment within each class; (e) provide adequate means for the plan's implementation; (f) provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and (g) contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.  *See* 11 U.S.C. § 1123(a).

38.     The Plan fully complies with each requirement of section 1123(a) of the Bankruptcy Code.  As previously noted with respect to the Plan's compliance with section 1122 of the Bankruptcy Code, Article III of the Plan designates three separate Classes of Claims and Interests, as required by section 1123(a)(1) of the Bankruptcy Code.  Article 4.1 of the Plan specifies that the

---

[2]     In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Claims and Priority Tax Claims have not been classified.  *See* Plan, Art. II.

Claims in Class 1 are Unimpaired under the Plan, as required by section 1123(a)(2) of the

Bankruptcy Code.  Articles 4.2 and 4.3 further specify that the Claims or Interests in Classes 2 and

3 are Impaired and Article IV describes the treatment of each such Class in accordance with section

1123(a)(3) of the Bankruptcy Code.  Further, as required by section 1123(a)(4) of the Bankruptcy

Code, the treatment of each Claim or Interest within a Class either is (i) the same as the treatment

of each other Claim or Interest in such class or (ii) otherwise consistent with the legal rights of such

claimant.

39.     In accordance with the requirements of section 1123(a)(5) of the Bankruptcy Code,

the Plan provides adequate means for its implementation through Article V and various other

provisions.  Specifically, the Plan provides for, among other things:

a.      the transfer to the Purchasing Entity of certain of the Debtor's remaining assets, including the Debtor's equity interests in certain operating subsidiaries, pursuant to section 363 of the Bankruptcy Code, free and clear of all liens, claims and interests, at the direction of the DIP Lender in exchange for good and valuable consideration including the Purchasing Entity's agreement to enter into the Exit Financing Facility as a guarantor of collection;

b.      the revesting of the remainder of the Debtor's remaining assets in the Reorganized Debtor;

c.      entry into the Exit Financing Facility on the Effective Date to satisfy and discharge the DIP Credit Agreement;

d.      the satisfaction of all Allowed Claims for which Cash payment is required to be made following the Effective Date; and

e.      the appointment of the Reorganized Debtor as the Plan Administrator.

40.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate

organizational documents prohibit the issuance of non-voting equity securities.  The Debtor does

not propose to issue any non-voting equity securities under the Plan, and the amended charter as

15

included in the Plan Supplement will, as of the Effective Date, prohibit the issuance of nonvoting equity securities and otherwise comply with the requirements of 1123(a)(6).

41. Finally, section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, directors, or trustee under the plan . . . ." 11 U.S.C. § 1123(a)(7). This provision is supplemented by section 1129(a)(5) of the Bankruptcy Code, which directs the scrutiny of the court to the methods by which the management of the reorganized corporation is to be chosen to provide adequate representation of those whose investments are involved in the reorganization — *i.e.*, creditors and equity holders. *See* 7 Alan N. Resnick et al., COLLIER ON BANKRUPTCY ¶ 1123.01[7] (16th ed. rev. 2010).

42. The Plan Supplement identifies the known directors and officers who will serve in such capacity with respect to the Reorganized Debtor. The Plan provision governing the manner of selection of any officer or director is consistent with the interests of creditors and equity security holders and with public policy.

### 3. Section 1123(b) of the Bankruptcy Code – Discretionary Contents of the Plan

43. Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a plan but are not required. For example, a plan may impair or leave unimpaired any class of claims or interests and provide for the assumption or rejection of executory contracts and unexpired leases. 11 U.S.C. §§ 1123(b)(1)-(2). A plan also may provide for (a) "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate;" (b) "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;" (c) "the sale of all or substantially all of the property

16

of the estate;" and (d) "the distribution of the proceeds of such sale among holders of claims or interests." 11 U.S.C. §§ 1123(b) (1-4), (6).

44.     The Plan includes various provisions that fall under the broad spectrum of section 1123(b) of the Bankruptcy Code. For instance, the Plan impairs Classes 2 and 3, leaving Class 1 unimpaired. *See* Plan Art. III. The Plan further provides for approval of the treatment of executory contracts and unexpired leases to which the Debtor is a party. *See* Plan Art. VIII.

45.     In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes other provisions designed to ensure its implementation that are consistent with the Bankruptcy Code, including the provisions of Article XI, regarding retention of jurisdiction by the Court over certain matters after the Effective Date. The Debtor believes each of these provisions is appropriate under applicable law, including sections 1123(b)(1), (3) and (6) of the Bankruptcy Code.

**B.     Section 1129(a)(2) of the Bankruptcy Code**

46.     The Plan complies with section 1129(a)(2) of the Bankruptcy Code, which requires that a plan proponent comply with applicable provisions of the Bankruptcy Code. The legislative history accompanying section 1129(a)(2) indicates that the principal purpose of this section is to ensure compliance with the disclosure and solicitation requirements set forth in section 1125 Bankruptcy Code. *See In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000) ("[Section] 1129(a)(2) [of the Bankruptcy Code] requires that the plan proponent comply with the adequate disclosure requirements of § 1125."); *Official Comm. of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715, 719 (Bankr. E.D. Cal. 1992) ("Compliance with the disclosure and solicitation requirements is the paradigmatic example of what Congress had in mind when it enacted Section 1129(a)(2)."); *see also* S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 (1978) ("Paragraph (2) [of Section 1129(a)] requires that the proponent of the plan

17

comply with the applicable provisions of chapter 11, such as Section 1125 regarding disclosure.");
H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368 (1977).

47.     As already explained above, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including the provisions of section 1125 regarding disclosure and plan solicitation.  Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan from holders of claims or interests "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or summary of the plan, and a written disclosure statement approved . . . by the court as containing adequate information."  11 U.S.C. § 1125(b).  In the instant case, the Debtor solicited votes to accept the Plan from Class 2(General Unsecured Claims) as such Class was Impaired.  The Debtor did not solicit votes from Classes 1 and 3 as such Classes are either deemed to accept or deemed to reject the Plan.

48.     Pursuant to the Solicitation Procedures Order, the Court determined on an interim basis that the Disclosure Statement contained adequate information within the meaning of section 1125 of the Bankruptcy Code.  *See Solicitation Procedures Order* ¶ 2.  The Court further approved the form of notices of (i) the Confirmation Hearing (the "**Combined Hearing Notice**") and (ii) the Non-Voting Notice and Opt-Out Form.  The Court also required that the Debtor serve creditors the Combined Hearing Notice and/or the Non-Voting Notice, as applicable, pursuant to the Solicitation Procedures Order.

49.     The Debtor has complied with the Solicitation Procedures Order and caused the mailing of the Combined Hearing Notice and the Non-Voting Notice to occur in accordance with the requirements of the Solicitation Procedures Order. *Certificate of Service* (and any supplements thereto), dated January 19, 2026 [Docket No. 662].  The Debtor further complied with all applicable provisions of the Bankruptcy Code, including section 1125 of the Bankruptcy Code and Bankruptcy

18

Rules 3017 and 3018. As a result, the Plan meets the requirements of section 1129(a)(2) of the Bankruptcy Code.

### C. Section 1129(a)(3) of the Bankruptcy Code

50. The Plan satisfies section 1129(a)(3) of the Bankruptcy Code, which requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3); *see also In re Diocese of Camden, New Jersey,* No. 20-21257 (JNP), 2023 WL 5605156, at *25 (Bankr. D.N.J. Aug. 29, 2023) (citing *In re PWS Holding Corp.,* 228 F.3d at 242)); *In re TCI 2 Holdings,* 428 B.R. at 134. Bankruptcy Courts, including courts in the Third Circuit, have found that where a plan aims to maximize the value of the debtor's estate and the recoveries of creditors, in light of the totality of the circumstances, the good faith standard is satisfied. *See, e.g., In re PWS Holding Corp.*, 228 F.3d at 242 (quoting *In re Abbotts Dairies of Pa., Inc*., 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997) (quoting *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985); *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

51. Here, as demonstrated by the Blum Declaration and the record of this chapter 11 case, the Debtor has proposed the Plan with the goal of maximizing value, providing recoveries to creditors, and maximizing the value of the Debtor's estate. The Plan represents the culmination of collaborative efforts between the Debtor, their stakeholders, and their respective advisors resulting in payment in full of all Allowed Claims. The support of the Debtor's primary constituencies, and the unambiguous acceptance of the Plan by holders of Claims that voted, reflect the overall fairness of the Plan and the acknowledgment by the Debtor's stakeholders that the Plan has been proposed in good faith and for proper purposes. In addition, the Plan contains no provisions that are contrary to state or other laws, nor is there any indication the Debtor lacks the ability to consummate the

19

Plan. Accordingly, the Plan has been proposed in good faith and not by any means forbidden by law as required by section 1129(a)(3) of the Bankruptcy Code.

### D. Section 1129(a)(4) of the Bankruptcy Code

52. Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Bankruptcy Court as reasonable. 11 U.S.C. § 1129(a)(4). Courts in this district and elsewhere have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Bankruptcy Court as to their respective reasonableness. *Lisanti v. Lubetkin (In re Lisanti Foods, Inc.),* 329 B.R. 491, 503 (Bankr. D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."), aff'd, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.,* 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

53. The Plan satisfies section 1129(a)(4) of the Bankruptcy Code. Pursuant to the Plan and other orders of the Court, all Professional fee Claims are subject to Court approval. *See* Plan, Art. 2.2. Accordingly, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

### E. Section 1129(a)(5) of the Bankruptcy Code

54. The Bankruptcy Code requires the plan proponent to disclose the affiliation of any individual proposed to serve as a director or officer of the debtor or successor to the debtor under the plan. 11 U.S.C. § 1129(a)(5)(A)(i). Section 1129(a)(5)(A)(ii) further requires that the

20

appointment or continuation of such officers and directors be consistent with the interests of creditors and equity holders and with public policy. 11 U.S.C. § 1129(a)(5)(A)(ii).

55. The Plan satisfies section 1129(a)(5) because the Debtor has identified the known directors and officers who will serve in such capacity with respect to the Reorganized Debtor as of the Effective Date. The proposed appointed directors and officers are all experienced in the field of civil engineering and construction management and with the financial and business operations of the Debtor and will be able to manage the Debtor's post-emergence operations effectively.

**F.        Section 1129(a)(6) of the Bankruptcy Code**

56. Section 1129(a)(6) of the Bankruptcy Code requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." 11 U.S.C. § 1129(a)(6). The Debtor's business is not one that involves the establishment of rates over which any regulatory commission has jurisdiction or will have jurisdiction after the Plan's confirmation. Accordingly, section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Debtor.

**G.        Section 1129(a)(7) of the Bankruptcy Code**

57. The "best interests test" of section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time. *See Armstrong*, 348 B.R. at 165-66; *see also In re Tranel*, 940 F.2d 1168, 1172 (8th Cir. 1991) (considering evidence supporting best interests of creditors test outcome); *Eagle-Picher Indus.*, 203 B.R. at 266 (best interest of creditors test must be met even in cramdown situation).

21

58.     The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's chapter 11 plan that rejects the plan. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 428 (Bankr. S.D. Tex. 2009) ("This provision is known as the 'best-interest-of-creditors-test' because it ensures that reorganization is in the best interest of individual claimholders who have not voted in favor of the plan.").

59.     The Plan satisfies the best interests of creditors test as set forth in section 1129(a)(7) of the Bankruptcy Code because the Plan provides a greater recovery to the holders of Claims than such holders would receive under a liquidation under chapter 7 of the Bankruptcy Code based upon the Liquidation Analysis attached to the Disclosure Statement and additional evidence proffered or adduced at the Confirmation Hearing.

60.     In sum, no Holder of Claims or Interests would receive more in a hypothetical chapter 7 liquidation than it would receive under the Plan.  Accordingly, the Debtor submits that the Plan complies with and satisfies all of the requirements of section 1129(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

**H.     Section 1129(a)(8) of the Bankruptcy Code**

61.     Section 1129(a)(8) Bankruptcy Code requires that "with respect to each class of claims or interests — (A) such class has accepted the plan or (B) such class is not impaired under the Plan." 11 U.S.C. § 1129(a)(8).  Pursuant to section 1126(c) of the Bankruptcy Code, a class of claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class vote to accept the plan. *See id.* § 1126(c).  Pursuant to

22

section 1126(d) of the Bankruptcy Code, a class of interests accepts a plan if at least two-thirds in amount of allowed interests in that class vote to accept the plan. *See id.* § 1126(d).

62.    As set forth above, the holders of Claims in Class 1 are Unimpaired under the Plan and, pursuant to section 1126(f) of the Bankruptcy Code, conclusively presumed to have voted to accept the Plan. Thus, the requirements of section 1129(a)(8) have been satisfied as to Class 1.

63.    As set forth above and in the Voting Declaration, the holders of Claims in Class 2 voted to accept the Plan. Thus, as to the Impaired and accepting Class 2, the requirements of section 1129(a)(8) of the Bankruptcy Code likewise have been satisfied.

64.    Holders of Claims in Class 3 are not entitled to receive or retain any property from the Debtor's estate under the Plan on account of their Claims and Interests and, therefore, are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. The Plan nonetheless may be confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code, as discussed below.

**I.    Section 1129(a)(9) of the Bankruptcy Code**

65.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code, which requires that a chapter 11 plan provide for the payment of certain priority claims in full on the effective date in the allowed amount of such claims. In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, unless otherwise agreed by the holder, holders of claims of a specific kind specified in section 507(a)(2) of the Bankruptcy Code — administrative claims allowed under section 503(b) of the Bankruptcy Code — must receive cash equal to the allowed amount of such claims on the effective date of a plan. 11 U.S.C. § 1129(a)(9)(A). Section 1129(a)(9)(B) of the Bankruptcy Code further requires that the holders of claims of a kind specified in sections 507(a)(1) and 507(a)(4) through (7) of the Bankruptcy Code (generally, wage and employee benefit claims and consumer deposits that are entitled to priority) must receive: (a) if the class in which such claimants are members has

23

accepted the plan, deferred cash payments of a value equal to the allowed amount of these claims or, (b) if the class in which such claimants are members has not accepted the plan, cash equal to the allowed amount of these claims on the effective date of a plan. *See id.* § 1129(a)(9)(B).  Finally, sections 1129(a)(9)(C) and (D) of the Bankruptcy Code provide for the payment of priority tax claims, including secured claims that would otherwise meet the requirements of section 507(a)(8) of the Bankruptcy Code absent the secured status of such claims, in cash in regular installments. *See id.* § 1129(a)(9)(C) and (D).

66.     In accordance with section 1129(a)(9)(A) of the Bankruptcy Code, Article 2.1 of the Plan provides that, unless otherwise agreed by the holder of an Administrative Claim, and except as provided in Article 2.2 of the Plan, each holder of an Allowed Administrative Claim against the Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, Cash equal to the unpaid amount of such Allowed Administrative Claim on the latest of:  (a) the Effective Date; (b) 30 days after the date on which such Administrative Claim becomes Allowed; or (c) the date on which such Administrative Claim becomes due and payable in the ordinary course of the Debtor's business in accordance with the terms and conditions of any transaction or agreement relating to such Allowed Administrative Claim; *provided, however*, that notwithstanding anything to the contrary in the Plan, the Plan Administrator shall be authorized to pay Allowed Administrative Claims that arise in the ordinary course of the Debtor's business, in full, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions, post-confirmation.

67.     In accordance with section 1129(a)(9)(B) of the Bankruptcy Code, Article  4.1 of the Plan provides that each holder of an Allowed Priority Non-Tax Claim shall receive, in full and

final satisfaction, settlement, release, and discharge of such Claim, Cash equal to the unpaid amount

of such Allowed Priority Non-Tax Claim on the latest of (a) the Effective Date; (b) 30 days after

the date on which such Priority Non-Tax Claim becomes Allowed; and (c) the date on which such

Priority Non-Tax Claim becomes due and payable by its terms.

68.    In accordance with section 1129(a)(9)(C) of the Bankruptcy Code, Article 2.3 of the

Plan provides that each holder of an Allowed Priority Tax Claim shall receive, in full and final

satisfaction, settlement, release, and discharge of such Claim, Cash equal to the unpaid amount of

such Allowed Priority Tax Claim on the latest of (a) the Effective Date; (b) 30 days after the date

on which such Priority Tax Claim becomes Allowed; or (c) the date on which such Priority Tax

Claim becomes due and payable by its terms.

69.    Accordingly, the Plan satisfies the requirements set forth in section 1129(a)(9) of the

Bankruptcy Code.

**J.      Section 1129(a)(10) of the Bankruptcy Code**

70.    Section 1129(a)(10) of the Bankruptcy Code provides the following:

> If a class of claims is impaired under the plan, at least one class of
> claims that is impaired under the plan has accepted the plan,
> determined without including any acceptance of the plan by any
> insider.

11 U.S.C. § 1129(a)(10); *see also In re Martin*, 66 B.R. 921, 924 (Bankr. D. Mont. 1986) (holding

that acceptance by three classes of impaired creditors, exclusive of insiders, satisfied requirement

of section 1129(a)(10) of the Bankruptcy Code).  As set forth in the Voting Declaration, Class 2

(General Unsecured Claims) voted to accept the Plan, exclusive of insiders.  Accordingly, the

Debtor submits that the requirements of section 1129(a)(10) of the Bankruptcy Code are satisfied.

25

### K. Section 1129(a)(11) of the Bankruptcy Code

71.     The Plan satisfies section 1129(a)(11) of the Bankruptcy Code, which provides that a court may confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need further financial reorganization, of the debtor or any successor to the debtor under the plan."  11 U.S.C. § 1129(a)(11).  The debtor bears the burden of demonstrating the feasibility of the plan by a preponderance of the evidence.  There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.  *See, e.g., In re S B Bldg. Assocs.*, 621 B.R. 330, 354 (Bankr. D.N.J. 2020) ("A 'relatively low threshold of proof' may satisfy the feasibility requirement."); *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal citations omitted); *Berkley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden Motel & Apartments)*, 195 B.R. 294, 305 (D.N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *overruled in part on other grounds*, 464 B.R. 208 (Bankr. D. Del. 2011).

72.     "The feasibility requirement does not mean the debtor must provide a guarantee of success." *In re S B Bldg.,* 621 B.R. at 354.  *See also Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1004 (E.D. Va. 1994) (noting that the "plan must present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success"). Instead, the Bankruptcy Court must find that the "plan offers a reasonable expectation of success." *See In re G–I Holdings Inc.*, 420 B.R. at 267 ("[The] key element of feasibility is whether there is a reasonable probability the provisions of the Plan can be performed."); *In re S B Bldg.*, 621 B.R. at 354 ("In determining whether the feasibility standard is met, a court must be satisfied that the plan is workable and has a reasonable likelihood of success.").

26

73.      Here, for the reasons explained in the Blum Declaration, the confirmation of the Plan is not likely to be followed by the need for liquidation or further financial reorganization of the Debtor.  Among other things, the Debtor is emerging with its sole funded debt being held by its wholly owned parent on favorable terms and all third party Cash obligations will be funded on the Effective Date. In addition, given the importance of CCA and the Shared Services Program that it manages to the overall ecosystem of CCA's parent company and affiliates, CCA's parent company will remain highly motivated to support CCA.  The Plan also provides for reasonable procedures by which the Reorganized Debtor as the Plan Administrator may make the necessary distributions under the Plan.  Lastly, no party has disputed the feasibility aspect of the Plan or the Reorganized Debtor's ability to satisfy its obligations under the Plan, or suggested that the Reorganized Debtor may require a liquidation or further financial reorganization.  *See In re S. B Bldg.*, 621 B.R. at 360 (finding a plan feasible by noting that "the most important and primary factor in determining feasibility is what the parties with 'skin in the game' had to say. Here, those parties evidenced their support for the Debtors' Plan by either voting overwhelmingly in its favor, entering into settlements that formed the basis for the Plan and/or otherwise supporting (or not objecting to) confirmation of the Plan.").

74.      Accordingly, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code because the Plan: (a) provides the financial and legal necessities to implement the Plan; and (b) offers reasonable assurance that the Plan is workable and has a reasonable likelihood of success.

**L.      Section 1129(a)(12) of the Bankruptcy Code**

75.      The Plan complies with section 1129(a)(12) of the Bankruptcy Code, which requires that, as a condition precedent to the confirmation of a plan, "[a]ll fees payable under Section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."  11 U.S.C. §

27

1129(a)(12). The Plan specifically provides that all fees payable pursuant to Section 1930 of Title 28 of the United States Code will be paid on or prior to the Effective Date. *See* Plan, Art. 2.4. As such, the Plan complies with section 1129(a)(12) of the Bankruptcy Code.

**M.    Section 1129(a)(13) through (a)(16) of the Bankruptcy Code Do Not Apply[3]**

76.    Section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan, as it requires that a plan of reorganization provide for the continuation of all retiree benefits at the level established by agreement or by court order pursuant to section 1114 of the Bankruptcy Code at any time prior to confirmation of the plan, for the duration of the period that the debtor has obligated itself to provide such benefits. The Debtor has no obligation to pay retiree benefits after the Effective Date and, as such, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.

77.    Section 1129(a)(14) of the Bankruptcy Code is inapplicable because the Debtor is not subject to any domestic support obligations. 11 U.S.C. § 1129(a)(14). Section 1129(a)(15) of the Bankruptcy Code is inapplicable to the Plan because the Debtor is not an "individual" as that term is defined in the Bankruptcy Code. 11 U.S.C. § 1129(a)(15). Section 1129(a)(16) of the Bankruptcy Code is also inapplicable because the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust. 11 U.S.C. § 1129(a)(16).

**II.    SECTION 1129(b) OF THE BANKRUPTCY CODE**

78.    Section 1129(b)(1) of the Bankruptcy Code allows for confirmation of a plan in cases where all requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) (*i.e.*, the plan has not been accepted by all impaired classes of claims or interests), by allowing a court to "cram down" the plan notwithstanding objections or deemed rejections as long

---

[3]    *See* Blum Declaration ¶ 30.

28

as the court determines that the plan is "fair and equitable" and does not "discriminate unfairly" with respect to the rejecting classes. 11 U.S.C. § 1129(b)(1).

79.    As noted above, all impaired classes of Claims entitled to vote on the Plan voted in favor of the Plan. However, Class 3 (Interests) is deemed to have rejected the Plan. Nonetheless, the Plan meets the "cram down" requirements of section 1129(b) of the Bankruptcy Code to confirm the Plan over the deemed rejection by Class 3, because the Plan is fair and equitable and does not discriminate unfairly with respect to holders of Interests in that rejecting Class.

A.    **The Plan is Fair and Equitable with Respect to the Impaired Rejecting Class**

80.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule. *Bank of Am. Nat. Trust & Sav. Ass'n*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'"). This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest. 11 U.S.C. § 1129(b)(2)(B)(ii).

81.    The Plan satisfies section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that Class 3 (Interests) is deemed to have rejected the Plan, the Plan is confirmable. Specifically, the Debtor has only one class of stock, and does not have any preferred stock or holders of junior interests of the kind that could potentially run afoul of section 1129(b)(2)(C) if not properly

treated under the Plan. Accordingly, the Plan is fair and equitable with respect to holders of Interests in Class 3.

        **B.**     **The Plan Does Not Discriminate Unfairly with Respect to the Impaired Rejecting Classes**

82.     Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination. *See In re TCI 2 Holdings, LLC*, 428 B.R. at 158 (neglecting to apply a set standard or test to ascertain whether a plan unfairly discriminates, instead opting to consider "various standards" for a general analysis of unfair discrimination including whether the discrimination is "supported by a reasonable basis" and is "proposed in good faith"); *In re S B Bldg. Assocs.*, 621 B.R. 330, 375 (Bankr. D.N.J. 2020) (considering the unique factual circumstances to determine whether the requirements of section 1129(b) are satisfied); *Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra)*, 590 B.R. 75, 93 (D. Del. 2018), aff'd, 834 F. App'x 729 (3d Cir. 2021), *as amended* (Feb. 2, 2021) ("As unfair discrimination is not defined in the Bankruptcy Code, courts must examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.").

83.     In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so. *See, e.g.*, *See In re Ocean View Motel, LLC*, No. 20-21165-ABA, 2022 WL 243213, at *1 (Bankr. D.N.J. Jan. 25, 2022) (stating that "[u]nder 1129(b)(1), a plan unfairly discriminates when it treats similarly situated classes differently without a reasonable basis for the disparate treatment") (internal citations omitted); *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (citing cases and noting that separate classification and treatment of claims is acceptable if the separate

30

classification is justified because such claims are essential to a reorganized debtor's ongoing business). A threshold inquiry in assessing whether a proposed plan of reorganization unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to the class allegedly receiving more favorable treatment. *See Armstrong*, 348 B.R. at 121.

84. Here, the Plan provides for the same treatment by the Debtor of all holders of Interests in Class 3 and therefore does not discriminate unfairly with respect to holders of such Interests. Accordingly, the Plan should be confirmed even if this Class is deemed to reject the Plan.

## III.  SECTION 1129(c) OF THE BANKRUPTCY CODE

85. The Plan satisfies section 1129(c) of the Bankruptcy Code, which provides that, with a limited exception, a bankruptcy court may only confirm one plan. The Plan is the only plan that has been filed in this chapter 11 case and is the only plan that satisfies the requirements of subsections (a) and (b) of section 1129 of the Bankruptcy Code. Accordingly, the requirements of section 1129(c) of the Bankruptcy Code are satisfied.

## IV.  SECTION 1129(d) OF THE BANKRUPTCY CODE

86. The Plan satisfies section 1129(d) of the Bankruptcy Code, which provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of Section 5 of the Securities Act of 1933. Here, the Plan's principal purpose is not the avoidance of taxes or the avoidance of the requirements of Section 5 of the Securities Act of 1933, and there has been no filing by any governmental agency asserting the contrary. Accordingly, the Plan complies with section 1129(d) of the Bankruptcy Code.

## V.  SECTION 1129(e) OF THE BANKRUPTCY CODE

87. Section 1129(e) of the Bankruptcy Code is inapplicable because this chapter 11 case is not a "small business case."

31

## OTHER PLAN PROVISIONS ARE NECESSARY AND APPROPRIATE

### I.     THE SALE SHOULD BE APPROVED

88.     Section 1123(a)(5)(D) of the Bankruptcy Code contemplates that a debtor's plan may be implemented in part by a "sale of all or any part of the property of the estate . . . free of any lien . . . ." 11 U.S.C. § 1123(a)(5)(D).  Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Pursuant to sections 363(b) and 1123(a)(5)(D), and in accordance with the Stock Transfer Agreements, the Debtor is seeking approval of the sale of its equity interests in certain operating subsidiaries to the Purchasing Entity. Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(1) applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

89.     Bankruptcy Code section 363(f) is drafted in the disjunctive.  11 U.S.C. § 363(f). As such, courts have recognized that satisfaction of any one of its five requirements will suffice to permit the sale "free and clear" of liens and interests.  *See In re Sea Oaks Country Club, LLC,* 2020 WL 6588412 at *8 (Bankr. D. N.J. Nov. 10, 2020) ("The section is written in the disjunctive, a

32

trustee need only satisfy one of the factors to allow for a sale."); *In re Motors Liquidation Company*, 829 F.3d 135, 154 (2d Cir. 2016) ("A sale pursuant to § 363(b) may be made 'free and clear of any interest in such property' if any condition [listed under 11 U.S.C. § 363(f)] is met."). In addition section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Under section 363(b), courts require only that a debtor "show that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted).

90.     Here, the DIP Lender would not have directed the transfer of certain of the Debtor's assets to the Purchasing Entity in connection with its agreement to enter into the Exit Financing Facility and other settlements contained in the Plan, thereby adversely affecting the Debtor, its estate, creditors and other parties in interest, if the sale of these assets were not free and clear of any interest in such assets, including any Claims, liens, liabilities, Interests, rights and encumbrances in such assets, or if the Purchasing Entity would, or in the future could, be liable for any such Claims, liens, liabilities, Interests, rights or encumbrances or other interest in such assets. In addition, the only party with a lien on the transferred assets is the DIP Lender, which has consented to the sale, thereby satisfying section 363(f)(2). For these reasons, there can be little doubt that the Debtor's decision to sell certain assets to the Purchasing Entity is an exercise of sound business judgment, is in the best interest of the Debtor and its estate, and that section 363(f) of the Bankruptcy Code is satisfied.

91.     Lastly, while the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *In re*

33

*Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).  Here, the Debtor submits that there is sufficient evidence to support the finding that the Purchasing Entity is a good faith purchaser under section 363(m) of the Bankruptcy Code.

## II.   THE PLAN APPROPRIATELY INCORPORATES SETTLEMENTS OF CLAIMS AND INTERESTS

92.   Article 5.4 of the Plan provides for a general settlement of all Claims and Interests to the extent provided under the Bankruptcy Code or applicable law.  The standards for approval of a settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019.  *See In re S B Bldg.*, 621 B.R. at 380 ("The standards for approving a settlement are the same under both Bankruptcy Rule 9019 and section 1123(b)(3).").  Generally, courts in the Third Circuit will approve a settlement by the debtor if the settlement "exceed[s] the lowest point in the range of reasonableness."  *In re TCI 2 Holdings*, 428 B.R. at 136 (citation omitted); *Will v. Nw. Univ. (In re Nutraquest, Inc.),* 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them.").

93.   The Third Circuit has provided the following criteria that a bankruptcy court should consider when approving a settlement pursuant to Bankruptcy Rule 9019:  (a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (d) the paramount interest of creditors.  *See In re WebSci Technologies, Inc.*, 234 Fed. Appx. 26, 29 (3d Cir. 2007) (quoting *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)).  In addition, the court must determine whether the proposed settlement is fair and equitable, and in the best interests of the estate.  *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,

34

390 U.S. 414, 424 (1968) ("Under the 'fair and equitable' standard, we look to the fairness of the settlement to other persons, i.e., the parties who do not settle.").

94.     The Debtor believes the settlements embodied by the Plan satisfy the above factors. The Plan and Proposed Confirmation Order embody a settlement of Claims and Interests between the Debtor and certain other parties in interest. The settlements embodied in the Plan and the Proposed Confirmation Order are fair and equitable and consistent with the Bankruptcy Code.

95.     The Debtor and its advisors worked diligently to propose a Plan that is in the best interest of its estate and as to which creditors are receiving the greatest value possible on their claims.  If the Debtor was forced to litigate the issues necessary to resolve Claims and Interests outside of the Plan, such litigation would be costly, protracted, inherently uncertain, and would likely leave the Debtor and its stakeholders in a substantially worse off position.  Litigation would prolong the Debtor's bankruptcy process and drain the estate's assets.  By contrast, as reflected by the support of creditors for the Plan, the settlements embodied by the Plan are in the best interests of creditors and all parties in interest.

## III.   THE PLAN'S RELEASES, EXCULPATION, AND INJUNCTION PROVISIONS ARE APPROPRIATE AND SHOULD BE APPROVED

96.     Article 10.4(a) of the Plan provides for the releases by the Debtor of the Released Parties (the "**Debtor Release**") and Article 10.4(b) of the Plan provides for the releases by all holders of Claims and Interests other than those persons and entities who (i) opted-out of the Third-Party Release, (ii) did not receive a Ballot due to same being returned as undeliverable, and (iii) filed an objection to the Third-Party Release in connection with Plan confirmation that is not resolved before confirmation (the "**Third-Party Release**," and together with the Debtor Release, the "**Releases**").  The Plan also includes:  (a) in Article 10.5, a customary exculpation and limitation

35

of liability provision (the "**Exculpation Provision**") and (b) in Article 10.6, an injunction provision which provides for a permanent injunction for other Released Parties (the "**Injunction Provision**").

### A.     The Debtor Release

97.     Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." *See In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 380 (Bankr. D.N.J. 2020) ("The standards for approving a settlement are the same under both Bankruptcy Rule 9019 and section 1123(b)(3)."). Generally, courts in the Third Circuit will approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness." *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010) (citation omitted); *Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."). Additionally, the Third Circuit has held that, to approve a settlement pursuant to Rule 9019, the court must balance: "'(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.'" *In re WebSci Techns., Inc.*, 234 Fed. Appx. 26, 29 (3d Cir. 2007) (quoting *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)). Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (internal citation omitted); *see also In re Washington Muual., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citation omitted).

36

98.     Courts in this jurisdiction and elsewhere generally analyze five factors when determining the propriety of a debtor release, commonly known as the *Zenith* or *Master Mortgage* factors. *See In re Indianapolis Downs*, 486 B.R. at 303 (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999)); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994). The *Master Mortgage* factors have been adopted by the Third Circuit, including application by the Bankruptcy Court of the District of New Jersey as "neither exclusive nor conjunctive requirements, but . . . guidance in the Court's determination of fairness." *See In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *14 (Bankr. D.N.J. Mar. 5, 2014) (citing *In re Wash. Mut.,* 442 B.R. at 346). The analysis includes an inquiry into whether there is: (1) identity of interest between the debtor and non-debtor; (2) contribution to the plan by the non-debtor; (3) the necessity of the release to the plan; (4) overwhelming acceptance of the plan and release by creditors and interest holders; and (5) payment of all or substantially all of the claims of the creditors and interest holders. *See In re Wash. Mut.,* 442 B.R. at 346 (citing *In re Zenith Elecs. Corp.*, 241 B.R. at 110; *In re Master Mortg.*, 168 B.R. at 937). These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining fairness of a debtor's releases. *Id.* at 346 (citing *In re Master Mortg.*, 168 B.R. at 935). The Debtor Release easily meets the applicable standard and should be approved.

99.     ***First***, an identity of interest exists between the Debtor and the parties to be released under the Plan. With respect to the releases of the Debtor's current and former directors and officers, there is a clear identity of interest supporting the releases because the Debtor has a duty to indemnify those parties under the Debtor's operating and governance documents. *Id.; see also In re Indianapolis Downs*, 486 B.R. at 303 ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release.")

100.    Each Released Party, as a stakeholder and critical participant in the Plan process, also shares a common goal with the Debtor in seeing the Plan succeed, and would have been highly unlikely to participate in the negotiations and compromises that led the ultimate formulation of the Plan (or participate in the ultimate implementation of it) without the Debtor Release. The Debtor Release further provides finality to those parties critical to effectuating the sale of certain assets to the Purchasing Entity, and underpins the compromise of issues achieved by the Plan, maximizes value for creditors, and permits the Debtor's estates to consummate the Plan. Therefore, the inclusion of the Debtor Release inures to the benefit of all the Debtor's stakeholders, and the Debtor and the directors and officers share an identity of interest.

101.    ***Second***, the substantial contributions by the officers and directors are plainly apparent. In fact, the efforts of management are a substantial contribution. *See Su v. Offshore Inv. Ltd. (In re Vantage Drilling Int'l)*, 603 B.R. 538, 548 n.5 (D. Del. 2019) ("[A] person receiving a release generally must have provided something of value in return, such as by . . . facilitating the debtor's reorganization."); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (finding non-debtor parties had substantially contributed where (a) officers and directors made substantial contributions by designing and implementing the operational restructuring and negotiating the financial restructuring and (b) plan sponsor funded the plan and agreed to compromise its claim); *In re Hercules Offshore, Inc.,* 565 B.R. 732, 757–58 (Bankr. D. Del. 2016) (holding that a release of the debtors' officers, directors, and professionals was appropriate where the record reflected an "intensive and thoughtful effort by management and the special committee," with the advice and assistance of its hired professionals, "to respond to the market challenges" and who "chose the option that they believed would conserve the value of the [e]states and maximize recovery for all stakeholders, including equity holders").

102. In this chapter 11 case, and in addition to their day-to-day roles, the Debtor's directors and officers, among other things, prepared the Debtor's bankruptcy schedules, negotiated with stakeholders, and met with vendors and customers. The Released Parties provided integral support to the Debtor throughout this chapter 11 case to facilitate administration and support confirmation of the Plan. In the absence of these parties' contributions, the transactions contemplated by the Plan would not be possible. *Id.*

103. **Third**, the Debtor Release is essential to the success of the Plan. As described above, the Debtor's directors and officers contributed substantial value to this chapter 11 case and did so with the understanding that they would receive releases from the Debtor. Absent the releases, it is highly unlikely the Debtor would have been able to build the consensus with respect to the Plan and implementation of the Plan.

104. **Fourth**, as evidenced by the Voting Declaration and as discussed herein, the Debtor's stakeholders unambiguously support the Plan. Notably, the only Voting Class that the Debtor believes is Impaired and entitled to vote (Class 2 – General Unsecured Claims) accepted the Plan. *See* Voting Declaration.

105. **Fifth**, the Plan provides for meaningful recoveries for creditors. As demonstrated by the Liquidation Analysis, the ranges of recoveries for those holders of General Unsecured Claims are higher under the Plan than they would have been in a chapter 7 liquidation scenario. *See* Liquidation Analysis. The Plan has been carefully crafted to maximize value and provides meaningful recoveries for all stakeholders under the circumstances. These recoveries are available solely because the Debtor has agreed, among other things, to give up potential claims. Therefore, the Debtor Release was worth the significant benefits the Debtor received in exchange, including substantial payment of significant claims of the Debtor's creditors.

106.    Based on the above, the *Zenith* factors support approval of the Debtor Release and the Debtor has easily satisfied the business judgment standard in granting the Debtor Release under the Plan. The Debtor Release is fair, reasonable, supported by the requisite amount of creditors, and is in the best interests of the Debtor's estate. For these reasons, the Debtor's agreement to provide the Debtor Release is in the best interests of creditors and all stakeholders, is an integral part of the Plan, and should be approved.

### B.    The Third-Party Release Is Consensual and Appropriate

107.    The Third-Party Release is consensual, fair, and reasonable, and consistent with Third Circuit precedent and, therefore, should be approved.  The Third-Party Release is consensual since all parties in interest had ample opportunity to evaluate and opt out of the Third-Party Release. Moreover, the Third-Party Release is appropriately tailored to the specific circumstances at issue in this particular case, and is consistent with previous decisions of Courts in this district, and the Supreme Court's decision in the *Purdue Pharma* case. *See Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024) ("**Purdue Pharma**").

108.    The Supreme Court's decision in *Purdue Pharma* that the Bankruptcy Code does not permit non-consensual third-party releases of non-debtors (other than in the asbestos context), is a groundbreaking decision for bankruptcy practitioners that has significant implications for complex bankruptcies and the resolution of mass tort litigation.  Fortunately for our purposes, it has **no** bearing on the issues presented to this Court.  That is, the majority opinion concludes by stating that the narrow decision is confined to the question presented. The majority opinion states that it does not call into question the validity of consensual releases and does not decide what qualifies as a consensual release. *Purdue Pharma*, at 2087-88.[4]

---

[4]    "As important as the question we decide today are ones we do not. Nothing in what we have said should be construed to call into question consensual third-party releases offered in connection with a bankruptcy

40

109.   The U.S. Trustee has objected to the Third-Party Release on several grounds, including arguing that silence is not acceptance and that providing an "opt out" box to establish consent to the Third-Party Release is not consensual (U.S. Trustee Obj. ¶¶ 52-53). However, affirmative consent to a third-party release is not required for such release to be "consensual." Despite the U.S. Trustee's contentions, *Purdue Pharma* does not change that result.  Rather, courts in the Third Circuit, including this very Court, routinely find a third-party release is consensual against non-debtor parties where the releasing parties have the opportunity to opt out of the release but fail to do so.  *See, e.g.*, *In re New Rite Aid, LLC, et al.*, No. 25-14861 (MBK) (Bankr. D.N.J. Nov. 24, 2025) (confirming plan over objection of U.S. Trustee which included an opt-out mechanism for consensual third-party releases); *In re Sam Ash,* No. 24-14727 (SLM) (Bankr. D.N.J. Aug. 30, 2024) (same); *In re Invitae Corporation,* No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024) (same); *In re Cyxtera Techs., Inc.*, No. 23 14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023) (same); *In re Bed Bath & Beyond, Inc.,* No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) (confirming plan finding that holders of claims or interests who fail to affirmatively opt out, whether rejecting the plan, deemed to reject, or abstain are deemed to consent to the releases); *In re DirectBuy Home Improvement,* No. 23-19159 (SLM) (Bankr. D.N.J. Apr. 19, 2024) (approving consensual third-party releases because recipients of ballots and notices of non-voting status made a conscious well-informed decision as to whether to opt out of the third-party release); *In re SLT Holdco, Inc.*, No. 20-18368 (MBK), Docket No. 548 (Bankr. D.N.J. Oct. 22, 2020) (confirming a plan stating that all holders of claims or interests (whether or not they were entitled to vote), were deemed to consent to the releases unless they affirmatively opted out or objected to the releases).

---

reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at issue here." *Id.*

41

Courts recognize that "shareholders and creditors have an obligation to read their mail." *In re Mallinckrodt PLC*, 639 B.R. at 880 (quoting *In re EV Energy Partners*, No. 18-10814 (CSS), Hr'g Tr. at 214 (Bankr. D. Del. May 16, 2018) ("[S]hareholders and creditors have to read legal notices; that's just the way it is. And if you don't know that, then you're proceeding at your own risk when you invest in stocks and credit and bonds."); *see also In re Arsenal Intermediate Holdings, LLC*, No. 23-10097 (CTG), 2023 WL 2655592, at *7 (Bankr. D. Del. Mar. 27, 2023) ("[T]he creditor who throws away the plan unopened is barred from arguing that the third-party release failed to meet the *Continental* standard.").

110.   Notably, even under circumstances where stakeholders fail to vote, are deemed to reject the Plan, or vote to reject the Plan and fail to opt out, the overwhelming weight of authority in this district and others suggests that the Third-Party Release and opt out mechanisms constitute consensual releases. *See, e.g., In re New Rite Aid, LLC, et al.*, No. 25-14861 (MBK) (Bankr. D.N.J. Nov. 26, 2025); *In re Sam Ash,* No. 24-14727 (SLM) (Bankr. D.N.J. Aug. 30, 2024); *In re Invitae Corporation,* No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024); *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. June 13, 2024); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. May 30, 2024); *In re WeWork, Inc.*, No. 2319865 (JKS) (Bankr. D.N.J. May 30, 2024); *In re DirectBuy Home Improvement, Inc.,* No. 23-19159 (SLM) (Bankr. D.N.J. Apr. 19, 2024); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Sept. 14, 2023); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023). *See also In re Spirit Airlines, Inc.,* 668 B.R. 689 (Bankr. S.D.N.Y. 2025); *In re Robertshaw US Holding Corp.,* 662 B.R. 300 (Bankr. S.D. Tex. 2024); *In re Lavie Care Centers*, 2024 WL 4988600 (Bankr. N.D. Ga. Dec. 5, 2024).

111.    Faced with this overwhelming authority, the U.S. Trustee nevertheless argues that silence is not acceptance, asserting that state-law contract principles govern if a third-party release is consensual, and that under Delaware law, an agreement to release claims requires a manifestation of assent to that agreement. (U.S. Trustee Obj. ¶¶ 35-38).   Courts in this jurisdiction have unequivocally rejected the proposition that consensual third-party releases and opt-out release mechanics are governed by state law.  The U.S. Trustee filed a similar objection in *In re New Rite Aid, LLC, et al.* as the one filed in this chapter 11 case, to no avail.  In overruling the U.S. Trustee's objection in *In re New Rite Aid, LLC, et al.*, Case No. 25-14861(MBK), Judge Kaplan held as follows:

> This Court respectfully disagrees with the parties, and my thoughtful colleagues on the Bench in other districts that offer either questionable policy reasons or challenge the use of opt outs as being contrary to state law . . . Under the United States Constitution, Article I, Section 8, Clause 4, "Congress has the authority to enact uniform bankruptcy laws. This power displaces state law where state law interferes with uniformity or federal law directly governs the matter." Opt Out consent procedures are governed by federal rules. They involve questions concerning balance structure, disclosure adequacy, plan solicitation and release mechanisms, and they are governed by Sections 1125, 1126 and Federal Rule of Bankruptcy Procedure 3017 and 3018.

*Id.*, Hr'g Tr. at 58 (Bankr. D.N.J. Nov. 24, 2025).[5]

112.    Additionally, the Court correctly observed that "[s]tate law cannot dictate the legal effect of federal voting and solicitation process, and applying state law would defeat national uniformity." *Id*.

113.    In *In re Thrasio Holdings, Inc.*, Case 24-11840 (CMG), this Court found the third-party releases to be consensual based on the Plan's opt-out structure and the strength of the notice

---

[5]    A copy of the cited pages to the transcript is attached hereto as **Exhibit A**.

43

record. In particular, it found that "it's not a difficult burden to check the box." *Id*., Hr'g Tr. at 52 (Bankr. D.N.J. June 13, 2024).  *See also In re BlockFi Inc.*, Case No. 22-19361 (MBK) Hr'g Tr. 109: 4-24 (Bankr. D.N.J. Sept. 26, 2023) (overruling the U.S. Trustee's objection by finding that "This court, I, as well as my colleagues within the district, have approved opt-out releases, the lynchpin being the proper notice…And let's be clear, these are consensual releases because those who do not want to participate, who want to bring their claims, notwithstanding how they vote, had the ability and option to opt out and not doing so, made a conscious choice."); *In re Aceto Corp.*, Case No. 19-13448 (VFP) Hr'g Tr. at 74-75 (Bankr. D.N.J. Sept. 12, 2019) (approving opt-out releases by finding that "It's kind of like a class action, where people are bound all the time when they -- when they don't opt out, even though they didn't -- they didn't do anything. But I think the bold print, the options are enough to put people on notice that if they want to act, if they want to opt out, they need to do something.")

114.    Here, the releases are modeled after the conspicuous nature of the aforementioned established precedent.  All parties in interest had ample opportunity to evaluate and opt out of the Third-Party Release, which applies ***only*** to those holders of Claims or Interests that did not elect to exercise an opt out. The Debtor provided the holders of Claims and Interests with clear and conspicuous notice of the Third-Party Release via the Ballots, the Non-Voting Notices and the Opt-Out Form—all forms that were reviewed and approved by this Court in the Solicitation Procedures Order.  *See* Solicitation Procedures Order, **Exhibit 2** and **Exhibit 3**.

115.    The U.S. Trustee cannot credibly dispute that the opportunity to opt out was plain to all Releasing Parties under the Plan.   Stakeholders in the Voting Class had notice and an opportunity to "opt out" of the Third-Party Release by checking the appropriate box on the Ballots or objecting on or before the Voting Deadline.  Indeed, the Debtor clearly and explicitly included

44

the full text of the Third-Party Release in the ballots of the Voting Class, which ballots explicitly alerted such parties (i) of the deadlines to vote on and object to the Plan and (ii) that unless a partly expressly opts out or objects, it shall be deemed a Releasing Party under the Plan. Notably, the acceptance/rejection selection and opt out box were located on the same page in close proximity so that there could be no confusion that separate responses were required.[6]

116. In fact, as demonstrated by the Voting Declaration, the fact that multiple creditors elected to opt-out of the Third Party Release demonstrates that the mechanism was clear and worked as intended. *See In re Azul S.A.*, __ B.R. __, 2026 WL 40912 at * 10 (Bankr. S.D.N.Y. Jan. 6, 2026) (explaining that the receipt of opt-out elections "demonstrate[e] that this mechanism worked properly.").

117. Moreover, in connection with the ballots, the Debtor included conspicuous language in caps directly above the box to opt-out which provided: **"CHECK THE BOX BELOW TO OPT OUT OF THIRD-PARTY RELEASE PROVISION OF THE PLAN. IF YOU DO NOT OPT OUT OF THE THIRD-PARTY RELEASE, IT WILL BE BINDING ON YOU."**

118. Similarly, all non-voting stakeholders were given the opportunity to opt out of the Third-Party Release and received notice and instructions for doing so in their applicable Non-Voting Notice. Such stakeholders could opt out by checking the appropriate box on the Non-Voting Notice or objecting on or before the applicable noticed deadline.

119. The U.S. Trustee Objection relies heavily on *In re Gol Linhas Aerea Inteligentes S.A.*, __ B.R. __, 2025 WL 3456675 (S.D.N.Y. Dec. 1, 2025), an out of circuit, non-binding opinion that state law applies and that an opt-out mechanism is inadequate to demonstrate consent. However, even courts in the Southern District of New York have refused to follow the *Gol* opinion,

---

[6]    See excerpt of Ballot attached hereto as **Exhibit B**.

*see In re Azul S.A.,* 2026 WL 40912 at \*10 (court approving opt-out third-party releases whether you applied federal law or state law), and thus far no New Jersey bankruptcy judge has modified their position to adopt *Gol*.

120.    In sum, the conspicuous nature of the Combined Hearing Notice, the Non-Voting Notice, and the ballots, which explicitly include the full text of the releases and indicate that failure to opt out will bind such parties to the Third-Party Release, provided all claimants, including abstaining parties, with ample notice and an opportunity to opt out of the Third-Party Release.  It is thus evident from the record before this Court that the Third-Party Release is consensual, and the scope of the Third-Party Release here is necessary for the consummation of the Plan, warranted under the circumstances, clearly permitted by the applicable law, and should be approved as contemplated.  For these reasons, and as this Court and the Third Circuit have held, the UST objection should be overruled and the Third-Party Release should be approved as consensual as to all creditors and interest holders who did not opt out or object to the Plan.

### C.    The Exculpation Provision

121.    As shown in the Plan with technical modifications filed on February 9, 2026, CCA has resolved the U.S. Trustee's objection to the Plan's definition of Exculpated Parties by removing the DIP Agent and the DIP Lender from the definition. The Exculpation Provision now only provides for the exculpation of the Debtor, and all officers, directors, employees, agents, attorneys, financial advisors, investment bankers, consultants, and other professionals of the Debtor, to the extent such parties are or were acting in such capacity between the Petition Date and the Effective Date (collectively, the "**Exculpated Parties**").   The Exculpation Provision has a narrow and discrete purpose: to protect the Exculpated Parties, who made significant contributions to the success of this chapter 11 case, from lawsuits based on actions taken by the Exculpated Parties in

46

connection with the Debtor's restructuring, without relieving any party from liability for gross

negligence or willful misconduct.  As one court explained:

> an exculpation provision that is meant to insulate court-supervised
> fiduciaries and some other parties from claims that are based on actions
> that relate to the restructuring, with the exception of claims that are based
> on allegations of fraud, willful misconduct, or gross negligence. To some
> extent, these exculpation provisions are based on the theory that court-
> supervised fiduciaries are entitled to qualified immunity for their actions.

*In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019). *See also*

*In re Voyager Digital Holdings, Inc.*, 649 B.R. 111 (Bankr. S.D.N.Y. 2023); *In re Murray*

*Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 504 (Bankr. S.D. Ohio 2021).

122.    Courts evaluate the appropriateness of exculpation provisions based on a number of

factors, including whether the plan was proposed in good faith, whether liability is limited, and

whether the exculpation provision was necessary for plan negotiations.  *See In re Congoleum Corp.*,

362 B.R. 167, 195–97 (Bankr. D.N.J. 2007) (evaluating the appropriateness of the plan's

exculpation provisions based on whether the parties played a significant role in the negotiations that

led to the plan and whether the exculpation is necessary to the plan).  Exculpation provisions that

are limited to claims not involving a criminal act, actual fraud, willful misconduct, or gross

negligence, are customary and generally approved in this district and others under appropriate

circumstances.  *See In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023)

(confirming plan where exculpation provision covered the debtors and wind down debtors, the

creditors' committee, and related parties, including current and former control persons and

professionals); *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14,

2023) (same); *In re Wash. Mut., Inc.*, 442 B.R. at 350–51 (holding that an exculpation clause that

encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate

47

professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

123.    Unlike third party releases, exculpation provisions do not affect the liability of third parties *per se* but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtor's restructuring.  *See In re PWS Holding Corp.*, 228 F.3d at 245 (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Nickels Midway Pier*, No. 03-49462, 2010 WL 2034542, at \*14 (Bankr. D.N.J. May 21, 2010) (citing *PWS Holding Corp.*); *In re Premier Int'l Holdings*, 2010 WL 2745964, at \*10 (approving a similar exculpation provision as that provided for under the Plan).

124.    The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtor, and they should be entitled to protection from exposure to any lawsuits related to this chapter 11 process filed by unsatisfied parties.  Moreover, the liability standard set in the Exculpation Provision represent a conclusion of law that flows logically from certain findings of fact that the Bankruptcy Court must reach in confirming the Plan as it relates to the Debtor.  As discussed above, this Court should find, under section 1129(a)(2) of the Bankruptcy Code, that the Debtor has complied with applicable provisions of the Bankruptcy Code.  Additionally, this Court should find, under section 1129(a)(3) of the Bankruptcy Code, that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtor and, by extension, to the Debtor's officers, directors, employees, and professionals.  Further, these findings will hold that the Plan was negotiated at arm's length and in good faith.

125.    Here, the Debtor and its officers, directors, and professionals actively negotiated the Plan with creditors and other stakeholders, resulting in a Plan which maximizes value for all stakeholders.  Furthermore, the Exculpation Provision is limited to acts during this chapter 11 case and does not extend beyond such time period.  Accordingly, under the circumstances it is appropriate for the Bankruptcy Court to approve Exculpation Provision and to find that the Exculpated Parties have acted in good faith and in compliance with the law.  *See In re PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision exception for willful misconduct and gross negligence); *In re Indianapolis Downs*, 486 B.R. at 306 (same).

### D.    The Injunction Provision

126.    The Injunction Provision is necessary to effectuate the Releases and the Exculpation Provision contained in the Plan and to protect the Released Parties and Exculpated Parties from any potential litigation from prepetition creditors after the Effective Date.  Any such litigation would, if it could be pursued, defeat the purpose of those protections.  Moreover, any such litigation would increase the costs and hinder the efforts of the Reorganized Debtor to effectively fulfill its responsibilities as contemplated in the Plan and thereby maximize recovery for all holders.  As such, the Injunction Provision is a necessary part of the Plan precisely because it enforces the discharge, release, and exculpation provisions that are centrally important to the Plan.  *See SEC v. Drexel Burnham Lambert Grp.  (In re Drexel Burnham Lambert Grp.)*, 960 F.2d 285, 293 (2d Cir. 1992) (holding that a court may approve an injunction provision where such provision "plays an important part in the debtor's reorganization plan").  Accordingly, to the extent the Court finds that the Releases and Exculpation Provisions are appropriate, the Debtor respectfully requests that the Injunction Provision be approved in conjunction therewith.

127.    In sum, the Debtor submits that the discretionary provisions of the Plan are consistent with and permissible under section 1123(b) of the Bankruptcy Code.  In light of the

foregoing, because the Plan fully complies with sections 1122 and 1123 of the Bankruptcy Code, the Debtor submits that the Plan fully complies with and satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

### WAIVER OF STAY

128. The Debtor respectfully requests that the Court cause the Confirmation Order to become effective immediately upon its entry notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e), which states that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 3020(e); *see also* Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend. (stating that a "court may, *in its discretion*, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately") (emphasis added). Courts in this district have waived the stay where the Debtor demonstrates that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020(e) so that the Confirmation Order will be effective immediately upon its entry. S*ee, e.g.*, *Cyxtera Technologies, Inc., et al.*, No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023) (waiving the stay); *Bed Bath & Beyond, Inc., et al.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) (same).

129. Without a waiver of the stay, the Debtor's implementation of the Plan will be delayed, extending the time that the Debtor must remain in chapter 11 and incur additional fees. As further explained in the Blum Declaration, the Debtor has substantial operating expenses due before the end of February 2026 which, if it has not emerged from chapter 11 by then, would likely require an upsize of the DIP Facility to pay on time. This would entail considerable unnecessary administrative and professional expense, including professional expense subject to an administrative claim against the estate, to the detriment of other stakeholders. The Debtor may take certain steps to effectuate the Plan in anticipation of and to facilitate the occurrence of the Effective

50

Date so that the Effective Date can occur promptly.  Therefore, good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.  To the extent a party wishes to seek an appeal, it may seek to stay the effectiveness of the Confirmation Order in connection with the appeal.[7]

## CONCLUSION

For the reasons set forth in this Memorandum of Law, the Debtor respectfully submits that: (a) the Disclosure Statement and the Plan fully satisfy all applicable requirements of the Bankruptcy Code; (b) the Disclosure Statement should be approved on a final basis and the Plan should be confirmed by the Court; (c)  all objections, to the extent not previously withdrawn or resolved, should be overruled, and (d) the 14-day stay of the Confirmation Order should be waived.

[*Remainder of Page Intentionally Left Blank*]

---

[7]    If for some reason a party in interest appeals the Confirmation Order, such party is on notice that the Debtor is asking the Court for a waiver of the stay imposed by Bankruptcy Rule 3020(e).  Therefore, such party is on notice that it must request a stay pending appeal immediately after the entry of the Confirmation Order.  *See, e.g.*, *Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 187 (3d Cir. 2001) (noting that all parties were on notice that plan called for "Immediate Effectiveness," allowing appellants the opportunity to seek stay immediately upon confirmation of plan).

Dated: February 9, 2026

/s/ Michael D. Sirota
**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Felice R. Yudkin
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone:  (201) 489-3000
Facsimile:   (201) 489-1536
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
rjareck@coleschotz.com

-and-

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (admitted *pro hac vice*)
Sidney P. Levinson (admitted *pro hac vice*)
Erica S. Weisgerber (admitted *pro hac vice*)
Elie J. Worenklein
Rory B. Heller (admitted *pro hac vice*)
66 Hudson Boulevard
New York, NY 10001
Telephone: (212) 909-6000
Facsimile:   (212) 909-6836
nlabovitz@debevoise.com
slevinson@debevoise.com
eweisgerber@debevoise.com
eworenklein@debevoise.com
rbheller@debevoise.com

*Co-Counsel to the Debtor and Debtor in Possession*

52

## EXHIBIT A

**(*New Rite Aid* Confirmation Transcript)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 25-14861-MBK |
| | . | |
| NEW RITE AID, LLC, | . | Clarkson S. Fisher U.S. |
| et al., | . | Courthouse |
| | . | 402 East State Street |
| Debtors. | . | Trenton, NJ 08608 |
| | . | |
| | . | November 24, 2025 |
| . . . . . . . . . . . . . . | . | 11:31 a.m. |

TRANSCRIPT OF MOTIONS HEARING

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

For the Debtors:          Cole Schotz P.C.
                          By:  FELICE R. YUDKIN, ESQ.
                          25 Main Street
                          Hackensack, NJ 07602

                          Paul, Weiss, Rifkind, Wharton &
                             Garrison LLP
                          By:  ALICE BELISLE EATON, ESQ.
                             SEAN A. MITCHELL, ESQ.
                          1285 Avenue of the Americas
                          New York, New York 10019

For Bank of America, N.A.:  Choate, Hall & Stewart LLP
                          By:  JONATHAN D. MARSHALL, ESQ.
                          Two International Place
                          Boston, MA 02110

Audio Operator:           Linda Brakel

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**Email:  jjcourt@jjcourt.com**

**(609) 586-2311     Fax No.   (609) 587-3599**

Indeed, in the District of New Jersey our court -- our courts have been rather uniform in recognizing opt out provisions as fundamentally fair and consistent with due process and applicable bankruptcy law.  This Court respectfully disagrees with the parties, and my thoughtful colleagues on the Bench in other districts that offer either questionable policy reasons or challenge the use of opt outs as being contrary to state law.

I of course incorporate my reasoning comments from past decisions, but I will add the following.  Under the United States Constitution, Article I, Section 8, Clause 4, "Congress has the authority to enact uniform bankruptcy laws.  This power displaces state law where state law interferes with uniformity or federal law directly governs the matter."

Opt Out consent procedures are governed by federal rules.  They involve questions concerning balance structure, disclosure adequacy, plan solicitation and release mechanisms, and they are governed by Sections 1125, 1126 and Federal Rule of Bankruptcy Procedure 3017 and 3018.

These are procedural federal rules and Federal Court statutes and, thus, the Federal Courts maintain exclusive authority over them.  State law cannot dictate the legal effect of federal voting and solicitation process, and applying state law would defeat national uniformity.

A Chapter 11 plan is a federal judgment, not a

59

contract.  Confirmation under Section 1141 binds all creditors, including nonvoting, dissenting or silent creditors.  Courts have repeatedly emphasized that a Chapter 11 plan is a Federal Court order, not merely a private contract with state law consent requirements.

Courts evaluating releases, therefore apply federal bankruptcy standards, such as good faith, fairness, adequacy of notice and not necessarily state assent doctrines.  Bankruptcy laws routinely treats silence as consent.  Bankruptcy law often recognized deemed consent in various contexts.

It says Section 1126(f) where unimpaired classes are deemed to accept; 1126(g), where nonrecovering classes are deemed to reject; Rule 3007, claim objections are sustained if there's been no response; Rule 4001, stay relief is granted if there's no opposition.

Thus, federal law already treats notice and no objection as consent in appropriate situations.  State contract law, which often requires affirmative consent, conflicts with this fundamental bankruptcy structure.  If state contract doctrines controlled consent, creditors in 50 states would be subject to differing assent requirements.

For instance, some states requires affirmative signatures.  Some states treat silence and acceptance only in limited circumstances, or impose a heightened waiver standard. The results would be a nonuniform, unmanageable Chapter 11

60

landscape.

For this Court there is bottom line a strong policy argument supporting the use of an opt out mechanism.  How to best protect those very disinterested creditors who don't read their mail.  Often, Chapter 11 plans will offer some measure of monetary incentives to creditors who grant third-party releases.

Creditors who ignore the plan process may indeed miss out if they're required to opt in.  The very constituency that the U.S. Trustee wishes to protect may fare worse in an opt in process, all in the name of providing them with an opportunity to bring lawsuits, which in reality are highly unlikely to pursue.

So for those reasons the Court overrules the U.S. Trustee's objection to the opt out mechanism in this plan.  Bear with me.  With respect to debtor releases, the Court overrules the trustee's objection.  The Court finds that the releases involve estate causes of actions, which have been approved by the true economic stakeholders.

The Court is cognizant and has noted that the causes of actions which may be extant have already been pledged to the lenders who are significantly underwater.  There is no evidence of misconduct warranting exclusion.  The releases are consistent with practice in complex Chapter 11 cases.

The Court finds that the Zenith factors have indeed

## EXHIBIT B

### (Ballot Excerpt)

**If the Balloting Agent does not receive your Ballot on or before the Voting Deadline, February 6, 2024, at 4:00 p.m. prevailing Eastern Time and if the Voting Deadline is not extended, your vote as either an acceptance or rejection of the Plan will not count. If the Bankruptcy Court confirms the Plan, it will bind you regardless of whether you vote.**

**Item 1. Amount of Class 2 General Unsecured Claim for Voting.[3]**

The undersigned hereby certifies that as of the Record Date, July 31, 2025, the undersigned was the holder of a Class 2 General Unsecured Claim in the amount set forth below (insert amount in box below):

**Item 2. Class 2 General Unsecured Claim Vote on the Plan.**

The holder of the Class 2 General Unsecured Claim set forth in Item 1 votes to (please check one):

☐  ACCEPT THE PLAN          ☐  REJECT THE PLAN

**ANY BALLOT THAT IS EXECUTED BY THE HOLDER OF A CLAIM BUT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.**

**Item 3. Opt Out of the Third-Party Release Provision**

**CHECK THE BOX BELOW TO OPT OUT OF THIRD-PARTY RELEASE PROVISION OF THE PLAN. IF YOU DO NOT OPT OUT OF THE THIRD-PARTY RELEASE, IT WILL BE BINDING ON YOU.**

The undersigned holder of the Class 2 General Unsecured Claim set forth in Item 1 elects to:

☐ Opt Out of the Third-Party Release Provision